# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In Re

TERRY MANUFACTURING               In re Case No. 03-32063-WRS
COMPANY, INC.,                        Chapter 7

            Debtor.


J. LESTER ALEXANDER, III,          Adv. Pro. No. 04-3135-WRS
TRUSTEE,

           Plaintiff,

v.

DELONG, CALDWELL, NOVOTNY &
BRIDGERS, LLC; DELONG,
CALDWELL, LOGUE & WISEBRAM;
DELONG & CALDWELL, LLC; and
EARNEST H. DELONG, JR.,

          Defendants.

## DEFENDANT'S DESIGNATION OF CONTENTS FOR INCLUSION IN RECORD ON APPEAL AND STATEMENT OF ISSUES ON APPEAL

The defendants herein pursuant to Bankruptcy Rule 8006, file this Designation of Contents for Inclusion in the Record on Appeal and Statement of Issues on Appeal:

***The following shall be included in the record on appeal:***

1.     Plaintiff's Complaint, dated 12/08/2004; (AP Docket #1)

1

2.     Motion to Transfer Venue, dated 1/10/05; (Docket #6)

3.     Memorandum of Law in Support of Motion to Transfer Venue, dated 01/10/05; (Docket #7)

4.     Defendant's Answer, dated 01/10/05; (Docket #8)

5.     Response to Defendant's Motion to Transfer Venue, dated 01/25/05; (Doc #11)

6.     Memorandum Decision, dated 02/08/05; (Docket #13)

7.     Order on Motion to Transfer Venue, dated 02/08/05; (Docket #14)

8.     Motion for Leave to File Amended Complaint, dated 03/07/05; (Docket #23)

9.     Order Granting Motion to Amend Complaint, dated 03/14/05; (Docket #24)

10.    Amended Order on Plaintiff's Motion to Amend Complaint, dated 03/18/05; (Docket # 28)

11.    Objection to Motion for Leave to File First Amended and Restated Complaint, dated 03/25/05; (Docket #30)

12.    Brief, dated 03/25/05; (Docket #31)

13.    Reply to Objection to Trustee's Motion for Leave to File First Amended and Supplemental Complaint, dated 04/11/05; (Docket #32)

14.    Memorandum Decision, dated 04/14/05; (Docket #33)

15.    Order on Motion for Leave to File First Amended and Supplemental Complaint, dated 04/14/05; (Docket #34)

16. Motion to Dismiss Case or in the Alternative Transfer Venue or Abstain on State Law Claims, dated 05/16/05; (Docket #42)

17. Supporting Brief and Memorandum of Law of Joint Motion to Dismiss, dated 05/16/05; (Docket #43)

18. Amended Complaint, dated 05/27/05; (Docket #161)

19. Trustee's Objections to Motion to Dismiss, dated 06/15/05; (Docket #52)

20. Response to Trustee's Opposition to Motion to Dismiss, Transfer Venue or Abstain, dated 06/30/05; (Docket #57)

21. Memorandum Decision; dated 07/25/05; (Docket #76)

22. Order Denying Motion to Transfer, dated 07/25/05; (Docket #77)

23. Order Granting Motion to Amend Complaint, dated 07/25/05; (Docket #78)

24. Defendants' Answer to the Second Amended and Restated Complaint, dated 08/04/05; (Docket #82)

25. Memorandum Decision/Opinion, dated 05/29/07; (Docket #201)

26. Judgment, dated 05/29/07; (Docket #202)

27. Defendant's Notice of Appeal, dated 06/08/07;

28. This Designation of Contents and Statement of Issues, dated 06/22/07;

29. Trial Transcript.

***Statement of Issues:***

1. Whether the payments which Terry Manufacturing Company made to Earnest H. DeLong were fraudulent conveyances or fraudulent transfers

pursuant to O.C.G.A. § 2-2-22 or O.C.G.A.§2-2-70 to 2-2-80;

2. Whether the payments Terry Manufacturing Company made to Mr. DeLong were fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B);

3. Whether Mr. DeLong received the payments made by Terry Manufacturing in good faith and for reasonably equivalent value;

4. Whether, if Mr. DeLong is liable to the Trustee for any amounts of payments he received from Terry Manufacturing Company, he served as a mere conduit for those portions of the payments which were made to Terry Manufacturing Company's co-Counsel, Jerry Thomas, Esq. for work Mr. Thomas performed in the defense of the Company, for which payments Mr. DeLong should not be held liable;

5. Whether the Court improperly denied Defendant's Motion to Transfer Venue.

6. Whether the Court improperly denied Defendant's Motion to Dismiss the Complaint.

Submitted this 22nd day of June, 2007.

s/ Charles R. Bridgers
Earnest H. DeLong, Jr.
Georgia Bar No. 217300
Michael A. Caldwell
Georgia Bar No. 102775
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Defendants*

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150
404/979-3170 Facsimile

4

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In Re

TERRY MANUFACTURING                          In re Case No. 03-32063-WRS
COMPANY, INC.,                               Chapter 7

        Debtor.


J. LESTER ALEXANDER, III,                    Adv. Pro. No. 04-3135-WRS
TRUSTEE,

        Plaintiff,

v.

DELONG, CALDWELL, NOVOTNY &
BRIDGERS, LLC; DELONG,
CALDWELL, LOGUE & WISEBRAM;
DELONG & CALDWELL, LLC; and
EARNEST H. DELONG, JR.,

        Defendants.

### CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2007, I electronically filed the foregoing **Defendant's Designation of Contents for Inclusion in Record on Appeal and Statement of Issues on Appeal** with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Brent B. Barrier, T.A.
    Catherine E. Lasky
    Phelps Dunbar, LLP
    One Canal Place

365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534

I further certify that I sent a copy of the foregoing by U.S. Mail, postage prepaid

to:

Jerry A. Buchanan
Buchanan & Land, LLP
Post Office Box 2848
Columbus, Georgia 31902

Submitted this 22nd day of June, 2007.

s/ Charles R. Bridgers
Earnest H. DeLong, Jr.
Georgia Bar No. 217300
Michael A. Caldwell
Georgia Bar No. 102775
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Defendants*

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150
404/979-3170 Facsimile

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| TERRY MANUFACTURING COMPANY, | ) |
| INC., | ) |
| Debtor | ) Case No. 03-32063 |
| | |
| J. LESTER ALEXANDER, III | ) |
| Trustee for Terry Manufacturing | ) |
| Co., Inc. and Terry Uniform | ) |
| Co., LLC | ) |
| | ) |
| vs. | ) Adv. No. 04-3135 |
| | ) |
| DELONG, CALDWELL, et al. | ) |
| | Montgomery, AL |
| | January 30, 2007, 9:10 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

Vol. I - Pages 1 to 226

APPEARANCES:                          Brent B. Barriere
                                      Catherine E. Lasky
                                      Phelps Dunbar, LP
                                      365 Canal St., Suite 2000
                                      One Canal Place
                                      New Orleans, LA 70130

Electronic Recorder
Operator:                             Linda Bodden

Transcriber:                          Patricia Basham
                                      6411 Quail Ridge Drive
                                      Bartlett, TN  38135
                                      901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

APPEARANCES (Continued):

Charles R. Bridgers
Earnest H. DeLong, Jr.
DeLong, Caldwell & Bridgers, L.L.C.
Suite 3100, Centennial Tower, 101 Marietta Street, NW
Atlanta, Georgia 30303

3

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Earnest H. DeLong | 42 | -- | -- | -- |
| J. Lester Alexander | 201 | -- | -- | -- |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|---|---|---|---|
| 1 - 141 | Plaintiff': | 12 | 12 |
| 142 | Certificate from Sec. Of State | 161 | 162 |
| 143 | Excerpt from Alexander's Report | 211 | -- |
| 144 | Excerpt from Alexander's Report | 211 | -- |

4

1          (CALL TO ORDER)

2          THE COURT: Good morning.  Please be seated.

3          COURTROOM DEPUTY: Adversary case number 04-3135,

4     Alexander versus DeLong, Caldwell.

5          THE COURT: All right.  Let's take appearances first

6     for the record.

7          MR. BARRIERE: Good morning, Your Honor.  Brent

8     Barriere.  I am joined this morning by Katie Lasky of my firm,

9     Phelps Dunbar.  Also here today is Les Alexander, who is the

10    trustee and plaintiff in this adversary proceeding.

11         THE COURT: All right.  Good morning.

12         MR. BRIDGERS: Good morning, Your Honor.  Charles

13    Bridgers.  It is nice to meet you in person finally.  I am here

14    with Mr. Woody DeLong.

15         THE COURT: Okay.  Good morning, gentlemen.  Just

16    before we get started, just a couple of things.  First, I know

17    we have got one group of lawyers from Louisiana and another

18    group of lawyers from Georgia, and we are here in Alabama.  Let

19    me just run through a few basics to make sure we are on the

20    same page.

21         I prefer that counsel stand when they address the

22    court.  When it is necessary to address someone, if you would

23    use surnames, Mr. Jones, Ms. Smith, not Jim Bob or Betty Lou.

24    I do prefer that, when a lawyer is examining a witness, that he

25    do so from the podium and not be wandering about the courtroom.

5

1        I also have another rule I call the one-witness/one-

2   lawyer rule.  That is, when a lawyer puts a witness on the

3   stand, he completes that witness.  In other words, I call it

4   the no-tag-team rule.  We don't have one lawyer doing an

5   examination and then another lawyer for the same side making

6   objections and then return to the first lawyer.  One lawyer,

7   one witness.

8        Another thing, and I know it varies from place to

9   place but, when I went to law school in the late seventies, I

10  learned trial ad from an old, old Indiana judge, and we would

11  put a witness on the stand and we would simply go back and

12  forth until someone said someone quit.  So our trials would go

13  on, no matter how simple, would go on until the wee hours of

14  the morning because, of course, law students always wanted to

15  get the last word in.

16       That's not my practice.  I remember the first time I

17  tried a case in federal court, I was quite surprised when I was

18  limited to direct, cross, redirect, and that's it.  So we don't

19  go back and forth.  I don't know if that's the practice where

20  anyone else is but, once in a great while, I will allow recross

21  but generally not.  So the lawyer putting a witness on should

22  ask all of his questions up-front, and then the lawyer doing

23  cross should ask all of his questions and not count on

24  necessarily having another presentation.

25       Evidentiary objections, I prefer that, if someone has

6

1    an objection, they stand up and they simply make the objection,

2    you know, relevance, hearsay, foundation, what have you, and

3    not launch into a detailed explanation as to why, unless I ask

4    for it, and most of the times – I have read your pleadings.  I

5    feel I have a general idea of what's going on.  I don't sleep

6    up here.  I generally listen to what the lawyers say and what

7    the witnesses say.  So I really don't want lengthy argument.

8    I don't want arguments on objections unless I specifically ask

9    for it.

10            The last question I have of the lawyers is, is anybody

11    invoking a separation of witnesses?

12            MR. BARRIERE: As a practical matter, Your Honor – the

13    answer will be yes but I think, as a practical matter, the only

14    fact witnesses are the Terrys and, correct me if I am wrong, I

15    am not aware of other fact witnesses who are going to be

16    testifying besides people who are parties, and they are de

17    facto, I think, sequestered in any event.  If I am wrong in

18    that regard, I will defer to Mr. Bridgers.

19            THE COURT: Yes, sir.

20            MR. BRIDGERS: No, Your Honor.  The fact witness,

21    looking forward to just parties, people related to parties.

22            THE COURT: Okay.

23            MR. BRIDGERS: I would bring up Mr. Beltran, the

24    trustee's expert, back here.  I would ask that he be

25    sequestered.

7

1          MR. BARRIERE:  He's an expert, Your Honor, and I

2     would-

3          THE COURT: Yeah, I don't sequester experts.  You are

4     free to have your expert.  It is the fact witnesses that I do,

5     so I will not.

6          MR. BRIDGERS: Yes, Your Honor.

7          THE COURT: All right.  I guess, before we get started,

8     does anybody have anything, any questions, any motions, any

9     comments before we get started?

10         MR. BARRIERE: Your Honor, I think the only issue that

11    probably is worth taking up right now is I know it has been the

12    court's practice in a couple of trials we have had, one which

13    I heartedly endorse, that we, except for those rare instances

14    where there is serious dispute, introduce exhibits at the

15    front-end, and I will be moving to introduce our exhibits.

16         We have an issue today, I think, on a large exhibit,

17    I guess I would call it, by the DeLong firm.  Mr. Bridgers was

18    kind enough to send me a list yesterday of the specific

19    pleadings drawn from the files of the DeLong firm with respect

20    to the Commercial Factors litigation, which he would seek to

21    introduce, and I have no objection to any of those.

22         I am told this morning, however, that in addition to

23    those discrete exhibits, those discrete pleadings or

24    correspondence, it is their desire to introduce the entirety of

25    the firm's file maintained with respect to the Commercial

8

1    Factors litigation, which, as you can see, I think amounts to

2    something in the range of fifteen boxes, and I am told

3    something in the range of forty-seven thousand separate pages.

4        I am in something of a quandary. I suspect that, as

5    to virtually all of pleadings and the like, I have no

6    objection. My problem is I am not really sure what's in these

7    boxes. We last reviewed these in May of 2005, took discrete

8    pleadings, correspondence and the like. I am not really sure

9    what's in here. So I am not sure how the court – whether the

10    court wishes to address that during the course of the trial or,

11    as has been the court's practice, address sort of in global

12    introduction before we begin with testimony and opening.

13        MR. BRIDGERS: Your Honor, if I may respond?

14        THE COURT: Yes, sir.

15        MR. BRIDGERS: As far back as when we filed our initial

16    pretrial disclosures at the beginning of December, we put in a

17    "will offer litigation filed in the matter of Commercial

18    Factors," basically the underlying case. As Mr. Barriere said,

19    we have pulled out certain more relevant things and provided

20    those to him.

21        I will admit it is an unusual situation but, in this

22    circumstance where the value or the substantial value of what

23    was done is at issue, this was kind of what's done. This is

24    the litigation file.

25        THE COURT: This raises a good point and maybe you both

9

1    can clarify for me, if my understanding is correct, and I am

2    not sure that it is, but you had this large litigation, and I

3    am looking at approximately fifteen boxes full of stuff that

4    frankly I am not inclined to read it all.  But the – now, was

5    Terry Manufacturing a party to this?

6            MR. BRIDGERS: Yes, Your Honor, it was.

7            THE COURT: Okay.  They were a party.

8            MR. BRIDGERS: And, Your Honor, just to go ahead and

9    point out, this was made completely available to the trustee

10   and has been for –

11           THE COURT: Right.  No, no, I am not – I don't have any

12   problem with the point that there hasn't been fair notice or

13   simply an opportunity.  I am just sort of looking ahead.  I am

14   reluctant to let forty-seven – you know, fifty thousand pages

15   of stuff in and I know darn good and well I am not going to

16   read.

17           Another thing that I am a little sort of dismayed

18   about is that – let me take a step back to what I started to

19   say a minute ago, was that I didn't think that there was going

20   to be any dispute.  It was like seven hundred thousand was

21   paid?  It was quite a bit of money; is that right?

22           MR. BARRIERE: Four hundred and seventy-six thousand,

23   two hundred and thirty-three dollars.

24           THE COURT: I am sorry.  How much?

25           MR. BARRIERE: I am sorry, Your Honor.  Four hundred

10

1    and seventy-six thousand, and there is a stipulation now in the

2    record to that effect.

3         THE COURT: Okay. Good. But then the point is I don't

4    think the idea is that the services weren't worth four hundred

5    and seventy thousand. The point was that Terry Manufacturing

6    didn't really benefit from that, or am I –

7         MR. BRIDGERS: We are not sure what the trustee's

8    position is going to be in that matter, Your Honor.

9         THE COURT: Okay. Well, let's do this: Rather than

10   sort of guess, why don't we just have – Mr. Barriere, why don't

11   you just offer your documents in now and, after I hear the

12   presentation of your case, I will be in a much better idea – I

13   will have a much better idea. Like I said, I am going to be

14   very reluctant to look at fifteen boxes of stuff. On the other

15   hand, certainly I am going to have to look at some of it to see

16   what was Terry Manufacturing's role in there and how did the

17   parties fit together. So I will certainly have to learn

18   something about the case. I guess we will just take it from

19   there.

20        Mr. Barriere, what, if anything, would you like to

21   offer on the front-end of your case?

22        MR. BARRIERE: I would at this time, Your Honor, offer

23   – we have several volumes of exhibits we have put up there. I

24   would offer Exhibits 1 through 139. The only two I would

25   withhold seeking to enter at this time are the expert reports

11

1    of Messrs. Alexander, Mr. Beltran, both of whom will be

2    testifying today.  I have a separate index.

3            THE COURT: Okay.  Thank you.

4            MR. BARRIERE: There is an index by volume.

5            THE COURT: All right.  So these would be Exhibits –

6    would this be 1 through 141?

7            MR. BARRIERE: That's correct, Your Honor, and we would

8    offer, mark and introduce those at this time.  And just as a

9    closing note, if at some point counsel for the defendants can

10   simply confirm on the record that all of the documents here

11   were indeed generated contemporaneous with the handling of that

12   litigation, there are no newly created documents or to the

13   extent there are documents that are inadvertently filed there,

14   that may resolve the issue, at least as far as we are

15   concerned, of admission of all of these documents.

16           THE COURT: Okay.  I understand.  I don't doubt that

17   you and Mr. Alexander spent weeks pouring through this stuff.

18   Before I let you all go at trial, I want to get – I want you to

19   know what it is I am going to look at and what I'm not going to

20   look at.  Unless I can really avoid it, I am not going to look

21   at fifteen whole boxes of stuff.  I mean, that would take me,

22   I don't know, several weeks, maybe longer, to go through.  But,

23   anyway, we will talk about that later.

24           Let's talk first about these exhibits 1 through 141.

25    They are offered.  Is there any objection, Mr. Bridgers?

1          MR. BRIDGERS: Your Honor, in terms of the

2     authentication, no, no objections to that.  I am not sure – my

3     understanding of the court's pretrial order is that we would

4     have the opportunity to bring up relevancy, prejudice

5     objections –

6          THE COURT: That's correct.

7          MR. BRIDGERS: Okay.  And that is what I was concerned

8     about, Your Honor.  In terms of the authenticity, everything

9     looks fine, with the stipulation that the expert reports are

10    not going to be offered at this time.

11         THE COURT: That's correct.  And, of course, you are

12    free to raise relevancy throughout the course of the trial.

13    Okay.  Thank you.  Subject to those, these exhibits are

14    admitted and, if Mr. Bridgers has a problem with relevancy of

15    anything later on, we may take that up on the back end of the

16    presentation of the plaintiff's case.

17         MR. BARRIERE: Very good.  Your Honor, consistent with

18    the court's pretrial scheduling conference and order, in

19    advance of today's date Mr. Bridgers and I conferred concerning

20    potential stipulations, which have now been filed into the

21    record.  They are somewhat limited.  I will be happy to provide

22    another copy to the court if it does not have one handy on the

23    dais.  We have stipulated to the fact that –

24         THE COURT: Can I cut you off for just half a second

25    and let me ask – I can't seem to find the mouse.  Oh, wait a

13

1       minute, is this it here?  That's not it.

2              COURTROOM DEPUTY: It's underneath.  Do you have it?

3       Okay.

4              MR. BARRIERE: These would have been filed, Your Honor,

5       for reference purposes, this past Friday.

6              (Pause)

7              THE COURT: Okay.  We have got a joint stipulation

8       filed, document 193, so that is made a part of the evidence.

9       We will accept the stipulation.

10             MR. BARRIERE: Thank you, Your Honor, and let me just

11      touch upon these very briefly.  They obviously speak for

12      themselves.  The parties have stipulated to the issuance of the

13      engagement letter in the Commercial Factors litigation.

14             Secondly, the parties have stipulated to the fact that

15      Terry Manufacturing paid four hundred seventy-six thousand, two

16      hundred  thirty-three  dollars  and  sixty-seven  cents  in

17      connection with statements for fees and expenses incurred in

18      the defense of the Commercial Factors litigation.  All of the

19      statements were issued using the billing program of DeLong and

20      Caldwell, LLC.

21             Thirdly, the parties have stipulated that Mr. DeLong

22      represented Terry Manufacturing and Rudolph Terry in the

23      Commercial Factors litigation.  Neither Mr. DeLong nor any of

24      the other DeLong defendants, and those are the law firms that

25      have been named, ever issued a writing addressing any actual or

14

1    potential conflict of interest between Terry Manufacturing and

2    Rudolph Terry.  Neither Terry Manufacturing, nor Rudolph Terry,

3    ever issued a writing waiving any potential or actual conflict

4    of interest presented by the dual representation.

5         Forth, the parties have stipulated that a number of

6    entities were unsecured creditors of Terry Manufacturing prior

7    to January 18, 2000.  That was the date on which there was the

8    first payment to DeLong and Caldwell, LLC, and they remained

9    unsecured creditors of Terry Manufacturing as of the date it

10    filed for relief under Chapter 11 of the bankruptcy code, and

11    the specific identities of those unsecured creditors is

12    included in stipulation number four.

13         Fifth, the parties have stipulated that Terry

14    Manufacturing was insolvent throughout the period of January 1,

15    2000, through July 7, 2003, the date on which it filed for

16    relief under Chapter 11 of the bankruptcy code.  Throughout

17    this time period, the amount of Terry Manufacturing's

18    liabilities exceeded the fair value of its assets.  During the

19    same period, Terry Manufacturing had unreasonably small capital

20    to conduct its business and incurred debts which it knew, or

21    reasonably should have known, it could not pay timely in

22    accordance with the respective terms.

23         The stipulation should not be deemed or construed as

24    an admission by any defendant that any of the defendants had

25    actual or constructive knowledge of the insolvency of Terry

15

1   Manufacturing at any time prior to the filing by Terry

2   Manufacturing of a petition for relief under Chapter 11 of the

3   bankruptcy code.

4           THE COURT: Thank you.

5           MR. BARRIERE: If I may proceed with opening

6   statements, Your Honor?

7           THE COURT: Yes, sir.

8           MR. BARRIERE: Your Honor, again, good morning. Brent

9   Barriere, on behalf of J. Lester Alexander, the trustee. I am

10  joined this morning by Katie Lasky.

11          Your Honor, in this action the trustee seeks to

12  recover from Earnest DeLong and his several serial law firms

13  all amounts paid to them by Terry Manufacturing, which, as the

14  court has just heard, has been stipulated to be four hundred

15  seventy-six thousand, two hundred and thirty-three dollars and

16  sixty-seven cents.

17          The trustee has asserted causes of action under both

18  the state fraudulent conveyance statutes and the federal

19  bankruptcy code. He also asserts that the DeLong defendants

20  committed breaches of legal and fiduciary duties amounting to

21  legal malpractice and should be required to disgorge all of the

22  fees and expenses paid to them by Terry Manufacturing.

23          In early January 2000, until Terry Manufacturing's

24  Chapter 11 filing in early July 2003, the DeLong defendants

25  represented Terry Manufacturing and Rudolph Terry in a

16

1    litigation styled "Commercial Factors of Atlanta, Inc. versus

2    Terry Manufacturing Company, Inc., Floodgates, Ltd., and Jon

3    Pouncey," a state civil lawsuit pending in the Superior Court

4    for Gwinnett County in Georgia.

5          That litigation arose out of a factoring fraud scheme

6    by which Jon Pouncey and Rudolph Terry conspired to defraud

7    Commercial Factors.  In this rather crude scheme, Mr. Pouncey

8    and his company, Floodgates, Ltd.., generated millions of

9    dollars of invoices purporting to represent sales of goods to

10   Terry Manufacturing.

11         In fact, those goods never existed.  Rudolph Terry

12   provided the necessary bills of lading, acknowledgments of

13   receipt, obviously false.  Those documents then, in turn, were

14   presented to Commercial Factors, which would advance something

15   in the range of eighty to eight-five cents on the dollar

16   against what Mr. Pouncey had purportedly sold to Terry

17   Manufacturing.

18         The funds were siphoned through Mr. Pouncey's account,

19   the Terry Manufacturing account and then ultimately used to

20   repay, in part, Commercial Factors, but with some funds being

21   apparently siphoned off by Rudolph Terry and Mr. Pouncey.

22         The civil litigation was originally filed in December

23   of 1999.  It was a rather garden-variety collection suit at

24   that time. Commercial Factors apparently was unaware of the

25   factoring fraud scheme.  At the time of the initial complaint,

17

1    it was a suit on open account only against Pouncey, Floodgates

2    and Terry Manufacturing, seeking collection of three million,

3    three hundred twenty thousand dollars.

4         Over the coming three years, the reality of the

5    factoring fraud scheme would come to light; Rudolph Terry would

6    be named as an additional defendant.  Ultimately Mr. Terry and

7    Mr. Pouncey would be convicted of mail fraud in federal court

8    in Atlanta.

9         The numbers involved were massive.  The court may have

10   some difficulty seeing this schematic.  This was actually

11   produced by Rudolph Terry's criminal attorney, as I understand

12   it, but it gives you a sense of the amount of dollars that were

13   supposedly flowing through.  Commercial Factors advanced

14   something in the range of eleven point one million dollars on

15   the strength of these fraudulent invoices. Terry Manufacturing,

16   in turn, flowing through Floodgates or Commercial Factors

17   directly, paid something in the range of ten point five million

18   dollars of that back.

19        It was probably inevitable that this scheme would

20   ultimately come to light. Terry Manufacturing was supposed to

21   be paying a hundred percent of the amount of an invoice,

22   together with fees and expenses; it was only receiving, at

23   most, something in the range of eighty percent of the dollars.

24   In fact, Terry Manufacturing received less than that because of

25   siphoning by Pouncey and Terry.

18

1          Now the factoring fraud scheme was initiated in 1997,

2     and Mr. Pouncey would testify as early as June of 2000 that

3     there had been no transfers of product whatsoever from 1997 on.

4     So it was inevitable, I suspect, that this increasing

5     deficiency between what was being paid out by Commercial

6     Factors and repaid would come to light.  Indeed, by the fourth

7     quarter of 1999, that deficiency had grown well over two

8     million dollars.

9          It was at that time that Mr. Terry executed the

10    acknowledgment that would ultimately serve as the basis for his

11    federal conviction wherein, and it is a little difficult to

12    read on the screen, I know, Your Honor, but what this is, is a

13    document generated by Commercial Factors, listing the various

14    invoices that Floodgates had attempted to factor to Commercial

15    Factors, and Mr. Terry signed his name at the bottom and he

16    writes, quote:

17              "The above signed acknowledges receipt and acceptance

18              of the goods reflected in the invoices attached.  I am

19              aware that Commercial Factors of Atlanta is relying on

20              my verification to advance Floodgates, Ltd., and I am

21              not aware of any official reductions or returns

22              associated with these invoices."

23    That's a quote.

24          This, as an aside, Your Honor, is the specific

25    fraudulent acknowledgment which was the basis of count sixteen

19

1    in the federal indictment of Mr. Terry, and that is the count

2    to which he pled guilty.

3        By the fourth quarter of 1999, Commercial Factors had

4    initiated collection actions against Terry Manufacturing.  They

5    were dealing with Rudolph Terry exclusively.  As the court will

6    hear, Mr. Terry was desperate to both use the company's monies

7    to pay off this debt and to attempt to obtain absolute

8    confidentiality of that.  He was plainly concerned, as the

9    documents will evidence, that this scheme would come to light

10   and become known to Terry Manufacturing's other creditors,

11   vendors, preferred shareholders and the like.

12       There is a period of about three months where Mr.

13   Terry is attempting to negotiate a settlement.  Interestingly,

14   he conditions the settlement primarily on two things.  One,

15   that Mr. Pouncey and Floodgates be released; two, that there be

16   absolute confidentiality.  And plainly the reason for that was,

17   were those two conditions not met, this scheme would come to

18   light and become known to other persons with an economic

19   interest in Terry Manufacturing.

20       Ultimately suit is filed.  On January 3, 2000, Mr.

21   DeLong, then practicing with the firm of DeLong and Caldwell,

22   LLC, meets at length with Rudolph Terry and executes an

23   engagement letter which is forwarded to him.  Mr. DeLong and

24   Jerry Thomas agree in that correspondence to represent Terry

25   Manufacturing, its officers, directors and shareholders, at a

20

1    rate of two hundred and fifty dollars per hour.

2           Your Honor, we will show, we believe, that at this

3    moment there was an actual conflict between the interest of the

4    corporation and Rudolph Terry.  The corporation had an officer,

5    an employee, who plainly was engaged in criminal conduct.  That

6    officer, at the same juncture, was desperate to have the

7    corporation use its funds to pay off and effectively mask that

8    fraudulent conduct.

9           What is before you is a copy of the engagement letter.

10   It was issued under the names of DeLong and Caldwell, LLC, and,

11   as I indicated, in that letter Mr. DeLong agrees that his firm

12   will be representing the corporation, officers, directors and

13   shareholders.

14          As an aside, Your Honor, the DeLong and Caldwell name

15   will become familiar to you.  All of the bills that are issued

16   and paid by Terry Manufacturing appear on the billing heading

17   of DeLong and Caldwell; correspondence appears under the name

18   of DeLong and Caldwell, LLC; pleadings are filed in the name of

19   DeLong and Caldwell, LLC; and all of the checks issued by Terry

20   Manufacturing, with precious few exceptions -- I think there

21   are three exceptions made payable to Mr. DeLong -- are made

22   payable to DeLong and Caldwell, LLC.

23          In contrast to other proceedings you have heard,

24   however, those finances are not handled out of Roanoke,

25   Alabama.  All of the bills and monies for payment of the bills

21

1    are funneled through Terry Manufacturing's Atlanta operation,

2    which I believe the court is aware, was controlled by Rudolph

3    Terry.

4         In late January, Terry Manufacturing files an answer

5    and a counterclaim where it admits it owes two point one

6    million dollars to Floodgates, which it offers to pay.  It

7    describes in the answer Floodgates being its customer and that

8    these amounts arise out of the ordinary course of business.

9    Plainly untrue.  That is a copy of the answer.  We will see a

10   better copy in a moment.

11        Consistent with that, in April, Mr. DeLong writes to

12   counsel of Commercial Factors at the Smith-Gambrell firm and

13   proposes a consent judgment under which Terry Manufacturing

14   will pay in excess of two million dollars for product it has

15   never received.  Indeed, product which never existed.

16        By late April, Terry, Rudolph Terry is deposed -- I am

17   sorry.  There is a second amendment, again an acknowledgment of

18   amounts due and owing, and basically the answer says Terry

19   Manufacturing simply needs a schedule in which to pay off this

20   amount, again an amount for product it never received.

21        In May, Rudolph Terry is deposed.  He testifies at the

22   deposition about actually receiving the product, including

23   T-shirts from Floodgates; acknowledges receipt of the product.

24   He claims to have forwarded the product to various unidentified

25   customers.  Indeed, during the course of the deposition, he

22

1    claims he is unable to identify the customers to who he sold

2    literally millions of dollars of product.  He also at that time

3    refuses to produce documents evidencing his sales, or Terry

4    Manufacturing's sales of the product.  Plainly those documents

5    did not exist.  There had been no product, there had been no

6    sales.

7         May 23, counsel for Commercial Factors advises Mr.

8    DeLong that Commercial Factors intends to add Rudolph Terry as

9    a  defendant  in  the  litigation  and  that  there  will  be

10   allegations of fraud forthcoming.

11        Notably, at approximately the same time, the DeLong

12   defendants file a motion for a protective order, which asks the

13   court  to  preclude  Commercial  Factors  from  seeking  --  from

14   obtaining  documents  concerning  the  product  which  had  been

15   purchased from Commercial -- pardon me -- from Mr. Pouncey at

16   Floodgates,  precluding  production  of  documents  showing  the

17   checks that were used to pay that, the bills of lading and,

18   perhaps more importantly, precluding production of all of the

19   documents evidencing the resale of this property.

20        As the court will learn, no such documents existed.

21   There had been no product.  Nonetheless, there is a request for

22   a protective order precluding the development or the seeking of

23   those documents.

24        Mr. Pouncey had also been the subject of an aggressive

25   campaign  by  Commercial  Factors  in  the  Gwinnett  County

23

1   litigation to obtain documents evidencing the transactions.  He

2   had  stonewalled.    When  the  state  court  issued  an  order

3   compelling  production  of  those  documents,  he  and  Floodgates

4   both file for relief under Chapter 11 of the bankruptcy code in

5   Atlanta.

6        Mr. Pouncey is deposed in early June of 2000, at which

7   time  he  testifies  that  he  had  obtained  the  product  sold  to

8   Terry Manufacturing from an entity known as RGB Enterprises.

9   He  refused  to  identify  his  contact  at  RGB,  advising  he  was

10  known only to him as Robert and that RGB was located somewhere,

11  I believe, in Aiken, South Carolina.

12       Shortly  thereafter,  there  is  a  confluence  of  events.

13  Mr. Pouncey gets new bankruptcy counsel who obviously insists

14  that he testify truthfully, and Commercial Factors investigates

15  the existence of RGB and finds there is no such entity.

16       As  a  result,  it  moves  for  civil  contempt.    At  that

17  time, Mr. Pouncey acknowledges that RGB does not exist; there

18  is no Robert; he has not purchased any product, nor sold any

19  product, to Terry Manufacturing.

20       On the 27th of June, Mr. Pouncey is deposed under Rule

21  2004, during which he states that the invoices and the bills of

22  lading are all fake; there was no product actually exchanged;

23  and that Rudolph Terry was aware of both of these facts.

24       So just so the court understands, by this time frame,

25  what we have is a suit against Terry Manufacturing.  Mr. DeLong

24

1    is now on notice that Rudolph Terry is going to be named as an

2    additional defendant.  He has already agreed to represent him,

3    as have the other DeLong defendants.  There is sworn testimony

4    that this open account suit in fact is a commercial factoring

5    fraud arrangement and that no product actually exchanged hands.

6        September,    there    are    discussions    apparently

7    orchestrated before the judge in Gwinnett County.    Terry

8    Manufacturing again seeks to settle this claim for two plus

9    million dollars for product it never received.  Mr. DeLong

10   apparently leaves with the impression that he has an

11   enforceable settlement.    The Commercial Factors lawyers

12   disagree and there is actually a motion to enforce settlement

13   agreement  filed  in  Gwinnett  County  under  which  Terry

14   Manufacturing would pay two million dollars.

15       Notably, notably, the DeLong defendants are quite

16   candid in advising the court that a principal concern is that

17   this litigation, the knowledge and existence of this litigation

18   would adversely affect Terry Manufacturing's relationships with

19   its creditors, its other vendors and its banks, as it plainly

20   would have.

21       Following the – the motion is denied.  The parties

22   then pursue litigation.  On November – excuse me – October 9,

23   Commercial Factors actually files a motion to add Rudolph Terry

24   as a defendant.  That motion is granted.

25       October 31, Mr. Terry is yet again deposed.  This time

25

1　　the story changes fairly dramatically.  At this deposition he

2　　says that, yes, he really probably didn't acquire any product

3　　and he can't identify any customers, that what was really going

4　　on was a lending relationship by which he would borrow money

5　　from Terry Manufacturing without authority from anyone.  He

6　　would then loan the money to Jon Pouncey and that it was his

7　　personal loans and he took full responsibility for it.

8　　　　　　So at this point, at least, the story becomes that

9　　Terry Manufacturing really isn't a party to any of this; it is

10　　Rudolph Terry's personal business.  Nonetheless, we have the

11　　same firm representing both Terry Manufacturing and Rudolph

12　　Terry, and that defense, those sorts of defenses – this was

13　　Rudolph Terry's personal business; that he acted outside the

14　　scope of his employment; that he acted in a criminal or quasi-

15　　criminal way, for which the corporation should not be liable –

16　　those defenses simply don't come to the fore.

17　　　　　　Interestingly, Rudolph goes so far as to testify that

18　　he has told no one else about this.  And what is not clear, and

19　　we will hear more today, is the extent to which Roy Terry

20　　actually knew anything about this.  The bills, which the court

21　　will see, make reference to virtually daily communications with

22　　Rudolph Terry, no indication of communications with Roy Terry.

23　　　　　　March 16, Commercial Factors files a revised amended

24　　complaint adding fraud claims against all of the defendants

25　　seeking punitive damages.  It names in that both Terry

26

1    Manufacturing and Rudolph Terry.

2        Interestingly, at some point in the 2001 time frame,

3    the defense changes fairly dramatically.  As the court will

4    see, the defense becomes that Rudolph Terry really had no

5    responsibility for this; he was the victim of a scam involving

6    Jon Pouncey and Tracy Eden, the president of Commercial

7    Factors, by which they would induce him to sign up on these

8    bogus invoices so that they could profit.

9        Indeed, the claim against Tracy Eden alleged that Mr.

10   Eden acted with Jon Pouncey to mislead and defraud Rudolph

11   Terry and Terry Manufacturing and that Eden and Commercial

12   Factors derived the real benefits from this scheme.

13       A cross-claim is filed against Mr. Pouncey, a third-

14   party claim against Eden, a counterclaim against Commercial

15   Factors.

16       I submit the court will conclude this was ultimately

17   just an illusion.  The very week that suit was filed by Terry

18   Manufacturing and Rudolph Terry against Mr. Pouncey, for

19   example, Mr. Pouncey was setting up a meeting with Mr. DeLong.

20   This is a memorandum making reference to here are some things

21   I would like to ask Woody and Jerry tomorrow, Jerry being Jerry

22   Thomas.  And in that memorandum, Mr. Pouncey is soliciting Mr.

23   DeLong's input, quote:

24       "Need opinions on what I should do to protect my house

25       from judgment.  One thought I have is to legally sign

27

1           over to my wife as an exchange for the credit card
2           debt she has occurred to help keep us afloat."
3           So what we have is a purported lawsuit initiated by
4    Mr. DeLong, signed by Mr. DeLong, against Jon Pouncey at the
5    very moment he is advising on how he can hide his house from
6    creditor claims.
7           The other tale that comes to the fore at this point is
8    that Rudolph Terry only agreed to pay this amount because he
9    was concerned that Commercial Factors was controlled by members
10   of the Mafia.
11          Now, the court will hear significant evidence
12   concerning the massive time and effort expended on suppressing
13   deposition and disclosure of documents by Richard Rose.  I
14   think the court is familiar with Mr. Rose.  He was the
15   accountant who purportedly audited the Terry Manufacturing
16   financial statements, the very financial statements, of course,
17   that Roy and Rudolph Terry have now acknowledged in their
18   guilty plea were massively fraudulent.
19          In June of 2000, Commercial Factors issues a subpoena
20   to Richard Rose for his deposition, and they asked for
21   production of any financial statements prepared for Terry
22   Manufacturing and a list of the documents on which Rose relied
23   to prepare such statements and the work papers themselves.
24   Okay.
25          Now, as the court, I believe, now knows from its

28

1    familiarity with the Terrys' own guilty pleas, those financial

2    statements were fraudulent and the work papers, in large

3    measure, did not exist. They simply had been fabricated.

4        Mr. Rose – interestingly, those very financial

5    statements, of course, had been widely distributed. They were

6    hardly a matter of great confidence. They had been provided to

7    the banks. They had been provided to trade vendors. They had

8    been provided to literally dozens, if not hundreds, of persons

9    who the Terrys had identified as potential investors in the

10   preferred share offerings.

11       This is a copy of the subpoena that was issued by

12   Commercial Factors. Now, Mr. Rose appears for that initial

13   deposition and basically refuses to answer any questions. This

14   was a matter discussed between Mr. DeLong, Rudolph Terry and

15   Jerry Thomas. They discuss that Rose's testimony will, quote,

16   enable Commercial Factors to say Terry cooked the books, and

17   that is a copy of the handwriting in Mr. DeLong's handwriting

18   where he says, in effect, referring to Commercial Factors,

19   wants testimony enabling them to say Terry cooked the books.

20   And indeed, had there been full disclosure of these financial

21   statements and the work papers, it would have evidenced that

22   the Terrys had cooked the books.

23       March 2001, Rose is deposed for a second time pursuant

24   to a motion to compel filed by Commercial Factors. He again

25   refuses to basically answer any questions, refuses to produce

29

1    the financial statements, the work papers.

2        Commercial Factors then files their renewed motion to

3    compel.  That is granted in August of 2001.  Immediately Mr.

4    Rose seeks a protective order.  As the records will reflect, he

5    has his own lawyer, a Mr. Mitchell, but is working very closely

6    with Mr. DeLong, each making comments on the other's pleadings

7    and the like.

8        The protective order is ultimately denied on April 30,

9    2002.  The court holds that the attorney/client – excuse me –

10   the accountant privilege, to the extent it is applicable, is

11   lost because of the crime fraud exception.  Again, even as late

12   as this date, these financial statements, widely distributed,

13   have not been given to Commercial Factors or any of the work

14   papers.

15       An appeal is taken to the Georgia Court of Appeals.

16   Terry Manufacturing files an amicus brief reiterating that it

17   is not waiving the privilege and that Mr. Rose should not be

18   permitted to testify, nor to produce the requested documents.

19   The court denies that order on July 8.  It affirms the trial

20   court.  Of course, by this point, the court is aware in late

21   June 2003, the falsity of these financial statements finally

22   comes to light when Southtrust brings its audit team in, the

23   incident which led directly to the Chapter 11 filing in this

24   court.

25       All told, between June 2000 and January 2003, Mr.

1    DeLong spends more than 500 hours and charges Terry

2    Manufacturing more than a hundred and thirty thousand dollars

3    attempting to avoid Richard Rose's testimony and the disclosure

4    of documents.  And, Your Honor, we will submit that the

5    evidence will show that Terry Manufacturing, as a corporation,

6    could not have had a legal interest in suppressing these

7    financial statements.  That plainly was the interest of the

8    Terrys because they recognized, and correctly ultimately, that

9    if these financial statements and work papers were accessible

10   to the public, it would be the end of the facade of financial

11   stability they had worked so hard to maintain.

12        Just to complete the story, January of 2003, Rudolph

13   Terry and Jon Pouncey are indicted on sixteen counts relating

14   to the Commercial Factors scheme.

15        June 17, 2003, now we are talking three years and six

16   months after the initial engagement, Mr. DeLong finally files

17   a motion for partial summary judgment where he says that, if

18   Rudolph Terry acted outside the scope of his employment, then

19   the corporation should not be liable.

20        We will, I believe, be able to demonstrate there was

21   absolutely nothing in these pleadings which could not have been

22   asserted by an attorney loyal only to Terry Manufacturing weeks

23   or years before.

24        The motion is supported by an affidavit from Roy

25   Terry.  Again, not acknowledging anything Rudolph did was

1     improper but, if it was improper, then the corporation should

2     not be liable.

3          July 7, of course, we have a Chapter 11 filing.

4     October 2, Rudolph pleads guilty to mail fraud for the very

5     instrument which we showed the court earlier.

6          Commercial Factors, of course, remains owed money.  It

7     filed a proof of claim in this proceeding for just less than

8     one point eight million dollars.

9          At the end of the story, the court is obviously aware

10    Mr. Terry has pled guilty here, as has Rudolph Terry.  Included

11    among that, as a principal count, is that the very financial

12    statements that were the subject of the Richard Rose saga were

13    false, fraudulent and were sent through the mail to investors,

14    lenders and trade vendors.

15         Your Honor, the court has indicated in the past that

16    this is a somewhat complex and confusing matter.  Hopefully we

17    will have more clarity today.  We will submit that by the close

18    of this trial we will have established what we believe to be

19    four dispositive points.

20         First, Terry Manufacturing was insolvent throughout

21    the period in question.  That is no longer a matter of dispute.

22    It has been stipulated to.

23         Secondly, Roy and Rudolph Terry caused   Terry

24    Manufacturing to pay for approximately four hundred and

25    seventy-five thousand dollars in fees and expenses to the

32

1    DeLong firm with actual intent to hinder, delay or defraud the

2    other creditors of Terry Manufacturing.

3    The entire defense of the Commercial Factors

4    litigation was built around the proposition that creditors

5    could not learn of either the factoring fraud conducted by

6    Rudolph Terry or the fraudulent financial statements supposedly

7    audited by Richard Rose. There can be no other explanation, we

8    believe the court will be able to determine from the evidence

9    we will present, as to why Terry Manufacturing was presented as

10   eager, indeed desperate, to pay well over two million dollars

11   for product it never received. Nor can there be any other

12   reasonable explanation as to why hundreds, well over five

13   hundred hours and hundreds of thousands of dollars were

14   expended in seeking to suppress financial statements and work

15   papers of Richard Rose.

16   There can only be one rationale for an investment of

17   that nature, particularly given that those financial statements

18   were widely available. If Rose had been required to testify,

19   if he had been required to produce his financial statement,

20   even the most superficial examination would have demonstrated

21   the falsity of those financial statements and that the work

22   papers were fraudulent. Indeed Roy Terry has so admitted.

23   Thirdly, Terry Manufacturing did not receive

24   reasonably equivalent value for the sums it paid to the DeLong

25   defendants. The defense that was presented was designed to

33

1    mask Rudolph Terry's criminal conduct. Ultimately that effort

2    was unsuccessful. Rudolph did plead guilty. Nonetheless, the

3    evidence will demonstrate that the massive defense effort in

4    this case was designed to protect Rudolph's interest, not those

5    of the company.

6          Fourth, and finally, there was a fundamental and

7    actual and pervasive conflict of interest between the

8    corporation, which of course has to be recognized as a separate

9    juridical entity, and Rudolph Terry. There was no written

10   disclosure of that conflict; there was no written waiver.

11         We submit under the applicable Georgia ethical rules,

12   which the court will see later in the testimony, that there

13   could be no informed waiver. Here, there plainly was not. The

14   corporation's employee was engaged in criminal conduct. The

15   corporation should have had separate counsel to prosecute its

16   independent defenses, to advise it with respect to its

17   indemnity obligation. Because of the dual representation,

18   there could not be the assertion of either of those defenses,

19   nor meaningful, if any, advice on indemnity.

20         The DeLong defendants could not serve both masters.

21   They served Rudolph Terry.

22         The court asked at the beginning are we really

23   contesting that work was done. Of course, the answer is not.

24   These fifteen boxes attest to that, but that work was not for

25   Terry Manufacturing; it was fundamentally for Rudolph Terry.

34

1          At the close of evidence, the trustee will request

2     that he be granted judgment.  Specifically he will request a

3     disgorgement of the fees paid by Terry Manufacturing to the

4     DeLong defendants, together with attorney's fees under the

5     applicable Georgia statutes, interest and costs.

6          Thank you, Your Honor.

7          THE COURT: Thank you.  Mr. Bridgers.

8          MR. BRIDGERS: Good morning, Your Honor.  Charles

9     Bridgers, again for the defendants.

10         Your Honor, the defendants – I'm sorry.  My computer

11    went the wrong direction.  Your Honor, we will demonstrate in

12    the  coming  trial  that  Mr.  DeLong  was  a  disinterested

13    professional.  He never knew the Terrys, had never met them,

14    had never even heard of Terry Manufacturing before he came in

15    to represent the company in the Commercial Factors lawsuit.  He

16    was brought in to help his client.  That is his business.

17         He had never had any reason to suspect the level of

18    financial difficulties and the solvency of Terry Manufacturing

19    was in question.  The trustee's records demonstrate that Terry

20    Manufacturing,  during  approximately  that  same  time  frame,

21    brought in about a little over one hundred million dollars.

22    Over that same time frame, Mr. DeLong's legal fees, which he

23    and Jerry Thomas incurred, were approximately the four hundred

24    and  sixty.   Rough  math,  forty-five  one-hundredths  of  one

25    percent of the income of Terry Manufacturing during that time.

35

1      He had understood, like everyone else, that Terry

2   Manufacturing was a strong company. These Richard Rose

3   financials that have been discussed are in our file, are in the

4   file. To the extent that apparently they are apparently

5   fraudulent, that's what Mr. DeLong had to work with. That is

6   what he was told and that is what he understood about the basis

7   of the company.

8      Terry Manufacturing is and Rudolph – excuse me – both

9   – Roy Terry will testify that he never mentioned any financial

10  information to Mr. DeLong because he didn't need to have that

11  information. Mr. DeLong was also brought in to litigate this

12  case. One reason I found myself standing, and it was probably

13  inappropriate, but Mr. Barriere said that the firms agreed in

14  the stipulation, and that is not what the stipulation said.

15  The stipulation says that Jerry Thomas and I – "I" being Mr.

16  DeLong – agree to represent you. I shouldn't have stood up,

17  but it jumped my attention.

18      The court will see that they were brought in for this

19  litigation. They were not brought in as General Counsel; they

20  were not brought in to give broad-ranging business advice to

21  the company and help them navigate through whatever problems

22  they were having financially. They were brought in to defend

23  a lawsuit.

24      Now let's talk about Terry Manufacturing. Obviously

25  Roy and Rudolph Terry, the court has apparently had a fair

36

1    amount of dealings with them.  The sole shareholders, the sole

2    voting shareholders, the sole directors, the sole officers.

3    They will testify – Roy will testify that he believed that the

4    attack on Rudolph was a mechanism, a lever, to get to Terry

5    Manufacturing.  That is why the defense had to be so incredibly

6    vigorous.

7        The Terrys were informed, both of them, on behalf of

8    themselves and Terry Manufacturing, was informed on several

9    occasions about the possibility that a conflict might arise.

10   They were advised that it might be best to have different

11   lawyers.  They were advised they should seek other counsel; it

12   would be a good idea if they sought other counsel to advise

13   them on this.  The brothers talked.  The brothers decided that

14   they were not going to be split up.  The brothers understood

15   that the indemnification agreements or indemnification clauses

16   in the operating agreements and the bylaws allowed them to do

17   that.

18       The brothers will also testify that they, again,

19   refused to be split up in this situation.  So what was Mr.

20   DeLong faced with?  He was faced With a complicated case.  That

21   is probably undisputed.  He was faced with a complicated case.

22   It was potentially worth many millions of dollars.

23       The court will hear evidence that Terry Manufacturing,

24   as  Mr.  Barriere  said,  started  off  this  garden-variety

25   collection suit, started off in the amount of approximately

37

1    three point three million dollars.  I thought it was an

2    interesting notation by Mr. Barriere that they only ended up

3    filing a claim for one point eight million dollars in the

4    bankruptcy.

5          So right there, I think it is firmly established that

6    - it will be firmly established that what Commercial Factors

7    was seeking was not even arguable, they hadn't even tried to

8    make a claim in bankruptcy court under that amount.  They

9    started off making a claim for three point three million

10    dollars.

11          Mr. Barriere is obviously correct that, as time went

12    on, the complaints were amended and certain other claims were

13    added in.  Within three, four, five, six months, intentional

14    tort claims were added against Terry Manufacturing - fraud,

15    conspiracy, punitive damages - obviously ratcheting up the risk

16    from even the three million dollars claimed, up even further

17    into punitive damages, general damages, into things that a jury

18    might truly get excited about, risk to the company.

19    Eventually, as the court will hear, a RICO claim was added

20    against the company, potentially just generally trebling those

21    damages.

22          So now Terry Manufacturing is looking at Commercial

23    Factors' claims perhaps in excess of ten million dollars, give

24    or take a few million dollars, obviously, but the court will

25    see that this was an incredible risk to Terry Manufacturing and

38

1      it had to be – it had to be dealt with. Terry Manufacturing did

2      not have a choice.  If Mr. DeLong had just said, "Ah, whatever,

3      just take a default judgment and we will move on from here," we

4      would be here in a different situation.  We would be here in a

5      different claim.

6           Terry Manufacturing, Mr. DeLong will testify, had to

7      be defended.  It was an incredibly significant claim to them.

8           The record will also reflect that Commercial Factors

9      never stopped pursuing Terry Manufacturing.  They did not back

10     off when affidavits were filed by Rudolph Terry about what had

11     happened.  They continued to pursue Terry Manufacturing the

12     entire time up until, of course, the filing of the bankruptcy.

13          Mr. DeLong attempted to settle the case on the

14     directions of his clients.  Mr. Beltran testified in his

15     deposition there is nothing wrong with trying to settle the

16     case, especially when there perhaps could be some liability out

17     there.

18          The settlement, as Mr. Barriere said, was eventually

19     denied and Mr. DeLong, as he will testify, was forced to have

20     to litigate the case.  Mr. DeLong will testify that it turned

21     out to take longer than expected.  Mr. DeLong will testify that

22     it turned out to be probably more expensive than expected.  Mr.

23     DeLong will testify that that is not a unique story in

24     complicated commercial litigation.

25          Your Honor, the facts may come out that there may have

1    been some liability – excuse me.  That was not what I was

2    trying to say.  As the evidence comes out, the court will hear

3    that Terry Manufacturing may have had some liability.

4    Certainly Commercial Factors thought so.  However, Mr. DeLong

5    will testify, and it is not a huge secret, sometimes defense

6    counsel's best efforts have to be in limiting damage.

7         Now, as the evidence will show, Commercial Factors

8    apparently started off asking for a million and a half odd

9    thousand – a million and a half odd, you know, dollars, more

10   than they actually have asked the bankruptcy court for.  The

11   court will hear that Commercial Factors asked for punitive,

12   treble damages, all of these things.

13        Mr. DeLong will testify that his obligation as defense

14   counsel was to engage in that, to look at, well, what might

15   actually be owed under the law, what might be exaggerated.

16   Again, as Mr. DeLong will say, not an unusual story for

17   plaintiffs to exaggerate what their claims are under the law.

18        The testimony will arise, as well, that Mr. Barriere,

19   of course, termed it as trying to suppress the Richard Rose

20   information.  Defense counsel would characterize it as

21   enforcing an evidentiary privilege.  Again, a key role, as Mr.

22   DeLong will say, of defense counsel engaging in and trying to

23   limit whatever potential damage there might be.

24        As Mr. Barriere pointed out, summary judgment was

25   filed.  Mr. DeLong will testify it was his strategy to wait

40

1    until a certain time came, to wait until certain amounts of

2    evidence were in, and then he filed a motion for summary

3    judgment stating that Rudolph Terry, if he did these things,

4    acted out of – not within the scope of his employment, *ultra*

5    *vires* type defenses.

6         That motion was denied.  Now the court will see that

7    we don't have a written order on that, but there was a written

8    order presented to the judge.  He said from the bench I am

9    denying your motion.  The case continued up until bankruptcy.

10        So the trustee's position that, well, perhaps the

11   summary judgment motion should have been filed a little bit

12   earlier holds no water.  It was denied.  Causation is going to

13   be an important issue in what we are going to be presenting to

14   the court because at the core the court will see that Terry

15   Manufacturing was faced with the possibility of a judgment in

16   excess of ten million dollars.  After significant legal effort

17   on behalf of Mr. DeLong and Mr. Thomas, Terry Manufacturing was

18   never held liable for a single penny of that claim by

19   Commercial Factors.  That is a value, as the evidence will

20   show, that Terry Manufacturing received from Mr. DeLong's

21   representation and, to have done otherwise, would have exposed

22   Terry Manufacturing to much more difficulties.  Again, in the

23   end, they received a judgment against them for absolutely

24   nothing.

25        Your Honor, thank you.

41

1        THE COURT: Okay. Thank you. Mr. Barriere.

2        MR. BARRIERE: Your Honor, we would call, on cross

3    examination, Mr. DeLong.

4        THE COURT: Okay. Mr. DeLong.

5        MR. DELONG: Your Honor, before I get on the witness

6    stand, could we take a break so I can use the restroom?

7        THE COURT: Sure. Let's do this. It is about five

8    minutes past. Let's take about ten minutes.

9        (Recess from 10:07 a.m. until 10:23 a.m.)

10       COURTROOM DEPUTY: Court is back in session.

11       THE COURT: Okay. Just one other small point I wanted

12   to make. I tried a bunch of cases before I went on the bench

13   before Judge Butler in Mobile. I don't know if you ever – but

14   old Butler was a slave driver. We started at 8:30 and not

15   8:31. We would go until 4:30 or later in the afternoon. We

16   had an hour for lunch and a fifteen minute break in the morning

17   and mid-afternoon and that was it. That's not – I hate to

18   start before nine. We usually try to break by 4:30 and, if we

19   need a couple of breaks throughout the day, I don't have a

20   problem with that at all.

21       So, Mr. DeLong, or if anybody needs a break, just

22   speak up and that is not a problem in my view at all.

23       So we are in the plaintiff's case and, Mr. DeLong, you

24   are up, I guess.

25       (EARNEST H. DELONG, WITNESS, SWORN)

DeLong - Direct                                    42

1                           DIRECT EXAMINATION

2       BY MR. BARRIERE:

3       Q.        Good morning, Mr. DeLong.  Would you state your full

4       name for the record, sir?

5       A.        Earnest H. DeLong.

6       Q.        And what is your business address, sir?

7       A.        101 Marietta Street, Suite 3100, Atlanta, Georgia,

8       30303.

9       Q.        And what is your home address, sir?

10      A.        365 Craighead Drive, Atlanta, Georgia, 30319.

11      Q.        Are you a member of the Georgia bar?

12      A.        Yes.

13      Q.        And when were you first admitted to the Georgia bar?

14      A.        In 1970.

15      Q.        Have you ever been the subject of any disciplinary,

16      revocation or like proceedings by the Georgia bar?

17      A.        Yes.

18      Q.        Would you describe those for the court, please?

19      A.        In connection with my mother's death, I filed an

20      application to be appointed administrator of her estate and I

21      signed my brother's name to the application, thinking that he

22      wanted me to do that.  It turned out I was mistaken, he didn't

23      want me to do that.  He filed a bar complaint.  I withdrew the

24      application as soon as I found out that he didn't want me to do

25      that, and agreed for him to be appointed administrator.

DeLong - Direct                           43

1    Q.      When did that occur?

2    A.      I am not sure.  I brought a copy of the thing that I

3    received with me today and it has the date on it, but I really

4    don't know what it was.

5    Q.      Well, we can return to that.  Have you ever been a

6    member of any bar other than the state of Georgia?

7    A.      No.

8    Q.      All right.  You represented Rudolph Terry and Terry

9    Manufacturing in the Commercial Factors litigation; is that

10   correct, sir?

11   A.      I started off representing the Terry Manufacturing

12   Company.

13   Q.      If I could ask you to look to Exhibit No. 10 in the

14   binder before you.  It will be volume number one.

15          MR. BRIDGERS:  If I could ask you to pull the

16   microphone a little closer so we can hear a little bit better.

17          THE WITNESS:  Pull the mike closer.  Is that better?

18          THE COURT:  Excuse me.  Linda, are you getting that?

19   Okay.  Thank you.  Go ahead.

20   BY MR. BARRIERE:

21   Q.      Is that a copy, Exhibit No. 10, is that a copy of the

22   engagement letter you issued in connection with the Commercial

23   Factors litigation?

24   A.      Yes, it is.

25   Q.      And you issued that on the name of DeLong and

DeLong - Direct                                    44

1   Caldwell, LLC?

2   A.      No, I issued it on the letterhead that I used to write

3   letters.  I issued it in the name of me and Jerry Thomas.

4   Q.      Well, my question obviously wasn't artful.  That

5   appears on the DeLong and Caldwell letterhead; does it not?

6   A.      Yes.

7   Q.      All right.  And you were a member of DeLong and

8   Caldwell, LLC, as of January 3, 2000?

9   A.      Yeah.

10  Q.      All right.  Who were the other members of DeLong and

11  Caldwell, LLC, as of January 2000?

12  A.      Do you want me to answer – I am not sure how to answer

13  the question.  I can give you an explanatory answer or I can

14  say Mike Caldwell but, if I give you Mike Caldwell, that's not

15  a complete picture.

16  Q.      Well, let me just make sure I understand. DeLong and

17  Caldwell, LLC, purported to be a Georgia limited liability

18  company; is that correct?

19  A.      DeLong and Caldwell, LLC, is, or at least at this

20  time, was actually DeLong, Caldwell and Wisebram.  DeLong,

21  Caldwell and Wisebram was a name change from DeLong, Caldwell,

22  Logue and Wisebram.  And when you sued us, we took a look, at

23  some point after that, and it turns out Mike and I both thought

24  that we had changed the name from DeLong, Caldwell and Wisebram

25  to  DeLong and Caldwell, but we never did.

DeLong - Direct                                    45

1          So actually from the standpoint of the records of the

2    Secretary of State, the LLC was DeLong, Caldwell and Wisebram,

3    but we were operating as DeLong and Caldwell because Steve, who

4    was a personal injury lawyer, had gone in with a personal

5    injury firm.

6    Q.      All right.  Well, let me make sure I understand.  The

7    initial firm with which you were associated, and Mr. Caldwell

8    were associated, was DeLong, Caldwell, Logue and Wisebram; is

9    that correct?

10   A.      Yes, sir.

11   Q.      All right.  Was that an LLC?

12   A.      Yes.

13   Q.      Was it registered with the Georgia Secretary of State?

14   A.      Yes, it was.

15   Q.      And the members of that firm were Messrs. DeLong,

16   Caldwell, Logue and Wisebram?

17   A.      That is correct.

18   Q.      All right.  If I could ask you to look to Exhibit No.

19   2 in that same binder, sir.

20   A.      Yes.

21   Q.      All right.  This is a certificate of search attested

22   to by the Secretary of State of the state of Georgia issued on

23   the 16th of January of this year, and I'm going to quote here:

24          "I, Karen Handel, Secretary of State of the state of

25          Georgia, do hereby certify under the seal of my office

DeLong - Direct                                    46

1          that the automated database for business entities has

2          been searched and the following named entity was not

3          found for filed of record as of the date stated above.

4          DeLong, Caldwell, Logue and Wisebram."

5     Why do you believe that that entity in fact recorded

6     LLC papers with the state of Georgia?

7     A.      It did and then it changed its name.  Keith went in-

8     house with one of the waste management companies and we changed

9     the name to DeLong, Caldwell and Wisebram.  If you pull the

10    Secretary of State's website up and search it, you will find

11    that DeLong, Caldwell and Wisebram is the result of a name

12    change.

13    Q.      And that is your testimony despite the fact that, at

14    least as far as the Secretary of State is concerned, this

15    entity never recorded anything with her office?

16    A.      That is not what it says.  It says the name is not

17    there now, as I understand it.  When we take a break, if you

18    want to google it, you can see that what I am telling you is

19    accurate.

20    Q.      All right.  Now, as I understand your testimony, Mr.

21    Logue left; is that correct?

22    A.      Yes.

23    Q.      All right.  Mr. Logue left and that left DeLong,

24    Caldwell and Wisebram?

25    A.      Yes.

DeLong - Direct                              47

1    Q.       And then Mr. Wisebram left?

2    A.       Yes.

3    Q.       And at that point you began holding yourself out as

4    DeLong and Caldwell, LLC; is that correct?

5    A.       Yes.

6    Q.       All right.  Am I correct, sir, and you can certainly

7    take time to look, but is it not true that all of the bills

8    issued to Terry Manufacturing for representation in Commercial

9    Factors were issued under the name of DeLong and Caldwell, LLC?

10   A.       Yeah, it was – the billing program, what is it,

11   Timeslips, that Mike and I had, yes.

12   Q.       And on each of those statements would bear the

13   notation, and I am going to quote here, "Payment is due ten

14   days from the date of this statement for your check made

15   payable to DeLong and Caldwell, LLC."  Correct?

16   A.       If that is what it says, yeah.

17   Q.       All right.  And indeed with, I think, exceptions of,

18   what, one or two checks, all of the checks issued by Terry

19   Manufacturing were made payable to DeLong and Caldwell; is that

20   correct?

21   A.       I believe that is correct, yes.

22   Q.       All right.  And at least for some period of time after

23   your engagement, pleadings you filed in the Commercial Factors

24   litigation, you filed under the name of DeLong and Caldwell,

25   LLC; is that correct?

DeLong - Direct                                48

1    A.       I don't think so.  I think typically what I would do

2    and, of course, we can look and confirm this but I think

3    typically what I would do is I would sign my name on the

4    signature line and then I would just put my address over to the

5    left.  Jerry would sign his name, or sometimes I would sign

6    Jerry's name and his address would go over to the left.

7    Q.       Well, let's just look by way of illustration at

8    Exhibit 32.  I believe it is the initial answer you filed in

9    this case.  If you will look at page eleven, your signature

10   appears.  Am I not correct that on the left-hand margin it

11   shows DeLong and Caldwell, LLC?

12   A.       Yeah, that is exactly what it shows.

13   Q.       All right.

14   A.       But I would think that would be appropriate because

15   that was where I practiced law.

16   Q.       All right.

17            THE COURT: Now Jerry Thomas was not a member of DeLong

18   and Caldwell –

19            THE WITNESS: No, sir.

20            THE COURT: Or any of those others?  He had a separate

21   practice?

22            THE WITNESS: Separate lawyer.  Jerry's the one that

23   brought Terry Manufacturing to me.

24            THE COURT: Okay.  Thank you.

25   Q.       But just so the record is clear, all of the time that

DeLong - Direct                                    49

1    Jerry Thomas billed to this file appears on the bills of DeLong

2    and Caldwell, LLC; does it not?

3    A.      Yes.

4    Q.      All right.  So DeLong and Caldwell issued bills that

5    included Jerry Thomas' time and that was, in turn, paid by

6    Terry Manufacturing to DeLong and Caldwell?

7    A.      Yes.

8    Q.      All right.  And consistent with what we said a moment

9    ago, you amended that answer on, what, the 28th of April, it

10   appears as Exhibit 35 and, again, appeared as  DeLong and

11   Caldwell, LLC?

12   A.      That's what it shows, yes.

13   Q.      All right.  Now, you indicate that DeLong and

14   Caldwell, LLC, was a change from DeLong, Caldwell and Wisebram.

15   There was no filing to that effect with the Secretary of State;

16   was there?

17   A.      No.  We thought that we had changed the name when

18   Steve left.  Apparently I thought Mike had done it and Mike

19   thought, you know, we thought each – each one of us thought the

20   other had done it and it was not until we got involved in

21   litigation with you that we went back and looked and found out

22   that we had never actually changed the name from DeLong,

23   Caldwell and Wisebram.

24   Q.      All right.

25   A.      In fact, we have done that recently so that the name

DeLong - Direct                                    50

1   has been changed from DeLong, Caldwell and Wisebram to  DeLong

2   and Caldwell.

3   Q.      All right.  Well, DeLong and Caldwell, LLC, has never

4   been recorded with the Secretary of State; correct?

5   A.      Yes, it has.

6   Q.      When did that occur?

7   A.      Just within the last few days.

8   Q.      Okay.

9   A.      It had been pointed up to us, so we corrected it.

10  Q.      So on the eve of trial, you finally got papers filed

11  for DeLong and Caldwell, LLC?

12  A.      Yeah.

13  Q.      Okay.  And just so the record is clear, if you will

14  look to Exhibit 1, this is the certificate of search from the

15  Secretary of State confirming that there is no record in her

16  files of DeLong and Caldwell, LLC, dated January 16, 2007.

17  Would I be correct, then, that your recording of the LLC papers

18  for DeLong and Caldwell occurred sometime after January 16 of

19  this year?

20  A.      When you sent us this, this is what prompted us to do

21  that.

22  Q.      Okay.  So was that in the last day?

23  A.      I am not sure exactly.  Our office manager took care

24  of it for us but, yeah, it has been very, very recently.

25  Q.      All right.  Now DeLong and Caldwell, LLC, I take it,

DeLong - Direct                                        51

1    would incur office expenses; rent, for example?

2    A.      Yes.

3    Q.      And who was responsible, besides yourself, for payment

4    of those expenses on behalf of the DeLong and Caldwell, LLC?

5    A.      Mike Caldwell.

6    Q.      Mike Caldwell.  The employees of DeLong and Caldwell,

7    LLC, all reported to you and Mr. Caldwell?

8    A.      Yes.

9    Q.      You maintained accounts in the name of DeLong and

10   Caldwell, LLC, checking accounts?

11   A.      Yeah, we had an operating account that we paid the

12   expenses that we incurred in running the practice, sure.

13   Q.      All right.  And when those employees received their

14   W-2s at the end of each year, those were issued in the name of

15   DeLong and Caldwell, LLC?

16   A.      Yes.

17   Q.      Was your lease in the name of DeLong and Caldwell,

18   LLC?

19   A.      I think the lease was in the name of DeLong, Caldwell

20   and Wisebram, but it might have been in the name of DeLong,

21   Caldwell, Logue & Wisebram.  I am really not sure about that.

22   Q.      You are not sure about that, okay.  So just so I

23   understand it, insofar as the public was concerned, your

24   employees were DeLong and Caldwell, LLC, employees; the bills

25   were issued by DeLong and Caldwell, LLC; the payments were to

DeLong - Direct                                    52

1    DeLong and Caldwell, LLC; and pleadings you filed were in the

2    name of DeLong and Caldwell, LLC.  Is that all correct?

3    A.      Well, yeah, substantially.  The payments were made and

4    put in the trust account because I was a conduit for the money

5    at that point.  A part of the money was Jerry Thomas' money.

6    So rather than putting it in my operating account, for example,

7    I put it in the trust account and then, from there, I disbursed

8    money to Jerry that he was entitled to have.

9    Q.      Well, that is what happened to the money once it hit

10   your door.  Just so I understand, clients of DeLong and

11   Caldwell, LLC, Terry Manufacturing, specifically, they wrote

12   checks to DeLong and Caldwell, LLC; correct?

13   A.      Yeah, they wrote the checks that they wrote, sure.

14   Q.      Now your engagement letter is dated January 3, 2000.

15   Was that the first time you met Rudolph Terry?

16   A.      No, I believe I met Rudolph – Jerry called me, and I

17   am not sure when.  My best guess is that Jerry probably called

18   me in late 1999 and asked me to meet with him and Rudolph Terry

19   concerning a suit that had been filed against Terry

20   Manufacturing.  I'm not sure exactly when I met with him, but

21   my memory at this point is that I probably, after meeting with

22   Terry and after the meeting was done, probably within the next

23   day or so, I wrote the engagement letter.

24   Q.      All right.  Was Roy Terry present at that meeting?

25   A.      No.

DeLong - Direct                                    53

1    Q.       Was he on the telephone?

2    A.       No.

3    Q.       When did you first meet Roy Terry?

4    A.       I don't know.  Within the first few weeks.

5    Q.       Where did that meeting take place?

6    A.       Probably over the telephone.

7    Q.       At the time of your meeting with Mr. Terry, did he

8    provide you or did Mr. Thomas provide you with a copy of the

9    complaint that had been filed by Commercial Factors?

10   A.       I don't specifically remember, but I would think

11   probably so.

12   Q.       If I can direct your attention to Exhibit 31, sir,

13   which is the original complaint.  Did you review that complaint

14   with Mr. Rudolph Terry in connection with that first meeting?

15   A.       I would think so, yeah.

16   Q.       Okay.  What did he tell you about the case?

17   A.       Basically he said that Terry Manufacturing owed

18   Commercial Factors some money; that he had been trying to

19   negotiate a resolution of the amount that was owed; that he had

20   not been successful in negotiating it and wanted mine and

21   Jerry's help in getting it done.  It looked like it was a large

22   amount of money but it looked at that point like a fairly

23   simple collection case.

24            The problem was that Commercial Factors had two

25   batches of invoices.  It had some invoices that had been

DeLong - Direct                                          54

1    factored, and it had some invoices that Commercial Factors had

2    not at that time purchased.   There was about two million

3    dollars in factored invoices and about a million dollars in

4    unfactored invoices that apparently Commercial Factors had had

5    Jon Pouncey turn into it.   And it wanted Terry Manufacturing

6    Company to pay all three million dollars.   Well, that wasn't

7    right.

8            So my job was to find out what the amount of the

9    invoices was that was actually owed and to negotiate a

10   resolution of it.

11   Q.    Did you discuss with Mr. Terry at that time why it

12   owed money on these invoices, what it had gotten for the

13   invoices?

14   A.    No, I don't think so because, like I said, what I got

15   out of it was that here is the situation, I have been trying to

16   get it resolved, I can't get it resolved, I need your and

17   Jerry's help to get it resolved.

18   Q.    Okay.   Look, if you will, at the exhibit attached.   It

19   is DeLong 7051?

20   A.    70 –

21   Q.    7051.

22   A.    7051.

23           THE COURT: Sir, where are you looking at?

24           MR. BARRIERE: It is an attachment to the complaint,

25   Your Honor, and it is Bates stamped DeLong 7051.

DeLong - Direct                                                55

1           THE COURT: I have got it.  Thanks.

2   Q.      Now Mr. Terry signed this and it states, and I quote:

3           "The above signed acknowledges receipt and acceptance

4           of the goods reflected on the invoices attached.  I am

5           aware that Commercial Factors of Atlanta is relying on

6           my verification to advance Floodgates, Ltd. I am not

7           aware of any official reductions or returns associated

8           to these invoices."

9   Unquote.

10          That was untrue; was it not?

11  A.      I didn't see this at the time that I saw the original

12  complaint.  There were, I believe, three or four of these

13  different forms that Commercial Factors sent to Rudolph Terry

14  and asked him to sign that had different language down here at

15  the bottom.  I think Rudolph signed them all, and I really – I

16  don't remember when this came up, but this was not an early

17  part of the dispute that I was aware of between the companies.

18          THE  COURT: Wait  a  minute.   Let  me  make  sure  I

19  understand.  Was this an attachment to the original complaint?

20          THE WITNESS: No, sir, I don't believe it was.

21          THE COURT: Oh, okay

22          MR. BARRIERE: I am sorry, the answer?

23          THE  COURT: He  said  it  was  not.   I  was  under  the

24  impression this was an attachment to the original complaint in

25  the Commercial Factors civil action, and Mr. DeLong just said

DeLong - Direct                    56

1   that he didn't think it was.

2          MR. BARRIERE: Well, actually you and I were of the

3   same impression, Your Honor.

4   BY MR. BARRIERE:

5   Q.      Well, just so I am clear – this is taken from your

6   files, Mr. DeLong. Paragraph fifteen of this complaint states,

7   "Terry owes CFA three million, three twenty" – this appears on

8   page four, paragraph fifteen –

9   A.      Paragraph fifteen?

10  Q.      Paragraph fifteen.

11         THE COURT: Okay.  We are talking about paragraph

12  fifteen of the original complaint?

13         MR. BARRIERE: Right, DeLong 7028 is the Bates stamp

14  number.

15  Q.      "Terry owes CFA three million, three hundred twenty

16          thousand, seven hundred and ten dollars according to

17          the   account   attached   hereto   as   Exhibit   (b),

18          incorporated here by reference."

19         I then turn to page 7050 and someone has written – has

20  scratched out DC and put "B" and then what follows is that

21  account statement.  What precedes it is Exhibit "A."  Would

22  that not suggest to you that in fact this was attached as

23  Exhibit "B" to the original complaint?

24  A.      You could be right.  I was thinking that this had come

25  out later, but it could have been part of the original

DeLong - Direct                                    57

1    complaint.

2    Q.      All right.  Well, returning to my question, I guess

3    which was really broader, at some point in the course of this

4    litigation you recognized that what is Exhibit "B" to this

5    complaint contained a false representation by Rudolph Terry; is

6    that correct?

7    A.      No, not really.

8    Q.      Well, could you elaborate?

9    A.      Well, what – it's a sort of long, convoluted story.

10   Q.      Well, if it is going to be a long, convoluted story,

11   let me ask you a different question then.

12   A.      Okay.

13   Q.      And maybe we can break it down a little bit.  Am I

14   correct, sir, is this not the very false verification on which

15   Rudolph Terry pled guilty?

16   A.      I believe that is correct, yes.

17   Q.      Okay.  And, of course, you came to know of that at

18   some point?

19   A.      Yeah, at about the time he pled guilty.

20   Q.      All right.  And at some point during the course of

21   this litigation, you learned that Mr. Terry in fact had never

22   obtained any product after 1997 from Floodgates; correct?

23   A.      Yes.  That was probably fairly early in the litigation

24   that I learned – I would say certainly within the first year I

25   learned that Terry Manufacturing had not obtained product as

DeLong - Direct                                    58

1    reflected on these invoices.

2    Q.      Do you think it was a full year?  Was it more like a

3    matter of weeks or months after your initial engagement?

4    A.      Well, I am not sure because it would have come about

5    the time I amended the answer to say that Terry Manufacturing

6    was not indebted under these invoices.  You know, you can look

7    through there and find that.  That would have been about the

8    time that I would have learned of that.

9    Q.      Now you told me a moment ago that Mr. Terry had

10   attempted to resolve this before he came to see you.  He tried

11   working out a deal with Commercial Factors; correct?

12   A.      That is what he had told me, yes.

13   Q.      All right.  If I can ask you to look at Exhibit 18.

14   This exhibit and what follow are various correspondence that

15   address those pre-filing negotiations.  Were those letters

16   provided to you at or about the time you were engaged in this

17   case?

18   A.      I really can't say.  I know I got this and a

19   significant amount of other correspondence between Rudolph and

20   Terry Manufacturing Company and the Smith-Gambrell firm, but I

21   don't know exactly when I got it.

22   Q.      All right.  On December 15, Smith-Gambrell, Mr. Coles

23   - Mr. Barab, pardon me - writes in the first paragraph, quote:

24           "Before you review the enclosed documents" - these are

25           dealing with the service - "let me remind you that, as

DeLong - Direct                                    59

1    Matt Coles and I have emphasized, we are prepared to

2    urge you to allow us to negotiate the terms of this

3    agreement through your attorney.  Nonetheless since

4    you have informed us during our conversations you have

5    chosen not to refer this matter to your counsel thus

6    far, we are proceeding to deal directly with you

7    concerning this matter."

8         Did you ask Rudolph why it was he had wanted to handle

9    this by himself?

10   A.       He didn't want to spend the money to hire a lawyer.

11   Q.       Did he ever suggest to you that he was very concerned

12   that these entire negotiations remain confidential and that's

13   why he hadn't spoken with anyone else?

14   A.       No, not at that point.

15   Q.       At what point did he tell you that?

16   A.       Well, when Commercial Factors started trying to turn

17   up the heat by deposing McDonald's and deposing Perseco, I

18   think was one of them, and deposing Burger King and all of the

19   people that I understood or all of the companies, I guess I

20   should say, that I understood that Terry Manufacturing was

21   doing business with, it was clear that Commercial Factors'

22   intent was to collect at least a million dollars from Terry

23   Manufacturing Company that, no matter what the facts were,

24   Terry Manufacturing didn't owe.  And their way of going about

25   that was to try to increase pressure on the company.  They

DeLong - Direct                                    60

1    thought that Terry Manufacturing Company was basically a pot of

2    gold and all they had to do was squeeze hard enough and Terry

3    would write them a check to make them go away.

4    Q.        So, as I understand your testimony, Commercial Factors

5    sought to take depositions from Perseco, I think you pronounced

6    it?

7    A.        Perseco, I believe.

8    Q.        Perseco and from McDonald's?

9    A.        Yeah, and they wanted to depose Bank of America and

10   they wanted to depose a couple of banks over in Alabama, all

11   on, you know, a simple collection case.  We have invoices.

12   These invoices have been factored, some of them, and Terry was

13   saying the amount of monies owed.  There was no reason to go

14   outside and depose all of these people about this.  We had the

15   invoices that were Terry invoices; we had the amount.  What we

16   had to do was figure out what the amount actually was.

17   Q.        But, in fact, had not Rudolph Terry at some point

18   testified that the product he obtained from Floodgates, he had

19   sold to McDonald's and Perseco?

20   A.        Yeah, but that was not based on the questions that

21   were asked him.  That didn't have anything to do with whatever

22   this exhibit is that you just showed me, the invoices that were

23   identified on that, because, as you asked me a minute ago,

24   early on it became clear –  they told me that these invoices

25   did not actually reflect goods that had been sold; they

DeLong - Direct                                        61

1    reflected the extension of an agreement that Pouncey had worked

2    out with Tracy Eden, the president of Commercial Factors, back

3    before the Olympics.

4    Q.      Who told you that?

5    A.      Well, ultimately Pouncey told me that.

6    Q.      So the co-conspirator who pled guilty to the factoring

7    fraud scheme?

8    A.      Well, yeah, I have an affidavit – I think you have a

9    copy of it – that reflects the one time I sat down and talked

10   to Pouncey.  That is what he swore to.

11   Q.      All right.  Well, I want to go back to my question a

12   moment ago.  You expressed some concern, I take it, that

13   Commercial Factors was squeezing Terry Manufacturing by seeking

14   to depose McDonald's and Perseco, and plainly Rudolph Terry

15   didn't want his customers involved in this litigation in any

16   way; correct?

17   A.      Correct.

18   Q.      And I take it that Commercial Factors justified the

19   need for those depositions because Rudolph Terry in fact had

20   testified under oath that product he obtained from Pouncey,

21   from Floodgates, he had in turn sold to McDonald's and Perseco;

22   correct?

23   A.      Well, that was true, I believe.

24   Q.      It was true that he had done so?

25   A.      Yeah.

DeLong - Direct                                  62

1    Q.        When had he done that?

2    A.        I think back during the time of the Olympics.

3    Q.        Well, but the invoice at issue for the product were

4    all dated in the '98/'99 time frame.  He hadn't sold anyone

5    product obtained from Pouncey during that period; had he?

6    A.        No, I don't believe so.  I think at that time Terry

7    Manufacturing was buying T-shirts from Pouncey on a very

8    sporadic, erratic basis.  As they said, they would buy T-shirts

9    regularly on the spot market and, if Pouncey had T-shirts at a

10   price that was acceptable to him, Terry would buy the T-shirts

11   from him.

12   Q.        All right.  But certainly he wasn't buying millions of

13   dollars of product as reflected on that acknowledgment we just

14   looked at;  Rudolph Terry was not buying millions of dollars of

15   product?

16   A.        Yes, that's true.

17   Q.        Okay.  So with respect to these depositions of

18   McDonald's and Perseco, Commercial Factors' position was they

19   were entitled to depose people who bought the product.  Rudolph

20   Terry didn't want that to happen; correct?

21   A.        Well, no, I probably didn't want that to happen

22   because, as I said, my initial perception was that this was a

23   pretty straightforward, simple collection case, although it

24   involved a lot of money and although there was a significant

25   dispute as to the amount of money that was involved.  There was

DeLong - Direct                                63

1    just no reason to go out and depose all of these other people

2    where this was concerned.

3         Initially Commercial Factors flew in some lawyer from

4    Texas to depose Rudolph, and he was asking questions that, in

5    my view, had absolutely nothing to do with the case and I did

6    what I thought I was supposed to do.  I did what I could do to

7    prevent him from getting into things that weren't relevant to

8    the issues based on the lawsuit that his co-counsel had filed.

9    Q.      Mr. DeLong, I appreciate all that.  I will suggest to

10   you, if you can answer the question I am posing, though, we can

11   probably move along.  I know you have a lot of information and

12   I promise we will get to it.

13        You did tell me, though, that this was a simple

14   collection suit.  You would agree with me, I take it, this

15   quickly became something far beyond a simple collection suit;

16   this was a factoring fraud scheme?

17   A.      Well, that was certainly the position that Commercial

18   Factors tried to develop.

19   Q.      Well, don't you agree with that position?

20        THE COURT: I should know the answer to this and I

21   apologize that I don't, but what was the ultimate disposition

22   of the Commercial Factors case?

23        THE WITNESS: Your Honor, the Commercial Factors case

24   was still going at the time that Terry Manufacturing filed

25   bankruptcy.  That stayed the case as it pertained to Terry

DeLong - Direct                              64

1  Manufacturing.

2          THE COURT: Okay. So there is no settlement or

3  judgment involving Terry Manufacturing?

4          THE WITNESS: There is no judgment and the case has

5  been dismissed now.

6          THE COURT: Okay. Well, I apologize to interrupt.

7          MR. BARRIERE: Not at all, Your Honor.

8          THE WITNESS: There was ultimately a summary judgment

9  rendered in that case against Rudolph Terry and the amount of

10  the judgment was seven hundred odd thousand dollars.

11          THE COURT: Thank you.

12  BY MR. BARRIERE:

13  Q.      I want to return, if we can, to the discussion we were

14  taking off on, Mr. Terry's negotiations prior to your

15  involvement. If I could get you to look at Exhibit 20. Would

16  you agree with me, sir, these are Mr. Terry's comments to Mr.

17  Barab on a possible settlement?

18  A.      It could be. This is – I don't even know when it is

19  dated. December 20, 1999. There is a December 15 letter from

20  Smith-Gambrell to Terry Manufacturing that has a number of

21  handwritten notes. I don't recognize the handwriting. There

22  is a payment schedule and this came out of my file but I just

23  don't remember specifically when I got it.

24  Q.      All right. Well, the first page says, "Comments from

25  Rudolph Terry to draft agreement," right?

DeLong - Direct                                                65

1    A.        Yeah.

2    Q.        And the second page says, paragraph three:

3              "CFA must relinquish all rights of action against all

4              parties named and unnamed in the litigation."

5    Do you see where I'm referring to?  It is the last sentence,

6    paragraph number three?

7    A.        Yes.

8    Q.        All right.  You discussed with Mr. Terry at

9    approximately the time of your initial engagement why he was

10   concerned that Commercial Factors, as part of this settlement,

11   release not only its claims against Terry Manufacturing but

12   also against Pouncey and Floodgates?

13   A.        Did I discuss that?

14   Q.        Yeah.

15   A.        Yeah.  I am not sure that it was at the time of the

16   initial engagement but fairly early on in the process, yes, I

17   did.

18   Q.        Okay.  What did he tell you in that regard?

19   A.        Why he wanted Pouncey released?

20   Q.        Yeah.

21   A.        Well, he thought that Pouncey had a good business and

22   he thought that, if they paid this on Pouncey's behalf – "they"

23   being Terry Manufacturing Company – that Terry Manufacturing

24   Company could recover the money from Pouncey.  They also – and

25   "they" this time is Roy and Rudolph Terry – felt some, I guess,

DeLong - Direct                                    66

1    responsibility is the best word, to Jon Pouncey because of help

2    that Jon Pouncey had provided to them in the days before the

3    Olympics when they were trying to develop that Atlanta part of

4    Terry Manufacturing Company and get it up and going.

5    Q.        How do you know what Roy Terry felt about Mr. Pouncey?

6    A.        Because I had conversations with Roy and Rudolph and

7    it was really – it was probably mostly Rudolph that had the

8    contact.  I really don't know the extent to which Roy had any

9    direct contact with Pouncey, but I do know that Rudolph felt a

10   strong  sense  of  obligation  to  Pouncey,  and  I  think  Roy

11   understood  that  and  was  agreeable  to  it.   Maybe  that  is  a

12   better way to say it.

13   Q.        How often did you speak with Roy Terry?

14   A.        Gosh, I don't know, probably at least monthly.

15   Q.        And that would be true from the time of the initial

16   engagement until the time of the Chapter 11 case in 2003?

17   A.        It was probably, and I don't remember specifically,

18   but it was probably at least a month or so into the litigation

19   before I had any contact with Roy at all.

20   Q.        Okay.  So for the first month you had no contact.  How

21   about thereafter?

22   A.        I don't remember.  I know, as it got to the point that

23   it was clear that this was more than just a simple collection

24   case  that  involved  a  significant  amount  of  money,  then  Roy

25   became actively involved.

DeLong - Direct                              67

1   Q.      When you say active, what did that translate to as to

2   how often you spoke with him?

3   A.      I am just guessing.  I would say at least every month.

4   Q.      Did you ever write to him?

5   A.      I don't know that.

6   Q.      Well, sir, I will represent to you that in our review

7   of the fifteen boxes we did not find a single letter sent by

8   you to Roy Terry.

9   A.      Well, I guess I didn't then.

10  Q.      All right.  Now paragraph eight reads, and I quote:

11          "Any disclosure shall be known to Terry in advance.

12          Terry  shall  have  the  right  to  challenge  such

13          disclosure.  All separate parties and entities must

14          enter  into  confidentiality  agreements  with  Terry

15          except governmental agencies and courts."

16          Do you see where I am referring to?

17  A.      Yes.

18  Q.      All right.  Did Mr. Terry discuss that provision with

19  you?

20  A.      I  don't  remember  him  discussing  any  of  this

21  specifically with me.

22  Q.      All right.  Am I correct that a principal concern of

23  Rudolph Terry from the moment you were initially engaged,

24  really  until  the  end,  2003,  was  to  limit  the  publicity

25  associated with this with respect to either other vendors,

DeLong - Direct                                        68

1    lenders or preferred shareholders?

2    A.        Yeah.   Well, I don't know anything about preferred

3    shareholders but, yeah, that is probably true because, for

4    example, McDonald's is a very straightlaced company.  Terry had

5    worked very, very hard to establish a good, strong relationship

6    with McDonald's that would allow it to sell uniforms to

7    McDonald's franchisees, and I think the Terry brothers were

8    rightly concerned that, if McDonald's got the idea that Terry

9    was being sued for multimillion dollars, no matter what the

10   facts or the outcome, that McDonald's would look askance on

11   that.

12   Q.        Now, if I could get you to look at Exhibit 21, another

13   fax from Mr. Terry to Matt Coles of December 27, looking at the

14   first paragraph, I guess the third sentence, and I quote:

15             "If I have not done so, let me now request that your

16             secretary or assistant call before they fax.  I cannot

17             overstate the confidentiality of the issues we are

18             discussing.  My fax is in an area that is accessible

19             by person who have no reason to be given access to my

20             private information."

21             Do you see where I'm reading from?

22   A.        Yes.

23   Q.        All right.  Did Mr. Terry ever explain to you why his

24   dealings with Commercial Factors were considered by him to be

25   his private information?

DeLong - Direct                                69

1    A.        I think what he was saying was that he didn't want the

2    people in his office to know about the inner workings of the

3    company to the extent that this kind of thing was out there.

4    Q.        Now with the benefit of learning sometime not long

5    after your engagement that Terry Manufacturing in fact had not

6    acquired product with these invoices that have been sold to

7    Commercial Factors, did you come to the conclusion that Mr.

8    Terry's concern to keep this highly confidential and private

9    information was driven by the fact that he knew he had engaged

10   in criminal conduct?

11   A.        No.

12   Q.        When did you come to the realization that Mr. Terry

13   had played a role as a co-conspirator in a factoring fraud

14   scheme?

15   A.        I never did come to that realization.

16   Q.        Now let's jump ahead, if we can, sir, to the answer

17   that you filed on behalf of Terry Manufacturing.  It is behind

18   tab number 32.

19   A.        32?

20   Q.        Yes, sir.

21   A.        Okay.

22   Q.        Now before I ask you about this specifically, you were

23   engaged on January 3, an engagement letter that indicated that

24   Mr. Thomas would be representing the company, its officers,

25   directors and shareholders.  Between that date and the 31st of

DeLong - Direct                                                      70

1    January, did you evaluate whether there were any potential

2    conflicts of interest between the interest of the shareholders

3    and specifically Rudolph Terry and Terry Manufacturing?

4    A.      No, I am pretty confident that I did not because, like

5    I said, at that point in the case it appeared to be a

6    collection case where the plaintiff was trying to get more

7    money than it was entitled to receive and my job was to

8    determine what an appropriate amount was.

9    Q.      All right.  Now, turning to your answer, I see on

10   page, what is marked 7820, Mr. Terry has verified the accuracy

11   of this answer. Do you see where I am referring to?

12   A.      Yes.

13   Q.      All right.  And I take it Mr. Terry would have

14   reviewed the answer before he signed this before you as notary

15   public; is that correct?

16   A.      Yes.

17   Q.      All right.  Did you review the answer with him

18   paragraph by paragraph before he signed this verification?

19   A.      That's my practice, so my best guess is that I did,

20   yes.

21   Q.      All right.  Did you review the answer with Roy Terry?

22   A.      I don't think so.

23   Q.      All right.  Provide him a copy?

24   A.      That, I don't know.

25   Q.      All right.  Now if I can direct your attention to

DeLong - Direct                                    71

1    paragraph four on the second page of the answer.  It is also

2    Bates stamp 7810.  It states, and it is about halfway down the

3    paragraph, it says:

4              "However, this defendant is indebted to defendant

5              Floodgates for an amount that has been incurred in the

6              ordinary course of the business dealings between

7              itself and defendant Floodgates."

8              Do you see where I am referring to?

9    A.    Yes.

10   Q.    And I take it that was among the paragraphs of the

11   information that Mr. Terry would have signed before he executed

12   the verification – he reviewed before he executed the

13   verification?

14   A.    Yes.

15   Q.    And you would have relied upon him, I take it, for

16   that information?

17   A.    I would assume so, yes.

18   Q.    And did you in fact not come to learn that that was

19   not true, that any debt was not incurred in the ordinary course

20   of business between Floodgates and Terry Manufacturing?

21   A.    No, not really.

22   Q.    Well, I guess I am a bit confused.  Mr. Pouncey and

23   Mr. Terry pled guilty based on the fact that they were

24   exchanging bogus invoices and no product was being submitted.

25   How, then, was there an ordinary course of business between

DeLong - Direct                                           72

1    Terry Manufacturing and Floodgates?

2    A.        Well, that is not what they pled guilty to, as I

3    understand it.  What they pled guilty to was mail fraud,

4    sending through the mail a statement that wasn't correct.

5    Q.        And that statement was that Mr. Terry had received

6    product from Floodgates; correct?

7    A.        Yeah.

8    Q.        Well, returning to my question, what, then, did you

9    understand, with all of the benefit of hindsight, to be the

10   ordinary course of business between Terry Manufacturing and

11   Floodgates?

12   A.        Do you mean right now or at the time that I signed –

13   at the time that we filed this?

14   Q.        No, I am talking about now.  With the benefit of

15   hindsight, what was the ordinary course of business between

16   Floodgates and Terry Manufacturing with respect to the

17   indebtedness that was the subject of this lawsuit?

18   A.        Well, back – I'm trying to remember when.  Pouncey

19   apparently went to Tracy Eden, the president of Commercial

20   Factors, back prior to the Olympics, back in the '94/95 time

21   frame. At that point Pouncey's company was factoring with

22   Commercial Factors and Pouncey asked Tracy Eden if he would

23   work out an arrangement under which Pouncey could generate some

24   more cash flow.  He said he needed more cash flow to grow his

25   business.  And they talked and agreed that Commercial Factors

DeLong - Direct                                73

1    would factor invoices for, I believe they called it Wrights,

2    which didn't reflect goods or services or anything else.

3    Eden's condition was that Pouncey find somebody who would

4    guarantee those invoices.

5         Pouncey apparently went to Terry Manufacturing or

6    Rudolph Terry, I'm not sure which, and explained what he was

7    doing and asked if those invoices would be guaranteed.  Terry

8    agreed to do that and there were, I have forgotten now, eight

9    or nine, or ten invoices for about nineteen thousand dollars

10   each that were actually factored when they didn't reflect

11   anything and were guaranteed by Terry.

12        Then, according to Pouncey, at some point later he

13   went back to Tracy Eden and said, "I need to do the same kind

14   of thing we did a few years ago."  And Eden said to him, well

15   —

16        MR. BARRIERE:  Let me interrupt you. I think we are

17   going to hear some type of hearsay.  I don't think we can have

18   this witness testifying of what Tracy Eden supposedly said to

19   Jon Pouncey.

20        THE COURT: No, no.  What I am taking Mr. DeLong's

21   testimony is his understanding of the underlying facts and, of

22   course, most of his understanding is going to be based on

23   hearsay and not firsthand knowledge.

24   MY MR. BARRIERE:

25   Q.       Please continue.

DeLong - Direct                                    74

1   A.       Pouncey went back to Tracy Eden and said, "I need to

2   do the same thing again," and Eden said, "Well, get a guarantor

3   and we will do some of that."

4            As I understand it, this time, though, Pouncey didn't

5   tell anybody at Terry Manufacturing Company, specifically

6   didn't tell Rudolph Terry what he was doing.  He went to Terry

7   and said to Terry, "Can you help me out with my cash flow?  You

8   know, I am financing with Commercial Factors and, from time to

9   time, I need some help."  And Terry said, "Yeah, I will do

10  that."

11           And according to Pouncey during the Olympics period

12  they had been doing, you know, fast and furious small invoices

13  for small things and Rudolph had just signed in blank an awful

14  lot of invoices.  And Pouncey picked up these invoices without

15  Terry's knowledge.  Those are the invoices that are reflected

16  on this exhibit here, and those are the invoices that generated

17  all of this cash flow.  So they were signed by Rudolph Terry

18  but they were not signed at the time that they were generated.

19  They had been pre-signed.

20           At the time that this statement that reflects the

21  three million dollars was signed, it was sent to Rudolph Terry.

22  Rudolph Terry said, "I don't understand this. I don't know what

23  it is about."  He went to Pouncey.  Pouncey, for the first

24  time, sort of unloaded on him, told him what he had been doing,

25  and said, "Look, I will get this straight.  You know I have got

DeLong - Direct                                    75

1    these big Wal-Mart contracts coming through.  I can get the

2    money.  Just don't blow the whistle on me."

3            Pouncey convinced Rudolph to do that.  Rudolph signed

4    the agreement, sent it back, and it was on that basis that he

5    committed mail fraud.

6    Q.      Well, in fact, sir, leading up to that hadn't Mr.

7    Rudolph Terry routinely received funds from Pouncey, obtained

8    from Commercial Factors?  We are talking about, according to a

9    schedule Mr. Steel generated, we are talking about over ten

10   million dollars running through Terry Manufacturing's accounts;

11   correct?

12   A.      Yeah, and I think if you match up the payments, what

13   you see is that every time Pouncey delivered money to Terry

14   Manufacturing, it was to repay Terry Manufacturing for an

15   amount that Terry Manufacturing had either advanced to Pouncey

16   or had delivered to Commercial Factors on Pouncey's behalf.

17   Q.      Okay.  And delivered to Commercial Factors and

18   payments for invoices for product never received, correct?

19   A.      Whatever.

20   Q.      Well, no whatever; the answer is yes, correct?

21   A.      Yeah.  I think - it was my understanding that

22   everybody knew - well, I say everybody knew - that Pouncey and

23   Tracy Eden understood that there were no goods and services as

24   reflected on these invoices.

25   Q.      Mr. Eden denied that; did he not?

DeLong - Direct                                    76

1    A.        Yeah, but he also denied the others, the nine that I

2    mentioned to you earlier, and we were able to find those.

3    Q.        Now you went on in paragraph eight to state:

4              "Since Terry is currently indebted" – and this is on

5    page nine, Bates stamp 7817.

6              "Since Terry is currently indebted to Floodgates on

7              outstanding invoices in an amount that exceeds two

8              million, one hundred and thirty thousand dollars" –

9    A.        Excuse me, Mr. Barriere.  My paragraph eight doesn't

10   say that at all.  So apparently we are looking at different

11   things.

12             THE COURT: What tab are we looking at?

13   Q.        Well, it is page nine of your answer, DeLong 7817.

14   A.        Oh, page nine.  I am sorry.  I thought you said

15   paragraph.  Okay.  I am with you now.

16   Q.        All right.

17             "Since Terry is currently indebted to Floodgates on

18             outstanding invoices in an amount that exceed two

19             million, one hundred and thirty thousand, six hundred

20             and twenty-eight dollars and ninety-one cents, Terry

21             has offered to pay that amount to CFA."

22   And CFA means Commercial Factors; correct?

23   A.        Yes, sir.

24   Q.        "Provided CFA first substantiates it is entitled to

25             the money and further provides CFA agrees to a payment

DeLong - Direct                    77

1          schedule consistent with the purchase and payment

2          history that was developed between Terry and

3          Floodgates during the course of their business

4          dealings."

5    Unquote.  Did I read that accurately?

6    A.      Yes.

7    Q.      All right.  At the time you filed this answer, was it

8    your understanding that Roy Terry was the majority shareholder

9    of Terry Manufacturing?

10   A.      Yes.

11   Q.      It was your understanding he was the president of the

12   company?

13   A.      Yes.

14   Q.      Did you confirm with him that you were authorized to

15   offer up payment of two million, one hundred and thirty

16   thousand dollars to Commercial Factors?

17   A.      Did I – excuse me.  I was pouring water.  I think I

18   heard you.  You said did I clear with Roy this?

19   Q.      Yes, sir.

20   A.      No.  No, I spoke to that only about Rudolph, I

21   believe, because I don't believe I had spoken to Roy yet at the

22   time that I filed this answer.

23   Q.      Okay.  You went on to state, and I quote:

24          "CFA has subjected Terry to financial and business

25          harm by disclosing confidential information that it

DeLong - Direct                                78

1    has obtained concerning Terry's business with third

2    parties, e.g., Floodgates."

3    Do you see what I am referring to?

4    A.    Yes.

5    Q.    What confidential information had Commercial Factors

6    disclosed?

7    A.    I really don't remember now.

8    Q.    To whom had Commercial Factors disclosed that

9    confidential information?

10   A.    I don't remember that either.

11   Q.    All right. Now if I could ask you to look at the next

12   exhibit, Exhibit No. 33, your letter to Mr. Coles of February

13   9, 2000. I take it that is your signature, Mr. DeLong?

14   A.    Yes.

15   Q.    And that appears on the letterhead of DeLong and

16   Caldwell, LLC?

17   A.    It does.

18   Q.    All right. You would agree with me, sir, that this is

19   your proposal for the settlement of this litigation through the

20   payment of two point one million dollars to Commercial Factors

21   by Terry Manufacturing?

22   A.    Well, I think two point one million dollars was the

23   amount that it contended to be owed based upon the invoices

24   that it was holding that had actually been factored. My point

25   was – I am told that that is probably not the right number and

DeLong - Direct                                  79

1  we have to get to the right number but, once we get to the

2  right number and assuming we can work out an appropriate

3  payment schedule, I have authority to get the thing settled.

4  Q.      Okay.  And that is why you say, and I quote:

5          "Terry proposes to enter into a consent judgment to

6          pay two million, one hundred thirty thousand, six

7          hundred and twenty-eight dollars in accordance with

8          the attached schedule."

9  A.      Yeah.      Matt, as would naturally concern any

10 plaintiff's lawyer, had said, "Okay, we enter into a settlement

11 agreement.  What if they don't pay?"  And I spoke to, at least

12 Rudolph, and said, "Well, they are concerned about you not

13 paying.  Would you be willing to enter into a consent

14 judgment?"  And he said, "Yes."  So I said, "Yeah, we will do

15 that.  That's not an issue."

16 Q.      You said you spoke to at least Rudolph.  Did you speak

17 to anyone besides Rudolph?

18 A.      February 9, it is possible that I spoke to Roy but I

19 can't sit here and tell you that I spoke to Roy.  I just don't

20 know.

21 Q.      Okay.  On April 21, which is the next exhibit, 34, you

22 again confirm with Mr. Coles that you are prepared to enter a

23 consent judgment for the two million, one hundred thirty

24 thousand, and lay out a schedule for that?

25 A.      That looks right.

DeLong - Direct                                    80

1    Q.      And you were instructed to do that by Rudolph Terry;

2    is that correct?

3    A.      Probably because Rudolph was my prime contact.  I

4    don't want to say day-to-day contact but I had a lot more

5    contacts with Rudolph than I did with Roy.  I had regular

6    contacts with Rudolph and I had regular periodic contacts with

7    Roy.

8    Q.      As you sit here today, do you know whether you

9    provided a copy of this letter to Roy Terry before you sent it?

10   A.      No, I don't.

11   Q.      Do you know whether you even discussed the letter with

12   Roy Terry before you sent it?

13   A.      No, I don't.

14   Q.      Okay.  Now the next document, Exhibit 35, is your

15   second amendment to answer, filed at approximately the same

16   time you sent that letter to Mr. Coles.  You state in paragraph

17   fifteen:

18           "Defendant Terry admits that it is indebted to

19           plaintiff in the amount of two million, one hundred

20           and thirty thousand, six hundred and twenty-eight

21           dollars and ninety-one cents, less the one hundred and

22           ninety-three thousand which has been paid by defendant

23           Terry, accepted by plaintiff."

24   Do you see where I am reading from?

25   A.      Yes.

DeLong - Direct                                               81

1   Q.       Was that answer and that admission reviewed by Rudolph

2   Terry before filing by you?

3   A.       I would think so, yes.

4   Q.       All right.  Did you have Roy Terry look at it?

5   A.       Again, I don't know.  Roy was over in Alabama; Rudolph

6   was in Atlanta.  The entire litigation was Atlanta, in Atlanta,

7   so my contacts – as far as sitting down, face-to-face and

8   looking at something, the majority of those things were with

9   Rudolph and not with Roy.

10  Q.       So you would agree with me, sir, this is a judicial

11  admission of an indebtedness owed; correct?

12  A.       Yes.

13  Q.       It is.  And as facts would prove out, this was a

14  judicial admission for an indebtedness pursuant to invoices for

15  product never received by Terry Manufacturing; correct?

16  A.       Yes.

17  Q.       All right.  And as best you can recall, the person who

18  instructed you to make that judicial admission was Rudolph

19  Terry and not Roy?

20  A.       Yes, probably.

21  Q.       And I think we covered this a moment ago but just to

22  be clear, you signed –

23  A.       You know, I have to say this was filed in April and,

24  by April, I was having phone contact with Roy.  So, you know,

25  Roy may very well – I am sure Roy knew about it.

DeLong - Direct                                         82

1    Q.        Was it your practice that whenever you talked to Roy

2    that you would make a note of that and retain it in your file?

3    A.        Yeah.

4    Q.        This pleading was filed under the name of DeLong and

5    Caldwell, LLC, was it not?

6    A.        Well, it reflects my address as DeLong and Caldwell,

7    LLC, yeah, 945 East Paces Ferry Road.  Typically in Georgia –

8    well, never mind.  Excuse me.

9    Q.        All right.  Sir, if I could get you to jump ahead to

10   Exhibit 44.

11   A.        I have it.

12   Q.        You  attended  the  deposition  of  Rudolph  Terry,

13   conducted on April 28, 2000, did you not?

14   A.        Yes.

15   Q.        All right.  Now in advance of that deposition, and you

16   are certainly welcome to look at the notice that appears as

17   Exhibit – just ahead of that – Commercial Factors had requested

18   a variety of documents concerning the invoices at issue and

19   Terry Manufacturing's  resale  of  the  product;  is  that  not

20   correct?

21   A.        I believe it had, yeah.

22   Q.        And when Mr. Terry appeared at this deposition, he

23   didn't bring any documents with him; did he?

24   A.        I don't think he did.

25   Q.        All right.  And, in fact, there were no documents

DeLong - Direct                                83

1    evidencing resale of this product because the product had never

2    been purchased; correct?

3    A.      Yes.

4    Q.      Now at page 49, Mr. Terry is asked, quote:

5            "So the Floodgates products were shipped to you, and

6            that was basically you just resold those goods?"

7    And the answer is:

8            "That was basically the situation, yes."

9    A.      Where are you reading from?

10   Q.      The fourth, I think, question and answer on the middle

11   of the page.

12   A.      On page 49?

13   Q.      Yes, sir.

14   A.      "Getting back to where we all started, where we

15           started on this, and that was who were your main

16           customers, I think you said military agencies,

17           correct?"

18   That's my page 49.

19           MR. BARRIERE: If I may approach, Your Honor?

20           (Pause)

21           MR. BARRIERE: Yeah, that's where I am at.

22           THE WITNESS: Okay.  I'm sorry.  I just had the wrong

23   question.  Okay.

24   Q.      "So the Floodgates products were shipped to you and

25           that was basically you just resold those goods?"

DeLong - Direct                                           84

1   Answer:

2           "That was basically the situation, yes."

3           Do you see where I'm reading from?

4   A.      Yes.

5   Q.      Now that testimony was not true; was it?

6   A.      No.  When I prepped a witness for a deposition, one of

7   the things that I drive home with the witness is to be very

8   literal and very specific. You are to answer the question you

9   are asked. You are not to anticipate where the questioner is

10  going. You are not to read anything into it.  You are to answer

11  specifically that question. And Rudolph took me absolutely

12  literally in this deposition.  That is what he did.

13          THE COURT: Whoa, whoa, whoa. Let me break in here for

14  just a minute. Looking again at the question we are talking

15  about:

16          "So the Floodgates products that were shipped to you,

17          that was basically you just resold those goods?"

18  Answer:

19          "That would basically be the situation, yes."

20          I mean, as I understand it, there was never any

21  substance to these underlying invoices and that that would have

22  been – I mean, he lied right there under oath is my

23  understanding, and I thought you admitted that, and then you

24  started talking about how you prep a witness to be literally

25  true, so on and so forth. You said some things like that. And

DeLong - Direct                                          85

1    then it sounded like you backed away from it and you said,

2    well, no, that was not false testimony.

3              THE WITNESS: No, Judge.  When this deposition

4    occurred, this is the one where the lawyer from Texas came in,

5    and this is when I began to understand that this case was not

6    just a simple collection case because the lawyer came in and he

7    was asking all kinds of questions that really made no sense to

8    me as I understood what had happened at the time.  I had told

9    Rudolph –

10             THE COURT: You are getting way, way, way afield from

11   the question.  I think all Mr. Barriere was trying to establish

12   was kind of a baseline.  He said, look, this testimony right

13   here was false; and I thought the answer is yes.  Now, you may

14   not have understood it to be false at the time, you know.  You

15   may have had reason to think the testimony was true but – I

16   mean, I am getting back to the question.  Was that testimony

17   true or false?

18             THE WITNESS: Well, as it turns out and, if you put the

19   whole thing in context, yeah, I think the testimony was false.

20             THE COURT: Okay.

21             THE WITNESS:  That was not what I understood at that

22   time.

23             THE COURT: Right, but I think you are getting ahead of

24   Mr. Barriere's question.

25             THE WITNESS: Okay.

DeLong - Direct                                86

1          THE COURT:  I think all he was trying to do is set a

2     baseline, okay, Rudolph Terry lied in this deposition right

3     there.  I mean, I am not thinking that you knew that he was

4     lying at the time.  You know, if that is what is in the back of

5     your head.  You know, he will probably be getting to that in a

6     minute, but all I'm trying to do is make sure – see, the

7     problem is you gentlemen have been working with this case for

8     a long time and you have got some idea, you know – you are each

9     going obviously different directions, and that is to be

10    expected.  I mean, if you weren't, we wouldn't have a trial.

11    But, on the other hand, there has got to be some common factual

12    understanding, and I was thinking Barriere is trying to get

13    there and then we are going to get to your point of divergence.

14          THE WITNESS: All right, sir.

15          THE COURT:  But, anyway – I mean, this testimony was,

16    from everything I can see, was a lie.

17          Why don't you ask the next question and that may be

18    where you are going, and maybe I shouldn't try to anticipate

19    too soon.

20          MR. BARRIERE: You are right on point, Judge.

21    BY MR. BARRIERE:

22    Q.     All right.  If I can get you to turn to page 105.  All

23    right.  Now, starting at the bottom of page 105, question, the

24    last question on that page:

25          "I am asking you who did you – who did Terry

```
                        DeLong - Direct                        87
```

1          Manufacturing supply the T-shirts that you obtained

2          from Floodgates to?"

3    Question:

4          "Specifically, it is proprietary in terms of who my

5          customers are.  I mean, as I have said to you

6          previously, that generally my customers are numerous

7          individual accounts around the nation, McDonald's and

8          other similar accounts around the nation."

9    Question:

10          "So you are still refusing to answer that question?"

11          "No, sir, I am answering specifically that my

12          customers were numerous, were numerous, numerous

13          accounts."

14          "Tell me who they are."

15          "McDonald's franchisees around the country."

16          "So McDonald's is one?"

17          "That's not what I said but I said what I said."

18          "I know you did but it doesn't answer my question."

19          Now isn't the fact of the matter, sir, that he hadn't

20    sold any of these T-shirts to McDonald's franchisees?

21    A.     Yeah, I think that is true.  I think any T-shirts, any

22    Pouncey T-shirts that he sold were sold during the Olympics

23    time.  I don't know if there were any afterwards.

24    Q.     And, in fact, there weren't numerous, numerous

25    customers for these T-shirts.  There was no customers for these

DeLong - Direct                                88

1    T-shirts at issue in '98 and '99?

2    A.        I think that is true.

3    Q.        Okay.   And then at page 108 and, again, this

4    continuing attempt to find out the names of the customers, the

5    second paragraph of the answer:

6              "With that said" – I'm quoting here – "product from

7              Floodgates has gone to customers such as McDonald's

8              franchisees, Coca-Cola Bottlers, other distributors

9              and manufacturers including Hanes and a number of

10             people."

11   Unquote.   Again, that was untrue, perjurious testimony,

12   correct?

13   A.        It turned out to be that, yes.

14   Q.        All right.   Now I could go through it serially, sir,

15   but is your recollection that there was lengthy testimony or

16   questioning concerning what efforts Mr. Terry had undertaken to

17   collect from these customers, and that he indicated he was

18   pursuing these customers but had not gotten paid.   Is that your

19   recollection of the testimony?

20   A.        I am not sure that his testimony was that he was

21   pursuing customers.   I agree his testimony was that he had not

22   been paid on any of these invoices, but I don't think that he

23   testified that he was pursuing any customers.

24   Q.        Well, I can certainly walk through with you.   Page

25   114, question –

DeLong - Direct                                    89

A.        Well, whatever the deposition says is what it says.
You just asked me what I remembered.

Q.        I understand.  I was trying to short-circuit it and I
was foolish in attempting it.  We will stay with the actual
language –

          THE COURT: I don't see a page 114.  I see 108, 109 and
then it goes to 137.  We are looking at the Rudolph Terry
deposition?

          MR. BARRIERE: Yes, sir.  If I can approach, Judge?

          THE COURT: Yes, sir.  Here, why don't you just have a
look at that and see if it is missing any pages.

          What don't we do this?  Why don't we break for about
ten minutes and we will come back.  You can look through what
I have got.

          (Recess from 11:35 a.m. until 11:50 a.m.)

          COURTROOM DEPUTY: Court is back in session.

BY MR. BARRIERE:

Q.        All right.  I think we were on page 114 actually, Mr.
DeLong.  Question by Mr. Hart starting at the second question
on that page:

          "What efforts are you undertaking to collect the
          monies from the franchisees who have not paid you?"
Answer:

          "I am always making efforts to collect all dollars
          owed to me."

DeLong - Direct                                    90

1           "But specifically what are you doing or what is Terry

2           Manufacturing doing to collect those funds?"

3           "I guess probably less than I should or could simply

4           because I am, you know, so much of my time is tied up

5           related to this matter and others but, yes, certainly

6           we are making efforts to collect."

7    Unquote.  Do you see where I am reading from?

8    A.      Yes.

9    Q.      Now that testimony was just flat out untrue, correct?

10   A.      It turned out to be, yeah.

11   Q.      All right.  Page 117, Mr. Hart ultimately says:

12          "I give up.  What have you done to try to collect the

13          money?"

14          "My effort has been, first, to pay off Commercial

15          Factors and then focus on the collection process."

16   Do you see where I'm reading from?

17   A.      Yes.

18   Q.      And, in fact, there was no collection process from

19   customers because there were no customers for these T-shirts,

20   correct?

21   A.      That's - yeah.

22   Q.      Okay.  Now at the time of this April 28 deposition,

23   were you then aware that, in fact, Terry Manufacturing had not

24   purchased any product in '98 and '99?

25   A.      I don't believe I was then.

DeLong - Direct                                     91

1    Q.      All right.  Well, you heard your client unable to

2    identify or unwilling to identify any customers or any efforts

3    to collect from any customers.  Did that raise any question in

4    your mind whether in fact product had been purchased and resold

5    by Terry Manufacturing?

6    A.      Yeah.

7    Q.      Did you discuss that issue with Mr. Terry?

8    A.      I am sure I did.  I don't remember, you know, exactly

9    what the sequence was but, yeah, that was when I began to

10   recognize that there was probably a fair bit about this that I

11   didn't know.

12   Q.      Okay.  At that time you discussed with Mr. Terry the

13   necessity for splitting the engagement between yourself and

14   another  lawyer  so  that  there  would  not  be  the  dual

15   representation?

16   A.      I am sorry.  I don't understand your question.

17   Q.      At that time you discussed with Mr. Terry the prospect

18   that there was a conflict of interest between the company and

19   him personally and that there might be a need for separate

20   counsel?

21   A.      It could have been then.  That could have been the

22   first time I had that conversation.  I am not sure.  I think,

23   as we sit here now, that probably – the reason I am hesitant is

24   because what I remember that triggered that conversation was

25   Matt Coles telling me that he was inclined to amend to add a

DeLong - Direct                                                92

1    fraud count, and I don't remember whether that was, you know,

2    at about the time that this deposition came out or what, but

3    all of those things kind of ran together.  I guess the short

4    answer to your question is, yes, it probably is because there

5    was probably some meshing together of those things.

6    Q.    All right.  Now who, besides yourself and Rudolph

7    Terry, was a party to that conversation?

8    A.    The initial conversation I had with Rudolph and I

9    think Jerry Thomas participated in it.  What I initially said

10   to Rudolph was that he needed to go and talk to Roy about this.

11   Roy did not participate in that initial conversation.  I had a

12   follow-up phone call with Roy and Rudolph, and I think Jerry,

13   a few days later where we talked about it after – based on what

14   Roy said to me that he and Rudolph had talked about.

15   Q.    Okay.  Well, tell me, as precisely as you can, what

16   was discussed in this conversation concerning a possible

17   conflict of interest?

18   A.    They are going to amend their complaint and allege

19   fraud.  Rudolph, as the doer, whatever the circumstances are,

20   is the one that will be the focus point.  That's going to

21   potentially create a situation where the company will want to

22   go in directions, the company will want to do things, the

23   company might want to raise things that would be different than

24   the directions that Rudolph would want to go in, the kind of

25   things he would want to do, the kind of things he would want to

DeLong - Direct                                    93

1    raise.  That is the potential for a conflict.  You need to talk

2    to another lawyer and review all of this with another lawyer

3    and decide what you want to do.

4    Q.      Now at the time you had this conversation, was it

5    understood among the participants that this was no longer a

6    garden-variety collection suit, that there was a – some serious

7    issues arise as to whether there ever had been any product sold

8    whatsoever?

9    A.      I am not sure of that.  Now this was an ever growing

10   child and I don't know, as I sit here now seven years later,

11   exactly when all of these things came together but it was

12   working towards that.

13   Q.      Now you said you suggested the company might want to

14   do or raise some things that would go away from Rudolph.  I

15   think I wrote that down accurately.  What things specifically

16   did you identify the company could do?

17   A.      Well, if, for example, if there was fraud and if

18   Rudolph was the one that was the participant of the fraud,

19   there were some significant issues whether he was acting within

20   the scope of his authority, whether the company would have

21   acquiesced in the fraud, you know, that sort of thing.

22   Q.      Did you say those words to Roy and Rudolph Terry?

23   A.      I think I probably did.

24   Q.      You think you did or are you sure you did?

25   A.      Well, you are asking me to remember a conversation

DeLong - Direct                                94

1    that was seven years ago and I can't say with absolute

2    certainty what every word was, but I certainly can tell you

3    what the import of the conversation was.

4    Q.    Okay.  So you suggested that there could be a defense

5    that Rudolph acted outside the scope of his employment.  What

6    other things, if any, did you suggest the company might wish to

7    do or raise which would be adverse to Rudolph's interest?

8    A.    Just generally that the company had nothing to do with

9    any fraud, was unaware of any fraud and the company just wasn't

10   a participant.

11   Q.    All right.  And what were the things that you

12   suggested Rudolph might wish to raise or do which might be

13   adverse to Terry Manufacturing's interest?

14   A.    I don't know.  Rudolph – the point that I was trying

15   to make was that, if the company wanted to do those things,

16   then the likelihood was that Rudolph – they would not be in

17   Rudolph's best interest.

18   Q.    Did you commit any of this thought process to writing?

19   A.    No.

20   Q.    Now at the time you had this discussion, did you

21   review the applicable Georgia canon of ethics?

22   A.    I don't know whether I pulled out the rules or not.

23   I think at the time I was generally familiar with the

24   requirements that would have applied to dealing with a

25   conflict, but I can't tell you that I went to the rules and

DeLong - Direct                                    95

1    opened them up and read them.  I just don't know.

2    Q.      Let me direct your attention to what I have put up on

3    the screen.  This is ethical consideration 5-18 that was in

4    effect at the time of this conversation, assuming it occurred

5    before January 1, 2001.  I take it that is your working

6    assumption?

7    A.      Say that again.

8    Q.      It is your assumption this conversation you are

9    describing occurred sometime before January 1, 2001?

10   A.      Yes.

11   Q.      All right.  It states, and I quote:

12           "A lawyer employed or retained by a corporation, or

13           similar entity, owes his allegiance to the entity and

14           not to the stockholder, director, officer, employee,

15           representative, or other person connected with the

16           entity.  In advising the entity, a lawyer should keep

17           paramount its interest and his professional judgment

18           should not be influenced by the personal desires of

19           any person or organization."

20           Do you see where I'm reading from?

21   A.      Yes.

22   Q.      Did you evaluate, given Rudolph's key role here,

23   appearance of fraudulent conduct, that you could in fact keep

24   the interest of Terry Manufacturing paramount and you would not

25   be influenced by Rudolph Terry's personal desires?

DeLong - Direct                                96

1    A.       Yes.  Had I thought that I could not do that, I would

2    not have continued.

3    Q.       Now the next ethical canon I wanted to ask you about

4    is number 5-18, and it states, and I quote:

5           "Occasionally a lawyer for an entity is requested by

6           a    stockholder,    director,    officer,    employee,

7           representative,  or  other  person  connected  with  the

8           entity to represent him in an individual capacity.  In

9           such case, a lawyer may serve the individual only if

10          the lawyer is convinced that differing interests are

11          not present."

12          What did you do to convince yourself at the time you

13   had this conversation that differing interests were not present

14   as between Rudolph Terry and Terry Manufacturing?

15   A.       Well, the claims were identical.  If you remember, the

16   first  fraud  claim  was  brought  against  the  company.   Then

17   Rudolph was added as a defendant sort of as an afterthought.

18   What happened as far as – well, I shouldn't say as far as.

19   What happened was that Commercial Factors was doing everything

20   it  could  to  leverage  Terry  Manufacturing  Company,  and  it

21   thought that, if it put sufficient pressure on the owners of

22   Terry Manufacturing Company, that they, on behalf of Terry

23   Manufacturing,  would  just  acquiesce  to  whatever  Commercial

24   Factors wanted done.  But there was a commonality of the claims

25   that were made, so there really, as far as what the plaintiffs

DeLong - Direct                                    97

1    were contending, there was no difference in what it contended

2    vis-à-vis Terry Manufacturing and what it contended where

3    Rudolph Terry was concerned.

4    Q.      Well, you indicated a moment ago, though, when you

5    were discussing this with Rudolph Terry, you did raise the

6    prospect the company would want to challenge whether he had

7    acted within the scope of his employment and whether the

8    company had any interest, involvement, in this fraudulent

9    escapade whatsoever?

10   A.      Yes.

11   Q.      How could you prosecute that defense, simultaneously

12   represent Rudolph Terry, and convince yourself that there were

13   not differing interests?

14   A.      Well, at that point that was a possible defense that

15   had to be fleshed out and developed.  I wanted to go along and

16   see if I could do that.  I wanted them to know that that was a

17   possibility that that might be where we were going.  And that

18   was ultimately where I went in the motion for summary judgment.

19   Q.      In 2003, June of 2003?

20   A.      Yeah.

21   Q.      And this conversation, of course, was occurring in the

22   May time frame of 2000?

23   A.      Okay.

24   Q.      And just so I understand, in order to flesh out

25   whether Rudolph Terry was acting in the scope of his

DeLong - Direct                                    98

1   employment, isn't it true that the only people you needed to

2   talk to were Rudolph or Roy?

3   A.      Well, yeah, but that's not what I was saying when I

4   was talking about fleshing out the defenses.  What I was

5   talking about was how to come up with a viable defense that

6   could potentially work in the case.  I mean, you know, you have

7   all kinds of theories but then you have to put the – you have

8   to put it all together and at that point I didn't have it all

9   put together and I didn't really have the facts.

10  Q.      Well, didn't it concern you, sir, there would be a

11  challenge for you to stand next to your one client, Rudolph

12  Terry, while at the same time arguing your other client wasn't

13  involved in Rudolph's activity and Rudolph acted outside the

14  scope of his employment?

15  A.      Sure.

16  Q.      Okay and –

17  A.      And it was because of that, that I said to them you

18  need to be mindful that there is the clear potential for a

19  conflict here and it needs to be dealt with.

20  Q.      And you told that to Rudolph and then you subsequently

21  said it to Roy in a phone conversation?

22  A.      Well, I told Rudolph that this was going to be an

23  issue at some point, and I said you need to focus on it and we

24  need to deal with it, and you need to talk to Roy about it.

25  And he did because a few days later we had a conversation, Roy,

DeLong - Direct                                        99

1    Rudolph and I.

2    Q.      And what did Roy say during the course of that

3    conversation?

4    A.      Roy said that he was not going to have Commercial

5    Factors divide him and his brother, period.

6    Q.      Tell me what you told Roy during that phone

7    conversation concerning the potential conflict.

8    A.      All of the things that we talked about.  I repeated

9    everything that I had said to Rudolph because I wanted to make

10   sure that Rudolph had gotten across to Roy what my concerns

11   were.

12   Q.      Okay.  Who set up that call?  Did you start that call?

13   A.      At this point, I couldn't tell you.

14   Q.      And I take it you have no notes of this conversation

15   whatsoever?

16   A.      No.

17   Q.      That was no?

18   A.      No.

19   Q.      Now I think we established in earlier testimony that

20   Rudolph perjured himself during the April 28, 2000, deposition.

21   Did you apprise Roy of that fact?

22   A.      At some point, I did.  At this time, though, I don't

23   think I was aware that Rudolph was perjuring himself, because

24   I am not going to let a client perjure himself.

25   Q.      Well, you plainly had suspicions; did you not?

DeLong - Direct                                    100

1    A.        Well, no.  At this point what I was focusing on was

2    what I considered to be a bizarre turn that this thing had

3    taken based on the questions the Commercial Factors lawyer was

4    asking and the things that they were trying to get at, which I

5    just didn't think were relevant at all to the case that they

6    had filed.

7    Q.        Well, did you ask Rudolph how is it that you can't

8    identify any of the customers for millions of dollars of

9    product?

10   A.        Oh, I am sure I did, but I don't remember exactly when

11   I did it.

12   Q.        Okay.  Did you ask him how is it that you can't tell

13   us anything of what you have done to collect millions of

14   dollars of bills owed to you?  I mean, plainly money was an

15   issue.  You had made clear, time and time again, that Terry

16   Manufacturing need a payment schedule to pay back this two

17   point three million dollars.  Obviously a source of that would

18   have been all of these people who purchased product.  Didn't

19   you ask Roy or Rudolph about that?

20   A.        Yeah, I am sure I did.  The difference is, when I came

21   into this thing, what I understood was that Terry Manufacturing

22   owed some money and then, you know, we started having these

23   questions come up that clearly put a different spin on the

24   case, and I started doing everything that I thought was

25   appropriate to find out what was going on, what had happened,

DeLong - Direct                    101

1   and how we had gotten to where we were, and why things did not

2   appear to be the way I had thought they were.

3           THE COURT: All right.  Why don't we break for lunch

4   right here.  We will come back and begin again at 1:30.

5           (Recess from 12:09 p.m. until 1:39 p.m.)

6           COURT DEPUTY: Court is back in session.

7           THE COURT: Okay.  Mr. DeLong, you are up.  Please be

8   seated.  Gentlemen, just one thing.  I wanted to – and Mr.

9   Bridgers and Mr. DeLong, you be thinking about this.  When the

10  plaintiff – in a situation like this where the plaintiff calls

11  a defendant or a main witness for the defendant, what I prefer

12  to do is get one presentation of that witness' testimony by his

13  lawyer.  So what I would prefer that you do is at some point in

14  the not too distant future, I hope Mr. Barriere will sit down

15  and pass the witness, and at that point you can decide if you

16  are going to examine Mr. DeLong.  In which case, I will give

17  you a wide-open cross and you start and go where you want to

18  go, but then don't call him again in your case-in-chief, or you

19  just elect not to cross and then call him again in your case-

20  in-chief.  What I don't want is I don't want two complete

21  presentations with cross and all of that of Mr. DeLong.  Too

22  much of a good thing can be too much.

23          So you don't have to tell me right now.  You can wait

24  until Mr. Barriere passes the witness.  I will give you a

25  couple minutes to confer to see which way you want to go.  You

DeLong - Direct                                        102

1    know, of course the upside of that is, if you elect to take Mr.

2    DeLong on cross, then I am not going to listen to any

3    objections beyond the scope of direct or anything.  If you do

4    it, it will be wide open.

5           So, anyway, that is just something to be thinking

6    about.  Thank you.

7    BY MR. BARRIERE:

8    Q.      Mr. DeLong, before we broke for lunch we were spending

9    a little time reviewing testimony given by Rudolph Terry on

10   April 28.  I would like for you now to open the second of those

11   two volumes to the transcript of his deposition taken

12   approximately three weeks later on May 17, 2000.

13   A.      What number is it?

14   Q.      It is the, I believe, first exhibit, number 45.

15   A.      Okay.

16   Q.      Now you understood this was a continuation of the

17   April 28 deposition?

18   A.      I frankly don't remember but I will take your word for

19   it.

20   Q.      I will make it easy for you.  If you look at the very

21   first page of the transcript, you will see the court reporter

22   picked up with page 151.

23   A.      That is what it says.  Volume two, continuation.

24   Q.      All right.  And is it your recollection that, as with

25   the first session, Mr. Terry neglected to bring any documents

DeLong - Direct                                        103

1    to this deposition consistent with the notice issued by

2    Commercial Factors?

3    A.       I really don't remember at this point.

4    Q.       All right.  If you will look at page 160, the first

5    question on that page, and this is a little hard to follow.

6    There are four pages, Judge.  This is actually page four of

7    this transcript.  The question is:

8              "Why didn't you bring the documents from your private

9              office that you say you have gathered here this

10             morning?"

11   Answer:

12             "Because I don't think that as – there are probably

13             not any documents I have that Commercial Factors does

14             not already have."

15             "Is that the only reason?"

16             "No, that's not the only reason.  I have not completed

17             the process."

18             So that would suggest to you, would it not, and

19   refresh your recollection that no documents were produced at

20   this second session?

21   A.       Apparently not.

22   Q.       All right.  If I could direct your attention to page

23   165, the sixth page of this transcript, Mr. Rudolph Terry is

24   being examined on the recipients of the Floodgates product,

25   supposed product, and the question is:

DeLong - Direct                          104

1          "Other than Mr. Gene O. Dorsey, would there have been

2          any other person who would have been responsible for

3          receiving for Terry Manufacturing, say, in 1998/99" –

4     A.        Are you reading from page 165?

5     Q.        69, I'm sorry.

6     A.        69, I'm sorry.  Okay.  I have it.

7     Q.        "As we sit here today, I am sure that there might" –

8     excuse me – he answers:

9          "I am sure there might have been and I would be happy

10         to look as far as seeing who else might have received

11         anything but – "

12    Question:

13         "As we sit here today, you can't tell us of anybody

14         other than Mr. Dorsey?"

15    Answer:

16         "In  terms  of  the  time  period  related  to  the

17         merchandise we are looking at here, that would be my

18         guess.  I would certainly want to look back through

19         it, but that would be my guess."

20         Now, we know, do we not, Mr. Dorsey did not receive

21    any product from Floodgates; correct?

22    A.        I think that's true, yeah.

23    Q.        All right.  So this was false testimony?

24    A.        I think it was, yes.

25    Q.         Is there anyone named Gene O. Dorsey, to your

DeLong - Direct                                      105

1    knowledge?

2    A.        I have no idea.

3    Q.        Have you ever met a Gene O. Dorsey?

4    A.        Say it again.

5    Q.        Have you ever met anyone named Gene O. Dorsey, say

6    with Terry Manufacturing?

7    A.        No.

8    Q.        So as you sit here today, you are not even sure

9    whether this was just a fabricated individual?

10   A.        I have no idea.

11   Q.        All right.  Did you ask that question of Mr. Terry?

12   A.        At this point, seven years later, I just don't know.

13   Q.        Page 175, Mr. Terry is asked concerning the delivery

14   trucks bringing the phantom product.  Question:

15        "You met the trucks.  You must remember the name."

16   Answer:

17        "None of them had markings.  I mean, we have had

18        trucks dropped but I don't know what truck lines.  I

19        mean, over a period of time, I guess a number of truck

20        lines have dropped.  The Averitt's and," et cetera.

21   Question:

22        "I don't know how you spell that.  Averitt's would

23        bring loads from Floodgates to Terry Manufacturing?"

24        "We've had them.  There have been a lot of times there

25        would be trucks that were not marked.  So I don't know

                        DeLong - Direct                    106

1              whose trucks necessarily they were."

2              Did you find it peculiar that your client couldn't

3      identify any of the delivery people, any of the delivery

4      trucks, for what was supposedly million dollars of product?

5      A.      Yes.

6      Q.      Perhaps during a break or after the deposition

7      concluded, did you ask him what is the truth here?

8      A.      I am sure I did.

9      Q.      All right.  Did he acknowledge that all of this was

10     just a make-believe story?

11     A.      Not really, no.

12     Q.      Page 186, Mr. Terry is asked concerning the persons

13     who he –

14     A.      Excuse me, Mr. Barriere.  Where on –

15     Q.      186.  It is page ten of this mini-script.

16     A.      Yeah, I have page 186.  I was just wondering what line

17     you are reading from.

18     Q.      I'm sorry.  I'm actually starting at page nine, the

19     tail-end of Mr. Terry's testimony.

20              "So the answer is we have not been paid by our

21              customers for any goods that are for any of the

22              invoices that are currently outstanding to Commercial

23              Factors."

24     THE COURT: Excuse me.  Where are you reading from?

25     MR. BARRIERE: Page 186, line number nine.

DeLong - Direct                            107

1          THE COURT: Okay.  I have got you.  Thank you.

2          MR. BARRIERE: Mini-script ten, Judge.

3          THE COURT: I have got you.

4   Q.     Mr. Terry is being asked about receipt of payment on

5   the product obtained from Commercial Factors – pardon me – from

6   Floodgates.  He concludes, quote:

7              "So the answer is we have not been paid by our

8              customers for any goods that are for any of the

9              invoices that are currently outstanding to Commercial

10             Factors."

11  Question:

12             "Which customer has not paid you?"

13  Answer:

14             "None of the customers have paid me on any of the

15             invoices relating to any of the outstanding invoices

16             that are open and related to this transaction."

17          Now I suppose that is true, but the fact of the matter

18  is there were no customers for any of that product, correct?

19  A.     Yes.

20  Q.     All right.  Page 187, Mr. Terry is asked, question:

21             "Have you been pursuing those debts?"

22  This is at line eight.  Answer:

23             "As best I can, yes."

24          In point of fact, there were no customers and there

25  were no efforts of collection, correct?

DeLong - Direct                                          108

1    A.       That is what I understand turned out to be the case,

2    yes.

3    Q.       All right.   Now at page 187, you introduced or

4    interjected the following objection in response to an inquiry

5    of the name of the customers.  Quote:

6            "It seems to me that you are trying to backdoor into

7            getting him to identify customers.  Until the judge

8            instructs us that we are supposed to do that, which he

9            has not, then we are not going to identify customers."

10   Unquote.  Do you see where I am reading from?

11   A.       Yes.

12   Q.       Now when you interposed that objection to that line of

13   questioning, what was your understanding of whether there were

14   or were not any customers?

15   A.       Well, I was beginning to have questions by that point

16   as to what was going on because this was still early enough in

17   the process that my mind-set, I guess you would say, was that

18   this was a collection case.  That there were invoices, there

19   was money owed for the invoices.  They were claiming more than

20   they were entitled to.  We needed to find out what the right

21   amount of money was.  But as we went through this stuff, this

22   thing really got more and more bizarre.

23   Q.       Well, April 28, I think you will agree, sir, would you

24   not, Mr. Terry's testimony concerning the identity of his

25   customers had been, shall we say, fanciful?  He couldn't

DeLong - Direct                                    109

1    identify any of hundreds of customers?

2    A.        (No response.)

3    Q.        I can review that testimony with you again.  I think

4    we talked about –

5    A.        Well, I guess I'm having a hard time -- was that a

6    question?  I don't know what you want me to say.

7    Q.        Well, it was the predicate to the question.

8    A.        Okay.

9    Q.        April 28, Mr. Terry can't identify any customers.  It

10   is now three weeks later.  The same set of questions are being

11   asked – identify customers.  Is it your testimony that during

12   that three weeks you simply didn't ask your client what's the

13   deal, who are these customers, why can't you identify them?

14   A.        I am sure that during that three-week period I was

15   trying to get to the bottom of what was going on.

16   Q.        What did you find out?

17   A.        During that specific three-week period, Mr. Barriere,

18   I can't tell you because it has been long enough that this

19   whole thing has kind of melded together.  I have a general

20   chronology but, as far as what happened specifically at any

21   three-week time, I just couldn't tell you.

22   Q.        All right.  Page 201 and 202.  We talked earlier today

23   about Commercial Factors' efforts to take a deposition of, I

24   think what you have pronounced as Perseco, P-E-R –

25   A.        I believe it is Perseco.

DeLong - Direct                                110

1    Q.       Perseco.  All right.  And I think you indicated that

2    Mr. Terry was very upset that there would be an attempt to get

3    to his customers.  Is that a fair summary of your testimony?

4    A.       Well, I think what I said is that I thought that we

5    ought to prevent that because that was just outside the scope

6    of the lawsuit they filed.  There was just no need to go to

7    Terry's customers when what we were dealing with was your basic

8    collection lawsuit.

9    Q.       All right.  And, indeed, there came a time – and we

10   will get to this later in the examination – when you actually

11   filed a motion for protective order to preclude that very sort

12   of deposition, correct?

13   A.       I believe I did.

14   Q.       All right.  Now, as you will see on 201, there is a

15   discussion about Perseco as a customer.  Question – this is at

16   201:

17           "This is a new question.  It may be related to the

18           old, but it is a new question.  Are you telling me

19           that the goods Terry Manufacturing supplied to

20           Perseco" –

21   A.       Excuse me.  Where are you?  Where on page 201?

22   Q.       I am starting at line 17.

23   A.       Okay.

24   Q.       "...supplied to Perseco were the T-shirts and golf

25           shirts that Terry Manufacturing obtained from

                          DeLong - Direct                      111

1           Floodgates; yes or no?"

2     Answer:

3           "The kind of goods and services to supply to Perseco

4           and Perseco's customers would be stained T-shirts,

5           golf shirts – I'm trying to think if there was

6           anything else."

7     Question:

8           "Were those stained T-shirts and golf shirts obtained

9           by Terry Manufacturing from Floodgates?"

10    Answer:

11          "Yes."

12    Drop down to line 11:

13          "Give me a name of someone you deal with at Perseco

14          with regard to Floodgate T-shirts?"

15    Answer:

16          "I don't have a name.  I can, you know, we can come

17          back to it.  Let me think through and come back to it.

18          Names, I am absolutely terrible with."

19    Unquote.  Now, as you learned at some point, at least, there

20    had been no sales to Perseco, at least of Floodgates' T-shirts;

21    correct?

22    A.    During this time period with these invoices, yeah.  As

23    I understood it, the way it worked generally was that a

24    manufacturer like Terry would get approval with McDonald's to

25    sell its products to the franchisees and Perseco was somehow

DeLong - Direct                                    112

1    the intermediary between McDonald's and the franchisees.  So

2    that for a given line of goods, Perseco was the one, as I

3    understood it, that actually approved, you know, particular

4    products.

5    Q.      Did you ever confirm that Perseco even exists?

6    A.      Yeah, I did at one time, and I can't tell you now what

7    I did but, yeah, Perseco, the best I could find out, was a real

8    company.

9    Q.      Okay.  But plainly the testimony that it had received

10   Floodgates' T-shirts was false testimony, correct?

11   A.      Apparently so.

12   Q.      And Mr. Terry's claim that he couldn't remember any

13   contacts there was simply a cover-up; is that correct?

14   A.      Well, you know, you can draw your own conclusions.  I

15   don't know.

16   Q.      Finally 217, Mr. Terry is asked at line 19 –

17   A.      Hang on.  Let me catch up with you, please.

18   Q.      Sure.

19   A.      Where are you on there?

20   Q.      Page 217, line 19, question:

21           "How many customers or clients of Terry Manufacturing

22           received goods produced or provided by Floodgates?"

23   Answer:

24           "Probably at least hundreds."

25   Unquote.  Do you see where I am reading from?

DeLong - Direct                    113

1    A.      Yes.

2    Q.      And that plainly was perjurious testimony also?

3    A.      It turned out that – yeah.

4    Q.      All right.  Now we have seen repetitive instances on

5    April 28 and May 17 when Mr. Terry perjured himself.  Did he

6    ever correct any of those statements on the record?

7    A.      I don't know that.  He testified a number of times

8    and, without sitting down and going through all of the

9    transcripts, I just couldn't answer that question.

10   Q.      Well, let me say this.  I mean, this is a fairly

11   significant occurrence to you as a trial lawyer, is it, to have

12   your client perjure himself?

13   A.      Oh, yes.

14   Q.      Absolutely.  You never sent a letter to the court or

15   errata  sheet  confirming  that  there  had  been  perjurious

16   testimony; did you?

17   A.      No.

18   Q.      And you never made any effort to correct any of this

19   on the record; did you?

20   A.      I don't know that.  I just don't know.

21   Q.      You certainly can't think of anything right now; I

22   take it?

23   A.      No, I can't think of anything right now.

24   Q.      All right.  And any efforts you made to correct the

25   record would be contained somewhere in these fifteen boxes?

DeLong - Direct                                       114

1    Because we haven't seen it.  That is the reason I am asking.

2    A.        I would think so.

3    Q.        Do you have any present recollection of at any time

4    writing to the court, writing to the court reporter, writing to

5    counsel for Commercial Factors and say I need to advise you

6    that Mr. Terry lied, and lied repetitively, and here is the

7    truth?

8    A.        At some point I confirmed with the lawyers for

9    Commercial Factors that there were no goods or services – I

10   shouldn't say services – that there were no goods that were

11   reflected by these invoices, and I think it was fairly soon

12   after this.  But did I go in and say that everything that Mr.

13   Terry said was a lie, no, I don't think I did do that but, yes,

14   I did go back to them and say you understand that there wasn't

15   anything sold.

16   Q.        When did that occur?

17   A.        Again, I am going back seven years.  It was somewhere

18   relatively early in the process, but I couldn't be more precise

19   than that.

20   Q.        Okay.  Would it have been after the time you attempted

21   to confect the settlement in September?

22   A.        I don't know.  It could be but more than likely it was

23   before that.

24   Q.        Now you indicated this morning that at this time, in

25   May, you probably were in a position to have some telephonic

DeLong - Direct                          115

1    communication with Roy Terry.  Did you call him up to alert him

2    to the fact that his brother had repeatedly perjured himself?

3    A.        At this point, I couldn't say one way or the other.

4    Q.        All right.  Did it concern you, given your dual

5    representation, that you had one client, perhaps fictitious,

6    nonetheless a corporation on the one hand and another client

7    who had perjured himself?

8    A.        Probably, but this was an ongoing thing and you are

9    asking me to tell you when things came together, and I can't do

10   that at this point.  We have this testimony, but how that fit

11   into the greater scheme of when I was understanding, and when

12   I was asking questions, and the kinds of questions I was

13   asking, and the answers that I was getting, no, I can't say

14   that it all occurred – I don't even know what date this is – on

15   or about May 17 of 2000.  It was an ongoing process and I was

16   pressing for all I was worth to protect the company.

17   Q.        All right.  Now, let me ask it this way, sir.  Terry

18   Manufacturing, as you indicated earlier, sort of became a non-

19   party to this litigation on July 7, 2003, filed for Chapter 11

20   relief, automatic stay applied.  At any time between May 17,

21   2000, and July 7, 2003, did you communicate to Roy Terry that

22   he needed to be aware that his brother, the other defendant you

23   were representing, had repeatedly perjured himself?

24   A.        I don't know.

25   Q.        All right.  Now if I could ask you to look back at

DeLong - Direct                                    116

1    volume one and specifically Exhibit 39.

2              THE COURT: Mr. Barriere, where is it we are looking

3    now?

4              MR. BARRIERE: We are now looking at Exhibit 39 in

5    volume number one, Your Honor.

6              THE COURT: Okay.  Thank you.

7    Q.        Now, Mr. DeLong, as you saw, the last exhibit was the

8    deposition of May 17.  Am I correct this is a motion for

9    protective order you filed on behalf of Terry Manufacturing the

10   day after that deposition or May 18, 2000?

11   A.        Well, there is a reference down here to a motion for

12   a protective order filed May 18.

13   Q.        Go to the second page.  That may be helpful.  The

14   first page, I think is –

15   A.        That looks like it, yes.

16   Q.        All right.  Look at page two.  You say:

17             "Terry Manufacturing Company now moves the court to

18             enter a protective order relieving Rudolph Terry, Roy

19             Terry and Terry Manufacturing from producing documents

20             in response to the referenced notice."

21   Do you see where I am reading from?

22   A.        Yes.

23   Q.        The second page of the motion for protective order?

24   A.        Yes.

25   Q.        All right.  Prior to filing this motion for a

DeLong - Direct                                    117

1    protective order, what documents did you review which you

2    wanted the court to keep from the prying eyes of Commercial

3    Factors?

4    A.       As we sit here right now, I wouldn't – I don't

5    remember what I would have looked at before May 18 of 2000.

6    Q.       Okay.  Well, let's go through the categories.  The

7    first one is Terry Manufacturing Company, Inc.'s entire file

8    regarding relationship with Floodgates, Ltd. and/or Jon L.

9    Pouncey.  Did Terry Manufacturing have any file regarding that

10   relationship?

11   A.       Yeah, I believe it did.

12   Q.       What was contained therein?

13   A.       I don't remember now.

14   Q.       All right.  Number two, all purchase orders and/or

15   invoices pertaining to goods or services obtained from

16   Floodgates, Ltd., and/or Jon L. Pouncey.  Given that Terry

17   Manufacturing actually hadn't acquired any product, were there

18   purchase orders?

19   A.       Not for during this period, I don't think.  What I had

20   done here is just track their notice.

21   Q.       I understand.  I guess what I'm trying to get to, sir,

22   were you seeking to bar examination of documents that existed?

23   A.       I think at this point I was still trying to find out

24   what did exist and what didn't exist and what had happened to

25   whom, by whom.

DeLong - Direct                                    118

1    Q.      Well, did you ask your client?

2    A.      Oh, I am sure I did.

3    Q.      Well, what did he tell you?

4    A.      I don't remember.

5    Q.      Let me jump ahead, I guess, to number eight.  The

6    request was for – and I quote now:

7            "All invoice registers, sale journals or invoices

8            detailing the transactions between Terry Manufacturing

9            and any third parties pursuant to which transactions

10           Terry Manufacturing sold or transferred to third

11           parties any of the goods and/or services obtained by

12           Terry Manufacturing from Floodgates and/or Jon

13           Pouncey."

14           Do you see where I'm reading from?

15   A.      Yes.

16   Q.      All right.  Now you would agree, sir, there are no

17   such documents?

18   A.      Yeah, but what you have to remember is that this, as

19   I have said several times, was a collection suit.  There were

20   invoices out here that reflected a certain amount of money.  I

21   had been told that the company owed the money.  I had been

22   hired to try to get that resolved.  We had everything that we

23   needed before the court.  There was no reason to make any

24   effort to get into these other things, whether they existed,

25   whether they didn't exist, or anything else.  This should have

DeLong - Direct                              119

1    been, based on the complaint that the plaintiff filed, a very

2    simple straightforward matter and it turned out not to be.

3    Q.       Understood.  But we now have had testimony on April 28

4    and May 17 where, I think you would agree with me, sir, Mr.

5    Terry's testimony with respect to the existence of customers is

6    rather incredible?

7    A.       Yeah, looking back on it, in light of everything that

8    we have learned since then, sure, but –

9    Q.       Let's just keep this on the day of –

10   A.       But to step forward to, you know, back then and to say

11   that  at  that  time  under  the  circumstances  given,  what

12   information I had then, that it was incredible, I'm not sure

13   that we can go that far.

14   Q.       Well, let me just ask you a simpler question.  Before

15   you went to the court and said give me a protective order

16   barring Commercial Factors from seeing documents concerning

17   Terry Manufacturing's resale of Floodgates' merchandise, did

18   you ask Mr. Terry what documents is it I am seeking to protect?

19   A.       I am sure I did.

20   Q.       And what did he tell you?

21   A.       I don't remember.  This has been a long time ago.

22   Q.       Understood.  Well, isn't the fact, sir, he could have

23   told you one of two things?  He could have either told you no

24   such documents exist or he could have lied to you; correct?

25   A.       Well, he could have told me at least those two things,

DeLong - Direct                                    120

1    yeah.  There are probably other things that he could have told

2    me but, yeah, those two are clear possibilities.

3    Q.       There are only two options, is there not, with respect

4    to existence of documents – either there are no documents or

5    there are documents, correct?

6    A.       Yeah.

7    Q.       And if he had told you there were documents, we know

8    now that would have been a lie?

9    A.       Yeah, we know that now.

10   Q.       All right.  Would you have continued to represent a

11   client who lied to you?

12   A.       We would prefer not to represent clients who lie to

13   us, but it has happened before, and I suspect that it will

14   happen again.  Clients tend to tell their lawyers what they

15   think their lawyers need to know in some circumstances.  I am

16   sure you have had that happen.

17   Q.       I can't say that I have but – now, when you went to

18   argue this motion for protective order, did you advise the

19   court that this universe of documents you were seeking to

20   protect actually existed?

21   A.       I don't remember what I advised the court.  My

22   suspicion is that there were some documents, they were probably

23   not all of the documents that are called for here.  Whether I

24   knew at the time that I filed this motion that the documents

25   did not exist, I don't know.

DeLong - Direct                              121

1    Q.        Well, I assume you didn't volunteer to the court you

2    were there to protect the production of documents that did not

3    exist; correct?

4    A.        Excuse me.  I didn't hear you.

5    Q.        You would not have advised the court you were there to

6    protect the production of documents which did not exist;

7    correct?

8    A.        No, if I understand your question.

9    Q.        All right.  And what you can't tell any of us, as you

10   sit here today, is whether you in fact had any idea whether

11   there were any documents responsive to this request?

12   A.        No, I can't say specifically what was there that was

13   responsive.

14   Q.        Would you agree with me, sir, that had there been an

15   admission by Mr. Terry, by you, that there were no documents

16   responsive to number eight, Terry Manufacturing had never sold

17   the product, Floodgates at that point, at least – excuse me –

18   Commercial Factors at that point would have understood that

19   this was not a simple collection suit, it was a factoring fraud

20   suit?

21   A.        Well, it was my understanding that Commercial Factors

22   knew and, again, you know, the time gets kind of wound

23   together, but it was my understanding that Commercial Factors

24   knew that there were no documents.  I don't mean that there

25   were no documents; that there was no product exchanged.

DeLong - Direct                                                    122

1    Q.        And when did you come to that understanding?

2    A.        Relatively early in the process.  I can't tell you

3    specifically.

4    Q.        So your testimony, I take it, then, would be that

5    Commercial Factors was seeking production of documents it knew

6    did not exist?

7    A.        There was certainly some indication of that, yeah.  I

8    don't know what was going on between Commercial Factors and its

9    lawyers.

10   Q.        Now you are aware, are you not, that during this time

11   frame Jon Pouncey filed for relief under the bankruptcy code;

12   correct?

13   A.        Yes.

14   Q.        All right.  And you are aware that he was examined

15   under rule 2004 by Commercial Factors in the May time frame?

16   A.        Yes.

17   Q.        And you are aware in his initial examination he told

18   a story to the effect that the product sold to Terry

19   Manufacturing had been obtained from RGB Enterprises, an entity

20   that in fact did not exist?

21   A.        I'm aware that Mr. Pouncey's testimony was all over

22   the place.

23   Q.        If I could get you to return to the second binder

24   again, sir.  Let me first ask you to look at, before you turn

25   to Mr. Pouncey, let me ask you to look at Exhibit 49.

DeLong - Direct                    123

1    A.        49, okay.

2    Q.        The final paragraph, before the salutation, Mr. Cole

3    writes, and I quote:

4              "On a related topic you were advised we were preparing

5              both an amended complaint and a motion to add Mr.

6              Terry as a defendant in this case.  Because it is

7              likely you want to ask questions regarding those

8              allegations, you may well wish for that reason to take

9              Mr. Eden's deposition after the amended complaint is

10             filed.  That decision, of course, is also yours."

11   Do you see where I am reading from?

12   A.        Yes.

13   Q.        All right.  Was this the first notice that you

14   received that Commercial Factors was going to add Rudolph as a

15   defendant?

16   A.        It could be.  I am just not sure.

17   Q.        You are just not sure.  All right.  Did you apprise

18   Rudolph Terry that Commercial Factors had advised you that he

19   was to be added as a defendant?

20   A.        Yes.

21   Q.        Did you apprise Roy Terry of that?

22   A.        Yes.

23   Q.        All right.  What did you tell Roy Terry in that

24   conversation?

25   A.        I don't remember because I don't remember the context

DeLong - Direct                              124

1    here.   I don't remember whether they intended to just add

2    Rudolph,  whether  this  was  after  they  had  amended  their

3    complaint to bring a fraud count against the company and wanted

4    to  add  a  fraud  count  against  Rudolph.   I don't know.    I

5    discussed with them whatever was appropriate, given what was

6    going on in the case at the time.

7    Q.      Okay.   So you don't recall anything specific you

8    discussed with either of them?

9    A.      No.

10   Q.      Did  you  have  any  specific  discussion  concerning

11   whether this notice that Rudolph would be added as a defendant

12   raised again the prospect of a conflict of interest?

13   A.      Well, yeah, when Rudolph came in or when they started

14   talking about Rudolph being added as a defendant, that clearly

15   raised the potential for a conflict, and that was the kind of

16   thing that prompted me to go to both Rudolph, and Roy, and say,

17   on several occasions, "We have this potential for a conflict

18   and we need to deal with it."

19   Q.      You say several occasions.  Do you know how many times

20   you had that conversation?

21   A.      Oh, I don't know.  At least three or four, probably

22   more.

23   Q.      At least three or four, probably more, but none of

24   those conversations are the subject of any writing whatsoever?

25   A.      No.

DeLong - Direct                                125

1    Q.      All right.  Let's turn, if we could, to Exhibit 54,

2    transcript of Mr. Pouncey's deposition.  You are aware, are you

3    not, sir, that he was held in civil contempt by the bankruptcy

4    court for false testimony?

5    A.      Is this the 2004?

6    Q.      Yes, sir?

7    A.      Yes, I'm aware of that.

8    Q.      But you are aware prior to that the bankruptcy court

9    ordered a new examination and held him in contempt, correct?

10   A.      You know, the – yeah, I guess I am.  Those facts are

11   not in the front of my memory.

12   Q.      All right.  I note that page six, the very beginning

13   of the examination, Mr. Coles makes reference to the fact that

14   Jerry Thomas is an attendant to the examination.  Do you see

15   where I am reading from?

16   A.      On page six?

17   Q.      Yeah.

18   A.      Up at the top?

19   Q.      Yeah.

20           "MR. COLES: For the record, we now have someone else

21           in the room with us, Mr. Jerry Thomas."

22   A.      Yes.

23   Q.      And Mr. Jerry Thomas represents Terry Manufacturing?

24   A.      Yes.

25   Q.      And Mr. Thomas, were you aware he was going to attend

DeLong - Direct                                    126

1    this 2004 examination?

2    A.        Yes.

3    Q.        And in fact he reported back to you on it shortly

4    after it concluded; did he not?

5    A.        Well, Mr. Coles took the position that, since Terry

6    Manufacturing Company was not a party in the bankruptcy, that

7    he couldn't keep Jerry out of the room, but Jerry wasn't going

8    to be given the opportunity to ask any questions.

9    Q.        Okay.  But the answer to my question, Mr. Thomas did

10   attend and then he reported to you on what had transpired;

11   correct?

12   A.        Well, I am sure he did.

13             (Pause)

14   Q.        All right.  Page 37, Mr. Pouncey testifies at the

15   beginning of - at line five.

16   A.        Page 37, line five?

17   Q.        Yes, sir.

18             "On April 2, 1997, you submitted the first fake

19             accounts receivable to Commercial Factors?"

20   Answer:

21             "That is correct."

22             "It is your testimony that every accounts receivable

23             predating April 2, 1997, was a valid accounts

24             receivable for goods actually produced and delivered?"

25   Answer:

DeLong - Direct                               127

1          "That's correct."

2     Question:

3          "Is it your testimony that each accounts receivable

4          after April 2, 1997, was a fake accounts receivable

5          for goods that were never produced, nor provided?"

6     Answer:

7          "That's correct."

8     Question:

9          "Just to make sure this is clear for the record, sir,

10         for each invoice from April 2, 1997, going forward in

11         time, is it your testimony that the invoice was fake,

12         it did not represent goods actually produced or

13         delivered to Terry Manufacturing?"

14    Answer:

15         "I believe so."

16         Is that consistent with the understanding you reached

17    at or about this time?

18    A.     Yes.

19    Q.     Okay.

20    A.     Although I will have to say that characterizing the

21    invoices as fake invoices was Matt Coles' term.  I didn't

22    understand, based on what I was told, that they were what I

23    would call fake invoices.

24    Q.     Well, they were invoices for property that was never

25    delivered; correct?

DeLong - Direct                                                  128

1    A.          Yeah, but, as I said, as the facts were explained to

2    me, they wouldn't have been characterized as fake invoices.

3    Q.          All right.  Page 49, question:

4                "That's not my question, sir.  Rudolph Terry actively

5                assisted you by signing bills of lading and invoices

6                and making it appear to Commercial Factors as if

7                Floodgates was continuing to provide apparel goods to

8                Terry Manufacturing when no such goods were actually

9                being provided; isn't that true?

10   Answer:

11               "He signed the bills of lading, the sales orders and,

12               yes."

13   Question:

14               "By signing the bills of lading and the sales orders,

15               Rudolph Terry was actively assisting you in fooling

16               Commercial Factors into continuing to buy worthless

17               accounts receivable.  That's true; isn't it?"

18               "As I stated, he was – he used the word assist.  He

19               was –"

20   Question:

21               "Do you understand my question?  What I am asking you

22               is, you have already told us that you had several

23               accounts with Rudolph Terry?"

24   Answer:

25               "Yes."

DeLong - Direct                             129

1       "And told him he needed to sign fake bills of lading?"

2    Answer:

3          "That's correct."

4    Question:

5          "And fake sales orders, is that correct?"

6    Answer:

7          "That's correct."

8          "And you told him that you were going to use that

9          paper to continue to get money from Commercial

10         Factors?"

11   Answer:

12         "That's correct."

13         "Without Rudolph Terry signing those documents, those

14         fake documents, you could not have continued to get

15         money from Commercial Factors; could you?"

16   Answer:

17         "No."

18         All right.  It drops down through some colloquy.

19         "Will you agree with me that Rudolph Terry assisted

20         you in obtaining from Commercial Factors money for

21         invoices that were fake, that were worthless?"

22   Answer:

23         "Again, he signed the documentation that enabled those

24         dollars to go to Floodgates."

25   Do you see where I am reading from?

DeLong - Direct                                  130

1    A.        Yes.

2    Q.        All right.  Now once you learned of this testimony by

3    Mr. Pouncey, what did you do?

4    A.        I wanted to find out if that testimony was true.

5    Q.        Okay.  How did you go about doing that?

6    A.        In the meantime, Commercial Factors attempted to

7    introduce this 2004 examination into the litigation in Gwinnett

8    County.  I opposed that on the basis that we had not been given

9    the opportunity to examine Mr. Pouncey and, before his

10   testimony should be before the court, we certainly were

11   entitled to that opportunity.

12              The judge agreed with me, excluded this from the

13   Gwinnett County proceeding, and told Commercial Factors that,

14   if it wanted Mr. Pouncey's deposition in that case, they needed

15   to take it in that case.  So they did.

16   Q.        All right.  Now what did you do about informing Roy

17   Terry of this testimony?

18   A.        Well, I am sure I told him about this.

19   Q.        You don't have any present recollection of that; you

20   are just assuming that?

21   A.        You mean any specific recollection?

22   Q.        Sure.

23   A.        No, I don't, but I know I told him about it.

24   Q.        Okay.  You have told us earlier that, when you took

25   this over, it was just a collection suit.  We have now had

DeLong - Direct                                131

1    testimony by Rudolph Terry.  He can't identify who he sold the

2    product to; he has no documents evidencing who he sold the

3    product to; he can't tell us anything about his efforts to

4    collect invoices for the product.  Followed by Jon Pouncey

5    saying the whole thing was a fake.  How did your analysis of

6    this case change?

7    A.          Well, by this point, it was changing pretty

8    dramatically.  I had never spoken to Pouncey at this time.

9    Never spoke to him, in fact – I guess the first actual

10   conversation I had with him was quite a bit later when I

11   reviewed information to get an affidavit, but I had never

12   spoken to him, but this was not consistent with the general

13   information that I was having on the case, and I wanted to know

14   what was going on because, in order to properly defend the

15   company, I had to find out what the facts were.

16   Q.          So what did you find out?

17   A.          Well, we deposed Pouncey and in this next deposition

18   Pouncey basically changed his testimony.  He was – I say we

19   deposed him.  I didn't depose him.  The Commercial Factors

20   lawyers deposed him again, and this time he said that

21   everything that he had done here, that there were no goods that

22   were associated with these invoices but that this was the

23   result of a plan that he and Tracy Eden had put into place to

24   allow him to generate extra revenue.

25   Q.          And when did that deposition take place?

DeLong - Direct                                    132

1    A.        Gosh, I don't know.  It was after this one.  You

2    know, by the time I had filed, they had tried to introduce this

3    into court.  I filed a motion to prevent them from using this.

4    The judge had a hearing on it.  The judge agreed with me that

5    this was inappropriate in this case under the circumstances and

6    told them that, if they wanted to introduce Mr. Pouncey's

7    testimony by deposition, they needed to take his deposition.

8    After that, they went out and set it up and took his deposition

9    but, exactly when that was, I don't remember.

10   Q.        How many times did you meet with Jon Pouncey between

11   the time of this 2004 examination and his deposition?

12   A.        Never.

13   Q.        Never?

14   A.        I never spoke to him.

15   Q.        Your testimony, sir, is that you never spoke with Jon

16   Pouncey?

17   A.        Between –

18   Q.        Between the time of this 2004 in 2000, in June of

19   2000, and when he was ultimately deposed in the Commercial

20   Factors case?

21   A.        Yeah, I think that is correct.  The first time I

22   remember specifically speaking with Pouncey – and I don't know

23   when this was.  We can look at the affidavit that he signed and

24   tie the date down reasonably closely, but the first time I

25   remember speaking with him directly, I called his lawyer and

DeLong - Direct                                                    133

1    asked him if he would allow me to sit down with Pouncey and ask

2    him some questions, and he said he would speak to Pouncey and

3    see if that was all right.  He called me back and said, yeah,

4    we could do that.

5            I met with Pouncey and Tom Cain at Tom Cain's office

6    in Lawrenceville.  I took notes and generated the affidavit

7    that Pouncey ultimately signed out of that.  That's the first

8    time that I remember having a specific face-to-face meeting

9    with Pouncey.

10   Q.      You mentioned his lawyer.  Were you instrumental in

11   trying to ensure that Pouncey had counsel?

12   A.      No.  I had never heard of Tom Cain, didn't know Tom

13   Cain, nothing.  Where Tom Cain came from, I have no idea.

14   Q.      And it is your testimony that you did not attempt to

15   find or secure representation for Mr. Pouncey?

16   A.      I think Tom Cain asked me if I could suggest strong

17   bankruptcy counsel, and I think I told him that Jay Burton was,

18   in my understanding, an outstanding bankruptcy lawyer, and Jay

19   came into the case.

20   Q.      May I ask you to look at Exhibit 86?

21   A.      86?

22   Q.      Yes, sir.

23   A.      Okay.

24   Q.      A letter from your files from Joseph Burton to Jon

25   Pouncey of November 2001.

DeLong - Direct                                        134

1          "Dear John: After several discussions with you and

2          Woody regarding our attorney's fees and the collective

3          desire for us to remain active in the Gwinnett County

4          litigation in the bankruptcy case, I have gone back

5          and reviewed the billing history on your file."

6          Does that refresh your recollection that, in fact, you

7    were involved actively in discussions trying to maintain

8    counsel for Jon Pouncey?

9    A.          I had some conversations with Jay saying, "Jay,

10   please don't get out of the case," yeah, but I didn't have any

11   – you are inferring from this that there was a conversation or

12   multiple conversations involving Jay and Pouncey and me.  That

13   is not the case.  I did have conversations with Jay, as I said,

14   saying, "Please, Jay, do what you can to stay in the case."

15          THE COURT: Okay.  I have lost the thread of this.  Can

16   you double back just a little bit and explain to me what you

17   are both talking about because you have lost me.

18          MR. BARRIERE: Yeah.  Jon Pouncey is examined, as the

19   court has picked up, I assume, in June and basically confesses

20   to this fraudulent scheme.  In follow-up questions, the witness

21   apprises, "Well, Mr. Pouncey had to be re-deposed and he said

22   other things."  And I asked him how many times he had met with

23   Mr. Pouncey.  I think his testimony was he had not met him but

24   once in connection with his affidavit.  I asked him whether

25   indeed he had not been instrumental in securing and keeping

DeLong - Direct                                    135

1  counsel for Mr. Pouncey, and this exhibit was what I presented

2  in connection with that line of questioning.

3          THE COURT: Okay.  Just go ahead.  I am kind of losing

4  the thread here.

5          MR. BARRIERE: All right.

6  BY MR. BARRIERE:

7  Q.      Sir, I would like to turn, if I may, to the efforts

8  in August and September of 2000, once again to settle this

9  lawsuit.  Do you remember being involved in those discussions?

10 A.      Yes.

11 Q.      All right.  I take it there was a meeting at the

12 court  chambers  to  discuss  possible  resolution  of  the

13 litigation?

14 A.      We had a hearing about something.  I don't have any

15 idea what the basis for the hearing was, but we were up there

16 before Judge Winegarden regularly in this case.  And at that

17 point, I had started – well, no, I am not – I started to say I

18 had started to collect a settlement fund, but I am not sure

19 that – I may have my timing out of sequence.  Anyway, the judge

20 in the middle of the hearing stopped and said wait a minute,

21 and he convened a settlement conference, took us all into his

22 jury room, sat at the head of the table and presided over a

23 settlement conference.  And we thought that the case had been

24 settled.

25 Q.      And what was the terms of that settlement, as best

DeLong - Direct                                               136

1    you can recall?

2    A.        I can't tell you specifically.  We said to the judge

3    there needs to be a payment schedule because this, after all,

4    is a small company and it just doesn't make sense for the

5    company's ongoing operations to write a check for almost two

6    million dollars out of its cash flow.  So what we need is a

7    payment schedule that everybody can agree on, everybody can

8    live with, and the judge said that made sense.

9    Q.        All right.

10   A.        And then we talked about an amount.  We came in at,

11   and I have forgotten.  It was something under two million

12   dollars.  And the judge said, "Well, if these people are going

13   to take a payment schedule over a period of time, you need to

14   sweeten the pot a little bit."  So I think we came up with

15   about two million one.

16            Jerry went out of the room and spoke to both of the

17   Terry brothers and came back in and said they approved it.  And

18   so we basically wrote it out, thought we had an agreement.  I

19   went back, prepared what I thought was a settlement agreement,

20   thinking that finally we had gotten to where we had been trying

21   to get for all of this time.

22            And, of course, Commercial Factors that afternoon – I

23   believe it was that same afternoon – was when it filed its

24   amended complaint alleging fraud.

25            THE COURT: I am sorry.  I lost something.  When did

DeLong - Direct                    137

1    this settlement conference happen?

2            THE WITNESS: Judge, I am not sure.  I would say

3    probably eight to nine months into the litigation.

4            MR. BARRIERE: Your Honor, if I may, Exhibit 41 is one

5    of the two motions to enforce settlement.  I was going to put

6    them in the record momentarily.  Attached thereto is a proposed

7    consent order which references that the conference occurred on

8    August 17, 2000.

9            THE COURT: Okay.

10   BY MR. BARRIERE:

11   Q.        Now Commercial Factors ultimately denies that there

12   has been a settlement; correct?

13   A.        Well, yeah.

14   Q.        A motion to compel was filed both by Mr. Pouncey and

15   Floodgates and by Terry Manufacturing; correct?

16   A.        Well, a motion to enforce the settlement, yes.

17   Q.        Fair enough.  Now you told us that Jerry Thomas went

18   out of the room.  Were the Terrys in attendance at this –

19   A.        No.  No, the Terrys weren't at this hearing at all.

20   If we were going to do something like that, we had to have

21   their permission since they ran the company.

22   Q.        Did you speak with Roy Terry ever concerning this

23   settlement?

24   A.        You mean on that day, no, I didn't.

25   Q.        Well, let's start with that day.

DeLong - Direct                                    138

1    A.        No.  Jerry went out and called him and talked to him.

2    Q.        And did you ever speak with Roy Terry about the

3    efforts to compel Commercial Factors to live by the terms of

4    the settlement?

5    A.        I am sure I did.

6    Q.        Okay.  Do you recall any specifics of that

7    conversation?

8    A.        No.  I told him that I thought the case was settled

9    and I thought that it would be appropriate to file a motion to

10   enforce the settlement because I thought that was what was

11   done.

12   Q.        Was it clear in your mind that Roy Terry was

13   approving using two million, one hundred thousand dollars of

14   Terry Manufacturing's money to pay for invoices for product

15   that it had never received?

16   A.        Yeah.

17   Q.        Did you question that in any way?

18   A.        Yeah, I did, and this goes back to what we had talked

19   about earlier.  The Terrys told me that they felt some

20   responsibility – and that's my word, not theirs – for assisting

21   Pouncey because of the help that Pouncey had given to them

22   earlier and because of the kinds of things that they thought

23   Pouncey could do for them in their retail operation.  Rudolph

24   had come over, as I understood it, pre Olympics, to get started

25   in what I call a retail operation because, up until that point,

DeLong - Direct                                    139

1    as I understood it, all the company did was make uniforms.  It

2    made military uniforms and fast-food company uniforms and

3    things like that, and apparently they believed there was a

4    significant market for retail kinds of apparel and they wanted

5    to get into it.

6    Q.        Now the court ultimately denied your motion to

7    enforce settlement; correct?

8    A.        Right.

9    Q.        And at that juncture you moved for yet another

10   protective order on behalf of Terry Manufacturing?

11   A.        If you have something that I can look at.

12   Q.        Sure.  To make it easy, let's look at Exhibit 42.  I

13   would like to review with you some of the representations you

14   made in this pleading when you get it before you, sir.

15   A.        Okay.  I have it.

16   Q.        All right.  Page three, numbered paragraph four:

17             "Terry repeatedly explained that the proposed payment

18             schedule, which would have paid more than two million

19             by April, could be met only if customers and lending

20             sources were not alarmed by information or leaks

21             suggesting financial or legal instability within the

22             company."

23             Do you see where I am referring to?

24   A.        Yes.

25   Q.        All right.  On what did you base that allegation,

DeLong - Direct                                    140

1    what sorts of information?

2    A.          I suspect that was based on information that Roy

3    Terry and Rudolph Terry supplied to me.

4    Q.          All right.   Did they identify for you specific

5    customers or lenders who they were concerned should not learn

6    of the existence of the Commercial Factors litigation?

7    A.          Well, as I mentioned earlier, and I am not sure how

8    all of this integrates, but they were concerned, for example,

9    that McDonald's might look unfavorably on the company if it

10   had, you know, a two million dollar liability hanging out there

11   because McDonald's wants to deal only with, what would you want

12   to call them, extremely solid, stable companies, and they were

13   concerned that something like this might suggest something

14   else.

15   Q.          Did they ever discuss with you the implications of

16   the preferred shareholders learning of this litigation or of

17   the claims asserted by Commercial Factors?

18   A.          I don't think I ever heard anything about any

19   preferred shareholders until after the company was in

20   bankruptcy.

21   Q.          Paragraph seven of page four, you state, and I quote:

22              "Even though Terry has at all time agreed to pay the

23              outstanding invoices, plaintiff noticed the deposition

24              of entities that were Terry's primary resources,

25              including customers, its primary lender and its

1          accountant, all of which further frustrated Terry's

2          ability to secure funds for payment."

3    Do you see where I am referring to?

4    A.          Yes.

5    Q.          All right.  And that, again, would have been based

6    upon information provided to you by Roy and/or Rudolph Terry;

7    correct?

8    A.          Yes.

9    Q.          All right.  Now, in fact, Rudolph had testified the

10   McDonald's franchisees had acquired the phantom inventory;

11   correct?

12   A.          Yeah, I believe so.

13   Q.          And he had also testified that Perseco had purchased

14   some of the phantom inventory; correct?

15   A.          There was something about Perseco.  I don't think he

16   ever testified that Perseco had bought the inventory.  I think,

17   if my memory is right, what he said about Perseco, was that it

18   received some of the inventory.  You know, it approved what

19   inventory or what specific items would go to the McDonald's

20   franchisees.  I believe is what he said about Perseco.

21   Q.          And that testimony, of course, was perjurious;

22   correct?

23   A.          Well, no, it was – I don't think it was perjurious as

24   far as it was testimony on how the operation actually worked.

25   I think probably what it was perjurious on is to the extent

DeLong - Direct                                142

1   that it pertained to these particular invoices that were at

2   issue.

3   Q.        Fair enough.  And indeed had McDonald's been deposed

4   about these particular invoices, it would have come to light

5   that there was no product and no sales; correct?

6   A.        Yeah, probably so.

7   Q.        And likewise a deposition of Perseco would have

8   caused disclosure of the fact that there was no product and no

9   sales to it or to franchisees or representatives; correct?

10  A.        Probably.

11  Q.        Yes?

12  A.        Yes.

13  Q.        Now at the same time this motion for protective order

14  was filed, Mr. Rudolph Terry submitted an affidavit.  I believe

15  it is behind tab 43.  Would you get that in front of you?

16  A.        Okay.

17  Q.        Did you assist Mr. Terry in the preparation of this

18  affidavit?

19  A.        Well, since I notarized it, I did something.

20  Q.        Well, I am going beyond merely putting your name and

21  your stamp there, sir.  Did you not review this with him and

22  actually help him draft the statements contained in this

23  affidavit?

24  A.        There is a pretty good chance I had some input into

25  it.  You know, I don't specifically know, but I am sure I did

DeLong - Direct                              143

1    something with it.

2    Q.        Okay.  Now, paragraph five states, and I quote:

3              "Affiant's only involvement with the subject factoring

4              transactions was to assist Floodgates in paying the

5              Terry invoices that had been factored by Commercial

6              Factors."

7    Do you see where I am reading from?

8    A.        Yes.

9    Q.        That was not true; was it?

10   A.        I am not sure.  As I sit here, I think maybe that was

11   true.

12   Q.        Well, he plainly, Mr. Rudolph Terry plainly had

13   provided acknowledgments of receipt, for example.  He had

14   provided fake bills of lading; correct?

15   A.        No, he hadn't provided fake bills of lading because,

16   as I understood the facts, Pouncey had picked all of those up

17   pre-signed by Terry during the time of the Olympics.  It was

18   never my understanding that Terry signed those kinds of things

19   after the fact during the time that these invoices that are in

20   question were generated.  And I know Pouncey at one point

21   testified to that but, at other times, he said, no, that wasn't

22   so.

23   Q.        Well, we can go back through the documentation but

24   hadn't Mr. Terry signed in September of 1999 an acknowledgment

25   of receipt of product for millions of dollars and it was an

DeLong - Direct                                          144

1    acknowledgment that served as his basis for a criminal

2    conviction?

3    A.          Yeah, he did sign that, but that was after all of

4    these invoices had been generated.  He signed that statement

5    but, as I understood it, he never signed the invoices that were

6    referenced in that statement.

7    Q.          Paragraph nineteen:

8                "Throughout the discussions and negotiations, affiant

9                has repeatedly cautioned Commercial Factors that

10               involving Terry Manufacturing in litigation or other

11               notable proceedings would have a severely detrimental

12               impact on Terry's ability to generate the funds

13               necessary to make the payments."

14               Do you see what I am referring to?

15   A.          Yes.

16   Q.          Did you understand from Mr. Terry that its ability to

17   repay this or to pay this two point three million dollars was

18   dependent upon it finding a lender who would be willing to

19   advance those funds?

20   A.          No, not really.  That was more directed at the

21   business that the Terrys had built.  They were pretty much

22   pioneers.  Rudolph, for example, during the Olympics period,

23   had attempted to get a direct Olympics license for Terry

24   Manufacturing Company and had not been successful.  Terry

25   Manufacturing Company was, I believe, the only African American

```
                              DeLong - Direct                      145
```

1    owned apparel manufacturer that McDonald's or Burger King used

2    as suppliers of product.   And the Terry brothers were very

3    concerned about the relationship that they had established, and

4    they were concerned that, if somebody became concerned about

5    their stability or anything, that those relationships could go

6    away.

7    Q.       Now you go on to note, in paragraph twenty – excuse

8    me – the affidavit notes, I guess:

9             "Commercial Factors' counsel scheduled a deposition of

10            Terry's CPA without notifying any of the defendant's

11            counsel –"

12   A.       Wait.  Where are you?

13   Q.       Paragraph twenty, subparagraph (a).

14   A.       Okay.

15   Q.       "Commercial Factors' counsel scheduled a deposition of

16            Terry's CPA without notifying any of the defendant's

17            counsel.  Plaintiff's counsel not only completely

18            ignored affiant's prior expressed statements that

19            Terry would not waive the accountant privilege but it

20            also inferred to the CPA that he was somehow complicit

21            in an imagined criminal conspiracy."

22            Do you see where I am reading from?

23   A.       Yes.

24   Q.       All right.  The CPA we are referring to there is

25   Richard Rose; is it not?

DeLong - Direct                        146

1    A.        Yes.

2    Q.        All right.  How did you and when did you advise

3    Commercial Factors that Terry would not waive the accountant

4    privilege?

5    A.        I was sitting in my office one day, and I got a call

6    from Matt Coles and he said, "Richard Rose is here for his

7    deposition.  Why aren't you?"  I said, "Matt, you never let me

8    know that you were going to depose Richard Rose."  And he said,

9    "Well, I am.  Can you come now?"  And I said, "Yeah, I will be

10   there in a few minutes."  So I went down there.

11        And in the meantime, I don't think I called Roy.  I

12   think I called Rudolph and said, "I have just gotten a call

13   that Commercial Factors' lawyer is intending to depose Richard

14   Rose," and his response was, "Well, we are not interested in

15   waiving the privilege."

16        So I went down there and Rose was sitting in one of

17   their conference rooms and Matt Coles was in there with him,

18   and I went in and sat down and introduced myself to Mr. Rose.

19   I had never met him before.  And he said, "Can I talk to you?"

20   And I said, "Sure."  And he said, "I am not going to testify in

21   this case."  He said, "There is an accountant/client privilege

22   and I will not do anything that might appear to violate it."

23   And we went in and went forward with the deposition, and I

24   think my only comment was I confirmed with Matt at that time

25   that Terry Manufacturing Company was not willing to waive the

DeLong - Direct                    147

1    privilege.

2    Q.        And that presumably occurred sometime before you

3    filed this motion for a protective order on October 20, 2000?

4    A.        Probably.

5    Q.        All right.  Let me ask you next, sir, to return to

6    volume two.  I want to turn next to the testimony of Mr. Terry.

7    A.        Hang on just a second.

8    Q.        Sure.  On October 31.

9    A.        Volume two, what exhibit?

10   Q.        Well, let's go to the excerpt, 46, the October 31,

11   2000, deposition.

12   A.        Okay.

13   Q.        All right.  I am going to ask you to turn to page 466

14   in the excerpt.

15   A.        All right.

16   Q.        466, line six:

17             "Who is the person that has responsibility in '99 and

18             2000 for writing checks for Terry Manufacturing on non

19             Floodgates matters?"

20   Answer:

21             "Probably William Hudson."

22             "Why did you and only you have responsibility for the

23             Floodgates stuff to write checks?"

24   Answer:

25             "I wouldn't want Jon Pouncey to worry anybody else to

DeLong - Direct                                    148

1           death."

2       Question:

3           "So you undertook it by yourself?"

4       Answer:

5           "Nobody else would – would have chosen probably to end

6           up loaning this stuff to Jon.  That is something I did

7           personally  and  so  it  had  nothing  to  do  with  the

8           company.   That wouldn't have – I mean nobody would

9           have done that."

10          "You say you did it personally?"

11      Answer:

12          "Yes."

13      Turning to 467, question:

14          "And you use Floodgates?"

15      Answer:

16          "But  sometimes  it  would  have  been  temporarily – it

17          would have been Terry Manufacturing money but it was

18          more  of  a  matter  of  Terry  Manufacturing  Company,

19          quote, loaning me dollars and I loaned them to Jon

20          Pouncey.  I took full responsibility for it and I take

21          full   responsibility   for   it   now.    It   is   my

22          responsibility to get it paid back."

23      Question:

24          "So  now  we  add  another  layer  to  this.   Terry

25          Manufacturing lent  the  money  to  Rudolph  Terry  and

DeLong - Direct                    149

1              Rudolph Terry lent the money to Pouncey?"

2    Answer:

3              "That is basically what happened.  I chose to make a

4              loan to Jon Pouncey."

5    Question:

6              "And you used Terry Manufacturing's money to loan the

7              money?"

8    Answer:

9              "That's correct."

10   Question:

11             "Did you tell anybody else at the company you were

12             using their money?"

13   Answer:

14             "No."

15             Do you see where I am reading from?

16   A.        Yes.

17   Q.        All right.  Now, Mr. Terry's current story is that,

18   rather than purchasing product, he was making personal loans to

19   Jon Pouncey of Terry Manufacturing's money.  Did you report

20   that new story to Roy Terry?

21   A.        I am sure I did.

22   Q.        All right.  Did you ask him how could – strike that.

23   Did you suggest to him there was some conflict between the

24   company and Mr. Rudolph Terry if what we had now were personal

25   loans with Rudolph Terry making loans to Jon Pouncey and not

DeLong - Direct                                    150

1   telling anyone else about them?

2   A.        It wasn't my impression that he was not telling

3   anyone else about them.  It was my impression that Roy was

4   aware of the loans and whatever it was that was going on with

5   Pouncey.

6   Q.        What was the basis of that impression?

7   A.        Just the general things that were said in

8   conversations that I had with Roy, the conversations that I had

9   with Rudolph, and just the information that I had accumulated

10  over the course of my representation of the company.

11  Q.        Well, Mr. Terry had been quite specific.  He was

12  asked:

13            "Did you tell anybody else at the company you were

14            using their money?

15  Answer:

16            "No."

17            "Did you ever call Roy Terry to say your brother has

18            testified he is basically using the money as a

19            personal kitty for personal loans to Jon Pouncey.  Are

20            you aware of that?"

21  A.        Well, there is a note on the front of that that's

22  written in my handwriting that says, "Coles tells Roy Rudolph

23  swore he didn't tell Roy he was using TMC's money to make loans

24  to Pouncey," and the note says, "Not so," and has a page and

25  line reference.  So I am assuming that, beyond what's in here,

DeLong - Direct                                    151

1     there was something that indicated to me that Rudolph and Roy

2     had discussed it and that Roy had approved it.

3     Q.        Well, isn't the line and page referenced to the

4     testimony I just read into the record, page 467 –

5     A.        Yeah, but all I am saying to you is that I went back,

6     because I – well, I don't specifically remember except that I

7     saw the note, but when Matt Coles made the kinds of statements

8     to Roy that he made when he deposed Roy about this sort of

9     thing, I went back to confirm whether those things had been

10    said, and I determined that that was not at all what had been

11    said between the two of them.  Now, where it is, I don't know.

12    We just have a few pages here from the transcript.

13            But, no, my understanding was that Roy and Rudolph

14    were both very familiar with whatever it was that Rudolph was

15    doing with Pouncey and he was doing it with Roy's blessing or

16    at least with Roy's consent and approval.  Maybe blessing is

17    not a good word.

18    Q.        Well, sir, this was, I take it, an unusual

19    circumstance in your career.  You have an officer who now is

20    testifying – strike that.  You have an officer who formerly

21    testified that he was buying product from Floodgates and

22    reselling it.  Now testifying that, in fact, the arrangement

23    was just a personal lending relationship using the company's

24    money.  You didn't feel it necessary to try and get something

25    in writing getting the story straight?

DeLong - Direct                                152

1   A.        I had two people who owned this company whose lives,

2   as far as I could tell, were devoted to this company.    We

3   weren't dealing with General Motors and one of its officers

4   where we had any number of other people who could do something.

5   Every decision that was to be made by this company was made by

6   these two people, and it was my impression that, when I spoke

7   to them and I got a response from them, that that was the

8   definitive response on whatever issue it was.

9   Q.        Well, my question is slightly different, sir.    You

10  were an officer of the court, admittedly a zealous advocate,

11  nonetheless an officer of the court, making representations

12  with respect to the defense.    Just in order to honor your

13  obligations to the court, didn't you feel a need for your

14  clients to get a straight story and a straight story in

15  writing?

16  A.        A straight story in writing?

17  Q.        Yes.

18  A.        I don't know what you mean by that.    Yeah, I had

19  spent up until – when was this?  October 31 of 2000.  So we are

20  ten months approximately into the case.    I had spent a great

21  deal of time trying to find out exactly what it was that was

22  going on, and it was a living, breathing animal.

23  Q.        Let me turn you next to Mr. Terry's deposition of

24  October 11, 2001.  It is number 49.

25  A.        No, 49 is a letter from Smith-Gambrell.

```
                        DeLong - Direct                    153
```

1    Q.        48, I apologize.  48.

2    A.        Okay.

3    Q.        Page ten, line sixteen.

4              "Number eight.  And let me ask you before I ask you

5              about number eight, who within Terry Manufacturing

6              keeps up with the internal accounting matters?  Who

7              does its internal bookkeeping?"

8    Answer:

9              "Everything related to this transaction would have

10             been kept up with by me."

11   Question:

12             "Okay.  When you say that, do I understand correctly

13             these transactions were not entered on your general

14             ledger or other?"

15   Answer:

16             "No, they were not."

17             Did you find it of any concern that millions of

18   dollars of funds flowing through Terry Manufacturing had not

19   appeared on its general ledger?

20   A.        Yeah.

21   Q.        Did you ask Roy Terry about that?

22   A.        The best I can say is I think so.  I know we had

23   conversations about why it was not listed on the general

24   ledger, and the explanation that I got was that these were

25   transactions, using their word, that only lasted a very, very

DeLong - Direct                                    154

1    short period of time.  There might be a few thousand dollars

2    out but then it would be paid back by Pouncey within just a few

3    days.

4          And the decision was made, and I believe Roy was aware

5    of it, that there was no need to reflect that kind of thing on

6    the general ledger because it was, in their view, purely a

7    short-term transaction.  And I am a lawyer; I am not an

8    accountant.  If they said that and that was a satisfactory way

9    for them to run their business and they kept up with it, then

10   I might have done it differently or you might have done it

11   differently, but it was their decision, I thought.

12   Q.       Well, plainly not all of these were short-term

13   transactions; correct?  I mean, there was a deficiency of a

14   couple of million dollars that was outstanding for several

15   months.  In fact, the basis of this lawsuit, right?

16   A.       Yeah.

17   Q.       Okay.  Did you ask Mr. Rose about whether these

18   transactions were on the general ledger or should be on the

19   general ledger?

20   A.       I don't remember talking to Mr. Rose about the

21   contents of the general ledger or about any of the specifics of

22   his work for Terry Manufacturing Company.  He was adamant that

23   he was not going to testify, and my sole involvement, except to

24   look at a couple of financial statements that he had prepared,

25   that looked pretty good to me, my sole involvement with him had

DeLong - Direct                    155

1    to do with his absolute refusal to testify.

2    Q.        All right.  Page 13, carrying over to 14, line 23.

3    Question:

4              "So is that done on a cumulative basis?  Let's just

5              take  an  example  here.    Let's  say  you  have  a

6              transaction  out  of  the  Atlanta  office  where  you

7              purchase  some  raw  materials  and  so  a  payable  is

8              generated.   How is, in general terms, that payable

9              reflected  on  the  company's  books  and  records  that

10             ultimately  your  outside  auditor,  like  Mr. Rose,  is

11             going to review?"

12   Answer:

13             "Let me say two things.  One, as far as on a payable,

14             one,  it  depends  on  what  it  is  but  a  payable  is

15             probably going to get reflected on a summary that is

16             done  in  Atlanta.    None  of  the  transactions  with

17             Floodgates  or  Commercial  Factors  were  ever  on

18             payables,  were  ever  in  a  payables  account,  a  payables

19             ledger or anything of that nature."

20        Again, sir, was it of concern to you that transactions

21   involving literally more than ten million dollars, no part were

22   ever reflected on a payables ledger or, quote, anything of that

23   nature, unquote?

24   A.        Yeah, it probably would have except for the fact that

25   it was my impression that Terry, for a small company, was a

DeLong - Direct                                                156

1    very substantial company and there was never a time when there

2    was ten million dollars at risk.  What you are looking at when

3    you get to ten million dollars is an accumulation that went on

4    over a long period of time.  So my thought was that, if it was

5    a little peculiar and maybe didn't satisfy generally accepted

6    accounting principles, that this is a company owned by these

7    two, run by these two, and, again, we are not dealing with

8    General Motors, we are dealing with people who are, as far as

9    I understood it, accountable to each other.  And if they

10   thought that doing something like that was all right, it really

11   didn't have any impact on what they had hired me to do, which

12   was to defend the Commercial Factors litigation.

13   Q.        Turn to page 38, line number five.

14             "Do you know whether during the course of Mr. Rose's

15             audits of Terry Manufacturing Company between 1997 and

16             1999 he was made aware by the company of either, (a),

17             any of the account activity in these Atlanta accounts

18             or, (b), any of the various transactions that took

19             place between Terry and Floodgates or Commercial

20             Factors?"

21   Answer:

22             "I will not comment as to what comments may or may not

23             have been made to Mr. Rose, but it is not my

24             expectation that it would have because the person who

25             had been communicating with Mr. Rose would have been

DeLong - Direct                                        157

1          Mr. Roy Terry, and Mr. Roy Terry wasn't aware of the

2          activity as it relates to Commercial Factors and

3          Floodgates that was taking place in the Atlanta

4          accounts."

5    Unquote.  Do you see where I am reading from?

6    A.      Yes.

7    Q.      All right.  Given that testimony, under oath, that

8    Roy Terry, the president and the majority shareholder, chairman

9    of the board, was not aware of these accounts, did you go back

10   to him to confirm that indeed he was aware of what his brother

11   was doing?

12   A.      Well, this testimony has to do with what was going on

13   in 1997 and 1999.  I had no idea because I had no involvement

14   with the company in 1997 and 1999.  By the time I got involved

15   with this, Roy was thoroughly familiar with what was going on.

16   Q.      Now you understand the reason he used '97 and '99,

17   that's the time frame in which the unpaid invoices arose;

18   correct?

19   A.      Yeah.

20   Q.      All right.  Did you go back, just so I am clear, did

21   you go back and say to Roy, "Are you aware now that it is your

22   brother's testimony that he was making, unilaterally and

23   without anyone's authority, loans to Jon Pouncey throughout

24   this two-year time frame?"

25   A.        I don't think the conversations that we had were

DeLong - Direct                                    158

1    exactly in those terms but, yes, absolutely, it was clear to me

2    from my conversations with him that Roy became aware.  When he

3    became aware, I don't remember, but Roy became aware of what

4    was going on with Pouncey and Floodgates.

5    Q.      Page 128, starting with line eight, question –

6    A.      Hang on a second and let me catch up with you.

7    Q.      Sure.  Take your time.

8    A.      128?

9    Q.      Yes, sir.

10   A.      Okay.  I have it.

11   Q.      "Okay.  Did you cause Terry to reflect on his internal

12           financials the loans that were made to Mr. Pouncey's

13           company?"

14   Answer:

15           "No."

16   A.      Wait a minute.  Where are you reading?

17   Q.      Line eight, page 128.

18   A.      Okay.  I am sorry.

19   Q.      Question:

20           "Okay.  Did you cause Terry to reflect on his internal

21           financials the loans that were made to Mr. Pouncey's

22           company?"

23   Answer:

24           "No."

25   Question:

DeLong - Direct                                    159

1          "Why not?"

2    Answer:

3          "Because all of them were loans usually for a fairly

4          short period of time or the expectation was for a very

5          short period of time and that usually – my expectation

6          was or his representation was that he would have me

7          paid back in a matter of days or whatever.  And so we

8          saw no reason to, in effect, inappropriately reflect

9          transactions that were not really Terry Manufacturing

10         transactions but rather transactions I had chosen to

11         do.  I saw no reason to reflect on the books or

12         misrepresent the position of Terry Manufacturing

13         related to anything that I was doing personally."

14   Unquote.  Do you see where I am reading from?

15   A.        Yeah.

16   Q.        All right.  Given now that Rudolph has repeatedly

17   testified that these are his personal loans, how could you

18   simultaneously represent the company, which had an obvious

19   defense that it had no involvement, that these weren't loans

20   made by the company, not transactions by the company and

21   Rudolph Terry?

22   A.        Well, first of all, this did not appear to me to be

23   a conflict because Roy and Rudolph knew and understood what had

24   gone on in the past.  They were aware of the potential for a

25   conflict.  We talked about the conflict.  They said, no, we

DeLong - Direct                                    160

1    want you to continue to represent both the company and Rudolph

2    and, you know, I have mentioned General Motors two or three

3    times.  This wasn't General Motors.  This was a company that

4    was owned by two brothers who were eminently or intimately, I

5    guess is the word, involved in the activities of the business

6    and in everything that they did.  So they had made the

7    decisions that these things were going forward, and they had

8    also made the decision that they did not want to bring in

9    another lawyer.

10   Q.        You at least agree that the company and Rudolph Terry

11   at this point had differing interests?

12   A.          I am not so sure that they did have differing

13   interests.  I don't know how to answer that.

14             MR. BARRIERE: Your Honor, I am about to move to a

15   different topic.  I note it is a little after three.  I don't

16   know if you want to take the mid-afternoon break at this time.

17             THE COURT: Yeah, this is a good time.  Why don't we

18   break for about fifteen minutes.

19             (Recess from 3:09 p.m. until 3:25 p.m.)

20             THE COURT: Please be seated.

21             MR. BARRIERE: Your Honor, when we began the day, we

22   spent a few moments walking through the various iterations of

23   DeLong and Caldwell, LLC.  You will recall some suggestions

24   about name change and the like and an invitation was extended

25   by Mr. DeLong to google or to check with the Secretary of

DeLong - Direct                                    161

1    State.

2            Consistent with that, I am going to offer and

3    introduce into evidence as Exhibit 142.  I have but one copy,

4    so I will impose perhaps to have a copy made.  A certification

5    from the Secretary of State for the state of Georgia, which

6    reflects the following:

7            That in 1995, there was a new filing by an entity

8    known then as DeLong, Caldwell, Logue and Wisebram.  The name

9    was changed at some point to DeLong, Caldwell and Wisebram.  It

10   timely filed registrations up until 1999.  It apparently ceased

11   to be registered from 2000 to 2005 when there was a

12   reinstatement.  That on Sunday of this week, there was a filing

13   to change the name to DeLong and Caldwell, LLC.

14           THE COURT: Did you show it to Mr. Bridgers?

15           MR. BARRIERE: I did.

16           MR. BRIDGERS: I have, Your Honor, and I appreciate the

17   correction to the record.  I would only point out that, as a

18   matter of law, that entity did not cease to be registered.

19   That's not what forgetting to pay your annual dues means.  As

20   a matter of law, the entity was still in existence and it was

21   able to be – until it is terminated, it can be brought back.

22   It is kind of the way most corporations are.

23           So, just as a matter of law, we can deal with that

24   later but that's –

25           THE COURT: No, I think your point is well taken.  I

DeLong - Direct                    162

1    guess while it is on my mind right now, maybe taking the point

2    a  little  bit  out  of  order,  but,  Mr.  Bridgers,  am  I

3    understanding that – I mean, I guess Mr. Barriere says the

4    lawyer was – this law firm, whatever its name was, did I

5    understand Mr. DeLong's testimony that it was his position that

6    he personally was the lawyer and not the firm?

7              MR. BRIDGERS: Yes, Your Honor.

8              THE COURT: Okay.

9              MR. BRIDGERS: It has been our position, the way we are

10    organized, that in Georgia – and we briefed this a little bit

11    – in Georgia, lawyers practice law, not law firms, and that Mr.

12    DeLong, I believe, has testified that he and Jerry Thomas were

13    engaged in this representation.  That's what the engagement

14    letter said.

15              Now, obviously in pleadings and addresses and things

16    like that, it says DeLong and Caldwell or DeLong, Caldwell,

17    Novotny and Bridgers, at times, because that was the address.

18    But that's basically it.

19              THE COURT: I understand.  So I guess the point is you

20    don't really care what the corporation was called at any point

21    in time because, in your view, this was not the lawyer, it was

22    Mr. DeLong personally?

23              MR. BRIDGERS: Yes, Your Honor.

24              THE COURT: Okay.  Well, we will accept Exhibit 142.

25    I really didn't mean to get off on that point.  It was just

                        DeLong - Direct                    163

1    something that came to mind.

2              Okay.  Mr. Barriere.

3              MR. BARRIERE: Thank you, Your Honor.

4    BY MR. BARRIERE:

5    Q.       If I could ask you to turn to Exhibit 57, please.  I

6    believe it is in volume two.

7    A.       All right.

8    Q.       And just so the record is clear, Mr. DeLong, this is

9    the motion filed by Commercial Factors seeking to add Rudolph

10   Terry as an additional defendant in October of 2000?

11   A.       That appears to be it, yes.

12   Q.       All right.  And Exhibit 58 reflects that that motion

13   was granted on October 20, 2000?

14   A.       Yes.

15   Q.       And 59 reflects that, on December 6, there was an

16   amended  complaint  naming  Rudolph  Terry  as  an  additional

17   defendant?

18   A.       Yes.

19   Q.       And then that – Commercial Factors filed what is

20   styled  as  a  revised  amended  complaint  on  March  10,  2001,

21   Exhibit 60?

22   A.       Yes.

23   Q.       All right.  Paragraph 41 on page three.

24   A.       Are you in Exhibit 60 now?

25   Q.       Yes, I am.  In fact, let me stay on paragraph 40, the

DeLong - Direct                                  164

1    carryover.   Sub,  I  guess,  clause  number  three  makes  the

2    allegation that Rudolph Terry made oral statements to CFA, or

3    its representatives, verifying the alleged sales.

4    A.        I am sorry.  Can you help me where you are?

5    Q.        If  I  approach,  maybe  that  will  make  it  a  little

6    easier.

7    A.        Okay.

8    Q.        Here is where I am reading from, right here.

9    A.        Okay.

10   Q.        In  any  event,  clause  three,  paragraph  40,  the

11   representation  or  the  allegation  is  that  Rudolph  Terry  made

12   oral  statements  to  Commercial  Factors  or  its  representatives

13   verifying the alleged sales.  Did you confirm that was true?

14   A.        I am sorry.  I don't understand your question.

15   Q.        Did  you  confirm  it  was  true  that  Rudolph  Terry

16   verified  orally  to  Commercial  Factors  that  indeed  Terry

17   Manufacturing purchased product from Floodgates?

18   A.        No.

19   Q.        You did not confirm that?

20   A.        No.

21   Q.        All right.  Paragraph 41, beginning with the second

22   sentence:

23            "The  representations  were  made  for  the  expressed

24            purpose  of  adducing  CFA  to  purchase  the  accounts

25            receivable from Floodgates, Ltd.  Defendants, through

DeLong - Direct                                      165

1          the representations of Rudolph Terry and Jon Pouncey,

2          assured CFA that these were bona fide business

3          transactions between Terry Manufacturing Company, Inc.

4          and Floodgates, Ltd., which bona fide business

5          transaction resulted in valid financial indebtedness

6          from Terry Manufacturing Company, Inc. to Floodgates,

7          Ltd."

8          That is true; is it not?

9    A.    Let me see.  Defendant's - (Pause).  The reason I am

10   having a hard time is that this Exhibit 60 was filed by the

11   plaintiff in response to my motion for a more definite

12   statement.  In Georgia, you are required to plead fraud with

13   particularity, and the original pleading, in my view, had

14   fallen way short, so I filed a motion and they filed this, and

15   I frankly thought that all they had done is used a whole lot of

16   words to say nothing.  And to this day, I really have a hard

17   time sorting out exactly what they are saying.

18         My impression is that they talked about bona fide

19   business transactions, but it was not my understanding that

20   they talked about there actually being the sale and delivery of

21   inventory.  I know that is a strange distinction, but that is

22   still where the facts that I obtained led me.

23   Q.    I am sorry.  Which "they" are you referring to?

24   A.    Pouncey and Floodgates and Terry Manufacturing

25   Company.

DeLong - Direct                                          166

1    Q.      Okay.  Well, you lost me.  They were not having bona

2    fide sales of product.  What were the bona fide transactions

3    they were participating in, then?

4    A.      Well, as I understood it, at least as Rudolph and

5    Terry Manufacturing understood, we were back to what Rudolph

6    had testified to that you were asking me about earlier, these

7    loans that he was making, and it went back to an arrangement

8    that Pouncey said he had with Tracy Eden under which he would

9    advance or he, Tracy Eden, Commercial Factors, would advance

10   money on invoices that didn't necessarily reflect goods and

11   services.

12   Q.      All right.  Page four, paragraph 45, about halfway

13   down the page, a statement is made, and I quote:

14           "Defendants represented to CFA that Floodgates, Ltd.,

15           had actually provided goods and services to Terry

16           Manufacturing Co., Inc."

17   Was that true?

18   A.      Well, that was part of my problem with it because they

19   had statements like that coming from Pouncey, but I don't

20   believe they had any statements like that coming from Rudolph

21   Terry or anybody else associated with Terry Manufacturing

22   Company and, in my view, that is not specific because they

23   used, you know, just the general defendants rather than

24   specifying who said what to whom.

25   Q.      Well, you have the benefit of having unlimited access,

DeLong - Direct                          167

1   I take it, to Mr. Rudolph Terry.  What did he tell you about

2   what representations he had made?

3   A.      Depending on the point in time, he hadn't made any

4   representations to Commercial Factors.

5   Q.      Well,  at  some  point  in  time,  had  he  made

6   representations to Commercial Factors?

7   A.      Yeah.  You get down to that statement that we started

8   off today with that had the three million dollars in invoices,

9   he clearly signed off on that.

10  Q.      All right.  They go on to state that, quote:

11          "Defendants  also  falsely  represented  to  Commercial

12          Factors that Terry Manufacturing Company could not

13          disclose the identities of third parties who allegedly

14          purchased from Terry Manufacturing the goods which

15          Terry  Manufacturing  obtained  from  Floodgates.

16          Defendants represented to CFA that the identity of

17          those third parties was confidential information which

18          could not be disclosed when, in fact, defendants knew

19          that, for the period of time in question, no third

20          parties  had  obtained  such  goods  from  Terry

21          Manufacturing, Inc."

22  Do you see where I'm referring to?

23  A.      Yes.

24  Q.      All right.  Were you aware that Rudolph Terry had

25  claimed that he could not disclose the identities of third

DeLong - Direct                                    168

1    parties?

2    A.      Well, I was in the depositions that you talked about

3    earlier which is, I think, probably where this came from and I

4    heard Rudolph say those things at the time that he said them,

5    yeah.

6    Q.      All right.  Now when you answered this allegation, did

7    you admit the truthfulness of that; do you know?

8    A.      I don't have any idea right now how I responded to any

9    of this.

10   Q.      I would like for you to turn, if you would, to Exhibit

11   64, responses of Rudolph Terry and Terry Manufacturing Company,

12   the plaintiff's first set of interrogatories.

13   A.      Okay.

14   Q.      I am particularly interested on page eight, paragraph

15   sixteen.

16              "Please state all facts that you contend support TMC,

17              Terry Manufacturing's, affirmative defense of release

18              and waiver."

19   Answer:

20              "Plaintiff through its agents knew or should have

21              known that the invoices identified by plaintiff as

22              forming the basis of its claim do not reflect goods or

23              services purchased by either Terry or TMC.  Armed with

24              that  knowledge,  plaintiff  continued  to  factor

25              Floodgates' invoices."

DeLong - Direct                                        169

1          What was the basis for that interrogatory answer?

2     A.          Basically Jon Pouncey's testimony that he had gone to

3     Tracy Eden and had said, "Tracy, I need to work something out

4     with you like we had done that before the Olympics."  And

5     according to Pouncey, and this is also what he told Rudolph

6     Terry, Tracy Eden agreed to do that and Tracy Eden set about

7     approving the purchase of invoices from Floodgates that did not

8     reflect goods and services.

9          For example, one of the things that I learned through

10    discovery was that Tracy Eden managed the Floodgates account

11    personally rather than having it as, you know, a typical

12    factoring account that was just managed in the ordinary course

13    of the company's business.

14         All of those things said to me that the statements

15    that were being made about Tracy Eden at the very least had a

16    significant element of truth to them.

17    Q.          Okay.  So Tracy Eden, in your mind, became sort of the

18    third prong of the conspiracy involving Rudolph and Jon

19    Pouncey?

20    A.          No.  As I understood it, Tracy Eden and Jon Pouncey

21    worked out whatever agreements they worked out and Pouncey then

22    went to Rudolph Terry and told him what he thought Terry needed

23    to hear in order to get Terry to do what he wanted him to do.

24    Q.          Now isn't it a fact, though, that your investigation,

25    or that of your investigators, of other Commercial Factors

DeLong - Direct                        170

1    employees indicated that Mr. Terry was repetitively called for

2    verification and always provided verification he had gotten

3    this product?

4    A.        At some point, and I think this actually came after

5    Rudolph was indicted, at some point the investigator that Brian

6    Steel had brought into the case located a couple of women who

7    worked at Commercial Factors, and it seems that maybe Jerry

8    Thomas talked to one of them.  And, yeah, there was something

9    like that that came out, but, you know, that was three years,

10   plus, into this thing before – because Commercial Factors had

11   done everything it could to block our having access to those

12   people.

13   Q.        I am a little confused.  Didn't those persons in fact

14   bolster Commercial Factors' theory by testifying that they

15   repetitively called Rudolph Terry for verification that he

16   received product, and he always provided it?

17   A.        Yeah.  Yeah, I would think so.  So I don't know what

18   it was that Commercial Factors was afraid these people would

19   say, but they sure went out of their way to keep me from having

20   access to them.

21   Q.        Now, did there come a time when you filed suit

22   against Mr. Eden and against Mr. Pouncey asserting that they

23   had in effect induced the fraudulent scheme?

24   A.        I filed suit against Pouncey, filed a cross-claim

25   against him, and I got the court's permission to allow me to

DeLong - Direct                              171

1    add Tracy Eden as a defendant in the counter-claim, yes.

2    Q.        What, as you recall, was your theory against Jon

3    Pouncey?

4    A.        Basically that Pouncey had set all of this stuff up.

5    Q.        Okay.  Now, at the same time you were filing suit

6    against Mr. Pouncey, were you in the process of conferring with

7    him?

8    A.        No.

9    Q.        You were not?

10   A.        No.  The only time I met with Pouncey directly was

11   when I mentioned earlier, the time that I sat down with him and

12   his lawyer, and it was the affidavit that was generated out of

13   that that was the basis of the action that I brought against

14   him on behalf of Terry Manufacturing Company.

15   Q.        So this was a true adversarial relationship.  You

16   were suing Jon Pouncey and you weren't consulting with him

17   simultaneously?

18   A.        A true – no, it was – I guess I would say that it

19   was, for a long, long time, benign neglect.  I was very

20   uncomfortable with Pouncey because he had said so many

21   different things.  So I felt like I needed to go to sources

22   other than Pouncey and try to figure out what was going on.  So

23   I didn't have any contact with Pouncey.

24   Q.        All right.  Well, I am now focused on the point where

25   you have come around to the need to sue Jon Pouncey.

DeLong - Direct                                          172

1    A.        Yeah.

2    Q.        That's truly an adversarial point; is it not?

3    A.        Yeah.

4    Q.        All right.  And you are not consulting with Jon

5    Pouncey at that time?

6    A.        No.

7    Q.        All right.  Let me ask you to look at Exhibit 95.  It

8    is a motion of Rudolph Terry and Terry Manufacturing to

9    authorize a cross-claim against Jon Pouncey and to add Tracy

10   Eden as defendant in counter-claim.  That is the claims we have

11   been talking about; right?

12   A.        Okay.

13   Q.        And the date that was filed was June 5, 2002; is that

14   correct?

15   A.        '95?

16   Q.        Yes, sir.

17   A.        It looks like it says May 5, 2002.  No, it must have

18   been June 5 because the certificate of service says June 5.

19   Q.        The certificate of service says June 5, 2002.  All

20   right.  Let me ask you now to look, if you would – (Pause).

21   Let me ask you to look at Exhibit 85, sir.

22   A.        85?

23   Q.        Uh-huh.  Now you told me a moment ago that as of June

24   5, I think we established, during this adversarial relationship

25   with Jon Pouncey, you are not consulting with him?

DeLong - Direct                    173

1    A.        Uh-huh.

2    Q.        This is a fax dated June 19, 2002; correct?

3    A.        Yeah.

4    Q.        Okay.  To you from Rudolph Terry; right?

5    A.        Yeah.

6    Q.        All right.  It is styled, it says:

7              "Rudolph: Here are some things I would like to ask

8              Woody and Jerry tomorrow."

9              Do you see what I am referring to?

10   A.        Yeah.

11   Q.        The second page.  All right.  This is from Jon

12   Pouncey; is it not?

13   A.        That's what it says, yes.

14   Q.        Okay.  Paragraph six:

15             "Need opinions of what I should do to protect my house

16             from judgment.  One thought I have is to legally sign

17             it over to my wife as an exchange for the credit card

18             debt which she has incurred to help keep us afloat.

19             However, will this stand up to the test of the law in

20             court  or  some  type  of  grandfather  clause  of

21             preexisting  ownership?   If  not,  what  are  some

22             alternatives?"

23   Signed Jon.

24   A.        Yeah.

25   Q.         So  within  two  weeks  of  your  supposedly  being

DeLong - Direct                                         174

1    adversarial and suing Jon Pouncey, in fact he is coming to meet

2    you  and  get  advice  on  how  to  protect  his  home  from  his

3    creditors; correct?

4    A.       He never came to meet with me.  He wasn't seeking my

5    advice. He sent this to Rudolph.  Rudolph forwarded it on to

6    me, and I said, "Rudolph, this is nuts.  I can't talk to Jon."

7    And I put it in the file.

8    Q.       Did you put that in writing to Rudolph?

9    A.       No, I didn't put that in writing to Rudolph.  Pouncey

10   did some very bizarre and very peculiar things, and this is

11   just a small example.

12   Q.       All right.  Let's talk about Richard Rose for little

13   while.  Turn, if you would, please, to Exhibit 104.

14   A.       Okay.

15   Q.       Do  you  recognize  this  to  be  the  subpoena  for

16   production of evidence at deposition sent to Mr. Rose in July

17   of 2000?

18   A.       Well, that is what it says, but do I recognize it, no.

19   Q.       All  right.   Mr.  Rose  was  asked  to  bring  with  him

20   copies  of  any  financial  statements  prepared  for  Terry

21   Manufacturing,  Floodgates  and  Jon  Pouncey,  and  a  list  of

22   documents upon which Richard Rose, CPA, relied to prepare said

23   documents.  Do you see what I am referring to?

24   A.       Yes.

25   Q.       All right.  Were the financial statements requested by

DeLong - Direct                                              175

1    Commercial Factors ever produced to him?

2    A.      You know, I don't know.  I know that Commercial

3    Factors - well, I shouldn't say I know.  I think Commercial

4    Factors had those Richard Rose financial statements that we

5    talked about earlier, but I don't know where they came from.

6    I don't know how Commercial Factors got them.

7    Q.      You didn't produce them?

8    A.      No.

9    Q.      How about any underlying documents; did you ever get

10   a list of work papers or underlying documents for the audit?

11   A.      Well, this wasn't directed to me; this was directed to

12   Richard Rose and Rose had a lawyer unrelated to me, so I didn't

13   respond to this at all.

14   Q.      Okay.  Well, to your knowledge, and you spent, I think

15   we'll see, a good bit of time on this issue; did you not?  Are

16   you aware of whether a list of the documents used to prepare

17   the audit was ever provided?

18   A.      I think Richard Rose absolutely stonewalled them.  I

19   don't think he was willing - he was hardly willing to say more

20   than name, rank and serial number.

21   Q.      Okay.  Now if I can get you to turn to Exhibit 105.

22   Is that your handwriting, sir?

23   A.      Yes.

24   Q.      This evidences or reflects a telephone conversation or

25   several conversations you had with Matt Coles, a lawyer for

```
                          DeLong - Direct                      176
```

1    Commercial Factors, and then with Rudolph Terry and Jerry

2    Thomas?

3    A.       It reflects some notes I made on August 28, 2000.

4    Beyond that, I don't have any idea what it reflects.

5    Q.       All right.  Sir, your bill or your time record for

6    that day reads as follows:

7            "Telephone call with plaintiff's counsel; conference

8            call with Rudolph Terry and Jerry Thomas; review and

9            revise consent order; correspondence with plaintiff's

10           attorneys, 2.8 hours."

11           Would that suggest to you that these notes are of two

12   separate calls, one with Matt Coles and one, what you described

13   as a conference call with Mr. Thomas and Mr. Terry?

14   A.       I don't know because this has to do with SMI, which

15   was a client of Smith-Gambrell, and two of the shareholders,

16   members, I am not sure what they were, of SMI were the Terry

17   brothers.   There is another note about – oh, I know.

18   Southtrust was apparently making a loan to SMI in connection

19   with these games and Southtrust had decided to go with lawyers

20   other than Smith-Gambrell.  But then it says, "Rudolph seems to

21   agree on a five-day grace period."  I don't know what that

22   means.

23           So, you know, these are notes that I made but, as I

24   sit here right now, I can't tell you specifically what they

25   pertain to.

DeLong - Direct                                    177

1    Q.        Okay.  Well, let's look if we can at the second page

2    of these notes.  The first comment is, quote:

3              "There may be some checks that Roy deposited and that

4              Rose reviewed.  Rudolph feels that they may not be

5              material from an accounting standpoint."

6    Unquote.  Did I read that accurately?

7    A.        Yes.

8    Q.        All right.  You presume that that is information that

9    Rudolph relayed to you during this conversation?

10   A.        I guess.  I don't know.

11   Q.        All right.  Paragraph, quote:

12             "Rose's  work  papers  contain  names  of  customers,

13             clients and volume of business being done."

14   Unquote.  Did Rudolph Terry provide that information to you?

15   A.        I would think, if I was provided that information, it

16   would have come from either Rudolph or Roy.

17   Q.        Okay.  What appears to be a plaintiff symbol, "Wants

18   testimony to enable him to say Terry cooked the books."  Do you

19   see where I am referring to?

20   A.        Yeah.

21   Q.         Was it your understanding from your conversation with

22   Rudolph Terry that Rose had cooked the books?

23   A.         No, I don't think so.  My impression of Rose's

24   financial statements was, like I said earlier, it looked pretty

25   good to me.  I think it showed something like thirty, or forty

DeLong - Direct                                    178

1    or fifty million dollars in revenue and showed twenty million

2    dollars in retained earnings and showed a couple million

3    dollars in pre-tax profits.  All of that looked pretty good to

4    me, and I thought this was a good strong company.

5    Q.        Well, how, then, would Rose's testimony enable

6    Commercial Factors to say that Terry cooked the books?

7    A.        I don't know, and this has been a long time ago and I

8    really don't remember what my thought process was then.  I am

9    guessing that I was speculating that that was what Commercial

10   Factors was hoping it could prove or could suggest or something

11   from deposing Rose; you know, with Rose resisting as hard as he

12   was, that maybe there was something wrong.  I don't think that

13   I ever saw anything that suggested to me that that was the

14   case.

15   Q.        Well, it was Terry Manufacturing's privilege; was it

16   not?

17   A.        Yeah.

18   Q.        Well, if you didn't think the books had been cooked,

19   you didn't think Commercial Factors could prove that theory,

20   why didn't you simply waive the privilege?

21   A.        Because the client said we are not waiving the

22   privilege.

23   Q.        All right.  Did they explain to you why?

24   A.        No.  They said we are not waiving the privilege.

25   Q.        Okay.  Did you ever suggest to them, you know, we can

DeLong - Direct                                              179

1    eliminate this big dispute by simply agreeing to produce these

2    financial statements under a confidentiality order?

3    A.        I probably did.

4    Q.        What did they tell you?

5    A.        They were not willing to waive the privilege.

6    Q.        Did you ever ask them how many recipients had already

7    received these very financial statements?

8    A.        No.

9    Q.        You never asked them that?

10   A.        No.

11   Q.        So you didn't know whether these had been given to one

12   customer or 500 people?

13   A.        No, I had no idea.

14   Q.        Wasn't that relevant to your decision as to whether

15   there had already been a waiver of the privilege?

16   A.        Had there already been a waiver of the privilege?

17   Q.        Well, as I understand it – correct me if I'm wrong –

18   if an accountant or the accountant's client freely gives out

19   information, that, in itself, may constitute a waiver; is that

20   not your understanding of the law?

21   A.        Yeah, probably.

22   Q.        All right.  Did you ever inquire as to, therefore, who

23   Terry Manufacturing had given these financial statements to?

24   A.        At this point, I don't remember, but the point was

25   that the two Terrys had made it very clear that they were

DeLong - Direct                    180

1    unwilling to waive the privilege for whatever reason.  They

2    just weren't going to do it.  And, even so, having had some

3    conversations with Richard Rose, like I referred to earlier,

4    had the Terrys said, fine, go ahead and testify, Rose was

5    absolutely adamant that he wasn't going to do it.

6    Q.      Well, I don't understand.  It is not his privilege; is

7    it?  Had they waived it, what option would he have had?

8    A.      All I can do is relay to you what he told me.

9    Q.      Now the next exhibit, 106, are these also your notes?

10   A.      It looks like my handwriting, yes.

11   Q.      The second page you have written:

12           "This is not about Terry and Pouncey and Rose would

13           set    standard    that    avoids    the    privilege.

14           Attorney/client   and   accountant/client   are   same

15           standard.   There is nothing to show" – you have

16           scratched that out and inserted, "No docs from Rose."

17           Does that suggest to you that Mr. Rose in fact had

18   documents that fell within the scope of the Commercial Factors'

19   subpoena?

20   A.      What it suggests to me is that Rose said he wasn't

21   producing documents.  Whether he had documents or not at this

22   point, I can't say, but he made it clear he was not producing

23   anything.

24   Q.      Did you go and review those documents?

25   A.      No.  I didn't represent Rose.  I didn't know what Rose

DeLong - Direct                          181

1    had.  Rose was just saying, no, not doing it.

2    Q.      Well, as you evaluated the extent to which you would

3    fight the privilege battle, you didn't feel it necessary to

4    find out what exactly it was that you were fighting over?

5    A.      Well, what I did, Rose had a lawyer and Rose's lawyer

6    was representing Rose in that, and Rose had said he wasn't

7    going to do it.  I spoke to Roy Terry and Rudolph Terry.  They

8    asked me to file an amicus brief.  I filed an amicus brief.

9    Q.      Now is it your recollection that Mr. Rose appeared

10   twice at his deposition and on both occasions basically refused

11   to provide any information?  I think you said not much more

12   than name, rank and serial number?

13   A.      I know he appeared more than one time.  I think it was

14   more than twice.  And I think he was ordered to appear a third

15   time and he did appear a third time.  At this point, I don't

16   remember what his testimony was.

17   Q.      All right.  And you were working with his attorney,

18   were you not, for the presentation to the court as to why Mr.

19   Rose should not be compelled to testify?

20   A.      No, not really.  His attorney was attending to his

21   part of it and I was attending to  Terry Manufacturing's part

22   of it.

23   Q.      Well, if you would look at Exhibit 111, a fax from

24   Albert Mitchell to you.

25   A.      Okay.

DeLong - Direct                                    182

1    Q.       Mr. Mitchell was Mr. Rose's attorney; was he not?

2    A.       Yes.

3    Q.       Okay.  He writes:

4             "Please review the draft of our argument for content.

5             Any and all comments will be appreciated.  Thank you,

6             Albert."

7             Do you see where I'm reading from?

8    A.       Yes.

9    Q.       All  right.   Did  you,  in  fact,  provide  him  with

10   comments on the brief?

11   A.       Probably.

12   Q.       Okay.  And likewise the next day he writes:

13            "Please review Rose's affidavit for content.  Any and

14            all comments will be appreciated.  Thank you. Albert"

15   A.       What are you looking at now?

16   Q.       112.

17   A.       Yeah.

18   Q.       Did the Terrys pay the fees of Albert Mitchell?

19   A.       I don't know but I don't think so.

20   Q.       On what basis?

21   A.       Well,  I  just  -  I  had  enough  contact  with  Albert

22   Mitchell that I suspect, if the Terrys had paid him, he would

23   have told me.  And I would also think that, if the Terrys paid

24   him, either they would have told me or they would have asked me

25   whether I thought they should.

DeLong - Direct                              183

1    Q.        Let me direct your attention next to Exhibit 116.

2    Does this appear to be notes of the conversation you had with

3    Roy Terry?

4    A.        It could be.

5    Q.        All right.  And the conversation with Mr. Terry, you

6    made a note, "Richard Rose.  Limit to background and audit

7    services," correct?

8    A.        That is what it says.

9    Q.        Okay.

10   A.        My guess at that is that I was relaying to him what

11   Rose had done or had said he was going to do or something, that

12   he was going to limit his testimony to his background and the

13   audit services that he provided.

14   Q.        Now I am happy to walk through your bills with you

15   page by page, but let me ask you, Mr. DeLong, does it surprise

16   you to note that you invested five hundred and thirty-six hours

17   in  connection  with  your  efforts  to  keep  Mr.  Rose  from

18   testifying?

19   A.        Yeah.

20   Q.        Would it surprise you that the associated fees were

21   over a hundred and thirty thousand dollars?

22   A.        Yeah.

23   Q.        If you wish, sir, I can show you on the screen what

24   appear to be excerpts of your bills that related to Mr. Rose

25   or, if you wish, they also appear at Exhibit 13.

DeLong - Direct                                    184

1    A.       Exhibit 13, not 113?

2    Q.       Just number 13.

3    A.       Okay.

4    Q.       All right.  The first of these is a three-point-two

5    hour charge which included research statutes and cases defining

6    right of factoring company to obtain and maintain interest in

7    factored goods after sale.  Research cases to develop theory of

8    law posed in plaintiff's claimed right of access to

9    information.

10            Does that appear to relate to the Rose issue?

11   A.       To information concerning identity and broad scope of

12   business transactions and sources.  No, that doesn't appear to

13   relate to the Rose issue at all.

14   Q.       How about researching cases limiting scope of

15   discovery in anticipation of motion for protective order

16   pertaining to plaintiff's attempts to require production of

17   documents; does that appear to relate to Mr. Rose?

18   A.       No.

19   Q.       All right.  By complete research on extent to which

20   documents being sought are relevant to issues formed on the

21   pleadings, does that relate to Mr. Rose?

22   A.       No.

23   Q.       What did that relate to, do you know?

24   A.       That's the issue that I had talked about earlier.

25   This was a simple, straightforward collection case and yet they

DeLong - Direct                                185

1    wanted to fly to Chicago and depose McDonald's; they wanted to

2    go to wherever Perseco was and depose it.  They wanted to go to

3    Bank of America's headquarters and depose it.  They wanted to

4    go to Alabama and depose two banks over there, none of which

5    had anything to do with the complaint that they had filed.

6    Q.      Well, you knew, apparently by no later than April of

7    2000, three months after you were engaged, this was no simple

8    collection suit; was it?

9    A.      Well, go back and look at when we began to have

10   deposition testimony and you begin to have spikes coming out of

11   that and you begin to have what I thought were bizarre

12   questions asked.  That would've been the time when I began to

13   have questions about this, and it would have been probably in

14   the May, June, July time frame, I would think.

15   Q.      Well, I think the record reflects that the first

16   deposition of Mr. Terry was in the third week of April.

17   A.      Okay.

18   Q.      Okay.  Deposition of company's CPA, telephone call

19   with Jerry Thomas, telephone call with Mr. Burton.  That

20   plainly related to Mr. Rose; did it not?

21   A.      Yeah, I would think so.

22   Q.      Okay.

23   A.      Are you suggesting that I shouldn't have attended the

24   deposition?

25   Q.      No.  I am just trying to get a handle on the amount of

DeLong - Direct                               186

1    investment you had in this case.  You have a series of motions

2    and motions for protective order in mid-September.  Was not

3    part of that driven by the attempt to get an order precluding

4    the deposition of Mr. Rose?

5    A.        I don't think so.

6    Q.        Well, we can go back and look at the order, but it was

7    one of the grounds you cited as grounds for relief; was it not?

8    A.        Well, it might have been one of the things but that

9    was certainly not the major part of my emphasis.

10   Q.        Throughout September you were working on motions and

11   briefs.  Was this part of what you were working on or at least

12   part of what you were doing was working on Mr. Rose's issue at

13   this time as they were seeking to take his deposition?

14   A.        Well, it could be depending on how the timing matches

15   up and what else was going on but, unfortunately, I didn't

16   write enough down here to be able to say specifically what I

17   was doing.  There were a lot of motions and a lot of briefs

18   going on and, as I told you, it seemed that at least early on

19   in the case we were up before Judge Winegarden at least once a

20   month about something.

21   Q.        We have multiple references to brief.  I will be happy

22   to pull out the briefing you did at that time.  Is it your

23   recollection that dealt with the Rose issue?

24   A.        I don't know.  I know there was one point when I sent

25   Rudolph a bill and I had just put down all of the time that I

DeLong - Direct                                    187

1    had expended that month, and I wrote him a cover letter and

2    said this is a lot of time for what's done, let's talk about

3    it.

4    Q.       Okay.

5    A.       And we came to some agreement so that Terry

6    Manufacturing didn't pay for that time.

7    Q.       All right.  Then in October we have additional work on

8    the same brief.  We are not sure exactly what, though, because

9    at the time you were seeking the protective order, was it not,

10   to preclude the deposition of Mr. Rose?

11   A.       Final edits and revisions to brief.  It was a brief

12   about something but, as I said, there were a number briefs.  I

13   don't know.  Review draft of final brief.  Prepare for hearing

14   to enforce settlement and for a protective order.  That had

15   nothing to do with Rose.

16   Q.       Well, the protective order did, did it not?

17   A.       That's not my memory, but I could be wrong about that.

18   That has been a long time.

19   Q.       We are now into 2001.  January, you work on issues

20   pertaining to compelling testimony of accountant.  The only

21   accountant whose testimony was compelled was Mr. Rose; correct?

22   A.       That seems to be pretty clearly pertaining to Mr.

23   Rose.

24   Q.       All right.  Telephone call with Rudolph Terry re CPA

25   related issues.  That relates to Mr. Rose plainly; does it not?

```
                           DeLong - Direct                    188
```

1    A.        I would think so.

2    Q.        On the 29th, work on Rose motion.

3    A.        Let's go back to that. It talks about three hours of

4    work and a telephone call with Rudolph Terry.  The telephone

5    call might have been five minutes of that three hours. So, you

6    know, that is way short of what you are suggesting.

7    Q.        Finalize and file motion, correspondence with court,

8    finalize and file discovery, complete research re Rose.  Again,

9    at least some part of this time is spent on the Rose issue; is

10   it not?

11   A.        Yeah.

12   Q.        Review revised Rose motion.  Telephone call with court

13   reporter re not having received copy of Rose's deposition.

14   Review deposition copy received via e-mail.  Correspondence to

15   plaintiff's attorney again requesting he fully respond to

16   outstanding discovery and give me dates for the Tulleners

17   deposition.

18          Again, you would agree, would you not, that at least

19   some portion –

20   A.        Some portion of that time had to do with Rose, yeah.

21   Q.        I am sorry. Was I reading too quickly? Slow it down.

22   Okay.  The 15th, again, work on brief pertaining to accountant

23   privilege.  On the 19th, revise order on motion to compel.

24   Begin outlines of briefs.  Both of those entries, at least, it

25   would appear that some of that time was spent on the Rose

DeLong - Direct                                    189

1    issue; is it not?

2    A.        Well, the first one up there, brief pertaining to

3    accountant privilege, some of that time, yeah, but the rest of

4    it, no, I don't think so.

5    Q.        On the 10th of July, you spent seven hours on this

6    file and at lease the last entry plainly relates to Mr. Rose,

7    does it not, work on brief pertaining to accountant/client

8    privilege under Georgia law?

9    A.        Yes.

10   Q.        The 11th, five hours billed, some of which is work on

11   brief re accountant/client privilege, correct?

12   A.        Yeah, some of it.  Most of it was devoted to getting

13   those people in California in front of me.

14   Q.        How do you know that?

15   A.        Well, I just remember that I had a hard time doing it

16   and I ended up having to learn how to effect subpoenas in

17   California, and I didn't know what I was doing.  So it took me

18   a while to figure it out and find somebody to get it done for

19   me.

20   Q.        Okay.  The following day, again, you spent some time.

21   Issues re accountant/client privilege.  Again, that was the

22   Rose matter; was it not?

23   A.        Yes, some part of that hour.

24   Q.        The 18th, draft brief re Rose testimony; 24th, revise

25   and expand brief concerning accountant/client privilege.

DeLong - Direct                                    190

1      MR. BRIDGERS: Your Honor, if I might object.  We are

2    not going to have any way to take a look at this in the record.

3    Mr. Barriere is selectively leaving out portions.  Basically

4    fifty to sixty percent of what he is reading, he is leaving out

5    portions of it.  I am worried about the state of the record as

6    we try to figure out what we are looking at going forward.  I'm

7    not sure exactly what my objection is.  I am worried about the

8    record and we either should read it or not.

9      THE COURT: Let me follow-up a little bit.  We have had

10   a lot of testimony here and I'm trying to fit in what I am

11   hearing in the context of what this case is about.  Clearly

12   this  Commercial  Factors  litigation  was  a  big  piece  of

13   litigation.  Mr. DeLong billed a bunch of money and got paid a

14   bunch of money for it.  We have got a huge gob of paper.  I

15   know all of that.  We have walked through the testimony of Mr.

16   Rudolph Terry in considerable detail.  Let's kind of ground

17   where we are going here.

18      What I want to do is I don't want to retry Commercial

19   Factors, and that is what I am afraid we are doing.  What I

20   want to do is I want to try the counts that you raised here,

21   and just kind of explain to me because I just kind of lost the

22   thread of what you have been talking about all afternoon and

23   how it fits into anything that we have got going here.

24      MR. BARRIERE: Well, let's focus on Mr. Rose for a

25   moment, Your Honor.  I am going through the process, which the

DeLong - Direct                                    191

1    court may or may not wish to hear, of what was, I think, a huge

2    investment in preventing Mr. Rose or assuring that Mr. Rose

3    would not testify.

4              THE COURT: Right.  I have got that.

5              MR. BARRIERE: I am going to suggest – I don't think

6    I'm ever going to get this out of this witness but –

7              THE COURT: Yeah, that is a good point right there.  He

8    is not going to admit – I don't understand, and that is why I

9    have given you some leeway.  He is not going to say, yeah, I

10   knew Rudolph was defrauding everybody and their brother,

11   including the preferred shareholders, right from the get-go.

12   He is not going to say that

13             MR. BARRIERE: I understand but I –

14             THE COURT: And you have got to get it in inferentially

15   but, on the other hand –

16             MR. BARRIERE: Well, I suspect that the next witness is

17   going to testify that had Mr. Rose and his work papers ever

18   seen the light of day, it would have had a disastrous effect

19   from the Terry standpoint and that is why we have, you know,

20   hundreds of hours being invested here and tens and tens of

21   thousands of dollars of attorney's fees.  I mean, you know, the

22   obvious question is why did they care.  You know, why is this

23   battle to the death over the attorney privilege – excuse me –

24   the accountant privilege over financial statements which have

25   been sent to anyone who shows any remote interest in investing

DeLong - Direct                              192

1    in Terry Manufacturing?

2          I think that the court can reasonably conclude - you

3    have to hear the testimony - that the reason for that was that

4    Richard Rose and maintaining this purported privilege was

5    critical to maintaining the facade of Terry Manufacturing, and

6    that will go directly to the issue of whether the transfers at

7    issue here were made with actual intent to hinder, delay or

8    defraud because, in point of fact, they did ensure the

9    creditors did not learn of the true state of affairs of Terry

10   Manufacturing.

11         THE COURT: Okay. Fine. That helps a little bit. We

12   are going into excruciating detail and, I mean, I think Mr.

13   Bridgers' objection is a good one. It is awful hard to follow

14   at times and, you know, I have kind of got the body language

15   here. I can see everything on the screen. I am a little bit

16   worried as to what kind of record we are making at this point.

17         MR. BARRIERE: Let me jump ahead, Your Honor.

18   BY MR. BARRIERE:

19   Q.     Let's turn to the hard papers so there is no concern

20   about what is on the record. I am looking at Exhibit 13,

21   DeLong 14400.

22   A.     144?

23   Q.     14400.

24   A.     Can you give me a hint where it is?

25   Q.     Sure. About two-thirds of the way through.

DeLong - Direct                    193

1    A.        I may have found it.

2    Q.        Do you have it?

3    A.        I think I may have it.  Yeah, here it is.

4              THE COURT: Okay. We are looking at a statement dated

5    November 19, 2002?

6              MR. BARRIERE: Correct.

7    Q.        This is a statement issued by  DeLong and Caldwell,

8    LLC, in the Terry Manufacturing matter, Commercial Factors,

9    sir?

10   A.        Yes.

11   Q.        All right.  Am I correct that every entry on that

12   statement is for work performed on an appellate brief – an

13   amicus brief concerning the District Court's ruling that Mr.

14   Rose would have to testify and produce the requested documents?

15   A.        Yes, it seems to be.

16   Q.        So in that month alone we have an investment of, what,

17   a hundred and forty-six hours?

18   A.        That's what it shows, yeah.  And the next thing over

19   is what I mentioned to you earlier.  When I sent this to

20   Rudolph, I sent him a note and said this is a lot of time for

21   a brief.  Let's you, Jerry and me discuss it within the next

22   few days.  I don't remember now what he paid me but it wasn't

23   anything like thirty-six thousand dollars and it certainly

24   wasn't anything like for a hundred and forty-six hours of time.

25   Q.        We probably won't reach an agreement on the number of

DeLong - Direct                                    194

1    hours and the amount of dollars, but would you at least agree

2    with me you spent an awful lot of time relating to the

3    accountant client?

4            MR. BRIDGERS: I object to vagueness.

5    A.      Well, this one invoice –

6            MR. BRIDGERS: I object to vagueness on the last

7    question, Your Honor.

8            THE COURT: Sustained.

9    Q.      All right.  This month alone, you spent a hundred and

10   fifty hours, approximately?

11   A.      Say it again.

12   Q.      This month alone you spent a hundred and forty-six

13   hours?

14   A.      Well, that is what the time record says, a hundred and

15   forty-six hours.

16   Q.      All right.  But just so I am clear, it is your

17   testimony that you never took the effort or never had the

18   opportunity to review the papers, the underlying work papers

19   that were requested by Commercial Factors?

20   A.      I am pretty confident that the only work product I

21   ever saw from Richard Rose was the financial statements that he

22   had prepared for a couple of years and, you know, whatever

23   notes were attached to that.  I don't think I ever saw work

24   papers and that sort of thing that he may have generated.

25   Q.      Okay.  I am going to ask you to look at Exhibit 16,

DeLong - Direct                                              195

1    sir.

2    A.        16?

3    Q.        Uh-huh.   These  are  the  restated  articles  of

4    incorporation  of  Terry  Manufacturing  Company.   Have  you

5    previously seen those?

6    A.        The  first  time  I  ever  saw  these  was  when  you

7    delivered them to me, to us.

8    Q.        Were  you  ever  asked  by  Roy  Terry  to  opine  as  to

9    whether  the  company  had  an  indemnity  obligation  for  Rudolph

10   Terry?

11   A.        No.  I was hired to deal with the Commercial Factors

12   litigation.  That was the only role that I had in the company.

13   I  wasn't  corporate  counsel.   I  wasn't  asked  to  do  anything

14   where  the  company  was  concerned  except  for  this  one  piece  of

15   litigation.

16   Q.        Did  you  ever  ask  Rudolph  Terry  whether  the  company

17   owed him some indemnity obligation?

18   A.        If I did, I can't remember it now.

19   Q.        Now, there did come a time, did there not, when you

20   ultimately asserted the defense that Rudolph Terry had acted

21   outside the scope of his employment?

22   A.        No.  There came a time when I asserted the defense

23   that, if Commercial Factors' claims that Rudolph Terry acted

24   outside the scope of his authority, that – I am sorry.  I get

25   myself all turned around.  There came a time when I asserted

DeLong - Direct                                    196

1    the defense that, if Rudolph did the things that Commercial

2    Factors was contending that he had done, that that was outside

3    the scope of his authority as an officer, director, employee,

4    whatever, of the company.

5    Q.        And you finally did that in June of 2003; is that

6    correct?

7    A.        That seems about right.

8    Q.        Okay.  What is it that prevented you from asserting

9    that defense prior to June of 2003, if anything?

10   A.        It would have been a very bad idea to do it.

11   Q.        And why is that?

12   A.        You don't file summary judgments or motions for

13   summary judgment until discovery has been completed.  The facts

14   that had come out, the evidence that Commercial Factors had

15   presented, just the bare fact that there were invoices that

16   Commercial Factors had purchased that were Terry Manufacturing

17   Company invoices, that were signed by Rudolph Terry, meant that

18   there were an awful lot of things going against the company.

19   And I had to develop a basis to go to the court and say to the

20   court, look, this is very likely a situation where Terry

21   Manufacturing has no involvement.

22           And so what I had to do is develop the theory very

23   carefully and, when it was too late for Commercial Factors to

24   come back and do the things that it might otherwise do to get

25   around it was the right time to file the motion.

DeLong - Direct                              197

1   Q.        What information did you develop concerning the scope

2   of his employment and Rudolph Terry's conduct that was not

3   available to you from Roy and Rudolph Terry?

4   A.        What did I – nothing concerning that.  What I was

5   intent on doing was pinning down the other side as to what it

6   had and where it was going with the case.  I knew what my

7   potential theory was and where I wanted to go with it.  It was

8   just a matter of determining when, in my view, was the most

9   appropriate time to assert it, and I did it when I thought it

10  was most appropriate.

11  Q.        Let me ask you to look at Exhibit 89, sir.

12  A.        Okay.

13  Q.        This is your Terry Manufacturing trial outline?

14  A.        There are a lot of trial outlines.  There are a lot

15  of theory development kinds of outlines.  There are a lot of

16  questions kind of outlines.  This says trial outline, so it was

17  somewhere in the process, yes.

18  Q.        This is a document you drafted?

19  A.        Probably.

20  Q.        Is there any way you can confirm that?  Isn't that

21  your handwriting on it?

22  A.        It has my handwriting on it.

23  Q.        Okay.  Page two, point thirteen, states, and I quote:

24            "During the period, Pouncey would periodically tell

25            Terry that he owed CFA money and would ask Terry to

DeLong - Direct                               198

1              advance the payment due for a few days.  Terry would

2              comply."

3      And then you have written:

4              "Is it believable that this practice went on for up to

5              three years without Terry knowing it was going on?

6              Eleven million dollars was passed during the period."

7              Do you see where I am reading from?

8      A.      Uh-huh.

9      Q.       Did you not find it incredible that anyone would

10     accept the notion that Roy Terry and Rudolph Terry was clueless

11     of what was going on when eleven million dollars passed through

12     his account?

13     A.      No.  This was a jury trial.  This was a trial that

14     was coming up before a jury, and what I was asking myself is

15     the kinds of things that a jury is going to ask itself.  And I

16     was saying is this – does it sound right.  Is it the kind of

17     thing that a jury would find acceptable?

18             MR. BARRIERE: Judge, I think I am close to done.  If

19     you want to give me about five minutes, I can confer and look

20     at exhibits.

21             THE COURT: That's fine.  We will take five minutes.

22             (Recess from 4:27 p.m. until 4:39 p.m.)

23     BY MR. BARRIERE:

24     Q.       All right, Mr. DeLong, just a few follow-ups.

25     Following the Chapter 11 case, you continued to – the filing of

DeLong - Direct                          199

1    the Chapter 11 case by Terry Manufacturing, you continued to

2    represent the Terrys personally; is that correct?

3    A.        The Terrys?

4    Q.        Yes, sir.

5    A.        Yeah, I guess.  In the Gwinnett County litigation,

6    once the bankruptcy had been filed, Brian Steel withdrew.  And

7    then Roy and Rudolph called me and asked me to do something

8    having to do with a couple of cases that were pending in

9    Randolph County.

10   Q.        And you also represented them in connection with this

11   Chapter 11 case; did you not?

12   A.        I don't think so.  I think I wrote a letter or

13   something but, no, I didn't really represent them.  You know,

14   I am not a bankruptcy lawyer.  I don't know anything about it.

15   I think the bankruptcy lawyer was Von Memory; is that right?

16   Q.        But you did send correspondence on behalf of the

17   Terrys asserting that they had interest in certain property and

18   you wished to protect their interest?

19   A.        Yes, I did that.

20   Q.        Fair enough.  Sir, you handled this case from early

21   January 2000 until sometime in mid July 2003.  Was this your

22   largest and most lucrative engagement during that time frame?

23   A.        It was my largest engagement during that time frame.

24   I wouldn't say it was my - well, yeah, I guess I would have to

25   say it was my most lucrative because it took up so much time it

DeLong - Direct                    200

1    prevented me from doing better quality work.

2    Q.        Well, you billed this client four hundred and

3    seventy-five thousand dollars during that three-year period.

4    Did you bill any other client that amount, or more?

5    A.        No, but about – well, let's see.  I think it worked

6    out to be thirty-six percent of that was Jerry Thomas' money.

7    So what I ended up doing is spending dramatically more time

8    than I ever had intended to spend on a case that I was able to

9    recover significantly less than my normal hourly rate and so,

10   consequently, I took what was a bad deal for myself and made it

11   a worse deal for myself.

12            MR. BARRIERE: Your Honor, I pass the witness.

13            THE COURT: Mr. Bridgers, remember we had – what are

14   your –

15            MR. BRIDGERS: I do remember our conversation, Your

16   Honor, and we will reserve our direct until our case-in-chief.

17            THE COURT: Okay.  Very good.  Then you may step down.

18            THE WITNESS: Thank you, Your Honor.

19            MR. BARRIERE: Do you want another witness, Your Honor,

20   or do you want to call it a day?

21            THE COURT: No, I would just as soon start one more.

22   I thought we would work until five.

23            MR. BARRIERE: Your Honor, the trustee calls the

24   trustee, Lester Alexander.

25            THE COURT: All right.

Alexander - Direct                        201

1       (JULIAN LESTER ALEXANDER, III, WITNESS, SWORN)

2                      DIRECT EXAMINATION

3    BY MR. BARRIERE:

4    Q.        Mr. Alexander, would you state your name and address

5    for the record, sir?

6    A.        Julian Lester Alexander, III, and I am at number two,

7    Twentieth Street, North, Suite 1400, Birmingham, Alabama.

8    Q.        And by whom are you employed, sir?

9    A.        County Economics Appraisal Group, or AEA Group.

10   Q.        Are you a member or a partner of AEA?

11   A.        I am a member, yes.

12   Q.        Were you appointed trustee in this case in early July

13   2003?

14   A.        I was.

15   Q.        Prior to your engagement as trustee, had you been

16   engaged in any investigatory activities pertaining to Terry

17   Manufacturing?

18   A.        Yes.

19   Q.        And could you describe those for the court?

20   A.        I was contacted by an individual named Wayne

21   Durlacker, who was with SouthTrust Bank, Workout Group.  They

22   had some concerns about whether a reported misstatement in the

23   Terry's financial statements was a misappropriation of assets

24   or just a financial statement misstatement.

25   Q.        Okay.  Were you engaged by SouthTrust to go forward?

Alexander - Direct                                    202

1   A.          Yes. My firm was engaged by SouthTrust.  We went on-

2   site for a day and then we withdrew and they started looking at

3   other avenues.

4   Q.          Why did you withdraw after that single day?

5   A.          Well, I sent a team on site and we go in with a

6   standard list of documents that we need.  In this case, we were

7   looking for the general ledger, the accounts receivable

8   listings, inventory listings, and when my team showed up and

9   began asking for documents, the individual they were dealing

10  with, Sidney Lavender, told them he was going to take the

11  Fifth.

12  Q.          I am sorry.  Mr. Johnson, Sidney Johnson said that?

13  A.          Yes.

14  Q.          Take the Fifth, all right.  Now subsequent to that

15  aborted one-day effort at auditing or investigating Terry

16  Manufacturing, you were appointed trustee; is that correct?

17  A.          Yes.

18  Q.          All right.  At the time you were appointed as

19  trustee, what did you do to attempt to secure the books and

20  records of Terry Manufacturing at its facility in Roanoke?

21  A.          I can't remember the exact day.  I believe it was a

22  Friday.  It may have been the eleventh.  We came to Roanoke and

23  to the Atlanta facility on a surprise basis to take control.

24  There was some concern – we had heard rumors that things were

25  being hauled off in trucks.

Alexander - Direct                    203

1        MR. BRIDGERS:  Objection, Your Honor.  Hearsay.

2        THE COURT: Overruled.

3    A.        Being hauled out on trucks.  So we arrive, and myself

4    and a team took control over Terry Manufacturing in Roanoke.

5    However, in Atlanta, we were not allowed to enter the property.

6    So it was several days later we were able to take over the

7    Atlanta location.

8    Q.        Let's focus on Roanoke initially.  What was the

9    physical condition of the facility at the time you arrived?

10   A.        Well, the administrative offices and the accounting

11   offices were in complete disarray.  It looked like someone had

12   gone into every office a number of months back and just

13   ransacked all of the files and then continued to work there on

14   top of the ransacked files.  So there were documents on the

15   floor; there were documents piled on desks; and virtually every

16   office was that way.

17   Q.        What, if anything, did you do to attempt to secure the

18   documents that were there at the time you arrived?

19   A.        Well, we took control of the property.  I was ordered

20   by Judge Williams to allow the property – the company to

21   continue to operate for a week.  So we stayed on-site during

22   that time and began sifting through the piles of documents,

23   looking for records of ownership and title and also looking for

24   the financial records that we originally went in looking for,

25   the general ledger and receivables listing and those types of

Alexander - Direct                                              204

1   things.

2   Q.       Did you find a general ledger?

3   A.       No.

4   Q.       Have you ever found a general ledger?

5   A.       No.

6   Q.       Have you ever found a receivables listing?

7   A.       Not for the government contract work, only for the

8   McDonald's work.

9   Q.       Can you describe for me what types of documents, what

10  categories of documents were you able to obtain and secure?

11  A.       Well, with the McDonald's line of business, they

12  forced a software program on them which would prepare inventory

13  and accounts receivable listing, so we found those records.

14          We found an out-of-date manual, accounts payable

15  ledger from the 70s era and then, other than that, we just

16  found the underlying base records like invoices, you know, the

17  stuff you would actually prepare your books and records from,

18  but no books and records, no subsidiary records, no fixed asset

19  listings, no government inventory listings, no government

20  accounts receivable listings, no bank reconciliations, and so

21  forth and so on.

22  Q.       All right.  Did you find tax returns?

23  A.       Yes, I did.

24  Q.       Did you find multiple sets of tax returns?

25  A.       Yes, I did.

Alexander - Direct                                    205

1    Q.      Did you find multiple sets of tax returns for the same

2    year?

3    A.      Yes, I did.

4    Q.      Were you able to ascertain – strike that.  Based upon

5    your investigation, to determine whether one set had been filed

6    with the IRS and the other set used for some other purpose?

7    A.      Yes, we were able to determine that one set – we had

8    two returns for each year.   One set was filed with the

9    government and the other set was not.

10   Q.      All right.  Did it appear during the course of your

11   attempt to take control of the Roanoke facility that certain

12   documents had been removed?

13   A.      Yes.

14   Q.      What sorts of documents?

15   A.      Well, when I toured the facility that first day,

16   Sidney Johnson did take me through and showed me where records

17   were supposed to be and what the piles of paper were and he

18   referred me to some boxes that used to have computers in them,

19   and he told me those computers had been taken off-site.

20   Q.      Okay.  Did you find notes of Roy Terry?

21   A.      I found a lot of notes of Roy Terry, yes.

22   Q.      Could you describe those for the court?

23   A.      Throughout the offices, Roy Terry maintained several

24   offices, a conference room that he kept as an office, his own

25   office that he was working in the day I arrived, and there were

Alexander - Direct                    206

1    other places where he would work and, in those locations, were

2    stacks of mainly yellow pads that had very detailed notes,

3    almost like diaries and then, in addition to the yellow pads,

4    there were these loose note papers like the memo that is up on

5    the screen where he would take extremely detailed notes about

6    the business activities of the company.

7    Q.      Was this in the nature of sort of a looseleaf journal

8    of his day-to-day activity?

9    A.      It read very much like a personal journal, yes.

10   Q.      Mr. Alexander, are you a certified public accountant?

11   A.      I am.

12   Q.      Are you a certified fraud examiner?

13   A.      Yes, I am.

14   Q.      You are certified in both categories in the state of

15   Alabama?

16   A.      Yes.  Well, the CPA, you are certified by state; and

17   then the certified fraud examiner is a national certification.

18   Q.      All right.  You have previously been accepted by this

19   court as both a CPA and a certified fraud examiner?

20   A.      Yes.

21   Q.      And have testified with respect to your analysis of

22   Terry Manufacturing's records?

23   A.      Yes, I have, yes.

24          MR. BARRIERE:  Your Honor, I am unclear, frankly, to

25   the degree to which Mr. Alexander is going to be testifying as

Alexander - Direct                                    207

1    an expert and as a fact witness.  I would go ahead and tender

2    him to the extent I am going to be extracting expert opinions

3    from him during the course of his testimony.

4              THE COURT: Okay.  I understand.  Let's just wait and

5    then, Mr. Bridgers, if you have an objection to a specific

6    opinion or a specific piece of evidence, you can make it then.

7              MR. BRIDGERS: Thank you, Your Honor.

8    BY MR. BARRIERE:

9    Q.        Mr. Alexander, at the time you first became involved

10   in this project, did you uncover what appeared to be, to you,

11   to be evidence of financial statement fraud?

12   A.        Yes.

13   Q.        Did you make a report to the court, to this court,

14   with respect to your findings?

15   A.        Yes, to Judge Williams' court, yes.

16   Q.        All right.  We have put up on the screen excerpts from

17   the report you initially tendered to the court, which are in

18   the record.  Can you describe for the court what is before you?

19   A.        It is one of the documents that represents the type of

20   support that we found –

21             MR. BRIDGERS:  Your Honor, I have come to understand

22   – I need to check something – I have come to understand that

23   this has not been identified in the pretrial disclosures of the

24   trustee.

25             MS. LASKY: That's incorrect.

```
                        Alexander - Direct                208
```

1          MR. BRIDGERS: I'm trying to find out where it came –

2          THE COURT: What are we referring to right now?

3          MR. BRIDGERS: I am looking at 143 and 144.

4          THE COURT: 143 and 144.

5          MR. BRIDGERS: Your Honor, perhaps I am wrong but I

6     figured I would check before we got too much further.

7          MR. BARRIERE: I can put a hard copy before Your Honor.

8          THE COURT: I think I have got it right here.

9          MS. LASKY: No, they are not in the binder.

10          THE COURT: 143 and 144.

11          MR. BRIDGERS: These are materials that were put into

12     the bankruptcy court record.  They are on your list as 143 –

13          MS. LASKY: No, they're not on the list as 143 of the

14     trial  exhibits,  but  they  were  listed  in  the  pretrial

15     disclosures as various handwritten notes of Roy Terry and they

16     were  part  of  the  141  boxes  available  for  review  at  the

17     trustee's office.

18          MR. BARRIERE: More importantly, this is an excerpt

19     from a report filed with this court as part of the record in

20     July of '03.

21          THE WITNESS: It was July or August of '03, yes.  And,

22     again, another report filed in October that referred to this

23     information.

24          MR. BRIDGERS: Your Honor, assuming, of course, that

25     these are somewhere in the 144 boxes of information of the

Alexander - Direct                    209

1    trustee, that was not nearly specific enough to put us on

2    notice.  I would just object to these records, these exhibits,

3    because they were not listed with enough specificity to

4    understand.

5            THE COURT: Okay.  Bill, can you hand me the documents?

6    Okay.  So these are notes of Mr. Terry and, Mr. Barriere, tell

7    me again where they are on your list of exhibits.

8            MR. BARRIERE: The second disclosure – I don't have –

9            MS. LASKY: Do you have access to Pacer, Your Honor?

10           THE COURT: Yes.

11           MS. LASKY: Okay.  I think it is the second one that we

12   filed.  It says various handwritten notes of Roy Terry, I

13   believe is how we phrased it.

14           THE COURT: Okay.  I see.  Identification of certain

15   handwritten notes of Roy Terry and Rudolph Terry retrieved from

16   Terry Manufacturing offices.  Okay.  We have got notes dated

17   March 29, '01, March 31, '02 and, Mr. Bridgers, I take it – I'm

18   sorry.  Go ahead.

19           MR. BRIDGERS: Pardon me.  I didn't mean to interrupt,

20   Your Honor.  My objection is simply the listing was not with

21   enough specificity.  They were certainly not provided in the

22   documents that the trustee sent us this past weekend, nor were

23   given to us earlier.  They were obviously intended, having them

24   on PowerPoint, to be used.  They were not provided and I would

25   object on that extent, Your Honor.

Alexander - Direct                    210

1      THE COURT: Okay.  Mr. Barriere.

2      MR. BARRIERE: Well, I have to say, Your Honor, I find

3  this  rather  extraordinary.   We  have  provided  repetitive

4  communications to these attorneys over the last few weeks with

5  precious  little  response.   The  detail  with  which  we  have

6  produced the documents, I think contrasts rather dramatically

7  with what we have received in response.

8      If Mr. Bridgers needs time to review these in advance

9  of  cross-examining  Mr. Alexander,  I  am  more  than  happy  to

10  provide it.  Indeed, will have an evening.  I think these are

11  going to be offered for the very limited purpose of setting the

12  background to the trustee's investigation of what cannot be a

13  matter  of  serious  dispute  here,  which  is  the  financial

14  statements of Terry Manufacturing were fraudulent.  Roy Terry

15  has confessed to that, pled guilty.

16      THE COURT: No, I understand that.  I guess what I'm

17  getting to is – I mean, at some point during your pretrial

18  preparation, I take it you sent them a stack of documents

19  saying these are my exhibits.  Were those in –

20      MR. BARRIERE: We sent them the list and I called Mr.

21  Bridgers on Friday and said do you want me to send you your

22  binders ahead of time so you could have the weekend to digest

23  them.  He didn't call me back.  Katie finally called him late

24  in the afternoon.  At that juncture, yes, we do want them.  We

25  sent them overnight, what was in the binders at that time.

Alexander - Direct                211

1        THE COURT: But these weren't in the binders?

2        MR. BARRIERE: They were not in the binders.

3        THE COURT: Okay.  Here is what I'm going to do, I

4   guess.  We will mark them for identification purposes.  I am

5   going to sustain the objection and, for what it is worth, what

6   is sauce for the goose is sauce for the gander as far as

7   specificity on exhibits.

8        MR. BARRIERE: Understood, Your Honor.

9   BY MR. BARRIERE:

10  Q.      Mr. Alexander, let me come at it this way.  Did you,

11  in the connection with your examination initially, as trustee,

12  find indicia of financial statement fraud?

13  A.      Yes.

14  Q.      Can you describe that for the court, please?

15  A.      Well, one of the first things we ran across was, of

16  course, the missing, underlying subsidiary ledgers and general

17  ledger that you would use to prepare a financial statement.  So

18  we couldn't find that information.  So we began looking for the

19  documents that would have been used to generate the financial

20  statements, and that is what led us to the handwritten notes.

21  Q.      All right.  Did you find what appeared to be financial

22  statements where literally there had been a cut-out of Mr.

23  Rose's signature placed on a financial statement prepared by

24  somebody at Terry Manufacturing?

25  A.      Yes, we found what I call a cut and paste mockup of a

Alexander - Direct                    212

1    draft financial statement and it was done the way I was taught

2    to do it when I was a staff accountant where they would make

3    copies and then cut out things and then tape them in. And then

4    they went a step further.  They cut Mr. Rose's signature,

5    someone taped it on the typed-up opinion and then photocopied

6    it, and that file was all arranged in reverse chronological

7    order so you could see step-by-step how they prepared the

8    audited opinion for one set of financial statements.

9    Q.      Okay.  What about appraisals?  Did you find any

10   indication that persons at Terry Manufacturing had generated

11   their own appraisals of furniture, fixtures and equipment?

12   A.      Yes, we found the same type of file for appraisals

13   where they had taken other documents and cut and paste them and

14   basically manufactured equipment appraisals.  We found similar

15   information for manufacturing invoices for supposed equipment

16   purchases.

17   Q.      You indicated that you had found two sets of income

18   tax returns.  Were you able to ascertain whether a set perhaps

19   showing more profitable operations had been distributed outside

20   of Terry Manufacturing?

21   A.      Yes, the set that shows profits and basically

22   reconciled to the supposed audited financial statements is my

23   understanding was distributed outside of the company.

24   Q.      Okay.  Now you indicated that you had found this

25   series of notes, extensive series of notes by Roy Terry.  What

Alexander - Direct                                213

1    did you do with those notes?

2    A.      Well, we read through them because it was essentially

3    a roadmap of what had been going on at Terry Manufacturing over

4    the years and I collected them, the ones that are relevant to

5    what I am doing as trustee, and brought them back to my

6    offices.

7    Q.      All right.  Have you maintained possession of those at

8    all times since you became Chapter 11 trustee in July of 2003?

9    A.      Yes.  Well, except when the Justice Department took

10   them and we maintained copies.  They took some of them.

11   Q.      Approximately how many boxes of documents did you

12   secure from the Roanoke facility?

13   A.      There are several sets but one set alone is just raw

14   documents.  It is over 140 boxes, the last time I counted, and

15   then there are other cutouts of documents.  Like there is the

16   reconstruction, where we reconstructed their accounting

17   records, and that is like about nine or ten boxes in addition

18   to the 140.

19   Q.      Okay.  Now you told us that you initially went to the

20   Roanoke facility.  Did you also go to the Atlanta facility?

21   A.      Yes, I did.

22   Q.      All right.  What did you find to be the condition

23   there?

24   A.      A similar condition.  It didn't appear to have as many

25   people occupying the offices, so some of the offices weren't

Alexander - Direct                          214

1    ransacked, is my word.   They weren't ransacked.   But the

2    offices that the people appeared to be working in were

3    ransacked, documents piled all over the desk, on the floor,

4    some things in filing cabinets but mainly just kind of laying

5    around.

6    Q.      Were you able to ascertain what business had actually

7    been conducted at the Atlanta facility?

8    A.      Yes.   I don't know if it is an opinion or not but,

9    yes, I have an opinion about what business was conducted there.

10   Q.      Could you share that with us, please?

11   A.      The facility in Atlanta was largely just a facade.

12   The main business activity – it is a huge warehouse and there

13   were a lot of boxes of stuff in it, but the actual

14   manufacturing capability was the embroidery operation that had

15   been moved from Roanoke to Atlanta.   So the biggest business

16   they were in was simply shipping things from one Terry location

17   to another and then back again.

18           Their outside business mainly was just printing T-

19   shirts was the main business and they held themselves out to be

20   in the licensed apparel goods, but we didn't really see much

21   evidence of that, other than things hanging on racks.

22   Q.      Did you see any indication of any meaningful sales of

23   T-shirts out of the Atlanta facility?

24   A.      Nothing that could be meaningful, no.   It was a T-

25   shirt shop.

Alexander - Direct                              215

1    Q.      Okay.  Did you find in the Atlanta facility any

2    documents that appeared to pertain to the Commercial Factors

3    litigation?

4    A.      Yes, I did.

5    Q.      All right.  Could you describe those for the court?

6    A.      When I came to the facility, I went to Rudolph Terry's

7    office and, like I said before, there were piles and piles of

8    paper and then, right on top of the paper, there appeared to be

9    some pleadings that he had been working on possibly just before

10   we arrived.  There were some markups of some pleadings and

11   under that was a Commercial Factors file.

12   Q.      Okay.  Now, returning to the Roanoke facility for a

13   moment, were there certain documents that you chose not to

14   transport with you to Birmingham?

15   A.      Yes.

16   Q.      And what did you leave behind in Roanoke?

17   A.      We left behind mainly the older files, files older

18   than four years old and there was employment files.  I'm trying

19   to think what else.  And then a large volume of sales invoices

20   for the McDonald's business.

21   Q.      All right.  Did you secure and take to Roanoke any and

22   all of the Roy Terry notes?

23   A.      Take to Birmingham, you mean?

24   Q.      Yes.

25   A.      Yes.

```
                      Alexander - Direct                    216
 1    Q.        Did you secure and take with you to your Birmingham
 2    facility any documents that appeared to relate to financial
 3    accounting in any form?
 4    A.        Yes.
 5    Q.        Accurate or not?
 6    A.        Yes, we did.
 7    Q.        All right.
 8    A.        For the four-year period, yes.
 9    Q.        Did you take all correspondence you could find from
10    outside vendors?
11    A.        Yes, we did.
12    Q.        Did you take any correspondence you could find from
13    outside counsel?
14    A.        Yes.
15    Q.        And you secured all of that in Birmingham?
16    A.        Yes, we did.
17    Q.        And have you personally, or persons under your
18    direction and control, reviewed all of those documents since
19    you were engaged initially in July of 2003?
20    A.        Yes.
21    Q.        All right.  Sir, have you found among those 140 boxes
22    any documents whatsoever pertaining to Commercial Factors?
23    A.        Other than what I retrieved from Rudolph's desk?
24    Q.        I'm talking about in Roanoke, now, what you brought
25    out from Roanoke.
```

Alexander - Direct                    217

1   A.        Oh, in Roanoke.

2   Q.        Did you find a single document pertaining to

3   Commercial Factors?

4   A.        No, no formal documents.  I am just thinking about the

5   notes.  There may have been a few entries, maybe three entries,

6   agenda items, in the volumes and volumes of handwritten notes.

7   Q.        When you say agenda items, what do you mean?

8   A.        Well, sometimes these notes would be an agenda of a

9   meeting and it appears to be subjects, like monthly sales with

10  Terry Uniform and McDonald's, meetings with bankers, and then

11  it would say Atlanta litigation.  There could be other

12  litigation but, you know, being conservative, it also could be

13  Commercial Factors, and I think there are about three, at most

14  four, entries like that.  Nothing specific, nothing detailed at

15  all.

16  Q.        All right.  Having reviewed Mr. Terry's extensive

17  notes, what observations can you offer the court with respect

18  to how he would memorialize telephone conversations with

19  persons outside of Terry Manufacturing?

20  A.        Roy Terry, at least his practice that I observed from

21  reading his notes, he would take incredibly detailed notes,

22  even down to color coding what someone said in one color, what

23  he was thinking as they said it in another color, what he was

24  going to tell them in another color, and then what he did tell

25  them in another.  So he had all of this color-coded stuff.  He

Alexander - Direct                                    218

1    was an amazing note taker or is an amazing note taker.

2    Q.      I want you to think carefully through those hundreds

3    of pages of notes.  Is there any reference in any of those

4    notes to any conversation with Earnest DeLong?

5    A.      No.

6    Q.      Is there any conversation in any way referencing of

7    the specifics, of the substance of the lawsuit filed by

8    Commercial Factors?

9    A.      No.

10   Q.      Any discussion concerning Rudolph Terry engaged in a

11   factoring fraud scheme?

12   A.      No.

13   Q.      Any discussion concerning Rudolph Terry's testimony in

14   the Commercial Factors litigation?

15   A.      No.

16   Q.      Any reference to any discussion concerning a potential

17   or actual conflict of interest between Terry Manufacturing and

18   Rudolph Terry?

19   A.      No.

20   Q.      Any suggestion whatsoever that another counsel should

21   be consulted as to whether Mr. DeLong could represent both

22   Terry Manufacturing and Rudolph Terry?

23   A.      No.

24   Q.      Is there any reference you could find anywhere in

25   those notes which he was in any way discussing any substantive

Alexander - Direct                    219

1    issue with regard to either Mr. DeLong's engagement or the

2    Commercial Factors litigation?

3    A.      When Rudolph was indicted, which was sometime in

4    February of 2003, there is a journal entry that discusses – it

5    doesn't discuss Mr. DeLong or Commercial Factors; it discusses

6    the indictment and it has been a long time since I have seen

7    that, Mr. Barriere, but that is the only written thing I recall

8    in Roanoke, but it is about the indictment.

9    Q.      Okay.  Fair enough.  Now you heard Mr. DeLong's

10   testimony earlier today, I take it?

11   A.      Yes.

12   Q.      And you heard his reference to several conversations

13   with Roy Terry concerning this potential or actual conflict;

14   did you not?

15   A.      I did.

16   Q.      Did you see any reference to those conversations

17   anywhere in these notes?

18   A.      No.

19   Q.      All right.  Did you see any reference to the fact even

20   that Rudolph Terry had been named as a defendant in the

21   Commercial Factors litigation?

22   A.      No.

23   Q.      All right.  So basically there is just nothing in

24   these notes at all about this case; is that correct?

25   A.      Not until the indictment, that is correct.

1      THE COURT: All right.  Since we are at a stopping

2   point or you are changing topics, so why don't we break right

3   here for a minute.  There are a couple of things I want to talk

4   about before I let everybody go.

5      Getting back to this big stack of documents, Mr.

6   Bridgers, Mr. DeLong, my thoughts are that, regardless of what

7   Mr. Barriere objects or doesn't object to or hasn't objected

8   to, I am not going to read fifteen boxes of stuff.  I think

9   rule 403 of the Federal Rules of Evidence allows me a little

10  bit of latitude to keep relevant evidence out if it is either

11  cumulative or a waste of time, and I am not going to spend the

12  several weeks it would take to do that.

13     What I will do is I will look at a reasonable amount

14  of stuff and, at some point before we break for the trial, I

15  want you to winnow that down to what you think is a reasonable

16  amount of stuff.  I mean, if I was just forced to go in and

17  look at all of that stuff, probably what I would do is I would

18  start with the pleadings, you know, any substantial motions,

19  and any orders on those motions.  That would be a place to

20  start.  I would try to separate out discovery files and

21  probably throw out or weed out huge piles of stuff that don't

22  seem to have any relevance to what we are doing.

23     I am thinking you could probably do a better job than

24  I would at doing that.  You don't have to do it right now but

25  at some point before you head out of here, I would like for you

221

1    to make that identification for me, and then I will look at

2    what you think is most relevant.

3         Point number two is we have got a small trial

4    scheduled for Thursday that I think is a half a day or less.

5    What I am thinking is we will reset it to Friday.  I mean, I am

6    taking we probably won't finish tomorrow, but what is

7    everybody's thought as to how we are going?  I don't know if

8    anybody has a feel yet.

9         MR. BARRIERE: I think we will close before the lunch

10   hour tomorrow.  Well, it turns really on what Mr. Bridgers

11   decides to do with respect to when Mr. DeLong is heard.

12        THE COURT: No, I understand that.

13        MR. BARRIERE: But if it is simply my concluding with

14   Mr. Alexander, then calling Mr. Beltran, I would assume we are

15   finishing around the lunch hour or shortly thereafter.

16        THE COURT: Okay.  Not to pin you down at this point

17   because you have not heard the plaintiff's whole case, but for

18   your case, is a day to a day and a half a reasonable period,

19   you think?

20        MR. BRIDGERS: Very much so.  I think, even with cross-

21   examination, from what I have understood of the testimony, we

22   should get through by around lunch tomorrow in the plaintiff's

23   case.  Running through some of our witnesses, I think it is

24   very doable to get finished.  That is what we certainly aim

25   towards.  We will get into Thursday, for sure.  It is very

222

1    doable to get finished on Thursday.

2          One of the things that we are going to try to do is

3    our expert, Dr. Ross over at the law school in Birmingham, we

4    are going to try to schedule him a little bit so he misses the

5    least amount of class, basically.

6          THE COURT: Okay.  All right.  Then we will shoot to

7    wrap up by close of business Thursday then.

8          MR. BARRIERE: I am assuming – Mr. Caldwell had been

9    listed by you as a "may call" witness.  I assume the fact that

10   he is sitting in the courtroom represents that he is not going

11   to be called; is that correct?

12         MR. BRIDGERS: No, he is here as a – he will probably

13   be called, yes. He is a corporate representative of DeLong and

14   Caldwell.

15         MR. BARRIERE: Okay.

16         MR. BRIDGERS: Your Honor, if I could maybe go back to

17   your first thing about the file here.  What we have tried to do

18   in some of the documents we have provided you is give you some

19   of the more concentrated ones.  We will certainly try to winnow

20   those out.  With the court's indulgence, what we may do, until

21   Mr. DeLong is on the stand, to kind of say this is what is

22   here, this is what is here, this is what is here.  Perhaps not

23   – obviously not admitted after the court's ruling but more in

24   the terms of a proffer, in terms of at least what we are

25   looking at, if we need to take a look at it on the record.

223

1          THE COURT: Well, no, that's fine.  I am thinking that

2     – it sounds like Mr. Barriere doesn't really care what comes

3     in, you know, subject to him looking at it; but what I am

4     thinking is I am just reluctant to allow a huge stack of

5     documents in, knowing that I am not going to look at them.  And

6     I think the more fair thing to everybody is, you know, to

7     winnow it down.  You see, if you just throw all of those

8     documents at me, you don't know what I am going to look at;

9     whereas, at this point, if I give you the shot to – I mean, I

10    want to make it reasonable.  If you think you need a box and a

11    half of stuff, if you have a good reason, I will look at that,

12    but I want to winnow it down quite a bit as to what you think

13    is most pertinent to your case.  Obviously you have a better

14    idea of where you are going with your case than I do.

15          MR. BRIDGERS: We will certainly work on that and get

16    that done for you.

17          MR. BARRIERE: Your Honor, if I may, I don't mean to

18    drag this out.  I guess I am losing the thread a bit.  As I

19    appreciated, there was no sort of intrinsic value to the vast

20    majority of this.  This was, in effect, a demonstrative of

21    value.  We must have provided a good value because we generated

22    15 boxes and 47,000 pages.

23          If that is indeed what I understand to be the purpose

24    of this exercise, I'm not sure that just producing a small

25    portion of that is particularly relevant.  I am wondering

224

1    whether the simplest way to do it is simply to have a proposed

2    stipulation that, in connection with the engagement, the DeLong

3    defendants generated "x."   Is that why we are going through

4    this exercise?

5              THE COURT: But I think they are going – no, I think

6    they are going further than that.  I think they are saying that

7    Terry Manufacturing paid this four hundred some thousand

8    dollars in fees and there was value to Terry Manufacturing and

9    not just value to Rudolph Terry, the individual, and –

10             MR. BARRIERE: I understand – I am sorry – I didn't

11   mean to interrupt you.  I understand, but I did not appreciate

12   that there was an attempt to extract discrete documents to say,

13   aha, this is evidence of the particular value to Terry

14   Manufacturing.  I thought the exercise was simply this is, if

15   you will, the most compelling visual demonstration of value.

16   And, if that is the case, rather than trying to find discrete

17   pieces of paper, I suspect we could simply enter a stipulation

18   as to the volume.

19             THE COURT: I am all in favor of the stipulation if you

20   can do it but, to me, this seems like this is a fundamental,

21   factual dispute as to whether or not this work did or did not

22   benefit Terry Manufacturing.  So I'm not expecting – I mean, if

23   you stipulate to that, then it seems to me the case goes away

24   one way or the other.

25             MR. BARRIERE: Well, that won't be stipulated to.  I

225

1    was simply trying to get past the volumetric issue, if you

2    will.

3            MR. BRIDGERS: Is the trustee going to agree, or

4    stipulate, or contest that the work that Mr. DeLong billed for

5    was actually done?  I understand the value not to the Terry's

6    but the work that Mr. DeLong billed for over the three odd

7    years was actually done?  It seems to me that would be a

8    fundamental issue.

9            THE COURT: All right.  Why don't you two talk about

10   that.  Maybe you can agree on that.  What I had taken was the

11   key factual issue was whether or not this benefitted Terry

12   Manufacturing or not.  Like I said, if you can agree on that,

13   fine.  I am not holding out a lot of hope that you are going to

14   agree on that.

15           MR. BRIDGERS: Probably not.

16           MR. BARRIERE: We are not going to get there.  I

17   thought it was on a slightly different topic and perhaps Mr.

18   Bridgers and I can work on that in the court's absence.

19           THE COURT: But failing that, all I am asking from them

20   is a little bit of help in what they think is the most – the

21   documents that most help their case.

22           Well, gentlemen, we will see everybody at 9 a.m., and

23   we will be here.

24           (Off the record at 5:17 p.m.)

226

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date:  March 5, 2007