# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF ALABAMA

In Re

TERRY MANUFACTURING            In re Case No. 03-32063-WRS
COMPANY, INC.,                  Chapter 7

         Debtor.

J. LESTER ALEXANDER, III,         Adv. Pro. No. 04-3135-WRS
TRUSTEE,

         Plaintiff,

v.

DELONG, CALDWELL, NOVOTNY &
BRIDGERS, LLC; DELONG,
CALDWELL, LOGUE & WISEBRAM;
DELONG & CALDWELL, LLC; and
EARNEST H. DELONG, JR.,

         Defendants.

## DEFENDANT'S DESIGNATION OF CONTENTS FOR INCLUSION IN RECORD ON APPEAL AND STATEMENT OF ISSUES ON APPEAL

The defendants herein pursuant to Bankruptcy Rule 8006, file this Designation of Contents for Inclusion in the Record on Appeal and Statement of Issues on Appeal:

***The following shall be included in the record on appeal:***

     1.      Plaintiff's Complaint, dated 12/08/2004; (AP Docket #1)

1

2.    Motion to Transfer Venue, dated 1/10/05; (Docket #6)

3.    Memorandum of Law in Support of Motion to Transfer Venue, dated 01/10/05; (Docket #7)

4.    Defendant's Answer, dated 01/10/05; (Docket #8)

5.    Response to Defendant's Motion to Transfer Venue, dated 01/25/05; (Doc #11)

6.    Memorandum Decision, dated 02/08/05; (Docket #13)

7.    Order on Motion to Transfer Venue, dated 02/08/05; (Docket #14)

8.    Motion for Leave to File Amended Complaint, dated 03/07/05; (Docket #23)

9.    Order Granting Motion to Amend Complaint, dated 03/14/05; (Docket #24)

10.   Amended Order on Plaintiff's Motion to Amend Complaint, dated 03/18/05; (Docket # 28)

11.   Objection to Motion for Leave to File First Amended and Restated Complaint, dated 03/25/05; (Docket #30)

12.   Brief, dated 03/25/05; (Docket #31)

13.   Reply to Objection to Trustee's Motion for Leave to File First Amended and Supplemental Complaint, dated 04/11/05; (Docket #32)

14.   Memorandum Decision, dated 04/14/05; (Docket #33)

15.   Order on Motion for Leave to File First Amended and Supplemental Complaint, dated 04/14/05; (Docket #34)

16.    Motion to Dismiss Case or in the Alternative Transfer Venue or Abstain on State Law Claims, dated 05/16/05;  (Docket #42)

17.    Supporting Brief and Memorandum of Law of Joint Motion to Dismiss, dated 05/16/05;  (Docket #43)

18.    Amended Complaint, dated 05/27/05;  (Docket #161)

19.    Trustee's Objections to Motion to Dismiss, dated 06/15/05;  (Docket #52)

20.    Response to Trustee's Opposition to Motion to Dismiss, Transfer Venue or Abstain, dated 06/30/05;  (Docket #57)

21.    Memorandum Decision; dated 07/25/05;  (Docket #76)

22.    Order Denying Motion to Transfer, dated 07/25/05;  (Docket #77)

23.    Order Granting Motion to Amend Complaint, dated 07/25/05;  (Docket #78)

24.    Defendants' Answer to the Second Amended and Restated Complaint, dated 08/04/05;  (Docket #82)

25.    Memorandum Decision/Opinion, dated 05/29/07;  (Docket #201)

26.    Judgment, dated 05/29/07;  (Docket #202)

27.    Defendant's Notice of Appeal, dated 06/08/07;

28.    This Designation of Contents and Statement of Issues, dated 06/22/07;

29.    Trial Transcript.

***Statement of Issues:***

1.    Whether the payments which Terry Manufacturing Company made to Earnest H. DeLong were fraudulent conveyances or fraudulent transfers

pursuant to O.C.G.A. § 2-2-22 or O.C.G.A.§2-2-70 to 2-2-80;

2. Whether the payments Terry Manufacturing Company made to Mr. DeLong were fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B);

3. Whether Mr. DeLong received the payments made by Terry Manufacturing in good faith and for reasonably equivalent value;

4. Whether, if Mr. DeLong is liable to the Trustee for any amounts of payments he received from Terry Manufacturing Company, he served as a mere conduit for those portions of the payments which were made to Terry Manufacturing Company's co-Counsel, Jerry Thomas, Esq. for work Mr. Thomas performed in the defense of the Company, for which payments Mr. DeLong should not be held liable;

5. Whether the Court improperly denied Defendant's Motion to Transfer Venue.

6. Whether the Court improperly denied Defendant's Motion to Dismiss the Complaint.

Submitted this 22nd day of June, 2007.

s/ Charles R. Bridgers
Earnest H. DeLong, Jr.
Georgia Bar No. 217300
Michael A. Caldwell
Georgia Bar No. 102775
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Defendants*

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150
404/979-3170 Facsimile

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF ALABAMA**

In Re

TERRY MANUFACTURING                    In re Case No. 03-32063-WRS
COMPANY, INC.,                         Chapter 7

         Debtor.


J. LESTER ALEXANDER, III,              Adv. Pro. No. 04-3135-WRS
TRUSTEE,

         Plaintiff,

v.

DELONG, CALDWELL, NOVOTNY &
BRIDGERS, LLC; DELONG,
CALDWELL, LOGUE & WISEBRAM;
DELONG & CALDWELL, LLC; and
EARNEST H. DELONG, JR.,

         Defendants.

### CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2007, I electronically filed the

foregoing **Defendant's Designation of Contents for Inclusion in Record on**

**Appeal and Statement of Issues on Appeal** with the Clerk of Court by using the

CM/ECF system which will send a notice of electronic filing to the following:

    Brent B. Barrier, T.A.
    Catherine E. Lasky
    Phelps Dunbar, LLP
    One Canal Place

365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534

I further certify that I sent a copy of the foregoing by U.S. Mail, postage prepaid

to:

Jerry A. Buchanan
Buchanan & Land, LLP
Post Office Box 2848
Columbus, Georgia 31902

Submitted this 22nd day of June, 2007.

s/ Charles R. Bridgers
Earnest H. DeLong, Jr.
Georgia Bar No. 217300
Michael A. Caldwell
Georgia Bar No. 102775
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Defendants*

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150
404/979-3170 Facsimile

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| TERRY MANUFACTURING COMPANY, INC., | ) |
| Debtor | ) Case No. 03-32063 |
| | ) |
| J. LESTER ALEXANDER, III Trustee for Terry Manufacturing Co., Inc. and Terry Uniform Co., LLC | ) ) ) ) |
| | ) |
| vs. | ) Adv. No. 04-3135 |
| | ) |
| DELONG, CALDWELL, et al. | ) |
| | Montgomery, AL January 31, 2007, 9:05 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

VOL. II - Pages 227 to 460

APPEARANCES:

Brent B. Barriere
Catherine E. Lasky
Phelps Dunbar, LP
365 Canal St., Suite 2000
One Canal Place
New Orleans, LA 70130

Electronic Recorder
Operator:                        Linda Bodden

Transcriber:                     Patricia Basham
                                 6411 Quail Ridge Drive
                                 Bartlett, TN  38135
                                 9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

228

APPEARANCES (Continued):

Charles R. Bridgers
Earnest H. DeLong, Jr.
DeLong, Caldwell & Bridgers, L.L.C.
Suite 3100, Centennial Tower, 101 Marietta Street, NW
Atlanta, Georgia 30303

229

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| J. Lester Alexander | 230 | 257 | 296 | -- |
| Frank Beltran | 298 | 340 | 388 | 390 |
| Rudolph Terry | 398 | 423 | -- | -- |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|---|---|---|---|
| 140 | Plaintiff's:<br>J. Lester Alexander's Report | 296 | 296 |
| 141 | Beltran Expert Report | 304 | 340 |

Alexander - Direct                                    230

1              (CALL TO ORDER)

2              THE COURT: Okay.  Please be seated.  I think, Mr.

3       Alexander, you are up.  And, if I recall, Mr. Barriere, you had

4       Mr. Alexander on direct.

5              MR. BARRIERE: Correct, Your Honor.

6              THE COURT: All right.

7              MR. BARRIERE: Good morning, Your Honor.

8              THE COURT: Good morning.

9                     DIRECT EXAMINATION (Resumed)

10      BY MR. BARRIERE:

11      Q.     Mr. Alexander, at the time we broke yesterday, I

12      believe we were discussing your review of the records of Terry

13      Manufacturing you secured from its Roanoke facility, and you

14      had told us that you found no notes which made any reference to

15      any communications with Mr. DeLong or any substantive

16      information whatsoever with respect to this litigation.

17             Did you also review the correspondence files of Terry

18      Manufacturing stored in the Roanoke facility?

19      A.     I did, yes.

20      Q.     All right.  Did you find any correspondence from Mr.

21      DeLong in those files?

22      A.     No.

23      Q.     Did you find any correspondence to Mr. DeLong in those

24      files?

25      A.     No.

Alexander - Direct                              231

1    Q.        Did you find any correspondence in any way addressing

2    the Commercial Factors litigation?

3    A.        No, not in the Roanoke facility, no.

4    Q.        Did you find any correspondence whatsoever addressing

5    Commercial Factors whatsoever?

6    A.        Whatsoever, corporate wide, in any location?

7    Q.        Let's focus on Roanoke for the moment.

8    A.        No.

9    Q.        All right.  Now you also indicated that you secured

10   documentation from the Atlanta facility; correct?

11   A.        That is correct.

12   Q.        And I believe you told us yesterday that there was a

13   file on what was Rudolph Terry's desk which contained some

14   information concerning the Commercial Factors litigation; is

15   that correct?

16   A.        That is correct, yes.

17   Q.        And you reviewed the contents of that file?

18   A.        I did.

19   Q.        All right.  Did you find any writing whatsoever in

20   that file concerning either a potential or an actual conflict

21   of interest between Terry Manufacturing and Rudolph Terry?

22   A.        No.

23   Q.        Did you find any correspondence or other writing from

24   Mr. DeLong concerning a conflict of interest issue?

25   A.        No.

Alexander - Direct                                    232

1    Q.        Did you find any correspondence in that file addressed

2    by Mr. DeLong to Roy Terry?

3    A.        No.

4    Q.        Did you find any correspondence that Roy Terry may

5    have addressed to Mr. DeLong?

6    A.        No.

7    Q.        Did you find anything in the nature of a report letter

8    advising with respect to developments in the litigation?

9    A.        No.

10   Q.        What correspondence, if any, did you find pertaining

11   to the Commercial Factors litigation?

12   A.        I don't really recall any correspondence.  All I

13   really recall at this time are draft pleadings that were marked

14   up.  There may have been transmittal letters with those.  I

15   don't remember.

16   Q.        But just so the record is clear, did you find anything

17   that appeared to be a substantive report or a substantive

18   analysis of the litigation?

19   A.        No, I would have looked for that and, no, there was

20   nothing like that there.

21   Q.        All right.  Sir, if I could have you open volume one

22   of the exhibits before you, and I particularly would ask that

23   you turn to Exhibit 15.

24   A.        Okay.

25   Q.        In connection with securing and reviewing the books

Alexander - Direct                          233

1    and records of Terry Manufacturing, did you obtain a copy of

2    the bylaws that appear as Exhibit 15?

3    A.      Yes.

4    Q.      Did you obtain a copy of the restated articles of

5    incorporation that appear as Exhibit 16?

6    A.      Yes.

7    Q.      And you are generally familiar with both of those

8    documents?

9    A.      Yes.

10   Q.      You have reviewed them?

11   A.      I have.

12   Q.      All right.  I would like for you to turn to page

13   twelve of the bylaws, article Roman numeral eleven, addressing

14   indemnification.

15   A.      Okay.

16   Q.      And you understand this to be the section of the

17   bylaws addressing indemnification of legal fees incurred by

18   officers and directors?

19   A.      Yes.

20   Q.      All right.  If you could turn to page fourteen,

21   section three.

22   A.      Okay.

23   Q.      It states, and I quote:

24           "The corporation may pay for or reimburse for

25           reasonable expenses, including counsel fees, incurred

Alexander - Direct                                234

1          by an indemnitee who is a party to a proceeding in

2          advance of final disposition of that proceeding if,

3          one, the indemnitee furnishes the corporation a

4          written affirmation of good faith and belief that he

5          or she has met the standard of conduct described in

6          section one of article XI above."

7     Did you find in the books and records of Terry

8     Manufacturing a written affirmation of good faith from Rudolph

9     Terry?

10    A.    No.

11    Q.    Has anyone ever asserted to you during your years as

12    trustee and investigation of the Terry Manufacturing's affairs

13    that such a written affirmation was provided?

14    A.    No.

15    Q.    "Two, the indemnitee furnishes the corporation a

16          written undertaking, executed personally or on the

17          indemnitee's behalf, to repay the advance if it is

18          ultimately determined that the indemnitee did not meet

19          the standard of conduct or is not otherwise entitled

20          to indemnification."

21    Did you find, among the books and records of Terry

22    Manufacturing in Atlanta, Roanoke, anywhere, a written

23    undertaking executed either by Rudolph Terry or on behalf of

24    Rudolph Terry to repay the advance if it was ultimately

25    determined that he was not entitled to indemnification?

Alexander - Direct                                    235

1    A.        No, I did not.

2    Q.        All right.

3              "Three, a determination is made that the facts then

4              known to those making the determination would not

5              preclude indemnification under this article XI."

6              Did you find among the books and records any written

7    analysis whatsoever of the claims against Rudolph Terry in the

8    Commercial Factors litigation?

9    A.        No, other than to the extent the papers in the file on

10   Rudolph's desk contained any kind of discussion of the case,

11   and the pleadings.

12   Q.        And the pleadings.  All right.  But just so the record

13   is clear, there was no analyses provided by Mr. DeLong, at

14   least among the books and records you reviewed, with respect to

15   whether Mr. Terry was or was not entitled to indemnification;

16   is that correct?

17   A.        Absolutely not.  There was no such analysis.

18   Q.        Was there any such analysis from any other attorney

19   besides Mr. DeLong?

20   A.        No.

21   Q.        Was there any such analysis that appeared to be

22   authored by anyone who was not an attorney?

23   A.        No, there was no such analysis.

24   Q.        All right.  Turn to section four.

25              "The Corporation may not indemnify an indemnitee under

Alexander - Direct                    236

1        section one of this article above unless authorized in

2        a specific case after a determination has been made

3        that indemnification of the indemnitee is permissible

4        under the circumstances because the indemnitee has met

5        the standard of conduct set forth in section one of

6        this article XI above.

7        (b), the determination shall be made by the Board of

8        Directors of the Corporation by a majority vote of a

9        quorum consisting of directors not at the time parties

10        to the proceeding."

11    You reviewed the minute book of the Board of Directors

12    of Terry Manufacturing?

13    A.        To the extent the minutes could be located, we

14    reviewed all of them.

15    Q.        All right. Did you find any board resolution in any

16    way addressing either indemnification of Rudolph Terry or the

17    Commercial Factors litigation?

18    A.        No.

19    Q.        All right. Now number two says:

20        "If a quorum cannot be obtained under subdivision one,

21        by a majority vote of a committee designated by the

22        Board of Directors, consisting of two or more

23        directors not at the time parties to the proceeding."

24    There were only two directors, correct, Rudolph Terry

25    and Roy Terry?

Alexander - Direct                          237

1   A.        That is my understanding, yes.

2   Q.        All right. So you couldn't reach the quorum, so that

3   takes you to number three, "by special legal counsel." Did you

4   find any indication whatsoever special legal counsel had been

5   engaged to evaluate indemnification of Rudolph Terry?

6   A.        No.

7   Q.        Did you find any bills for attorneys that would

8   suggest they had acted in the role of special legal counsel?

9   A.        No.

10  Q.        Number    four    provides    that    indemnification    be

11  authorized:

12           "By the shareholders but shares owned or voted under

13           the control of indemnitees who are at the time parties

14           to    the    proceeding    may    not    be    voted    on    the

15           determination."

16           Did you find a shareholder resolution authorizing

17  indemnification of Rudolph Terry?

18  A.        No.

19  Q.        If I could ask you to turn to volume two, sir. In

20  volume two, I believe it is actually the last exhibit perhaps,

21  close to the back.

22  A.        135?

23  Q.        131. It is the financial statement as of December 31,

24  2000, '99, the years then ended.

25  A.        Okay.

Alexander - Direct                              238

1   Q.        All right. I have also put up on the board the

2   financial statement as you have reconstructed it in your expert

3   report.   Are you familiar with that document?

4   A.        Yes, I am.

5   Q.        All right. Now in the course of your engagement as

6   trustee, have you had occasion to evaluate the accuracy of this

7   particular financial statement, Exhibit 131?

8   A.        I have, yes.

9   Q.        And what conclusion did you reach in that regard?

10  A.        That it is wholly inaccurate.

11  Q.        All right. Did you have occasion to review financial

12  statements issued for subsequent years, 2001 and 2002?

13  A.        Yes.

14  Q.        And what conclusions did you reach with respect to

15  the accuracy of those financial statements?

16  A.        The same conclusion.   They are inaccurate.

17  Q.        All right. Tell me, in evaluating the financial

18  statement before us, Exhibit 131, were you able to find

19  supporting books and records on which an auditor could have

20  relied in generating this financial statement?

21  A.        No. The customary records that would support an

22  audited financial statement, and be necessary to allow an

23  auditor to issue an audited opinion on such financial

24  statements, could not be located.

25  Q.        All right.   What documents or records are you

Alexander - Direct                          239

1    referring to?

2    A.        General  ledger,  subsidiary  ledgers,  supporting

3    accounts, account analyses.

4    Q.        All  right.   Now,  with  respect  to  the  financial

5    statements  for  subsequent  years,  2001,  2002,  were  there

6    supporting  documents  an  auditor  could  have  relied  upon  in

7    generating those financial statements?

8    A.        No.

9    Q.        Were the same category of documents missing for those

10   years?

11   A.        The    same    general    categories.    Basically  the

12   fundamental bookkeeping records that are used to account for a

13   company's business could not be located.

14   Q.        All right.  Did you find any evidence that suggested

15   to you that at least for certain years the financial statements

16   were simply fabricated out of whole cloth by the Terrys?

17   A.        Yes.

18   Q.        And for which years?

19   A.        I believe 2000, 2001, 2002, 2003, I believe we have

20   evidence in all years that they were fabricated and essentially

21   made up.

22   Q.        And what is that evidence, sir?

23   A.        Handwritten  notes,  the  document  process  of  how  the

24   financial statements were generated, exchanging notes back and

25   forth between Sidney Johnson and Roy Terry, showing how the

Alexander - Direct                    240

1    financial statements were prepared.

2    Q.      Let me just turn to the first page with financials on

3    it.  It is the balance sheet.  I'm going to focus for the

4    moment – let's just focus on the year 2000.  This financial

5    statement indicates that at that time the company had cash of

6    a million, two hundred fifty-one thousand dollars.  Did you

7    find any evidence supporting that figure?

8    A.      No, the company didn't have anywhere near that amount

9    of cash.

10   Q.      When you revised the financial statement for that

11   year, what number did you use?

12   A.      I used a conservative number of a hundred and thirty-

13   seven thousand, but that number has not been reduced for

14   outstanding checks.

15          MR. BRIDGERS: Your Honor and Mr. Barriere, if I could,

16   just point of order, I think we have two copies of this.  They

17   may be perfectly identical but I'm just wondering which one the

18   witness is referring to.

19          MR. BARRIERE: He is looking at the financial statement

20   –

21          MR. BRIDGERS: I know.  There are just two copies of it

22   in the exhibit.  I would just like to know if he is looking at

23   the one that is Bates numbered the DeLong number or the one

24   that's first.  They may be perfectly identical.

25          MS. LASKY: They are not identical.

Alexander - Direct                    241

1          THE COURT: Okay.  Let's get this clear.  I am looking

2     at Exhibit 131.  Is that what we're looking at?  I see only one

3     financial statement.

4          MS. LASKY:   We had inadvertently put the wrong year

5     on the financial statement.  1999 and 2000 is correct.   2001

6     and 2002, which is behind it, should have been switched up.

7          MR. BRIDGERS: Oh, I see.  All right. It is multiple

8     different years.  I'm sorry, Your Honor.  It just looked like

9     the same copies.

10          THE COURT: Let's make sure.  What we're looking at

11     right now is Exhibit 131.

12          MR. BARRIERE: It has a stamp on the front page, Judge?

13          THE COURT: Yes, sir.  It says "Received June 1."  I

14     can't read the year.   Issued by Richard Rose. and it is

15     financial statements for 2000, and then they also show – they

16     compare 1999, but it would be the 2000 date.

17          MR. BARRIERE: That is the correct copy.

18          THE WITNESS:   That is what I have.

19          THE COURT: And I just want to make sure that is what

20     Mr. Bridgers has before we go on.

21          MR. BRIDGERS: Yes, Your Honor, we do.

22          THE COURT: Okay.

23          MR. BRIDGERS: It was confusing to me.

24          THE COURT: All right.  Thank you.

25     BY MR. BARRIERE:

Alexander - Direct                                242

1    Q.      Okay.  You used a hundred and thirty-seven thousand

2    dollars.  I think you were about to explain to us why you used

3    that figure in lieu of the one million, two hundred and fifty-

4    one thousand dollars that appears in this financial statement.

5    A.      We went to the banks of Terry Manufacturing and got

6    all of their bank records and that's the sum total of the bank

7    balances as of that day.  It does not take into account any

8    checks that had been written that were outstanding as of that

9    date, so really it is higher than the actual balance.

10   Q.      In your view of, I think what you described as 140 odd

11   boxes of Terry Manufacturing records, was there any document

12   that appeared to support a cash balance at year-end 2000 of

13   over a million, two hundred thousand dollars?

14   A.      No.

15   Q.      All right.  The next line item here is accounts

16   receivable, trade, ten million, one hundred nineteen thousand

17   dollars.  Do you believe that to be an accurate figure?

18   A.      I believe it is inaccurate.

19   Q.      All right.  Did you find any document anywhere in the

20   records of Terry Manufacturing supporting that figure?

21   A.      No.

22   Q.      Now what number did you use as accounts receivable as

23   of 12-31-2000 in your reconstructed financial statement?

24   A.      For the accounts receivable number, we used the number

25   that was on the tax returns that were actually filed with the

Alexander - Direct                              243

1   federal government, which is two million, one hundred and seven

2   thousand dollars.

3   Q.      All right.  Move to the next number of substance.

4   Other accounts receivable, did you include that in your - your

5   number was a global for accounts receivable; is that correct?

6   You didn't divide them between trade accounts and other

7   accounts receivable?

8   A.      We found no evidence of anything that would be another

9   accounts receivable.

10  Q.      And just so the record is clear, you attempted to

11  track this financial statement to find supporting documentation

12  for each line item on the asset ledger?

13  A.      Yes, absolutely.  That is part of our record search,

14  was to find the supporting records for these items and we

15  started with the financials as our only clue as to what the

16  assets of Terry Manufacturing were.

17  Q.      Next is inventories.  At that time, valued on this

18  financial statement at nineteen point eight million dollars.

19  Did you find any documentation supporting inventory having that

20  value?

21  A.      No.

22  Q.      What did you conclude to be the value of the inventory

23  as of 12-31-2000?

24  A.      It is seven million, three hundred and forty-eight

25  thousand.

Alexander - Direct                                    244

1    Q.      Okay.

2    Q.      The fixed assets here were valued at three million,

3    eight hundred and eight thousand dollars in aggregate.  Did you

4    find any documentation supporting that figure?

5    A.      No, not at all.

6    Q.      Did you find any appraisals included among the

7    documents that you secured from the Roanoke facility?

8    A.      Yes, we did.

9    Q.      Do you have an opinion as to the validity or accuracy

10   of those appraisals?

11   A.      The appraisals, particularly the appraisals of the

12   equipment and fixed assets, were completely inaccurate as to

13   value and also as to the items listed on there.

14   Q.      All right.  Do you have any knowledge as to who

15   actually prepared those appraisals?

16   A.      It appears the handwriting – we have got the drafts

17   where they were prepared from, and the handwriting is

18   consistent with Roy Terry's but it was definitely generated in

19   the offices of Terry Manufacturing.

20   Q.      On whose letterhead did those appraisals appear?

21   A.      Henderson Sewing, I believe was the name of the

22   company that the equipment appraisal was on, and I cannot

23   remember the name of the real property appraisal that also

24   included that equipment appraisal in his work.

25   Q.      Based upon your experience as a certified fraud

Alexander - Direct                                    245

1    examiner, did it appear to you that that appraisal was

2    basically a forgery?

3    A.        There is no question – at this time, there is no

4    question it was a forgery but, yes, at the time it appeared to

5    be a forgery.

6    Q.        All right.  Sir, you will recall the discussion

7    yesterday concerning the subpoena issued in the Commercial

8    Factors litigation to Mr. Rose for production of financial

9    statements and supporting work papers.  Do you recall that

10   testimony?

11   A.        I do.

12   Q.        Do you recall that subpoena?

13   A.        I do.

14   Q.        All right.  As a certified fraud examiner, do you have

15   an opinion as to what disclosure or what would have come to

16   light had in fact there been compliance with that subpoena?

17   A.        Well, the fact that these financial statements were

18   completely false, it would have come to light immediately.

19   Q.        Let me ask you something.  How difficult was it to

20   drill down and determine that these were fabricated and false

21   financial statements?

22   A.        One inquiry for the most basic records told me that

23   the financial statements were most likely completely bogus and

24   that was, "May I have a copy of the general ledger?"  and the

25   controller took the Fifth Amendment.  That was a Friday and, by

Alexander - Direct                          246

1    the end of the weekend, we had confirmed that there was no

2    general ledger on-site, a hard copy, and we also inspected the

3    hard drives of all of the computers in the facility and there

4    was no trace of a general ledger there.

5    Q.       Now you told us briefly yesterday of your engagement

6    by Southtrust, and I understood your testimony to be that

7    Southtrust had become concerned as to the accuracy of the

8    financial statements in its possession?

9    A.       Yes.

10   Q.       And it attempted through your offices to investigate

11   the accuracy of the financial?

12   A.       That is correct.

13   Q.       When it was determined or when the Terry Manufacturing

14   people refused to cooperate, what action did Southtrust take at

15   that time?

16   A.       I believe they took – the next step was to have a

17   receiver appointed, and they asked me would I agree to serve as

18   a receiver.

19   Q.       All right.   And how long after that did Terry

20   Manufacturing voluntarily seek Chapter 11 relief?

21   A.       I am not real clear on the exact days but it is my

22   recollection that, the day of filing for the receivership, they

23   filed for Chapter 11, or immediately following, the next day.

24   Q.       And, as you understand it, the action to file a

25   receiver was directly an outgrowth of the determination that

Alexander - Direct                    247

1    the financials were inaccurate?

2    A.       Yes.  More specifically, the inventories and accounts

3    receivable were overstated by several tens of millions of

4    dollars.

5    Q.       And that was the case as of December 31, 2000, also;

6    was it not?

7    A.       Yes, that was the case.

8    Q.       Was that the case as of December 31, 2001?

9    A.       Yes.

10   Q.       Indeed, were the accounts receivable and inventory

11   grossly overstated in each of the financial statements

12   generated by Terry Manufacturing?

13   A.       Yes.

14   Q.       All right.  Sir, have you attempted to ascertain who

15   received, who outside the company received copies of these

16   financial statements?

17   A.       Yes, I have gained that knowledge, yes.

18   Q.       All right.  And who is your understanding of the

19   universe of persons who received these financial statements?

20   A.       Well, all of the bankers that I have knowledge of –

21   Southtrust; in addition, Bank of Wedowee; First Bank of

22   Tuskegee, I believe; First Bank of Roanoke and Tuskegee bank –

23   I can't remember their name – and there is a bank in Eatonton,

24   Georgia.  They all received the financial statements.

25          To my knowledge, most of their unsecured creditors

Alexander - Direct                                    248

1    received them.  I specifically remember HLC received them and

2    some others.  All of the preferred shareholders received them

3    and then, in addition, we have seen substantial evidence of

4    solicitations  of  other  monies  and,  along  with  those

5    solicitations, they would include the financial statements.

6    Q.      All  right.   What  was  the  number  of  preferred

7    shareholders of this company?

8    A.      More than fifty.

9    Q.      Okay.   Have  you  seen  evidence  that  there  were

10   something  in  excess  of  fifty  persons  solicited  to  acquire

11   preferred stock?

12   A.      Yes.

13   Q.      All right.  Do you have an estimate of the numbers?

14   A.      It  would  overlap  to  some  degree  with  the  preferred

15   shareholders but they were solicited on numerous occasions.  In

16   other words, they may have invested as preferred stockholders

17   and then Mr. Terry would go back, Mr. Roy Terry, would go back

18   to them and solicit them again, and again, and again for more

19   funds.  But I don't have a number.  It would be a very high

20   number.

21   Q.      All right.  As best you can ascertain, when persons

22   who either purchased or did not purchase were solicited to buy

23   preferred  stock,  were  they  provided  with  copies  of  these

24   financial statements?

25   A.      The  evidence  that  I  have  seen  indicates  they  were

Alexander - Direct                                    249

1    provided with financial statements, yes.

2    Q.        As a certified fraud examiner, do you have an opinion

3    as to why a company would refuse to release its financial

4    statements and work papers?

5    A.        Refuse to release their financial statements after

6    having released them?

7    Q.        Yes, sir.

8    A.        I do.

9    Q.        And what is that opinion?

10   A.        That the financial statements – there is a problem

11   with their financial statements.

12   Q.        Indeed were there work papers to be produced had Mr.

13   Rose complied with that subpoena?

14   A.        It is my belief that there are no legitimate work

15   papers that Mr. Rose could produce.  I don't know whether he

16   has any work papers similar to the work papers I saw, which

17   were handwritten notes where Mr. Terry on one hand would

18   develop his theories about what the assets should look like and

19   then the controller would fill in the blanks for the

20   liabilities side of the balance sheet.  He may have work papers

21   like that.

22   Q.        Would he have had a general ledgers?

23   A.        Oh, no.

24   Q.        Would he have had any subsidiary ledgers?

25   A.        No.

```
                    Alexander - Direct                    250
```

1    Q.      Would he have had any related schedules?

2    A.      No.

3    Q.      Now you heard testimony yesterday concerning the

4    extensive efforts running over a multi-month period to secure

5    a settlement by which Terry Manufacturing would make payment of

6    more than two million dollars to Commercial Factors.

7            MR. BRIDGERS: Objection, Your Honor.  Vague,

8    argumentative.  This is direct.

9            THE COURT: I am sorry.

10           MR. BRIDGERS: I said objection, Your Honor.  It is

11   vague, argumentative, to how the phrasing of the question is on

12   direct.

13           THE COURT: Overruled.

14   BY MR. BARRIERE:

15   Q.      You heard that testimony, I take it?

16   A.      I did.

17   Q.      As the trustee and as a certified fraud examiner, do

18   you have an opinion as to whether that transaction, that

19   proposed transaction, that proposed settlement, was of benefit

20   to, of in the best interest of Terry Manufacturing?

21           MR. BRIDGERS: Objection.  Speculation.

22           THE COURT: Overruled.

23   A.      From an accounting perspective, it clearly is not a

24   benefit to the company.

25   Q.      And why is that, sir?

Alexander - Direct                                          251

1   A.        Well, it is the nature of the circumstances.  I mean,

2   an officer of the company is involved with submitting bogus

3   invoices for goods and services that were never received, and

4   then the position that the lawyer was taking was asserting that

5   the company should pay that amount or some amount, between one

6   point eight million and two million, and that is basically

7   putting a liability on the books for nothing in exchange.

8   Q.        Have you seen any evidence whatsoever that Terry

9   Manufacturing, as the company, obtained any benefit from the

10  factoring fraud scheme?

11  A.        No.

12  Q.        Have you seen any evidence that it actually

13  represented a liability to the company?

14  A.        Oh, yes.

15  Q.        And what is that?

16  A.        There has been a claim now filed in the bankruptcy by

17  Commercial Factors in excess of a million eight, and that is an

18  example.

19  Q.        Now you are a certified fraud examiner; are you not,

20  sir?

21  A.        I am.

22  Q.        You are a certified public accountant?

23  A.        Yes, I am.

24  Q.        During the course of your career you have conducted

25  audits; is that correct?

Alexander - Direct                                    252

1    A.        I have.

2    Q.        Have you also participated in or directed internal

3    audits?

4    A.        Yes, I have.

5    Q.        And what do you mean by the term – when you use it,

6    what do you mean by the term internal audit?

7    A.        Internal auditing is different than external auditing

8    because it is done directed towards things like is the company

9    following its policies and procedures, and it is typically done

10   by employees of the company, although we have been regularly

11   involved as consultants and advisers and participants in that

12   type of work.

13   Q.        Okay.  Were you engaged in an audit and it came to

14   your attention the company had paid legal fees on behalf of an

15   officer, would that be an item that would be subject to

16   investigation by –

17   A.        Yes.  Regardless of whether you are an internal

18   auditor or an external auditor, possibly for different reasons

19   you would definitely want to look at that situation.

20   Q.        All right.  And why would you do that, sir?

21   A.        Well, from an external audit point of view, one of the

22   things that an auditor has to do is to make sure – is to take

23   active steps to make sure all material fraud is detected and

24   that laws are complied with.  And so one of the common steps on

25   every audit program is to look at all of the legal fees, review

Alexander - Direct                                        253

1    the bills and make a determination as to what is going on and,

2    if necessary, even correspond with outside counsel to

3    understand the case and what is going on.

4    Q.       All right.  And what steps or what tests would you

5    take with respect to your investigation or evaluation of the

6    legal fees?

7    A.       Well, in an example like this case where the legal

8    fees ended up being related to, you know, allegations of

9    wrongdoing by a corporate officer, you know, there are several

10   things you might do.  So I'm not sure.  Were you asking that

11   question or –

12   Q.       Yes, sir.

13   A.       Okay.  Well, that is where my experience as a fraud

14   investigator kicks in, and it has been my experience that the

15   next step is to conduct a special investigation of the

16   propriety of those fees and the circumstances that led to the

17   litigation and the officer being sued and getting the company

18   sued.

19   Q.       All right.  Assume for the purposes of my question

20   that the investigation had revealed the facts of this case,

21   that the officer engaged in a factoring fraud scheme or

22   explained what was involved were personal loans, using the

23   company's money without authorization of anyone.  Under those

24   circumstances, what conclusions would you reach as to whether

25   payment of those fees was a legitimate and proper corporate

Alexander - Direct                                    254

1    expense?

2    A.        That is a serious problem and those fees would not be

3    a legitimate – in my experience, those fees would not be a

4    legitimate expense of the corporation.

5    Q.        All right.  Based upon your experience as a corporate

6    auditor, as a certified fraud examiner, does the company

7    receive a meaningful benefit for paying fees under those

8    circumstances?

9    A.        Well, from an auditor's perspective, those expenses –

10   they are not expenses of the company and so you have to deal

11   with the presentation of that expense, and I don't know what

12   that says about benefit but it should not be an expense of the

13   company.

14           From a fraud auditor point of view, it is put in the

15   category of using corporate assets for personal benefit, which

16   is on the list of bad things for a fraud examiner.  So I can't

17   imagine there would be any benefit to that.

18   Q.        From an accounting standpoint, from your analysis of

19   the books and records, not an analysis of a lawyer, have you

20   reached a conclusion as to whether Terry Manufacturing received

21   a benefit for paying Rudolph Terry's fees and expenses in this

22   litigation?

23   A.        From a numbers point of view, yes, I have.

24   Q.        And what is that conclusion, sir?

25   A.        That Terry Manufacturing couldn't have possibly

Alexander - Direct                                    255

1    received a benefit from those fees.

2    Q.        And why is that?

3    A.        Well, first of all, it's the conduct of Rudolph Terry.

4    It's wholly outside what I would consider the scope of any

5    reasonable officer's employment.  I mean, he is falsifying

6    invoices and having the assets of the company used to

7    ultimately, we find, participate in a factoring fraud but, even

8    if you listen to his stories early on, all of the things he was

9    putting up as excuses for what he was doing just don't pass the

10   test of what an officer should be doing with the corporate

11   assets.  You know, they shouldn't be disbursing funds without

12   records.  They shouldn't be making up records in order to

13   support them, and they certainly shouldn't be paying for things

14   that were not acquired, for services that weren't received.

15        So, I mean, in that sense it is a problem, but also

16   the other problem I have is the legal team was asserting

17   positions that was putting Terry in the position of basically

18   assuming the liability for these actions.  You know, at one

19   time proposing the two million, plus, settlement.

20        MR. BRIDGERS: Objection, Your Honor.  Narrative.  It

21   goes outside the scope of his expertise.

22        THE COURT: Okay.  Here is what I will do.  I am not

23   sure about the scope of the expertise, but I do agree that we

24   have gotten into a narrative.  So if we could try to keep the

25   questions a little more focused and the answers a little more

Alexander - Direct                                256

1   focused, that will give the defendants a better chance to cut

2   off any testimony they think is improper.

3           MR. BARRIERE: Fair enough.

4   BY MR. BARRIERE:

5   Q.      I think you were telling me that one factor you have

6   looked at is the – strike that.  You have told us a moment ago

7   with respect to the proposed settlement you saw no benefit of

8   the   company   undertaking   that   obligation;   in   fact,   it

9   represented a net liability.  Can you find any evidence in the

10  books and records of Terry Manufacturing that there was any

11  determination that payment of Commercial Factors would in some

12  way benefit other business interests of Terry Manufacturing?

13  A.      No.

14  Q.      All right.  Based upon your analysis of the business

15  as conducted by Terry Manufacturing in 2000, can you conceive

16  of any benefit to its other business operations from paying

17  Commercial Factors?

18  A.      No.

19          MR. BARRIERE: I will pass the witness, Your Honor.

20          THE COURT: Thank you.  Mr. Bridgers.

21          MR. BRIDGERS: Thank you, Your Honor.

22          MR. BARRIERE: Your Honor, I have not introduced Mr.

23  Alexander's expert report.  I would like to introduce as a

24  separate exhibit his reconstructed balance sheet which is up on

25  the screen.

Alexander - Cross                    257

1     THE COURT: Okay.  And what exhibit number is that?

2     MR. BARRIERE: It is one of the last.  Your Honor, if

3   I may, it is in the third binder.  What I will do is on a break

4   I will segregate the specific financial statement and take out

5   the balance.

6     MS. LASKY: That spreadsheet is currently a part of the

7   entire Exhibit 140.

8     MR. BARRIERE: Exhibit 140.  I will just take out the

9   specific spreadsheet we are introducing as an exhibit and take

10  the balance out of your binder.

11    THE COURT: Okay.  All right.  Thank you.  If you

12  would, whatever you're going to do, run it by Mr. Bridgers so

13  you are on the same page.

14    MR. BRIDGERS: Yes, Your Honor.  That is fine.

15    THE COURT: Thank you.

16                      CROSS EXAMINATION

17  BY MR. BRIDGERS:

18  Q.      Mr. Alexander, good morning.

19  A.      Good morning.

20  Q.      I want to start off with a couple of questions.  I

21  don't believe we took your deposition in this matter, so I need

22  to put a couple of things on the record.  What is your

23  financial interest in this case?

24  A.      I am the trustee.

25  Q.      And how are you paid as trustee.

Alexander - Cross                                    258

1    A.        Well, I have an hourly rate but also I believe I am

2    limited to the standard trustee fee schedule.

3    Q.        All right.  I am sorry.  What does that mean?

4    A.        It means that there is a fee schedule where you have

5    to do the work and then the court then compares the time and

6    effort you have spent to the fee schedule, which is based on a

7    percentage of the money distributed.

8    Q.        All right.  So in some circumstances you would be on

9    a contingency fee interest of the money that would be taken in,

10   in this case?

11   A.        I can understand how you can view it that way.

12             THE COURT: Wait a minute.  I am going to object to

13   that.  What he is talking about is 11 USC, Section 326 and, no,

14   I don't view that as a contingency at all.  The law is what it

15   is.  326 places an upper limit on his compensation.

16             MR. BRIDGERS: Your Honor, I am not a bankruptcy –

17             THE COURT:  No, I –

18             MR. BRIDGERS:  So this is just informational for me.

19             THE COURT:  No, I understand, and, yes, there is an

20   inherent conflict because the trustee's maximum compensation is

21   a percentage of the estate.  So he is better off – the more

22   money he can bring in, the better off he is.  So in that

23   regard, I think you are quite right to ask questions, that he

24   does have an interest in that.  But when you said contingent

25   fee, I just kind of jumped at that because that is not the way

Alexander - Cross                                259

1    I see it.  I mean, I think your point is well taken.  I don't

2    mean to nitpick this, but it is –

3         MR. BRIDGERS:   That sounds like a much better choice

4    of words, Your Honor.

5         THE COURT:   Well, you have stepped on an issue that

6    is very sensitive and is discussed in great detail.   For

7    example, this, I know, has no interest to you but it has always

8    been a beef of mine that it is so difficult to get trustees

9    interested in filing 727 complaints in Chapter 7, individual

10   cases, because frequently there is no way to pay them.  And it

11   is not applicable here because this is a corporate case, but

12   every once in a while, I see a 727 case that doesn't have much

13   merit but a trustee has hired his buddy of a lawyer who is

14   running his meter.

15        And so, anyway, you have triggered all of these

16   memories that have nothing to do with this case, and I really

17   didn't mean to get off on that.  But your point is well taken.

18        MR. BRIDGERS:   No.  Thank you, Your Honor.  You were

19   allowing me to find something anyway.

20        THE COURT:   Yes, that gave you a minute to shuffle

21   through your papers.

22        MR. BRIDGERS:   Yes, sir, you did.

23   BY MR. BRIDGERS:

24   Q.        Again, Mr. Alexander, and this just may be ignorance

25   on my part, how does the trustee compensate Phelps Dunbar?

Alexander - Cross                    260

1    A.        The Phelps Dunbar firm is on a contingent fee

2    arrangement.

3    Q.        And what is that contingent fee arrangement, please,

4    sir?

5    A.        Off the top of my head, I cannot remember the

6    percentages.  It varies depending on the type of action.

7             THE COURT:  Yeah, there is a court order on it, and

8    I don't recall exactly what – I am sure Mr. Barriere knows

9    exactly what it is, but there is a court order on it and he

10   does periodically file fee applications.

11            MR. BRIDGERS: Thank you, Your Honor.

12   Q.        Mr. Alexander, if I could turn your attention back to

13   Trustee's Exhibits 15 and 16, the bylaws and the articles.

14   A.        Which exhibit book?

15   Q.        15 and 16.

16   A.        Which book?

17   Q.        I am sorry.  The first volume.

18   A.        Okay. I have 15 in front of me.

19   Q.        Thank you, sir.  My question is do you know or do you

20   have any evidence that these are the latest versions of the

21   bylaws and articles?

22   A.        No. This is the only copies that we have.

23   Q.        All right.  It is the only ones you found?

24   A.        That is correct.

25   Q.        And if I could ask you to turn your attention to

Alexander - Cross                    261

1    Exhibit 15, page 15.

2     A.       I am there.

3     Q.       If you would take a look at the bottom of the page,

4     the very last paragraph, "Powers of Directors to Amend," would

5     you agree with me that this section states:

6              "The Board of Directors shall have the power to alter,

7              amend, and repeal the bylaws of the Corporation or

8              adopt new bylaws for the Corporation at any regular or

9              special meeting of the board."

10   And it does go on about quorums.

11             "Provided that the Board of Directors may not alter,

12             amend, or repeal any bylaw which establishes" – excuse

13             me – "which establishes what constitutes a quorum at

14             such shareholders' meeting, or which may be adopted by

15             the shareholders, and specifically provides that it

16             cannot be altered."

17             Would you agree this is part of their corporate

18   governance materials?

19   A.        Yes.

20   Q.        And were not Mr. Rudolph and Mr. Roy Terry the sole

21   directors of Terry Manufacturing at all times pertinent to

22   this?

23   A.        That is my belief.

24   Q.        Mr. Alexander, do you have – can you present to us any

25   evidence that Mr. DeLong ever saw, or Mr. Thomas, ever saw what

Alexander - Cross                                    262

1   here is listed as Exhibits 15 and 16?

2   A.      No.

3   Q.      And can you present us with any evidence that either

4   Mr. DeLong or Mr. Jerry Thomas was ever engaged to give any

5   advice on the significance of Exhibits 15 or 16, the corporate

6   governance of the company?

7   A.      No.

8   Q.      You had mentioned the existence of some preferred

9   stockholders.  Do you recall that in your direct testimony?

10  A.      I do.

11  Q.      Have you found or can you present us with any evidence

12  that Mr. DeLong would have had any knowledge of even the

13  existence of preferred shareholders of Terry Manufacturing?

14  A.      Based on his testimony yesterday, yes.

15  Q.      Was it not his testimony that he learned about that

16  having seen these bylaws?  Never mind.  That is a poor

17  question.

18          Other than what he testified to yesterday, which we

19  can look at the record, do you have any other evidence –

20  A.      The financial statements disclose them, and he

21  testified yesterday that he read the financials and he worked

22  at length on trying to prevent the underlying documents

23  supporting those financials from being produced.  I don't

24  understand how you could not know about the preferred

25  shareholders if you have read the financial statements.

Alexander - Cross                              263

1    Q.      Well, let's turn then to the financial statements, if

2    you would.  I believe that is Exhibit 131, the second volume.

3    Mr. Alexander, this somewhat becomes relevant to what I was

4    trying to get to when I interrupted Mr. Barriere earlier.  The

5    trustee's exhibit 131, as I understand it, does not bear a

6    Bates numbering stating DeLong at the bottom right.  Is that

7    what your exhibit shows?  I just want to make sure I understand

8    this.

9    A.      That's correct.  That is what it shows.

10           (Pause)

11           MR. BRIDGERS:   Your Honor, if I may approach the

12   witness, what I'm going to hand him is basically the trustee's

13   first version of 131 that they subbed out.

14           THE COURT: Okay.

15   Q.      Mr. Alexander, can you - we will mark that in a second

16   - can you tell us what this exhibit constitutes that I just

17   handed you?

18   A.      It appears to be - it appears to be financial

19   statements for Terry Manufacturing for different years that

20   also have been modified with exhibit numbers put at the top, so

21   that indicates to me it may have been used for a different

22   purpose, and it has got DeLong, Bates numbers, and then behind

23   it there is more information that is unrelated to the financial

24   statements, which appear to be personal financial statements

25   for Roy Terry, Rudolph; and then DeLong 14,498 which is part of

Alexander - Cross                                    264

1    this exhibit, there appears to be internal financial statements

2    which are dated March 31, 2003.

3              THE COURT: Let me stop you right here.  You might want

4    to get that marked because this is not exhibit 131.  Let's call

5    it something else.  I don't care what we call it, but I just

6    want to make it clear that – let's see.  How are we going to do

7    the numbers?

8              MR. BRIDGERS:   Your Honor, we had premarked some

9    exhibits as defendant's exhibits.  Perhaps we will just start

10   at the next one.

11             THE COURT: Okay.  That is good.

12             MR. BRIDGERS: We had premarked through 32.  I suggest

13   we --

14             THE COURT: Okay.  We will call that Defendant's 33.

15   Let's mark that Defendant's 33 so it is clear for the record

16   what Mr. Alexander is looking at.

17             (Pause)

18   BY MR. BRIDGERS:

19   Q.        Mr. Alexander, let me hand you back Defendant's

20   Exhibit No. 33.

21   A.        Thank you.  Would you like to clip this?

22   Q.        Afterwards.   He couldn't find one.  Mr. Alexander,

23   I think you have indicated that, at the bottom right of this

24   document, all of those pages, they do indicate a Bate number,

25   DeLong, some number; is that correct?

Alexander - Cross                265

1    A.        They do, yes

2    .Q.       And it is your understanding, based on the course of

3    this case, that those are documents that were obtained from Mr.

4    DeLong's office, produced by the defendant –

5    A.        Based on having a Bates number on there, that is what

6    I would presume, yes.

7    Q.        All right.  Do you have any other evidence – can you

8    present us with any other evidence that Mr. DeLong received any

9    additional financial statements except what we have marked here

10   as Defendant's Exhibit No. 33?

11   A.        My conclusion that he received financial statements

12   was based on his testimony yesterday when I was understanding

13   him to be talking about –

14         MR. BRIDGERS: Objection, Your Honor.  I don't think

15   that is responsive at this point.  It is speculative.

16         THE COURT: No, you have opened the door.  You have

17   asked him why he thinks Mr. DeLong might have seen the

18   financials, and I will allow him to answer.  You can follow up

19   but –

20         THE WITNESS: Based on his testimony yesterday, it was

21   my belief that he was talking about the 2000 financial

22   statements, which is the ones at exhibit 131 because he was

23   discussing his services involved with the Rose subpoena and in

24   that same time frame.

25   BY MR. BRIDGERS:

Alexander - Cross                     266

1    Q.        To follow-up, though, is that, Defendant's Exhibit

2    No. 33, do you have, other than that, do you have any other

3    evidence that Mr. DeLong or Mr. Thomas received written

4    financials, other than that exhibit we are taking a look at

5    now?

6    A.        Not to my knowledge, but I haven't reviewed the

7    DeLong documents.

8    Q.        Mr. Alexander, your report and, I believe, your

9    testimony indicate that the financial reports of Terry

10   Manufacturing Company were in complete disarray.  Is that a

11   fair statement?

12   A.        Yes.

13   Q.        And that computers were taken from the office?

14   A.        There were computers taken, about ten, yes.  There

15   were still computers there.  There were many computers still

16   there.

17   Q.        And not only the financials were in disarray but

18   also the administrative sides of the office were in disarray,

19   as well?

20   A.        That is correct.

21   Q.        And that included Roy Terry's office at the Roanoke

22   facility?

23   A.        That is correct, his offices.  He had more than one.

24   Q.        And you stated at some point that your team, your

25   staff, left a number of documents behind when you pulled out of

Alexander - Cross                                           267

1    the facility.  Is that a fair statement?

2    A.      Yes.  We made arrangements for them to be stored at

3    the facility after we sold it.  The person who bought the

4    facility was allowing us to store the records there.

5    Q.      How many people were on that team that went into the

6    Roanoke office?

7    A.      In the initial surge, which was in the July time

8    frame?

9    Q.      Yes, sir.

10   A.      It is hard to remember, but there may have been eight

11   of us.

12   Q.      And I wasn't clear.  Were you at Roanoke or were you

13   in Atlanta?

14   A.      Another team went to Atlanta.  I was in Roanoke, and

15   then we had a third team, and part of the Atlanta team also

16   went to the Arkansas site.

17   Q.      Did you personally look at all of the documents that

18   were left behind?

19   A.      No.

20   Q.      I want to turn back to your discussion about the notes

21   you covered yesterday.  The notes that you mentioned from Roy

22   Terry, were they all dated?

23   A.      No.

24   Q.      So would you agree with me, then, there is no way to

25   match up date by date to see what is there on a particular date

Alexander - Cross                                    268

1    and what is not there on a particular date?

2    A.        I can't agree with that.  I mean, I agree that it is

3    not possible to put things in date by date order but it is

4    possible to identify events and then tie them to dates.

5    Q.        Perhaps, but generally without dates on some of the

6    notes, that chronology would be at least more difficult to put

7    together?

8    A.        That is true.

9    Q.        Have you ever made a detailed analysis of what dates,

10   what notes might be missing for what particular dates?

11   A.        No.  That is not possible because they are not dated.

12   Q.        Now you don't contend that Roy Terry never heard of

13   the Commercial Factors litigation; do you?

14   A.        No.

15   Q.        But you didn't really find anything in Roy Terry's

16   notes about the Commercial Factors litigation; did you?

17   A.        No, other than the notes that we are discussing, and

18   I don't know the time frame but I presume it is the February

19   2003 time frame that were discussing the indictment.

20   Q.        All right.  Given that Roy Terry was obviously aware

21   of the Commercial Factors lawsuit, and given the fact that you

22   didn't find any notes at all about the Commercial Factors

23   lawsuit, isn't it just as likely as you simply never found his

24   notes?

25   A.        And that assumes that it would be appropriate for a

Alexander - Cross                              269

1    president to approve the conduct of Rudolph Terry, but it is

2    likely that there are notes that I did not find.

3    Q.        Mr. Alexander, I just want to make sure I understand

4    about your biography.  You never went to law school, practiced

5    as an attorney, or anything like that?

6    A.        No, I am not an attorney.

7    Q.        You probably made a wise career choice.

8              In this litigation you reviewed or did you review a

9    part of the file that was produced from the DeLong /Thomas file

10   to the trustee?

11   A.        I reviewed limited parts of it.

12   Q.        So certainly you didn't review all the entire bulk of

13   material that was produced to the trustee; is that a fair

14   statement?

15   A.        No.  I relied on counsel.

16   Q.        And what portions of the material produced from the

17   DeLong/Thomas file to the trustee did you actually physically

18   take a look at?

19   A.        Principally the information that has been either

20   produced as part of the pleadings or in these exhibits.

21   Q.        And principally that would be most of it, perhaps

22   there is something else, but most of what you looked at is part

23   of these exhibits?

24   A.        That is correct.

25   Q.        A fair statement.  Mr. Alexander, you have indicated

Alexander - Cross                    270

1    that Terry Manufacturing had two sets of tax returns?

2    A.        Yep.

3    Q.        And that the financial records of Terry were either

4    erroneous, highly misleading or outright fraudulent.  Is that

5    a fair statement?

6    A.        It is fair.

7    Q.        And is it safe to say that in your mind Terry

8    Manufacturing was not being honest with its financial

9    reporting?

10   A.        You always try to be careful not to characterize

11   things generally, but I think in this case it is safe to say

12   they were not being honest.

13   Q.        Do you think it is fair to say they were not being

14   honest in the information they gave their creditors about their

15   finances?

16   A.        I believe that that's a fact in this case, yes.

17   Q.        And do you believe that in the same way they were not

18   being honest to their vendors about their financial status, to

19   the extent it might have come up?

20   A.        I believe it is clear from this record that the

21   Terrys were involved in fraud and they were not telling the

22   truth about their financial position, including that they were

23   insolvent at the time that they were dealing with Mr. DeLong.

24   Q.        All right.  Is it your opinion that as part of that

25   scheme, which is what it was, as part of that scheme, it did

Alexander - Cross                    271

1    rest  on  not  telling  people  that  they  were  financially

2    insolvent?

3    A.        Definitely part of the scheme was to prevent people

4    from finding out that they were truly insolvent when they were

5    telling  people  that  they  were  not,  most  notably  their

6    creditors.  That was definitely part of the scheme that was

7    going on in the 2000 time frame.

8    Q.        And would that also include the vendors as opposed

9    to the creditors, in addition to the creditors perhaps?

10   A.        I am not sure I understand the distinction but, if

11   you're drawing one, then it would include parties that dealt

12   with Terry Manufacturing.

13   Q.        Parties such as Mr. DeLong and Mr. Thomas?

14   A.        It  would  include  parties  like  Mr.  DeLong  and  Mr.

15   Thomas possibly.  I can't speak for Mr. Thomas because I don't

16   know  what  he  knew  or  didn't  know  and  I  haven't  heard  his

17   testimony but, with regard to Mr. DeLong, the question in my

18   mind is at what time has he learned enough to realize that he,

19   too, was being deceived.

20   Q.        Can you present anything in writing that Mr. DeLong or

21   Mr. Thomas might have had that would have led them to believe

22   that Terry Manufacturing was insolvent before the bankruptcy

23   petition was filed?

24   A.        You  know,  the  bogus  invoices  are  the  act  of  a

25   desperate company doesn't have money.  You know, while it is

Alexander - Cross                                    272

1    going the wrong way, it still raises a question.  I'm not sure

2    that raises a question of insolvency, but it raises a lot of

3    questions; but I am not aware of anything in writing that Mr.

4    DeLong has generated or that Mr. Terry has generated along

5    those lines.

6    Q.      Going back to the financial reports of Mr. Rose, has

7    Mr. Rose ever produced any type of work papers or anything

8    beyond the financial statements we have seen today regarding

9    Terry Manufacturing?

10   A.      No.

11   Q.      Has Mr. Rose been under – and I just don't know the

12   answer to this.  Has he ever been prosecuted for any type of

13   role in this matter?

14   A.      I am not aware whether he has been prosecuted or not.

15   It is my belief that he has not.

16   Q.      Did you ever attempt to obtain the underlying work

17   papers for Mr. Rose?

18   A.      Yes.

19   Q.      And he refused to provide them to you?

20   A.      Yes.

21   Q.      And to your knowledge he has never given those

22   underlying work papers, assuming there is something there, to

23   anybody; is that a fair statement?

24   A.      And particularly pointing out that you are assuming

25   that there is something there, you are correct.  If there is

Alexander - Cross                          273

1    something there, he hasn't provided it to anyone.

2    Q.      Other than the factors you pointed to as to the

3    solvency - strike that question.  Mr. Terry, will you agree

4    with me, will you not, that neither Mr. DeLong, nor Mr. Thomas,

5    own any stock or any interest in Terry Manufacturing Company?

6    A.      I don't mean to be a quibbler, but I think you just

7    called me Mr. Terry.

8    Q.      I am sorry, sir.  Mr. Alexander, then, would you

9    agree that neither Mr. Thomas, nor Mr. DeLong, owned any stock

10   or financial interest in Terry Manufacturing?

11   A.      I am not aware of any interest.

12   Q.      And would you agree with me that Terry Manufacturing,

13   to your knowledge, never owned any interest in the law

14   practices of Mr. Thomas or Mr. DeLong?

15   A.      Not my knowledge.

16   Q.      And would you agree with me that Terry Manufacturing

17   never operated Mr. DeLong's business or Mr. Thomas' business

18   under any kind of lease or any other arrangement?

19   A.      Not that I am aware of.

20   Q.      Do you have any evidence that Mr. DeLong or Mr. Thomas

21   controlled any of the assets of Terry Manufacturing Company?

22   A.      Well, other than the settlement funds but I think, in

23   the spirit of your question, I don't have any evidence they

24   controlled other assets.

25   Q.      Very good.  And those are the settlement funds that

Alexander - Cross                                    274

1    were either given – a portion given to Commercial Factors and

2    a portion sent back to Terry Manufacturing?

3    A.       My specific knowledge ends at the check leaving our

4    account.  This four hundred thousand dollars that was disbursed

5    to DeLong and Caldwell, it is my understanding were settlement

6    funds.

7    Q.       And it is your understanding that three hundred of

8    that was returned back to Terry Manufacturing?

9    A.       I don't know, but I don't dispute that either.

10   Q.       Would you agree with me that neither Mr. DeLong, nor

11   Mr. Thomas, were ever officers of Terry Manufacturing?

12   A.       I'm not aware that they were ever officers.

13   Q.       And they weren't in any type of general or limited or

14   any other type of partnership with Terry Manufacturing?

15   A.       You are getting a little bit out of my expertise but,

16   based on my expertise, I would agree with you.

17   Q.       And you would agree with me that neither Mr. DeLong

18   nor Mr. Thomas were ever a director of Terry Manufacturing?

19   A.       Based on what I know, I agree with you.

20   Q.       And you would agree with me that neither Mr. DeLong

21   nor Mr. Thomas were ever managers of any type at Terry

22   Manufacturing?

23   A.       I agree with that.

24   Q.       And other than the payments for the litigation

25   services, do you have any evidence of any other financial

Alexander - Cross                                    275

1    relationships between Mr. Thomas, Mr. DeLong, and Terry

2    Manufacturing?

3    A.        With respect to Mr. DeLong, I don't. With respect to

4    Mr. Thomas, and it is not necessarily financial relationships

5    but there is other relationships and I am not sure I know what

6    they are.

7    Q.        Okay. Other financial relationships?

8    A.        I'm not sure I know enough about the relationships.

9    It is just that Mr. Thomas has appeared in this matter in

10   several different situations, including the day we turned over

11   personal or we went through personal effects of Rudolph Terry,

12   claiming to represent Rudolph Terry personally. So all I am

13   pointing out is that Mr. Thomas seems to have other

14   relationships; many of those I am not aware of.

15   Q.        All right. But other than working as a lawyer, you

16   don't know of any other financial relationships with Mr. Thomas

17   and Terry Manufacturing?

18   A.        Yeah, I don't know.

19   Q.        Okay. Do you have any evidence that Mr. DeLong or Mr.

20   Thomas were ever retained to do general counsel type work for

21   Terry Manufacturing?

22   A.        Again, Mr. Thomas has appeared in this courtroom and

23   has observed and has come and overseen the closing of the

24   Atlanta facility. So if you separate the question, it is

25   easier to answer. I am not aware with Mr. DeLong, but I really

Alexander - Cross                              276

1    cannot answer the Thomas question.  I have seen indications

2    that he has performed other types of services that go beyond

3    this matter that we're talking about here.

4    Q.      Mr. Alexander, I am going to ask you a question

5    regarding Trustee's Exhibit, a portion of the Trustee's Exhibit

6    1, your report towards the end of the second one, so you can

7    start pulling it out.  I am not going to ask you about your

8    entire report, but I would like for you to turn, if you would,

9    to appendix "C" of that, and that number is –

10   A.      Mr. Bridgers, can you remind me what exhibit number it

11   is?

12   Q.      Yes, sir.  I'm trying to find my note, where it went.

13   140.

14   A.      Thank you.  Is this in volume three?

15   Q.      No, sir – yes, I'm sorry.  Yes, it is, the small one.

16   It is, I think, right over there.

17   A.      Okay.

18   Q.      If you would turn to Appendix "C."

19           THE COURT:  I am sorry.  Which exhibit is this?

20           MR. BRIDGERS: Number 140, Your Honor.

21           THE COURT:  140.  Thank you.

22   Q.      My understanding, and correct me if I am wrong, is

23   that Appendix "C" is your reconstruction as to what you

24   actually think happened with Terry Manufacturing's finances

25   during this time period?

Alexander - Cross                          277

1    A.        Not exactly, no.  It is a statement of cash, sources

2    and uses.

3    Q.        But has this statement, sources and uses of cash

4    statement, been verified by you, or is this part of the fraud,

5    is what I'm trying to get at?  Is this the fraudulent one or is

6    this the good one?

7    A.        I, and others working for me, reconstructed the

8    records and this is – appendix "C" was prepared by me.

9    Q.        Your best estimate of what happened; would that be a

10   fair statement?

11   A.        It is not intended to present the financial position

12   or the results of operations.  It is simply a statement of the

13   cash that was collected and the disbursements that went out

14   over time.

15             It is severely affected by the status of insolvency

16   and the fact that they were not paying many expenses, and it is

17   also impacted by some of the other things that we found going

18   on in the bank accounts of Terry Manufacturing.

19   Q.        All right.  Given those caveats, my understanding of

20   this is that from 2000 through June 30, 2003, the total cash

21   receipts of Terry Manufacturing were one hundred million, five

22   hundred and twenty-seven thousand dollars, forty-one dollars?

23   A.        From their legitimate lines of business, yes.

24   Q.        Can you present us with any evidence that Mr. DeLong

25   or Mr. Thomas knew or suspected that Terry Manufacturing was

Alexander - Cross                                    278

1   making payments to them and therefore not making payments to

2   other creditors?

3   A.      No.

4   Q.      Mr. Alexander, if I could ask you to open up that

5   white notebook.

6           MR. BRIDGERS: Your Honor, may I approach the witness?

7           THE COURT: Yes, sir.

8           MR. BRIDGERS: Mr. Alexander, if I could ask you to

9   turn to Exhibit 1, and I am going to swap out, Your Honor, if

10  I may, these are actually the originals and take the copy back.

11          THE COURT: Okay.

12          MR. BRIDGERS:   I am sorry.  I thought I had the

13  original up there.

14  Q.      Mr. Alexander, if you would take a look at Exhibit No.

15  1.  Have you found that?  It is entitled, "Complaint and

16  Verified Suit on Open Account."

17  A.      I have it, yes.

18  Q.      And is it your understanding that this is the original

19  complaint by Commercial Factors against Terry Manufacturing and

20  Jon Pouncey?

21  A.      Let me just look over it real quickly.

22  Q.      Certainly.  And just for the record, it does have

23  apparently some work notes on it in handwriting.

24  A.      I see that.  Yes, it appears to be the complaint.

25  Q.      And, Mr. Alexander, if you would please turn to page

Alexander - Cross                    279

1    ten in this complaint.  If I could direct your attention to the

2    "Wherefore."

3    A.      Okay.

4    Q.      The bottom third of page ten.

5    A.      Okay.

6    Q.      Would you agree with me that the "Wherefore," section

7    (a) says, as to count one, that judgment be entered against

8    Terry in the amount of three million, three hundred and twenty

9    thousand dollars and seven hundred ten dollars, together with

10   interest thereon?

11   A.      That is what the document says.

12   Q.      And this is your understanding as to what Commercial

13   Factors was seeking at the time from Terry Manufacturing?

14   A.      In my role as trustee, I never attempted to form an

15   understanding of what Commercial Factors was originally

16   seeking, but the document speaks for itself.

17   Q.      If I could ask you to flip to the next page, section

18   (d), would you agree with me that this states as to count four

19   that judgment be entered against Floodgates and Pouncey,

20   jointly and severally, for reasonable attorney's fees as

21   provided by law, as well as – and the judgment be entered

22   against Terry, Floodgates and Pouncey, jointly and severally,

23   for expenses of collection, and it goes on to say with any

24   recovery thereon, for attorney's fees to be applied against the

25   joint and several liability of Floodgates and Pouncey for

Alexander - Cross                    280

1    reasonable attorney's fees.

2            If you know where I am, sir, is it your understanding

3    that, in addition to the three million, three hundred and

4    twenty odd thousand dollars, that at this time Commercial

5    Factors was seeking attorney's fees against Terry

6    Manufacturing?

7    A.      You know, I am happy – yes, but I want to caution you

8    that I am a CPA and you are asking me to interpret remedies

9    contained in a complaint, and the document speaks for itself.

10   Q.      Very well.  I am not asking you for a legal opinion

11   but, as a CPA, would not this number represent a level of

12   threat or risk or even possible contingent liability to the

13   company?

14   A.      It establishes some potential range maybe.  It really

15   depends on the facts and circumstances and a lot of information

16   that I don't possess before a CPA can begin rendering opinions

17   about what the real number is.

18   Q.      Absolutely, and I understand your caveats here, but

19   would you agree with me, if this was a complaint for twenty

20   thousand dollars, it would represent a different level of

21   threat or risk to Terry Manufacturing than a complaint for

22   three million, three hundred and thirty thousand dollars?

23   A.      And, again, it is hard to say.  Based on – I mean,

24   clearly the number is bigger but whether that ultimately is a

25   risk to Terry Manufacturing in these circumstances is really

Alexander - Cross                    281

1    hard to say.  I mean, my experience in these type matters is,

2    when an officer is found to be conducting potentially criminal

3    conduct, that the officer is –

4            MR. BRIDGERS: Your Honor, I will object.  I do believe

5    it is unresponsive.

6            THE COURT: Okay.  I will sustain that.  I mean, I

7    think the question was, is a complaint asking for three million

8    dollars in damages a greater risk than one asking for twenty

9    thousand.  I think your answer was something to the effect that

10   it depends on the underlying facts.  So I think I understand

11   that.  Why don't we just go on, and we will just strike

12   everything in the answer after that.

13   BY MR. BRIDGERS:

14   Q.        I'm just trying to move on quickly.  Mr. Alexander,

15   do you have any understanding that at some point the complaint

16   against Terry Manufacturing was amended to add tort claims?

17   A.        I learned that yesterday.

18   Q.        All right.  And is it your understanding – if it is

19   not, we will move on – but the tort claims potentially exposed

20   the company to additional damages greater than merely the

21   underlying invoices?

22   A.        That is so fact intensive, I don't really have any

23   opinions either way or knowledge.

24   Q.        Are you aware that, at some point later in the

25   litigation, a RICO claim was added against Terry Manufacturing?

Alexander - Cross                                    282

1    A.        I heard Mr. DeLong testify to that yesterday.

2    Q.        And do you have any general awareness of what possible

3    damages could come from a RICO claim, or is that beyond your

4    area?

5    A.        Again, it is facts and circumstances and I don't know

6    those facts and circumstances, so I don't have an opinion.

7    Q.        Is it your understanding that this matter – let me

8    back up.   Had bankruptcy not been filed, is it your

9    understanding that this matter would have eventually gone to a

10   jury trial?

11   A.        I don't have enough knowledge of the process of how

12   this complaint developed to be able to answer this specific of

13   questions.

14   Q.        Do you have any understanding or opinion about whether

15   or not the existence of a jury trial added a level of

16   uncertainty into the analysis of how much this claim was worth?

17   A.        It depends on the circumstances.   It may have or it

18   may not.   I don't know.

19   Q.        Mr. Alexander, you had referenced in your direct

20   testimony that Commercial Factors filed a claim, I believe you

21   said in excess of one point eight million.   Can you narrow that

22   down or tell us how much in excess it could possibly be?

23   A.        It as a matter of public record in the claims record

24   but, off of the top of my head, no, I don't know what the

25   number is.

```
                           Alexander - Cross                    283
 1    Q.      Was it approximately one point eight million?  You

 2    said in excess earlier, I believe.  I am asking you –

 3    A.      It is in excess of one point eight.

 4            THE COURT:  The claim is in evidence.  Do you want us

 5    to find it?

 6            MR. BARRIERE: It has been admitted as an exhibit.

 7            THE COURT:   Yeah, I have seen a copy of it.

 8            MS. LASKY: It is 88.

 9            MR. BRIDGERS: Thank you, Your Honor.  I apologize.  I

10    missed that.

11            THE COURT: I was just looking at it not long ago.

12            MR. BRIDGERS: I don't want to belabor it if it is in

13    evidence.  I won't.  It is in evidence and I don't need to do

14    that.

15    BY MR. BRIDGERS:

16    Q.      Mr. Alexander, from your understanding of dealing with

17    your trustee matters, are claims, proof of claims, filed under

18    penalty of perjury in the bankruptcy court?

19    A.      That's my understanding.

20    Q.      And have you ever observed persons being pursued for

21    lying under oath in bankruptcy matters, prosecuted perhaps?

22    A.      Bankruptcy fraud?

23    Q.      Yes, sir.

24    A.      I have heard that that can occur.

25    Q.      And in that environment, Commercial Factors has only
```

Alexander - Cross                    284

1   made a claim for – has made a claim for substantially less than

2   the three point three million dollars they originally sought;

3   is that true?

4           THE COURT:   The proof of claim amount is a million,

5   seven ninety-three, three "o" two, forty-two, is the proof of

6   claim I am looking at.  Assuming it has not been amended, that

7   is the number.

8           MR. BRIDGERS: What was that number, Your Honor?

9           THE COURT:   One million, seven hundred ninety-three

10  thousand, three "o" two point forty-two cents.   That's the

11  amount of the claim filed September 13 of 2004.

12          THE WITNESS:   It's plus interest, Your Honor

13          THE COURT:   Well, no, it is not plus interest because

14  the interest clock stops.  That's a legal problem we will take

15  care of at another date but, assuming the claim has not been

16  amended, and it is not uncommon for claims to be amended, but

17  that's the figure we are looking at.  I can pull up the claims

18  register right now, if you want me to.

19          MR. BRIDGERS: No, Your Honor.  I mean, I guess it is

20  part of the record.

21  BY MR. BRIDGERS:

22  Q.      Mr. Alexander, do you know if it has been amended one

23  way or the other?

24  A.      No.

25  Q.      Would you agree with the broad statement Terry

Alexander - Cross                                    285

1   Manufacturing needed legal services to defend this claim?

2   A.          In the Commercial Factors case?

3   Q.          Yes, sir.

4   A.          I agree that Terry Manufacturing needed to be

5   represented.

6   Q.          And do you agree that the company had an obligation

7   to defend itself?

8   A.          With my expertise, I don't know that I have an

9   opinion about the legal obligations.

10  Q.          Do you have an opinion - Mr. Alexander, would you

11  agree with me that at least some of the money paid to Mr.

12  DeLong and Mr. Thomas was necessary to defend the company in

13  the Commercial Factors lawsuit?

14  A.          I haven't seen any documents that would allow me to

15  make that determination and, other than hearing the testimony

16  yesterday, I have very little information to base that on other

17  than what I have already testified about.

18  Q.          Do you know what would have happened if Terry

19  Manufacturing had not answered the complaint against it?

20  A.          I do not, but I can presume that that would not be a

21  good thing based on my experience.

22  Q.          Very well. I think you have answered these. Have you

23  read any of the depositions that were taken in the Commercial

24  Factors case?

25  A.          When we first started this process, I read bits and

Alexander - Cross                                286

1    pieces of depositions that I have come to learn were taken in

2    some of the Commercial Factors proceedings, either the civil or

3    the criminal.  I am not sure which ones.

4    Q.      Do you have an understanding or an opinion about – let

5    me back that up and state that again.  Would you agree with me

6    that it was a reasonable decision on Terry Manufacturing's part

7    to attempt to have summary judgment granted in order to take it

8    out of the case?

9    A.      Other than the timing, and I am not sure I can speak

10   to the reasonableness, per se, here, but it is my experience

11   that early on in cases that the company – when an officer has

12   conducted himself the way Rudolph Terry did, that companies

13   typically distance themselves from the officer until all of the

14   facts are known.  And if summary judgment was part of that

15   process, then I would agree with it.

16   Q.      And you have mentioned the timing issue.  Do you have

17   any evidence at all that the motion for summary judgment would

18   have been ruled upon differently had it been filed at any other

19   time?

20   A.      No.

21   Q.      Have you reviewed any of the motions in which Mr.

22   DeLong was attempting to gain access to the GMAC documents?

23   A.      No.

24   Q.      Have you reviewed any of the documents that he

25   actually was able to obtain from GMAC?

Alexander - Cross                    287

1   A.      No.

2   Q.      Do you have any understanding about whether or not Jon

3   Pouncey testified in a 2004 deposition at some point?

4   A.      I mean, I heard that testimony yesterday and I don't

5   know where he may have testified, whether it was a 2004,

6   criminal proceeding or a civil proceeding, but I know he has

7   testified.

8   Q.      Well, we will move on then.  Would you agree with the

9   general statement that had Rudolph Terry engaged or obtained

10  separate counsel, a separate team, perhaps, would you agree

11  with the general statement that it is much more likely than not

12  that the total legal fees for the company and Rudolph Terry

13  would have been in excess of the legal fees that Mr. DeLong and

14  Mr. Thomas incurred?

15          MR. BARRIERE:  Your Honor, I am going to have to

16  object.  That calls for just rank speculation.

17          THE COURT: I will overrule.  If you have an opinion,

18  go ahead and say.  If you have an opinion on the matter, I

19  would like to hear it.  If you don't have an opinion, then you

20  can say that also but, if you do, I would like to hear it.

21          THE WITNESS: I have an opinion from the perspective of

22  the estate.  I believe --

23          MR. BRIDGERS: I would object to being nonresponsive

24  because he is --

25          THE COURT: No, no.  He is the trustee and he is giving

Alexander - Cross                    288

1    an opinion as the trustee.  If you want to withdraw your

2    question, I will allow that, but you're going to have to take

3    the answer.  Go ahead and answer, if you can.

4            THE WITNESS: Well, from the estate, I believe that the

5    fees incurred by Terry Manufacturing would've been less.

6    BY MR. BRIDGERS:

7    Q.      Very well.  My follow-up question, though, what I was

8    trying to get to is do you think it is more likely than not

9    that had there been a set of lawyers representing Terry

10   Manufacturing and a set of lawyers or a lawyer representing

11   Rudolph Terry, that the total of those two would have been

12   greater than what Mr. DeLong and Mr. Thomas charged?

13   A.      Understanding that my answer is based on the

14   assumption that Rudolph, not Terry Manufacturing, would have

15   paid his legal fees, the fees could have been more, they

16   could've been less, I don't know.

17   Q.      Would you agree with me, then, at least, that assuming

18   there is a hypothetical deposition, two lawyers show up billing

19   on an hourly basis, it is much more likely that the bill is

20   going to be greater than one lawyer showing up and billing on

21   an hourly basis?

22   A.      Again, assuming that those two lawyers are billing the

23   same client, you are going to be charged two for one, yes.

24   Q.      Mr. Alexander, do you have any evidence, can present

25   us any evidence that Mr. DeLong and Mr. Thomas did not actually

Alexander - Cross                    289

1   do the work for which they billed?

2   A.      I am not making any contentions that they did not

3   perform services.

4   Q.      Are you making any contention that the rate they

5   charged, the two fifty an hour, was unreasonable given their

6   experience and the time of the case?

7   A.      To the estate – to be clear, to the estate, I think

8   that is the whole nature of this lawsuit.

9   Q.      Yes, sir, I understand –

10  A.      I haven't really made an evaluation of whether that

11  rate was fair to Rudolph Terry or not.

12  Q.      But am I understanding you are contesting the fact

13  that they billed the company at all; is that more or less your

14  point?

15  A.      Yes, because I haven't seen any evidence of the value

16  received from the company.

17  Q.      Very well.  My question, I was trying to be a little

18  more narrow, are you contesting that, as a general matter, two

19  hundred fifty dollars an hour for an attorney, two attorneys

20  actually, but two hundred fifty dollars an hour was an

21  unreasonable rate to charge?

22  A.      It depends on what the attorney did for the estate,

23  and I don't have that information.

24  Q.      Well, I understand the value.  Absolutely, that is

25  part of the case.  I am just asking do you have any evidence

Alexander - Cross                    290

1    that two hundred fifty dollars an hour was an unreasonable rate

2    for an attorney of Mr. DeLong's experience at the time the case

3    goes on?

4    A.      I understand what you are asking me but you also

5    understand you can't separate the value from the rate.  But to

6    help you, do I think two hundred and fifty dollars an hour on

7    its face for a qualified, competent lawyer is out of line?  No.

8    Q.      Do you have any evidence that Mr. DeLong and Mr.

9    Thomas were not qualified and competent attorneys?

10   A.      I don't know Mr. Thomas well enough to answer that

11   question.

12   Q.      How about as to Mr. DeLong?

13   A.      I don't have any other evidence about Mr. DeLong than

14   what I have learned in this trial, and I'm not going to issue

15   an opinion about him professionally.

16   Q.      Mr. Alexander, as part of, I believe, Roy Terry's

17   sentence, was he required to cooperate with the trustee?

18   A.      Part of the sentencing reflects that he negotiated a

19   cooperation agreement.  He attempted to.

20   Q.      Did you in fact write any type of letter on behalf of

21   Roy Terry expressing, at least, acknowledging his cooperation

22   or at all dealing with his cooperation?

23   A.      I did not, and I don't recall what role any letter may

24   have played.  I don't recall that.

25   Q.      In the end, when all was said and done, Mr. Alexander,

Alexander - Cross                           291

1   was Terry Manufacturing ever found liable to Commercial Factors

2   for a dime in this matter?

3   A.      I think in the end has not arrived yet.     In

4   prosecuting the bankruptcy, I have been advised by trustee

5   counsel to wait to evaluate the validity of claims, but there

6   is a claim.  It is one point seven million, nine hundred and

7   some odd thousand – one point seven-nine-three, I believe,

8   claim, and that is directly related to this matter.

9   Q.      Well, let me narrow my question.  The claim for which

10  Mr. DeLong and Mr. Thomas did work in the Gwinnett County Court

11  in Georgia, was Terry Manufacturing ever found liable to

12  Commercial Factors?

13  A.      I think you are asking a real technical legal question

14  and I'm not sure how to answer it.  I think it has been stayed.

15  I don't know what happened to it after that.

16  Q.      But so far they have not been found liable in the

17  Gwinnett County matter – Terry Manufacturing has not been found

18  liable to Commercial Factors in the Gwinnett County matter, to

19  your knowledge?

20  A.      That's my belief.

21          MR. BRIDGERS:  Your Honor, if I might have a minute.

22          THE COURT: Yes, sir.

23          (Pause)

24  Q.      Mr. Alexander, one more question only because it came

25  up yesterday.  In your professional life – we will stay away

Alexander - Cross                                    292

1    from personal – but in your professional life have you ever

2    refused to produce documents in a lawsuit based on an

3    evidentiary privilege?

4    A.        Yes.

5             MR. BRIDGERS: Thank you, sir. I have no further

6    questions, Your Honor.

7             THE COURT: Okay. Here is what we are going to do. We

8    are going to break for about 15 minutes. We will come back and

9    we will have redirect, if any. For planning purposes, I have

10   got a telephonic hearing at three o'clock this afternoon. So

11   we will take a mid-afternoon break. I don't think it is going

12   to take a real long time, but we may break a little bit longer

13   this afternoon than normal, just to let you know for planning

14   purposes. So, anyway, we will take fifteen minutes.

15            MR. BRIDGERS: Your Honor, before you leave, if I could

16   bring up, because I mentioned yesterday we are trying to do

17   some scheduling of our expert, Professor Ross, and an idea we

18   had – we wanted to get the court's opinion on it – was to ask

19   Professor Ross to be here tomorrow morning at the beginning of

20   court and then perhaps, so we don't waste any time today, it

21   might become necessary, if Mr. DeLong or Mr. Caldwell is

22   testifying, perhaps to break their testimony, take Professor

23   Ross in the morning and let him get back to class in the

24   afternoon.

25            THE COURT: I don't have any problem with that. That

Alexander - Cross                          293

1    is fine.

2            MR. BRIDGERS: Just so we can make the best use of our

3    time.

4            THE COURT: Did you offer Defendant's – we identified

5    Defendant's, I believe it was 33.  Is that offered?

6            MR. BRIDGERS: It is, Your Honor.

7            THE COURT: Mr. Barriere.

8            MR. BARRIERE: I have no objection.  The other comment

9    I was going to have in that regard, since the record contains

10   some testimony with respect to Exhibit "C" which is not in the

11   record, we should probably admit that or admit the entire

12   expert report.  It is of no moment to me one way or the other.

13   But that was the cash flow statement of --

14           THE COURT: Wait a minute.  I thought I saw it in the

15   binder.

16           MR. BARRIERE: It was, but we had – at that moment, at

17   least, the assumption was we were going to remove all of the

18   expert report other than Exhibit "D." I will either leave the

19   entire report in –

20           THE COURT: Why don't we just leave the entire exhibit

21   in, then, the attachments.

22           MR. BARRIERE: That is fine.

23           MR. BRIDGERS: Your Honor, I'm not sure.  I think I

24   might object to the entire expert report, given the fact that

25   Mr. Alexander has testified.  Certainly the piece he referred

Alexander - Cross                                    294

1   to, I showed him, should be coming into evidence.

2           THE COURT: All right.  We will take it up after break.

3           MR. BRIDGERS: I am sorry.  I didn't mean to hold you

4   up.

5           (Recess from 10:37 a.m. until 10:58 a.m.)

6           THE COURT:  We have had direct and cross.  I thought

7   we had Mr. Alexander – I thought we had all of the stuff in the

8   binders into evidence subject to some caveats.  So, I guess,

9   Mr. Bridgers, if you have an objection to Mr. Alexander's

10  reports or any of this stuff that we have been talking about,

11  I think now is the time to make them.

12          MR. BRIDGERS: Your Honor, as a status, my memory is,

13  as to the notebooks, I think we agreed that everything was – I

14  believe Mr. Barriere was holding out the expert reports on the

15  initial offer.  That is why I never understood they had been

16  offered into evidence yet.

17          THE COURT: What is your recollection?

18          MR. BARRIERE: I think that is correct, Your Honor.  My

19  point as we closed was, given that we now have two exhibits to

20  the report that are referenced in the report into evidence,

21  that the record would be much more pristine were we to admit

22  the entire expert report and therefore we would offer, mark and

23  introduce into evidence the entire expert report, including the

24  two exhibits that have been the subject of examination.

25          THE COURT: Okay.  Which tab are we looking at now?

Alexander - Redirect                                    295

1          MR. BARRIERE: 140.  It is the small, third volume.

2          THE COURT: 140, and does 140 have the Exhibit "C?"

3          MR. BARRIERE: Exhibit "C" and "D," I believe, have

4     been the subject of examination and they are both part of that.

5          MR. BRIDGERS:  Your Honor, if I may be heard on that?

6          THE COURT:  Yes, sir.

7          MR. BRIDGERS:  Certainly as to the two pieces of paper

8     that the trustee testified about, they should be marked and

9     made a part of the record.  The rest of the report was not

10    referenced on direct and, having Mr. Alexander now on direct,

11    having given his opinions, having him be here, I would say

12    there is really no use or relevance to admit that report, as

13    well.  It is duplicative.

14         THE COURT:  Okay.  Mr. Barriere.

15         MR. BARRIERE:  Your Honor, I think at some point when

16    a witness is talking about exhibits at such length, it is going

17    to be arguably confusing on the appellate record as to where

18    those exhibits are drawn from.  The exhibits are described as

19    to what they represent.  As the court will recall, there was

20    some fairly lengthy testimony and examination as to what

21    exactly the cash flow statement is.  My concern only would be

22    that simply having the exhibits in isolation will create more

23    confusion than it will resolve.  I don't believe there is

24    anything in the report that differs or varies from the

25    testimony we heard today.  I think it is probably somewhat

Alexander - Redirect                                    296

1   duplicative but I don't believe in any way prejudicial to the

2   defendants and would urge its introduction.

3            THE COURT:  Well, here is what I am going to do.

4   Generally I do allow the expert report in.  I don't see any

5   reason not to here.  And I agree, I think it would be confusing

6   not to have the full report.  So I am going to admit, over

7   objection, Plaintiff's 140.

8            Mr. Barriere, you have redirect.

9            MR. BARRIERE:  Very brief.

10                       REDIRECT EXAMINATION

11  BY MR. BARRIERE:

12  Q.       Mr. Alexander, during your cross-examination you were

13  asked to review what has now, I believe, been marked as

14  Defendant's Exhibit 33.  It was a subsequent financial report

15  appearing under, at least, the letterhead of Mr. Rose.  Do you

16  recall that?

17  A.       Yes.

18  Q.       All right.  You testified at some length in your

19  initial examination concerning the flaws you found in the 1999

20  and 2000 report.  I think you also made reference to subsequent

21  years.  Would I be correct in understanding, sir --

22            MR. BRIDGERS:  Objection.  Leading.

23            MR. BARRIERE:  It is an expert, Your Honor.

24            THE COURT:  Overruled.

25  Q.       Would I be correct that the same flaws you identified

Alexander - Redirect                    297

1    specifically with respect to the '99 and 2000 report exists

2    with respect to the 2001 and 2002 report?

3    A.    Yes.

4    Q.    Would there be the same complete dearth of underlying

5    work papers with respect to the 2001 and 2002 report that you

6    described for the 99/2000 report?

7    A.    Yes.

8    Q.    in each instance, are you of the opinion that the

9    financial reports were fundamentally fraudulent?

10   A.    Yes.

11   Q.    Are you of the opinion that both reports badly

12   misstated the financial condition and results of operation of

13   Terry Manufacturing?

14   A.    Yes.

15   Q.    All right.  Finally, during the cross-examination Mr.

16   Bridgers rightly pointed out that the only two directors of

17   this company of Terry Manufacturing are Rudolph and Roy Terry.

18   Is a closely-held corporation subject to a different standard

19   with respect to the propriety of payment of legal fees of

20   officers than a publicly-held company?

21        MR. BRIDGERS:  Your Honor, I would object only to the

22   extent this calls for a legal conclusion.

23        THE COURT:  Well, I am going to sustain it.  I think

24   it is irrelevant.  We have a publicly traded -- at least we

25   have shareholders here.

Beltran - Direct                                    298

1           MR. BARRIERE:  Let me come at a different way, Your

2    Honor.

3    BY MR. BARRIERE:

4    Q.      Is the propriety, the reasonableness of a legal

5    expense different merely because it is a closely-held

6    corporation, is the accounting standard any different?

7    A.      No, not at all.

8           MR. BARRIERE:  I have nothing further, Your Honor.

9           THE COURT:   Thank you, sir.  You may step down.

10          MR. BARRIERE:  Your Honor, at this time we would call

11   Frank Beltran.

12          THE COURT:  Okay.  Mr. Beltran..

13          (FRANK J. BELTRAN, WITNESS, SWORN)

14          MR. BARRIERE: Your Honor, for ease of reference, Mr.

15   Beltran. we will seek to admit -- I will be discussing  what

16   appears at 141, tab three.

17          THE COURT:  All right.

18                      DIRECT EXAMINATION

19   BY MR. BARRIERE:

20   Q.      Good morning, Mr. Beltran.  Would you state your full

21   name for the record, sir?

22   A.      Frank, middle initial "J", Beltran, B-E-L-T-R-A-N.

23   Q.      All right.  What is your address, Mr. Beltran?

24   A.      I live in Atlanta, Fulton County, and I practice in

25   Atlanta, Fulton County.  My address is 3621 Mayfair, that is

Beltran - Direct                                          299

1    one word, Place, Northeast, Atlanta, Georgia.

2    Q.        All right.  You say you practice in Atlanta.  What is

3    the nature of your practice?

4    A.        Our firm is called Beltran and Associates and our

5    practice, since the early to mid 1980s, involves everything

6    involving lawyer matters, from the admissions process to

7    winding lawyers down to emeritus and everything in between.  It

8    involves ethics, professionalism, and when lawyers split up,

9    when they start firms, everything that relates to lawyer

10   conduct.

11   Q.        So I take it your legal practice exclusively involves

12   lawyer-related issues; is that correct?

13   A.        I would say ninety-eight percent.  From time to time,

14   we may have -- we are trial lawyers and we may be involved with

15   another case, but most of the time we are involved because it

16   involves lawyer matters.

17   Q.        Are you a member of the Georgia bar?

18   A.        I am a member of the Georgia bar.

19   Q.        And when were you admitted?

20   A.        I was admitted in June of 1976.

21   Q.        Where did you attend law school?

22   A.        I went to Mercer University in Macon after I graduated

23   from the University of Georgia.

24   Q.        All right.  Have you been a member in good standing of

25   the Georgia bar since initially admitted?

Beltran - Direct                                    300

1    A.       I have always been a member in good standing with the

2    Georgia bar.

3    Q.       Has your license ever been subject to a disciplinary

4    or revocation proceeding?

5    A.       No, sir.

6    Q.       You told us that your practice focuses on lawyer

7    issues.  Have you been engaged in this case to offer opinions

8    with respect to the ethical obligations of attorneys and the

9    standard of care of attorneys practicing in the state of

10   Georgia?

11   A.       I have, yes, sir.

12   Q.       All right.  Sir, have you previously been engaged as

13   an expert to offer opinions with respect to the ethical

14   obligations and standard of care of attorneys practicing law in

15   the state of Georgia?

16   A.       Yes, sir, I have.  During the last twenty years, I

17   have been an expert both for the plaintiff client and for the

18   defendant lawyer.

19   Q.       All right.  On how many occasions approximately have

20   you been engaged as an expert in those fields, sir?

21   A.       Well, over the past twenty years, I would say our

22   practice, it could be anywhere from ten to twenty-five percent,

23   depending on the size of the case.  Many times when we are

24   engaged, I give -- it is called the section 9-15-14 affidavit

25   -- excuse me -- 9-11-9.1 affidavit, which is required.  Many

Beltran - Direct                                301

1   times that doesn't develop into anything because the case

2   resolves itself.

3   Q.      I'm sorry.  I am not familiar with that term.  What is

4   that affidavit?

5   A.      In Georgia, in the late 80s, early 90s, the General

6   Assembly passed a statute that said, in order to file a

7   malpractice action, you must have an affidavit of a licensed

8   professional in that field, whether it be medicine, law, to

9   give an affidavit.  So in order to bring a legal malpractice

10  claim, lawyers must get an affidavit from another lawyer.

11  Q.      I see.

12  A.      So many of those I have given the affidavits, but that

13  is the only involvement I have in the case.

14  Q.      All right.  Have you been called to testify in a court

15  of law with respect to ethical issues, legal obligations of

16  attorneys and the standard of care?

17  A.      Yes, sir, I have.

18  Q.      All right.  Can you identify what courts in which you

19  have been called to testify?

20  A.      I have just testified in December in the US District

21  Court for the Northern District of Georgia, Judge William

22  Duffey.

23  Q.      Were you accepted as an expert at that time?

24  A.      I was accepted as an expert.  I have also been an

25  expert in the state courts of Georgia in different counties, in

Beltran - Direct                                              302

1    DeKalb County and in Rockdale County, which makes up part of

2    metro Atlanta.

3              I have also been accepted as an expert in Dallas,

4    Texas, in the probate court involving the conduct of a Georgia

5    lawyer there, and I have always been accepted.

6    Q.       All right.  Have you ever had occasion to be a speaker

7    at seminars addressing issues of lawyers' ethical obligations,

8    standard of care, and the breach thereof?

9    A.       Yes, sir, I speak on a regular basis to all of the bar

10   associations and I spoke recently to the law clerks or staff

11   lawyers of the Georgia Court of Appeals and the Supreme Court

12   on ethics and legal malpractice.

13   Q.       Have you written in the area?

14   A.       Yes, I have.  I regularly prepare seminar outlines

15   and, in the past, I have written articles in the *Georgia State*

16   *Bar Journal* and in the *Georgia Trial Lawyers Verdict Magazine*,

17   and I continually update a chapter -- it was ten, but now I

18   think it is chapter twelve -- of the *Georgia Trial Lawyers*

19   *Notebook on Conduct of Counsel*.

20   Q.       And that chapter addresses ethical obligations,

21   standard of care and the breach thereof?

22   A.       Yes, sir.

23   Q.       All right.  Has there ever been an occasion when you

24   have been tendered as an expert in those fields and, for any

25   reason, the tender has been rejected, you have not been

Beltran - Direct                                303

1    accepted as an expert?

2    A.      That has never happened.

3    Q.      All right.

4            MR. BARRIERE:  Your Honor, at this time I would tender

5    Mr. Beltran as an expert, qualified to offer opinions with

6    respect to the ethical obligations applied to attorneys

7    practicing in the state of Georgia; the standard of care

8    applicable to attorneys practicing in the state of Georgia and

9    the breach thereof; and specifically opinions with respect to

10   the conduct of the defendants in this case.

11           THE COURT:  Okay.  So at this point you are just

12   saying that this gentleman is an expert and later on -- you are

13   not offering the opinion at this point?

14           MR. BARRIERE:  I will do so.  I think I have to have

15   either acceptance of his expertise by Mr. Bridgers or, if he

16   wishes to challenge him as an expert, he is entitled to

17   obviously cross-examine him at this time.

18           THE COURT:  Mr. Bridgers.

19           MR. BRIDGERS:  Your Honor, I have no challenge to Mr.

20   Beltran's status as an expert.  As time goes on, I may, of

21   course, challenge some opinions and perhaps the basis under the

22   Daubert and Kumho cases.

23           THE COURT:  No question.  Yes, sir.

24           MR. BRIDGERS:   Thank you, Your Honor.

25           THE COURT:  You don't even need to reserve that.  I

Beltran - Direct                                    304

1    take that as a given.

2              MR. BRIDGERS:  All right.

3    BY MR. BARRIERE:

4    Q.      Mr. Beltran, just to get a frame of reference, you

5    were engaged as an expert in this case; is that correct?

6    A.      Yes, sir, I was.

7    Q.      All right.  And what areas were you asked or what

8    issues were you asked to address as an expert in this case?

9    A.      I was asked to review whatever records and testimony

10   you provided and to let you know whether, in my legal opinion,

11   my expert opinion, there was a conflict of interest.  And if

12   there was such a conflict, were appropriate notifications and

13   waivers, if possible, given and, you know, if there was a

14   conflict, was the conflict waivable or non-waivable.

15   Q.      All right. Were you also asked to opine as to whether

16   the defendant's conduct in the handling of the Commercial

17   Factors litigation and dual representation breached the

18   standard of care applicable to attorneys in the state of

19   Georgia?

20   A.      I was, yes, sir.

21   Q.      All right.  Are your at least initial opinions

22   summarized in Exhibit 141, the expert report you tendered in

23   this case?

24   A.      Yes, sir, they are.

25   Q.      All right.  Incidentally, sir, does that -- does

Beltran - Direct                                    305

1    Exhibit -- excuse me -- the first attachment represent the

2    writings you have presented in the area of legal ethics and

3    standard of care?

4    A.        Yes, sir.

5    Q.        Does that also indicate the matters in which you have

6    been called to testify as an expert at trial in these areas

7    over the last four years?

8    A.        It does up until, at some point after number twelve,

9    and I have given approximately four or five deposition

10   testimonies and one trial testimony.

11   Q.        And that is in addition to what is set forth here?

12   A.        Yes.

13   Q.        And in what matter did that occur?

14   A.        Okay. I made a list right here because I thought you

15   might ask me. In a case that was in federal court, it is

16   called *Atlantic Rim v. Slutzky, Wolfe and Bailey*, I was deposed

17   in that case in September of 2006 and, as I said, I testified

18   in federal court in December of 2006. That was one that I was

19   involved in.

20            I was recently, in January, in a deposition taken

21   where I was the expert for the defendant/counterclaimant,

22   Community Bank. It was a plaintiff, Jones, versus Community

23   Bank; and both of those cases involved conflicts.

24            I think since I gave that, there was one other

25   deposition where I was hired by the Fellows, Johnson & LaBriola

Beltran - Direct                                    306

1    law firm to testify for a corporation called Urim against an

2    out-of-state firm called Arter & Hadden, and I gave a

3    deposition in that.  So that, I believe, would update my list.

4    Q.        Very well.  And does the final attachment represent

5    your firm's resume?

6    A.        Yes, that was our resume in 2006 and it is

7    substantially the same.  There are just a few changes, although

8    nothing substantial.

9    Q.        All right.  Now, sir, as a frame of reference, is my

10   understanding correct that Georgia has had different ethical

11   rules applicable to its attorneys during the pendency of the

12   Commercial Factors litigation?

13   A.        Yes, sir.  Prior to January 1 of 2001, Georgia had a

14   set of rules which had three components.  There were the

15   ethical considerations, the directory rules and the standards

16   of conduct.  And then on January 1 of 2001, our Georgia Supreme

17   Court promulgated the model rules, which are very similar to

18   the ABA model rules but they are not identical.  And so

19   lawyers, during this transition, have been under two sets of

20   rules.

21   Q.        All right.  You are aware, are you not, that Mr.

22   DeLong of DeLong and Caldwell -- well, the DeLong and Caldwell

23   engagement letter signed by Mr. DeLong was issued on January 3,

24   2000; are you aware of that?

25   A.        Yes, I am.

Beltran - Direct                                              307

1   Q.        And what body of rules were applicable to attorneys

2   practicing in Georgia on that date?

3   A.        On that date, it would be the previous rules, the

4   ethical considerations, the directory rules and the standards

5   of conduct.

6   Q.        All right.  I have put before you on the screen rule

7   3-105, canon five, "A lawyer should exercise independent

8   professional judgment on behalf of his client."  Is that

9   obligatory to all attorneys?

10  A.        It is obligatory to all lawyers.  It is a very

11  important component in representing a client.

12  Q.        What implications, if any, does rule 3-105 have with

13  respect to dual representation?

14  A.        Well, a lawyer must provide a client utmost -- give

15  the client utmost trust and confidence and he must have

16  undivided loyalty, vigor and zealousness according to the cases

17  and the law.  And the only way he can do that is by exercising

18  independent professional judgment.

19            Somebody mentioned, I think earlier in this trial, you

20  can't serve two masters; and a lawyer should always be able to

21  exercise independent professional judgment on behalf of each

22  client he or she represents.

23  Q.        Let's talk next about next EC 5-1.  I will just read

24  it into the record:

25            "The professional judgment of a lawyer should be

Beltran - Direct                                              308

1          exercised, within the bounds of the law, solely for

2          the benefit of his client and free of compromising

3          influences and loyalties. Neither his personal

4          interests, the interests of other clients, nor the

5          desires of third persons should be permitted to dilute

6          his loyalty to his client."

7                What implications, if any, do you believe ethical

8     consideration 5-1 has with respect to a lawyer faced with or

9     conducting dual representation?

10    A.      Well, this is an expansion of the canon which it comes

11    under, and what it is saying is you can only really serve one

12    client if your independent professional judgment is affected in

13    any way, and that could be affected by your own personal

14    interest; it could be affected by interest of another client,

15    whether it be a former client, current client or the desires of

16    third persons, someone trying to influence you, maybe like

17    paying your bill for your client and expecting something in

18    return.

19    Q.      What are the implications for attorneys faced with the

20    dual representations where a defense, an affirmative defense he

21    could assert on behalf of one client may be adverse to the

22    interest of another client or the position taken by another

23    client?

24    A.      Well, that would definitely affect the independent

25    professional judgment of a lawyer because a lawyer has to be

Beltran - Direct                                    309

1  able to represent one client with absolute, undivided loyalty.

2  So if you are trying to represent two people and one has a

3  defense and one doesn't, you can't provide independent,

4  professional judgment to the one with that defense.

5  Q.        Ethical consideration 5-14:

6            "Maintaining the independence of professional judgment

7            required of a lawyer precludes his acceptance or

8            continuation of employment that will adversely affect

9            his judgment on behalf of or dilute his loyalty to a

10           client. This problem arises whenever a lawyer is asked

11           to represent two or more clients who may have

12           differing interests, whether such interests be

13           conflicting, inconsistent, diverse, or otherwise

14           discordant."

15           Obviously this EC directly addresses the conflict

16  situation; does it not?

17  A.        It does and it further identifies a division of

18  loyalty if you have differing interests, and it goes further

19  and tells you what those differing interests mean, and it is a

20  very low threshold – conflicting, inconsistent, diverse or

21  otherwise discordant – but the very low threshold that's been

22  addressed by the Georgia Supreme Court in these type cases.

23  Q.        As a general proposition, sir, what is the standard of

24  care for an attorney practicing in the state of Georgia?

25  A.        The standard of care, and I set forth this in my

Beltran - Direct                                    310

1    expert report, a lawyer's duty is to use such skill, prudence

2    and diligence as lawyers of ordinary skill capacity commonly

3    possess and exercise in the performance of the tasks which they

4    undertake.

5          Then our Supreme Court went further and said the

6    standard of care in general is that level of competency of the

7    legal profession in Georgia and the related standards of the

8    state bar of Georgia, and it is that care, practiced on a

9    day-to-day basis, in general, throughout the state of Georgia.

10   Q.    All right.    What implications do the ethical

11   considerations have with respect to the standard of care of an

12   attorney insofar as his ethical obligations are concerned and

13   insofar as his duties to his client with respect to loyalties

14   and the other issues you have mentioned?

15   A.    Well, a lawyer must abide by the ethical

16   considerations in representing a client.

17   Q.    In your judgment, is a breach of the ethical

18   considerations likewise a breach of the standard of care

19   applicable to attorneys in the state of Georgia?

20   A.    It is and, in fact, in the *Lefkoff v. Duncan* case, the

21   court said standing alone by itself, if you just cite the

22   ethical rule, that won't provide the deviation, but that, along

23   with expert testimony, is the standard of care and can be

24   brought into evidence for the trier of fact to determine what

25   the standard was, if that ethical consideration addresses the

Beltran - Direct                                    311

1    conduct in question.

2    Q.       All right.  And as you have testified, this, among

3    others we will look at, specifically addresses the conflict

4    situation?

5    A.       It does, yes, sir.

6    Q.       If a lawyer is requested to undertake -- this is EC

7    5-15:

8            "If a lawyer is requested to undertake or to continue

9            representation of multiple clients having potentially

10           differing interests, he must weigh carefully the

11           possibility that his judgment may be impaired or his

12           loyalty divided if he accepts or continues the

13           employment. He should resolve all doubts against the

14           propriety of the representation."

15           Is this determination to be made by the lawyer

16   independent of the client?

17   A.       You work with the client in determining all of the

18   facts to see if your loyalty can be impaired in any way, but

19   the way the courts resolve it is what would an independent

20   lawyer, looking at just client one, what would that lawyer say,

21   would his obligation be diluted in any way, what would a

22   reasonable lawyer do in that situation, not the lawyer trying

23   to represent two people but if you are representing just that

24   client.

25           In other words, would you do something different if

Beltran - Direct                                    312

1   you were representing just one client versus two clients is the

2   way it has been said.

3   Q.      Now this ethical consideration makes reference to

4   continue and continuing.  Does that, as you understand it,

5   require that there be an ongoing evaluation of whether there

6   are differing interests between the clients?

7   A.      Yes, throughout.  In fact, there are two steps.  It is

8   at the commencement.  The rule says when you commence a

9   relationship with your client, and then throughout the

10  relationship that you have this continuing duty to make sure

11  that your loyalty is not divided in any way on behalf of your

12  client.

13  Q.      All right.  Let's make sure that I understand.  Let's

14  assume a simple hypothetical.  Two people come to visit me.

15  They have been hit in a car wreck, there has been an accident.

16  They want me to sue the driver of the other car.  I interview

17  them and it appears that, you know, all of the facts are

18  consistent as they stated, the driver was not at fault.  Six

19  months later it comes to my attention that, in fact, the driver

20  was both impaired and speeding.  Do I need to, at that

21  juncture, reevaluate the dual representation?

22  A.      Absolutely, you do.  You need to reevaluate on behalf

23  of each of the clients and you may be able to continue, you may

24  have to withdraw, or you may be able to represent one client

25  and not the other.

Beltran - Direct                          313

1    Q.      Is my client's desires paramount and dispositive

2    there? By that, I mean, let me just assume with those same two

3    clients, they say, "Well, we are comfortable with this.  We

4    like you and we want to save money, lawyers are expensive.  We

5    would like to save some money, so we want to stay with you."

6    Is that dispositive of the issue?

7    A.      No.  The Georgia Supreme Court in cases and in formal

8    of advisory opinions have said that, many times where the

9    client has consented, the court is not going to allow the

10   representation to proceed.

11   Q.      EC 5-15:

12           "A lawyer should never represent in litigation

13           multiple clients with differing interests, and there

14           are few situations in which he would be justified in

15           representing in litigation multiple clients with

16           potentially differing interests."

17           What, as you understand it, is the meaning of the term

18   "differing?"  Do they have to be directly adverse?

19   A.      Well, we go back to, I think it was the earlier EC

20   that says different can mean, or differing means conflicting,

21   inconsistent, diverse or otherwise discordant.  And so the

22   courts have said differing is a very low threshold.

23           So it doesn't mean you have to have, you know, an

24   actual conflict if you have differing.  Differing, the courts

25   in the ethical considerations, have been promulgated to say

Beltran - Direct                                            314

1    then you have got a problem as a lawyer and you have to step

2    back and decide whether your independent, professional judgment

3    has been affected or will be affected.

4    Q.      All right.  The second clause reads or instructs that

5    there are few situations in which you would be justified in

6    representing in litigation multiple clients with potentially

7    differing interests.  Have the Georgia courts provided any

8    meaning to or definition of how one determines whether he is in

9    one of those, quote, few situations?

10   A.      Well, they have issued formal advisory opinions where

11   it is very clear where you cannot be involved, and then they

12   have issued formal advisory opinions that have basically said

13   that, if there are differing interests, a lawyer should not

14   proceed; and the Supreme Court, in March of '99, said if there

15   are potentially different reasons, only can you rarely obtain

16   consent from a client.

17           So it is a very, very small, small, I guess, range of

18   what you can do.  They haven't gone specifically what are those

19   ranges because you have to look at each case upon its facts.

20   Q.      Fair enough.  Ethical consideration 5-16:

21           "In those instances in which a lawyer is justified in

22           representing two or more clients having differing

23           interests, it is nevertheless essential" -- essential

24           -- "that each client be given the opportunity to

25           evaluate his need for representation free of any

Beltran - Direct                          315

1          potential conflict and to obtain other counsel if he

2          so desires."

3          What is required by ethical consideration 5-16 to

4   satisfy the essential requirement that each client be given the

5   opportunity to evaluate his need for separate representation?

6   A.       Well, the lawyer must go to each client and say, if I

7   were representing you individually, this is what I would do

8   differently than if I am representing you two together.  A

9   lawyer cannot just say there is no conflict because lay people

10  don't understand what that is.  The court in the formal

11  advisory opinion said you have to explain what are the risks

12  and what are the advantages and disadvantages if you have one

13  lawyer representing two people.  And then, after you provide

14  them with all of the information, you have to tell them that

15  they have a right to go and see another lawyer, an independent

16  lawyer, to advise them further on whether they should hire

17  separate counsel or, if it is consentable, whether they should

18  come back and consent to the dual representation.

19  Q.       All right.  I take it you need to advise the client

20  not only of the possible differing claims or defenses, you have

21  to discuss with him strategic issues and how it will impact the

22  performance of the case?

23  A.       Sure you do.  Now, one thing you have to do any time

24  you are involved with multiple clients, at the very get-go you

25  must let them know that there is an issue of confidentiality.

Beltran - Direct                                        316

1    There are two options available.  One is that both clients,

2    whatever they say to you, will remain confidential, which can

3    cause a lot of problems and you have to deal with it.  The

4    other is that both clients understand that whatever they tell

5    you, the lawyer, there is no attorney-client privilege.  So

6    that is something you have to decide at the get-go and then,

7    based on that, the lawyer goes forward.

8    Q.      EC 5-16:

9            "Thus, before a lawyer may represent multiple clients,

10           he    should    explain    fully    to    each    client    the

11           implications of the common representation and should

12           accept or continue employment only if the clients

13           consent.  If there are present other circumstances

14           that might cause any of the multiple clients to

15           question the undivided loyalty of the lawyer, he

16           should    advise    all    of    the    clients    of    those

17           circumstances."

18           Is there a necessary form, or format, for the client's

19   consent?

20   A.      No, there really isn't but, in order to give the

21   consent, the client has to receive a detailed disclosure from

22   the lawyer of all of the, again, the risks and the advantages

23   and disadvantages of using one lawyer for two clients versus

24   having a separate lawyer for each client.

25   Q.      Must that disclosure be in writing?

Beltran - Direct                                    317

1    A.        Well, in Georgia, prior to January 1, 2001, there were

2    three  – two instances where it needed to be in writing.  One

3    was involving successive representation where you had a former

4    client and then you represent a new client and it is in a

5    substantially related matter, you had to get written permission

6    from the former client.  That was standard 69 that spelled that

7    out, and there are cases that discuss that standard 69.

8           Then there was standard 30 that said, if the lawyer's

9    own personal interest, at all, affect his independent

10   professional judgment, he either must give written disclosure

11   or receive written consent from the client.

12          And then in the multiple representation, prior to

13   January 1, 2001, there was not a requirement for a written

14   disclosure or consent.

15          However, on January 1 of 2001, the Supreme Court in

16   the model rules says that you must provide a full, detailed,

17   written disclosure to the client and that the client doesn't

18   have to consent in writing but it would be preferred that they

19   do, but they do require that a written, full and detailed

20   disclosure go to the client regarding the conflict.

21   Q.        All right.  Now, based upon your knowledge of the

22   facts and developments in this case, do you have an opinion as

23   to whether there had to be written disclosure by Mr. DeLong,

24   DeLong and Caldwell, to Terry Manufacturing and Rudolph Terry

25   at the time of the initial engagement?

Beltran - Direct                                    318

1    A.        At the time of the initial engagement, I do not

2    believe that there needed to be a written consent at that time.

3    At some point, I believe, as a continuing representation, under

4    standard 30 there had to be a written consent or a written

5    disclosure of how the lawyer's personal interests were

6    affecting his independent professional judgment.

7    Q.        Based upon your review of the testimony and what you

8    heard in court in the last 36 hours, have you reached any

9    opinion as to likely when that point was reached?

10   A.        Well, when I first read the deposition of Mr. DeLong,

11   it was in the summer or fall of 2000.  When I heard his

12   testimony, he started to have questions as early as March or

13   April of 2000.  So I would say sometime within the spring or

14   summer of 2000, it was clear that he needed to provide some

15   type of disclosure to the client.

16        Now Mr. DeLong, to this day, says there was never an

17   actual conflict.  Well, I have an opinion and disagree with

18   that.  But at some point, if Mr. DeLong determined that there

19   was a potential and/or an actual conflict after January 1,

20   2001, he was then under the new --

21        MR. BRIDGERS:  Objection, Your Honor.  This moves

22   beyond the scope of Mr. Beltran's January -- after January 31,

23   2000, moves beyond the scope of both his deposition and his

24   expert report.

25        THE COURT:  Okay.  Let's do this.  Mr. Barriere asked

Beltran - Direct                                    319

1    a fairly pointed question and then Mr. Beltran kind of picked

2    up the ball and ran with it.  I think the answer went beyond

3    the question.  So what I am going to do is simply cut off the

4    answer and then ask for a more specific question.  And then, if

5    you have got a problem with that, Mr. Bridgers, you can make a

6    fresh objection.

7            MR. BRIDGERS:  Thank you, Your Honor.

8    BY MR. BARRIERE:

9    Q.      Okay.  Well, I am going to ask him -- do you believe

10   that after January 1, 2001, Mr. DeLong should have provided

11   written disclosure?

12   A.      Yes.

13           MR. BRIDGERS:  Your Honor, that was a direct question.

14   The same objection.  It goes beyond the scope of his report and

15   it goes beyond the scope of his deposition, changing the basis

16   of his opinion, which is not allowed under 26(a)(2)(B).

17           THE COURT:   Okay.

18           MR. BARRIERE:  Your Honor, we can debate this at some

19   length.  I am looking at the report itself.  By no later -- if

20   you wish me to quote from it:

21              "By no later than late June 2001, Mr. DeLong knew or

22              should have known that Floodgates and Rudolph Terry

23              had engaged in a fraudulent scheme.  Specifically,

24              Floodgates issued invoices to the company -"

25   He goes on.  He is told that Mr. Terry will be added as an

Beltran - Direct                           320

1    additional defendant.  He did so late in the summer of 2001.

2             "Mr. DeLong then also assumed the defense of Rudolph

3             Terry.   Again, he  failed  to  provide  any  written

4             disclosure of potential or actual conflicts between

5             the  interests  of  the  company  and  the  interests  of

6             Rudolph Terry."

7             He then goes on to say why he believes that breaches

8    the duty of care.

9             THE COURT: Okay.  The objection is overruled.  I will

10   allow him to answer.

11            MR. BARRIERE:  Thank you, Your Honor.

12   BY MR. BARRIERE:

13   Q.       Please.

14   A.       Like I had said earlier, there are two times under the

15   rules -- the rules were under a state of flux because you had

16   the old rules until January 1, and then the new rules kicked

17   in.  Under both rules, there were circumstances where written

18   disclosure had to be given.  Now under the old rules, it said

19   you can have written consent or written disclosure.  Under the

20   new rule, it says that you must give written disclosure, we are

21   not going to require written consent but it is preferable that

22   you get it.  So the answer is, under both, you had to provide

23   some kind of written disclosure to the client.

24   Q.       Now let me ask you this.  We saw earlier an ethical

25   consideration  that  suggested  that  this  was  a  continuing

Beltran - Direct                                    321

1    obligation.  If a potential conflict arguably was ripening into

2    an actual, the attorney needed to reevaluate.  If an attorney,

3    in good faith, had determined it was a potential conflict prior

4    to the adoption of the new rules but, after January 1, 2001,

5    became concerned of developments that it was perhaps moving

6    towards the actual, then would he be required to give written

7    disclosure at that time?

8    A.        Not in all cases, but if his personal interest became

9    involved, he would have to give written disclosure.

10   Q.        Under the new rules, in your judgment, was Mr. DeLong

11   required to give written disclosure after January 1, 2001,

12   because of the adoption of the new rules?

13   A.        Yes, the new rules make it mandatory that they be

14   given written detailed disclosure.

15   Q.        Ethical consideration 5-18:

16            "A lawyer employed or retained by a corporation or

17            similar entity owes his allegiance to the entity, not

18            to the stockholder, director, officer, employee,

19            representative or other person connected with the

20            entity.  In advising the entity, a lawyer should keep

21            paramount its interest and his professional judgment

22            should not be influenced by the personal desires of

23            any person or organization."

24            Would you agree with me, sir, that this basically

25   confirms that your client is the corporation and not the

Beltran - Direct                                322

1    persons associated with it?

2    A.       There is no question when you represent a corporate

3    entity, or any type of entity, the entity is the client and not

4    the constituents or the members or partners or shareholders of

5    that entity.

6    Q.       All right.  In that regard, we had a lot of testimony

7    yesterday to the effect that, look, this is a closely-held

8    corporation; they had two shareholders, they had two officers,

9    they had two directors.  This isn't General Motors, I think was

10   the reference I heard.

11          Is this rule somehow inapplicable when the attorney is

12   representing a closely-held corporation?

13   A.       No, this rule applies to both.  I believe, when you're

14   dealing with a closely-held corporation of a small number of

15   shareholders, especially if it is nonpublic, this rule gives

16   even further guidance because a lawyer can't just be a file

17   cabinet.  A lawyer has to think and, when an individual comes

18   in, in two shareholder, three shareholder type corporation that

19   is not public, a lawyer has to really careful up-front that

20   that individual, whoever it is, doesn't think the lawyer is

21   representing him or her, too.

22          The lawyer has to make it clear from the get-go that

23   I only represent the corporation, I can't represent you and, if

24   your interests are different at any time, I just need to tell

25   you anything you tell me is not confidential.  These are

Beltran - Direct                                    323

1   disclosures that have to be made at the very beginning of the

2   relationship of an entity.

3            And so, therefore, with a closely-held corporation, I

4   think it is more important that the lawyer give even a further

5   and full disclosure to the constituent, or shareholder, or

6   officer that comes to him or her.

7   Q.       All right.  Well, let me ask you a practical issue.

8   It says here, I am reading the point that is in bold:

9            "A  lawyer  should  keep  paramount  its"  –  the

10           corporation's  –  "interests  and  his  professional

11           judgment  should  not  be  influenced  by  the  personal

12           desires of any persons or organization."

13           What are the implications of that requirement when the

14   lawyer is asked to represent both the closely-held corporation

15   and one of its principal stockholders?

16   A.       Well, the lawyer has to make sure that there is no

17   differing interests, which has already been defined by either

18   conflicting, inconsistent, you know, diverse or discordant.  So

19   the lawyer has to make sure that the interests are parallel and

20   not differ in any way because his allegiance, his undivided

21   absolute loyalty is to the entity and to no one else.

22   Q.       EC 5-18:

23           "Occasionally a lawyer for an entity is requested by

24           a  stockholder,  director,  officer,  employee,

25           representative  or  other  persons  connected  with  the

Beltran - Direct                              324

1          entity to represent him in an individual capacity.  In

2          such case, the lawyer may serve the individual only if

3          the lawyer is convinced that differing interests are

4          not present."

5          Can the lawyer's judgment be overridden by the

6     corporation and the officer?  If the corporation or the

7     officers say, in effect -- or if the officer says, "We don't

8     want to pay multiple lawyers, so we want you to represent us

9     both," can the lawyer accept that judgment notwithstanding

10    concerns that there may be differing interests?

11    A.        If there are differing interests, the lawyer cannot

12    accept the multiple representation of the entity and the

13    individual.

14    Q.        The Georgia Rules of Professional Conduct, after

15    January 1, 2001, we will get to those in a moment.  I want to

16    focus now, if I may, on your methodology in reaching your

17    opinions in this case.  What did you review in order to form

18    your opinions?

19    A.        I received from you pleadings and deposition testimony

20    and deposition exhibits, which I have reviewed, and I have also

21    reviewed the Georgia rules, both prior to January 1, 2001, and

22    after January 1, 2001; the formal advisory opinions of our

23    Supreme Court; and case law that touches upon these issues.

24    Q.        All right.  Have you reached an opinion as to whether

25    there was a conflict between the interests of Rudolph Terry and

Beltran - Direct                                325

1    Terry Manufacturing at the time of the initial engagement?

2    A.        At the time of the initial engagement, there was an

3    actual   conflict   between   Mr.  Rudolph  Terry   and   Terry

4    Manufacturing.

5    Q.        And why is that?

6    A.        Well, because of the testimony yesterday where Mr.

7    Rudolph had obtained -- he had these fraudulent invoices where

8    he had received no product, was paying for certain product or

9    paying for product not received, and people refer to them as

10   fake invoices or invoices of interest, or whatever they were.

11   But he was doing things that the corporation received no

12   benefit or had no knowledge of.

13   Q.        All right. Now, Mr. DeLong, of course, has testified

14   that he wasn't aware of that. Just a garden-variety collection

15   suit.

16   A.        Yeah, he said when he was first hired, he was not

17   aware of it.  I don't know if he was aware of it or not, but

18   the issue is was he aware of it and should he have been aware

19   of it, and I think the court can decide that after it hears all

20   of the evidence.

21   Q.        Are you aware, based upon your review of the record

22   prior to coming to court, or what you heard yesterday, whether

23   there  were  differing  interests,  objectively  ascertainable

24   differing interests at the time of the initial engagement?

25   A.        Based upon what I've heard, I am not sure, but a

Beltran - Direct                                      326

1    lawyer, again, must probe.  When someone comes to him, the

2    lawyer must probe and find the basis for the allegations and

3    say where is the documentation, this sort of thing.  And then

4    if the client can't answer the questions or gives answers that

5    troubles the lawyer, or can't produce certain documentation,

6    then the lawyer might be on notice.

7          But based upon Mr. Terry just coming to that initial

8    meeting, I can't say whether Mr. DeLong knew there were

9    differing interests at that exact time, but the record is clear

10   that there was shortly thereafter.

11   Q.      Now, in your judgment at the time of the initial

12   engagement, could there be an effective waiver between Rudolph

13   Terry, on the one hand, and the company, on the other, of

14   multiple representation?

15   A.      At that time, there could have been but, again, the

16   lawyer is under a continuing duty and, once these differing

17   interests come into existence, then the lawyer has a duty to,

18   you know, go and talk to the different clients, provide them

19   the disclosures we have already talked about and then make a

20   decision as to whether he, with their consent, he can continue

21   to represent them or, even if they consented, he can no longer

22   represent them, or whether he can only represent one, or

23   whether he has to withdraw from representation of either.

24   Q.      We will hear from him tomorrow but my appreciation,

25   hearing Dr. Ross' testimony in his deposition, was that,

Beltran - Direct                              327

1    provided they have got adequate information, two clients can

2    waive any conflict.  Is that consistent with the law of the

3    state of Georgia?

4    A.        That's absolutely incorrect.  The Supreme Court in

5    formal  advisory  opinions  and  in  cases  have  said,

6    notwithstanding that the clients consented, we are not going to

7    allow this representation to go forward.  So, you know, there

8    are  many  times  --  and  the  rules  themselves  provides  when

9    conduct -- where representation can be consented to and where

10   it  can't  be  consented  to.   So  there  are  many  times  where

11   individuals want to consent, and do consent, and under Georgia

12   they can't consent as a matter of law.

13   Q.        Now based upon the depositions you read, the testimony

14   you heard yesterday, do you believe there came a time when it

15   was  objectively  ascertainable  that  there  were  differing

16   interests between the company, Terry Manufacturing, and Rudolph

17   Terry?

18   A.        I have, yes.

19   Q.        And what is your opinion in that regard?

20   A.        The opinion would be that sometime between March of

21   2000, the end of March of 2000, the middle to end of March

22   of 2000 and early summer of 2000, there is no question that the

23   lawyer  knew  or  should  have  known  that  there  were  severe

24   differing  interests  between  Mr.  Rudolph  Terry  and  Terry

25   Manufacturing.

Beltran - Direct                                    328

1    Q.        And what did you, based upon your analysis, perceive

2    to be those differing interests?

3    A.        Well, the first was there was the testimony in March

4    by Mr. Rudolph Terry where he had trouble identifying records

5    and documents.  And then there is a letter — then Mr. DeLong

6    testified there was conversation with the Smith-Gambrell

7    lawyers where they were suggesting that something wasn't right,

8    and he said in his mind spikes went up and I had a question

9    right there.  Then they sent a letter to him and they said we

10   are going to add a claim against Mr. Rudolph Terry, and then

11   you had testimony of Mr. Pouncey.  I think he testified in May

12   and he testified in June, and during that time it was clear

13   that the lawyer knew, or should have known, that there were no

14   invoices for this claim for three point whatever thousand

15   dollars, or the two point one they wanted to settle for.

16   Q.        Do you have an opinion as to whether Mr. DeLong,

17   DeLong and Caldwell, were compelled to withdraw from the

18   representation of one or both, Rudolph Terry and the company,

19   at that time?

20   A.        Well, at that time they were representing -- they

21   initially, according to their testimony, they initially

22   represented the company and they continued to represent the

23   company. When Mr. Rudolph Terry sought advice from them, legal

24   advice, at that time they had to tell him we cannot represent

25   you, we cannot represent you.  We can only represent the

Beltran - Direct                                329

1    entity.  You need to go and get another lawyer.  Even if you

2    consent, even if it is cheaper, we cannot represent you.

3         And, of course, he had two choices.  He could go and

4    get another lawyer or he can try to get another lawyer for the

5    corporation, but Mr. DeLong could not represent both of them at

6    that time.

7    Q.      All right.  Mr. Beltran, let me ask you, I have heard

8    it said if a lawyer had a conflict in a malpractice context, it

9    is not the end of the inquiry, there has to be some injury,

10   some resulting damage.  Is that true?

11   A.      Yes.  What the Georgia cases have said in the *Peters*

12   *v. Hyatt Legal Services* case and Read *v. Benedict*, that if

13   there is a conflict of interest between the lawyer and a

14   client, then the law is going to presume nominal damages, let

15   the trier of fact determine whether punitive damages are

16   applicable because there is harm -- the court imputes harm

17   because the relationship is thereafter tainted, and also allows

18   for disgorgement of the fees that were earned by the lawyer if

19   the conflict begins and continues.

20   Q.      Do you believe there came a time when there was an

21   actual and direct conflict of interest between the interests of

22   the company and Rudolph Terry; do you have an opinion?

23   A.      I believe an actual conflict of interest developed in

24   the summer to the fall of 2000, yes, sir.

25   Q.      Did that continue through the balance of the

Beltran - Direct                                    330

1    engagement?

2    A.      It did.

3    Q.      Are you aware or have you concluded that anything

4    different would have occurred in this litigation had Terry

5    Manufacturing and Rudolph Terry had separate counsel?

6    A.      Well, the corporation would have been better served

7    because early on the corporation could have gone to the

8    plaintiff and said whatever happened was outside the scope of

9    business.  The Corporation received no monies, received no

10   interest.  Everything that was done was *ultra vires* and the

11   corporation shouldn't be liable.

12           So at the same time, the corporation, if the

13   plaintiffs would not let him out, had a viable third-party

14   claim against Rudolph Terry and, if someone found them liable,

15   then Mr. Terry was liable back to the corporation.

16   Q.      Now you indicated that the actual conflict continued

17   throughout the term of the engagement, and you previously

18   testified that new rules came into effect January 1, 2001.  Did

19   those rules in any way alter the matrix such that there was no

20   longer a conflict of interest between the parties?

21   A.      No.  In fact, I believe it put a lawyer on more

22   heightened duty because now it required not just an oral

23   disclosure but a lawyer needs to give a full written disclosure

24   to the client under the new rules.

25   Q.      Has Georgia, faced with situations where there was an

Beltran - Direct                              331

1    actual conflict between the attorney between two clients, has

2    it opined as to what the appropriate remedy or measure of

3    damages is?

4    A.       I think I mentioned earlier --

5             MR. BRIDGERS:  Objection, Your Honor.  I do think that

6    is an ultimate issue if he is just asking him what damages can

7    you receive on a malpractice case.

8             THE COURT:  Overruled.

9    Q.       You can answer.

10   A.       The courts have said that there would be a

11   disgorgement of attorney's fees and expenses received by the

12   lawyer.  It also said that the client -- the issue of punitive

13   damages would go to the trier of fact or the jury, and it also

14   said that, if the conflict prevented a favorable settlement for

15   the client, then the client also could receive damages for the

16   lawyer not obtaining that favorable settlement.

17   Q.       A question posed earlier repetitively, and to both Mr.

18   Long and Mr. Alexander, was is there any evidence that Mr.

19   DeLong was called upon to give advice with respect to the

20   company's indemnity obligations; do you recall that?

21   A.       I do.

22   Q.       Do you have an opinion as to whether any attorney

23   representing Terry Manufacturing in this case should have

24   provided advice or at least inquired as to the company's

25   indemnity obligations?

Beltran - Direct                                    332

1    A.        The  moment  that  a  lawyer  starts  representing  a

2    constituent, officer, director, or employee of the company and

3    the  company  begins  paying  the  bills,  if  the  lawyer  is  also

4    representing the company, the lawyer must do some due diligence

5    to  see  if  that's  a  proper  payment.   And  so,  yes,  the  lawyer

6    needs  to  do  something.   Again,  the  lawyer  can't  just  be  a  file

7    cabinet.  It doesn't matter if you are representing somebody in

8    just one litigation, the lawyer must go and advise the client

9    of all of its risk.

10            For  example,  if  a  lawyer  is  representing  someone  and

11   they see that there is some act with a statute that is going to

12   run, they have got to advise the client, even though they are

13   not representing him in that situation.

14   Q.        Mr.  Beltran,  several  times  the  objection  has  been

15   raised  that,  under  Georgia  law,  law  firms  don't  practice;

16   lawyers do.  Individual lawyers do.  I'm not sure I understood

17   that.   Georgia,  I  take  it,  is  no  different  than  any  other

18   state.   It  issues  licenses  to  individual  attorneys;  is  that

19   correct?

20   A.        Individual  lawyers  receive  licenses  and  law  firms

21   practice law through the individual lawyers.

22   Q.        Right.  And law firms, whether it is King and Spalding

23   with eight hundred lawyers or a three-man firm in Valdosta,

24   those law firms don't get licensed in Georgia; do they?

25   A.        No, sir.

Beltran - Direct                                333

1    Q.       But that is true of all states of the Union; is it

2    not?

3    A.       It is.

4    Q.       All right.   In the event that an attorney is

5    associated with a firm and he participates in malpractice, is

6    not the firm equally liable under Georgia law?

7    A.       The firm is equally liable under Georgia law.   For

8    example, when --

9            MR. BRIDGERS:  Objection, Your Honor.  I'm going to

10   have to.   This is beyond any -- I mean, corporate law in

11   Georgia is not what Mr. Beltran was said to testify about here.

12   It is an ultimate issue.  Obviously the court will review the

13   law.

14           MR. BARRIERE:  If I may respond?

15           THE COURT:  Here is what I'm going to do.  I'm going

16   to overrule the objection.  You have made objections a couple

17   of times on ultimate issues.  I don't think that is a proper

18   objection if the testimony is otherwise admissible.  What I

19   think he did is I think we had a fairly specific question from

20   Mr. Barriere, we had an answer and then he went further.  So I

21   am going to sort of cut him off there on the grounds that the

22   answer has gone beyond the scope of the question.

23           So on that basis I will sustain the objection but I

24   won't strike the answer as much as it was given.

25   BY MR. BARRIERE:

Beltran - Direct                                334

1    Q.        I think you told me that, no, a law firm is liable for

2    its attorneys' acts when associated with the law firm; correct?

3    A.        That is correct.

4    Q.        Is that somehow different if the attorney says, no, it

5    was me, not the law firm, representing the client?

6    A.        No, it is not different.

7    Q.        All right.  In that regard, sanctions standpoint, just

8    so I understand.  In Georgia I sign my name, the firm's name.

9    Under  appropriate  circumstances,  is  both  the  firm  and  the

10   attorney subject to sanctions?

11   A.        They both can be subject to sanctions.

12   Q.        Now you have reviewed the engagement letter in this

13   case; have you not, sir?

14   A.        I have, yes, sir.

15   Q.        All right.  In your judgment, did that engagement

16   letter  somehow  separate  the  representation  of  Terry

17   Manufacturing between DeLong and Caldwell, LLC, and Earnest

18   DeLong, individually?

19   A.        No, it did not.

20   Q.        It appeared on DeLong and Caldwell letterhead; did it

21   not?

22   A.        It did, yes, sir.

23   Q.        If  an  attorney  was  attempting  to  limit  the

24   relationship, the legal duties to him personally as opposed to

25   the law firm, what would he be required to do under Georgia

Beltran - Direct                                    335

1   law, to your knowledge?

2   A.      First of all, he would have to use his own letterhead;

3   but if he is in the same office, says "of counsel," as soon as

4   a client comes in, anyone in that office, whether they are a

5   group of sole practitioners practicing under the umbrella of a

6   firm, they must do a conflicts check because the court has

7   said, as far as the lay person is concerned, when a lay person

8   walks into a firm or sees the firm name, they can assume the

9   firm is representing them; and even "of counsel" is the same

10  issue.  You can be "of counsel" to a firm and the firm can be

11  liable.  They must do the same conflicts check as if it was a

12  true firm of all partners.

13  Q.      Mr. Beltran, have you reached a conclusion as to

14  whether Earnest W. DeLong breached the duty of care applicable

15  to attorneys in Georgia in his handling of the Commercial

16  Factors litigation?

17  A.      Yes, sir, I have.

18  Q.      And what is that opinion?

19  A.      My opinion is that he breached and deviated from the

20  standard of care in Georgia at the time.

21  Q.      And could you be specific in what manner he did so?

22  A.      In the manner of – in accepting the multiple

23  representation of Terry Manufacturing and Rudolph Terry at a

24  time when there were differing interests and his continuation

25  of this representation, this multiple representation.

Beltran - Direct                                              336

1    Q.        All right.   Have you reached a conclusion as to

2    whether DeLong and Caldwell, LLC, breached the duty of care?

3    A.        My opinion is the same, that they jointly and

4    severally breached the duty of care and deviated from the

5    standard.

6    Q.        I'm not going to ask you to ferret through the

7    machinations and the evolutions of the law firm, but would it

8    be your opinion that any law firm Mr. DeLong was associated

9    with during the course of his engagement also breached the duty

10   of care?

11   A.        Yes, sir.

12   Q.        Do you have an opinion as to whether Mr. DeLong

13   breached fiduciary duties owed as an attorney to the client?

14   A.        Yes, sir.

15   Q.        And what is that opinion?

16   A.        Well, when you have a conflict of interest like this

17   and you ignore the conflict and continue the multiple

18   representation, that is a breach of your fiduciary duty.  It is

19   a breach of your undivided loyalty to the client.

20   Q.        And what about DeLong and Caldwell, LLC?  Do you have

21   an opinion as to whether it breached fiduciary duties to the

22   extent it owed those to  Terry Manufacturing?

23   A.        The law firm itself, the DeLong and Caldwell, LLC,

24   likewise breached its fiduciary duties to Terry Manufacturing.

25   Q.        And what is your opinion as to what fiduciary duties

Beltran - Direct                                337

1   were owed by DeLong and Caldwell, LLC, to Terry Manufacturing?

2   A.      Well, the first fiduciary duty was to not accept the

3   multiple representation at the time that the lawyer knew, or

4   should have known, that there was these differing interests.

5   That's the first breach.  Then the second breach was in

6   continuing that representation which was an absolute conflict

7   of interest.

8   Q.      Are those the same breaches of fiduciary duty

9   committed by Mr. DeLong personally?

10  A.      Yes.

11  Q.      Would you be of the opinion that those same fiduciary

12  duties were breached and in the same manner by whatever law

13  firm Mr. DeLong was associated with during the course of his

14  engagement in the Commercial Factors litigation?

15  A.      Yes, as to the law firm.

16  Q.      All right.  Now I take it that there were -- Mr.

17  DeLong, at least, claims there were communications, oral

18  conversations with Roy and Rudolph Terry where they said, "We

19  want you to represent us both.  We don't want to split the

20  brothers and we want to save money."  Was that waiver, if it

21  occurred -- we will hear from the Terrys shortly -- if that

22  occurred, does that in any way excuse the conflict here?

23  A.      No.  I think it exacerbates the conflict.

24  Q.      And why is that?

25  A.      Because at that point it was a non-waivable conflict.

Beltran - Direct                                338

1    A lawyer knew, or should have known, that clients cannot

2    consent to a non-waivable conflict.

3    Q.      Does that sort of consent by clients, made freely --

4    we will assume it was made freely -- does that somehow relieve

5    a lawyer of the legal duties you assert were breached in this

6    case?

7    A.      Not at all.

8    Q.      Does it in any way relieve the lawyer from the

9    fiduciary duties that you believe were breached in this case?

10   A.      Not at all.

11   Q.      Is it a defense in any way under Georgia law to a

12   breach of legal or fiduciary duty?

13   A.      No.  The courts have said, Georgia courts, state and

14   federal, have said that even a lawyer acting in good faith, if

15   they breach their duty or have a conflict like this, it is no

16   defense.

17         MR. BARRIERE:  Your Honor, if I may have just a

18   moment, I may be able to finish up with Mr. Beltran.

19         THE COURT:  All right.

20         (Pause)

21   Q.      Mr. Beltran, are you familiar with disciplinary rule

22   5-105 that was in effect, I believe, up until the adoption of

23   the new rules in 2001?

24   A.      Yes.

25   Q.      And this is the disciplinary rule addressing a

Beltran - Direct                          339

1   lawyer's acceptance or refusal of multiple clients in a single

2   engagement?

3   A.      Yes, sir.

4   Q.      All right.  Do you have an opinion as to whether the

5   conduct  at  issue  in  this  case  was  violative  of  that

6   disciplinary rule?

7   A.      It was violative of that disciplinary rule.

8   Q.      And in what regard, sir?

9   A.      That rule has a very low threshold.  It says that, if

10  the multiple representation is begun or commenced and there is

11  an adverse interest to the client or the likelihood, not a high

12  likelihood, not medium, but the likelihood that it could become

13  adverse,  then  the  lawyer,  you  know,  cannot  continue  his

14  representation.

15          MR. BARRIERE:  Your Honor, I will pass the witness.

16          THE  COURT:   Okay.   It is  just  a  couple  of  minutes

17  until 12:00  noon.  We will break until 1:30 and then we will

18  pick back up with defendant's cross-examination.

19          (Recess from 11:57 a.m. until 1:35 p.m.)

20          COURTROOM DEPUTY: Court is back in session.

21          THE COURT: Please be seated.

22          MR.  BARRIERE:   Good  afternoon,  Your  Honor.   I

23  neglected before  lunch  to  mark,  offer  and  introduce  into

24  evidence as Exhibit 141 Mr. Beltran's expert report, and would

25  so move at this time.

Beltran - Cross                                    340

1          THE COURT: Okay.  Mr. Bridgers.

2          MR. BRIDGERS: Your Honor, subject to my understanding

3    of the court's general policy, I would still object based on

4    the fact that it is duplicative with Mr. Beltran already having

5    testified.

6          THE COURT: That is correct.  Exhibit 141 is admitted.

7          MR. BARRIERE: With that, Your Honor, the trustee

8    passes the witness.

9          THE COURT:  All right.

10         MR. BRIDGERS: May I begin, Your Honor?

11         THE COURT: Yes, sir, go ahead.

12                        CROSS-EXAMINATION

13   BY MR. BRIDGERS:

14   Q.       Mr. Beltran, good afternoon.

15   A.       Hello, Mr. Bridgers.

16   Q.       I want to follow up first with a few things you said

17   in your direct and perhaps explain some of my misunderstanding.

18   Do you recall when we took your deposition in this matter?

19   A.       I remember giving it and you just handed me a copy of

20   it and it says it was on May 31, 2006, in my office.

21   Q.       All right.  I believe it was your testimony on direct

22   examination – your testimony involved both the old rules and

23   the new rules; is that true?

24   A.       I believe so, yes.

25   Q.       And do you recall where I asked you several places in

Beltran - Cross                                    341

1    your deposition which rules were pertinent?  If you don't

2    recall it, perhaps –

3    A.        No, I remember that and I remember my answers.

4    Q.        Well, let me ask you to turn your attention, then, to

5    page six of your deposition.

6    A.        Okay.

7    Q.        Turn your attention to line ten.

8    A.        Yes, sir.

9    Q.        Question:

10              "All right.  That is what I was trying to get at."

11   Answer:

12              "Right."

13   Question:

14              "If you looked at the old rules or the new rules?"

15   Answer:

16              "No, I looked at the old rules because the model rules

17              went into effect January 1, 2001, and the conduct I am

18              primarily going to testify to today that's in my

19              report involve matters that happened in 2000."

20   Do you recall that?

21   A.        I remember that question and I remember that answer.

22   I also remember a later answer I gave on page 80 about the new

23   rules.

24   Q.        Let me turn your attention to page 42 of your

25   deposition, then, line five.

```
                         Beltran - Cross                    342
```

1    A.      Yes, sir.

2    Q.      Question:

3            "Perhaps took a look at the new rules?"

4    Answer:

5            "I probably – yeah, I looked.  I didn't spend a lot of

6            time on the new rules once I realized the time frame

7            was prior to January 1, 2001, that I was planning to

8            testify."

9    A.      Yes.

10   Q.      All  right.   Let  me  ask  you  to  also  turn  your

11   attention, if you would, to page 152, line three.

12   A.      Yes, sir.

13   Q.      Question:

14           "Are those the new rules or the old rules?"

15   Answer:

16           "Those are the rules in effect up until January 1,

17           2001.  The old rules, if you want to call them that,

18           but they were applicable to the facts of this case."

19   A.      I remember saying that, but earlier I had also talked

20   about the model rules on page 80, line 14 through, I believe,

21   23.

22   Q.      Let me ask you to turn your attention to page 68.

23   A.      Okay.

24   Q.      Line eight.

25   A.      Okay.

Beltran - Cross                           343

1    Q.        Question:

2              "Mr. Beltran, I think I would like to move through

3              this again.  Of the standard of care violations that

4              you have laid out in your report, you have referenced

5              back that the applicable ethical rules, ethical

6              considerations, would have been under rule 3-105."

7    Your answer was:

8              "Yes."

9    The question was:

10             "Not under the model rules?"

11   And your answer was?

12   A.        My answer was, "That is correct."

13   Q.        And in this particular line of questioning, page 68,

14   you were referring of the standard of care violations you laid

15   out in your report, you referenced back and you said those are

16   the old rules and not the new rules.  Do you recall that

17   testimony?

18   A.        Right.  Your question was what did I use in coming to

19   my report, and I used the old rules at that time.

20   Q.        Mr. Beltran, just to point out, I said, "Of the

21   standard of care violations you have laid out in your report."

22   That is in global; is it not?

23   A.        Can you just tell me what line you are on?

24   Q.        Certainly, sir.  Line ten, perhaps actually line nine.

25             "Of the standard of care violation that you have laid

Beltran - Cross                                    344

1              out in your report, you have referenced back the

2              applicable ethical rules."

3    And then later on you go, "and not under the newer model

4    rules," and you agreed with that?

5    A.        Yeah, that is what I said on that page, yes, sir.

6    Q.        I am sorry.  Where was the other page?

7    A.        On page 80, the middle of line 14.  Do you want me to

8    read it?

9    Q.        No, I don't think so.

10   A.        Okay.

11   Q.        I just want to see if I understood your testimony on

12   direct.  Did you suggest that it was possible that Commercial

13   Factors would have just went away and abandoned their claim if

14   indeed Terry Manufacturing had said this is not our fault, this

15   is Rudolph Terry's fault?  Do you think that was in any way

16   theoretically possible, given the facts of this case?

17   A.        I think, yes, I do.

18   Q.        You think it is theoretically possible.  Do you think

19   there is any practical, reasonable possibility, given the fact

20   they never did walk away from the claim, that Commercial

21   Factors would have just excused Terry Manufacturing if Terry

22   Manufacturing would have pointed the finger at Rudolph Terry?

23   A.        Yeah, if he had a lawyer with undivided loyalty to the

24   company and he went to the lawyers at Smith-Gambrell and laid

25   it out and said, look, the company had nothing to do with this,

Beltran - Cross                     345

1   it was beyond the scope, received no benefit, received no

2   monies, and therefore the company isn't liable.  There may be

3   other people but the company isn't liable and, based upon here

4   is our evidence, then, you know, you would lay it on the line

5   and they can be subject to abuse of litigation because you have

6   laid it on the line that the company had nothing to do with it.

7   Q.       Commercial Factors would have been able to have

8   pointed to invoices on Terry Manufacturing stationery; correct?

9   A.       Some.  I heard testimony earlier there were some old

10  invoices, yeah.

11  Q.       But under actually what we can look at it that

12  happened in the case, did Commercial Factors oppose Terry

13  Manufacturing's motion for summary judgment on *ultra vires*

14  issues?

15  A.       Well, it was –

16  Q.       Please, Mr. Beltran, did they oppose the motion of

17  Terry Manufacturing for summary judgment?

18  A.       I believe they filed a response.

19  Q.       Did they oppose it?

20  A.       I believe they did oppose it.

21  Q.       Does that give you any indication at all about whether

22  or not they would have abandoned their claim for three million

23  dollars two years earlier if somebody would have just asked

24  nicely?

25  A.       Well, notice what I am saying.  If early on somebody

Beltran - Cross                              346

1    with undivided loyalty to the corporation went to the other

2    side and showed the corporation had nothing to do with this,

3    then, if I could just explain my answer, then we wouldn't have

4    seen that three years of delay that somehow the corporation was

5    a co-conspirator.  That was the problem here and that is where

6    the case – if a lawyer with conflicting loyalties causes a

7    delay, it shows that he is dividing his loyalties.  And so for

8    three years they fought Commercial Factors.  So three years

9    later when they said Commercial Factors had nothing to do with

10   it, I can see where a reasonable lawyer on the other side would

11   think, well, it's a last-minute thing, we're not sure.  So I

12   would see why they would oppose it.

13   Q.      I will move on but, in point of fact, they never

14   dropped their claim against Terry Manufacturing; did they?

15   A.      No.  I think someone said they have even filed a proof

16   of claim in this proceeding.

17   Q.      In the same similar vein, do you have any evidence at

18   all, other than perhaps speculation, Terry Manufacturing could

19   have made a reasonable settlement at that time?  Excuse me.  I

20   should clarify.  At the time that Mr. DeLong first took over

21   the case.

22   A.      Well, if Terry had no involvement in this and their

23   hands were clean and they never received any benefit or monies,

24   then there is really no claim against Terry; or if there is a

25   claim, they had a remedy by bringing in a third-party, the

```
                      Beltran - Cross                    347
```

1   perpetrator of the fraud.

2   Q.      Rudolph Terry?

3   A.      Yes.

4   Q.      Do you believe it ever entered into Commercial

5   Factors' analysis that Terry Manufacturing was the one who

6   theoretically had all of the money.

7   A.      Oh, I am sure.  When you bring a lawsuit, you look for

8   the deep pockets, sure.  There is no question.

9   Q.      All right.  And in terms actually of settling, when

10  you were asked about settling, you said, as to Mr. DeLong, if

11  you recall your testimony on page 96 – I could point you to.

12  96, line 23.

13  A.      Okay.  Just a second, please.  Yes, sir.

14  Q.      "Well, the first thing is he did try to settle the

15          case and there is nothing wrong with that and then

16          that fell through."

17          So that was your opinion on the settlement discussions

18  at the time?

19  A.      Right, and then I went on with what he should do after

20  that.

21  Q.      Okay.  Very well.

22  A.      Do you want me to read it?

23  Q.      Not particularly.  Mr. Beltran, when you reviewed this

24  file in order to give your declaration and to give your

25  deposition, you reviewed about three or four inches of

Beltran - Cross                          348

1   material.  Do you recall testifying to that?  At least in terms
2   of pleadings, I should say.
3   A.       Oh, pleadings, yes.  I mean, I reviewed probably six
4   to eight, if you count all of the testimonies.  I mean, the
5   exhibits to Mr. DeLong's deposition were more than three
6   inches, and I reviewed all of those exhibits.
7   Q.       If I could turn your attention to page 34, like 24.
8   A.       34, line 24?
9   Q.       Yes, sir.
10  A.       Yes, sir.
11  Q.       Question:
12           "So basically you are limiting this now to the
13           documents that were contained in the attachments to
14           Mr. DeLong's deposition?"
15  Answer:
16           "Right, which were – which was three or four inches
17           thick and in there were most of the pleadings."
18  A.       The exhibits to his deposition, right.
19  Q.       Were three to four inches thick?
20  A.       That's right.  I was guessing there.  I have got them
21  in a box back there.  I didn't measure them.
22  Q.       I have got a tape measure, but we are talking three or
23  four inches as opposed to perhaps the 15 or 16 boxes we have
24  over here?
25  A.       Oh, there is no question there is a lot more in those

Beltran - Cross                          349

1   boxes than what I reviewed.

2   Q.       All right.  And I believe you testified that you

3   looked over the two depositions of Rudolph Terry?

4   A.       I think I got three transcripts.  It is the same

5   deposition, I believe, but three volumes.

6   Q.       Very well.  You looked over Rudolph Terry's

7   deposition?

8   A.       Yes.

9   Q.       But you read no other depositions of the Commercial

10  Factors case; is that fair?

11  A.       Well, I read the statements of Mr. Pouncey.

12  Q.       I didn't think of that as a deposition but –

13  A.       Okay.

14  Q.       Okay.  But certainly you read Mr. Pouncey's.

15  A.       And, of course, Mr. DeLong's.

16  Q.       Okay.  But none of the 35 odd depositions that were

17  taken in the Commercial Factors case?

18  A.       No, I didn't receive those.

19  Q.       And as an expert you really made no independent

20  investigation of Terry Manufacturing or  Commercial Factors or

21  anything like that?

22  A.       No.  What I did, I received documents, reviewed them

23  and came up with my opinion.

24  Q.       Would you agree with me – well, let me show you, if I

25  could, if I could ask you to turn to the white notebook.

                    Beltran - Cross                    350

1    A.        I have got it right here.

2    Q.        Paragraph one – not paragraph, excuse me.  Exhibit 1.

3    A.        All right.

4    Q.        Do you recognize this as the original complaint and

5    verified suit in the Commercial Factors case?

6    A.        Yes, the one filed on December 10 of 1999.

7    Q.        And just for the record, as I said with the trustee,

8    it has a couple of handwritten notes.

9    A.        Yes.

10   Q.        But generally it is a complaint on open account, and

11   you are aware that at the time Commercial Factors was seeking

12   over three million dollars against Terry Manufacturing?

13   A.        I saw that in their prayer, yes, sir.

14   Q.        Would you agree with me, beyond a shadow of a doubt,

15   Terry Manufacturing needed a lawyer?

16   A.        There is no question.  Anyone who is sued ought to

17   hire a lawyer to defend himself or itself.

18   Q.        Even if they had wanted to do this pro se, they could

19   not have under, you know, Georgia law?

20   A.        Under Georgia law, a corporation could not have.  You

21   are right.

22   Q.        Exactly.  And I believe your testimony was that at the

23   time this appeared to be a garden-variety collection suit?

24   A.        I think that was Mr. DeLong's testimony.  I agreed

25   with it, based upon looking at the complaint by itself.

Beltran - Cross                                                351

1   Q.      I think it was in your report, but that is fine.  Mr.

2   DeLong answered the suit?

3   A.      I believe he did.

4   Q.      Not to belabor the point but obviously, without

5   answering, it would have been a default?

6   A.      Right.  I didn't see an answer in this pleading but I

7   know he answered.  I know he filed a responsive pleading.  I

8   agree with that.

9   Q.      Now if I could turn your attention to tab two, Exhibit

10  2 there.

11  A.      Yes.

12  Q.      This is styled, "Amended Complaint."

13  A.      Uh-huh.

14  Q.      Apparently filed on June 17 of 2000?

15  A.      Right.

16  Q.      And would you tell the court what additional counts

17  were added into it?

18  A.      Well, they added a count six and they identified it as

19  conspiracy to defraud, and they added a count seven, which was

20  fraud and deceit, and then they added a count eight for

21  conversion, and a count nine for punitive damages.

22  Q.      From your knowledge of Georgia law, these are

23  obviously torts?

24  A.      They are.

25  Q.      And as torts, did they expose the company to general

Beltran - Cross                                         352

1    damages?

2    A.        They do.

3    Q.        And as torts, such as fraud and conversion, do they

4    expose the company to punitive damages?

5    A.        Well, they can.

6    Q.        Other than the conflict issues, which I know we will

7    come back to, I would like to raise – I would like to try to

8    find out your understanding.  I'm going to ask you some

9    questioning about when Mr. DeLong might have actually done

10   wrong in the litigation, other than just be there.

11           I believe at some point in your testimony you said Mr.

12   DeLong should have conducted a more thorough investigation?

13   A.        Yes.

14   Q.        And what – excuse me.  I withdraw that.  (Pause) Mr.

15   Beltran, other than what might have been in Mr. DeLong's

16   deposition, you have no personal knowledge of what he actually

17   did do as an investigation; is that correct?

18   A.        I only know what he did based upon his deposition and

19   what I heard in open court.

20   Q.        All right.  Now in terms of actual behavior in the

21   litigation – again, not just being there but in terms of actual

22   behavior in the litigation, are you still contending the delay

23   in the summary judgment motion was a violation of the standard

24   of care?

25   A.        It was.  It is my opinion that it was, especially in

Beltran - Cross                                353

1    light of the fact that he continued to represent – had multiple

2    representations.

3    Q.        Now, in terms of his actual conduct in the litigation,

4    is there any other pleading or motion or any other thing that

5    you can point to that he did wrong other than filing a summary

6    judgment late?

7    A.        Other than the conflict issues?

8    Q.        Yes, sir, other than just being there, any other

9    thing you can point to specifically he did wrong in the conduct

10   of the Commercial Factors litigation?

11   A.        Again, he talked about what he did at the initial

12   engagement.  He said he didn't even consider any type of

13   conflict –

14   Q.        Mr. Beltran, if I can cut you off there.  What I am

15   looking for, though, is anything he actually – I will narrow my

16   question more – but in terms of what he filed, what he didn't

17   file, what depositions he took?

18   A.        No, I am not here to opine on that.

19   Q.        Okay.  So the only criticism – well, you are, just as

20   to the summary judgment motion?

21   A.        Right.  You said other than.

22   Q.        Yes, I am sorry.

23   A.        No.

24   Q.        We are just talking about the summary judgment motion.

25   So to sum up your opinion on that, is that delaying filing a

Beltran - Cross                                      354

1    motion for summary judgment on the *ultra vires* issues was a

2    violation of the standard of care.  Is that basically the

3    summary of your opinion?

4    A.      Yes.

5    Q.      But you would agree, would you not – let me back up.

6    Mr. DeLong waited until the end of discovery to file a motion

7    for summary judgment?

8    A.      I don't know exactly when discovery ends.  In Georgia,

9    usually it is six months after filing of the answer.

10   Q.      It is usually but it certainly can be extended and

11   oftentimes is in complicated cases?

12   A.      It can be if people get a stipulation from the court

13   and there is an agreement.

14   Q.      But oftentimes it is in complicated cases?

15   A.      It has been, yes.

16   Q.      Not just has been; it is often the case?

17   A.      When you say often, I mean, there are a number of

18   times lawyers will extend discovery in cases of this magnitude.

19   Q.      All right.  Well, assuming that Mr. DeLong waited

20   until the end of discovery, which he will testify to, wouldn't

21   you agree that the majority of time in Georgia lawyers wait

22   until the end of discovery to file motions for summary

23   judgment?

24   A.      I would say more so than filing them early.  That

25   would be the general following, yes.

Beltran - Cross                                    355

1    Q.        The majority of the time, I believe you testified to?

2    A.        Yes.

3    Q.        And in the cases where summary judgment motions are

4    filed before discovery ends, would you agree that the majority

5    of those are very simple cases, like suits on a note, or

6    something like that?

7    A.        I have filed them early in legal malpractice cases and

8    breach of fiduciary duty early.

9    Q.        And, of course, under 56(f) – I mean, you are aware of

10   the case law in Georgia that as long as the – that the other

11   side can come back and say, as long as we haven't finished

12   discovery, it is not ripe for the court to rule on summary

13   judgment?

14   A.        Sure.  That is an option that the respondent can make.

15   Q.        All right.  And would you agree with me that sometimes

16   a strategy of a lawyer is to wait until after discovery ends to

17   file summary judgment in order not to tell the other side

18   everything about your case before you get to summary – before

19   you end discovery?

20   A.        That can be strategy.

21   Q.        Okay.  And if that is what Mr. DeLong testifies to,

22   isn't that a reasonable tactic on his part?

23   A.        In the absence of the conflict, it might be but, if

24   you have divided loyalties, the courts have held that a delay

25   shows that you are dividing your loyalties between the two

Beltran - Cross                                 356

1    clients.

2    Q.      All right.  Courts have held?

3    A.      Yes.

4    Q.      Which case?

5    A.      Well, there is a case out of the Second Circuit that

6    the US District Courts of Georgia keeps citing.  I think it is

7    the *Cinema Five* case.

8    Q.      And where is that out of?

9    A.      Out of the Second Circuit.  Judge, I think, Tidwell

10   has cited to it and Judge Forrester, with approval.

11   Q.      All right.  I will look that up.  But just to be

12   clear, your criticism, then, of Mr. DeLong is not for waiting

13   – the mere waiting until the end of discovery to file a motion

14   for summary judgment can, as I understand your testimony, be a

15   reasonable tactic?

16   A.      In the absence –

17   Q.      Except in the absence of a conflict?

18   A.      In the absence of a conflict, yes.

19   Q.      So what you're saying is that, even though the same

20   lawyer might have done the exact same thing, the conflict

21   taints it?

22   A.      The conflict affects it and it shows the divided

23   loyalties, especially when the client is innocent of the

24   alleged wrongdoing.  The client being Terry Manufacturing.

25   Q.      Let's get to that a second.  Commercial Factors made

Beltran - Cross                        357

1    a claim against Rudolph and the company, true?

2    A.        You mean – they filed a lawsuit against –

3    Q.         Yes, sir.

4    A.        – Terry Manufacturing.

5    Q.        That is a better way to say it.  Commercial Factors

6    certainly filed a lawsuit.  Terry Manufacturing's motion for

7    summary judgment was denied; correct?

8    A.        Right.

9    Q.        The company was exposed, therefore, to a jury trial on

10   these issues; is that a fair statement?

11   A.        But for the stay, yes.

12   Q.        Absolutely, but for the stay.  But basically, then,

13   under the law of the case, sir, the decision of the case as it

14   is pending, at least the judge wasn't willing to say Terry

15   Manufacturing was innocent at the time?

16   A.        Not at the time but, again, you have to look at the

17   whole picture.  For almost three years the corporation had been

18   fighting a different battle and then, on the eve of trial, they

19   file a motion for summary judgment.  The judge –

20   Q.        Where else do you file a motion for summary judgment

21   but before a trial?

22   A.        Well, I file it – you can file a summary judgment at

23   any time.

24   Q.        But what I am trying to get back to is that the

25   decision to delay – the decision to file summary judgment at

Beltran - Cross                                    358

1    the end of discovery, that's not objectively the wrong

2    decision.   It is only wrong for Mr. DeLong; is that your

3    testimony?

4    A.      It is wrong if you have a conflict situation.

5    Q.      But as to independent counsel, it may or may not have

6    been wrong at all?

7    A.      Yeah, and if Mr. DeLong was representing the

8    corporation alone, it might not have been, but he wasn't.

9    Q.      Do you have a shred of evidence that suggests that,

10   if Mr. DeLong had moved earlier, the outcome of the motion for

11   summary judgment would have been any different?

12   A.      Well, I understood from Mr. DeLong's testimony that

13   summary judgment – the case was getting ready to go to trial

14   and the summary judgment was filed shortly before the case was

15   to go to trial.  In my experience, judges – in fact, the rule

16   says that filing a motion for summary judgment would not delay

17   the start of a trial.  So my understanding and my experience is

18   that, if you file a late motion before the trial, the court is

19   going to deny it and let the case go to trial.

20   Q.      So you are saying that the court is going to ignore

21   the facts and the law to punish Terry Manufacturing for waiting

22   until the end of discovery to file a motion for summary

23   judgment; isn't that what you have just said?

24   A.      No.  The court is going to – if for some reason the

25   lawyer waited and, if there is any question, the court doesn't

Beltran - Cross                          359

1    want a delay of its docket, and so if the defendant is correct,

2    they will get out on a directed verdict.

3    Q.        Let me ask you if you agree with this statement:

4              "Negligence, of course, is the category generally

5              associated with legal malpractice.  The premise is

6              that an attorney has committed an error that would

7              have been avoided by the hypothetical, competent

8              attorney who comports with the standard of care."

9              Would you agree with that statement?

10   A.        I think the statement by itself is accurate.

11   Q.        All right.  But in a legal malpractice case, it then

12   requires an error –

13   A.        Or a deviation from the standard of care, yes.  The

14   same thing.

15   Q.        And would you agree with me that a taint is not an

16   error?

17   A.        A lawyer involved in a conflict of interest is in

18   error and is a breach of their fiduciary duty.

19   Q.        Well, of course, in this case there is no breach of

20   fiduciary claim.  It is not a count in this case.  So what I

21   want to go back and ask, then, in terms of legal negligence, an

22   error has to be something that – it has to be an act; it can't

23   just be a status?

24   A.        It can be an omission.

25   Q.        Perhaps, absolutely, act or omission but that is not

Beltran - Cross                    360

1    a status; is it?

2    A.        I don't know what you mean by status.

3    Q.        Well, you're saying you can't point to, other than

4    summary judgment, an act or omission that Mr. DeLong did; you

5    are only saying that, because of who he was, he is guilty or

6    liable for legal malpractice?

7    A.        I'm not saying who he was.  I am saying because he was

8    involved in a conflicts situation.

9    Q.        Perhaps I should have used the word his status, but

10   you are saying that, regardless of the fact, other than summary

11   judgment, you can't point to an error and omission he did in

12   the case, he is still liable for legal malpractice because of

13   his status.  Is that a fair summary of your opinion?

14   A.        I think a general precept – I don't know if I would

15   call it status, but there are cases where a lawyer is found –

16   there was no legal malpractice error but still breach of

17   fiduciary duty because of a conflicts situation.

18   Q.        I am not sure about that but, again, there is no

19   breach of fiduciary –

20   A.        I can cite you a case.

21   Q.        Well, I'm just speaking of the law.  We will look at

22   that later.  But since there is no breach of fiduciary duty

23   claim in this case, at least as a separate claim, that's why I

24   was doing that.

25   A.        A breach of fiduciary duty can be a separate claim

Beltran - Cross                    361

1    and it also can be a claim of the legal malpractice.  It is

2    just like, if you say legal malpractice, you don't have to say

3    conflicts of interest as a separate count.  It is the same

4    thing with breach of fiduciary duty.

5    Q.    But basically your criticism is Mr. DeLong's status is

6    conflicted?

7    A.    Yes.

8    Q.    I'm going to move on to some of the conflict and

9    waiver issues.  Some conflicts can be waived?

10   A.    Some can be waived, yes, sir.

11   Q.    And other than perhaps what you heard Mr. DeLong

12   testify here today and in his deposition, you are not – you

13   wouldn't have any other personal knowledge or knowledge really

14   of any sort as to what he actually told Roy and Rudolph Terry?

15   A.    Only what he said in his deposition or in court,

16   that's correct.

17   Q.    Now assuming it possible to waive this conflict by

18   Terry Manufacturing, Roy Terry would have been the one to have

19   been able to do it?

20   A.    Yes.

21   Q.    When Woody was talking to – excuse me – when Mr.

22   DeLong was talking to Roy and Rudolph Terry, he was talking to

23   one hundred percent of the voting shareholders?

24   A.    Yes.

25   Q.    And you have acknowledged that corporations like Terry

Beltran - Cross                         362

1    Manufacturing make decisions based on different criteria than

2    perhaps publicly traded companies?

3    A.        I would assume so, yes.

4    Q.        Now I want to turn to the issue of cross-claims.

5    A.        Okay.

6    Q.        It was not mandatory on Terry Manufacturing to file a

7    cross-claim against Rudolph Terry; was it?

8    A.        No, it was – at first, it would have been a third-

9    party claim because he wasn't a party but, no, it is

10   permissive.  In fact, the statute doesn't even begin to run on

11   a third-party claim until there is a judgment against the

12   defendant.    But, in Georgia, we have no compulsory and

13   permissive counterclaims.

14   Q.        So you do agree that basically the company did not

15   have to file a cross-claim or a third-party claim against

16   Rudolph Terry at all?

17   A.        They did not have to.

18   Q.        Even if Mr. DeLong would have --

19             THE COURT: Wait a minute.  By not doing so, they

20   didn't waive their right to do so later.  That is the point

21   you're getting at; is that right?  That they weren't giving

22   anything up by not making it.

23             MR. BRIDGERS: Yes, Your Honor.

24             THE COURT: Okay.  I have got you.  Thank you.

25   Q.        And obviously you would agree with me that the status

Beltran - Cross                               363

1    of the Terrys as brothers probably had something to do with

2    some of their decisions?

3    A.        It might.  I don't know that, but it could.

4    Q.        But the cross-claim decision, at least, was the

5    client's; Mr. DeLong could not have done that on his own; could

6    he?

7    A.        No.  He had to have authority.

8    Q.        Now, Mr. Beltran, Roy Terry has said in his

9    declaration, and I expect he may say so again, that regardless

10   of what he had been told about conflicts of interest, he would

11   have asked Mr. DeLong to continue with the representation?

12        MR. BARRIERE: Your Honor, I am going to object.  The

13   supposed statements of Mr. Terry contained in an affidavit is

14   plainly out-of-court testimony and I don't think it is

15   admissible, per se.  He may or may not testify in that regard.

16   I think it is an improper predicate to the question.

17        THE COURT: Well, I think he is asking a hypothetical

18   of an expert and I will allow it on that basis.

19        MR. BRIDGERS: Your Honor, that is the direction I am

20   going on.

21   BY MR. BRIDGERS:

22   Q.        All I was going to ask, Mr. Beltran, is would you

23   agree with me that Roy Terry knows his thoughts and motivations

24   a lot better than you might?

25   A.        Anyone would, sure.

Beltran - Cross                                          364

1    Q.      Under the old rules, a waiver of conflict of interest

2    did not have to be in writing; is that a fair statement, with

3    two exceptions –

4    A.      That's right.  Right, except for successive rep or

5    personal interest, right.

6    Q.      I understand your two exceptions, successive and

7    personal interest.

8    A.      Right.

9    Q.      But under the old rules, generally a conflict, either

10   disclosure, nor the waiver, needed to be in writing; is that

11   correct?

12   A.      That's right.

13   Q.      Getting on to the rules, the EC's that we looked at a

14   few times this morning, those are aspirational, aren't they?

15   A.      They are ethical considerations which the judge or the

16   jury can consider as evidence of the standard of care of

17   lawyers in Georgia.

18   Q.      Well, I want to – and perhaps that's the law.  We will

19   figure that out later.  But in terms of lawyer discipline, the

20   ethical canons are aspirational; is that correct?

21   A.      Right, that's correct, and the directory rules and

22   standards are mandatory.

23   Q.      Exactly.  So under those set of rules, you had a

24   canon, kind of the big theme; you had the ethical

25   considerations, which are the shoulds, the aspirations.  Fair

Beltran - Cross                               365

1    enough?

2    A.        Fair enough.

3    Q.        And the directory rules are what lawyers could

4    actually be disciplined for?

5    A.        Correct.

6    Q.        Let me turn to the successive representation issue.

7    A.        Okay.

8    Q.        If I could ask you to turn in your deposition to page

9    128.

10   A.        What page, sir?

11   Q.        128.

12   A.        128?

13   Q.        Yes, 128.  I am starting to mumble.

14   A.        That's all right.  Yes.

15   Q.        If I could ask you to turn to – well, we will start at

16   line seven.  Question:

17             "Okay.  And is it your testimony that you understand

18             that he first represented Terry Manufacturing Company

19             and then at some later point began to represent

20             Rudolph Terry, individually?"

21   Your answer was:

22             "I think earlier on, I said I believe that's what his

23             testimony is but, with his engagement letter, I am not

24             sure if he had a successive rep or a multi-rep.  But

25             I believe the thing I read in his deposition was that

Beltran - Cross                              366

1          he represented the company and then represented

2          Rudolph."

3     And you go on to say – I said:

4          "Does it matter to your opinion whether it was

5          successive or multiple at the same time?"

6     And you say, "No."

7          But at this point from the engagement letter you were

8     not sure which one it was?

9     A.    Well, at the time, I had read Mr. DeLong's deposition

10    and I really wasn't sure whether he had successive or multiple.

11    I have come to the conclusion, after his testimony in court, it

12    is multiple representation and not successive.

13    Q.    What changed your mind?

14    A.    Because he made it clear that it was never a former

15    client. Successive rep is only when you have a former client.

16    Like I said, it doesn't matter whether it is multiple or

17    successive, but I just wasn't sure, in reading his deposition,

18    as to what the representation was. After hearing him in court,

19    my testimony is on multiple representation.

20    Q.    All right. Do you have any type of cases you can

21    point to that demonstrate this rule in the context of two

22    persons who were basically working with the same attorney the

23    entire time, in different roles, perhaps in different roles?

24    Are there any cases that you can cite to at this time?

25    A.    Identical to this fact situation?

Beltran - Cross                                                367

1    Q.      Yes, sir.

2    A.      I don't think I have one that is identical but I do

3    have cases where the courts have held that, even though the

4    client  gave  consent,  the  lawyer  can't  continue  the

5    representation.

6    Q.      Well, I understand the other waivable.  We will get

7    there.  Let me move on to your second exception about waiver,

8    is this financial interest.

9    A.      Yes.

10   Q.      My understanding of your opinion is the financial

11   interest here is simply a legal fee?

12   A.      Well, it can be a legal fee if the fee –

13   Q.      In this situation, it is just a legal fee?

14   A.      If  someone  is  neglecting  client  (a),  Terry

15   Manufacturing, and incurring fees on behalf of client (b),

16   substantial fees that Terry by itself might not have had to

17   pay, then standard 30 would kick in.

18   Q.      I am not sure I follow that but, in terms of standard

19   30, this is – you are basing your standard 30 violation,

20   financial interest, on legal fees alone; is that correct?

21   A.      Yeah, on excessive legal fees for client (a).  In

22   other words, collecting – when you are in a conflict situation,

23   you have accepted client (b) and you continue to bill client

24   (a) when you should have either got out of the case or only

25   represented client (a).

                    Beltran - Cross                    368

1    Q.        So you are dealing with that with excessive legal

2    fees?

3    A.        Yes.

4    Q.        I believe in your deposition you referenced the *Tante*

5    case.

6    A.        Oh, yeah, *Herring v. Tante*.

7    Q.        *Tante*, I am sorry.  Perhaps *Tante v. Herring*.

8    A.        Everybody calls it Tante, Tante, you are right.  It

9    is out of Columbus.

10   Q.        That's a case you referenced, I believe certainly in

11   your deposition but perhaps on direct.

12   A.        Well, that was one that I thought of off of the top

13   of my head.

14   Q.        Well, you were counsel there; right?

15   A.        I was counsel of record for the plaintiff.

16   Q.        And that was a sex-related case; right?

17   A.        It was a sexual misconduct, yes.

18   Q.        And eventually that was found not to be legal

19   malpractice; was it not?

20   A.        Well, here is what happened.  The trial court and the

21   Court of Appeals found legal malpractice and breach of

22   fiduciary duty.  And the Supreme Court said it can't be legal

23   malpractice because he won in the Social Security disability,

24   but it was breach of fiduciary duty, breach of fiduciary duty,

25   and the lawyer wound up getting suspended and liable under the

                              Beltran - Cross                        369

1    civil laws.

2    Q.          Okay.  So because it was a successful representation,

3    there was no legal malpractice according to the Georgia Supreme

4    Court?

5    A.          Because the lawyer won the case for the client in the

6    Social Security disability hearing, but he breached a fiduciary

7    duty because of his conflicts with the client.

8    Q.          I understand the breach of fiduciary duty, the claim

9    you are talking about but, again, it is not a claim in this

10   lawsuit?

11          MR. BARRIERE: Let me object.  We can debate this

12   later. Plainly the claim of malpractice incorporates breach of

13   legal duty and breach of fiduciary duty.  We acknowledge there

14   is not a separate count so identified.

15          MR. BRIDGERS:  All right.  I won't argue –

16          THE COURT:  I mean, I think that's correct.

17          MR. BRIDGERS:  I won't argue.

18   BY MR. BRIDGERS:

19   Q.          But, Mr. Beltran, in terms of the legal malpractice

20   issue, the successful representation precluded the legal

21   malpractice case, then, according to the Georgia Supreme Court?

22   A.          In that case, right.

23   Q.          All right.  Can you point to any cases or authority

24   that basically say that financial interest can be triggered

25   simply by legal fees, even excessive legal fees?

Beltran - Cross                                370

1    Q.        Well, there are two formal advisory opinions by the

2    Georgia Supreme Court.  One is 90.2, and that's where part-time

3    law clerks, they can't appear as a lawyer before his or her

4    present employer judge because it affects their compensation,

5    and standard 30 was brought in on that basis.

6         There is a second one, formal advisory opinion 99.1

7    that came out in March of '99, and it said an attorney can't

8    defend a client versus an insurance contract when the attorney

9    simultaneously represents a company in an unrelated matter and

10   the company claims subrogation rights versus the attorney's

11   defendant client because it affects the fee relationship

12   between the insurance company and the lawyer.

13        So those two formal advisory opinions are two that

14   deal with compensation or fee type issues.

15   Q.        All right.  But one is a law clerk appearing in front

16   of the judge that he or she is working for?

17   A.        In fact, that law clerk had consent by everyone to do

18   it and the court addressed two issues.  It said, even though

19   there is consent, we are not going to allow it and, number two,

20   because of the compensation, the payment, standard 30 is

21   invoked.

22   Q.        All right.  Other than these two advisory opinions,

23   then, can you point –

24   A.        Those are the only two that I found.  I have read

25   your cases in your brief on some other issues but –

Beltran - Cross                                    371

1    Q.        Those six or so cases?

2    A.        I am sorry.  What?

3    Q.        Never mind.  Let's go on and assume that a waiver

4    should have been in writing.  Let's go ahead and assume a

5    waiver should have been in writing.

6    A.        Okay.

7    Q.        Old rules, new rules, whatever, it should have been in

8    writing.  Again, if Mr. Terry, Roy Terry, testifies that it

9    didn't matter to him that it wasn't in writing, again would you

10   agree with me that you know his thoughts and motivations better

11   or he knows his thoughts and motivations better than you do?

12   A.        Well, he should, but the courts and the Supreme Court

13   of Georgia said it doesn't matter if there is consent, a lawyer

14   can proceed.

15   Q.        That is in an unwaivable conflict; right?

16   A.        Yes.

17   Q.        Okay.  That is not necessarily in just not getting it

18   in writing?

19   A.        Right.

20   Q.        Okay.  Moving on to the waivable issue, then, you, I

21   believe in your deposition you reference that one of the

22   reasons that Mr. DeLong should have known this was an

23   unwaivable conflict was based on the deposition of - the 2004

24   of Jon Pouncey?

25   A.        That was one of the factors, right.

Beltran - Cross                                    372

1     Q.        One of the factors, and you have heard testimony here

2     that Mr. Pouncey basically recanted parts of that testimony?

3     A.        Well, he was all over the place.

4     Q.        Absolutely.

5     A.        He was.

6     Q.        So he testified multiple different directions, would

7     you agree?

8     A.        He did.

9     Q.        And do you understand that Rudolph Terry basically the

10    entire time took the position that Commercial Factors, through

11    Tracy Eden, had some understanding of the fraud as it was

12    ongoing?

13    A.        Well, that was his third story.  His first story was

14    they received the product.  He said that under oath.  The

15    second story was he was doing a favor for Mr. Pouncey; and then

16    his third story involved this situation you just mentioned.

17    Q.        I understand some of his story certainly changed, no

18    doubt about it, but that from the beginning he did take the

19    position that Tracy Eden knew more, that Tracy Eden had more

20    involvement in this than he had ever admitted to?

21    A.        He made those allegations, yes, sir.

22    Q.        And, Mr. Beltran, I will ask you this: Have you ever

23    seen a situation where a client dribbled out information to

24    their attorney as opposed to just putting the whole story on

25    the line the first day?

Beltran - Cross                                373

1    A.      Oh,  absolutely.    Every  lawyer  has  been  in  that

2    situation.

3    Q.      Apparently not every lawyer, but –

4    A.      If you have been practicing as long as I guess I have,

5    and maybe Mr. DeLong has, we have.  You are a lot younger.

6    Q.      But I want to go back over – stay on this unwaivable

7    conflict issue.  I take it at some point you looked into the

8    *Keohane versus Keene* case.  That is the Northern District

9    opinion that we cited.

10   A.      I looked at that one time, not recently.

11   Q.      All right.  And if you recall – if I can maybe refresh

12   your memory with this, there was a line in there that said:

13          "Under the Georgia rules of professional conduct, the

14          simultaneous representation of parties whose interest

15          in litigation may conflict, such as co-defendants in

16          a civil action, constitutes a waivable conflict."

17          Does that, at least, refresh your memory as to what

18   this case was about?

19   A.      Sure.   That was in a disqualification case and I

20   believe that was a statement in there.

21   Q.      In that case the court refused to disqualify the

22   counsel who had the conflict?

23   A.      Yeah, but in disqualification cases there are many

24   times where there is a conflict that the court makes the

25   determination that the motion was raised by someone without

Beltran - Cross                                374

1    standing or for purposes of delay or trial tactics, but there

2    is still a conflict there between the client and his lawyer.

3    Q.      Fair enough, but in this particular case the Northern

4    – I can't remember which Judge – the judge in the Northern

5    District.

6    A.      I think it was Judge Story, Richard Story out of

7    Gainesville.

8    Q.      Judge Story, very well.  He did not, you know,

9    basically did not force the lawyer out of the case?

10   A.      In that case, he did not.

11   Q.      Mr. Beltran, have you found any citations to any

12   cases, did you bring us any cases that conflict with this

13   statement that defendants, co-defendants in a civil action

14   constitutes a waivable conflict?

15   A.      Well, for example, there is a case from 1978 – there

16   are a lot of cases, but I pulled one up.  It is the First

17   National Bank of Chattooga where the plaintiff sued the

18   defendant.  The defendant third-partied in another bank.  There

19   were three banks.  And a lawyer was representing the plaintiff

20   and third-party, and the Georgia court said, even though there

21   is consent to this representation, we are not going to allow

22   it.  There is a formal advisory opinion 99.1 that goes into,

23   you know, when you should or shouldn't, and what it says is

24   that all doubts about divided loyalties should be resolved

25   against the propriety of the representation and that generally

Beltran - Cross                          375

1    consent should not be obtained when clients have differing

2    interests in litigation and rarely obtained when they have only

3    potentially differing interests in litigation.  So that is the

4    Georgia Supreme Court, and that came out, you know, less than

5    a year before the engagement began.  It came out in – well, he

6    actually – it came out on May 27, 1999.

7              And there is a case out of the US Supreme Court, *Wood*

8    *v. Georgia*, that went up to the Supreme Court and they sent it

9    back to determine whether the lawyer could represent the

10   employer and the employees at the same time.  That is another

11   case.

12             There is another case out of the Georgia Supreme

13   Court, *Womble v. Womble,* where the court said, you know, we are

14   not going to allow it even with consent.  So there are a lot of

15   cases.

16   Q.        That was a divorce case, right?

17   A.        I believe it was.

18   Q.        Where the lawyers necessarily had to be plaintiffs

19   versus defendants.

20   A.        That was a domestic case and I don't remember the

21   facts right now.

22   Q.        I will certainly take a look at the law but, as a

23   general statement, in legal malpractice you cannot equate bad

24   results with bad lawyering?

25   A.        No.  A good lawyer can have a bad result.

Beltran - Cross                    376

1    Q.      And other than the claim you have made that Terry

2    Manufacturing paid too much, there is no bad result here; is

3    there, no objective bad result here?

4    A.      Not yet.

5    Q.      The case has been dismissed, correct?

6    A.      Well, I think there is a claim pending here.

7    Q.      You mean the proof of claim inside the bankruptcy

8    court?

9    A.      Yeah.

10   Q.      But in the Gwinnett County action –

11   A.      I believe that case was stayed.  If it was dismissed

12   –

13   Q.       Perhaps, perhaps, but as a statement of fact, in the

14   Gwinnett County action that Mr. DeLong actually represented,

15   there has not been a bad result?

16   A.      Other than the client paid "x" hundred thousand in

17   fees when it had no unclean hands.

18   Q.      And you really have no information, no evidence, that

19   would lead you to believe that Terry Manufacturing would have

20   received a different result with different lawyers; do you?

21   A.      No.

22   Q.      And you can't state with any degree of legal certainty

23   that another lawyer who represented both Terry Manufacturing

24   and Rudolph Terry would have done anything different in this

25   litigation?

Beltran - Cross                                377

1    A.        If another lawyer did it, he or she would be guilty of

2    a conflict of interest, too.

3    Q.        I want to get to the actual stuff that happened, not

4    the status but the actions and the litigation.  You can't state

5    with any degree of legal certainty that another lawyer who

6    represented both Terry Manufacturing and Rudolph would have

7    done anything different and can you point – I am going to

8    withdraw the question.  Let's just assume we have got two

9    different sets of lawyers.

10   A.        Okay.

11   Q.        You can't say with any degree of legal certainty that

12   the outcome would have been any different at all, can you?

13   A.        In my opinion, more probably than not, the corporation

14   would have gotten a better position with the plaintiff,

15   Commercial Factors, if they had separate counsel who was able

16   to prove all of those things I told you.  It wasn't in the

17   scope, it did not authorize, it did not receive any benefit,

18   those types of things.

19   Q.        All right.  And that's the claim that Commercial

20   Factors in reality never gave up; is that correct?

21   A.        They filed a proof of claim.

22   Q.        Perhaps it is just another truism.  Would you agree

23   with the statement that the perfect vision and wisdom of

24   hindsight is an unreliable test for determining the existence

25   of legal malpractice?

Beltran - Cross                                    378

1    A.       The trier of fact has to sit in the position of where

2    the lawyer was in making the determination as to whether there

3    was –

4    Q.       Would you agree with that statement?

5    A.       Would you repeat it one more time?

6    Q.       Certainly.   Perhaps I can read it to you.   It is

7    yours, out of your *Georgia Trial Notebook*.

8    A.       Okay.

9    Q.       "The perfect vision and wisdom of hindsight is an

10   unreliable test for determining the existence of legal

11   malpractice."

12   A.       All right.

13   Q.       That was a '93 version.   Perhaps that's –

14   A.       Well, I have updated it, and I think I have to update

15   it again this year.

16   Q.       All right.   But you would still agree with it?

17   A.       Yeah.

18   Q.       I'm going to hit just a couple of concepts, Mr.

19   Beltran, and I will let you go.   Would you agree with the

20   statement, to paraphrase maybe our Secretary of Defense, that

21   you go to litigation with the facts that you've got?

22   A.       You go to litigation informed, fully informed.

23   Q.       What lawyer is ever fully informed, Mr. Beltran, when

24   he starts a case as to where it is going to go?

25   A.       Well, there is a difference when you start the case

Beltran - Cross                    379

1    but, when you go try the case, it is different.

2    Q.       All right.  But perhaps basically all of the facts,

3    all of the actions that happened here had taken place before

4    Mr. DeLong ever got in the case; is that your understanding?

5    A.       You mean all of the wrongdoing?

6    Q.       Yes, sir.

7    A.       It did.

8    Q.       And let's talk about liability concepts just a little

9    bit.  Every claim against a party has certain – claims just

10   have elements?

11   A.       Claims have what?

12   Q.       Elements.

13   A.       Right.  That is true.

14   Q.       Contracts 101, whatever.  Claims have elements.  Would

15   you agree with me that it is the duty of the defense counsel to

16   analyze each of those elements to see if any of them could be

17   knocked out?

18   A.       Yes.

19   Q.       And in terms of liability, I want to ask you to, under

20   the facts of this case, we have got basically fraud and

21   conspiracy, just generally, we have got those type of cases,

22   looking at liability.  To simplify things, if "A" and "B" – if

23   "C" claims "A" and "B" defrauded "C," if it could be proven

24   that "B" and "C" had some type of side agreements and some type

25   of side knowledge, wouldn't you agree as to liability that

                    Beltran - Cross                    380

1   might affect how "A" could be liable if "B" and "C" were having

2   some type of communication?

3   A.      It might have an effect.  I would need more facts, but

4   it could.

5   Q.      Certainly you may need to have more facts but – and I

6   will come back to that in just a second, but let's look at the

7   element of damages.

8           Would you agree that it is the absolute duty of a

9   defense counsel to look at the claims of damages and decide

10  which ones are proximately caused by the harm, the tort,

11  whatever?

12  A.      Right.

13  Q.      In a car wreck, even if there is complete liability,

14  defense counsel still can say we will pay your orthopedic

15  claims, we are not going to pay your heart surgeon three years

16  from now?

17  A.      Exactly.

18  Q.      So defense counsel has to look at what might be owed

19  and what might not be owed based on the causation?

20  A.      Right.

21  Q.      All right.

22  A.      And the lawyer needs to advise the client what he

23  doesn't owe.  If the client wants to pay it, even though he

24  doesn't owe it, his lawyer still has to advise him what he owes

25  and what he doesn't owe, so the client can make a fully

Beltran - Cross                                    381

1    informed decision.

2    Q.        Absolutely because sometimes clients may want to

3    settle those type of claims saying they will settle for the

4    smaller number and not the larger number, right?

5    A.        Sometimes.

6    Q.        Would you agree with me that is also the role of

7    defense counsel, the absolute necessity role of defense

8    counsel, to try to figure out who might be liable, who else

9    might be liable for the tort?

10   A.        Absolutely, and that defense counsel should not

11   represent the one who is liable for the tort.

12   Q.        But in terms of perhaps adding claims against Tracy

13   Eden and filing counterclaims against Commercial Factors to

14   lessen or to somehow offset anything that Terry Manufacturing

15   might owe, that would be a duty of defense counsel, right?

16   A.        It is, just like bringing a third-party claim.

17   Q.        Right. And, Mr. Beltran, we are going towards the end

18   here but obviously – I'm not going to say obviously – but I

19   think it was everyone's understanding that, after the motion

20   for summary judgment was denied, barring the stay, it was going

21   to a jury trial?

22   A.        It looked like it was going that way unless they

23   wanted to ask for a certificate of immediate review.

24   Q.        Certainly. And I know it could have been all

25   convoluted and this case certainly was, but at some point they

Beltran - Cross                              382

1    would have gotten to a jury trial; would you agree?

2    A.      Yes.

3    Q.      And would you agree that it is a truism that juries

4    look at the nature of the conduct of the parties when they are

5    considering general damages?

6    A.      They do.

7    Q.      And if defense counsel – is it one of defense

8    counsel's, again, just absolute roles to present the underlying

9    facts of the litigation in the most sympathetic light so that

10   a jury doesn't punish their client?

11   A.      That's true, but he should not sacrifice one client to

12   protect a second client.

13   Q.      But in this case as to Terry Manufacturing, there was

14   no sacrifice; was there?  Because there never was any harm to

15   Terry Manufacturing at the end of this case, other than your

16   claim of excessive legal fees?

17   A.      Well, the conflict was a harm.  The courts have held

18   that a conflict itself is a harm.

19   Q.      And I am not asking about remedies.  I am asking about

20   damages.

21   A.      Okay.

22   Q.      Not remedies.  That is a whole other issue.  The

23   damages.  Here, Terry Manufacturing, other than your claim for

24   excessive legal fees, never suffered any damage because of Mr.

25   DeLong's representation; isn't that true?

Beltran - Cross                          383

1    A.        Well, an issue might – Mr. Brent Barriere decides on

2    the trial strategy of this case, and the courts allow, in a

3    conflict case, to prove loss of favorable settlement when there

4    is a conflict.

5    Q.        All right.  But we have talked about the favorable

6    settlement.  In fact, Terry Manufacturing tried to settle it

7    and was rebuffed.  Is that correct?

8    A.        They tried to settle it with a payment plan, yes.

9    Q.        Have you ever known of a defendant that wasn't

10   interested in paying a judgment over time?

11   A.        No, but, to me, that was important to show that maybe

12   the company didn't have the money they claimed they had.

13           MR. BRIDGERS: Your Honor, if I could have a couple of

14   seconds?

15           THE COURT: Yes.

16           (Pause)

17   Q.        Mr. Beltran, just one last question about the motion

18   for summary judgment.  Do you have any evidence that the trial

19   in the Commercial Factors case was actually scheduled or

20   delayed – do you have any evidence that the trial was actually

21   scheduled in the Commercial Factors case when Mr. DeLong filed

22   a motion for summary judgment?

23   A.        I don't know that.  I just know, as far as the

24   scheduling, whatever Mr. DeLong said yesterday in open court,

25   that it was close to the trial.

Beltran - Cross                              384

1          MR. BRIDGERS: Very well, Your Honor.  Thank you.  I

2     have no further questions.

3          THE COURT: Thank you.  Redirect, Mr. Barriere.  Just

4     one question I wanted to ask before we get to redirect, and

5     kind of following up on a question that was asked a few minutes

6     ago.

7          If you would, get Exhibit 141 in front of you, which

8     is your opinion letter.

9          THE WITNESS: The expert report?

10          THE COURT: Yes.

11          THE WITNESS: Yes, I have got it right here.

12          THE COURT: Page four.

13          THE WITNESS: Uh-huh.

14          THE COURT: There is a list of five things you said Mr.

15     DeLong, you know, basically did wrong.  I am not going to read

16     the whole thing, but just let me kind of paraphrase.  For

17     example, number two, failure to provide full disclosure to the

18     company.  Number three, failure to advise the company of

19     certain things.  Four, failure to receive a written waiver and

20     consent from the company.  How mechanically do you think Mr.

21     DeLong could have done that in the context of this Terry case?

22          THE WITNESS: Well, ideally, preferably is to put it in

23     writing and then it needs to be a detailed writing.  A lawyer,

24     when he discloses all of the risks and advantages, he should

25     have separate disclosures to each of the two clients and should

Beltran - Cross                                385

1     point out all of the good reasons why separate counsel should

2     represent them.

3              THE COURT: Okay.  Let's accept for a moment your claim

4     that there is a conflict here and that Mr. DeLong should have

5     written something in writing and who would he send that letter

6     to?

7              THE WITNESS: He would send one letter to Terry

8     Manufacturing saying, if I represent just you, this is what --

9              THE COURT: Terry Manufacturing is not a human being.

10    It is just a thing.  What human being would he have told that

11    to?

12             THE WITNESS: To Roy.

13             THE COURT: To Roy?

14             THE WITNESS: Yes.

15             THE COURT: Okay.  Let me just ask you a hypothetical

16    now that is loosely based on this case but I'm going to factor

17    out some of the complicating things.  Let's say we have got a

18    commercial case, breach of contract case, a plaintiff versus

19    defendant and the defendant is a corporation.  Let's assume for

20    the sake of discussion the defendant corporation has got one

21    shareholder and that individual is also the president and

22    basically runs the show and everybody else, all of the other

23    human beings that work at the company in various capacities are

24    all subordinate or subservient to – in other words, there is

25    one strong guy and that is a situation that is not terribly

Beltran - Cross                          386

1       unusual in the cases that I see.

2             And let's say we have a lawyer hired to represent this

3       defendant corporation and the lawyer does a bunch of work and

4       investigation, talks to people, and he comes back and he says,

5       well, sir, I have looked at this case and the president is a

6       real rascal, we have got to sue him.  In which case, he would

7       say, well, that is me.

8             In that hypothetical, what would you have the lawyer

9       do?

10            THE WITNESS: The lawyer in that case would probably

11      have to withdraw, and this comes up – this is a great question

12      in the bankruptcy context.   And a lawyer also has an

13      obligation in a closely-held corporation to protect the rights

14      of creditors.  So the lawyer can't be like a party to or a

15      conspirator with the bad client to defraud the creditors

16      because he has an obligation to the court, an obligation to his

17      clients, and to the third-party creditors.  So the lawyer can't

18      be a conduit for the corporation or its sole shareholder to

19      deplete the assets to affect the creditors, and I think there

20      are a lot of – you probably are aware of the case law better

21      than me.   There is case law in bankruptcy courts that have

22      found the lawyer liable because he breached that duty.  So I

23      think that is what would happen in this case, and the lawyer

24      would need to withdraw.

25            THE COURT: Well, because, as it happened, you know,

Beltran - Cross                           387

1    both Rudolph and Roy are crooks, they are both in shackles

2    someplace in this building.  I mean, let's say for the sake of

3    argument that Mr. DeLong had written this letter, one copy to

4    Roy and one copy to Rudolph, what would have changed?

5           THE WITNESS: Nothing, but Mr. DeLong wouldn't be here

6    today.  He would have withdrawn.

7           THE COURT: Okay.  You are saying, in other words,

8    besides just writing a letter, you are saying he should have

9    simply withdrawn, that Roy and Rudolph couldn't have waived

10   this conflict?

11          THE WITNESS: Yes.  And he has a duty to the third-

12   party creditors of the corporation.

13          THE COURT: Here is what I'm going to do.  I know I

14   have kind of broken ground.  Mr. Barriere, I'm going to give

15   you redirect.  I don't know if that has triggered any further

16   thoughts, Mr. Bridgers, but I am going to give you some recross

17   just because I have opened something after you sat down but,

18   you know, some of the questions you asked kind of triggered my

19   thinking on this.

20          So I will give you a shot to ask a couple of questions

21   following up if that is what you want to do.

22          Mr. Barriere.

23          MR. BARRIERE: I will be very brief, Your Honor. I

24   wanted to follow up on a question that I think got sort of

25   halfway out and answered earlier.

Beltran - Redirect                                          388

1                         REDIRECT EXAMINATION

2       BY MR. BARRIERE:

3       Q.          Mr. Bridgers asked you about the challenge faced by

4       an attorney when he is before a jury, claims of tort which can

5       support, at least under the laws of the State of Georgia, a

6       claim for punitive damages.  Isn't the challenge that lawyers

7       face, and what is addressed by these rules, the prospect that

8       he will be before that jury with both a corporation and an

9       officer who has engaged in quasi-criminal conduct?  Is that not

10      the challenge that is addressed by these very rules, sir?

11      A.          Yes, it is, and the lawyer wants to distance himself,

12      the lawyer representing the clean client wants to distance

13      himself from the culpable client.

14      Q.          All right.  Now, consistent with that, there was an

15      awful lot of time spent on what was not done or was done for

16      Terry Manufacturing to the exclusion of Rudolph Terry and, of

17      course, a lot of discussion about that motion for summary

18      judgment.

19              Let me ask you, sir, would it be your expectation,

20      both as a trial lawyer and as an expert in this area, that had

21      Terry Manufacturing had separate counsel, it would have

22      developed a defense separating itself from Rudolph Terry long

23      before June of 2003?

24      A.          My answer would be yes.

25      Q.          Would it also not be your expectation the fact that it

Beltran - Recross                                389

1  failed to do so, that that defense was only raised three and a

2  half years into this case, in some measure undermined the

3  merits of that defense?

4  A.      And I think I alluded to that.  For three years they

5  were aligned and all of a sudden at the last minute the

6  corporations have not aligned.  Either the plaintiff lawyers,

7  or the court, or the juries, are going to wonder, well, why

8  now, why now is that true.

9  Q.      So when you were asked about the acts of Mr. DeLong,

10  you focused on the summary judgment.  What you weren't asked

11  about were the omissions, the defensive mechanisms that would

12  have been raised by Terry Manufacturing had it been separate

13  and apart from Rudolph Terry, correct?

14  A.      Yes, correct.

15  Q.      All right.  And is that, in your judgment, a direct

16  reflection of the actual conflict in this case?

17  A.      I believe it is a direct reflection of the conflict.

18  Q.      All right.

19          MR. BARRIERE: Thank you, Your Honor.

20          THE COURT: Mr. Bridgers, I'm going to limit you to the

21  ground that I broke, but you are free to ask some follow-up

22  questions if you would like.

23          MR. BARRIERE: Ms. Lasky has asked that I correct a

24  question I previously asked.  When I was asking about DR 5-105,

25  I referred to it as a disciplinary rule.  It is a directory

Beltran - Recross                    390

1    rule.

2            THE COURT: Okay.

3            MR. BRIDGERS: Your Honor, may I ask – it is against

4    your standard rule but, with your permission, I was going to

5    ask Mr. Beltran one question based on something --

6            THE COURT: Well, I guess I did it, so you can, too.

7                        RECROSS-EXAMINATION

8    BY MR. BRIDGERS:

9    Q.      Mr. Beltran, in terms of the separate trial,

10   possibility of trial conflict, do you recall that Brian Steel

11   had been brought into the case towards the end of the

12   litigation to represent Mr. Rudolph Terry?

13   A.      I remember Mr. Steel came in for a while and he also

14   got a withdrawal, too, at some point.

15   Q.      After the bankruptcy?

16   A.      Yeah.

17           MR. BRIDGERS: That is the last for that, Your Honor.

18   Q.      And, Mr. Beltran, I will ask you one thing that was

19   raised when you were responding to the judge.  You talked about

20   Mr. – I thought you talked about Mr. DeLong's duty to the

21   third-party creditors.  How, in Gwinnett County Superior Court,

22   Mr. DeLong can't have a duty to someone other than his clients,

23   right?

24   A.      What I said was, if a client is involved in wrongdoing

25   and a lawyer assists that wrongdoing, was a conduit, that the

Beltran - Recross                                    391

1   federal courts have created a claim against a lawyer, and so

2   the lawyer – we have duties to society, we have duties to our

3   clients, we have duties to the court, we have duties to

4   opposing counsel.  And if you are involved in wrongdoing, a

5   lawyer can be liable if they assist in that wrongdoing.  That

6   is where I am headed.

7   Q.      Very well.  Kind of a crime exception basically?

8   A.      Yeah, it could be like a crime fraud exception.

9   Q.      All right.  Did Mr. DeLong do anything like that?

10  A.      No, but the question to me was what if there was just

11  one shareholder, what should the lawyer do.  I don't know what

12  Mr. DeLong would have done at trial, but the fact that he has

13  aligned – you know, if he tells the jury that I represent both

14  Terry Manufacturing and Roy, it is my opinion that it damages

15  the corporation, Terry Manufacturing, because of the

16  culpability of Rudolph.

17  Q.      All right.  But, at least in terms of this idea about

18  duties to a third-party creditor, that really has no bearing on

19  the facts of this particular case; does it?

20  A.      No.  The question was if there was one shareholder.

21  That would apply only if he became a conduit or assisted in the

22  wrongdoing.

23  Q.      All right.  Which we don't really have any evidence

24  here?

25  A.      Other than what has been testified to.

392

1          MR. BRIDGERS: Thank you, sir.

2          THE COURT: Thank you.  You may step down.

3          THE WITNESS: Thank you, Judge.

4          MR.   BARRIERE:   Thank   you,   Your   Honor.   The

5     trustee/plaintiff rests at this time.

6          THE COURT:  All right.

7          MR. BRIDGERS:  Your Honor, one housekeeping matter.

8          THE COURT: Yes, sir.

9          MR. BRIDGERS: In terms of the exhibits the trustee has

10    offered, I just want to kind of work that out.  It is my

11    understanding that you have offered all exhibits that have been

12    marked?

13          THE   COURT:   The   following   have   been   offered   and

14    admitted, Exhibits one through, is it 142?

15          MR. BARRIERE: I believe that to be correct, Your

16    Honor.  We had one that was not in the binder, which we may

17    need extra copies of.

18          THE COURT: Well, this one here was just some –

19          MR. BARRIERE: Right, from the secretary of state of

20    Georgia?

21          THE COURT: Yeah.

22          MR. BRIDGERS: Your Honor, if the court recalls, I did

23    reserve   some   rights   possibly   under   relevance   and   403.

24    Basically as to everything – the vast majority of it, no

25    objections whatsoever.  There are three things I would like to

393

1    bring to the court's attention.

2                THE COURT: Okay.

3                MR. BRIDGERS: And that's Exhibit 6, 8 and 133.

4                THE COURT: All right.

5                MR. BRIDGERS: I don't believe those were mentioned

6    directly and even though – I think there was other stuff that

7    wasn't mentioned directly either, but we are not objecting to

8    that at all.  It just seems like these three documents, 6, 8,

9    and 133, are not relevant.  They just don't appear to have any

10   basis to this particular case.

11               THE COURT:   Six is ESP Ventures, certificate of

12   existence.  Eight is Edwin C. Moses Associates, Inc.  And 133,

13   was that the other one?

14               MR. BRIDGERS: Yes, Your Honor.  It was a memo done for

15   another case in our office.  It was sent to Rudolph Terry some

16   months after the bankruptcy was filed.  And it just struck us

17   – like I said, we're not trying to be obstructionists here.

18   Everything else is fine, but these just have no relevance.

19               THE COURT: Let's put 133 on the side.  Mr. Barriere,

20   what does exhibit six and eight have to do with it?

21               MR. BARRIERE: Six and eight, Your Honor, may become

22   relevant if, and only if, there is related testimony by one of

23   the Terrys.

24               THE COURT: Okay.  So six and eight are out for the

25   time being?

394

1          MR. BARRIERE: For the time being and the same –

2          THE COURT: What about 133?

3          MR. BARRIERE: The same.  I would take that out for the

4    time being also.

5          THE COURT: So we will sustain the defendant's

6    objections to 6, 8, 133, and everything else is in.

7          MR. BARRIERE: And I would ask that I reserve the right

8    to seek to admit those at a later time depending upon the

9    cross-examination of Rudolph or Roy Terry.

10         THE COURT: Understood.

11         MR. BARRIERE: Thank you, Your Honor.  With that, I

12   believe all of our exhibits are in order and in the record,

13   Your Honor, and we would, yet again, confirm our resting.

14         THE COURT:  All right.

15         MR. BARRIERE: Truly slumber.

16         MR. BRIDGERS: Your Honor, for the record, I would, at

17   the close of the plaintiff's case, I would make a motion for

18   judgment as a matter of law based on all of the claims.  I am

19   not sure if the court wants to hear any argument or reserve

20   that until later, but I think it is necessary at this time.

21         THE COURT: Okay.  Let me – excuse me.  Rebecca, can

22   you get that Smith decision.  Yes, go ahead.  Make your motion

23   now, you know, if you think it is appropriate.

24         MR. BRIDGERS: Your Honor, just on a short basis, we

25   are looking at a legal malpractice claim.  I will start there.

395

1  We have had no testimony other than excessive fees to base

2  damages on in a legal malpractice case.  No harm befell to

3  Terry Manufacturing because of the actions of Mr. DeLong

4  because no harm befell to Terry Manufacturing at all.

5      As to the legal fees, that has not been held to be a

6  basis for legal negligence, on its own.  Now that kind of boot

7  straps into the substantial value.  There has been totally no

8  testimony that – Terry Manufacturing needed a defense. Terry

9  Manufacturing was – Terry Manufacturing needed a defense, had

10  to have a lawyer.  Mr. DeLong did a tremendous amount of work

11  in defense of that case.  We have our 18 odd boxes here.  We

12  have had no allegation that the work done was not billed for.

13  We have no indication that the fee was unreasonable.  No one

14  will testify to that.

15      What we have a question of is the value to – certainly

16  the question arises what is the value that Terry Manufacturing

17  received for the work done on behalf of Rudolph Terry.  And I

18  would just point the court logically to the Commercial Factors

19  suit.  It is undisputed that, had bankruptcy not been filed,

20  the company was on its way to a jury trial, based at least

21  partially on the issue of whether or not Rudolph Terry's

22  actions could be imputed to the company. When summary judgment

23  was   denied,   that's   what,   at   least   partially,   Terry

24  Manufacturing was going to trial on, whether or not Rudolph

25  Terry's actions, fraudulent, crooked as they were, were going

1    to be imputed to Terry Manufacturing.  Because of that,

2    everything that was done, even if it was done for – let's

3    assume for a second there was work done for Rudolph Terry

4    individually, all right.  Well, if the company can be held

5    liable for Rudolph Terry's actions, well, then any work

6    defending Rudolph Terry is going to benefit the company when

7    they head to this jury trial on that issue.

8         Your Honor, I would say that between that and all of

9    these claims tend to be premised on that, that Rudolph Terry's

10   – the work for Rudolph Terry had no value, but the company was

11   heading to trial based on that.  And so what else could have

12   been done at that time?

13        Your Honor, that is basically the substance of my

14   motion.

15        THE COURT: Okay.  Thank you, Mr. Bridgers.  I am

16   referring to a decision I authored in 2003, *Smith versus Homes*

17   *Today*, found at 296 BR 46.  Page 58 of the decision, I discuss

18   what's called, in the federal system, motion for judgment on

19   partial findings under rule 52©), which is the way I am going

20   to construe the motion.  And then reading the applicable

21   paragraph:

22             "The standard to be applied to such motions, a

23             recently articulated decision in the US District Court

24             from the Southern District of Alabama, the court may

25             resolve conflicts in the evidence, as well as make

397

1          credibility assessments," citing to a Fed. Circuit

2          case.  "Additionally, the court should evaluate the

3          evidence without making any special inferences in

4          favor of the non-moving party, and should resolve the

5          case on the basis of a preponderance of the evidence."

6     Well, based on what we have seen, I mean, it is clear

7     that Mr. DeLong, or DeLong and Caldwell, was hired to represent

8     Terry Manufacturing.  Fairly early on, he went into settlement

9     negotiations saying, yeah, Terry Manufacturing owes a couple

10    million dollars in invoices, which in fact it did not owe.

11    There was quite a clear conflict of interest at that point.

12         Early on, Mr. DeLong didn't know of the conflict, or

13    there is no evidence to show that he did, but there is

14    certainly a great deal of evidence to show that he knew, or

15    should have known, of the conflict fairly early on and he

16    proceeded to represent both Terry Manufacturing and Rudolph

17    Terry in the face of a clear conflict of interest.  So  Terry

18    Manufacturing was denied the advice and services of a lawyer

19    without a conflict of interest.

20         So I don't think the motion is well taken.  It is

21    denied.

22         We are going to break.  We will take – it is ten until

23    three.  We are going to have a telephonic conference in here at

24    three o'clock in another case.  You are welcome to come and go

25    as you please but it will probably take us about ten minutes.

Rudolph Terry - Direct                    398

1    So for planning purposes, Mr. Bridgers, why don't you count on

2    starting your case at 3:15.  If you want to start with one of

3    the Terry brothers, why don't we run down the marshals and see

4    if we can't get him here so that we can get started at 3:15.

5         MR. BARRIERE: For planning purposes, could we have an

6    identification of which – are we having a Terry brother and, if

7    so, which one it will be?

8         THE COURT: Yeah, you're going to need to identify him

9    and let the marshals know so that we know who to bring.

10        MR. BARRIERE: Roy or Rudolph?

11        MR. BRIDGERS: Rudolph.

12        (Recess from 2:54 p.m. until 3:21 p.m.)

13        COURTROOM DEPUTY: Court is back in session.

14        THE COURT:  Please be seated.  Mr. Bridgers.

15        MR. BRIDGERS: Thank you, Your Honor.  We call Rudolph

16   Terry.

17        THE COURT: Okay.

18        (RUDOLPH TERRY, WITNESS, SWORN)

19                    DIRECT EXAMINATION

20   BY MR. BRIDGERS:

21   Q.     Good afternoon, Mr. Terry.

22   A.     Good afternoon.

23   Q.     I am Charles Bridgers and I'm going to ask a few

24   questions here today.  Could you give us your full name for the

25   record, please?

Rudolph Terry - Direct                              399

1    A.        Rudolph Terry.

2    Q.        Mr. Terry, what is your educational background?

3    A.        High school education in Roanoke, Alabama.    I

4    graduated with a BA degree in business administration from

5    Morehouse College in Atlanta.

6    Q.        And generally, Mr. Terry, what is your working

7    background, your employment history?

8    A.        Apparel manufacturing from '63 through 2003.

9    Q.        And how long had you worked at Terry Manufacturing?

10   A.        From '63.  Full-time from '69 to 2003.

11   Q.        What was your primary responsibility at Terry

12   Manufacturing?

13   A.        It changed over the years.  I mean, I started out

14   obviously doing – you know, in high school, doing menial

15   things, and then in '69 when I came back full-time with the

16   company, I worked in a lot of capacities.  Ultimately in the

17   late 90s, early 90s, I was the chief financial officer and I

18   remained in that capacity but, in 1994, moved to Atlanta to

19   open a facility there.  And from '94 forward, basically ran the

20   Atlanta operation as my primary focus as far as running the

21   operation, although I retained the title of vice-president and

22   chief financial officer.

23   Q.        Mr. Terry, of Terry Manufacturing, what percentage of

24   stock did you hold in that company?

25   A.        Forty-nine percent.

Rudolph Terry - Direct                                    400

1    Q.        Thank you, sir.  Did you become aware that Terry

2    Manufacturing was being sued by Commercial Factors?

3    A.        Yes, I did.

4    Q.        And when was that generally?

5    A.        That would've been in approximately December of 1999.

6    Q.        Did you read the complaint that Commercial Factors had

7    filed against Terry Manufacturing?

8    A.        I did.

9    Q.        And what was your response – what did you do then?

10   A.        What I read the complaint, I think my first reaction

11   was to – I didn't understand it because it referred to invoices

12   and etc., which I was totally unfamiliar.  I did not have a

13   business relationship with them.  So initially, I read it and

14   was very confused.

15   Q.        Did you take steps at some point to hire an attorney?

16   A.        I did.

17   Q.        And how did that – how did you take steps to hire an

18   attorney?

19   A.        In December '99, January 2000, I contacted an

20   attorney, Mr. Jerry Thomas, attorney Jerry Thomas, and had

21   conversations with Jerry Thomas and then ultimately, through

22   consultation with Jerry Thomas, spoke with and hired, as well,

23   Mr. Earnest DeLong.

24   Q.        Did Terry Manufacturing end up hiring both Mr. DeLong

25   and Mr. Thomas?

Rudolph Terry - Direct                                    401

1    A.        Yes.

2    Q.        And what role did your brother, Roy, play in choosing

3    counsel?

4    A.        In choosing, more of an oversight, informed, etc., was

5    more where it was.    In terms of the initial seeking out

6    counsel, I did that.    He participated ultimately in terms of

7    becoming aware of and participating, you know, ultimately; but

8    in the initial selection was probably – I was the person most

9    involved.

10   Q.        Was your brother an officer of Terry Manufacturing?

11   A.        Yes, my brother was president and CEO of the company.

12   Q.        When Mr. DeLong and Mr. Thomas were hired in 1999, was

13   their hiring limited to the case in which they defended the

14   company, the Commercial Factors case?

15   A.        I am not hearing you real well.

16   Q.        I'm sorry.    I am starting to talk slower as the day

17   goes on.    Mr. Terry, what I had asked is was Mr. DeLong – was

18   the hiring of Mr. DeLong and Mr. Thomas at that time limited to

19   the defense of the Commercial Factors suit?

20   A.        Yes, at that time, and I am not really aware of

21   anything other than that, that I ever hired them for.

22   Q.        All right.    Before the Commercial Factors litigation

23   case began, had you ever hired Mr. DeLong or Mr. Thomas to do

24   any legal work for you or any legal work for Terry

25   Manufacturing?

Rudolph Terry - Direct                                      402

1    A.       No.

2    Q.       This may be a straightforward question, but did Mr.

3    DeLong, or Mr. Thomas, have any financial interest in Terry

4    Manufacturing?

5    A.       No.

6    Q.       As the litigation began, did Jerry Thomas serve as

7    counsel for Terry Manufacturing, as well?

8    A.       Counsel as it relates to this particular case, yes.

9    Q.       I am sorry, sir.  Thank you.

10   A.       Yes.

11   Q.       What role did Mr. Thomas play as opposed to Mr.

12   DeLong?

13   A.       Mr. Thomas was, I guess one of his primary

14   participation was in research and writing as it related to the

15   briefs and the research, and then sometimes reviewing the

16   writings or pleadings that were prepared by Mr. DeLong, but was

17   very involved in the writings and pleadings that were prepared

18   throughout the litigation.

19   Q.       Which attorney was lead counsel?

20   A.       Mr. DeLong.

21   Q.       And, Mr. Terry, did you attend depositions in the

22   Commercial Factors matter?

23   A.       Yes.

24   Q.       Do you think you attended most of them, some of them;

25   how many did you attend?

Rudolph Terry - Direct                                    403

1    A.      It is my belief that I probably attended all of them,

2    you know, if not ninety-eight percent, but I do not have a

3    recollection of one taking place that I did not attend.

4    Q.      All right.  In your attendance at those depositions,

5    did you observe Mr. Thomas also attending those depositions?

6    A.      Yes.

7    Q.      Do you think he attended all of the depositions that

8    you attended?

9    A.      Probably all.  There is only one that goes through my

10   mind that I am not certain of, but I would not want to say

11   absolute, but it is in the ninety-nine percentile, yes.  There

12   is one that I am not certain of.

13   Q.      All right.  Mr. Terry, did you ever participate in the

14   drafting of motions or other legal related correspondence in

15   the Commercial Factors case?

16   A.      Yes.

17   Q.      What was your involvement in that?

18   A.      I participated in terms of making sure that the

19   factual basis was correctly addressed because, you know, one of

20   the real issues was that many of the facts presented were not

21   facts in reality, and so I tried to participate from a factual

22   point of view in the process, and was probably very involved in

23   the factual side of the pleadings.

24   Q.      Did you observe Mr. Thomas working on the drafting of

25   legal motions or other documents in the Commercial Factors

Rudolph Terry - Direct                                    404

1    case?

2    A.        I'm absolutely – I am not sure that there were any

3    pleadings that he did not participate in, you know, throughout

4    the process.   I am not aware of any one that he did not

5    participate in.

6    Q.        Did you talk to Mr. Thomas on the phone about the

7    Commercial Factors case during that litigation?

8    A.        Yes.

9    Q.        How often, generally?

10   A.        At various points, very often.  There were times when,

11   I guess shall I say, the process was more active; other times,

12   it was more dormant, but when it was active, I spoke to him on

13   a very regular basis, probably as regular as Mr. DeLong, maybe

14   a little bit less but pretty much as much as Mr. DeLong.

15   Q.        Could you characterize your interactions with Mr.

16   DeLong during the Commercial Factors case?

17   A.        The same as Mr. Thomas.  You know, when the case was

18   very active, there was a very active participation, both by

19   phone sometime, by physically getting together, a lot of times

20   by conference calls, faxing back and forth and etc.  But it was

21   a very active professional participation as far as with Mr.

22   DeLong, as well as with Mr. Thomas, throughout the litigation,

23   especially at times when it was more active than dormant.

24   Q.        All right.   Well, other than Mr. DeLong and Mr.

25   Thomas, did any other attorneys provide legal services for

Rudolph Terry - Direct                                    405

1    either you, or Terry Manufacturing, in the Commercial Factors

2    case?

3    A.      No, not directly.

4    Q.      Did Brian Steel also provide services?

5    A.      Brian provided – and that is why I say not directly

6    but as an outgrowth of the criminal action that was ultimately

7    alleged, Mr. Steel, Brian Steel, became active in terms of, I

8    would call it more indirectly in terms of as it related to the

9    litigation.

10   Q.      All right.  Other than perhaps today, have you ever

11   met Michael Caldwell?

12   A.      I have seen him.  I have seen him, I think, in the

13   building but I have never had any direct dealings with him.  I

14   might have spoken to him.  I speak to everybody.  I am a

15   country boy from Alabama.  I speak to everybody walking down

16   the hall, but I have never had, you know, real communications

17   with him.

18   Q.      All right.  Have you ever met a man named Keith Logue?

19   A.      Who?

20   Q.      Keith Logue.

21   A.      I am not aware of it.

22   Q.      Have you ever met a man named Steve Wisebram?

23   A.      I don't believe so.

24   Q.      Have you ever met a man named Ed Novotny?

25   A.      No.  I know I remember his name from the firm, or

Rudolph Terry - Direct                                      406

1    whatever, but I don't know him.

2    Q.       And before kind of this issue arose here in this

3    adversary case, had you ever really met me?

4    A.       No.

5    Q.       Mr. Terry, if I could direct your attention to Exhibit

6    10, which I think I have opened up.  It is there in front of

7    you.

8    A.       Yes.

9    Q.       Mr. Terry, if I could direct your attention to Exhibit

10   10, could you read the body of the text, please?

11   A.       Okay.  It is:

12            "Dear  Mr.  Terry:  This  letter  is  intended  to

13            memorialize the understanding we have reached.  Jerry

14            Thomas  and  I  have  been  engaged  to  represent  the

15            interest  of  Terry  Manufacturing  Company,  Inc.,  its

16            officers,  directors  and  shareholders  in  the  defense  of

17            the  above  referenced  matter.  Terry  Manufacturing

18            Company  will  be  billed  at  the  end  of  each  month  for

19            time  and  expenses  incurred  during  the  month.  Attorney

20            time  will  be  billed  at  the  rate  of  two  hundred  fifty

21            dollars  per  hour  and  expenses  will  be  billed  as

22            incurred.  We  look  forward  to  working  with  you  on

23            behalf  of  the  company.  Sincerely,  Earnest  DeLong."

24   Q.       Do you recall receiving that letter at or about the

25   time it is dated?

Rudolph Terry - Direct                    407

1    A.       Yes.

2    Q.       Mr. Terry, at the time who did you understand that you

3    had hired to provide legal services for Terry Manufacturing?

4    A.       Jerry Thomas and Earnest DeLong.

5    Q.       Did you consider that you had hired the firm of DeLong

6    and Caldwell, or did you consider that you had hired Jerry

7    Thomas and Earnest DeLong?

8    A.       Jerry Thomas and Earnest DeLong.

9    Q.       Did the fact that the letterhead was on DeLong and

10   Caldwell stationery have any significance to that decision?

11   A.       I didn't even remember that it was.

12   Q.       Mr. Terry, at some point did you come to understand

13   that Commercial Factors might add a fraud type claim against

14   Terry Manufacturing in the Commercial Factors case?

15   A.       Yes.

16   Q.       And generally how did that understanding come about?

17   A.       It would have come about in terms of, I am sure, that

18   attorney DeLong advised me of their either having filed or

19   representing that they would be filing a fraud claim.

20   Q.       What did you believe was the reason behind the

21   possibility of Commercial Factors bringing a fraud claim

22   against Terry Manufacturing?

23   A.       My belief was that they had come to understand that

24   the co-defendant or co-defendants, Jon Pouncey and his

25   companies, could not pay them and they were looking to seek as

Rudolph Terry - Direct                                408

1   many dollars as they could from Terry Manufacturing Company and

2   either realized or it was becoming apparent that it was very

3   questionable in terms of the nature of the invoices that they

4   were alleging and, at that point, they sought to file fraud

5   charges.

6   Q.      Did Mr. DeLong speak to you about, or Mr. Thomas,

7   speak to you about the possible ramifications of a fraud claim

8   against the company, against Terry Manufacturing?

9   A.      Yes, from a financial implication, yes.

10  Q.      When you say in terms of a financial implication, what

11  do you mean?

12  A.      That they were in effect seeking to recover far in

13  excess of the dollar amounts alleged to be owed to them through

14  a pure commercial contract.  You know, I won't say a commercial

15  contract, but through pure commercial invoices.

16  Q.      And did Mr. DeLong at that time raise the issue of a

17  possibility of a conflict of interest?

18  A.      Yes.

19  Q.      And what did he say?

20  A.      Basically he said a couple of things.  The summary of

21  it was that there was a potential for some conflict of interest

22  as it related, and this part I have to be clear about.  I don't

23  know when they alleged fraud and when they considered naming me

24  individually were one and the same time as far as the thought

25  process, but the point is that at that point, at the point that

Rudolph Terry - Direct                                    409

1   you are referencing, as far as when they said that they were

2   going to allege fraud, he brought it to my attention that there

3   could be the potential of a conflict of interest in terms of my

4   interest as it related to being potentially different than the

5   interest of Terry Manufacturing Company.

6   Q.      Do you recall in any more specific detail what he said

7   about that particular topic of how the interest might be

8   different?

9   A.      Yes.  He ended up suggesting that I might want to seek

10  separate counsel, that I might want to consider legal – well,

11  I think it was kind of in two parts in the sense that I might

12  want to seek separate counsel and then there were conversations

13  that I had with my brother and we were coming to the conclusion

14  that we preferred to continue as we were, and I think he

15  further brought up the issue that we might want to consult

16  other counsel in terms of separate from himself and Mr. Thomas,

17  in terms of making a decision to continue with him representing

18  both the company and me.

19  Q.      And, Mr. Terry, let me take you back to – you

20  referenced your brother, Roy.  How did Roy become involved in

21  that particular issue, that particular conversation or series

22  of conversations?

23  A.      Roy is three things.  He is the majority stockholder

24  in Terry Manufacturing Company.  He is the chief executive

25  officer of Terry Manufacturing, and he is my older brother.

Rudolph Terry - Direct                                410

1    And in all of those respects, when an issue of that

2    significance and when they brought up the issue of a potential

3    conflict of interest, I wanted to make sure that he was

4    involved in the process, as well as me, and where the decision-

5    making process, they included Roy very heavily in that

6    decision.

7    Q.      Did Mr. DeLong suggest you talk to your brother, Roy,

8    about this issue?

9    A.      I am sure that he did.  I'm sure that he suggested

10   that I talk to Roy, but the reason is that is something that

11   would have happened, as well, but, yes, I am sure he suggested

12   that I speak to Roy, as well.

13   Q.      And did you indeed talk to your brother about this

14   issue?

15   A.      I indeed spoke to Roy and then, at some point, I think

16   we had – I won't say I think – we had a three-way where Mr.

17   DeLong reiterated some of the things that I had conveyed to Roy

18   about the concerns of a conflict of interest.  There was a

19   three-way to make sure that the understanding was conveyed

20   correctly in terms of what the implications were.

21   Q.      When you spoke with your brother about this – let me

22   withdraw that question.  Going back to the conversation, the

23   three-way conversation, when you say that, was that a phone

24   call or was that an in-person meeting?

25   A.      Was that –

Rudolph Terry - Direct                                        411

1    Q.        Was that a phone call, an in-person meeting?

2    A.        That was a three-way call.

3    Q.        Three-way conference call?

4    A.        Right.

5    Q.        Thank you, sir.

6    A.        Yes.

7    Q.        And did Mr. DeLong repeat the things he had mentioned

8    to you individually in that three-way conference call to your

9    brother and you?

10   A.        Yes.

11   Q.        Did you and your brother make a decision – actually I

12   think you testified your brother made a decision at some point.

13   Did you all make a decision on the telephone with Mr. DeLong;

14   did you talk about it differently?  How did that come about?

15   A.        We had – I mean, we came to a conclusion on the phone

16   call that we would continue with him representing both Terry

17   Manufacturing – and at that point, like I said, continuing to

18   represent Terry Manufacturing Company, knowing that there was

19   a potential conflict.  The caveat being that I am not sure that

20   it was at exactly that same date that I was actually named.  So

21   he wasn't representing me until I was named, is, you know, the

22   only hesitation there.

23   Q.        Yes, sir.  And I have been referencing conversations

24   – tell me if I am wrong – but I understood we were referencing

25   conversations that took place about the time you became aware

Rudolph Terry - Direct                                    412

1    that Terry Manufacturing might have fraud claims added against

2    it?

3    A.        Yes.  And the only thing that I am not clear of is

4    whether that same day – at some point subsequent to the initial

5    claim, I was named personally.  Whether the date that they

6    alleged fraud as it relates to the company and alleged that I

7    would be named personally may or may not have been exactly the

8    same date, and that is the only reason that I described them as

9    potentially close in time but may or may not have been

10   absolutely the same date.  It is quite possible that they said

11   to Mr. DeLong that they intended to file and, at that point,

12   there were conversations that we assumed that I would be named.

13   But the only thing is that I have a problem with saying that at

14   that point he represented me until the actual claim was filed

15   by them against me, and maybe that is just splitting hairs, but

16   that is the only point that I keep bifurcating.

17   Q.        Okay.  We will let the date issue stay for now.  After

18   – at some point after you came to understand that fraud claims

19   might be added against Terry Manufacturing, were they indeed

20   added as part of the Commercial Factors claim?

21   A.        Yes.

22   Q.        And at that point can you recall a distinct

23   conversation about the possibility of a conflict of interest

24   after Terry Manufacturing was added?

25   A.        Yes.

Rudolph Terry - Direct                                    413

1    Q.       And generally tell us about that.

2    A.       When you say after Terry Manufacturing, you mean after

3    the fraud claim was added?

4    Q.       Yes, sir, after the fraud claim was added.

5    A.       Yes.

6    Q.       Tell us that conversation.

7    A.       It would have been a very similar conversation, but I

8    would say that progressively Mr. DeLong became a little bit

9    more emphatic in terms of his explanation and insistence that

10   we, you know, strongly consider the implications of his

11   representing the company and interest that might relate to me

12   separately.  Again, whether I had already been named or not,

13   that became more insistent on his part for us to evaluate and

14   continue to evaluate but with a little bit more – I won't say

15   a little bit more – probably a lot more emphasis on the greater

16   potential of conflict and making sure that we understood the

17   potential of that conflict.

18   Q.       All right.  In perhaps that second series of

19   conversations that you are referencing, was your brother, Roy,

20   involved in those conversations, as well?

21   A.       Yeah.

22   Q.       Well, let me move on, then.  At some point were you

23   added in as an individual in the Commercial Factors case?

24   A.       Yes.

25   Q.       And at that point did the issue of conflicts of

Rudolph Terry - Direct                                       414

1    interest come up again?

2    A.       Yes.

3    Q.       And, Mr. Terry, generally what do you recall about

4    those conversations – let me ask you, first, do you recall if

5    they came up before you were added, after you were added as a

6    party?

7    A.       All of the above.  It came up but at each point the

8    nature of the case and the claims changed.  The conversation

9    related to conflict of interest was reemphasized, readdressed

10   and at each time we came to the conclusion to maintain the same

11   representation and ultimately the joint representation of me

12   and the company at the point that I was in fact a separate

13   named party.

14   Q.       All   right.   Going   into   that   last   series   of

15   conversations you have referenced, do you recall specifically,

16   do you have any memory specifically of what Mr. DeLong or Mr.

17   Thomas  might  have  said  to  you  during  that  last  series  of

18   conversations around the time you were added as an individual?

19   A.       Again, each time there was a ratcheting up of the

20   emphasis on the fact that the potential for conflict increased.

21   Certainly significantly at the point that I was, in fact, a

22   separate party was the most emphatic emphasis and re-insistence

23   on, again, analyzing it and suggesting that we might want to

24   seek counsel other than Mr. DeLong and Mr. Thomas to verify our

25   decision to go forward with the two of them representing both

Rudolph Terry - Direct                                415

1   me and the company was reemphasized but emphasized more

2   emphatically at the point that I was in fact named as a

3   separate party.

4   Q.      And at some point in this process you were indicted?

5   A.      That is correct.

6   Q.      And at that point did you hire criminal counsel?

7   A.      At that point I hired the Steel law firm, Brian Steel.

8   Q.      And did Mr. Steel ever enter an appearance in the

9   Commercial Factors case?

10  A.      I think he did.

11  Q.      Mr. Terry, why did you and your brother come to the

12  conclusion that Mr. DeLong and Mr. Thomas should continue to

13  represent both Terry Manufacturing and yourself, why?

14  A.      Because my primary interest was, and maybe foolishly,

15  but my primary interest was the interest of Terry Manufacturing

16  Company, and that it was my belief that the joint

17  representation of me and Terry Manufacturing Company jointly

18  provided the most cost effective and the most efficient manner

19  to protect the interest of Terry Manufacturing Company.

20          It became apparent that it was basically an extortion

21  attempt, and that the claims, in and of themselves, were

22  probably legitimate related to – I assume related to Floodgates

23  and the other parties but, as it related to Terry

24  Manufacturing, it was not, that they were trying to extort

25  millions of dollars from Terry Manufacturing Company.

Rudolph Terry - Direct                                416

1      I thought that the joint representation provided the

2    most concerted and concise effort and non-confusing effort to

3    protect the interest of Terry Manufacturing.

4    Q.      Did the fact that basically you were a brother to Roy

5    have anything to do with that decision?

6    A.      The fact that I was what?

7    Q.      Well, that was a poor question, but the fact that you

8    and Roy were brothers, did that have any bearing on your

9    decision to have Mr. DeLong continue as counsel with Mr.

10   Thomas?

11   A.      No.  I mean, no, no. I mean, we thought it was the

12   most efficient way to handle it as it related to the best

13   interest of the company, and it had nothing to do with the fact

14   that Roy was my brother.  I mean, I don't – that wasn't even a

15   consideration.

16   Q.      All right.  Did you ever instruct Mr. DeLong or Mr.

17   Thomas to withhold any information from your brother, Roy?

18   A.      No, no.

19   Q.      And, to your knowledge, did Mr. DeLong or Mr. Thomas

20   ever withhold information from your brother, Roy?

21   A.      No, nor did I.

22   Q.      Mr. Terry, there has become an issue about whether or

23   not – basically about a writing, that this was not put down on

24   paper.  My question to you is, if Mr. DeLong or Mr. Thomas

25   would have placed any of this information about a conflict of

Rudolph Terry - Direct                                      417

1    interest in writing, would that have made any difference to the

2    way you responded to it?

3    A.       No.

4    Q.       And why not?

5    A.       Because it was not their decision; it was my decision.

6    The fact that they said that it should be reviewed, the issue

7    should be reviewed, was of great significance to me; but

8    ultimately the decision was a decision that Roy and I made, and

9    it was based on certainly, reviewed at given points, based on

10   their insistence.  But the review and the decision were

11   decisions that Roy and I made, you know, as the parties looking

12   out for the best interest of Terry Manufacturing Company.

13   Whether it was in writing or verbal was not an issue.

14   Ultimately the decision was ours.

15   Q.       Mr. Terry, were you, to the extent you had control

16   over it, were you and Terry Manufacturing satisfied with the

17   legal work done by Mr. DeLong and Mr. Thomas?

18   A.       Yes.

19   Q.       I would like for you to look back now, knowing

20   everything you know up until today, would you have made any

21   different decision about continuing with Mr. DeLong and Mr.

22   Thomas than you made?

23   A.       No.  The results related to that were the results that

24   we were seeking.  Terry Manufacturing Company was never

25   subjected to the three plus million dollars in judgments and

Rudolph Terry - Direct                                          418

1    award of dollars that were being sought by the other parties.

2    So the results that we were seeking were achieved.

3    Q.      Mr. Terry, was Terry Manufacturing having financial

4    problems during the time that Mr. DeLong represented it?

5    A.      Well, I guess you would have to qualify that. I mean,

6    in terms of financial problems, in the sense that Terry, the

7    cash flow issue, yes, there were cash flow issues related to

8    the company but, as it relates to the Atlanta operation, etc.,

9    I can't characterize it as financial problems.  There are

10   always cash flow problems in a small company competing with

11   companies much larger than yourself.

12           But certainly what was ultimately determined to be

13   significant, much more significant cash flow issues and etc.

14   later on, in 2000 and 2001, and so not as serious as it became

15   in, say, 2003.

16   Q.      All right.  During that time period, were you, or to

17   your knowledge, anyone else at Terry Manufacturing telling your

18   creditors that you were having cash flow problems or however

19   you just characterized it?

20   A.      The answer is no.

21   Q.      And were you telling your vendors the same – anything

22   about those problems?

23   A.      No.

24   Q.      And, to your knowledge, was Mr. Thomas or Mr. DeLong

25   ever informed about these issues, financial issues, that you

Rudolph Terry - Direct                                          419

1   have raised?

2   A.      No.

3   Q.      Why not?  If they were your lawyers, why didn't you

4   tell them?

5   A.      They were hired to deal with specific issues related

6   to defending Terry Manufacturing concerning the Commercial

7   Factors case and had no bearing whatsoever on it.

8   Q.      Did Mr. DeLong or Mr. Thomas have any access to the

9   company's financial records, other than through you or your

10  brother?

11  A.      No.

12  Q.      Did you ever discuss with Mr. DeLong or Mr. Thomas the

13  fact that Terry Manufacturing was going to be filing for

14  bankruptcy before it actually happened?

15  A.      No.

16  Q.      Did you - I say you, but did Terry Manufacturing

17  continue to make payments to Mr. DeLong and Mr. Thomas during

18  the time they represented the company in the Commercial Factors

19  litigation?

20  A.      I'm sorry.  I am not following that.

21  Q.      It was a poor question.  I will withdraw that.  Then

22  up until just before the bankruptcy petition was filed, was

23  Terry Manufacturing continuing to pay Mr. DeLong and Mr.

24  Thomas?

25  A.      As long as the case was active - I mean, the caveat is

Rudolph Terry - Direct                                    420

1    that I am not sure exactly when - we paid Mr. DeLong and Mr.

2    Thomas as long as there was a month in which there was billable

3    activity.  And the reason I say that is that there were times

4    between 2001 and 2003 when they were not very active in terms

5    of what they were doing in any given month.  But the answer is,

6    if they had billable hours, there were paid for that billable

7    hours.

8    Q.     Did you believe that it was necessary for Terry

9    Manufacturing to pay those bills?

10   A.     Yes.

11   Q.     And why?

12   A.     Because, if we had not, there was three point

13   something million dollars in judgments that would have been

14   incurred and certainly would have been the immediate demise of

15   Terry Manufacturing.

16   Q.     And normally when did Terry Manufacturing pay these

17   legal bills as they came in?

18   A.     Usually within the month following the billing.  I

19   guess the billing would be incurred in a given month and at the

20   end of that month, they would be billed and during that

21   subsequent month, they would be paid.

22   Q.     Was there anything out of the ordinary about the way

23   Terry Manufacturing paid Mr. DeLong and Mr. Thomas on these

24   invoices?

25   A.     No.

Rudolph Terry - Direct                              421

1   Q.        Mr. Terry, other than the money that was returned to

2   Terry Manufacturing for the settlement that never occurred –

3   A.        Right.

4   Q.        Okay.  To your knowledge, did – no, not even to your

5   knowledge.  Did Woody DeLong or Jerry Thomas ever return any of

6   that money to either you or Terry Manufacturing, or your

7   brother?

8   A.        No.

9   Q.        And to your knowledge did Mr. DeLong pass along any of

10  those funds he received from Terry Manufacturing to anyone

11  other than Jerry Thomas?

12  A.        No.

13  Q.        Did you make any type of an effort to prevent people

14  from finding out that Terry Manufacturing was paying Mr. DeLong

15  and Mr. Thomas for their services?

16  A.        No.

17  Q.        Did you ever pay Mr. DeLong or Mr. Thomas more than

18  they actually billed?

19  A.        No.

20  Q.        Did you ever negotiate down any bills that Mr. DeLong

21  or Mr. Thomas sent to you?

22  A.        Yeah, a lot.  Yeah, sure.  I mean that's me.  That is

23  just me.  I nickel and dime every bill.

24  Q.        All right.  How often do you think you corrected any

25  of these legal bills from Mr. DeLong or Mr. Thomas?  You know,

Rudolph Terry - Direct                                        422

1    how regular was that?

2    A.       How regular did they bill?  I mean, I always went

3    through line by line every bill.  There might have been some

4    where I didn't have any issue or didn't, but I always went

5    through every bill.

6            How often we came to an agreement for reductions and

7    all, I am not absolutely certain but I never had a bill come

8    across my desk that I did not review in detail and quite often,

9    you know, requested concessions and etc.

10           But, like I said, there were times that bills, you

11   know, there were periods, several months, that became dormant,

12   but I always negotiated the bill.

13   Q.       Mr. Terry, do you recall any issue coming up about

14   billing related to an amicus brief filed in the Richard Rose

15   matter?  Do you recall anything specific about that issue,

16   about the billing in that issue?

17   A.       Not specifically right now.

18           MR. BRIDGERS: Your Honor, may I have a moment with my

19   client?

20           THE COURT: Yes, sir.

21           (Counsel conferring.)

22           MR. BRIDGERS: Your Honor, we pass the witness. Thank

23   you, Mr. Terry.

24           THE COURT: Mr. Barriere.

25           MR. BARRIERE: Thank you.

Rudolph Terry - Cross                                    423

1                       CROSS EXAMINATION

2      BY MR. BARRIERE:

3      Q.       Good afternoon, Mr. Terry.  My name is Brent Barriere.

4      I represent the trustee.  I don't believe we have had a chance

5      to meet.  In fact, I am sure of it.  I take it you have met Mr.

6      Bridgers previously?

7      A.       I might have seen him pass in the hall but, no, not

8      really.

9      Q.       All right.  Did you meet with Mr. Bridgers to prepare

10     for your testimony today?

11     A.       No.

12     Q.       Did you meet with him or any of the other attorneys to

13     prepare for your testimony today, or to prepare your affidavit

14     filed in this case?

15     A.       No, I don't think I met with them.

16     Q.       Mr. Terry, I would like to take you back to the

17     months, weeks, leading up to the filing of the Commercial

18     Factors litigation.  You had extensive discussion, did you not,

19     with their lawyers concerning possible settlement of that case

20     before it was even filed?

21     A.       Well, no.  I had discussions with them before I

22     realized it was filed.  What happened was I was on the phone

23     with them, they were discussing settlement because it was my

24     belief that Floodgates was prepared to pay them the amount, and

25     I found out that – they left the phone open in a three-way, and

Rudolph Terry - Cross                                424

1    I found out that they had actually filed suit against me when

2    they were representing that they were negotiating prior to

3    filing suit.

4           So technically, no, but the answer is I had

5    conversations with them before I realized that litigation had

6    been filed, but it had actually been filed, they just hadn't

7    served me.

8    Q.    Fair enough.  Now, during the course of that, isn't it

9    true that you offered that Terry Manufacturing would pay

10   Commercial Factors something in excess of two million dollars

11   provided you got a payment schedule?

12   A.    Yes.  That was on my belief that Commercial Factors –

13   I mean, that Floodgates and Jon Pouncey represented to me that

14   they could repay based on the same schedule.

15   Q.    And you were going to be paying, I take it, on

16   invoices held by Commercial Factors, invoices that had been

17   issued by Floodgates to Terry Manufacturing?

18   A.    No.  I was paying based on the representation from

19   Floodgates that they were prepared to, in effect, repay to me

20   whatever dollars I paid to Commercial Factors.

21   Q.    Well, let me ask you this question, sir.  Once the

22   lawsuit was filed, did you instruct Mr. DeLong to make an offer

23   of judgment for some two point three million dollars to

24   Commercial Factors?

25   A.    I am not sure what the amount was, but I was – but I

Rudolph Terry - Cross                                    425

1    did negotiate an agreement to pay them the amounts that

2    Floodgates represented that they would be able to pay back to

3    Commercial – to give to me and I, in turn, paid Commercial

4    Factors.

5    Q.        Well, did you condition your offer to Commercial

6    Factors on Floodgates paying you?

7    A.        Yes.  Maybe not in my documents to them but, yes, that

8    was the basis of my agreement to do so, was based on what

9    Floodgates represented that they could pay back to me.

10   Q.        Okay.  Now let me give you an illustration just so we

11   are talking about the same thing.  It says, quote:

12            "Defendant Terry admits that it is indebted to

13            plaintiff in the amount of two million, one hundred

14            thirty thousand, six hundred twenty-eight dollars and

15            ninety-one cents, less the hundred and ninety-three

16            thousand dollars which has been paid by defendant

17            Terry and accepted by plaintiff."

18            Did you authorize Mr. DeLong to make that judicial

19   admission on behalf of the company?

20   A.        If I did, it would have been based on representations

21   from Floodgates.  I had never seen the invoices, etc.

22   Floodgates represented to me that they had – you know, as to

23   what their arrangement was and what the situation was related

24   to income that they had to repay these dollars.  So my

25   representation to Mr. DeLong was to make an agreement

Rudolph Terry - Cross                                426

1     consistent with what Floodgates would be able to refund to me.

2     Q.        I guess I am a little confused, sir.  Isn't the fact

3     of the matter that Floodgates was telling Commercial Factors

4     they were selling a lot of product to Terry Manufacturing and

5     you were acknowledging that to be the case; were you not?

6     A.        No, that is not the case.

7     Q.        Did you not plead guilty to that?

8     A.        I pleaded guilty to signing a document – not to the

9     invoices.  There was no representation that – what I pleaded

10    guilty to was to mail fraud.  I pleaded guilty to signing a

11    document that had been prepared by the president of Commercial

12    Factors, and I don't know if he was supposed to mail it to me

13    but I certainly didn't mail it to him, that signed the document

14    but, in effect, there were three documents prepared by

15    Commercial Factors.  One for three million dollars, one for two

16    million dollars and one for one point something million

17    dollars, all of which were filed as false claims in the

18    bankruptcy court.  And I pleaded guilty to having mailed – to

19    one of the documents that I signed having been mailed.  I don't

20    know whether – I assume – I know they mailed it to me.  I guess

21    the assumption is they mailed it to me.  They represent they

22    mailed it to me.

23    Q.        Well, in fact, the document you signed, sir, and I am

24    going to quote.  It says:

25              "The above signed acknowledges receipt and acceptance

Rudolph Terry - Cross                                427

1          of the goods reflected in the invoices attached.  I am

2          aware that Commercial Factors of Atlanta is relying on

3          my verification to advance Floodgates, LTD.  I am not

4          aware of any official reductions or returns associated

5          to these invoices."

6    Unquote.  That is what you signed off on, right?

7    A.       Yeah.  If you want to show me the document, I can tell

8    you –

9    Q.       Sure.   This one is DeLong 0705, the one that was

10   attached to the original complaint.

11           THE COURT: It is Exhibit 31.

12           MR. BARRIERE: 31, yeah.

13           THE COURT: Do you have Exhibit 31 in front of you,

14   sir?

15           MR. BARRIERE: Your Honor, I think it would be a

16   challenge to get to it.

17           THE COURT: Okay.  Maybe --

18           MR. BARRIERE: If I could approach.

19           THE COURT: Okay.

20   Q.       This is the document you signed; is it not?

21   A.       It is one of three documents I signed.

22   Q.       All right.  And as you are aware, sir, in the

23   Commercial Factors litigation you were examined repetitively by

24   their lawyers, deposed repetitively about whether you in fact

25   received product from Floodgates; correct?

```
                      Rudolph Terry - Cross                    428
```

 1    A.       That is correct.

 2    Q.       All right.  And you acknowledged you had received

 3    product from Floodgates; didn't you?

 4    A.       Correct.

 5    Q.       And you had received product in 1989 and 1999,

 6    correct?

 7    A.       Correct.

 8    Q.       And that you had then resold that product to your

 9    customers?

10    A.       Wait, now, you are confusing – you said – let's get

11    the years straight.  The answer is, yes, I had received product

12    from Commercial Factors but --

13             THE COURT: Let me break in.  You said '89.  I think

14    what you meant was --

15             MR. BARRIERE: I am sorry.  I thought I said '98 and

16    '99.

17             THE COURT: '98 and '99 is the years he is talking

18    about.

19             THE WITNESS: I am not sure that I acknowledged

20    receiving – I know I would have received some goods from them

21    probably in '99 but, as far as the exact dates, I cannot tell

22    you but, yes, I have received goods from Floodgates.

23    Q.       All right.  And ultimately it came out when Mr.

24    Pouncey testified that he had not shipped any product to you;

25    correct?

Rudolph Terry - Cross                    429

1    A.        I think you are confusing perhaps yourself.  In terms

2    of Pouncey was asked as it relates to specific goods.  The

3    goods in these particular invoices had not been shipped to me.

4    Pouncey had shipped goods to me, but they were not goods –

5    those specific goods, nor in those quantities, but Pouncey had

6    shipped goods to me but not in those quantities.  I was not

7    asked specifically as it related to those goods, but had

8    Pouncey shipped to me in those years and the answer is yes then

9    and the answer is yes now.

10            MR. BARRIERE: Judge, I have to tell you, if this is

11   the route we are going to have to go here, I thought these

12   facts were unestablished.  I am wondering whether it is more

13   appropriate – can the witness be unshackled because we are

14   going to need to walk through some documents, I think.  I am

15   frankly surprised, given the criminal conviction, that we are

16   at this late hour having now the dispute as to whether there

17   was or was not product received by Terry Manufacturing.

18            THE WITNESS: No, there is not – well, I apologize.

19            THE COURT: Okay. I think we have before Mr. Terry

20   right now one of these certifications.  I mean, I think – I

21   mean, obviously what he is saying is inconsistent with some

22   other evidence we have heard before.  If you want to walk

23   through a line at a time, we can do that.  Now, unless you are

24   going to help, you know – I mean, I think we are just going to

25   have to go –

Rudolph Terry - Cross                          430

1          MR. BARRIERE: Fair enough.

2          THE COURT: If that is what you want to do.

3     BY MR. BARRIERE:

4     Q.        Let me ask you this, sir:  At the time you met with

5     Mr. DeLong originally.

6     A.        Right.

7     Q.        Did you tell him that Terry Manufacturing owed money

8     to Commercial Factors?

9     A.        No.

10    Q.        Did not owe any money to Commercial Factors?

11    A.        Did not.

12    Q.        All right.    It was your position that Terry

13    Manufacturing didn't owe anything at all to Commercial Factors?

14    A.        Did not.

15    Q.        Okay.  Did that remain your position throughout this

16    litigation?

17    A.        Yeah, other than the fact that once I agreed to pay

18    Commercial Factors, in return for Floodgates paying me, in that

19    sense I ultimately agreed to pay Commercial Factors but did not

20    ever take the position that I truly owed them.   Probably I

21    agreed to pay them, but I paid them with the belief that

22    Floodgates would be refunding the dollars to me.

23    Q.        Okay.  Well, let me ask you this.  Was this a true

24    statement as of January 31, 2000?

25              "This defendant, Terry Manufacturing, is indebted to

Rudolph Terry - Cross                    431

1          defendant Floodgates for an amount that has been

2          incurred in the ordinary course of business dealings

3          between itself and defendant Floodgates."

4          Is that true?

5     A.     Okay.  All right.  What is the statement? I mean, is

6     there a document that I can look at?

7     Q.     Sure.

8          THE COURT: Okay.  Why don't you tell us what tab or

9     what exhibit?

10          MR. BARRIERE: I am sorry.  That is the original answer

11     that appears at tab number 32, paragraph four.

12          THE COURT: Okay.  Tab number 32.

13     A.     That probably is technically incorrect, that I

14     probably was not indebted to Floodgates.  I was willing to pay

15     on behalf of Floodgates but wasn't actually indebted to

16     Floodgates.

17     Q.     Okay.  This is an answer and counterclaim of defendant

18     Terry Manufacturing Company.  Did you review this paragraph by

19     paragraph before it was filed?

20     A.     I probably did.

21     Q.     All right.  Now let's talk about this paragraph,

22     paragraph eight:

23          "Since Terry is currently indebted to Floodgates on

24          outstanding invoices in an amount that exceeds two

25          million, one hundred thirty thousand, six hundred

Rudolph Terry - Cross                                432

1          twenty dollars and ninety-one cents, Terry has offered

2          to pay that amount to CFA – ”

3     That is Commercial Factors, right?

4     A.     Right.

5     Q.     “Provided CFA first substantiate its entitlement to

6          the money and further provided CFA agrees to a payment

7          schedule consistent with the purchase and payment

8          history that has been developed between Terry and

9          Floodgates during the course of their business

10         dealings.”

11         Is that true?  Did Terry Manufacturing owe Floodgates

12    two-point-one-three million dollars?

13    A.     Probably – I mean, the answer is no, but we had

14    entered into an agreement that I would pay Commercial Factors

15    and Floodgates would, in turn, repay me for the dollars that

16    were paid to Commercial Factors.

17    Q.     Did you tell that to Mr. DeLong?

18    A.     I – well, I can't say what I told, but the bottom line

19    is that I probably said to Mr. DeLong that I was agreeing to

20    accept responsibility and pay to Commercial Factors the two

21    point something million dollars.

22    Q.     You, personally, or Terry Manufacturing?

23    A.      Terry Manufacturing Company, and Floodgates would be

24    repaying.

25    Q.     So you would be using Terry Manufacturing's money to

Rudolph Terry - Cross                                433

1   take care of Floodgates' problem?

2   A.      If we had entered into the agreement, yes.

3   Q.      All right.  But it is your testimony now, I take it,

4   that Terry Manufacturing didn't owe anything to Commercial

5   Factors?

6   A.      No.

7   Q.      Well, then, why would you take Terry Manufacturing's

8   money – I mean, we are talking about a serious amount of money,

9   right, two-point-one million dollars?

10  A.      Yeah.

11  Q.      Why were you going to take Terry Manufacturing's money

12  and take care of Floodgates' problem?

13  A.      Because at any one time it wouldn't be two-point-one

14  million dollars.  It would be a schedule and Floodgates would

15  pay to me; I would pay to Commercial Factors.

16  Q.      Did you explain all of that to Mr. DeLong?

17  A.      No.

18  Q.      Did you explain that to your brother?

19  A.      Yes.  Yeah, he was aware of that.

20  Q.      Okay.  Did he approve that?

21          THE COURT: If you are done showing him documents, why

22  don't you get back to the podium, please.

23          MR. BARRIERE: I am sorry.  I don't know how to do

24  this, judge, moving back and forth.  Perhaps if I can just open

25  the page, we can struggle with this.

Rudolph Terry - Cross                        434

1          THE WITNESS: What tab is it?

2          THE COURT: Okay.  As I understand, we are looking at

3     tab 32, which is the answer and counterclaim.

4          MR. BARRIERE: Page number nine.

5     BY MR. BARRIERE:

6     Q.      Paragraph eleven says:

7              "CFA  has  attempted  to  use  its  knowledge  of

8              confidential information concerning Terry's business

9              for improper purposes, including inter alia forcing

10             Terry to pay it money that it is not entitled to

11             receive."

12             Do you see where I'm reading from?  It is that last

13    paragraph on page nine.

14    A.      Okay.  The last paragraph, okay, yeah.

15    Q.      What confidential information was CFA trying to use?

16    A.      Commercial  Factors  had  received  confidential

17    information related to Terry Manufacturing, some financial

18    information and etc., and what I came to find out was that my

19    understanding from Floodgates, Jon Pouncey, was that Floodgates

20    and Commercial Factors' president had done – you have to

21    understand, my only understanding of Commercial Factors was

22    through Floodgates, and previously Commercial Factors and

23    Floodgates had done the same thing.  They had done invoices in

24    a financing arrangement to create financing for Floodgates that

25    Commercial Factors had done invoices previously where there

Rudolph Terry - Cross                    435

1    were no goods and services, but Terry Manufacturing agreed to

2    pay them, did pay them and was reimbursed by CFA, and

3    conversations that we had had with Commercial Factors, and

4    there was no issue.  That was the only relationship that I had

5    ever had directly with Commercial Factors, and that had been in

6    1996.  So this was not a new arrangement; it was something that

7    had occurred before and Commercial Factors, you know, doesn't

8    deny that.  It had occurred before.

9            I am not saying that it was a brilliant thing to do

10   but it had occurred before and nobody had any issues.

11   Commercial Factors had no issues, nor did Floodgates, and we

12   were both reimbursed for it.

13   Q.      All right.  Well, I think my question was what

14   confidential information was Commercial Factors using?

15   A.      They were using information – Commercial Factors and

16   their law firm, Smith Gambrell and Russell had just done

17   closing transactions and they were leveraging and had basically

18   made verbal threats to ruin Terry Manufacturing.  What it

19   turned out was that my factoring relationship was with Bank of

20   America – no, not bank – well at that time NationsBank, and so

21   was Commercial Factors.  We both had the same factoring

22   relationship.  It came out in depositions with Bank of America

23   that, in fact, Tracy Eden, who was the president of Commercial

24   Factors, not only in here but, in reality, was calling them and

25   said that he not only called Bank of America but was calling

Rudolph Terry - Cross                          436

1    other of my financial relationships and telling them that I had

2    committed a fraud even before the fraud case was ever filed.

3    So it is not a speculation.   It ultimately proved to be a

4    reality.

5    Q.       Well, let me go back to your last answer.   You told

6    me, as I understood it, that sometime before this Floodgates

7    had sold to Commercial Factors invoices showing product sales

8    to Terry Manufacturing which had not occurred; is that right?

9    A.       That is correct.

10   Q.       Okay.   And when this lawsuit developed in 2000, it

11   was, again, on the basis of invoices Pouncey had fabricated for

12   sales of product that had not occurred; is that correct?

13   A.       That is correct.

14   Q.       That's right.   Now, did you tell that to Mr. DeLong?

15   A.       No.

16   Q.       No?   You didn't tell him that these were invoices for

17   product that hadn't been sold?

18   A.       No.   I don't remember that as being something that I

19   told Mr. DeLong.

20   Q.       Did you tell him that at any point during the course

21   of this litigation?

22   A.       At some point that probably came out.   Well, let me

23   back up and say this.   There is probably a mistaken assumption,

24   and that is the mistaken assumption is that I knew what was

25   going on.   My information was coming from the best information

Rudolph Terry - Cross                                437

1    I could get from Jon Pouncey, and ultimately I came to the

2    conclusion that I don't know to this day who was telling me the

3    biggest lies, Jon Pouncey or Commercial Factors or Commercial

4    Factors' lawyers.   All of them were lying to me is the

5    conclusion that I have ultimately come to.

6    Q.      Well, let's –

7    A.      I mean, the only point that I am making is that there

8    are things that I was going on my best judgment of what I knew

9    at any one time, but what I knew at any one time was not

10   necessarily the truth or even what I came to believe was the

11   truth over two plus years of litigation.

12   Q.      What was your relationship with Jon Pouncey as of

13   January 1, 2000?

14   A.      As of January 1 of 2000, he was a minor supplier, both

15   buying and selling from me.   Some things, he bought from me;

16   some things he sold to me, but in fairly small volumes.

17   Q.      A minor supplier?

18   A.      Minor.

19   Q.      Okay.  Was he a particularly close friend?

20   A.      No, but Jon Pouncey in 1994, when I developed a

21   relationship as far as the whole reason – the impetus of the

22   specific timing of developing the Atlanta operation was around

23   a licensing arrangement for the 1996 Olympic games.   The

24   production for those games began in about '94.   In my bid to

25   obtain licensing, I had significant manufacturing experience,

Rudolph Terry - Cross                        438

1    no retail experience.  My initial bids were rebuffed as far as

2    the Olympic committee and etc., because of a lack of retail

3    background.

4         Jon Pouncey and a couple of other people had in bid

5    requests to the Olympics.  What ultimately they did was

6    subjugated their aspirations to assist me in putting together

7    my bid and so I owed him – the company, in many respects, owed

8    him as far as the Olympic license that was the basis of the

9    whole Atlanta operation because he brought his expertise in

10   retail sales and subjugated it to Terry Manufacturing Company's

11   effort to obtain an Olympic license.

12   Q.    So you had worked with him closely during the Olympics

13   in 1996, I take it?

14   A.    Yes, and was, you know, morally indebted, not

15   financially indebted.

16   Q.    All right.  Now, help me, sir, if he is a minor

17   supplier as of 2000, why is it that you wanted to use two-

18   point-three million dollars to pay his debt to Commercial

19   Factors?

20   A.    Because, one, I was convinced that he had the ability

21   and that it would not have been two-point-one million dollars;

22   it would have been whatever number of dollars at the time as

23   far as based on the schedule.  That is the point of the

24   schedule.  I would have paid them with monies on an ongoing

25   basis.  It was not at any point a two-point-one million

Rudolph Terry - Cross                                    439

1   dollars.

2           Two, I was of the belief that this was consistent with

3   basically an agreement that I had made with him to help

4   guarantee an arrangement he had with a firm, Karen Carson, and

5   that it was a multi-million dollar contract with Wal-Mart that

6   was a five or ten million dollar – you know, five plus million

7   dollar contract with an option beyond that.

8           So I was of the belief that by simply facilitating an

9   arrangement, that he represented was similar to the same as

10  what I had done in '96, would not actually cost the company

11  anything.

12  Q.      Okay.  It didn't cause you any concern that Pouncey

13  was indebted to Commercial Factors already for millions of

14  dollars that he hadn't paid?

15  A.      I didn't know what he was indebted to them for.  The

16  only thing I was going on was based on what he was saying to

17  me, and the reason that I was – I had no reason to doubt what

18  he was saying, but I was also of the opinion that I was facing

19  an extortion from these other guys.  Like I said, the only

20  reason that I knew is that one of the attorney's mother was ill

21  down at St. Simon Island, or somewhere, and they did a three-

22  way call and, when Commercial Factors' people thought they had

23  closed the line, the line was still open, and basically saying

24  that they were going to extort and ruin the company and etc.,

25  and that they had already sued the company and etc., just

Rudolph Terry - Cross                    440

1    absolutely different than what they had just said on the phone

2    to me.  So I just thought it was a little bit of a godsend in

3    terms of trying to figure out which one to believe most but, at

4    the moment, Pouncey was more truthful than what I knew that

5    these guys had just said on the phone in terms of how they were

6    going to – so the three million dollars that they were saying

7    was absolutely inconsistent with Pouncey was saying it was one-

8    point-six million and etc.  So the reality is I didn't know

9    except but one thing, and that was the company was either being

10   extorted on one side.  The other alternative was someone was

11   saying that we will do it a hundred or so thousand dollars at

12   the time, fifty thousand dollars at a time, and I can liquidate

13   it if they will agree to it.

14          That's the reality of the difficulty.  I'm not saying

15   that it was good and I still can't say other than what facts

16   developed over the period of time.  But at the moment, that was

17   the facts I had in front of me.

18   Q.     Did you explain all of this to Mr. DeLong?

19   A.     No.

20   Q.     You didn't?

21   A.     No.

22   Q.     Did you tell him why  – strike that.  When you told

23   him to admit the company owed two-point-one million dollars,

24   did you explain to him why the company owed that money?

25   A.     No.

Rudolph Terry - Cross                                    441

1    Q.        You just told him admit we owe the money?

2    A.        Yes.

3    Q.        Now I want to ask you about these conversations you

4    had with Mr. DeLong about the conflicts situation.  I take it

5    the first conversation you can best tie to some time about the

6    moment you learned a fraud count might be added; is that

7    correct?

8    A.        Well, I don't know if that was the first time.  I know

9    it became more emphatic at that time.  I mean, this has been

10   several years.  So I know that it came up initially when it

11   first became an issue related to fraud and when issues came up

12   related to me individually.  The fraud, I believe, came up

13   first.  And the reason it is a little bit confusing is there

14   was, in my recollection, a delay from when they first – because

15   they threatened, they threatened, and so everything that they

16   threatened never became a part of a pleading.  But when they

17   first threatened the fraud is when it is my opinion that we had

18   the first such conversation.  That may have been days, weeks,

19   even months between the time they threatened fraud and when

20   they actually filed fraud.  Because I know they threatened

21   fraud because when I didn't answer the way they wanted to

22   answer in depositions, they said, "Well, maybe – well, I will

23   just call my friend, the Attorney General.  I guess he can get

24   out of you.  Maybe when he asks you, you will answer

25   differently," and etc.

Rudolph Terry - Cross                    442

1    So there were threats of criminal action if I didn't

2    answer the way they wanted to answer.  There were threats that

3    were in advance of when it is my belief that the filings were

4    first filed.

5    Q.    I see.  Well, all right.  How many conversations did

6    you have with Mr. DeLong on the topic of possible conflict of

7    interest?

8    A.    There were at least three or four.  There were

9    probably more conversations.  There were probably other times

10   that he brought it up.  There were three times, and I guess I

11   can say three to four times when he brought it up in what I

12   will call a more formal this is – you know, speech situation.

13   There were other times that it came up, probably less

14   emphatically, but there were in my mind three to four speeches

15   or formal, I would say, lawyer speeches in terms of the issue

16   of conflict of interest.  There were other times there were

17   more, and I hate to characterize it as casual, but that there

18   were more concern – there were other times potentially that it

19   was brought up, but at least three to four lawyer speeches.

20   Q.    All right.  Let's focus on those three to four lawyer

21   speeches for a moment.  How many of those did your brother,

22   Roy, participate in?

23   A.    Three to four.

24   Q.    Three to four of the three to four?

25   A.    Yeah.

Rudolph Terry - Cross                                    443

1    Q.       Because I can't work the math.  Does that mean he

2    participated in all of them?

3    A.       That means that in all of the times that there was,

4    quote, this lawyer speech, either at that moment or subsequent

5    to that moment there was a three-way.  So sometimes he might

6    have brought it up – often issues would come up – Mr. DeLong

7    would bring it up to me.  After bringing it up to me, I would

8    make the arrangement.  Roy was not as accessible as I was at

9    all times.  So it might have been a matter of scheduling and

10   re-making the lawyer speech with Roy on it.  So when I say

11   three to four, there were three to four instances.  The lawyer

12   speech might have been made to me twice on two of those three

13   to four occasions and some of them, it was made with Roy on the

14   phone after having had the speech made to me individually in

15   advance of that.

16   Q.       All right.  So three to four times, lawyer speech to

17   Roy and to you together, correct?

18   A.       That's my recollection.

19   Q.       Very well.  Now, all of those were by telephone; is

20   that correct?

21   A.       I know there were probably at least three by phone.

22   There could have been one that was in person, but my

23   recollection is that there were at least three by phone.

24   Q.       Fair enough.  Now, during those three conversations,

25   in any one of them did Mr. DeLong ever discuss defenses that

Rudolph Terry - Cross                                    444

1    could be raised by Terry Manufacturing if you were not also

2    represented by him?

3    A.        Well, I am sure that defenses, that all of the

4    defenses, that many defenses and alternative defenses were

5    raised.  Specifically that some defenses could be raised

6    differently if I was not a party, I do not have a specific

7    recollection of one way or the other.  I don't represent that

8    I have an absolute recollection verbatim of all of the

9    conversations.

10   Q.        Well, did he ever tell you sort of generally, Roy,

11   Rudolph, look, if I represent both the company and Rudolph

12   Terry, I'm going to have to handle the case in this manner.  If

13   I don't represent both, I will handle the case in a slightly

14   different or a very different manner.  Did he ever tell you

15   that?

16   A.        Well, let me say this.  Let me say that one thing I

17   said to him, and even to Brian Steel, my position was always

18   that, if there is absolutely any question in terms of how to

19   handle any of this, then the interest of the company has to be

20   paramount, even to the point of my being willing at all points

21   to accept responsibility for it individually and take the

22   judgment.  There was never any confusion as to whose best

23   interest should always be represented, and that didn't

24   necessarily have to come from DeLong.  That was my

25   instructions and even my instructions to my criminal attorney

Rudolph Terry - Cross                                    445

1    was that the interest of Terry Manufacturing Company was

2    paramount and that, if it meant a concession judgment on the

3    part of Rudolph Terry, that I would take it to protect the

4    interest of Terry Manufacturing Company.  There was never any

5    confusion as to whose interest was to be protected if there

6    were to be a conflict.

7    Q.       I appreciate your comment, but my question, I guess,

8    is a little more specific.  Do you recall any discussions of

9    potential defenses, potential issues, that might be handled in

10   a different way depending on whether Mr. DeLong was or was not

11   representing the both of you?

12   A.       I guess my recollection is more - and nothing ever

13   happens exactly - I don't have a recollection exactly in the

14   manner of your question.  My recollection is more that the

15   defenses - that the issue that some of the defenses that could

16   be raised for Terry Manufacturing Company could be detrimental

17   to the interest of Rudolph Terry.  And I reiterated that that

18   interest should be weighed in favor of Terry Manufacturing

19   Company and not in favor of me, that I did not have any issue

20   there.

21            So in that sense, yes, but not in the sense of we are

22   not going to be able to raise a defense because Rudolph Terry

23   - I also represent Rudolph Terry.  And that is perhaps because

24   of my instructions from day one that, if there was a conflict

25   of interest, then the interest of Terry Manufacturing should be

Rudolph Terry - Cross                                    446

1    protected.

2    Q.       Do you recall specifically what he told you with

3    respect to which defenses could or could not be asserted

4    depending on the dual representation?

5    A.       I cannot say that, no.  I am not a lawyer.  I cannot

6    say that I have a recollection of the defenses and the defenses

7    – and I am not sure today – you know, perhaps if you will tell

8    me what defenses, you know, it might trigger my mind.  If you

9    can tell me what defenses were not raised that could've been

10   raised had he not represented me, I'm sure it might trigger

11   something.

12   Q.       Well, let me ask a simple question.  This conflicts

13   issue, did anybody ever write anything down about it?

14   A.       I do not know.

15   Q.       You didn't?

16   A.       I probably had notes related to it.  I had a

17   tremendous amount of notes related to Commercial Factors.

18   Q.       You don't have those documents today, I presume?

19   A.       No.  I don't even have my son's stamp collection or

20   letterman's jacket.  When the company was closed down in

21   Atlanta, I was barred from entry into the building and even my

22   son's personal items, I have never recovered anything, not even

23   my, you know, personal items from there, notes, things that

24   could have – I think I might not would have gone to prison on

25   the other case.  I mean, all of my files related to this were

Rudolph Terry - Cross                           447

1    taken.  I was not allowed back in the building and didn't

2    recover any of my documents, didn't recover my child's stuff.

3    Some of my employees didn't recover their children's

4    photographs.  So the answer is no.

5    Q.      How much product, dollar wise, did Terry Manufacturing

6    acquire from Floodgates?

7    A.      I am sorry.

8    Q.      During the year 1999, approximately how many dollars

9    — what was the dollar value of the product Terry Manufacturing

10   acquired from Floodgates?

11   A.      I don't have any idea.

12   Q.      Can you give me any estimate, a hundred thousand, a

13   million?

14   A.      I really don't remember how much.

15   Q.      How about 1998, a hundred thousand, a million, two

16   million?

17   A.      I don't.

18   Q.      But it was a minor supplier, I think you told me?

19   A.      Yeah, in comparison to, you know, the business I was

20   doing, yes, because I was doing millions of dollars with

21   entities.  So a hundred thousand would have been minor to me.

22   Q.      You are aware, are you not, in the summer of 2000

23   Commercial Factors wanted to take Richard Rose's deposition?

24   A.      I don't know when it was but at some point, yes.

25   Q.      And Commercial Factors asked that Mr. Rose produce

Rudolph Terry - Cross                              448

1   financial statements and the work papers he had for those

2   financial statements?

3   A.      I don't necessarily remember the specifics.

4   Q.      Well, do you recall telling Mr. DeLong that Mr. Rose

5   shouldn't testify, that you weren't going to waive any

6   privilege –

7   A.      Oh, yes, I remember telling him that I would not be

8   waiving any privilege.

9   Q.      Now the year 2000 financial statement, was that a

10  false document?  Did it contain false information concerning

11  the company's financial condition?

12  A.      I did not participate in the preparation of the 2000

13  financial statement.

14  Q.      Well, do you have personal knowledge as to whether

15  that financial statement presented false, wrong information?

16  A.      No.

17  Q.      How about the 2001 financial statement, what do you

18  know about the accuracy or inaccuracy of that financial

19  statement?

20  A.      I never participated in it.  I didn't participate in

21  the actual preparation of the – didn't work with Rose at all in

22  preparation of that.  My issue related to that was the fact

23  that these same guys were trying to extort any information and

24  was taking the information and calling McDonald's, calling

25  whomever.  My issue was that, as opposed to the accuracy or

Rudolph Terry - Cross                                    449

1    inaccuracy of the information.

2        I certainly remember as far as not waiving the

3    privilege, but it was because that these guys were specifically

4    calling my largest suppliers, even after the court ordered that

5    they not take the deposition of anyone at McDonald's and etc.,

6    they called – well, no, that they not send interrogatories.

7    They called McDonald's anyway.   It upset the judge

8    significantly because the judge, even after ordering them not.

9    So it was in that environment that I did not want them to have

10   access to any other information related to Terry Manufacturing

11   Company if I could prevent it, whether it was from the

12   accountant or from wherever.

13   Q.     You know today those financial statements were

14   inaccurate; do you not?

15   A.     I do not know that.  I believe that to be the case

16   based on information and etc., but I personally cannot tell you

17   one way or the other.  I have never worked with the accountant

18   in the preparation of the financial statements after the early

19   90s.

20   Q.     All right.  Well, did your brother ever tell you that

21   those financial statements were false?

22   A.     No.

23   Q.     All right.  When you were conferring – strike that.

24   Did you confer routinely with Mr. DeLong concerning Commercial

25   Factors' efforts to get those financial statements?

Rudolph Terry - Cross                          450

1   A.      I conferred with him related to that efforts as it

2   relates to Richard Rose, McDonald's, Coca-Cola, Bank of

3   America, all of those. I handled all of those, and I objected

4   to them having information related to all of them, and the

5   court ultimately agreed with me.

6   Q.      All right. Did you go over the financial statements

7   with Mr. DeLong?

8   A.      No.

9   Q.      Did you ever discuss with him the work papers that

10  Commercial Factors had requested?

11  A.      I can't even tell you that they requested it.

12  Q.      Did you ever discuss with your brother Commercial

13  Factors' demand for the financial statements?

14  A.      I don't know. If I did, it was in the sense of all of

15  our – you know, that I thought that we were being subjected to

16  a shakedown, yes, but not Rose and the financial statements any

17  different than McDonald's and any of the other information, or

18  Bank of America, etc., especially after the president of

19  Commercial Factors said in his deposition that he had called my

20  major suppliers and called every financial institution he had

21  been able to identify and told them that I was – that I had

22  committed a fraud related to these invoices. At that point,

23  everything that I could shut down relating to additional

24  information to them, I made an attempt to shut down.

25  Q.      Sir, I want to read you some testimony. If you would

Rudolph Terry - Cross                        451

1    like to follow along, let me get the book in front of you.

2    (Pause)

3           MR. BARRIERE: Judge, this is tab 47, the excerpt.

4    Q.    Are you on page 467 there, Mr. Terry, in the right-

5    hand corner?

6    A.    I don't see – yeah, I'm on page 466.

7    Q.    If you could turn to the next page if you want to read

8    along.

9    A.    Okay.

10   Q.    The answer begins on 467.  This is your testimony:

11         "But sometimes temporarily sometimes I – it would have

12         been temporarily – it would have been Terry

13         Manufacturing's money but it was more of a matter of

14         Terry Manufacturing Company, quote, loaning me dollars

15         and I loaned them to Jon Pouncey.  I took full

16         responsibility for it and I take full responsibility

17         for it now.  It is my responsibility to get paid back

18         the –"

19         Was that true?

20   A.    Yeah, that was my position in terms of really trying

21   to subject myself to whatever the implications were related to

22   it as far as saying, yes, while I was making these arrangements

23   related to Terry Manufacturing, that I personally was taking

24   responsibility for it and that Terry Manufacturing, while a

25   facilitator, was not the party who was indebted, was not

Rudolph Terry - Cross                                452

1    indebted and had never been indebted to Floodgates as I gained

2    more understanding of what the situation was.

3    Q.      Did you say Floodgates or Commercial Factors?

4    A.      Was never indebted to either Floodgates – well,

5    indebted to Commercial Factors would mean indebted to

6    Floodgates and reciprocally because Commercial Factors was

7    buying, quote, Floodgate invoices.  So to be indebted to

8    Commercial Factors is to be indebted to, first, Floodgates and

9    Floodgates invoice being sold and subsequently and

10   consequentially my owing Commercial Factors.  If the process

11   had been legally what was represented, that would have been the

12   case.  So that is kind of interchangeable.

13   Q.      Well, you didn't owe any money on those Floodgates

14   invoices; did you?

15   A.      No, did not.

16   Q.      Did not.  So you didn't owe any money to Floodgates,

17   you didn't owe any money to Commercial Factors either?

18   A.      No, not in reality.

19   Q.      Okay.  Did you tell Mr. DeLong that?

20   A.      Maybe not initially.  Initially I was totally in the

21   dark and fishing and trying to find out what was happening as

22   far as this extortion –

23   Q.      Let me interrupt you.

24   A.      I have no recollection of telling Mr. DeLong that.

25   Q.      All right.  I just want to make sure I am clear.  You

Rudolph Terry - Cross                                    453

1    were completely in the dark as to whether your company owed

2    money to Floodgates?

3    A.      No, no.  I was completely in the dark as to what was

4    happening, who it was that was telling the truth, who was

5    extorting money or what the nature of the extortion, but the

6    answer is that I do not have a recollection of telling Mr.

7    DeLong.  But the only point I'm pointing out is that at any

8    given point, and this you will see through following through

9    the deposition, at any given point what I knew or what I

10   believed was totally changing based on what I found out either

11   from Jon Pouncey or from depositions and etc.

12   Q.      All right.

13   A.      I just don't want it to be a misnomer that I actually

14   understood these transactions and the  process and to this day

15   still don't know who was lying in some cases, and the only

16   absolutely thing I am sure of is that all of the parties were

17   lying at various points, but which lies were lies, I don't have

18   a clear understanding of today.

19   Q.      And since you were completely confused, I am sure you

20   weren't able to educate your lawyer; were you?

21   A.      No.  I mean, we learned as we went along.

22   Q.      I see. All right.  Question:

23           "So now we add another layer to this.   Terry

24           Manufacturing lent the money to Rudolph Terry and

25           Rudolph Terry lent the money to Pouncey?"

Rudolph Terry - Cross                          454

1    Answer:

2            "That's basically what happened."

3    A.      Wait, now, what are we talking – let's be clear what

4    we are talking about.  I don't know – I mean, what are we

5    talking about here?

6    Q.      Well, right now we are not talking about anything.  I

7    am trying to ask you a question and then you can give me an

8    answer.  Okay.  I'm going to read your testimony and then ask

9    if it is accurate.

10   A.      Okay.

11   Q.      Question:

12           "So  now  we  add  another  layer  to  this.  Terry

13           Manufacturing  lent  the  money  to  Rudolph  Terry  and

14           Rudolph Terry lent the money to Pouncey."

15   Your answer:

16           "That's basically what happened.  I chose to make a

17           loan to Jon Pouncey."

18   Question:

19           "And you used Terry Manufacturing money to loan the

20           money?'

21   Answer:

22           "That's correct."

23   Question:

24           "Did you tell anybody else at the company you were

25           using their money?"

```
                    Rudolph Terry - Cross                    455

1    Answer:

2              "No."

3    Is that accurate?

4    A.       What are we talking about?  Do you know what we are

5    talking about?  Do you know what time period we are talking

6    about?  What are we talking about here?

7    Q.       My question, sir, is simply is your testimony accurate

8    here?

9              THE COURT: Why don't we back up a few questions and

10   ask.  Maybe he is having trouble putting that in context.  So

11   why don't you back up and try one more time?

12             MR. BARRIERE: All right.  I will attempt to, Your

13   Honor.

14   Q.       If you will turn to the next exhibit, sir, you will

15   see this is a deposition that was taken of you on –

16   A.       Okay.  When you say next exhibit, do you mean to 48?

17   Q.       Correct.  We were looking at 46.  You are going to

18   turn to 47.

19   A.       Okay.  We are at 46.  We are going to turn to 47.

20   Okay.

21   Q.       Yes.

22   A.       So this is a different deposition.  Can you tell me

23   what deposition date that was?

24   Q.       I will represent to you, sir, that 46 is an excerpt,

25   a part of 47.  They are both transcripts of your testimony on
```

```
                    Rudolph Terry - Cross                    456
```

1   October 31, 2000.

2   A.      Okay.

3   Q.      All right.  And the testimony that I am referencing,

4   I think really begins on page 465 and continues through what we

5   were looking at on 466, 467.  And I believe the questions

6   concerned monies that went to Floodgates in 1998 and 1999 and

7   2000.

8   A.      Okay.  468?

9   Q.        465, 6 and 7.  It is actually page 48 of the mini-

10  script.

11  A.      Okay.  And what is the page, the actual page?

12  Q.      467.

13  A.      Okay.

14          (Pause)

15  Q.      All right.  Is it accurate that you were borrowing

16  money from Terry Manufacturing and then re-loaning that money

17  to Jon Pouncey?

18  A.        What was happening was Jon Pouncey was tendering

19  checks to me.  I just want to make sure that we are clear in

20  terms of what we are talking about.  We are talking about

21  during the time period of '98, probably '99.  That Jon Pouncey

22  would tender checks to me in an amount equal to what I did for

23  him.  Jon Pouncey had a contract, and that was when I referred

24  to you earlier, with Karen Carson and, as an outgrowth of the

25  agreement — I won't say the agreement but an outgrowth of the

Rudolph Terry - Cross                                    457

1    relationship where Jon Pouncey had subjugated his Olympic

2    opportunity on behalf of Terry Manufacturing Company, kind of

3    a payback for that was that when he had an opportunity with a

4    company, Karen Carson, who flew down and met with me and asked

5    to help guarantee his invoices.

6         What would happen, and the reason I say that – Jon

7    Pouncey would give me a check in advance to reimburse me for

8    the amount that I might – where he had a week, two weeks, a few

9    days, whatever the shortfall might be in terms of collecting

10   his money, I was actually paying it, and he would end up

11   telling me, yes, you can put the check in today or tomorrow.

12   Sometimes I collected Jon Pouncey's money in advance of when

13   mine cleared the bank and sometimes not.  There was never a

14   time that I tendered a check on Pouncey's behalf that I did not

15   already have a Floodgates check in an equal amount.  It might

16   be that I had three Floodgates checks and was only able to

17   tender one of them, two of them.  So there was sometimes –

18   there is not an absolute.  You would have to follow any given

19   transaction to determine whether I had Pouncey's money first or

20   whether I did not.  But he had to go on and make his payments

21   to Commercial Factors in order to free enough line of credit to

22   get his next order of merchandise.

23        So if he got paid from Wal-Mart or from his vendors

24   early enough, I got my money – he had 30-day terms, so it

25   depended.  There was not an absolute.  Sometimes he was able

Rudolph Terry - Cross                                        458

1    to, say, go ahead and clear his check the day before my check

2    cleared; sometimes it was two days after; sometimes it was a

3    week after.  But at all points I had the belief that I had

4    Terry Manufacturing's monies back.  There was never a loan in

5    the sense of loan documents and hoping you are going to get

6    paid, but I had checks equal to the amount that was being paid

7    on his behalf in order to bring his line of credit down enough

8    to do the next transaction.

9    Q.        Mr. Terry, bear with me.  I am going to ask you a

10   simple question and I hope you can give me a straightforward

11   yes or no answer.  The question that was posed to you was, "Did

12   you use Terry Manufacturing money to loan the money to Jon

13   Pouncey?"  You said, "That is correct."  You then were asked,

14   "Did you tell anybody else at the company you were using their

15   money?"  And the answer was, "No."

16             Was that truthful testimony?

17   A.        That is a true statement.

18   Q.        All right.  So your loan arrangements back and forth,

19   the movement of checks back and forth, you kept that from your

20   brother, right?

21   A.        The checking accounts –

22   Q.        Can you give me a yes or no on that?  Did you not tell

23   your brother about this loan arrangement?

24   A.        I did not, but Roy was not involved in any of the

25   checking accounts that I had in Atlanta, nor was I involved in

Rudolph Terry - Cross                                    459

1    the checking accounts in Alabama.  So the answer is yes, but

2    the answer is not that I kept it from him but the fact is that

3    he didn't access the checkbook that I was doing in Atlanta and

4    I didn't access the checkbook he was doing in Alabama.

5    Q.       So you were free to use the Atlanta checkbook as you

6    wished and he dealt with the Roanoke checkbook; is that the way

7    it worked?

8    A.       Yes.

9    Q.       All right.

10           MR. BARRIERE: Judge, it is five o'clock.  We are not

11   going to be finished tonight.  How would you like to proceed?

12           THE COURT: I think we are going to knock off.  We will

13   start back at nine o'clock.  Is that going to cause a problem?

14   We will finish with Mr. Rudolph Terry's testimony and then,

15   after that, I assume Roy Terry will testify.

16           So, Mr. Terry, we will see you in the morning.

17           THE WITNESS: Thank you, judge.

18           THE COURT: We are adjourned.

19           (Off the record at 4:56 p.m.)

460

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date:  March 16, 2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | |
| TERRY MANUFACTURING COMPANY, | ) | |
| INC., | ) | |
| Debtor | ) | Case No. 03-32063 |
| | | |
| J. LESTER ALEXANDER, III | ) | |
| Trustee for Terry Manufacturing | ) | |
| Co., Inc. and Terry Uniform | ) | |
| Co., LLC | ) | |
| | ) | |
| vs. | ) | Adv. No. 04-3135 |
| | ) | |
| DELONG, CALDWELL, et al. | ) | |
| | | Montgomery, AL |
| | | February 1, 2007, 9:06 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

VOL. III - Pages 461 to 701

APPEARANCES:                         Brent B. Barriere
                                     Catherine E. Lasky
                                     Phelps Dunbar, LP
                                     365 Canal St., Suite 2000
                                     One Canal Place
                                     New Orleans, LA 70130


Electronic Recorder
Operator:                            Linda Bodden

Transcriber:                         Patricia Basham
                                     6411 Quail Ridge Drive
                                     Bartlett, TN  38135
                                     9O1-372-O613


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

462

APPEARANCES (Continued):

Charles R. Bridgers
Earnest H. DeLong, Jr.
DeLong, Caldwell & Bridgers, L.L.C.
Suite 3100, Centennial Tower, 101 Marietta Street, NW
Atlanta, Georgia 30303

463

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| Rudolph Terry | -- | 465 | 487 | -- |
| Roy Terry | 493 | 525 | -- | -- |
| Michael Caldwell | 539 | 549 | -- | -- |
| Earnest DeLong | 555 | 613 | 622 | -- |
| William G. Ross | 623 | 658 | -- | -- |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|-----|-------------|-----|-----|
| 1-28 | Defendant's: | 489 | 489 |
| 29 | DeLong's Ledger | 606 | 607 |
| 30 | | 489 | 489 |
| 31&32 | (Rejected) | -- | -- |
| 603 | Files to be selected from Delong's Commercial Factors litigation | 603 | 603 |

464

1          (CALL TO ORDER)

2          THE COURT: Good morning.

3          MR. BARRIERE: Good morning, Your Honor.

4          MR. BRIDGERS:   Good morning.

5          THE COURT:   Please be seated.   I would like to say

6   I apologize.  I had promised we could call the law professor

7   the first thing in the morning.  I had just forgotten that as

8   I walked out the door.  So I apologize for the confusion.

9          MR. BRIDGERS:   No problem, Your Honor.  When I heard

10  you say that, I figured you had made another decision and,

11  Professor Ross, we set him up for this afternoon anyway, so no

12  problem.

13         THE  COURT: Well, good.   I'm glad of that.   No,

14  actually I didn't.  It was one of those things as I was walking

15  up to my office it dawned on me and – but, anyway, I apologize.

16  Fortunately everything is going to work out.   So we will

17  proceed.

18         Mr. Barriere, I think you have got Mr. Rudolph Terry

19  on cross.

20         MR. BARRIERE: Right.   Thank you, Your Honor.   Good

21  morning again.

22

23         (RUDOLPH TERRY, WITNESS, RESUMED THE STAND, PREVIOUSLY

24  DULY SWORN)

25

Rudolph Terry - Cross                          465

1              CROSS EXAMINATION (RESUMED)

2      BY MR. BARRIERE:

3      Q.      Mr. Terry, a couple of follow-up questions from your

4      testimony yesterday.  You told me that you had not met with Mr.

5      Bridgers to discuss your testimony.  Did you speak with him by

6      telephone?

7      A.      I have spoken with him by phone, yes.

8      Q.      All right.  And he reviewed with you what you would be

9      testifying to today and yesterday; is that correct?

10     A.      Generally that it would be related to the CFA case and

11     etc.

12     Q.      And he discussed with you your recollection of these

13     conversations concerning the conflicts of interest; is that

14     correct?

15     A.      Not in detail, No, sir.

16     Q.      But you reviewed, certainly reviewed that topic; did

17     you not?

18     A.      He told me, you know, what the topic would be, that it

19     would be related to an affidavit that I had done and etc.

20     Q.      All right.  Did you also speak with Mr. DeLong?

21     A.      No.

22     Q.      So just Mr. Bridgers?

23     A.      Yes.

24     Q.      All right.  Now, listening to your testimony

25     yesterday, I guess I wanted to make sure I understood.  You

Rudolph Terry - Cross                                    466

1    told me and the court that you were lied to by Tracy Eden; you

2    were lied to by the Commercial Factors lawyers; you were lied

3    to by Jon Pouncey; you didn't know what was going on; you

4    learned about it during the course of the litigation.  Is that

5    all a fair summary?

6    A.    That is correct.

7    Q.    It sounds like – I want to make sure this is fair –

8    you were the victim of a scam by Pouncey and Eden and went to

9    jail as a result; is that true?

10   A.    That's pretty much the case.  I can't color it and

11   tell you exactly who – I still don't know exactly who knew what

12   when.

13   Q.    I see.

14   A.    But the answer is, yes, as a result of that.  How much

15   Tracy Eden and others knew in the beginning, how much they

16   assessed during the process, I cannot tell you who knew what

17   when.

18   Q.    But you were really the victim and you are the one who

19   went to jail, right?

20   A.    That's correct.

21   Q.    Okay.  Now I have before you Exhibit 20.  I have

22   opened the book to that.  Do you recognize this as your

23   proposal to Mr. Barab on December 20 for the resolution of

24   Commercial Factors' claim?

25   A.    No.  It is an edit of a draft that they sent to me.

Rudolph Terry - Cross                               467

1    It is my notes related to a conversation that we had had.  They

2    sent a draft to me.  That draft was incorrect.  In relation to

3    what we had agreed to verbally and what was on that draft were

4    two different things.  These were corrections of the – to make

5    what we agreed to comport with what was in writing.

6    Q.    All right.  So you made your corrections and then you

7    faxed those corrections back to Mr. Barab; correct?

8    A.    Right.

9    Q.    Okay.  If I could get you to look at page two, sir,

10   typewritten.

11   A.    And I guess when you say page two, you mean flip over

12   one page?

13   Q.    Yeah, the one right after the fax cover sheet.

14   A.    All right.

15   Q.    It has got, what, eight typewritten paragraphs?

16   A.    Yes.

17   Q.    And you prepared those notes, correct?

18   A.    Yes.

19   Q.    All right.  And, as I understand it, bullet point

20   number two is a schedule and that is the attached schedule of

21   the payments to be made by Terry Manufacturing to Commercial

22   Factors?

23   A.    Yes, based on what Pouncey had suggested to me, yes.

24   Q.    Okay.  So turning to the schedules, it is the next

25   page.

Rudolph Terry - Cross                          468

1   A.      Yes.

2   Q.      Per  your  agreement  with  Mr.  Pouncey,  Terry

3   Manufacturing was going to pay two-point-one-seven-five million

4   dollars to  Commercial Factors by the 31st day of March and

5   then that same amount would be paid to you by Pouncey; is that

6   correct?

7   A.      That was the expectation, yes.

8   Q.      Okay.  Now if I could get you – by the way, did Mr.

9   Pouncey pay any of those amounts to you?

10  A.      I cannot tell you that because the schedule never went

11  forward – I mean, the agreement never actually took place.

12  Q.      Okay.  Now if I can get you to turn to Exhibit 41.

13  Now just so I understand from what you told me yesterday, you

14  agreed that Terry Manufacturing would pay over two million

15  dollars to Commercial Factors not because you owed the money

16  but because Mr. Pouncey said he would pay it to you and you, in

17  turn, could pay it to Commercial Factors; right?

18  A.      That is correct.

19  Q.      Okay.  Now you recall in August and September 2000,

20  you thought you had another deal with Commercial Factors to

21  settle this litigation; do you recall that?

22  A.      That is correct.

23  Q.      That's correct.  And you authorized Mr. DeLong to

24  enter into that settlement on behalf of Terry Manufacturing?

25  A.      Yes.

Rudolph Terry - Cross                                              469

1    Q.        Did your brother play any role in that?

2    A.        He was aware of it, yes.

3    Q.        He was aware of it, okay.  And you got his approval

4    for the settlement?

5    A.        Yes.

6    Q.        Okay.  Now if you can look at the proposed consent

7    judgment – the proposed consent order is the third page there,

8    sir.

9    A.        The what?  Third page?

10   Q.        The third page of that, yeah.

11   A.        Okay.

12   Q.        It says, and I'm quoting, the second paragraph:

13             "In complete satisfaction of any and all claims that

14             were or could have been asserted by or on behalf of

15             plaintiff, Terry Manufacturing Company, Inc., shall

16             pay Commercial Factors of Atlanta the sum of two

17             million, one hundred thousand dollars.  The specified

18             amount to be paid in twelve installments as follows,"

19   and it lists those.  Do you see where I am reading from?

20   A.        I do.

21   Q.        All right.  Why did you agree in August or now late

22   September to pay two-point-one million dollars to Commercial

23   Factors?

24   A.        Because I actually didn't know what the number was.

25   I mean, I agreed – and that is the point I am making.  I had no

Rudolph Terry - Cross                                470

1    idea what the correct number was, the three million, the two

2    million, the one point six.  I agreed to pay what Floodgates

3    agreed to pay back to me.

4    Q.      Okay. Well, did Terry Manufacturing owe two-point-one

5    million dollars?

6    A.      No.

7    Q.      No, it did not?

8    A.      It did not.

9    Q.      So this, again, was just what Mr. Pouncey said he

10   would pay you, so you were willing to pay it to Commercial

11   Factors?

12   A.      Correct.

13   Q.      Now, as you told me, Mr. Pouncey hadn't paid the money

14   to you back in January when you tried doing the deal.  Weren't

15   you concerned that he wouldn't actually deliver?

16   A.      I can't say whether he had or had not paid that back.

17   The point is that the deal never went forward as far as the

18   actual settlement with Commercial Factors.  I think that what

19   - so I can't tell you exactly related to that, but the bottom

20   line is that certainly I was concerned and that is why, in

21   terms of any schedule, that is why it had to be scheduled out

22   based on what Floodgates represented that they could pay back

23   to me incrementally.

24   Q.      Was it your understanding that if Floodgates welched

25   on their deal, didn't pay you that money, you and   Terry

Rudolph Terry - Cross                                471

1    Manufacturing wouldn't have to pay Commercial Factors?

2    A.    That was not my understanding.

3    Q.    Okay.  So Terry Manufacturing was hanging out for two

4    million, one hundred thousand dollars regardless of what Jon

5    Pouncey did?

6    A.    That could be the case, yes.

7    Q.    All right.  Well, were you at all concerned, given

8    that this litigation now that's been pending for nine months,

9    that Jon Pouncey wouldn't pay up?

10   A.    Yes.

11   Q.    But you were still willing to commit the company to

12   two million, one hundred thousand dollars that it did not owe?

13   A.    Yeah, I mean, based on where I thought I was related

14   to the best interest of the company, yes.

15   Q.    And you thought it was in the best interest of the

16   company to agree to pay two-point-one million dollars it didn't

17   owe?

18   A.    As opposed to three-point-six or whatever, but the

19   answer is yes.

20   Q.    But it didn't owe the three-point-six either; did it?

21   A.    It did not.

22   Q.    All right.  Now yesterday we reviewed some of your

23   testimony from a deposition on April 28, 2000.  Do you recall

24   you were also deposed about three weeks later, May 17 of 2000?

25   A.    I probably was.  You know, I cannot say - I don't

Rudolph Terry - Cross                                   472

1    remember specific dates that far back but I believe you.

2    Q.      Okay.  Fair enough.  I want you to sort of think back

3    in that time frame.  If you want to see the transcript to

4    confirm it was May 17, I will be happy to show it to you.

5    A.      No.  If you say that is the date, I accept your

6    representation.

7    Q.      Fair enough.  I want you to think back to the

8    conversations you had with Mr. DeLong about that time frame.

9    Did you discuss with Mr. DeLong the testimony you gave in that

10   deposition?

11   A.      I honestly don't know, I mean, without knowing

12   specifically what – I mean if there is something specific you

13   are referring to, I really can't just generally say.

14   Q.      Fair enough.

15           MR. BARRIERE: Your Honor, may I approach to move the

16   process along?

17           THE COURT: Yes.

18   Q.      Let me show you Exhibit 13.  Do you recognize these as

19   the bills you received from DeLong and Caldwell for this work?

20   A.      Yes, based on the fact that that is what it says that

21   it is, but that is how they looked, yes.

22   Q.      All right.  Let me jump you ahead to five.  Do you see

23   the entries there are on 5-17, conference with Rudolph Terry,

24   deposition with Rudolph Terry?

25   A.      Yes.

Rudolph Terry - Cross                                       473

1    Q.      All right.  Now at that time, or later, did Mr. DeLong

2    ever ask you, "Mr. Terry, did you testify truthfully?"

3    A.      I am sure he did, but I cannot tell you that I have a

4    specific recollection of conversations back in 2000.  I really

5    don't.

6    Q.      All right.  At any time during the three and a half

7    years you worked with Mr. DeLong, did he ever suggest to you

8    that you hadn't testified truthfully?

9    A.      Did he ever suggest that I had not?

10   Q.      Correct.

11   A.      No, I don't think so.  I don't have a recollection of

12   that.

13   Q.      Well, if your lawyer in effect said, "Mr. Terry, have

14   you perjured yourself?", that is the kind of thing you would

15   remember, wouldn't you?

16   A.      Yeah, I mean, I guess certainly throughout the period

17   he always said to testify truthfully but, you know, as it

18   relates to any given date, I mean, how often he said that, but

19   I guess that was always the absolute assumption.

20   Q.      All right.  And you always did testify truthfully;

21   didn't you?

22   A.      Uh, yes.

23   Q.      All right.  Now do you ever recall him discussing with

24   you your testimony regarding the specific products that Terry

25   Manufacturing purchased from Floodgates?

Rudolph Terry - Cross                    474

1    A.        No, I don't.

2    Q.        All right.  Do you ever recall him discussing with you

3    your testimony concerning how much Terry Manufacturing owed for

4    actual product acquired by it from Floodgates?

5    A.        No, I don't.

6    Q.        All right.  Do you recall him ever discussing with you

7    whether or not in fact Terry Manufacturing acquired product

8    from Floodgates?

9    A.        No, I don't.

10   Q.        Do you ever recall him discussing with you your

11   testimony concerning whether you actually were indebted to

12   Floodgates and the amount of that debt?

13   A.        I am not saying it didn't happen, but I don't have a

14   specific recollection related to that.

15   Q.        Okay.  Did he ever discuss with you the accuracy of

16   your testimony concerning the customers to whom you had sold

17   product you obtained from Floodgates?

18   A.        My recollection is that always the expectation was

19   that he assumed and expected me to testify truthfully.  I mean,

20   if there are given statements or something that I need to

21   review, but I just cannot tell you in general that I remember

22   as it relates to, you know, the specifics of the conversation,

23   but the expectation was certainly always that I would testify

24   truthfully.

25   Q.        All right.  Just answer my question.  You don't have

Rudolph Terry - Cross                                    475

1    any recollection of a conversation where he asked you about the

2    accuracy of your testimony concerning who you had sold, re-sold

3    Floodgates product to?

4    A.      He might have, but I don't have total recollection of

5    that.

6    Q.      All right.  Did he ever ask you about your testimony

7    that you had sold Floodgates product or resold Floodgates

8    product to hundreds of customers?

9    A.      I don't know if he did or did not.

10   Q.      Did you resell Floodgates product to hundreds of your

11   customers?

12   A.      Absolutely.

13   Q.      Did he ever discuss with you the accuracy of your

14   testimony concerning your efforts to collect amounts owed to

15   you by your customers for product you acquired from Floodgates?

16   A.      He might have but, I mean, if you were more specific,

17   I could probably answer.  I am just not grasping – I mean,

18   nothing is coming through to click with me as it relates to a

19   specific conversation.

20   Q.      All right.  Did you ever hear of a guy named Gene O.

21   Dorsey?

22   A.      Yes.

23   Q.      Who is that?

24   A.      A former employee of Terry Manufacturing in Atlanta.

25   Q.      When did he leave Terry Manufacturing?

Rudolph Terry - Cross                                    476

1    A.        I don't know.

2    Q.        Can you give me any time reference?

3    A.        I don't –

4    Q.        '97?

5    A.        I really don't know.

6    Q.        Okay.  What was his job?

7    A.        He worked in a lot of different capacities.  He worked

8    in the screen printing operation at different points, screen

9    printing,  shipping,  receiving,  a  number  of  different

10   capacities.  Almost everybody was, you know, cross-trained.

11   Q.        Now I think you told us yesterday that what basically

12   evolved was an arrangement by which you were making loans out

13   of  the  Atlanta  account  to  Mr.  Pouncey  which  he  would  then

14   repay; is that correct?

15   A.        Ultimately, yeah, that was the net effect of it, yes.

16   Q.        All right.  And did any of those loans appear on Terry

17   Manufacturing's general ledger?

18   A.        No.

19   Q.        How many dollars were involved in this loan and re-

20   loan program?

21   A.        The net at any one time was zero.

22   Q.        Okay.  Well,  how  many  dollars  flew  through  the

23   program?

24   A.        I cannot tell you that.

25   Q.        Was it in excess of ten million dollars?

Rudolph Terry - Cross                                477

1    A.        I don't know that but the net at any given time, at

2    any snapshot at any given time, the net amount owed was zero.

3    Q.        Okay.  Well, it wasn't ultimately zero, right?  You

4    got sued for, what, two to three million dollars; correct?

5    A.        Well, on the books, that was zero, too.  They didn't

6    get two million dollars.  That is what would put it on the

7    books unless I am misunderstanding how the books worked.

8    Q.        Okay.  Because you didn't owe that two million

9    dollars?

10   A.        Didn't owe it.

11   Q.        All right.  But just in answer to my question, is it

12   your recollection that the total amount of money flowing from

13   your account either through Commercial Factors or Jon Pouncey's

14   account was well in excess of ten million bucks?

15   A.        I can't tell you that.  I can only tell you each

16   transaction was an individual transaction and at each point I

17   had the money from Jon Pouncey before I released money to Jon

18   Pouncey.  So the net effect was zero.

19   Q.        You were the one in charge of the Atlanta books,

20   correct?

21   A.        Yes.

22   Q.        You were the one in charge of the movement in the

23   account?

24   A.        Yes.

25             MR. BARRIERE: Your Honor, if I may stay here just a

Rudolph Terry - Cross                    478

1    moment, it will be a little bit easier to turn the page, if

2    that is acceptable.

3             THE COURT: All right.

4    Q.      Mr. Terry, let me show you a fax you sent to Brian

5    Steel and Woody DeLong on or about January 21, 2004.  Do you

6    see what I am referring to?

7             THE COURT:  Which tab are you looking at?

8             MR. BARRIERE: I'm sorry, Your Honor.  This is Exhibit

9    79.

10   Q.      I am referring to this chart here entitled, "Terry's

11   Summary."  Do you see what I am referring to?

12   A.      Yes.

13   Q.      And that is a summary you reviewed and forwarded on to

14   Mr. Steel and Mr. DeLong?

15   A.      That is my expectation.

16   Q.      I just want to make sure I understand the charts here.

17   It summarizes transactions involving Terry in 1998 and 1999; is

18   that correct?

19   A.      That is correct.  That is what it says.

20   Q.      All right.  And it shows payments from Commercial

21   Factors to Floodgates of eleven-point-one million dollars?

22   A.      Yes.

23   Q.      And payments from Floodgates to Terry Manufacturing of

24   twelve million dollars?

25   A.      I don't know if I am following it.  I didn't create

Rudolph Terry - Cross                              479

1   this chart, so let me – are you going straight across?

2   Q.      Yes.  The second line, payments from Floodgates to

3   Terry Manufacturing, twelve million, eight thousand dollars?

4   A.      Yes.

5   Q.      All right.  And then the total of the payments from

6   Terry to Floodgates and Terry to Commercial Factors amounted to

7   eleven million, nine hundred fifty eight thousand dollars?

8   A.      I don't see that number.  Oh, yeah, okay.  I see it

9   now.  Yeah, eleven million, nine hundred fifty-eight thousand,

10  yes.

11  Q.      As the man who is responsible for the books and

12  records in Atlanta and worked the checking account, is that

13  consistent with your recollection of the amount of funds that

14  you shipped from Terry to Commercial Factors or to Floodgates

15  in that two-year period?

16  A.      It is not consistent with my recollection.  I believe

17  it to be correct.  I believe the preparation of the chart to be

18  correct, but it is not based on my recollection; it is based on

19  the expert who came in and analyzed it and came to that

20  conclusion.  It is not my recollection.

21  Q.      I see.  And was that Mr. Butler?

22  A.      That is correct.

23  Q.      And you found his work to be competent and capable, I

24  take it?

25  A.      It made me happy it came out – I mean, the numbers

Rudolph Terry - Cross                    480

1   made me happy.  I will say that.  They weren't my numbers, but

2   they made me real happy.

3   Q.      All right.  Sir, if I could get you to turn to Exhibit

4   84 in that same binder?

5   A.      In this same one?

6   Q.      Yes, sir.

7   A.      I can't do it.

8           MR. BARRIERE: If I may, Your Honor.

9           THE COURT: You may.

10          (Pause)

11  Q.      Exhibit 84 are a series of checks to Commercial

12  Factors.  Are all of those bearing your signature?

13  A.      Without looking, I am sure they would, yes.

14  Q.      Because any checks that went to Commercial Factors

15  would've been signed by you, correct, from Terry Manufacturing

16  accounts, I mean?

17  A.      Well, out of Atlanta, yes.

18  Q.      Well, were there any payments out of Roanoke?

19  A.      I don't remember but I – I don't remember that.

20  Q.      Now if I could also ask you to look at the other

21  exhibit I put before you, which is Exhibit No. 12.  Do those

22  appear to be the checks that you issued to DeLong and Caldwell

23  in payment of its fees and expenses?

24  A.      Okay.  Now what exhibit are you --

25  Q.      Number 12.

Rudolph Terry - Cross                              481

1   A.       Okay.  Yeah, it is pretty blurred but I guess that is

2   what it says.  Okay.  That is a better one.  Yes.

3   Q.       All right.  And you signed each and all of those

4   checks?  If you would like, please take a moment –

5   A.       I signed the two that you flipped to.  I can flip to

6   some others.

7   Q.       Sure.

8            (Pause)

9   A.       Everything that I see appears to be – (pause).  Yes.

10  Q.       Okay.  And those are checks made payable to DeLong and

11  Caldwell on Terry Manufacturing's Atlanta account?

12  A.       On Terry Manufacturing's account, yes.

13  Q.       All right.  Finally, sir, if I could ask you to look

14  at Exhibit 64.  You are welcome to look through these, Mr.

15  Terry.  These are interrogatory answers filed on behalf of you

16  and Terry Manufacturing Company in the Commercial Factors

17  litigation.

18  A.       On what date?

19  Q.       Well, the date of service is November 26, if you would

20  like to look to the last page.

21  A.       I mean, I don't even know what year –

22  Q.       I am sorry, 2001.  If you will flip two pages, you

23  will see your verification.

24           THE COURT: Tell me again what tab are we looking at?

25           MR. BARRIERE: Yes, sir, this is 64.

Rudolph Terry - Cross                                482

1  Q.       Does that appear to be your signature, sir, on the

2  verification?

3  A.       Yes.

4  Q.       So you would have reviewed these interrogatory answers

5  before they were filed to make sure they were true and correct?

6  A.       I assume, yes.

7  Q.       All right.  Now, number sixteen, this is on page

8  eight, if you would like to read along.  It reads:

9           "Please state all facts that you contend support TMC,

10          Terry Manufacturing's, affirmative defense of release

11          and waiver?"

12 Response:

13          "Plaintiff, through its agents, knew or should have

14          known that the invoices identified by plaintiff as

15          forming the basis of its claim do not reflect goods or

16          services purchased by either Terry or TMC, Terry

17          Manufacturing.  Armed with that knowledge, plaintiff

18          continued to factor Floodgate invoices."

19          Is that accurate?

20 A.       What number is that?

21 Q.       Number sixteen.

22 A.       Number sixteen, okay.  I believe that to be true.

23 Q.       All right.  So just so the record is clear, all of

24 these invoices Commercial Factors was suing on didn't represent

25 product bought by Terry Manufacturing but an arrangement put

Rudolph Terry - Cross                                483

1   together by Tracy Eden and Jon Pouncey, without your knowledge

2   or involvement; is that correct?

3   A.      That's correct.

4   Q.      All right.  Now, I know you told me you had a long-

5   standing relationship with Mr. Pouncey.  You felt a great deal

6   of loyalty, I take it, because he had assisted you in getting

7   the Olympic license.  Did you ever ask your friend, Mr.

8   Pouncey, why won't you just pay off Commercial Factors and get

9   me out of this problem?

10  A.      Yes.

11  Q.      And what did he tell you?

12  A.      He said that he was willing to do that, had a

13  transaction that was with Wal-Mart that would be sufficient to

14  pay off this transaction, but needed the time to schedule it

15  out as far as the payout but, yes, that was the first question

16  to him.

17  Q.      This litigation went on for three and a half years.

18  I bet you began to doubt him, didn't you?

19  A.      Well, in the process, Commercial Factors did the same

20  thing with him as with me and set out to ruin all of the

21  business relationships if they were not paid three million

22  dollars and – let me say this.  It is the representation of Jon

23  Pouncey that it interrupted the relationship that would have

24  paid off this transaction.  I cannot say that to be the truth.

25  I can only represent that that was my understanding and belief

Rudolph Terry - Cross                    484

1   based on what I was told.

2   Q.       All right.  You told me that you had sold Floodgates

3   product to hundreds of customers.  Did you do that in 1988 –

4   excuse me – 1998 and 1999?

5   A.       No, sir.

6   Q.       That was in earlier years?

7   A.       That was in earlier years and that was one of the

8   problems that I had.  Many of the open-ended questions that

9   some guy, who was not even with Smith Gambrell and Russell,

10  came in and asked broad, open-ended questions that included all

11  of eternity; and I said, yes, that I had purchased thousands

12  and thousands of units from Floodgates and sold them to

13  hundreds and hundreds of customers.  And they came back and

14  represented that I was lying related to a period specific.

15       So it was true as it related to the world in general

16  but was not true when they came back and falsely represented

17  that the time period was a specific time period.  And therein

18  lies a lot of the confusion as to what is perceived to be a lie

19  is a misunderstanding.

20  Q.       So your testimony was correct; the questions were just

21  in artful, right?

22  A.       I wouldn't say that.  I would say that they were

23  probably more artful than I realized; I just got suckered.

24  Q.       Ah, so you were trapped by a shady lawyer?

25  A.       I won't say I was trapped by a shady lawyer.  I am not

Rudolph Terry - Cross                                    485

1    even  sure  that  he  understood  the  case  enough  to  end  up

2    understanding  that  they  were  different.    I  would  not  ever

3    represent  that  someone  was  doing  something - I  would  just  say

4    that  I  made  an  error  of  not  demanding  specificity,  did  not

5    understand  the  case  enough  to  know  that  specificity  meant

6    anything  at  the  time.

7            He  asked  the  questions,  and  that  is  probably  why  I

8    might  seem  a  little  bit  more  skeptical  when  I  answer  questions

9    today.    That  taught  me  a  lesson.    That  was  my  first  time  going

10   through  that  and  got,  I  won't  say  suckered,  but  I  certainly

11   gave  answers  that  I  would  have  made  absolutely  different

12   answers  had  I  understand  the  time  periods,  you  know,  that  we

13   were  dealing  with.    And  I'm  not  going  to  characterize  them  as

14   - I  can't  get  in  their  mind  as  to  whether  they  knew  what  they

15   were  doing.

16   Q.        Those  were  the  same  lawyers  you  told  us  yesterday  were

17   lying  to  you,  right?

18   A.        No.

19   Q.        Smith  Gambrell,  that  is  not  the  same  one?

20   A.        No,  this  was  a  different  lawyer  that  came  out  of

21   Texas.    He  came  in  and  did  that  deposition,  left  back  out  and

22   never  heard  from  him  again  as  far  as  where  some  of  the

23   different  answers  were.    So  I  don't  know  which  of  the  guys  it

24   was  on  this  particular  one.    Can  you  tell  me  who  did  that

25   deposition?

Rudolph Terry - Redirect                                486

1    Q.        When we break, I will get his name.

2    A.        No, don't bother.  It is just the point is that they

3    were bouncing around and every time it was a different lawyer

4    and etc.  So I am not sure that they didn't also confuse

5    themselves.

6    Q.        All right.  Now you tell me that with respect to the

7    Commercial Factors matter, you were really the victim and you

8    ended up going to jail.  How about your guilty plea in

9    connection with Terry Manufacturing, the one you are in jail

10   for now, were you a victim there also?

11   A.        In what sense?

12             THE COURT:  Did you do the things that they accused

13   you of doing in the indictment?

14             THE WITNESS: I wasn't indicted, but what was in the

15   information, yes.  The answer is yes.

16             THE COURT:  Right.  Your brother was indicted and –

17             THE WITNESS: I pleaded to an information specific.

18   And if you want to read that information, I will reiterate, but

19   the answer is that I pleaded guilty to what was specifically in

20   my plea agreement, and I don't have a dispute with that

21             THE COURT: But the question is did you do the things

22   the government said you did in the information?

23             THE WITNESS: In the information as it related to me in

24   my plea agreement, yes. I mean, the only thing that I don't

25   want to confuse is that I am not guilty of everything that Roy

Rudolph Terry - Redirect                    487

1   Terry pleaded guilty to is the only thing that I don't want to

2   --

3          THE COURT: I understand that.

4          THE WITNESS: – to misrepresent.

5          MR. BARRIERE: Your Honor, I'm going to pass the

6   witness at this time.

7          THE COURT: Okay.  Mr. Bridgers, redirect?

8          MR. BRIDGERS: Yes, Your Honor.  If I may approach,

9   Your Honor?

10         THE COURT: Yes, sir.

11                   REDIRECT EXAMINATION

12  BY MR. BRIDGERS:

13  Q.     Mr. Terry, I really just have one question for you.

14  If I can show you what I have not marked but it is a copy of a

15  declaration.  It purports to be signed by you in June of 2006,

16  this past June.

17  A.     Yes.

18         MR. BARRIERE: Your Honor, I only object to this – this

19  was not part of my cross, so plainly – if the court will

20  indulge me if there are necessary follow-up questions, fine.

21  Otherwise I will object to this line of questioning.

22         THE COURT: All right.

23         MR. BRIDGERS: I don't think it will be necessary, Your

24  Honor.

25  BY MR. BRIDGERS:

Rudolph Terry - Redirect                      488

1    Q.       My only question, Mr. Terry, does taking a look at

2    this declaration dated back in June of 2001 refresh your

3    recollection as to whether or not you met with Mr. DeLong to

4    prepare your declaration back last summer?

5    A.       Yes.  You said 2001 but I'm sure you mean 2006.

6    Q.       I do.  Yes, sir.

7    A.       Yes.

8    Q.       So did you meet with Mr. DeLong to work on this

9    declaration last summer?

10   A.       Yes.

11           MR. BRIDGERS: Your Honor, that is all of the questions

12   I have.  Thank you.

13           THE COURT:   Okay.

14           MR. BARRIERE: No recross.

15           THE COURT:    All right.  Thank you.   Do we need Mr.

16   Roy Terry next?

17           MR. BRIDGERS: Yes.

18           THE COURT: Okay.

19           MR. BRIDGERS: Your Honor, while we perhaps have a

20   second, I got started with the examination of Mr. Rudolph Terry

21   and did not – I handed these exhibits to the court early on.

22   I don't know if there is anything else I need to do to tender

23   them to the court.

24           THE COURT: Why don't you go ahead and hand them up.

25           MR. BRIDGERS:   I am sorry.

489

1              THE COURT:   Are those your exhibits?

2              MR. BRIDGERS:   Yes, Your Honor.  You have got a copy

3      up there.

4              THE COURT:   Oh, okay.  I have got three binders now.

5      Is this everybody's exhibits?

6              MR. BRIDGERS:   A white copy, a white binder?

7              THE COURT:   A white binder, I don't see – I think

8      these are all – no.  Can you hand that up, please?

9              MR. BRIDGERS:   Okay.

10             THE COURT:   Okay.  So you are offering Defendant's 1

11     to 33?

12             MR. BRIDGERS: Yes, Your Honor, to the same extent that

13     Mr. Barriere introduced at the beginning of his case.  I should

14     have started that immediately but I am, yes, Your Honor.

15             THE COURT:  All right.  Mr. Barriere.

16             MR. BARRIERE:  Your Honor, we received a list of these

17     on Monday and the binder, I guess, sometime on Tuesday.  We

18     will nonetheless not object to 1 through 28.  I do object to

19     29.  I don't believe it is a contemporaneous record.  If and

20     when Mr. DeLong testifies, perhaps they can seek to introduce

21     it at that time.  I have no objection to 30.  31, I'm going to

22     object to for the following reason, Your Honor, and 32.  These

23     are both affidavits of Jon Pouncey.  Had we been provided more

24     timely notice that that would be an exhibit, we would have

25     likely introduced a number of drafts of this, which we believe

490

1    would have been relevant to the court's determination of the

2    credibility of that affidavit.  If those drafts are accessible,

3    either from my office or of these files, we may withdraw that

4    objection, but at the present time I would object to 29, 31 and

5    32.

6         THE COURT: Okay.  Well, for starters, number 29, we

7    will just hold that.  I am assuming that, if it is a matter of

8    authentication and basically saying what it is, Mr. Bridgers

9    may or may not be able to satisfy that problem when he has got

10   Mr. DeLong back on the stand.

11        As for the affidavits, 31 and 32, are you saying were

12   they not listed on the list of exhibits?

13        MR. BARRIERE: Well, the history of this briefly, Your

14   Honor, is on December 1, we received an exhibit and witless

15   list from the DeLong defendants, consistent with the then

16   scheduling  order  in  effect.    It  basically  included  a

17   description of the fourth – the fourth exhibit was the entire

18   Gwinnett County litigation file.

19        As the court will recall, it then entered another

20   scheduling  order  with  respect  to  this  week's  setting  that

21   called for specific identification of exhibits, I believe on

22   the nineteenth, or earlier.  I am not sure.

23        As the court will recall from a prior hearing on this,

24   there was no exhibit list forthcoming.  I sent a letter to Mr.

25   DeLong saying, to the extent you are relying on the December 1

491

1    exhibit list, I need specificity because I don't know what is

2    contained in eighteen boxes of forty seven thousand pages.

3          This list was generated by Mr. Bridgers on the 29th.

4    I received it by fax when I arrived here in Montgomery sometime

5    early Monday afternoon.  So while there was identification of

6    the Jon Pouncey affidavit and Jon Pouncey affidavit with

7    handwritten notes, had we had advanced warning that was going

8    to be a specific exhibit, we would have in turn sought to

9    introduce various drafts of this exhibit, which I think would

10   have been relevant to the court's determination of whether this

11   represents Mr. Pouncey's work or Mr. DeLong's work.  And that

12   is the basis for my objection.

13         THE COURT: All right.  Mr. Bridgers.

14         MR. BRIDGERS: Your Honor, to go back, there was, as

15   the court is aware, an issue with the scheduling order.  We

16   basically had understood the scheduling order and the

17   disclosures were back in December.  We turned them in back in

18   December.  We did not --

19         THE COURT: Let me stop you right there, then.

20   Basically the question is are the earlier disclosures you made

21   sufficient.  Mr. Barriere says that they are not.

22         MR. BRIDGERS: In the original disclosures, we had

23   offered the litigation file, basically truly the entire file

24   here.  Something the trustee did have access to.  My

25   understanding is that these documents were actually looked at

492

1    and obtained by the trustee in pretrial discovery.

2              I believe, Your Honor, at least as to Exhibit 31, this

3    was filed in the court.  So definitely part of the Gwinnett

4    County action.

5              As to 32, my understanding of it is that it is a

6    working paper in which Mr. Pouncey - it reflects a meeting that

7    Mr. DeLong had with Mr. Pouncey.

8              THE COURT: Okay.

9              MR.  BRIDGERS: And  he  went  through  it  basically

10   paragraph by paragraph.  As we have heard, Mr. Pouncey was a

11   little bit around the world on some of his testimony.  Mr.

12   DeLong worked paragraph by paragraph with him to get his

13   permission.

14             So, Your Honor, yes, I would suggest it does meet the

15   specificity.  It is certainly something the trustee has had in

16   their possession.

17             THE COURT: Okay.  Well, I am going to hold you to the

18   same standard I held Mr. Barriere to earlier.  It seems to me

19   that  just  listing  a  huge  litigation  file  is  not  enough

20   specificity.  So 31 and 32 are not admitted.

21             Mr. Bridgers, you are up now.

22             (ROY TERRY, WITNESS, SWORN)

23             MR. BRIDGERS: Your Honor, at the appropriate time in

24   Mr. DeLong's deposition, I may make a proffer of those.

25             THE COURT: Of course.

Roy Terry - Direct                          493

1    MR. BRIDGERS: Thank you, Your Honor.

2                   DIRECT EXAMINATION

3    BY MR. BRIDGERS:

4    Q.      Mr. Terry, good morning.  Can you tell us your name,

5    please?

6    A.      Roy Terry.

7    Q.      Perhaps lean a little bit further into the microphone.

8    A.      Roy Terry.

9            MR. BRIDGERS: Your Honor, if I may adjust it?

10           THE COURT: Okay.

11           THE WITNESS: Roy Terry.

12   Q.      Thank you, Mr. Terry.  Mr. Terry, would you give us

13   just briefly an idea about your educational background?

14   A.      I went to high school in Roanoke, Alabama.  I went to

15   college   at   Morehouse   College   in   Atlanta,   business

16   administration degree, and further study at Atlanta University

17   without having obtained a master's degree.

18   Q.      Did you begin working on your master's degree then?

19   A.      Yes.

20   Q.      Mr.   Terry,   how   long   did   you   work   at   Terry

21   Manufacturing?

22   A.      Since its founding in 1963.

23   Q.      And   at   its   height,   how   many   people   did   Terry

24   Manufacturing employ?

25   A.      At its height, somewhere in the four hundred or so

Roy Terry - Direct                                    494

1    range.

2    Q.       And, on average, in the couple of years leading up to

3    the bankruptcy, what was your average number of people employed

4    at Terry Manufacturing?

5    A.       Probably in the three hundred plus range.

6    Q.       Mr. Terry, I will just represent to you that the

7    trustee's report we have seen before indicated that Terry

8    Manufacturing had an income in the nature of about a hundred

9    million dollars from 2000 on.  Is that – are you aware of that

10   figure by the trustee?

11   A.       I believe that I heard that figure.

12   Q.       Does that figure sound about right to you?

13   A.       I certainly can't say it is exactly right but maybe

14   that range.

15   Q.       Mr. Terry, just for the record, can you give us a

16   little bit of information about the types of goods that Terry

17   Manufacturing produced at its Alabama facilities?

18   A.       The Alabama facility was mainly uniforms that were

19   being produced, uniforms for the US military, specifically

20   battle dress uniforms, camouflage; secondly, for the US Forest

21   Service, fire retardant uniforms; and then a third major

22   category was uniforms for the fast-food industry, with

23   McDonald's restaurants being the main customer.

24   Q.       Given this background, would you consider yourself to

25   have been a fairly knowledgeable business person?

Roy Terry - Direct                               495

1    A.        Fairly knowledgeable, yes.

2    Q.        Mr. Terry, I don't think this will be controverted, so

3    I will try to move through very quickly.  Beginning in 1999,

4    who were the officers of Terry Manufacturing?

5    A.        The officers were Roy Terry and Rudolph Terry.

6    Q.        Mr. Terry, which position did you held?

7    A.        President and CEO.

8    Q.        And what position did your brother, Rudolph, hold?

9    A.        Vice-president and secretary/treasurer.

10   Q.        And beginning, at least beginning in 1999, who were

11   the sole directors of Terry Manufacturing?

12   A.        Roy Terry and Rudolph Terry.

13   Q.        And at least beginning in 1999, who were the sole

14   voting shareholders of Terry Manufacturing?

15   A.        Roy Terry and Rudolph Terry.

16   Q.        And Mr. Terry, what percentage of the stock did you

17   own?

18   A.        Fifty-one percent.

19   Q.        And what percentage did your brother, Rudolph, own?

20   A.        Forty-nine percent.

21   Q.        Mr. Terry, did you ever become aware that Terry

22   Manufacturing was being sued by Commercial Factors?

23   A.        Yes, I did at some point.

24   Q.        And approximately when did you become aware of that,

25   sir?

Roy Terry - Direct                    496

1    A.       I am sure soon after it happened.  Of course, we are

2    talking many years ago now, but I'm estimating somewhere in the

3    late '99 or early 2000, something like that.

4    Q.       Did you read that complaint at about that time?

5    A.       Yes, I am sure I did.

6    Q.       And do you recall generally how much money Commercial

7    Factors was seeking against Terry Manufacturing?

8    A.       I don't remember the exact figure but I am sure it was

9    in the two or three million dollar range.

10   Q.       Now, Mr. Terry, had you been aware that your brother,

11   Rudolph, had been in discussions with Commercial Factors prior

12   to the time the lawsuit had been filed?

13   A.       Yes, I am sure I was aware that there had been some

14   discussions with them.

15   Q.       Were you aware that your brother, Rudolph, had been

16   attempting to negotiate some type of settlement with Commercial

17   Factors prior to the time the lawsuit was filed?

18   A.       Yes, I'm sure that he had told me that he was having

19   discussions with them.

20   Q.       Did you, on behalf of Terry Manufacturing, or

21   yourself, or whoever, did you object to your brother, Rudolph,

22   attempting to try to settle that issue?

23   A.       No, I didn't.

24   Q.       After you became aware of the lawsuit by Commercial

25   Factors, did you or your brother take steps to hire an attorney

Roy Terry - Direct                          497

1    to represent the company?

2    A.       Yes.   Actually we decided that Rudolph, being the

3    person who was involved, should take the lead on doing so,

4    which he did.

5    Q.       Was that a decision you agreed with?

6    A.       Yes, I did.

7    Q.       And generally – we've heard some testimony on this but

8    generally how did you come to find or how did Terry

9    Manufacturing come to find an attorney for this Commercial

10   Factors matter?

11   A.       Of course, we are talking a long time ago now but, to

12   the best of my recollection, I believe that Rudolph knew an

13   attorney by the name of Jerry Thomas and, in working with

14   Jerry, they came up with Mr. Earnest DeLong as a good prospect

15   for the type of case that we were dealing with.

16   Q.       Did Terry Manufacturing eventually hire Mr. DeLong and

17   Mr. Thomas?

18   A.       Yes.

19   Q.       And what factors entered into your mind as to why you

20   were going to go ahead and hire Mr. DeLong and Mr. Thomas on

21   behalf of Terry Manufacturing?

22   A.       As best I recall, the fact of past experience with

23   this type of civil litigation, business type issues, that type

24   of thing.

25   Q.       Mr. Terry, was Mr. DeLong or Mr. Thomas hired to serve

Roy Terry - Direct                               498

1    as the company's general counsel for all its legal issues?

2    A.      No.

3    Q.      What were Mr. DeLong and Mr. Thomas hired to do?

4    A.      To work specifically on this Commercial Factors case.

5    Q.      And before the Commercial Factors case, had Terry

6    Manufacturing ever employed Mr. DeLong or Mr. Thomas for any

7    other legal work?

8    A.      No.

9    Q.      Is Mr. DeLong or Mr. Thomas related to either you or

10   your brother by blood or marriage?

11   A.      No.

12   Q.      And is Mr. DeLong or Mr. Thomas related to any

13   manager, director, shareholder, general partner of Terry

14   Manufacturing?

15   A.      No.

16   Q.      Did Terry Manufacturing, you, your brother, have any

17   relation, have any financial relationships with Mr. DeLong or

18   Mr. Thomas other than paying them legal fees?

19   A.      No.

20   Q.      Did Mr. DeLong or Mr. Thomas ever have any control

21   over the business operations of Terry Manufacturing Company?

22   A.      No.

23   Q.      Was either Terry Manufacturing, yourself, your

24   brother, ever involved in any other business venture with

25   either Mr. DeLong or Mr. Thomas?

Roy Terry - Direct                      499

1    A.      No.

2    Q.      You mentioned a little bit earlier what you had hired

3    Mr. DeLong for.  A follow-up question I have is did Mr. DeLong

4    or Mr. Thomas ever provide business or other corporate advice

5    to Terry Manufacturing other than what might have been

6    ancillary to the Commercial Factors matter?

7    A.      No, not that I recall, no.

8    Q.      Did Mr. DeLong, subsequent to the Commercial Factors

9    matter, did Mr. DeLong ever provide any of the litigation

10   services for Terry Manufacturing?

11   A.      I believe after the bankruptcy there was a case in

12   Randolph County that Mr. DeLong represented Terry Manufacturing

13   and Roy and Rudolph Terry in a matter with a creditor in the

14   local Randolph County Circuit Court.

15   Q.      And how did that other engagement compare to the scope

16   of Commercial Factors?

17   A.      This was something that was very limited, as I recall.

18   Q.      Mr. Terry, in your role from 1963, I guess, on, did

19   you work with other attorneys in your role as an officer of

20   Terry Manufacturing Company?

21   A.      Yes, from time to time, yes.

22   Q.      How many attorneys do you think you have worked with

23   since 1963?

24   A.      Well, certainly I don't remember exactly, but I am

25   sure at least eight, or ten, or twelve.

Roy Terry - Direct                               500

1   Q.        And do you believe you were a knowledgeable consumer

2   of legal services at the time you hired Mr. DeLong and Mr.

3   Thomas?

4   A.        I would think so.

5   Q.        Who was to be the lead counsel in the Commercial

6   Factors case?

7   A.        Mr. DeLong.

8   Q.        And what role was Mr. Thomas to serve in?

9   A.        In a supporting role.

10  Q.        What did Terry Manufacturing end up deciding to pay

11  Mr. DeLong and Mr. Thomas?

12  A.        I don't remember the exact hourly rate, but it was, as

13  I recall, an hourly rate, maybe two hundred and something

14  dollars per hour or something like that.

15  Q.        Could it have been two hundred and fifty dollars an

16  hour?

17  A.        Quite possibly, yes.

18  Q.        How was the fee arrangement to be handled between Mr.

19  DeLong and Mr. Thomas for the Commercial Factors case?

20  A.        As best I recall, it was set up such that Mr. Thomas

21  was to receive some part of that two hundred and fifty dollars

22  or two hundred and whatever number of dollars.

23  Q.        And did you know about that arrangement at the time

24  that you hired Mr. DeLong and Mr. Thomas?

25  A.        Yes.

                    Roy Terry - Direct                    501

1    Q.        Did you ever observe Mr. Thomas performing any legal

2    work on behalf of Terry Manufacturing in the Commercial Factors

3    matter?

4    A.        Yes.

5    Q.        Did you see him at your deposition?

6    A.        Yes.

7    Q.        Did you participate in telephone conferences with Mr.

8    Thomas?

9    A.        Yes.

10   Q.        Did you observe him working on any written documents

11   for the case?

12   A.        Well, you know, of course I was usually physically in

13   Alabama.  I was aware through the conversations with him and

14   with Rudolph and Mr. DeLong, I am aware that he worked on

15   documents but, as far as my being there to physically see him,

16   I was not in Atlanta most of that time.

17   Q.        Did you understand that Mr. Thomas played an active

18   role in the case during the entire proceeding?

19   A.        Yes.

20   Q.        Mr. Terry, other than Mr. DeLong and Mr. Thomas, did

21   any other attorneys provide legal services in the Terry

22   Manufacturing case?

23   A.        I am sorry.  Specifically in that case?

24   Q.        In the Commercial Factors case, I should have said.

25   A.        Not that I recall.

Roy Terry - Direct                        502

1    Q.      I will just reference to you that this is Michael

2    Caldwell over here on the far left.  Did you ever meet Mr.

3    Caldwell?

4    A.      I don't think so, no.

5    Q.      Have you ever met a man named Keith Logue?

6    A.      No.

7    Q.      How about a man named Steve Wisebram?

8    A.      No.

9    Q.      Have you ever met a man named Ed Novotny?

10   A.      No.

11   Q.      And before the day of your deposition in this

12   adversary case, had we ever met?

13   A.      No.

14   Q.      Mr. Terry, who did you consider that you had hired to

15   represent Terry Manufacturing and your brother, Rudolph?

16   A.      Mr. DeLong and Mr. Thomas.

17   Q.      All right.  Are you aware that Mr. DeLong was in a

18   firm named DeLong and Caldwell?

19   A.      Yes, I guess I am aware of that now, yes.

20   Q.      Did you consider that you had actually hired DeLong

21   and Caldwell, LLC?

22   A.      No, I don't recall ever having thought of it in that

23   manner as opposed to simply having hired Mr. DeLong.

24   Q.      Mr. Terry, did it ever come to your attention that

25   Commercial Factors was threatening to bring fraud claims

Roy Terry - Direct                                    503

1    against Terry Manufacturing?

2    A.        Yes, at some point that came to my attention.

3    Q.        And how did that come to your attention?

4    A.        I am sure that Rudolph told me about it.

5    Q.        And what did Mr. – I am sorry – what did your brother,

6    Roy Terry, tell you about the possibility of a fraud claim

7    being added against Terry Manufacturing?

8    A.        My brother, Rudolph Terry.

9    Q.        I am sorry.  Yes, sir.  I said the wrong thing.  Let

10   me ask the question again.  What did your brother, Rudolph,

11   relay to you about the possibility of a fraud claim being added

12   against Terry Manufacturing?

13   A.        Well, you know, of course I don't remember the

14   conversation in specifics at this time after all of these

15   years, but I'm sure it was generally something that they were

16   threatening to add the fraud claim and, I guess, just in

17   general, I had gotten the impression that Commercial Factors

18   was trying to squeeze money, I guess for lack of a better way

19   to put it, from Terry Manufacturing and that this was another

20   effort in doing so.  That was kind of the impression that I

21   recall getting.

22   Q.        Mr. Terry, let me digress a second.  As I understand

23   it, you were in Alabama and your brother was in Georgia; is

24   that correct?

25   A.        That is correct.

Roy Terry - Direct                                    504

1    Q.       How often did the two of you communicate on a day-to-

2    day, week-to-week basis, however?  Can you describe to us how

3    closely you and your brother worked together?

4    A.       Well, we, of course, had separate operations and

5    somewhat different types of operations in each city and each of

6    us was in charge of what was going on in that given city, but

7    generally, of course we talked on a daily basis as far as

8    business issues and things that were necessary to be

9    coordinated and that type of thing.

10   Q.       On an average day, how many times do you think you

11   spoke with each other on the telephone or otherwise?

12   A.       You know, certainly it would vary from day to day but

13   two or three times a day probably.

14   Q.       And in those conversations, did you and your brother

15   attempt to pass – let me strike that.  You wouldn't know that.

16   In your conversations with your brother, was it your practice

17   to pass along to him the more fundamental aspects of the

18   company's business that you were dealing with?

19   A.       Yes, that is correct.

20   Q.       And in those two or three conversations a day, did you

21   perceive that your brother, Rudolph, was keeping you informed

22   of the important aspects of the business from his point of

23   view?

24   A.       Yes.

25   Q.       Let me take you back to this conversation, then, about

Roy Terry - Direct                                    505

1  when your brother was mentioning the threat of adding a fraud

2  claim.  Did your brother relate to you any conversations he had

3  had with Mr. DeLong about the possibility or about the issue of

4  a conflict of interest in the representation?

5  A.      Yes, he did.

6  Q.      And can you recall for us what you remember – let me

7  strike that.  That is a poor question.  Can you tell us what

8  you recall about that conversation, Mr. Terry?

9         MR. BARRIERE: Objection.  Hearsay.

10        THE COURT: Okay.  I'm sorry.  Would you repeat your

11  question, as best you can?

12        MR. BRIDGERS: I believe I asked him what did he recall

13  about that conversation.  If I could respond, Your Honor,

14  multiple things.  (a), I would think it is an admission because

15  even though the trustee has a right to bring this action on

16  behalf of Commercial Factors, certainly it comes with the same

17  evidentiary status as it moved on.  But barring that, Your

18  Honor, it is also a verbal act in terms of it goes to the

19  notice that the company had, and it is also not hearsay used as

20  an effect on the hearer because it demonstrates what happened

21  then.

22        THE COURT: Right.  And that is what – I am

23  uncomfortable with your argument about the admission.  I don't

24  think I am going to buy that.  But as far as, if you are not

25  really offering the evidence to prove the truth of the facts

Roy Terry - Direct                              506

1    asserted, just the fact that the statement was made and it may

2    or may not have had an effect on Mr. Rudolph and what happened.

3    So on that basis, I will overrule the objection.

4              Why don't you rephrase the question so that Mr. Terry

5    has a cleaner question to answer.

6              MR. BRIDGERS: Yes, Your Honor.

7    BY MR. BRIDGERS:

8    Q.        Mr. Terry, as to the conversation you related about

9    the potential conflict of interest, can you tell us what you

10   recall your brother said to you?

11   A.        As best I can remember generally it was Mr. DeLong had

12   said to Rudolph, had asked Rudolph to discuss with me the fact

13   that there was the potential for a conflict of interest in

14   terms of Mr. DeLong's representation of both Terry

15   Manufacturing Company and Rudolph Terry. That was, I guess,

16   kind of the gist of what I recall that Rudolph said as a result

17   of his conversation with Mr. DeLong.

18   Q.        Did the topic of separate counsel come up in that

19   meeting, that conversation?

20   A.        Yes, it did.

21   Q.        And what about that topic of separate counsel?

22   A.        Well, I guess in effect that Mr. DeLong was saying

23   that he would have to recommend separate counsel for Terry

24   Manufacturing and for Rudolph Terry because of the potential

25   for conflict of interest.

Roy Terry - Direct                                    507

1    Q.        Did the topic of Terry Manufacturing consulting with

2    another attorney about the conflict arise?

3    A.        As I recall, yes, that was also a –

4    Q.        And what about that topic do you recall, sir?

5    A.        That it was recommended that we should do so.

6    Q.        Mr. Terry – never mind.  Let me come back to that.

7    What did you do after that conversation relating to the

8    conversation, obviously?

9    A.        Well, of course, Rudolph and I talked about the issues

10   that had been raised, and our initial thoughts were that we

11   didn't feel it was in the best interest of Terry Manufacturing

12   to do separate counsel.  I am pretty certain that we also said

13   that we would talk about it again later in the day.  Often

14   something like that that was brought up in the heat of the

15   business day, we would delay until late afternoon when we could

16   really talk without interruption.  I think this was one of

17   those situations.

18   Q.        Do you recall speaking with your brother again that

19   day?

20   A.        Yes.

21   Q.        You had said that your brother – did your brother – as

22   I understand your testimony, is your testimony that you and

23   your brother came to the conclusion that separate counsel was

24   not necessary; is that what you said?

25   A.        We decided that that was not in the best interest of

Roy Terry - Direct                    508

1    Terry Manufacturing.

2    Q.      And I just want to ask you, then, why; what led you to

3    that decision?

4    A.      Well, as I mentioned earlier, we had the distinct

5    impression that Commercial Factors was trying to force money

6    out of Terry Manufacturing unfairly, and we felt that we were

7    getting good representation from the team that we had.  We felt

8    that we did not want to allow our efforts or our defense to be

9    split, that Terry Manufacturing and Rudolph Terry ultimately

10   had the same goal.  And, of course, I am sure there was a

11   financial consideration.  We were not interested in bringing on

12   additional expense.

13   Q.      Did the fact that you two were brothers factor into

14   your decision, your analysis, of that issue?

15   A.      Yes, I would say so.

16   Q.      And why?

17   A.      Because we did not intend to have this company or

18   these persons to split us up as brothers or as business

19   partners.

20   Q.      Did your relationship as sole shareholders of Terry

21   Manufacturing have an impact on that decision about the

22   conflict?

23   A.      Yes, I would say so, similar to what I just said.

24   Q.      Did you at some point in the near future have a

25   conversation with Mr. DeLong regarding that issue of conflicts

Roy Terry - Direct                                  509

1   of interest?

2   A.       Yes.  As I recall, we had a three-way conference call.

3   Q.       And do you recall – a three-way.  Was that you,

4   yourself and Mr. DeLong – you, yourself, I am sorry – you, your

5   brother and Mr. DeLong?

6   A.       That is correct.

7   Q.       Do you know if anybody else was in that conversation

8   on the phone or in person?

9   A.       I don't believe so.

10  Q.       All right.  Can you tell us, then, what you recall

11  about that particular conversation with Mr. DeLong on the

12  three-way conference call?

13  A.       Well, as best I can recall, of course the conference

14  call was – I mean, everybody was notified that that was the

15  purpose of the call, first of all, as far as the conflict of

16  interest situation.  Mr. DeLong, you know, gave his thoughts,

17  as I just mentioned, the same thoughts that had been passed on

18  through Rudolph he repeated for purposes of that telephone

19  conference.  And then Rudolph and I restated for him our

20  conclusions that we did not want to move to separate counsel.

21  Q.       In your mind, did you, at that time, on behalf of

22  Terry Manufacturing waive any conflicts that might have arisen

23  or had arisen at that time?

24  A.       Yes, we did.

25  Q.       And did you tell Mr. DeLong that?

Roy Terry - Direct                            510

1    A.       Yes, we did.

2    Q.       Did you ask Mr. DeLong any questions about this issue

3    of conflicts?

4    A.       Yes.   You know, of course, I don't remember the

5    specific questions but there was a good general discussion and

6    I am sure it included questions and answers all the way around

7    from all of the parties.

8    Q.       Did Mr. DeLong ever – did Mr. DeLong refuse to answer

9    any of your questions?

10   A.       No.

11   Q.       Let me ask you a more general, another digression,

12   perhaps, but in the course of the Commercial Factors

13   litigation, was it ever your impression that Mr. DeLong was

14   withholding information from you that perhaps your brother

15   Rudolph might have told him?

16   A.       No, I never got that impression.

17   Q.       Did Mr. DeLong ever refuse during the Commercial

18   Factors case to answer questions that you might have had about

19   the case?

20   A.       No.

21   Q.       Mr. Terry, before I leave this conversation, I want to

22   ask you a few more specific questions about the conversations,

23   the series of conversations you had.   Did you have any

24   understanding as to how that potential conflict might have

25   affected the legal strategy in the Commercial Factors case

Roy Terry - Direct                              511

1   going out into the future?

2   A.        Well, I am sure that – at the time I am sure that I

3   did because, you know, of course it was something that was an

4   important matter at the time.  We are now, what, five, six

5   years down the road, so I have to apologize for not remembering

6   as many specifics now as I would have then but, generally I am

7   sure that I would have understood the potential that, you know,

8   at some point something in the case being such that one could

9   say that Terry Manufacturing's interest and Rudolph Terry's

10  interest was different.  And I am sure that the specifics of

11  that, that I understood at the time, and five or six years of

12  failing memory would cause me to not be able to recite all of

13  those details to you right now.

14  Q.        At sometime after the series of conversations you

15  related, did Commercial Factors go ahead and add the fraud

16  claims against Terry Manufacturing?

17  A.        Yes, they did.

18  Q.        And at that time, was there any conversations with you

19  about the conflict of interest – let me withdraw the question.

20  After the time that the fraud case was added, was there any

21  other conversations with Mr. DeLong or Mr. Thomas about a

22  conflict of interest?

23  A.        Yes, as I recall, there were further occasions.

24  Q.        First, do you recall seeing a copy of the amended

25  complaint where the fraud claims were added?

Roy Terry - Direct                                512

1    A.       Yes, I would have seen a copy.

2    Q.       Did you receive – how did you receive documents – let

3    me back up.    Did you receive other legal documents, or

4    pleadings, or papers of some sort in the Commercial Factors

5    case?

6    A.       Yes, I did.

7    Q.       And can you characterize for us what you saw?  Did you

8    see a small amount of things; did you see large amounts of

9    things; or would you characterize just what document you had a

10   chance to look at during that course of time?

11           MR. BARRIERE: Your Honor, I object to the ambiguity of

12   the question, small amount of things or large amount of things.

13           THE COURT: Overruled.

14   A.       Well, of course, I had access to all documents but, in

15   terms of trying to really review documents, you know, certainly

16   any amendment to the complaint or anything, you know, of a

17   change in the case, such as an amendment, that type of thing,

18   certainly would've been the kind of thing I would have looked

19   at, would have reviewed.

20   Q.       How did you physically get those documents, fax, mail,

21   hand delivery, pony express; how did you get those documents?

22   A.       I think all of the above with the exception of pony

23   express.

24   Q.       Yes, sir.

25   A.       We would get a fax from Rudolph or sometimes, I am

Roy Terry - Direct                           513

1    sure I would say that, if Mr. DeLong faxed something to him, to

2    just have it faxed on to Alabama.  We also had a truck that

3    often ran between Atlanta and Roanoke, you know, with goods,

4    you know, with garments, and so, therefore, that was a courier

5    method.  So often I would get documents in that method.

6    Q.       Did Mr. DeLong ever refuse to provide you documents in

7    the Commercial Factors case?

8    A.       No.

9    Q.       Let me go back.  Do you recall conversations or do you

10   recall the topic being raised about the conflict of interest

11   after the amended complaint was filed in the Commercial Factors

12   case adding the fraud claims?

13   A.       Yes.  As I recall, it came up at least another couple

14   of times, maybe two three times at various stages.

15   Q.       All right.  Let me just keep you in time after the

16   amended  complaint  was  filed.   Do  you  recall  anything

17   specifically about the conversation where the issue of conflict

18   of interest may have come up?

19   A.       As best I recall, it came up again in a conference

20   call that probably included some other things, as well, that

21   Mr. DeLong brought up the issue again and Rudolph and I

22   repeated our decision was still the same.

23   Q.       Do you recall what was said in those conversations

24   more  specifically?   Was  it  any  different  than  the  first

25   conversation?

Roy Terry - Direct                                514

1     A.        No, it was no different than the first conversation,

2     but I am sure, you know, we wouldn't have gone into as much

3     detail because everything had happened as, I guess kind of

4     predicted.  Our decision was based on what everybody thought

5     was going to happen once it was filed.  I guess we were kind of

6     confirming that we had not changed our mind based on what we

7     had seen in the amended complaint.

8     Q.        Do you recall your brother being added in as an

9     individual defendant sometime later in the year 2000?

10    A.        Yes.  I don't remember the exact timing but, yes, I

11    recall that that did happen.

12    Q.        And what was your understanding of the significance

13    of your brother being added in as an individual?

14    A.        I am sorry.  As far as the significance of it?

15    Q.        Perhaps when you learned – first, did you learn about

16    that before he was actually added in as an individual?

17    A.        I don't remember.  I think it might have been another

18    one of those things that were threatened verbally before it

19    happened.  So, if so, I would have heard about it ahead of time

20    but I can't be absolutely sure.

21    Q.        I am just trying to place this in time a little bit.

22    Did you have an understanding as to what the significance, the

23    legal significance would have been for adding your brother in

24    as an individual?

25    A.        Yes.  I mean, I certainly knew that that was a

Roy Terry - Direct                                    515

1    significant twist to the case, addition to the case.

2    Q.        And in this time frame when your brother was being

3    added or threatened to be added, do you recall the issue of

4    conflicts of interest arising again?

5    A.        Yes, it did arise again.

6    Q.        How did that topic come up?

7    A.        As I understand it, or as I recall, I should say, it

8    was brought to my attention again by Rudolph but it was at the

9    urging of Mr. DeLong.  It was kind of the same situation we had

10   gone through before, that Mr. DeLong had brought it up again

11   and had asked that Rudolph and I discuss it again.

12   Q.        And was there any further interaction with Mr. DeLong

13   in that series of conversations?

14   A.        Pretty much the same situation as before, I think.

15   Ultimately as far as a confirmation conference call.

16   Q.        Do you recall another conference call, then, with Mr.

17   DeLong?

18   A.        Yes.

19   Q.        Do you know if anyone other than yourself and your

20   brother were on that call?

21   A.        Not that I recall.  It is certainly possible that Mr.

22   Thomas could been on it, but I don't recall that.

23   Q.        Was it unusual for you, and your brother, and Mr.

24   DeLong, or Mr. Thomas, to have conference calls?

25   A.        No, that was not unusual.

Roy Terry - Direct                              516

1   Q.       How often do you think something like that – well, a

2   better question, how often did you personally communicate with

3   Mr. DeLong or Mr. Thomas during the Commercial Factors case?

4   A.       Well, certainly not on a day-to-day basis the way that

5   Rudolph did but, you know, probably every week or two,

6   something like that.  Sometimes, you know, there would be

7   something intense going on and I might talk to them two or

8   three times in the same day but, at other times, it could go,

9   I'm sure, a week or two.  There could have been times that it

10  was even several weeks without my having a direct conversation

11  with them because I was always in communication with Rudolph

12  and knowing what was going on.

13  Q.       Do you believe or did you believe at the time,

14  perhaps, did you believe that you were aware of the significant

15  aspects of the Commercial Factors case?

16  A.       Yes, I believe so.

17  Q.       And why do you think that; why do you believe that?

18  A.       Well, because of my constant conversations with

19  Rudolph as far as the paperwork that I was looking at in terms

20  of the periodic conversations with Mr. DeLong and Mr. Thomas.

21  Q.       Mr. Terry, I'm not sure I closed the loop on that

22  third set of conversations that you had mentioned.  Did you, in

23  fact, inform Mr. DeLong that Terry Manufacturing was waiving

24  any type of conflict issue and ask him to proceed with the

25  litigation?

Roy Terry - Direct                              517

1    A.      I am sorry.  Please repeat.

2    Q.      Sure.  I just want to make sure I close the loop on

3    that last series of conversations after your brother was added

4    as  an  individual  or  in  that  time  frame.   As  to  those

5    conversations, did you communicate to Mr. DeLong that you were

6    waiving any type of potential conflict and ask him to continue

7    with the representation?

8    A.      Yes, we did.

9    Q.      And that would've been, I guess, Mr. DeLong and Mr.

10   Thomas?

11   A.      It would have been intended for both of them.  Whether

12   they were both on the phone, I don't know.  I know Mr. DeLong

13   was.

14   Q.      Was Mr. DeLong's advice to you and Terry Manufacturing

15   more emphatic as the year 2000 went on?

16   A.      The  advice  as  related  to  the  separate  counsel,

17   conflict  of  interest,  yes,  I  would  say  it  became  more

18   concerned.

19   Q.      Mr. Terry, do you know if Terry Manufacturing had an

20   indemnification agreement in its bylaws or corporate articles?

21   A.      I am sure that it had some wording as far as being –

22   having a duty and ability to give defense to officers, owners,

23   you know, if they were involved in litigation.  Of course, I

24   don't remember the exact details.

25   Q.      At the time Terry Manufacturing – well, at some point

Roy Terry - Direct                          518

1    was Terry Manufacturing also paying Mr. DeLong and Mr. Thomas

2    to represent Rudolph Terry?

3    A.      Yes.

4    Q.      And at the time Terry Manufacturing was paying Mr.

5    DeLong and Mr. Thomas for that, did you have an understanding

6    about whether or not it was permissible for Terry Manufacturing

7    to do that?

8    A.      Yes, certainly, I considered it as being permissible.

9    Q.      Why did you think it was permissible?

10   A.      Well, because I knew that in terms of setting up the

11   company and the bylaws, with only two people as the main

12   representatives, that it would always be very possible that the

13   individual   stockholder/officer   could   be   in   need   of

14   representation because of their position, and so I am certain

15   that that is how we would have had the company bylaws and

16   structures set up.

17   Q.      Mr. Terry, if Woody DeLong or Jerry Thomas had put

18   this information regarding the conflicts that you received, if

19   they had put that information and given it to you in a letter,

20   in writing of some sort, would that have made any difference to

21   the actions that you took?

22           MR. BARRIERE: Objection, Your Honor.  That calls for

23   rank speculation – did not receive a writing, what would the

24   writing have said.

25           THE COURT: Sustained.

Roy Terry - Direct                          519

1        MR. BRIDGERS: Let me try to rephrase, Your Honor.

2   Q.      Mr. Terry, as to the information you received from

3   Mr. DeLong that you have described that came to you in the form

4   of a conversation, if that information had been simply put down

5   on a piece of paper and given to you, would it have changed

6   what you ended up doing in terms of telling Mr. DeLong to

7   continue the representation?

8   A.      No, it wouldn't have made any difference.

9   Q.      And why not?

10  A.      Because it would have been exactly the same thing. I

11  mean, it's a practical matter and whether it was in writing or

12  not wouldn't have had any bearing on it.

13  Q.      Let me go back and ask you are you - on behalf of

14  Terry Manufacturing, would you have ever authorized a legal

15  claim against your brother Rudolph?

16  A.      No, I don't believe so, no.

17  Q.      And why not?

18  A.      Well, because he was my business partner, my brother

19  and family member.

20  Q.      Would you say it one more time?

21  A.      I said he was my business partner, my brother, my

22  family member and so, no, I don't see circumstances under which

23  I would have suggested that the company make a claim against

24  him.

25  Q.      If Mr. DeLong or Mr. Thomas had urged you to make a

Roy Terry - Direct                           520

1    claim against your brother in the lawsuit, would that have

2    changed your mind?

3    A.        No, I don't believe so.

4    Q.        In the series of conversations you have described, did

5    you consider how your brother Rudolph's defense might have

6    affected –

7              THE COURT: All right.  I think this is getting pretty

8    repetitive.

9              MR. BRIDGERS: I am sorry.

10             THE COURT: We have pretty well covered, I think, the

11   fact that, you know, there was this lawsuit against Terry

12   Manufacturing and there were these discussions had between Mr.

13   DeLong, Roy Terry, Rudolph Terry, about possible conflicts and

14   problems and so on.  Unless you have got something really

15   different or new, like I said, we have pretty well covered that

16   ground, I think.

17             MR. BRIDGERS: Your Honor, I have one new topic on

18   this, two or three questions and we can move on.

19             THE COURT: Okay.

20             MR. BRIDGERS: Something that may become relevant.

21   BY MR. BRIDGERS:

22   Q.        Mr. Terry, I would like for you to look back at your

23   decision about hiring or continuing Mr. DeLong's representation

24   and Mr. Thomas' representation, look back at that decision.

25   Knowing everything you know up until this very moment, would

Roy Terry - Direct                        521

1    you have changed that decision to continue Mr. DeLong and Mr.

2    Thomas' representation of both Terry Manufacturing and your

3    brother, Rudolph Terry?

4    A.        No.

5    Q.        And why not?

6    A.        Well, because I think that they gave adequate, good

7    representation, and I don't see that someone else, you know,

8    either another single team or two separate teams, I don't see

9    that they could have done any better.

10   Q.        Do you have any personal criticism of Mr. Thomas or

11   Mr. DeLong's conduct in the litigation?

12   A.        No, I don't.

13   Q.        All right.  Thank you.

14            MR. BRIDGERS: Your Honor, I will be moving on to

15   another topic.  I am not sure – the court has been taking some

16   break at 10:30.

17            THE COURT: Well, I was hoping you were going to sit

18   down.  How much more have we got with Mr. Terry?

19            MR. BRIDGERS: Your Honor, I have basically a series of

20   financial questions about insider insolvency

21            THE COURT: Here is what we are going to do.  We are

22   going to break for fifteen minutes.  And I will tell Mr.

23   Barriere the same thing I am going to tell you.  We have had

24   some lengthy and repetitive questioning on both sides.  We are

25   going to start moving faster after break.  So we are going to

Roy Terry - Direct                    522

1    break for fifteen minutes and then I'm going to start moving

2    both of you along.

3          So for planning purposes, if you have got something

4    you really want to get to, you better get to it soon.

5          Okay.  Thanks.

6          MR. BRIDGERS: Yes, Your Honor.

7          (Recess from 10:37 a.m. until 10:54 a.m.)

8          COURTROOM DEPUTY: Court is back in session.

9          THE COURT:   Okay.  Please be seated.

10         Mr. Bridgers.

11         MR. BRIDGERS:   Thank you, Your Honor.

12   BY MR. BRIDGERS:

13   Q.      Mr. Terry, was Terry Manufacturing Company having

14   financial, any financial difficulties at the time of the

15   Commercial Factors lawsuit?

16   A.      Yes.

17   Q.      To your knowledge, were Mr. DeLong or Mr. Thomas ever

18   informed of the financial difficulties Terry Manufacturing was

19   in, whatever they were, until the bankruptcy was filed?

20   A.      No.

21   Q.      And did either Mr. DeLong or Mr. Thomas have any

22   access to the company's financial records other than through

23   you and your brother?

24   A.      No.

25   Q.      Did Terry Manufacturing continue to make payments to

Roy Terry - Direct                              523

1    Mr. DeLong and Mr. Thomas during the time the company was

2    experiencing financial difficulties?

3    A.      Yes.

4    Q.      And if the company was having financial problems or

5    difficulties, why did you continue to pay Mr. DeLong and Mr.

6    Thomas?

7    A.      Well, the case was very important and I am sure that

8    we had felt that we had to continue payments in order to

9    continue defending ourselves against the large claim that

10   Commercial Factors was trying to make, which would have

11   certainly been devastating to the company.

12   Q.      Do you believe that Terry Manufacturing had an

13   agreement to pay Mr. DeLong and Mr. Thomas?

14   A.      We did.

15   Q.      Did Terry Manufacturing receive bills from Mr. DeLong

16   and Mr. Thomas, the Exhibit 13 we have looked at?

17   A.      I am sorry.

18   Q.      I am sorry.  That was your brother.  Did Terry

19   Manufacturing receive bills from Mr. DeLong and Mr. Thomas?

20   A.      Yes.

21   Q.      And do you know how those bills were paid?

22   A.      How they were paid?

23   Q.      Yes, sir.

24   A.      By company check.

25   Q.      Okay.  Do you know how, in the ordinary course of

Roy Terry - Direct                                    524

1    business, do you know how the check was written to Mr. DeLong

2    and Mr. Thomas?

3    A.        Uh –

4    Q.        That was a poor question.  When Terry Manufacturing

5    received bills from Mr. Thomas and Mr. DeLong, did it pay them

6    most of the time?

7    A.        Yes, I'm sure we did, yes.

8    Q.        And generally how long did it take Terry Manufacturing

9    to pay those bills from Mr. DeLong and Mr. Thomas through the

10   Commercial Factors litigation?

11   A.        I am sure that it varied.  A few days, a week or two.

12   Q.        Okay.  In the normal course of Terry Manufacturing's

13   business, was it the course of conduct to basically promptly

14   pay those bills from Mr. DeLong and Mr. Thomas when they came

15   into the company?

16   A.        Yes, generally I would think so.

17   Q.        And in your experience with other attorneys, is that

18   the  way  Terry  Manufacturing  processed  other  attorney's

19   services, bills?

20   A.        Yes.

21             MR. BRIDGERS: Your Honor, if I might have a few

22   seconds, I may be done.

23             (Pause)

24             MR. BRIDGERS: Your Honor, we pass the witness.  Thank

25   you.

Roy Terry - Cross                                525

1          THE COURT: Mr. Barriere.

2          MR. BARRIERE: Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. BARRIERE:

5    Q.      Good morning, Mr. Terry.  I believe we have met in the

6    past.  I am Brent Barriere.  I represent the trustee.

7            Mr. Terry, when did you first become aware of the

8    conduct of your brother which led to his criminal conviction

9    concerning Commercial Factors?

10   A.      I'm sorry.  I'm trying to follow the question.  When

11   did I –

12   Q.      First learn that your brother had engaged in the

13   conduct which led to his criminal conviction in Atlanta, the

14   first time he was convicted.

15   A.      I guess the first that I heard of the controversy

16   about it, I guess as I mentioned a little earlier, was in this

17   late '99, early 2000 time frame.

18   Q.      Well, let me ask you this.  Maybe the question wasn't

19   artful.  When did you first learn that Commercial Factors was

20   demanding payment on invoices which were for product never

21   actually delivered to Terry Manufacturing?

22   A.      I am sorry.  I don't mean to be difficult but in terms

23   of –

24   Q.      Well, you understood, did you not, sir, that

25   Commercial Factors was suing Terry Manufacturing to collect on

Roy Terry - Cross                              526

1    invoices   which   supposedly   represented   products   sold   by

2    Floodgates to Terry Manufacturing?

3    A.      Yes, when I say that that was the controversy as far

4    as  Commercial  Factors  trying  to  collect  money  from  Terry

5    Manufacturing – well, you know, as far as that time framing –

6    time frame, I am sorry, that is my best recollection of it.

7    Q.      Well, why did you understand Commercial Factors was

8    suing Terry Manufacturing?

9    A.      My  understanding  was  that  they  were  claiming  that

10   Terry Manufacturing owed money to  Commercial Factors

11   Q.      And why, as you understood it, did Terry Manufacturing

12   owe money to Commercial Factors?

13   A.      Well,  I  believe  –  my  thoughts  were  that  Terry

14   Manufacturing did not owe money to Commercial Factors.

15   Q.      Do you recall authorizing Mr. DeLong to agree to pay

16   Commercial  Factors  something  in  the  range  of  two-point-one,

17   two-point-two million dollars in early 2000?

18   A.      I recall that we authorized Mr. DeLong to enter into

19   some attempts to settle the case.  I don't remember the dollar

20   figures.

21          THE  COURT:   Let me help you a little bit, Mr.

22   Barriere.

23          MR. BARRIERE: Yes, sir.

24          THE COURT: Remember yesterday we had a lengthy cross-

25   examination of Mr. Rudolph Terry where you tried to get him to

Roy Terry - Cross                                527

1   admit to this whole scheme, which he did not.  You were not

2   successful in getting him to admit that, which I think he

3   pretty clearly did.  It doesn't sound like you're going to be

4   a whole lot luckier today.

5          We are not going to spend an hour or an hour and a

6   half trying to get to that point.  I don't think it is that

7   important to this case.  Remember, the case we have got is a

8   fraudulent conveyance case involving DeLong and Caldwell and

9   Mr. DeLong.  We are not retrying Commercial Factors here.  So

10  we are not going to have a repeat of yesterday's lengthy cross-

11  examination.  Maybe he is going to admit everything, maybe he

12  is not.  If he doesn't, we are just going to kind of move on a

13  lot quicker.  So I will give you a few minutes, but –

14          MR. BARRIERE: I understand, Your Honor.  And you

15  understand we are simply trying to establish the inherent

16  conflict given –

17          THE COURT:  You have established it, and established

18  it, and established it, just like Mr. Bridgers established, and

19  established, and established over again that there were

20  apparently, at least according to the testimony, discussions

21  between Rudolph, Roy, and Mr. DeLong about the potential

22  conflict.  So you can ask him a little bit about the Commercial

23  Factors but, if you don't hit pay dirt fairly soon, we are

24  going to move on

25          MR. BARRIERE: Fair enough, Your Honor.  And I will be

Roy Terry - Cross                                    528

1    brief, Your Honor.  If I may approach.

2              THE COURT:   Okay.

3    BY MR. BARRIERE:

4    Q.      If I could get you to look, sir, at Exhibit 35 that I

5    have put in front of you.  Paragraph fifteen there, sir, reads,

6    and I quote:

7              "Defendant  Terry  admits  that  it  is  indebted  to

8              plaintiff" – that is  Commercial Factors – "in the

9              amount  of  two  million,  one  hundred  and  thirty

10             thousand, six hundred and twenty-eight dollars and

11             ninety one cents, plus the one hundred and ninety-

12             three  thousand  dollars  which  has  been  paid  by

13             defendant Terry and accepted by plaintiff."

14   Do you see where I'm reading from?

15   A.      Yes, I do.

16   Q.      Did you, as president of the  company,  authorize Mr.

17   DeLong to  make  that  admission  that  Terry  Manufacturing  was

18   indebted to Commercial Factors in that amount?

19   A.      I am sorry, sir, but can we back up and let me look at

20   – I mean, you are going to a certain paragraph but I haven't

21   even looked to see what document we are talking about here.

22   Q.      Very well.

23             (Pause)

24   A.      I am sorry.  What is the question?

25   Q.      The question, sir, is did you authorize Mr. DeLong to

Roy Terry - Cross                          529

1    admit that Terry Manufacturing was indebted to Commercial

2    Factors to the tune of two million, one hundred and thirty

3    thousand dollars?

4    A.     Yes, I would think so.  I am going back to the

5    document, but I am not going to take the court's time by going

6    all the way through the document but, just from what I've seen

7    from looking at the first page, I would think so.

8    Q.     Why would Terry Manufacturing admit to owing two

9    million, one hundred and thirty thousand dollars, when you told

10   us a moment ago in fact you didn't owe anything to Commercial

11   Factors?

12   A.     I said that it was my belief at the time that Terry

13   Manufacturing did not owe Commercial Factors at that time.

14   Q.     Fair enough.  So why did you authorize your lawyer to

15   admit to the contrary?

16   A.     I would think it was in terms of an effort to try and

17   get the case settled, I would think.  However, we are talking

18   six years ago and I would really have to look at the document

19   and try to let you help me put it back into context as to what

20   was happening.  This was somewhere over in the middle of the

21   case and I apologize for the fact that I can't be as clear on

22   what was happening with this particular time and document.

23   Q.     Did you have a chance to speak with Mr. Bridgers in

24   advance of today's trial with respect to your testimony?

25   A.     I spoke to Mr. Bridgers a couple of days ago.

Roy Terry - Cross                                      530

1    Q.       Fair enough.  And he told you he would want to hear

2    you testify about these conversations you had about the

3    conflict of interest issue?

4    A.       Not really, but generally I asked about what was going

5    on and that type of thing.  So we had a general conversation.

6    Q.       Did Mr. DeLong ever advise you that your brother had

7    testified falsely?

8    A.       No, not that I recall.

9    Q.       Well, is that something that you would recall if your

10   lawyer called you and said your brother has perjured himself;

11   do you think you would recall that?

12   A.       I would think so.

13   Q.       All right.  Fair enough.  Did Mr. DeLong ever advise

14   you that your brother had signed verifications of receipt of

15   goods when he in fact never received goods?

16   A.       There were several occasions on which Mr. DeLong would

17   have summarized to me what had happened to a certain point in

18   the case, and it probably would have included the types of

19   things that you are talking about.

20   Q.       Do you recall that specifically?

21   A.       As far as my specific recollection of it, no, I don't

22   remember that specifically, but I don't doubt that it might

23   have happened.

24   Q.       All right.  Did he tell you that Rudolph had testified

25   that he had distributed products obtained from Floodgates to

Roy Terry - Cross                          531

1    hundreds of customers, none of whom he could identify?

2    A.      I don't know.  I don't recall that.

3    Q.      Did Mr. DeLong tell you that Rudolph had testified he

4    had resold the Floodgates products to McDonald's franchisees

5    and Coca-Cola Bottlers and Hanes?

6    A.      I am sorry.

7    Q.      Did Mr. DeLong tell you that Rudolph had testified

8    under oath that he had resold the product he got from

9    Floodgates to Hanes, and to Coca-Cola and to McDonald's?

10   A.      I know that there were several times, maybe many

11   times, that I was brought up-to-date as to what was happening,

12   what had happened in the case and depositions, etc., etc.  In

13   terms of the specific language that you are using, I don't

14   recall that, but I don't doubt that it might have happened.

15   Q.      You just don't know one way or the other?

16   A.      I am sorry?

17   Q.      You just don't doubt – you just don't know one way or

18   the other; is that correct?

19   A.      Yes.

20   Q.      All right. Were you told by Mr. DeLong that something

21   in excess of ten million dollars had flowed through the Atlanta

22   accounts involving Commercial Factors and Floodgates?

23   A.      I am sure that I heard such figures in the summaries

24   of the case or maybe sitting in a depositions and all of that.

25   I was kind of up-to-date on what was happening in the case.  As

Roy Terry - Cross                               532

1    to whether that was something specific from Mr. DeLong in a

2    conversation, I don't know.

3    Q.        Were you told by Mr. DeLong that Rudolph had testified

4    that the funds going to Pouncey represented personal loans

5    Rudolph Terry was making using Terry Manufacturing money?

6    A.        Again, I guess that is in the same category.

7    Q.        You just don't know?  He may or may not have said that

8    to you?

9    A.        That's right.

10   Q.        Well, let me ask you, sir, as the president of the

11   company were you aware and did you authorize Rudolph Terry to

12   use something in excess of ten million dollars of the company

13   money to make loans to Jon Pouncey?

14   A.        I authorized Rudolph Terry to do business and business

15   transactions with Pouncey, yes.

16   Q.        Did that authorization include permitting him to make

17   personal loans to Jon Pouncey using the company's money?

18   A.        Yeah, I think he probably would have had authorization

19   to do so, I would think.

20   Q.        Now did there come a time when you learned that

21   Commercial Factors was trying to get the company's financial

22   statements through the discovery process?

23   A.        Yes, I recall that.

24   Q.        Were you also aware that Commercial Factors was trying

25   to get the work papers on which those financial statements were

Roy Terry - Cross                                    533

1  based?

2  A.        Yeah, I probably knew that.  I don't remember

3  specifically.

4  Q.        And you were aware, were you not, that those financial

5  statements were false, correct?

6  A.        I knew there were problems with them, yes.

7  Q.        I am sorry?

8  A.        Yes, I knew there were problems with the financial

9  statements.

10  Q.        All right.  In fact, those financial statements didn't

11  accurately portray the company's financial condition at all,

12  did they?

13  A.        No, they did not.

14  Q.        All right.  And you are also aware that there were no

15  work papers that would support those financial statements,

16  correct?

17  A.        No, I couldn't say that.

18  Q.        Well, there weren't any accurate documents that you

19  could look to, to support false financial statements; were

20  there?

21  A.        Well, there were documents to support it but, in terms

22  of the way you are terming it, I am not sure about that.  But

23  if you're trying to get to the point did I know that the

24  financial statements were inaccurate, yes, I knew that.

25  Q.        All right.  And you discussed with Rudolph, did you

Roy Terry - Cross                                            534

1    not, the need to ensure those financial statements were not

2    produced to Commercial Factors?

3    A.      No, I don't know that I – I don't believe that I made

4    such a discussion – had such a discussion.

5    Q.      Did you discuss that topic with Mr. DeLong, that you

6    didn't want those financial statements produced to Commercial

7    Factors?

8    A.      Did I have such a discussion with him?

9    Q.      Yes, sir.

10   A.      No, I don't think so.

11   Q.      Did you discuss with Mr. DeLong concerns as to the

12   accuracy of the financial statements?

13   A.      No.

14   Q.      Were you aware that Mr. DeLong was investing hundreds

15   of hours and tens of thousands of dollars of attorney's fees

16   seeking  to  keep   Commercial  Factors  from  getting  those

17   financial statements?

18   A.      No.

19   Q.      You were not aware of that?

20   A.      I was not aware of how much time or effort that he was

21   expending on that, no, I was not.

22   Q.      Had you not distributed those financial statements to

23   banks and to preferred shareholders and to trade vendors?

24   A.      To some of those, yes.

25   Q.      And ultimately it was discovered that those financial

Roy Terry - Cross                    535

1    statements were false; correct?

2    A.        That's correct.

3    Q.        And that is why you were convicted?  That is the

4    reason why you pled guilty; is it not?

5    A.        That is correct.

6    Q.        Okay.  Did Rudolph ever provide you with a writing

7    committing to repay the company the fees incurred in the

8    Commercial Factors case if he was ultimately found liable?

9    A.        I am tired.  Would you repeat –

10   Q.        Did Rudolph ever provide you a letter or any other

11   writing which said, in effect, if I am found liable in this

12   lawsuit, I will repay the company?

13   A.        No, I don't recall such, no.

14   Q.        All right.  When Mr. DeLong was having those

15   conversations with you about the potential conflict of

16   interest, did he discuss with you the possible defense that

17   Rudolph acted outside the scope of his employment?

18   A.        That he might have acted – I didn't hear the last part

19   of it.

20   Q.        Yes.  When Mr. DeLong was having those several

21   discussions with you that you testified to concerning a

22   conflict, did he discuss with you the defense that Rudolph

23   acted outside the scope of his employment?

24   A.        I am sure the thought that that could be one of the

25   allegations that could cause a conflict, I am sure that

Roy Terry - Cross                          536

1    would've been part of the conversation.

2    Q.      All right.  Well, I guess I was a little confused.

3    You told us earlier that Mr. DeLong talked about issues or

4    defenses that might cause differing interests between the

5    company and Rudolph Terry.  Do you recall that testimony?

6    A.      No.

7    Q.      All right.  Well, let me come at it straight up, then.

8    When Mr. DeLong raised this issue of the conflict with you, and

9    I think you told us there were three conversations, did he tell

10   you about specific issues or specific defenses that might cause

11   some difference between the company and Rudolph?

12   A.      As I said before, I am sure that we had some pretty

13   detailed discussions back at that time.  It is just that six

14   years later I can't repeat those.

15   Q.      So you think they were discussed but you have no

16   recollection of the specifics; is that a fair statement?

17   A.      That is not the way that I said it, but I certainly

18   don't remember all of the specifics.

19   Q.      Do you remember any of the specifics concerning the

20   defenses that might be raised if Terry Manufacturing and

21   Rudolph Terry had separate counsel?

22   A.      I am sure that there was a discussion of the fact that

23   it could be that the company's best interest might be served by

24   saying that if there were certain things that Rudolph might

25   have done that were improper, that the company had not

```
                        Roy Terry - Cross                      537
```

1    authorized it, that would be an example of a potential

2    conflict.

3    Q.       All right.  And what was your opinion as to whether

4    that defense should he asserted?

5    A.       Well, that if that became necessary that the company

6    should assert such a defense, then they could and should do so.

7    Q.       And Mr. DeLong would do that notwithstanding the fact

8    that he was also representing Rudolph?

9    A.       Yes.

10   Q.       In concluding that you wanted to just keep the team,

11   Mr. DeLong and Mr. Thomas, is it my understanding that the

12   principal concern was to save you money?

13   A.       I said that was one of them.

14   Q.       How in your mind would getting separate counsel for

15   the company and for Rudolph Terry have caused there to be a

16   split between the two?

17   A.       You are trying to take me back to my thinking five or

18   six years ago but I will give my best thought on it, was that

19   my feeling at the time was that the company was being attacked

20   by Commercial Factors and that they were trying to cause harm

21   to the company and trying to cause expense to the company,

22   trying to, in effect, extort money out of Terry Manufacturing

23   Company.  So as far as dividing up, adding some additional

24   expense or adding other people to the loop, I did not see that

25   being in the best interest of the company.

Roy Terry - Cross                                    538

1    Q.        And I take it, from your own testimony, you saw it in

2    the best interest of the company to go ahead and admit that you

3    owed two-point-three million dollars and settle the case?

4    A.        Obviously at that point, I did.

5    Q.        You were asked earlier about the bills for this case

6    that appear under the name of DeLong and Caldwell.  Did you

7    ever see those bills at the time they came in?

8    A.        Yes, I am sure I would've seen them at some point.

9    Q.        And you approved payment of those bills?

10   A.        Yes.

11   Q.        But the actual handling, I take it, of the payment

12   always came out of Atlanta?

13   A.        That's correct.

14   Q.        And that was true also of all of the funds that were

15   paid by Terry Manufacturing to Commercial Factors and Jon

16   Pouncey; that also came out of Atlanta, correct?

17   A.        Yes.

18   Q.        And that was all controlled by Rudolph?

19   A.        That's correct.

20             MR. BARRIERE: Your Honor, I am going to pass the

21   witness now.

22             THE COURT: Okay.  Redirect.

23             MR. BRIDGERS: Your Honor, no redirect.

24             THE COURT: Okay.  Thank you.  Thank you, sir.

25             (Pause)

Caldwell - Direct                                    539

1          THE COURT:  Go ahead and call your next witness.

2          MR. BRIDGERS: Thank you, Your Honor.  Defendants call

3     Michael Caldwell.

4          THE COURT: Mr. Caldwell.

5          (MICHAEL A. CALDWELL, WITNESS, SWORN)

6                       DIRECT EXAMINATION

7     BY MR. BRIDGERS:

8     Q.     Mr. Caldwell, will you state your name for the record,

9     please?

10    A.     Michael A. Caldwell.

11    Q.     Just very briefly, are you an attorney?

12    A.     I am.

13    Q.     What is your background and education?

14    A.     I  am  a  1968  graduate  of  Catholic  University,

15    undergraduate school; 1971 graduate of Catholic University Law

16    School.

17    Q.     And  can  you  very  briefly  describe  your  working

18    experience?

19    A.     Yes.  I am an employment lawyer.  I started with the

20    National  Labor  Relations  Board  as  a  staff  attorney  in  their

21    general counsel's office in DC.  I went into private practice

22    in law firms in DC, and later in Atlanta.

23    Q.     Have many years have you practiced?

24    A.     Thirty-six years.

25    Q.     And where do you practice now?

Caldwell - Direct                                                540

1    A.       I now practice with DeLong, Caldwell and Bridgers,

2    LLC, in Atlanta.

3    Q.       And starting at the beginning, can you tell me the

4    LLCs – we understand that is a limited liability company?

5    A.       Yes, shorthand.  LLC is a limited liability company.

6    Q.       Thank you.  Starting at the beginning, can you tell me

7    the LLCs you have worked at with Mr. DeLong?

8    A.       The first LLC that I worked at with Mr. DeLong was in

9    1993 with DeLong, Caldwell, Logue and Wisebram, LLC.  Then

10   after that, Keith Logue left in 1995, and we renamed it DeLong,

11   Caldwell and Wisebram.  Then in 1998 or 1999, Steve Wisebram

12   left us and we renamed it DeLong and Caldwell, LLC.  It was all

13   the same entity.

14   Q.       Where were you practicing law in January of 2000?

15   A.       I was with DeLong and Caldwell, LLC.

16   Q.       And your testimony is that is the same entity, just a

17   different name change?

18   A.       Yes, it is the same LLC as we started in 1993.

19   Q.       Was a change of name filed with the Secretary of State

20   after Mr. Wisebram left?

21   A.       No, we found out that it had not been.  That was a

22   mistake. Woody thought  – Mr. DeLong thought that I had filed

23   it, and I thought Mr. DeLong had filed it.

24   Q.       Has that name change now been accomplished?

25   A.       Yes, it has.

Caldwell - Direct                                    541

1   Q.      And that was just a few days ago; was it not?

2   A.      It was just a few days ago, yes.

3   Q.      Was that in response to anything received from the

4   plaintiff?

5   A.      Yes, it was in response to learning that we hadn't

6   filed the change of name with the Secretary of State.

7   Q.      Where did you next practice law after DeLong and

8   Caldwell, LLC?

9   A.      The next place I practiced law was a new LLC that we

10  formed with the limited liability partnership of Novotny and

11  Bridgers, LLP, which we formed in 2001. Actually we formed the

12  papers in around the middle of 2001, but we got really up and

13  operating towards late 2001. So it is a limited liability

14  partnership of DeLong, Caldwell, Novotny and Bridgers, LLC.

15  Q.      A second ago you said a limited liability partnership

16  of DC&B.

17  A.      I am sorry. I meant limited liability company. The

18  only things I have practiced in have been limited liability

19  companies. It is the only thing since 1993.

20  Q.      Is it the same business entity you are in now?

21  A.      No, it is not. The entity that I am with now is

22  DeLong, Caldwell and Bridgers, LLC.

23  Q.      And when was that formed?

24  A.      That was formed after Ed Novotny left our firm to go

25  to a big firm practice in Atlanta and we formed a new LLC with

Caldwell - Direct                           542

1    the remaining – well, actually, we formed a new LLC made up of

2    LLCs.

3    Q.        Who are the members, then, of DeLong, Caldwell and

4    Bridgers, LLC?

5    A.        The members of DeLong, Caldwell and Bridgers, LLC, are

6    Michael A. Caldwell, Attorney, LLC; Earnest H. DeLong,

7    Attorney, LLC; and Charles R. Bridgers, Attorney, LLC.

8    Q.        Have you ever had a partnership with Woody DeLong?

9    A.        I have never had a partnership with Woody DeLong.

10   Q.        Were any of these changes that you have discussed the

11   result of an official merger?

12   A.        No, there was never an official merger.

13   Q.        Did DeLong, Caldwell, Novotny and Bridgers, LLC,

14   assume the debts of DeLong and Caldwell or of Novotny and

15   Bridgers, LLP?

16   A.        No, it did not.

17   Q.        Did DeLong, Caldwell, Novotny and Bridgers, LLC,

18   acquire the Accounts Receivable of either DeLong and Caldwell,

19   LLC, or Novotny and Bridgers, LLP?

20   A.        No, it did not.

21   Q.        How do these LLCs make it possible for an individual

22   member to practice law?

23   A.        The LLCs are business institutions that make it

24   possible by, (a), leasing the space that we practice in,

25   leasing the common services such as the telephone service, the

Caldwell - Direct                                       543

1    Internet service, library service, Westlaw service, and they

2    employ our employees who work for us.

3    Q.        Does it also obtain insurance, some insurance?

4    A.        Yes, it obtains insurance, both health insurance and

5    malpractice insurance.

6    Q.        How will these LLCs obtain the money to pay the bills?

7    A.        The expenses, each month's expenses are broken down

8    and they are divided between us, and I am given a bill each

9    month and I have to pay into it each month, each of us, each of

10   the members have to pay into it each month to cover those

11   expenses.

12   Q.        As you may recall, Mr. DeLong testified in his

13   deposition in this case that you operated as sole

14   practitioners.  Can you explain your understanding of this?

15   A.        Yes.  I think what he is speaking of is, as economic

16   entities, each lawyer in the firm, each of the members of the

17   LLC functions on an "eat what you kill" basis.  That means that

18   each member is responsible for getting his own clients, for

19   doing the work for that client, for billing for the work of

20   that client and for collecting for the work of that client, for

21   paying the expenses incurred from that, and then he is

22   responsible for paying himself.

23   Q.        What is your understanding of how that interacts

24   professionally as an attorney?

25   A.        Professionally, each client retains an attorney, the

Caldwell - Direct                                    544

1    individual attorney.  The attorney is the one who makes the

2    legal judgments for the clients.  The attorney is the one who

3    provides the legal services for the client.  The attorney is

4    the one who controls all of the legal work being performed for

5    that client.  The attorney has to market himself to get the

6    clients.

7    Q.       How is this affected by the billing?  Excuse me.  Who

8    is responsible for billing the clients?

9    A.       Each attorney is responsible for billing and

10   collecting for the clients, for his own clients.

11   Q.       Have you worked in large firms, as well as small

12   firms?

13   A.       Yes, I have.  I have worked in large firms such as

14   Seyfarth Shaw, which had well over a hundred lawyers and

15   umpteen – well, quite a few offices.  I worked with Alagia Day,

16   Marshall, Mintmire & Chauvin, which had – I think we had nine

17   offices and over a hundred attorneys.

18   Q.       Is there any difference between the large and small

19   firms that you have worked at as to the way the lawyers

20   interact with each other and with their clients?

21   A.       There is a difference, yeah.  In a large firm, the

22   focus of the client relationship is upon the firm itself.  The

23   firm attracts the client and oftentimes the client looks to the

24   firm.  In a small firm, the focus of the client relationship is

25   upon the individual attorney.  The institution of the firm is

Caldwell - Direct                                      545

1    not a significant factor in terms of the client relationship.

2    As far as the attorneys go, in a small firm, while we do assist

3    each other when called upon, it is not as hierarchal as it is

4    in a large firm.  There is not the centralized control by a

5    firm that you would see in a large firm.  It is far more

6    individualized.

7    Q.      Did you ever share fees with Mr. DeLong in any of

8    these LLCs?

9    A.      No, we don't share fees.

10   Q.      Are you sometimes paid by Mr. DeLong or by clients for

11   work that you have done?

12   A.      On occasion, when I assist Mr. DeLong or the other

13   members of the firm with matters for their clients, I put my

14   billing, my hours into the time and billing system, but it is

15   up to the attorney whose client it is to bill the client to

16   decide what to bill, to cut my time if he so chooses, and then

17   to pay me for what he collects from the client.

18   Q.      Are you generally aware of how these LLCs you have

19   mentioned have practiced with billing and collections?

20   A.      They all practiced the same way.

21   Q.      And how did you become familiar with these practices?

22   A.      We talk about it a lot.  I mean, it is a matter of

23   discussion between us.  We are very small firm, and so it is a

24   matter of great discussion.  I have seen sometimes their bills

25   when I have worked on their client matters.  I am sometimes

Caldwell - Direct                                        546

1    asked to review the bill before it goes out for my time.

2    Q.        I don't mean to belabor the obvious, but have you

3    observed Mr. DeLong working on an hourly fee basis before?

4    A.        That is the general way that Mr. DeLong works,

5    especially when he is doing defense work.

6    Q.        Are you generally familiar with the hourly rates

7    charged by attorneys of Mr. DeLong's skill, experience and

8    ability in matters like the Commercial Factors case?

9    A.        I am.

10   Q.        And how would the two hundred and fifty dollar rate

11   hour – excuse me – how would the two hundred and fifty dollar

12   hourly rate that Mr. DeLong charged for his own and Mr. Thomas'

13   services to Terry Manufacturing compare with the ordinary and

14   customary rates charged by attorneys of similar experience,

15   skill and ability in similar cases?

16   A.        It would be on the low side of ordinary.  It would

17   certainly be very reasonable.

18   Q.        And how do you know that?

19   A.        Because, for one thing, I have hired attorneys myself.

20   I am active in several bar groups and I talk to other attorneys

21   about it, about their billing.  This is a frequent topic.  I

22   have gone to seminars in which billing procedures and practices

23   and amounts are discussed, and I review articles in the Fulton

24   Daily Report, which loves to report on what law firms are

25   charging by the hour for certain attorneys.

Caldwell - Direct                                              547

1    Q.       How frequently do the members of the LLCs send out

2    bills to their clients?

3    A.       It is periodically.  Generally monthly.  It could be

4    a little bit more than monthly depending on the attorney.

5    Q.       Can sometimes those bills stretch beyond thirty days

6    worth of work?

7    A.       Yes, sometimes they can.  Sometimes there is not

8    enough time in a month to make it worth the effort to bill.

9    Sometimes the attorney really just goes too long without

10   billing because he has been in the middle of something.

11   Sometimes he waits for a good break in the procedures before

12   billing that amount, but generally it is periodically and it is

13   ordinarily monthly or in that realm.

14   Q.       And were the billing and collection procedures you

15   have just described any substantially different from any other

16   law firms you have practiced with over the last thirty-six

17   years?

18   A.       No, not really.  Well, the ones that I just testified

19   about a second ago, yeah.  No, that is pretty much the way we

20   have all done it, yes.

21   Q.       You mean in terms of the LLCs you have practiced in

22   since 1993?

23   A.       Yes, in the LLCs I have practiced with, yes.

24   Q.       How does those type of procedures for billing clients

25   and collecting from clients compare to the perhaps larger law

Caldwell - Cross                              548

1    firms, other law firms you have practiced with over the thirty-

2    six years?

3    A.      In the larger law firms, the individual attorney does

4    not really have that much control over the billing process.

5    Q.      Based on this knowledge and experience, can you say

6    whether the billing and collection practices you have described

7    for Mr. DeLong were ordinary business practices for the legal

8    profession?

9    A.      Yes.

10   Q.      Did  you  ever  perform  any  work  on  the  Terry

11   Manufacturing case?

12   A.      No.

13   Q.      Did you receive any part of the fees for the Terry

14   Manufacturing case?

15   A.      No.

16   Q.      Have you ever met Rudolph or Roy Terry before?

17   A.      I  met  Mr.  Rudolph  Terry  when  he  came  for  his

18   deposition in this case before the court today.  I had never

19   met – that is the only time I met him, when he came.  I said

20   Rudolph.  Mr. Roy Terry when he came for his deposition in this

21   case.  I first laid eyes on Mr. Rudolph Terry yesterday.

22   Q.      Did you ever agree to represent Terry Manufacturing

23   Company?

24   A.      No.

25   Q.      Did you ever understand that you were representing

```
                         Caldwell - Cross                    549
```

1    Terry Manufacturing Company?

2    A.        No.

3              MR. BRIDGERS: Your Honor, I will turn the witness

4    over.

5              THE COURT: Okay.  Thank you.  Mr. Barriere.

6                         CROSS-EXAMINATION

7    BY MR. BARRIERE:

8    Q.        Good morning, Mr. Caldwell.  What is your business

9    address, sir?

10   A.        My business address?

11   Q.        Yes.

12   A.        Suite 3100, Centennial Tower, 101 Marietta Street,

13   Atlanta, 30303.

14   Q.        And what is your home address?

15   A.        54 - why is that - 5426 Brook Farm Drive, Dunwoody,

16   Georgia.

17   Q.        All right.  Now, as I understand the line, we started

18   with DeLong, Caldwell, Logue and Wisebram, and that was a

19   Georgia LLC; is that correct?

20   A.        That is correct.

21   Q.        All right.  You then had DeLong, Caldwell and

22   Wisebram, LLC.  Was that registered in any way with the

23   Secretary of State of the state of Georgia?

24   A.        I believe it was.

25   Q.        Okay.  We then had DeLong and Caldwell, LLC, which you

Caldwell - Cross                          550

1   acknowledged was never registered until this past Sunday with

2   the Georgia Secretary of State; correct?

3   A.        DeLong  and  Caldwell,  the  name  change  wasn't

4   registered, but it was the same entity.

5   Q.        My question, sir, is it not correct that until this

6   past Sunday there was no entity whose name appeared in the

7   Georgia Secretary of State's records which was named DeLong and

8   Caldwell, LLC?

9   A.        I assume that is true.  I don't know.  I haven't

10  checked.

11  Q.        Now is it not the case, sir, that DeLong, Caldwell and

12  Wisebram ceased filing annual reports with the Secretary of

13  State in 1999?

14  A.        I don't know.

15  Q.        And indeed failed to do so, then, for several years?

16  A.        I don't know.

17            MR. BARRIERE: If I may approach and give him a copy of

18  this exhibit that is on your bench?

19            THE COURT: Yes, sir.  Oh, you want the –

20            (Pause)

21  Q.        And the reason you ceased being DeLong, Caldwell and

22  Wisebram and became DeLong and Caldwell, LLC, is because Mr.

23  Wisebram left to go and work elsewhere?

24  A.        That is correct.

25  Q.        And so starting in 1998 or 1999, you were working with

Caldwell - Cross                551

1    a letterhead that said DeLong and Caldwell, LLC; is that

2    correct?

3    A.        That is correct.

4    Q.        And your bills to your clients were under the name of

5    DeLong and Caldwell, LLC, correct?

6    A.        That is correct.

7    Q.        And those bills dictated –

8    A.        You said starting in – I am sorry, repeat –

9    Q.        Starting in 1999 or thereabouts, the bills were issued

10   in the name of DeLong and Caldwell, LLC; correct?

11   A.        Yes, until 2001, yes.

12   Q.        2001.  And those bills directed that payment should be

13   made – that checks should be made payable, pardon me, to

14   DeLong and Caldwell, LLC?

15   A.        Actually, no.  I don't know what is on all of the

16   bills.  I know my bills ask that the checks be made payable to

17   me.  They generally –

18   Q.        Well, have you looked at the bills at issue in this

19   case, though?

20   A.        Have I looked at the bills at issue in this case?

21   Q.        Yes.

22   A.        I think I have seen them, yes.

23   Q.        All right.  If you would look at Exhibit 13, it should

24   be before you.

25   A.        Go ahead.

Caldwell - Cross                            552

1    Q.        The first of those bills, you can look at DeLong

2    14520, the second page.  That states that the payment should be

3    made with a check made payable to DeLong and Caldwell, LLC;

4    does it not?

5    A.        It does.

6    Q.        If you would look to the last of these bills issued on

7    May 16, 2003.  It is DeLong 014413.  It is a little tough

8    because the number has been cut off a bit.  The next page is

9    14414, if that is a helpful reference.

10   A.        Okay.  13?

11   Q.        Yes, sir.

12   A.        Yeah.

13   Q.        And that bill appears under the name of DeLong and

14   Caldwell, LLC, correct?

15   A.        It does.

16   Q.        And that's true, though, as you have testified,

17   DeLong, Caldwell, Novotny and Bridgers came into effect

18   sometime in 2001?

19   A.        Yes.

20   Q.        All right.  And as with the prior bill we looked at,

21   if you look at 14419, it indicates that the payment should be

22   made with a check made payable to DeLong and Caldwell, LLC?

23   A.        It does.

24   Q.        As I understood your testimony, DeLong and Caldwell,

25   as the entity, would have been responsible for leasing space

Caldwell - Cross                                      553

1    for the payment of, I guess then, was library services, whether

2    computer  or  otherwise,  for  insurance  and  the  payment  of

3    employees; is that correct?

4    A.        At what period of time are you speaking?

5    A.        This is in the, I guess, 1999, 2000, 2001, up until

6    2001; is that correct?

7    A.        Yes.  Well, the entity was DeLong, Caldwell and

8    Wisebram because I believe we had done the official name change

9    by that time; but, yeah, it was DeLong and Caldwell.

10   Q.        All right.  So the bills that you were getting in the

11   2000 time frame, were those made payable to – excuse me – were

12   those bills issued to DeLong and Caldwell?

13   A.        I am sorry.  Would you repeat the question?

14   Q.        Yeah. To the extent – well, let me ask you this.  If

15   you issued a W-2 to your employee for the year 2000, would that

16   not have listed her or his employer as DeLong and Caldwell?

17   A.        I honestly don't know because I didn't see the W-2s

18   that were issued, and I don't know what they said.  I assume it

19   would have the name of the correct entity but I don't know.

20   Q.        Now as a member of DeLong and Caldwell – strike that.

21   Who were the members of DeLong and Caldwell, LLC?

22   A.        The members of DeLong and Caldwell, LLC were Earnest

23   DeLong and myself.

24   Q.        Okay.  As a member, would you receive something in the

25   nature of a K-1 to reflect your share of expenses?

Caldwell - Cross                                554

1    A.        No, I would not.

2    Q.        Did you receive any tax information in the name of

3    DeLong and Caldwell, personal tax information?

4    A.        No, because I report everything just for me.

5              MR. BARRIERE: I will pass the witness, Your Honor.

6    Thank you.

7              THE COURT: Okay.  Thank you.  Redirect?

8              MR. BRIDGERS: No redirect, Your Honor.

9              THE COURT: Okay.  Thank you, sir.  You may step down.

10   Why don't we break.  We will start back up at 1:15.

11             (Recess from 11:48 a.m. until 1:22 p.m.)

12             THE COURT:   Please be seated.

13             Mr. Bridgers.

14             MR. BRIDGERS: Your Honor, I would call to the stand

15   Mr. Woody DeLong.  Your Honor, if I might introduce you, this

16   is Professor Ross.  He is here now.

17             THE COURT: Yeah, I was expecting to hear from him.

18   This is fine.

19             MR. BRIDGERS: We have worked Professor Ross' schedule

20   and just figured we would end up with him.

21             THE COURT: Very good.. Mr. DeLong, you testified

22   earlier in the trial.  You are still under oath.

23             MR. DELONG: Yes, sir.

24             (EARNEST H. DELONG, JR., WITNESS, RECALLED, PREVIOUSLY

25   DULY SWORN)

DeLong - Direct                                          555

DIRECT EXAMINATION

BY MR. BRIDGERS:

Q.        Mr. DeLong, just very briefly as an order of proof,
can you give us some background of your law practice?  How long
have you been practicing?

A.        I was admitted to the bar in 1970.  Initially – at the
time that I was finishing up law school, I was clerking for a
small firm in Atlanta, Shube, McLain and Jesse.  The firm
offered me a job when I was getting out of law school.  I
stayed there for, I want to say about four years and, from
there, I moved to – I am sorry.  I moved to Arnold, Golden and
Gregory.  I started off as an associate there.  I became a
partner there, and then I went in-house with one of our
clients, Health Service Centers.  I stayed there for a number
of years.

          The client – well, we converted him from a nursing
home and a hospital operator into basically a rent collector
for all of the facilities that he owned.  At that point, I went
back into the regular practice of law and that was when I met
Mike.

Q.        Over the last ten or fifteen years, or so, what has
been your practice area?

A.        Primarily the same thing that it has been all along.
Obviously it has been kind of eclectic with the healthcare work
and such.  But if somebody would ask me what I do, I would say

DeLong - Direct                    556

1   I am a commercial litigator.

2   Q.       Let me move on to more of the substance.  The first

3   thing I would like to ask you about is you heard Mr. Beltran's

4   testimony or perhaps speculation that, if another lawyer had

5   approached Commercial Factors, one without a conflict, that

6   something different would have happened –

7          THE   COURT:      Actually,  I  think  it  was  Terry

8   Manufacturing.

9          MR. BRIDGERS: Your Honor, you are absolutely correct.

10  No, actually I do believe it is Terry Manufacturing if I didn't

11  – if another –

12         THE COURT: Had they approached Commercial Factors on

13  behalf of Terry Manufacturing with no conflict – I'm sorry.  I

14  misunderstood.  I think he probably understands better than I

15  do.

16         MR. BRIDGERS: Yes, Your Honor.  It has been a long

17  couple of days.

18  BY MR. BRIDGERS:

19  Q.       Mr. DeLong, what is your response to that?

20  A.       Well, I don't want to sound glib, but that is silly.

21  Q.       Why?

22  A.       What it reflects is somebody that has no understanding

23  of what was going on; who has no understanding of the facts in

24  the case; who has no understanding of the history of the case;

25  and probably somebody who really doesn't have much experience

DeLong - Direct                                                      557

1    litigating these kinds of things.

2    Q.      Now, in your understanding, what was Commercial

3    Factors' goal at the time you were trying to litigate with

4    them?

5    A.      Commercial Factors' goal was to effectively get as

6    much money out of Terry Manufacturing Company as it possibly

7    could.  The people at Commercial Factors or the people at

8    Commercial Factors' lawyers thought the same thing that I did,

9    that this was a very successful company, and it became more and

10   more obvious that they believed that, if they just squeezed

11   hard enough and pressed the right button, that eventually

12   somebody on behalf of Terry Manufacturing Company would open

13   that great big checkbook and just write them a check for

14   whatever they wanted.

15   Q.      Going back to those negotiations or settlement

16   discussions, did the actions of Rudolph Terry before your

17   involvement in the case affect how you were able to deal with

18   Commercial Factors in those first few months?

19   A.      Oh, yes.

20   Q.      How so?

21   A.      Rudolph had apparently been dealing with Commercial

22   Factors' lawyers for at least six or eight weeks.  Sometime in

23   November is the first communication that I have seen between

24   him and Commercial Factors' lawyers and it went on for

25   November; it went on for December.  It even went on after I

DeLong - Direct                                    558

1    contacted Matt Coles and told him that I was representing Terry

2    Manufacturing Company.

3    Q.      How did the actions of Rudolph Terry, to get back to

4    the question, how did the actions of Rudolph Terry affect how

5    you were able to interact with Commercial Factors in those

6    first few months?

7    A.      Well, Terry had gone in and had basically acknowledged

8    that the company owed two-point-one million dollars and had

9    tried to negotiate a settlement.

10   Q.      Did that acknowledgment, in your opinion, affect how

11   you were able to negotiate and litigate with Commercial

12   Factors?

13   A.      Absolutely.

14   Q.      How so?

15   A.      Well, had I been in Commercial Factors' position,

16   reading the correspondence that went back and forth between

17   them, I would have been pretty convinced that Rudolph Terry was

18   acting on behalf of Terry Manufacturing Company, was speaking

19   as its vice-president, and had the authority of Terry

20   Manufacturing Company to make the commitments that he was

21   making.

22   Q.      What particular - let me ask you this question, Mr.

23   DeLong. Are those indeed the positions that Commercial Factors

24   continued to take throughout the course of the litigation?

25   A.      Oh, yes.

DeLong - Direct                          559

1    Q.      And not to jump ahead of the story too much, I want to

2    go to the motion for summary judgment, and this may be a good

3    time.  Was there a time in the Commercial Factors case that you

4    raised the *ultra vires* defenses on behalf of Terry

5    Manufacturing as to Rudolph Terry?

6    A.      Yes.  I raised them specifically in the motion for

7    summary judgment that I filed immediately upon the close of

8    discovery, not on the eve of trial as Mr. Beltran suggested

9    yesterday which, once again, is another example of the fact

10   that he has no familiarity with the file.

11   Q.      Was trial ever scheduled in this case, Mr. DeLong?

12   A.      No.

13   Q.      Well, not to jump ahead, but as to judge – did you

14   have a number of interactions with Judge Winegarden who was

15   presiding over the Commercial Factors case?

16   A.      Oh, yes.  There were many, many motions.  I think in

17   my earlier testimony I said that we were up there constantly.

18   Virtually everything we had to do, one side or the other

19   objected to it or opposed it.

20   Q.      When Judge Winegarden ruled on the motion for summary

21   judgment, did he, or clerks, or anybody give you an indication

22   that the judge was somehow punishing Commercial Factors –

23   excuse me – punishing Terry Manufacturing for waiting too late

24   to file a motion for summary judgment?

25   A.      No, no.  The judge said, you know, this --

DeLong - Direct                                          560

1        MR. BARRIERE: Objection, Your Honor.  It is hearsay

2   testimony, it seems to me.

3        THE COURT: Overruled.

4   A.       The judge said this is interesting.  He said,

5   "Typically when I have these kinds of motions with businesses

6   like this, what I am dealing with is the owners of the business

7   are trying to get out and leave the company in."

8            I said, "Well, Judge, the reason we are doing it

9   differently is because that's not the fact here."

10           And he said, "Well, I have heard a lot of evidence

11  going on all of this time.  I am going to let the jury decide

12  what to do with this case."

13  Q.       All right.  Was there any doubt in your mind that the

14  judge denied summary judgment?

15  A.       Oh, no, the judge denied summary judgment from the

16  bench.

17  Q.       I want to go back.  You had mentioned a few factors

18  that – well, when you filed the motion for summary judgment,

19  again to follow-up with something that Mr. Beltran inferred,

20  when you filed –

21  A.       Charles, I am having a hard time hearing you.

22  Q.       I am sorry.  When you filed the motion for summary

23  judgment, just to follow-up with something that Mr. Beltran

24  inferred, when you filed the motion for summary judgment, did

25  Commercial Factors just respond or did they actually oppose the

DeLong - Direct                                    561

1    motion for summary judgment?

2    A.      They were at least as aggressive opposing the motion

3    for summary judgment as they were in everything else that they

4    did in the case. Commercial Factors and its lawyers believed

5    that the source of the money was Terry Manufacturing Company

6    and they weren't about to let Terry Manufacturing out of the

7    case.

8    Q.      And those factors that you described that perhaps

9    Rudolph Terry set in motion before you became involved in the

10   case, did Commercial Factors point to that evidence in opposing

11   the motion for summary judgment?

12   A.      They pointed to that constantly throughout the thing.

13   You know, here we are, that was – you know, they would just

14   ratchet up the pressure constantly.  It started off as a

15   collection case and then interest was added, then stubborn

16   litigiousness was added and bad faith, and what they kept

17   coming back to as part of their basis every time they stepped

18   it up was the negotiations that had gone on between Ron Barab

19   and Matt Coles and Rudolph Terry in the couple of months before

20   Rudolph brought the case to Jerry and me.

21   Q.      And Ron Barab, who is that?

22   A.      Ron was one of – the name of the law firm passes

23   through my head, one of the lawyers for Commercial Factors.  He

24   and Matt Coles are partners in that firm.

25   Q.      Smith Gambrell?

DeLong - Direct                                              562

1    A.        Smith Gambrell, yes.

2    Q.        You mentioned Jerry Thomas.  Was Jerry Thomas a member

3    of your law firm?

4    A.        No.

5    Q.        What did Jerry do in this litigation?

6    A.        Probably a lot more than he intended to when we got

7    into it.  He attended every deposition.  I did, as the lead

8    lawyer, I asked questions; Jerry would feed questions to me,

9    would take notes.  We would consult in breaks in the

10   depositions.  He did the same thing in hearings.  When it came

11   to brief writing, Jerry's favorite comment to me is there is no

12   good writing, there is only good editing, and he took the

13   responsibility of editing all of the briefs.

14   Q.        How much did Mr. Thomas get paid as a percentage for

15   his work in the Commercial Factors case?

16   A.        Our agreement was that his time would not be billed

17   separately generally, that he would take thirty-five percent of

18   the fee and that, if he determined that the work that he was

19   doing exceeded that amount of the fee, that he would have the

20   right to have specific time included in the bills.

21   Q.        Did he indeed include specific time in the bills?

22   A.        Yes.

23   Q.        As a percentage or was it a significant amount of

24   time?

25   A.        Probably not, not given that we had eighteen or

DeLong - Direct                                    563

1    nineteen hundred hours in the case, it wouldn't have been

2    significant.  I think, if you were to consider what percentage

3    of the overall fee that Jerry took, it would be thirty-six,

4    thirty-seven percent; whereas our original agreement had called

5    for thirty-five percent.  So it didn't vary that much.

6    Q.    But the other percentage came in when he billed

7    separately pursuant to the agreement with your clients?

8    A.    Yes.

9    Q.    And did the clients know about this arrangement at the

10   beginning?

11   A.    Yes.

12   Q.    Both Rudolph and Roy Terry?

13   A.    Both Rudolph and Roy.

14   Q.    Do you believe that Mr. Thomas did at least thirty-

15   five percent of the actual legal work in this case based on

16   your observation of him through this three and a half years?

17   A.    Yeah.  Yeah, Jerry clearly earned his keep.

18   Q.    Mr. DeLong, if I could ask you to turn in the

19   exhibits, I would just like to run through these and identify

20   them fairly quickly.  They are in the white notebook.

21   A.    Okay.

22   Q.    We did not plan that but it worked out nicely.  Mr.

23   DeLong, if you would take a look at Exhibit 1, what is this?

24   A.    Well, I am looking at the index and it identifies it

25   as the complaint and the verified suit on open account.  That

DeLong - Direct                                          564

1    is what got the litigation started.

2    Q.      This was the complaint for three-point-three million

3    dollars, plus attorney's fees?

4    A.      Yes.

5    Q.      Would you flip over to Exhibit No. 7.

6    A.      That's the initial answer and counterclaim that I

7    filed.

8    Q.      If you would flip to Exhibit No. 9.

9    A.      That's the first amendment to the answer that I filed.

10   Q.      What was the effect of that amendment as to Terry

11   Manufacturing?

12   A.      Well, Pouncey was the reason that we were in Gwinnett

13   County because that is where he and his company, Floodgates,

14   were both domiciled.   The makeup of a potential jury in

15   Gwinnett County is much less favorable to an African-American

16   company than Fulton County which is the county that Atlanta is

17   in.   So when Pouncey moved or filed a petition in bankruptcy,

18   my understanding of the law is that, when you have what I will

19   call secondary jurisdiction over a company that is not actually

20   domiciled in the county, that if the entity that creates the

21   primary jurisdiction is no longer in the case, then you have

22   the right to move.

23          So I filed a petition with the court to change venue

24   and get us back to Fulton County where I thought Terry

25   Manufacturing Company would get a much fairer shake.

DeLong - Direct                          565

1    Q.       Did the case ever end up being transferred to Fulton

2    County?

3    A.       No, because Commercial Factors' lawyers and Pouncey's

4    lawyer agreed that the litigation, rather than going on in the

5    bankruptcy court, would go on in Gwinnett County and the

6    bankruptcy judge would just abide by whatever the holdings were

7    in Gwinnett County.  So the stay was lifted and the case came

8    right back.

9    Q.       This was after Mr. Pouncey had filed for bankruptcy?

10   A.       Yeah.

11   Q.       Let me ask you to turn to Exhibit No. 10.  What is

12   this?

13   A.       Well, this is a second amendment to answer.

14   Q.       What was the effect of this amendment as to Terry

15   Manufacturing?

16   A.       Well, by that time, I had identified another hundred

17   and ninety-three thousand dollars that had somehow been paid

18   over to Commercial Factors that hadn't showed up initially.  So

19   I just amended this because the Terrys had authorized me on

20   behalf of the company to admit that the company owed the two

21   million, hundred and thirty thousand dollars.  I found this

22   other hundred and ninety-three thousand and amended the

23   complaint – I mean, amended the answer to at least account for

24   that and reduce the amount that the company owed.

25   Q.       Did you begin discovery in the Commercial Factors

DeLong - Direct                                      566

1    case?

2    A.        Yes.

3    Q.        How did that start?

4    A.        Well, it was very difficult because the Commercial

5    Factors people wanted to turn up the heat but they were not

6    willing to do anything to allow us to get to what the real

7    numbers were.

8    Q.        When you say would not allow you to do anything, can

9    you give us an example of that?

10   A.        Yeah.  They moved for protective orders, they tried –

11   Q.        As to what?

12   A.        Well, I wanted to get records of their dealings with

13   Terry Manufacturing Company with Commercial – oh, what was the

14   name of the company – with Floodgates to see exactly how all of

15   this laid out and what was generated and they did everything

16   they could to block it.  I finally was able to depose the

17   president and the chief financial officer of Commercial

18   Factors.  They finally produced books, and books, and books of

19   ledgers and it became clear that, if Terry owed anything, it

20   was even less than what I had been told.  Well, it was less

21   than two million dollars.

22   Q.        Did you direct any discovery to Jon Pouncey?

23   A.        Yeah, and I am not sure when that was, but Pouncey was

24   all over the board, I think I mentioned.  He gave a 2004

25   testimony where he said –

DeLong - Direct                                                         567

1    Q.       Let me back up and try to keep us on track here.  But

2    in terms of discovery that was addressed to Jon Pouncey, what

3    was  his  response  to  receiving  discovery?   Did  he  file

4    bankruptcy?

5    A.       Yeah, yeah.  Okay.  Yes.

6    Q.       How did that come about?

7    A.       How did —

8    Q.       Not bankruptcy but was it your understanding that Jon

9    Pouncey filed bankruptcy in response to efforts to get him to

10   produce documents and do discovery?

11   A.       Yeah, and I guess why my answer to that wasn't so good

12   was because it wasn't — the initial discovery that went to

13   Pouncey  that  I  think  caused  him  to  file  bankruptcy  was

14   discovery that Commercial Factors served on him.  They served

15   discovery on him; he moved for a protective order.  The court

16   said no go, you have got to produce this stuff, and the next

17   thing I knew he had filed a bankruptcy petition.

18   Q.       Was it within that bankruptcy petition that he gave

19   the 2004 we have heard so much about?

20   A.       Yeah.

21   Q.       Going  back  to  the  deposition  of  the  plaintiff's

22   officers, plaintiff, Commercial Factors, did you learn anything

23   from those depositions relating to the invoices that they

24   claimed Terry Manufacturing owed?

25   A.       Well, one thing that I learned was that it wasn't

DeLong - Direct                                    568

1    nearly the amount that they were claiming.

2    Q.      Is that what you mentioned a few minutes ago?

3    A.      Yeah.

4    Q.      After learning that the amount of invoices might be

5    less than you were originally — I better ask that question to

6    make sure.  Was the amount of invoices you learned Terry

7    Manufacturing might be responsible for less than what you

8    thought it was to begin with?

9    A.      Oh, yeah.  I was told by the Terrys initially that the

10   company owed approximately two-point-one million dollars or

11   Rudolph said that he had been trying to tie Smith Gambrell down

12   to a specific amount, had not been able to.  So my initial

13   understanding was that this is your basic collection kind of

14   case and my job is to go in and get it sorted out and figure

15   out what is actually owed and work out an arrangement to pay

16   it.

17   Q.      After learning some information about the size or the

18   number of the invoices or perhaps the amount of the invoices,

19   was  Commercial  Factors  willing  to  negotiate  with  Terry

20   Manufacturing on any more reasonable terms?

21   A.      No.

22   Q.      What did they do at that time?

23   A.      I am sorry.

24   Q.      Did they begin to notice the depositions of Terry

25   Manufacturing's company?

DeLong - Direct                                         569

1    A.      Oh, yeah.  It was always, if we increase the pressure

2    or put enough pressure on Terry Manufacturing Company, it is

3    going to crack and it is going to pay us.  So they started out

4    sending out notices for banks, for some of Terry's principal

5    suppliers, for some of Terry's principal customers.

6    Q.      Was this the McDonald's, the Perseco, Bank of America,

7    the Alabama banks you discussed on Tuesday?

8    A.      Yeah.

9    Q.      All right.  What did you do on behalf of Terry

10   Manufacturing in response to those notices or those attempts to

11   take depositions?

12   A.      Well, I moved for a protective order because, from

13   what I could tell at that point, it just didn't have anything

14   to do with the lawsuit that these people had filed.

15   Q.      What was the result of your motion for protective

16   order?

17   A.      Well, the judge stopped them from going to McDonald's

18   and from going to Perseco and from going to the banks over in

19   Alabama.

20   Q.      So did the judge, then, agree with your argument that

21   going to these institutions was outside the scope of the

22   current pending litigation?

23   A.      Apparently so.

24   Q.      Go ahead.  After the judge actually entered the

25   protective order that you filed on behalf of Terry

DeLong - Direct                                          570

1    Manufacturing, what did Commercial Factors do at that point

2    related to these type of –

3    A.        Well, they began to conduct what they called informal

4    discovery .  They called McDonald's and began to inquire about

5    who would know about what had been sold to McDonald's during

6    this period of time that we are talking about.  And that really

7    upset the apple cart, as you can imagine.

8    Q.        What was your understanding of what they were trying

9    to do by going to those entities in informal discovery?

10   A.        They were just trying to get Terry Manufacturing

11   Company to pay as much money as they could figure out how to

12   squeeze out of them.

13   Q.        Was there a fear expressed to you by Rudolph or Roy

14   Terry that going to these large customers was going to affect

15   the business?

16   A.        Yes.

17   Q.        In your own mind, at the time, did you think that was

18   a reasonable fear?

19   A.        Yeah, I did, I did.

20   Q.        And why?

21   A.        Because the business, it appeared to me to be a good

22   strong business, that is, Terry Manufacturing Company, and I

23   think I mentioned this the other day.  Terry Manufacturing

24   Company, as I understood it, was the only African-American

25   owned supplier to McDonald's and Burger King and some of these

DeLong - Direct                                             571

1    other companies and McDonald's is very much a by the numbers

2    kind of company and, if McDonald's got it in its mind that

3    there was something askance about one of its providers, there

4    is a pretty good chance, it appears to me, that that provider

5    would no longer be a provider to McDonald's.  So, yeah, there

6    was a significant risk to the company at that point.

7    Q.      Let me ask you to turn to Exhibit 2 if I can.  Can you

8    tell us what this is?

9    A.      This is the amended complaint that Commercial Factors

10   filed alleging conspiracy to defraud and it contended that

11   Terry Manufacturing, Inc., Floodgates, Limited, and Jon Pouncey

12   conspired to defraud Commercial Factors.  It added a count for

13   fraud and deceit when it contended that those three defendants

14   defrauded Commercial Factors.  It added another count for

15   conversion when it contended that those three defendants

16   converted the property of Commercial Factors.  And it added a

17   claim for punitive damages.

18   Q.      These were basically tort general damage claims?

19   A.      Yes.

20           MR. BARRIERE: Excuse me, Your Honor.  Given the

21   court's rather clear admonition that we are not going to be

22   retrying the Commercial Factors case, I arise to question the

23   relevance of this continuing line of questioning.

24           THE COURT: Well, here is the thing, is you have

25   alleged, I guess, malpractice, and so I'm going to give him

DeLong - Direct                              572

1    some leeway to testify as to what he did in his effort to prove

2    that he, you know, did not commit malpractice.  So I think they

3    are entitled to some leeway to testify as to what Mr. DeLong

4    did.  Overruled.

5              MR. BRIDGERS: We will do our best to move through the

6    material, Your Honor.

7    BY MR. BRIDGERS:

8    Q.    Mr. DeLong, did you believe at the time that this

9    amended complaint changed the level of risk to Terry

10   Manufacturing of this case?

11   A.    Oh, yeah.

12   Q.    Up or down?

13   A.    Worse case under the contract theory, the initial

14   theory, was that Terry Manufacturing owed three million

15   dollars, and I wasn't concerned about that because a million

16   dollars of that was invoices that Commercial Factors had never

17   actually purchased.  It had acquired them because Pouncey had

18   apparently delivered them to it but, you know, they never paid

19   for them.  So I wasn't too concerned about that last million,

20   although it was still hanging out there, but when you get into

21   tort claims, it is an altogether different kind of thing

22   because now you are dealing with what the jury thinks is

23   appropriate under the circumstances when you talk about

24   punitive damages.

25              It could have been dramatically more money if the

DeLong - Direct                                    573

1    kinds of things that Commercial Factors was alleging could have

2    been proved.

3    Q.      Let me ask you to turn to Exhibit 4 and tell us what

4    that is, as well?

5    A.      This is titled, "Plaintiff's Second Amended

6    Complaint."  It adds a count ten; it alleges bad-faith and,

7    under Georgia law, bad-faith opens the door to a further award

8    of damages if it can be proved.

9    Q.      Let me ask you to turn to Exhibit 8.  What is that?

10   A.      Eight?

11   Q.      Eight, yes.

12   A.      Let's see.  This is an amendment to the answer that I

13   filed and what this reflects is that I had begun to find out

14   that some of the information that I had thought was accurate at

15   the time that I filed my first answer wasn't accurate.  So I

16   went back and amended trying to correct that based on what I

17   knew then, and then I added a sixth defense that just said that

18   anything not specifically admitted is denied and –

19   Q.      Did you add a stubborn litigious claim against

20   Commercial Factors?

21   A.      I'm not sure whether that was – at some point I did.

22   I am not sure whether that is in this or not but, yes, I did do

23   that.

24   Q.      Page three of the counterclaim, perhaps.

25   A.      Yeah, that seems to be right.

DeLong - Direct                                           574

1    Q.       Well, we can move on.  At some point you filed a

2    stubborn litigious claim.

3    A.       Yes.

4    Q.       What would that give Terry Manufacturing the ability

5    to  do  under  Georgia  law?   What  would  that  give  Terry

6    Manufacturing the ability to do under Georgia law as to –

7    A.       Well, hopefully it would give it the ability to fight

8    back and give us the ability to do some broader discovery.

9    Q.       Would it also allow Terry Manufacturing to perhaps

10   recover their legal fees?

11   A.       Yes.

12   Q.       I would like to run through, at some point did you

13   understand  that  Commercial  Factors  was  going  to,  or  was

14   threatening to add fraud claims against Terry Manufacturing?

15   A.       Yes.  I can't tell you exactly when but within the

16   first few months Matt Coles, in not just one discussion but in

17   several  discussions  that  we  had,  kept  suggesting  that  he

18   thought that there was fraud in the case and said that he was

19   inclined to amend his complaint to allege fraud.

20   Q.       And on Tuesday you testified somewhat about the

21   conversation you had with Rudolph Terry about the potential of

22   conflict of interest.  Do you recall that?

23   A.       Yeah.

24   Q.       Can you give us just maybe a brief recap of that to

25   make sure you covered the conversation?

DeLong - Direct                                                575

1   A.      Well, I went to Rudolph and I said they are alleging

2   fraud and they are pointing at you as the perpetrator of the

3   fraud, if you will, and if they do that, there is a clear

4   potential for a conflict to arise and we need to focus on that

5   and we need to deal with it.

6   Q.      Did you suggest it might be appropriate to have a

7   separate counsel?

8   A.      Yes.  I'm trying not to repeat myself but, yeah, I

9   said all of those things.  I told him that we needed – he

10  needed to talk to his brother; he needed to consult a lawyer

11  other than Jerry or me to get his opinion; and that they needed

12  to take a hard look at whether or not it was appropriate to

13  bring in another lawyer to represent Rudolph.

14  Q.      Did you eventually have a conference with both

15  Rudolph, Roy and yourself?

16  A.      Yes.  Within a few days, and I can't be any more

17  specific, I had a conference call with Roy in Alabama and

18  Rudolph and me and, I believe, Jerry Thomas was a part of that

19  but I'm not sure.

20  Q.      Did you cover the same material in that conversation?

21  A.      Yeah.

22  Q.      In your mind did the Terrys waive any possibility of

23  a conflict on behalf of Terry Manufacturing and Rudolph Terry

24  and ask you to continue?

25  A.      They made it clear to me that they had no intention of

DeLong - Direct                                              576

1   bringing in other lawyers, that they wanted Jerry and me to

2   defend both the company and Rudolph if it became necessary and

3   that they weren't going to do anything different.

4   Q.       And did you have any similar conversations with

5   Rudolph and Roy Terry after the actual amendment was filed

6   adding the fraud type claims?

7   A.       Yeah, I had that same conversation at least three or

8   four times and I had other versions of it periodically, you

9   know, just scattered throughout this.

10  Q.       Let me ask you to turn to Exhibit No. 5, just to go

11  ahead and identify it.  We have heard about it five times now.

12  A.       Yeah, this is after Commercial Factors had amended its

13  complaint to allege fraud and conspiracy to defraud, it then

14  sought permission to add Rudolph Terry as an additional

15  defendant.

16  Q.       And that was eventually granted?

17  A.       Yes.

18  Q.       Did you file any motions in response to this last

19  amendment?  Did you file a motion for a more definite

20  statement?

21  A.       Oh, yeah, I sure did.  Their allegations were real

22  loosey-goosey and in Georgia you have to plead fraud with

23  specificity.

24  Q.       What value, if any, did you expect the company would

25  derive from filing that motion?

DeLong - Direct                                577

1    A.       Say it again.

2    Q.       What value, if any, did you expect the company would

3    derive from filing that motion for a more definite statement?

4    A.       Well, in order to adequately defend a fraud claim on

5    behalf of the company, I had to know what the fraud claim was

6    all about and what the plaintiff was really contending and, in

7    order to do that, I needed to know specifically what it was

8    alleging and what the facts underlying those allegations were.

9    Q.       Let me ask you to turn to Exhibit No. 3, please, and

10   tell us what that is.

11   A.       This is the revised amended complaint.  This is what

12   Commercial Factors came back with after I pointed out to the

13   court that their initial pleadings concerning fraud were

14   woefully inadequate.  And I have to say they were very clever

15   in their drafting.  They just used a whole lot more words to

16   say basically the same thing, but everything was lumped

17   together in one thing.  It said defendants, Terry

18   Manufacturing, Floodgates, Limited, Jon L. Pouncey and Rudolph

19   Terry, but they never identified anything that any particular

20   defendant did.  It was always defendants did everything.  So

21   that there was, I guess, a continuity of allegations.

22   Everything was the same.

23   Q.       Did the continuity of allegations have any impact on

24   what you were doing?

25   A.       Yeah.  It meant that they were making exactly the same

DeLong - Direct                                          578

1   claims against Terry Manufacturing as they were against Rudolph

2   Terry so that it was all the same.  There was no difference or

3   distinction at all.  There was nothing to separate out and

4   treat any differently.

5   Q.       Did that continuity have a bearing on your analysis of

6   the possibility of a conflict of interest?

7   A.       Yeah, it did.  I still saw that there was the distinct

8   possibility of a conflict but, unless they were alleging, you

9   know, different acts by different doers or something that

10  showed some distinction, I personally didn't think that we

11  definitely had a conflict at this point.

12  Q.       Now that we have covered the pleadings, were there

13  also settlement discussions going on during this early part of

14  the Commercial Factors case?

15  A.       Well, as I said, what I was hired to do was to try to

16  get the case resolved but, yeah, we had numerous settlement

17  discussions.  I basically picked up where Rudolph Terry left

18  off and tried to negotiate a settlement.

19  Q.       Were there any conditions that Terry Manufacturing put

20  on the settlement?

21  A.       Yeah.  The conditions that Terry put on the settlement

22  were that we identify the real number, whatever that meant.

23  They said it was three million, it was possibly two point one.

24  By that point, or, well, by some point I had done enough

25  discovery to know that it was less than two million, giving

DeLong - Direct                                    579

1   Commercial Factors the benefit of every doubt.  So we had to

2   come to a real number and Commercial Factors wanted – I am

3   sorry – Terry Manufacturing wanted a complete release.

4   Q.      When you say real number, two million, three million,

5   whatever, when you say real number, was it still your

6   perception at the time that Terry Manufacturing had a defense

7   to the entire amount of money?

8   A.      Well, I ultimately realized that Terry Manufacturing

9   had a defense.  When I say ultimately, I don't mean way down

10  the line.  After a few months into it, I had finally gained

11  enough information that I had some serious questions whether

12  Terry Manufacturing owed anything.  And I went back at that

13  point and amended the answer and withdrew the provision where

14  I had formerly acknowledged that Terry owed two-point-one

15  million dollars and denied that Terry owed anything.

16          THE COURT: What – I am sorry.  I just have to do this

17  You have practiced law for a long time and you have tried a lot

18  of cases.  What do you think that did to your credibility as a

19  lawyer with that court when you did that?  I mean, to say we

20  owe two million and then come back and say we don't owe a dime?

21          THE WITNESS: Judge Winegarden is a very experienced

22  trial judge.  I don't think that had any impact on my

23  credibility.  He is real good in --

24          THE COURT: I don't mean you personally but I mean --

25

DeLong - Direct                    580

1          THE WITNESS: Well, the credibility in the case.  He

2     had seen enough stuff, he had seen enough motions and just the

3     wrangling going back and forth, that he knew this wasn't the

4     simple matter that the initial pleadings had suggested that it

5     was and, as I said, he is pretty good about giving lawyers the

6     latitude they need to try their cases and, when he has rule, he

7     makes a ruling.  I have always enjoyed trying cases in front of

8     him.

9          THE COURT: Thank you.  I'm sorry.

10          MR. BRIDGERS: Yes, Your Honor.

11     BY MR. BRIDGERS:

12     Q.    Mr. DeLong, if you thought there were serious

13     questions about whether or not Terry owed any money, why did

14     you continue with settlement discussions?

15     A.    Well, by that point, I wasn't having settlement

16     discussions anymore.  You know, it has been a number of years

17     ago and I am sure I don't have the chronology altogether.

18     There was one point when we had a hearing before the judge and,

19     in the middle of the hearing, the judge stopped it and convened

20     a settlement conference and at that settlement conference we

21     talked about what might be owed and what might be done.  And

22     the judge said, well, you need to sweeten the pot a little bit,

23     and that's how we came up with the two-point-one million

24     dollars, and I thought that the judge had actually brokered the

25     settlement.  But that was something that he convened and he

DeLong - Direct                                                581

1    orchestrated.

2            I have been doing this for long enough that I know

3    when the judge says, "We are going to sit down around the table

4    and talk about settlement," I'm not going to say, "No, judge,

5    we ain't doing that."

6    Q.      In this early stage of the case, early to mid-stage of

7    the case, was it your legal judgment that Terry Manufacturing

8    had real potential for exposure for a verdict against it?

9    A.      Yes.  There were so many statements made about what

10   had happened.  There was the negotiations that Rudolph had

11   entered into, you know, for the weeks before I got into the

12   case.  There were all kinds of things that I thought put Terry

13   Manufacturing Company severely at risk to get hit hard.

14   Q.      And is part of that reasoning – well, did you consider

15   the Terry's efforts to settle the case in the two million

16   dollar range to be reasonable under the circumstances?

17   A.      Yeah, I guess so, because initially I was told that

18   Terry owed the money.  So, you know, if you owe the money, then

19   you try to settle it.  You obviously try not to pay any more

20   than you have to but you don't want to go out and litigate

21   where you actually owe the money because a court generally is

22   not going to tolerate that sort of thing, and you're going to

23   run up attorney's fees and other kinds of expenses.  It just

24   doesn't make sense.

25   Q.      Did Commercial Factors' settlement demand go down as

DeLong - Direct                                          582

1    time went on?

2    A.      No.

3    Q.      What did it do?

4    A.      It kept going up. When we had negotiated the

5    settlement that I thought we had negotiated that Judge

6    Winegarden had presided over and Commercial Factors rejected

7    it, we filed a motion to enforce the settlement.

8    Q.      Is that Exhibit 12?

9    A.      Say it again.

10   Q.      Is that Exhibit 12?

11   A.      Yes.

12   Q.      I am sorry. Go ahead.

13   A.      We went up and had a hearing on that. Matt Coles'

14   position was that, if we wanted to settle this case, he needed

15   a three million dollar check. So the case was not settled and

16   it was – this is a little bit of an aside but, as it turns out,

17   the day that we left the courthouse after I thought that Judge

18   Winegarden had negotiated a settlement for us, Commercial

19   Factors filed an amended complaint alleging fraud.

20   Q.      Now you said his demand at that point was three

21   million?

22   A.      Yes.

23   Q.      And at some point that went as high as four million?

24   A.      Yeah.

25   Q.      That settlement eventually fell through?

DeLong - Direct                               583

1    A.        Yes.  At that point or when Commercial Factors reneged

2    on the settlement agreement that the judge had negotiated, it

3    became clear to me that we were in for a real fight.

4    Q.        Would you turn to Exhibit No. 13, please, and tell us

5    what that is and why it had value to the company?

6    A.        This was one of the protective orders, motion for

7    protective order that I filed.  Let me get over here and see if

8    I can see what this particular one pertains to.  (Pause)

9    Q.        Perhaps page seven.

10   A.        Yeah, this one – well, what it says here:

11             "Additionally Terry moves the court to enter a

12             protective order providing as follows:  Additional

13             discovery may not be had without the prior approval of

14             the court provided, however, there will be no

15             additional discovery so long as Terry complies with

16             the agreed payment schedule.  Plaintiff and its

17             representatives may not share information or opinion

18             concerning Terry Manufacturing of the subject dispute

19             with any third party.  The defendant Terry be awarded

20             an amount of attorney's fees."

21   Q.        Was part of your purpose here to get the Commercial

22   Factors tactics in front of the court?

23   A.        Yeah.  Yeah, I wanted to do that and, in looking at

24   this, this appears to be the one that was filed during the time

25   that we were dealing with whether the judge was going to

DeLong - Direct                                                584

1    enforce the settlement or not, and Commercial Factors was out

2    messing in Terry Manufacturing's business in the informal kind

3    of way that we have talked about.

4    Q.      I think this is the last actual pleading but can you

5    turn to Exhibit 6 and tell us what this amended complaint did?

6    A.      This is Plaintiff's amended complaint and it adds a

7    count eleven.

8    Q.      Is this the RICO count?

9    A.      This was their RICO count and they alleged, as the

10   predicate acts, their – the prior things that they had been

11   alleging.  So this was sort of the final ratcheting up of the

12   case.

13   Q.      At this point what was your understanding as an

14   attorney as to what the possible exposure to Terry

15   Manufacturing could be with the RICO claim in place?

16   A.      Well, under Georgia's RICO statute, the plaintiff can

17   prove its damages and then those damages are trebled, and it

18   can be awarded attorney's fees on top of that.  So if you gave

19   any credibility to Commercial Factors' position in the case,

20   then Terry could have really gotten whacked.

21   Q.      Was the initial risk to Terry Manufacturing a factor

22   in how you went forward to litigate the Commercial Factors

23   case?

24   A.      Sure.

25   Q.      Was the potential risk to Terry Manufacturing a factor

DeLong - Direct                                    585

1    in some of the settlement discussions that occurred perhaps

2    after this RICO claim was filed?

3    A.      Yeah.

4    Q.      How did the defenses in the RICO claim compare to the

5    defenses that you would have had to have made for Terry

6    Manufacturing only?

7    A.      They really weren't any different.  This was basically

8    coming at the same issue from multiple directions.  They kept

9    alleging the same thing.  They never really segregated out

10   anything.  They just would add another count that they thought

11   might give them more leverage.

12   Q.      Let's turn our attention back, if we are finished with

13   that, let's turn our attention back to Jon Pouncey.  You had

14   mentioned the 2004 deposition he had given in bankruptcy.

15   A.      Yeah.

16   Q.      Generally what was the effect of that deposition on

17   Terry Manufacturing and Rudolph Terry; what was the effect on

18   their claims against them?

19   A.      Well, Pouncey appeared and testified and basically

20   allowed Matt Coles to testify for him and Pouncey just agreed

21   with everything that Matt asked him.  And then Matt came along

22   and wanted to introduce the 2004 transcript –

23   Q.      Would that have been harmful – in your opinion, would

24   that have been harmful to  Terry Manufacturing?

25   A.      Oh, absolutely.

DeLong - Direct                                              586

1    Q.        And what did you do in response to that attempt to use

2    the 2004 deposition?

3    A.        I moved to block the introduction of the 2004

4    deposition.  The court agreed with me and told Commercial

5    Factors that, if it wanted Pouncey's deposition in the case, it

6    needed to go and take Pouncey's deposition.

7    Q.        And is that the motion to exclude in Exhibit No. 11?

8    A.        Yes.

9    Q.        Was Pouncey eventually deposed by Commercial Factors?

10   A.        Yes.

11   Q.        And what was generally the import of his testimony?

12   A.        Well, the same thing, a little different.  This time

13   he said that Tracy Eden had been aware of everything that had

14   been done in connection with these invoices.

15   Q.        And Tracy Eden is?

16   A.        Is the president of Commercial Factors.

17   Q.        Was this a significant difference in the testimony

18   that Mr. Pouncey gave in the 2004 deposition?

19   A.        Well, I really don't know the answer to that because

20   Matt Coles, who was representing Commercial Factors in the 2004

21   deposition, as well, took the position that, since Terry

22   Manufacturing was not a party to the bankruptcy, that nobody on

23   behalf of Terry Manufacturing could ask questions.  And so I

24   don't know what Pouncey would have said had we had the

25   opportunity to cross-examine him.

DeLong - Direct                                    587

1    Q.        Well, let me go back.  I guess not what could have

2    happened but what did happen.  Did Pouncey, in his 2004

3    deposition, did he state that Commercial Factors had knowledge

4    of some of these invoices?

5    A.        No, not in his 2004 at all.

6    Q.        But he did state so in his deposition?

7    A.        Yeah.

8    Q.        And that deposition came about partially because of

9    your motion to exclude the transcripts?

10   A.        Yeah.  Well, it was solely because of my motion to

11   exclude the 2004 transcript.

12   Q.        And do you believe that put Terry Manufacturing in a

13   better position to defend itself after these admissions that

14   Commercial Factors might have known something about the

15   underlying scheme came to light?

16   A.        Yes.

17   Q.        Why?

18   A.        Well, if the 2004 testimony had gone into evidence in

19   the Gwinnett County litigation unchallenged, then Commercial

20   Factors had substantially made out its case.  The only link

21   left was to connect what Pouncey was saying about Rudolph Terry

22   to the company.  And my concern was, going back to all of the

23   negotiations that had gone on early on before I got into the

24   case, that Rudolph had gone a long way toward taking care of

25   that himself.

```
                          DeLong - Direct                    588
```

1    Q.       Let me ask you to turn to Exhibit 31 if I could.

2    A.       Okay.

3    Q.       What was the significance to Terry Manufacturing of

4    this affidavit?

5            MR. BARRIERE: Judge, we have already had this document

6    excluded from evidence.  It strikes me that we are going in

7    through the back door.

8            MR. BRIDGERS: Your Honor, I am sorry.  My

9    understanding was 31 was okay because it was what was filed,

10   and 32 was what had been excluded.

11           THE COURT: No, 31 and 32 are excluded.

12           MR. BRIDGERS: Pardon me.  I thought it was either/or.

13   I thought it was one or the other.

14           THE COURT: No, it was the other one – here, just a

15   minute.  29, you have got the opportunity to authenticate and

16   get in, but 31 and 32 are excluded.

17           MR. BRIDGERS: Pardon me, Your Honor.  I thought it was

18   just the one.

19   BY MR. BRIDGERS:

20   Q.       Mr. DeLong, did you obtain an affidavit from Mr.

21   Pouncey?

22   A.       Yes, I did.

23   Q.       And what was the effect of that as to Terry

24   Manufacturing, not referencing at all the exhibit?

25   A.       What was the effect of Terry Manufacturing?  It gave

DeLong - Direct                                          589

1    me – well, it confirmed what I had been told for a good while

2    later on in the litigation, which was that Tracy Eden and Jon

3    Pouncey had gotten together and had worked out some agreements,

4    and it provided me the basis to go to the court and ask the

5    court to allow me to bring a cross-claim against Jon Pouncey,

6    which I did.

7    Q.      Let me ask you to turn to Exhibit No. 14, if I could.

8    A.      Okay.

9    Q.      Is this the motion you were just referencing?

10   A.      Yes.  That's a motion that I filed to authorize a

11   cross-claim against Pouncey and to add Tracy Eden as a

12   defendant and counter-claimant.  The court approved both of

13   those and I filed them both.

14   Q.      And under Georgia law, did the court have to approve

15   this particular procedural mechanism?

16   A.      Yes.

17   Q.      Let me ask you to turn, if you could, to paragraph –

18   is Exhibit 16 the actual complaint and counterclaim you filed

19   against Tracy Eden?

20   A.      Yeah, that's the one.  That is the amended

21   counterclaim that I filed against Tracy Eden.

22   Q.      After the court approved it?

23   A.      After the court approved it.

24   Q.      And if you would turn to Exhibit 17, what is that?

25   A.      Seventeen is the cross-claim that I filed against

DeLong - Direct                                           590

1    Pouncey.

2    Q.       How could these claims, these two cross-claims,

3    counterclaims, how could they have affected the liability of

4    Terry Manufacturing in the Commercial Factors case?

5    A.       Well, these dramatically impacted Terry's liability

6    because these suggested that there really was something going

7    on between Tracy Eden and Jon Pouncey that Terry Manufacturing

8    may not have known about and, even if it did know about it,

9    then how can you have fraud when the party that contends that

10   it was defrauded was aware of the arrangements that were made

11   that is now contending are fraud.

12   Q.       Let me ask you to turn to Exhibit 19, please. What is

13   this?

14   A.       This is Jon Pouncey's answer – well, it says, yeah,

15   answer to cross claim, yeah, that he filed in response to the

16   complaint that I filed against him.

17   Q.       Did Mr. Pouncey admit any of the factual allegations

18   that Terry Manufacturing had made in its claim against him?

19   A.       He admitted all of them.

20   Q.       And how did that admission, in your mind, affect the

21   legal position of Terry Manufacturing?

22   A.       Well, I thought it helped the legal position of Terry

23   significantly.

24   Q.       Let me ask you to turn to Exhibit 23.

25   A.       23?

DeLong - Direct                          591

1    Q.      Yes, sir.

2    Q.      Okay.  As this case went on, did you continue to

3    pursue discovery on behalf of Terry Manufacturing and Rudolph

4    Terry?

5    A.      Yes.

6    Q.      And can you tell us what the significance of

7    Defendant's Exhibit No. – I said 23 but 22, if I could get you

8    to turn to Exhibit 22.  What is the significance of this

9    discovery attempt?

10   A.      Well, it turns out that Commercial Factors' principal

11   financing source was GMAC, and it became clear to me that GMAC

12   likely had some information that would be very useful in

13   determining exactly what had gone on because at this point I

14   really wasn't sure what had gone on.

15   Q.      And I misled you just a second ago.  Perhaps the best

16   thing to look at is 23.

17   A.      Okay.

18   Q.      Was this the initial request to GMAC?

19   A.      Yes.  I had served a notice of deposition on GMAC and

20   had identified fifteen categories of documents that I wanted

21   GMAC to produce.

22   Q.      What was Commercial Factors' response to your efforts

23   to get these documents from GMAC?

24   A.      You would have thought the world was coming to an end.

25   Q.      How so?

DeLong - Direct                                          592

1    A.       Well, they filed motions, they did everything they

2    could to block me.  They didn't show up at depositions.  They

3    finally – I got a letter one day from one of Commercial

4    Factors' lawyers saying we have taken it upon ourselves to go

5    through GMAC's records and the only things that are pertinent

6    are these – and I have forgotten now what it was – four or five

7    pages that were virtually, totally redacted with a line here

8    and a line there.  You know, just virtually nothing, which

9    didn't make sense to me because Tracy Eden had testified that

10   Floodgates was a relatively significant one of its accounts.

11   And there was also testimony by this point that Tracy Eden was

12   personally managing the Floodgates account.

13          So these – I don't know when this – this was January

14   of '02.  It started here.  We fought over GMAC for a year and

15   a half.   We were still fighting over GMAC when Terry

16   Manufacturing Company filed its bankruptcy petition.

17   Q.       Did you ever obtain documents from GMAC in another

18   way?

19   A.       Yes.

20   Q.       How so?

21   A.       Brian Steel was representing Rudolph Terry in the

22   criminal charges that had been brought against him by this

23   time, and Brian had entered an appearance in the civil case on

24   behalf of Rudolph Terry, and he said to me, he said, "Listen,

25   you don't understand the federal criminal process.  I can get

DeLong - Direct                                          593

1    whatever we need."  And, sure enough, he got a bunch of stuff

2    from GMAC under the federal subpoena.

3            And going through those documents, what that disclosed

4    was that Commercial Factors could not use Floodgates as a part

5    of its borrowing base with GMAC.

6    Q.      What was the significance of that?

7    A.      Well, I wasn't sure but I knew it meant something

8    because, you know, if GMAC had looked at what was going on with

9    Floodgates and said to Commercial Factors you can't use this as

10   security for the loans that we are making to you, something is

11   not right.

12   Q.      Would that have gone to Floodgates' reasonable

13   reliance on the fraud?

14   A.      Yeah, I would think so.

15   Q.      If you would, Mr. DeLong, just flip through to

16   identify — I am not going to ask you anything specifically

17   about it, but was Exhibit 20 involved in that GMAC saga?

18   A.      Yes.  After I got — do you want me to just say yes or

19   do you want me to tell you a little bit about it?

20   Q.      Well, why don't we just say yes for now.

21   A.      Okay.

22   Q.      Was 21 involved in the GMAC saga?

23   A.      Yes.

24   Q.      Was 22 involved in the GMAC saga?

25   A.      Yes.

DeLong - Direct                                    594

1    Q.        You have already testified about 24.  No, you have

2    testified about 23.  How about 24?

3    A.        Yeah, 24 was the order.  I laid out all of this stuff,

4    as best I could, with the judge and the judge told Commercial

5    Factors that it had to get out of the way and that GMAC would

6    show up and would provide the information that I wanted.  But

7    the problem was that order was entered July 16 of 2003.

8    Q.        All right.  Which was after the bankruptcy?

9    A.        Yeah.

10   Q.        All right.

11   A.        So at that point when I was finally beginning to make

12   some real progress, I was effectively shut down.

13   Q.        However, you did obtain – just to make sure we are

14   clear, you were able to obtain at least some of the documents

15   from GMAC through the alternate route?

16   A.        Yeah, right.

17   Q.        Did you file a motion for summary judgment in this

18   case?

19   A.        Yes, I did.

20   Q.        Is that reflected in Exhibit No. 25?

21   A.        That's the brief or part of the brief.  I think under

22   the broad category of brief, I think I filed two or three

23   things.

24   Q.        Is Exhibit No. 26 a part of Terry Manufacturing's

25   motion for summary judgment?

DeLong - Direct                                               595

1    A.      Yes.

2    Q.      Is Exhibit 27 a portion of Terry Manufacturing's

3    efforts in the summary judgment case?

4    A.      Yes.

5    Q.      Generally what was the basis for the summary judgment

6    motion?

7    A.      Well, they had, as I said, they had – "they" being

8    Commercial Factors, and I suppose because they didn't have any

9    specific facts that they could point to, they had always

10   alleged this unified defendants did this, defendants did that.

11   So when discovery closed and there was no specific evidence

12   linking Rudolph Terry to Terry Manufacturing Company as having

13   done anything specific that was pointed to anywhere in the

14   discovery, I filed the motion saying that even if Rudolph Terry

15   had done all of the things that were alleged, that he was not

16   acting within the scope of his employment and he was not acting

17   within the scope of his agency and that, therefore, Terry

18   Manufacturing Company was not liable.

19   Q.      Before you did this, did you have the permission of

20   Roy and Rudolph Terry to take that position?

21   A.      Yes, and Roy filed an affidavit or Roy signed an

22   affidavit, I guess I should say, that I filed as an exhibit.

23   Q.      Did Rudolph give you any instructions about the

24   summary judgment motion?

25   A.      Rudolph's general instructions were you take care of

DeLong - Direct                                              596

1    the company.

2    Q.       I believe you testified the court denied the motion

3    for summary judgment?

4    A.       Yes.

5    Q.       If you would turn to Exhibit No. 28, was this the

6    proposed order?

7    A.       Yes, this is the order and this is the only copy I

8    have.  I don't know why I don't have a signed order, but I do

9    know the judge denied it.  He denied it from the bench.

10   Q.       What value, if anything, for Terry Manufacturing did

11   you accomplish by this effort to file summary judgment?

12   A.       Well, the judge had to understand - he was going to

13   let this case go to trial, but he had to understand that there

14   was a reasonable likelihood that Terry Manufacturing was not

15   liable.  I filed the motion to get him start thinking in that

16   area and, just based on his comments, I think I accomplished

17   that.

18            I also, based on the evidence that Commercial Factors

19   had presented up to that point, I thought the motion had a

20   reasonably good chance of success just because Commercial

21   Factors was not able to come up with anything substantial to

22   contravene what we were saying.

23   Q.       Did you have a post-trial strategy in mind at this

24   stage?

25   A.       Yeah, at this point I was planning ahead trying to

DeLong - Direct                           597

1   build appeal issues so that I could get the company out because

2   I thought there was a reasonable chance that I would have to do

3   that, and I thought that the issues that were laid out in this

4   motion provided a pretty good groundwork for that.

5   Q.       You heard Mr. Beltran testify that filing a summary

6   judgment motion at this time for someone in your status was a

7   breach of the standard of care.  You heard that testimony?

8   A.       Yeah, that is what he said.

9   Q.       And would you explain why your actions in filing the

10  summary judgment motion at this time fell within the standard

11  of care imposed on Georgia attorneys?

12  A.       Well, I have been doing this a long time and I have

13  filed a lot of motions for summary judgment and I have opposed

14  a lot of motions for summary judgment.  They are a whole lot

15  easier to defeat than they are to win.  If you file one early,

16  then what happens is you have telegraphed to the other side

17  where you are going, at least with a portion of your case, and

18  you have given them the opportunity to focus their discovery on

19  that particular area and come up with at least triable

20  arguments to defeat it.

21          So in my experience what you do is you try to divert

22  them.  When you think you have a pretty good issue, you try to

23  nail that issue down without being terribly open about where

24  you're going.  And once discovery closes and the other side

25  can't come in, then you improve your chances of succeeding

DeLong - Direct                                    598

1    dramatically.

2    Q.       Is it your position that you committed negligence in

3    any way in your representation of Terry Manufacturing in this

4    matter?

5    A.       Absolutely not.

6    Q.       If I could ask you to identify Exhibit No. 30, please.

7    A.       This is the case history report out of the clerk's

8    office for the clerk of the Superior Court of Gwinnett County

9    covering this particular piece of litigation that we are

10   talking about.

11   Q.       Have you had an opportunity to flip through this

12   report?

13   A.       Yeah.

14   Q.       Does this report include everything that was done in

15   the Commercial Factors case?

16   A.       No, it doesn't include everything that was done.  It

17   only includes the things that were filed with the court.  There

18   were a lot of other things done, but it – well, it goes on for

19   nineteen pages.  So it includes a whole bunch of stuff that was

20   filed with the court.

21   Q.       Under Georgia civil practice, are all discovery filed

22   in the clerk's office?

23   A.       No.

24   Q.       Under Georgia civil practice, sometimes you would file

25   a notice of serving discovery of some sort?

1    A.      Yes.

2    Q.      All right.  Mr. DeLong, let me ask you – Mr. DeLong,

3    we have seen reference pointed to a series of boxes over here

4    on the floor.

5            MR. BRIDGERS:  Your Honor, I would just like Mr.

6    DeLong, if it is approved with the court, just to step over

7    here and say this is this, this is that, this is this.

8            THE COURT: Sure.  That is fine.

9            MR. BRIDGERS: Very well, Mr. DeLong.

10   Q.      Mr. DeLong, what are we looking at for the record?

11   A.      Well, this is the fifteen boxes that comprises the

12   file in the Commercial Factors litigation.

13   Q.      Whose file?

14   A.      My file.

15   Q.      How long is the box?

16   A.      Well, let's see.  It's about fifteen inches.

17   Q.      Can you tell us just very generally, starting from

18   here, one, two, three, four, five, what these boxes contain?

19   A.      Well, the first two boxes are pleadings and discovery.

20   Well, that is the first box.  The second box is what I call

21   points of law.

22           THE COURT: Linda, are you picking all of that up?

23   Remember we are recording your voices electronically and, as

24   you get further away from the microphone --

25           THE WITNESS: Do I need to turn that way?

DeLong - Direct                                            600

1        THE COURT: Well, let's see.  I guess you have a
2    microphone over there.  It is probably okay.  I just wanted to
3    let you know.

4        THE WITNESS: One of my practices in dealing with legal
5    issues as they arise is to do the research and bind them
6    together in separate folders.  So, for example, I am holding
7    one here that has, it looks like, eighteen cases that pertain
8    to the motion for summary judgment that I filed, and I have a
9    whole box full of stuff like that that all is basically the
10   result of the twists and turns in the approach that Commercial
11   Factors took to the litigation.  Every time an issue would be
12   raised, I would do the research that had to be done so that I
13   would know what specifically was my position under the law.
14   You can't shoot from the hip, so you have to do the work.

15   Q.      How about box number three?

16   A.        This is an early trial exhibit box.  Another thing
17   that I do is, as I am going through, I accumulate on a
18   preliminary basis all along documents that I think I may want
19   to use in the trial of the case.  And, of course, when it gets
20   down to actually trying the case, there is less to do than if
21   I had to go through like these boxes back here, which are
22   documents that I recovered from the plaintiff in the course of
23   discovery.  I have already segregated out what I think may be
24   useful.

25   Q.      Let's go on through the numbers, boxes four and five.

DeLong - Direct                                          601

1    A.        Those are both boxes of deposition transcripts.  There

2    were about, I have forgotten now, three thousand pages of

3    depositions that were taken in the case.

4    Q.        Six and seven.

5    A.        Six is – well, it is some documents that were

6    produced.  It is a lot of attorney's notes.  Seven seems to be

7    the same thing.

8    Q.        Is part of your investigation into the facts of this

9    case contained here, in six and seven?

10   A.        Sure.

11   Q.        Seven or eight?

12   A.        Let's see.  What is this?  This is more documents that

13   were obtained, and I would have to go through there

14   specifically to know whether they were documents that were

15   generated by Terry Manufacturing Company or whether they are

16   documents that were retrieved from the other side or through

17   somebody that I inquired into in the discovery process.

18   Q.        Nine and ten?

19   A.        Once again, these are the documents that we generated

20   in the course of the case.

21   Q.        Eleven?

22   A.        More documents.

23   Q.        Twelve?

24   A.        Twelve is some notebooks.  I believe it is checks.

25   Yeah, these are copies of checks that Terry Manufacturing wrote

DeLong - Direct                                          602

1    to Floodgates in the course of the case.  This is something

2    that I had Rudolph Terry pull together that was used in a

3    deposition.

4    Q.      Thirteen?

5    A.      This is a bunch of different stuff.  It is some

6    documents that we generated in the case and some of my notes

7    and various other things.  And the last two boxes are documents

8    that were provided specifically through discovery requests that

9    were directed at Commercial Factors.

10           MR. BRIDGERS:  Your Honor, pursuant to our previous

11   discussions, we would mark the file our next exhibit and

12   proffer it to the court.

13           THE COURT: Well, here is what I am going to do: At

14   some point between now and when we finish or I guess I will

15   just say before you leave, when you finish the trial, what I

16   would like you to do is gather up a collection of what you

17   think is the most helpful, relevant, persuasive, what have you.

18   I can tell you right now I am not going to read all fifteen

19   boxes of that stuff, and I don't, by accepting it into evidence

20   and then later deciding it is cumulative, I mean, I think I

21   would be leading you astray.  And then the choice would be –

22   because I would look at some of it.  Would I just pick out some

23   things at random or would it be better off for you if you pick

24   out what it is I look at?

25           So give me a box of stuff and I will look at that.

DeLong - Direct                                                603

1    And then as far as the remainder of the boxes, the fifteen or

2    so odd boxes, you can simply take them with you.  We will make

3    you a custodian of that record and, if need be, if some other

4    court at some point in time wants to look at it, you can give

5    it to them; but I'm just not going to take a fifteen box

6    litigation file into evidence here.  I mean, I will look at

7    some of it but, if you think I am going to spend a month

8    reading through all of that, it is just not going to happen.

9          So that's sort of my ruling on that and, Mr. Barriere,

10   you are certainly free to look at what box, you know, what

11   stuff he has selected if that is of any interest to you.

12         MR. BARRIERE: It may or may not be, judge.  My only

13   question was this is going to be a box of stuff that hasn't

14   been  specifically  identified  before.    I  may  well  have

15   objections.  I may have no objections.  And I am not quite

16   clear how to present those to the court because I assume, quite

17   reasonably, the court wants this exercise to occur after we

18   close out here.

19         THE COURT: Yeah.  If you think I am going to sit and

20   watch you guys pour over all of this stuff but, like I said,

21   you know, if one of you – I guess it would be you.  If you have

22   got a problem with what he is putting in his box of stuff that

23   I am willing to look at, you know, you can notice it up somehow

24   and we will have a hearing on it.  You know, if we could do it

25   telephonically, that is fine; if you want to get back together

DeLong - Direct                                              604

1    and do it in court, we can do that.  I mean, I am sure not

2    meaning to pin you down or force you to waive any right to

3    object to anything until you know specifically what he has.

4    But that is just basically how I am going to do it.  I'm just

5    not going - I am just not going to take all of that stuff and,

6    if you have got a problem with it, you can raise it later.

7              MR. BRIDGERS: Thank you, Your Honor.  I had understood

8    most of that from our earlier discussion but I just thought

9    this was the place to raise it.

10             THE COURT: Sure.

11   BY MR. BRIDGERS:

12   Q.       Mr. DeLong, you have spoken about a variety of work in

13   the Commercial Factors case.  We have also taken a look through

14   the boxes over here in the floor in front of us.  Was the work

15   done that has been reflected, that has been pointed to,

16   necessary for the defense of Terry Manufacturing in the

17   Commercial Factors matter?

18   A.       In my opinion, it certainly was.  A simple thing, had

19   I not filed an answer, a default judgment would have been

20   entered against the company.  Had I not done the other things

21   that I did, the results would not have been good.

22   Q.       You have obviously heard the testimony that Terry

23   Manufacturing paid for Rudolph Terry's defense.  Was there any

24   significant work - let me rephrase the question.  Do you

25   believe that had you worked for Terry Manufacturing only, the

DeLong - Direct                                    605

1    efforts of you and Jerry Thomas would have been different in

2    any significant way?

3    A.       No.  If you go back and look at the way Commercial

4    Factors pled its case, there was a unity of allegations.  So

5    that whatever was done, there was nothing that was segregated

6    out that pertained to Rudolph Terry.  There was nothing that

7    was segregated out that pertained to Terry Manufacturing.  It

8    was defendants did this, defendants did that, defendants,

9    defendants, defendants.

10        So everything effectively had to be done for everybody

11   and in the case of Terry Manufacturing and Rudolph Terry, it

12   was all the same stuff.  The only real difference that I can

13   think of is the motion for summary judgment that was filed

14   exclusively on behalf of the company.

15   Q.       Mr. DeLong, you have had a chance to look at your

16   bills, which are part of the Trustee's Exhibit No. 13, I

17   believe?

18   A.       Yes.

19   Q.       Do you believe the effort that is documented in those

20   bills was reasonably necessary for the defense of Terry

21   Manufacturing in the Commercial Factors case?

22   A.       Yes, it was.

23   Q.       Did you do all of the work that you billed for?

24   A.       Yes.

25   Q.       Do you have an understanding as to a reasonable fee

DeLong - Direct                                    606

1    for an attorney of like and similar experience in the state of

2    Georgia in the years 2000 to 2003?

3    A.        Well, seven years ago a large firm lawyer of my

4    experience would have charged at a much higher billing rate

5    than I did, but his overhead is also a lot higher than my

6    overhead.    The two fifty an hour that I charged was very

7    reasonable at the time and very well within the accepted

8    standards for somebody who had been practicing the length of

9    time that I had been when I started this.

10   Q.        Mr. DeLong, let me turn your attention to Exhibit No.

11   29.

12            MR. BRIDGERS:  This was one of the contested exhibits,

13   Your Honor.

14   Q.        Mr. DeLong, can you tell us what this is?

15   A.        This is the ledger that I kept during the course of

16   the representation that reflected receipts and disbursements.

17   It is my habit to keep a general ledger, or what I call a

18   general ledger.  I don't mean what an accountant would talk

19   about as a general ledger, but I just keep a record that

20   reflects receipts and disbursements in a given piece of

21   litigation that I am involved in and that is what this is.

22   Q.        Was this ledger or record put together at or about the

23   time that the entries – reflected by the entries?

24   A.        Yeah.

25   Q.        And was it made in the ordinary and normal course of

                          DeLong - Direct                    607

1    your business?

2    A.      Yes.

3    Q.      And was it consistent with your business routine for

4    a case in which you were using the trust account?

5    A.      Yes.

6           MR. BRIDGERS: Your Honor, at this point, I would

7    tender Defendant's 29.

8           THE COURT: Okay.  Mr. Barriere.

9           MR. BARRIERE: Judge, my issue was really the timing of

10   this.  I understand from the witness' testimony now that this

11   was produced contemporaneously to 2002 – 2001, 2002, 2000?

12          THE COURT: Yes, that is his testimony.

13          MR. BARRIERE: Well, I will not object and I will

14   cross-examine him on the exhibit.

15          THE COURT: Okay.  29 is admitted.

16   BY MR. BRIDGERS:

17   Q.      Mr. DeLong, have you had a chance to look through

18   Exhibit No. 29?

19   A.      Yes.

20   Q.      Is this an accurate account of the fees in and out?

21   A.      Yes.  It reflects the receipts as they came in and it

22   reflects  the  disbursements  of  those  receipts.    The

23   disbursements  are  in  three  categories.    Reimbursement  of

24   expenses that I incurred during that particular period and the

25   allocation of the fee between me and Jerry Thomas.

DeLong - Direct                                          608

1          THE COURT: Okay.  Let's do this.  It is 2:45.  We are

2    going to take fifteen minutes.  Sir, what was your name again,

3    please?

4          MR. BRIDGERS: This is Professor Ross, Bill Ross.

5          THE COURT: Professor Ross, I am just wondering, and I

6    guess I will ask Mr. Barriere, I don't think we are going to

7    get to you today.  Maybe the thing – I mean, you are certainly

8    welcome to stay, if you would like.  I am just wondering if we

9    can let Professor Ross go and then have him come back the first

10   thing in the morning rather than have him sit around here all

11   afternoon,   unless   Mr.   Barriere   is   going   to   be

12   uncharacteristically brief on cross.

13         MR. BARRIERE: The answer is yes.

14         THE COURT: Well, maybe I spoke out of turn.

15         MR.  BARRIERE:  What  we  needed  to  cover  with  this

16   witness I believe we largely covered, Your Honor.  So right now

17   I would guess I don't have more than ten or fifteen minutes.

18         THE COURT: Well, I am stunned.  Okay.  Well, we will

19   take fifteen minutes and we will see how it goes.  Maybe we

20   will get to you, Mr. Ross.  Thank you.

21         (Recess from 2:50 p.m. until 3:06 p.m.)

22         THE COURT:   Yes, sir, proceed.

23         MR. BRIDGERS: Thank you, Your Honor.

24   BY MR. BRIDGERS:

25   Q.     Mr. DeLong, what was your understanding of the

DeLong - Direct                                           609

1    financial condition of Terry Manufacturing up until the time it

2    filed bankruptcy?

3    A.        I thought it was a very, very strong company.

4    Q.        Did anything in your dealings with Terry Manufacturing

5    lead you to believe that they were having financial problems

6    until they filed bankruptcy?

7    A.        No, no.  They always paid their bills in absolute

8    accordance with the understanding that we had.  When I talked

9    to them about the possibility of generating a settlement fund

10   back in the days when we were trying to settle the case, over

11   a very short period of time they deposited four hundred

12   thousand dollars with me.  So in my experience, a company that

13   can do that is on a very, very sound financial footing, a

14   little company owned by two people like this one was.

15   Q.        Prior to being hired as an attorney, had you had any

16   relationship with the Terrys, Terry Manufacturing, anybody

17   related to the Terrys?

18   A.        I had never heard of the Terrys or of Terry

19   Manufacturing Company.

20   Q.        Are you, or to your knowledge, Mr. Thomas, in any way

21   related financially, marriage wise, company wise, share wise,

22   of Terry Manufacturing?

23   A.        Well, I know I am not and I don't think Jerry Thomas

24   is either.  I think Jerry came to know them just because of

25   business dealings within the black community in Atlanta.

DeLong - Direct                                    610

1    Q.      Other than through payment of attorney's fees, have

2    you ever received any money from Terry Manufacturing?

3    A.      No.

4    Q.      How about from Rudolph Terry?

5    A.      No.

6    Q.      Mr. DeLong, was your financial and billing practice

7    with Terry Manufacturing in any way out of the ordinary for

8    your other clients, as opposed to your dealings with other

9    clients within your law practice?

10   A.      No.  It was, I would say, substantially the same.  I

11   suppose I could say it was exactly the same.  Most of the work

12   that I do is on an hourly basis and the Terry matter was

13   consistent with what I do.

14   Q.      And did you bill the Terrys on a periodic basis?

15   A.      Yeah.  My intent was to bill Terry Manufacturing on a

16   monthly basis and I really didn't follow through with that as

17   well as I probably should have but, yeah, I billed them on a

18   regular, periodic basis and every subsequent bill picked up

19   where the last bill had left off and covered the period of time

20   up until the date of the next bill.

21   Q.      And generally how fast did Terry Manufacturing pay

22   your bills?

23   A.      Well, they were very good.  Sometimes as quickly as a

24   week to ten days or two weeks and pretty generally within

25   thirty days or forty-five days and that's consistent with my

DeLong - Direct                                           611

1    general experience.  I would say, for the most part, clients

2    pay somewhere within thirty to ninety days.

3    Q.        If Terry Manufacturing would have refused to pay your

4    legal fees at some point, what would you have done?

5    A.        I would have had to quit working.

6    Q.        Did you ever see the articles of incorporation or

7    bylaws of Terry Manufacturing?

8    A.        No.

9    Q.        And why not?

10   A.        Well, I was hired for a discrete piece of litigation.

11   I wasn't corporate counsel; I wasn't asked to do anything for

12   the company other than defend it in this one piece of

13   litigation.

14   Q.        Turning your attention to just a couple more topics.

15   You heard a fair amount of conversation about Richard Rose.  Do

16   you recall that?

17   A.        Yes.

18   Q.        Have you ever seen in your law practice a client seek

19   to enforce an evidentiary privilege?

20   A.        Oh, yes.  I have done it many times myself.

21   Q.        And why were you told by the Terrys – it probably

22   seems too much.  Were you told by the Terrys to enforce that

23   evidentiary privilege on behalf of Terry Manufacturing?

24   A.        Yes.

25   Q.        And did they explain that?

DeLong - Cross                                                    612

1    A.        Well, their explanation, and at the time it made

2    sense, their explanation was that there was information in

3    those financial records that could be harmful to them if it was

4    disclosed generally. And based on Commercial Factors' approach

5    to the litigation, it was fairly clear to me that it would use

6    anything it could get its hands on for whatever purpose it

7    could make of it.

8    Q.        Have you come to understand there may have been

9    another reason that Terry Manufacturing was not interested in

10   releasing the Richard Rose documents?

11   A.        Yeah.  They were, what would you say, creative

12   documents.

13   Q.        Did you have any indication of that at the time?

14   A.        No.  I looked at the financial statement when I saw it

15   and it was – I don't remember now when I actually saw it.  I

16   guess it was at some point during the Richard Rose issues, but

17   it basically confirmed what I had been led to believe about the

18   company.  You know, this is a good, solid little company, doing

19   very well.

20   Q.        Do you believe you exercised the requisite degree of

21   skill, knowledge, diligence and care required of Georgia

22   lawyers in such cases as you were litigating on behalf of

23   Terry Manufacturing Company and Rudolph Terry?

24   A.        Yes.

25   Q.        Do you believe that you complied with all of the

DeLong - Cross                                    613

1    ethical obligations imposed on you by the Georgia bar during

2    all times that you represented Rudolph Terry and Terry

3    Manufacturing Company.

4    A.      Yes.

5    Q.      Mr. DeLong, do you have an opinion as to what the

6    maximum liability Terry Manufacturing might have faced in a

7    case with Commercial Factors?

8    A.      Well, if you give Commercial Factors the benefit of

9    the doubt and look at all of the various claims that it

10   ultimately raised, it is entirely possible that Terry

11   Manufacturing could have gotten tagged for ten or twelve or

12   fifteen million dollars.

13   Q.      And, in the end, how much was Terry Manufacturing

14   tagged for?

15   A.      Nothing.

16           MR. BRIDGERS: Your Honor, I will turn the witness

17   over.

18           THE COURT: Mr. Barriere.

19                         CROSS-EXAMINATION

20   BY MR. BARRIERE:

21   Q.      Mr. DeLong, Exhibit 29 in the white binder, as we

22   discussed a moment ago, reflects certain disbursements to Jerry

23   Thomas, correct?

24   A.      Yes.

25   Q.      All right.  As I understand the flow of funds, the

DeLong - Cross                                    614

1    bills would go out on DeLong and Caldwell to Terry

2    Manufacturing. Terry Manufacturing would then send the money

3    back to DeLong and Caldwell, and thereafter there would be

4    disbursement to Mr. Thomas; is that accurate?

5    A.      Yes.

6    Q.      All right.  How is it – how did you pay Mr. Thomas?

7    A.      I wrote him a check, I think.

8    Q.      How is it you don't have copies of any of those checks

9    now?

10   A.      Well, some of the documents that I had got misplaced

11   when we moved from one office to the other.  I had this ledger

12   that I had kept and the ledger is kept in the ordinary course

13   of my business and it actually reflects what was done.  So I

14   made the decision that this was an adequate record and I didn't

15   go back and try to reproduce documents that I didn't have.

16   Q.      Now when did you move?  You said that you lost some

17   documents in the move.  When did that occur?

18   A.      About halfway through this case.

19   Q.      So 2001?

20   A.      Yeah, something like that.

21   Q.      But you still don't have any canceled checks

22   evidencing payment to Jerry Thomas for the years 2002 and 2003

23   after you moved into your new space?

24   A.      Well, I didn't bring them here because I brought this

25   ledger that reflects them.

DeLong - Cross                                    615

1   Q.      Well, you were specifically asked to produce those;

2   weren't you?

3   A.      I don't remember that.

4   Q.      All right.  If you would look perhaps at Exhibit 14.

5   A.      14 in your exhibits here?

6   Q.      Correct.

7   A.      Okay.

8   Q.      Turn to page three, request number five.

9   A.      This says defendant, DeLong, Caldwell, Novotny and

10  Bridgers and Earnest H. DeLong – oh, okay, okay.

11  Q.      Moving to number five.  This is the response to

12  request for production number – request for production and

13  response, quote:

14          "Please   produce   all   records   relating   to   any

15          transaction" –

16  A.      Wait a minute.

17  Q.      I am sorry.  Page three.

18  A.      Oh, you said page five.

19  Q.      No.  Request number five.

20  A.      Oh, okay.

21  Q.      "Please   produce   all   records   relating   to   any

22          transaction including, without limited to, deposits,

23          checks, drafts, debits, credits and/or wires from any

24          and all trusts and operating accounts relating to the

25          disposition of or payout of any and all funds received

DeLong - Cross                                616

1          from Terry Manufacturing, Terry Uniform, Rudolph Terry

2          and/or Roy Terry by the firm or any other DeLong

3          entity, is or was employed, or associated with,

4          including, but not limited to, DeLong, Caldwell, Logue

5          and Wisebram and DeLong and Caldwell, LLC from 1999,

6          through and including the date of the answers to these

7          requests."

8          Now, wouldn't you agree that disposition of any funds

9     from Terry Manufacturing would include any checks purporting to

10    show transfers to Jerry Thomas?

11    A.    Yeah.

12    Q.    And, indeed, if there was any machination there, let's

13    turn to Exhibit 15(a), the next page.

14    A.    15(a)?

15    Q.    14(a), I apologize.

16    A.    Okay.

17    Q.    A letter sent to you and Mr. Bridgers on January 3 of

18    this year, quote:

19          "During a recent conversation, Charles indicated by

20          your calculation something in the range of two hundred

21          and eighty thousand dollars of the approximate four

22          sixty-one paid by Terry Manufacturing was ultimately

23          transferred to Jerry Thomas.  I mentioned to Charles

24          then, as I have on several prior occasions, that we

25          have never been provided with any checks or other

DeLong - Cross                        617

1          documents evidencing any funds transferred to Jerry

2          Thomas.    I have reviewed request for production

3          previously issued of all of the defendants and

4          confirmed that documents evidencing a disbursement of

5          funds to Mr. Thomas for services supposedly provided

6          to Terry Manufacturing would fall within the scope of

7          the request for documents.  I again request that  any

8          documents of this type be forwarded to us promptly."

9    Unquote.  And you indeed did not produce any wire receipts or

10   checks to Jerry Thomas; correct?

11   A.     There wouldn't have been any wire receipts.

12   Q.     All right.  So all we have is canceled checks and you

13   didn't produce any of those?

14   A.     Well, I don't have the canceled checks.  I don't get

15   my checks back from the bank.

16   Q.     Well, do you get back a bank statement showing who you

17   disbursed your funds to?

18   A.     No, it just has numbers.

19   Q.     Did you request of your bank that they provide you

20   with copies of the checks supposedly issued to Jerry Thomas?

21   A.     Well, this was filed by Flynn Mozingo and at some

22   point after this - this was the lawyer that the insurance

23   company had hired and, at some point, once the insurance

24   company decided that it was not going to provide us with the

25   defense anymore, it told Mr. Mozingo to pack his briefcase and

DeLong - Cross                                              618

1    leave.  And I may have seen this or I may have spoken to Flynn

2    about it on the phone at some point, but I am just not familiar

3    with it.

4    Q.        Well, are there other documents, relevant documents

5    responsive to this request that were not produced because of

6    the transition from Mozingo to your firm in the handling of

7    this case?

8    A.        I don't know.

9    Q.        Now you told me or you told Mr. Bridgers, pardon me,

10   that Mr. Pouncey had admitted to all of the allegations in the

11   cross-claim you filed against him; did I understand you

12   correctly?

13   A.        Yeah.

14   Q.        Now I have been doing this about as long as you.  I

15   have never had an adversary do that.  Were you surprised that

16   he admitted to every single allegation?

17   A.        Given the twists and turns in this case, I got to the

18   point where nothing surprised me but, yeah, that is not the

19   kind of thing that you expect out of an adversary in a case.

20   I will grant you that.

21   Q.        Jerry Thomas, is he still alive?

22   A.        Yeah.

23   Q.        He is practicing law in Atlanta?

24   A.        No.  Jerry is in the art business really.  He is a -

25   I guess what he would call himself is an art broker.  He

DeLong - Cross                                    619

1    represents vernacular black artists as he has explained it to

2    me, in promoting them, in finding markets for their work, and

3    all kinds of things.  As I understand it, even though he is

4    still admitted to practice law, that's how he is spending a

5    hundred percent of his time.

6    Q.       He is in the Atlanta area, I take it?

7    A.       Yeah.

8    Q.       And you have contact with him from time to time?

9    A.       Not too much but occasionally.

10   Q.       Occasionally.  All right.  Well, we obviously heard a

11   lot of testimony today about what Mr. Thomas did, the monies he

12   received, his role in this litigation.  He was listed as a "may

13   call" witness.  Why did Mr. Thomas not appear here to tell his

14   own story?

15   A.       We made the judgment call that it would have just been

16   repetitive, and I think we were probably right because it

17   sounds like, from some of the comments that the judge has made,

18   that he has had just about all of the fun he can stand.

19   Q.       All right.  Now you testified that you ultimately came

20   to the conclusion that Terry Manufacturing might have a

21   complete defense to all amounts demanded by Commercial Factors.

22   Did I understand you correctly?

23   A.       Yeah.

24   Q.       Am I correct, sir, that the two great impediments to

25   a complete defense were, one, Rudolph Terry had signed

DeLong - Cross                                    620

1    verifications of receipt of product he never received and, two,

2    he had *de facto* admitted to owing two-point-three million

3    dollars?

4    A.      That was certainly two of the things, yeah.

5    Q.      Now you also told us that you became concerned after

6    the addition of the tort claims that there could be, and I

7    think I wrote it down accurately, quote, dramatically more

8    money at stake because of the potential for the tort claims and

9    the punitive damages; correct?

10   A.      Yes.

11   Q.      Wouldn't you agree with me, sir, that as the trial

12   lawyer, defense trial lawyer, facing a claim of punitive

13   damages, it is a challenge to respond when you are

14   simultaneously representing both the company and the individual

15   who committed the fraudulent or otherwise tortious conduct?

16   A.      If we assume that that is what happened, yeah, you

17   probably are but, in my experience, a client has the right to

18   determine who his or its lawyer will be. And they told me in

19   no uncertain terms that they wanted me and Jerry to continue to

20   represent them, and Roy made it very clear that under no

21   circumstances would he allow anybody to proceed against Rudolph

22   in this case. It just was not going to happen.

23   Q.      So I take it from your comment when, I think it was

24   Mr. Bridgers' words, you have a client who is semi or actually

25   sophisticated consumer of legal services, he can make a call on

DeLong - Redirect                                     621

1    who are his lawyers and tell him to waive conflicts and the

2    lawyer should be bound by that; is that correct?

3    A.       I think so, yeah.

4    Q.       All right.  Now you told us also that the danger

5    presented by this case was ratcheted up because Mr. Coles

6    asserted fraud and he asserted other tort claims and he

7    ultimately asserted a RICO claim; is that correct?

8    A.       Yes, I think so.

9    Q.       Is the predicate to all of those claims, including the

10   quasi-criminal conduct within the RICO claim, that Rudolph

11   Terry had signed verifications for product that he didn't

12   receive?

13   A.       That was not the way it was pled.  It was pled in very

14   vague, general kinds of things because what they wanted to do

15   is keep everything tied together because apparently they

16   couldn't prove the specific, individual, kinds of things.

17   Q.       Well, didn't you understand as the trial lawyer,

18   though, that ultimately the linchpin for all of those theories

19   was the verification of receipt of product that was never

20   delivered?

21   A.       That was one item, yes, but that was not – I wouldn't

22   call that the linchpin.  And the evidence was just all over the

23   place.  There was an awful lot of evidence.  Pouncey, even

24   after he was indicted, continued to say this was all an

25   arrangement that I made with Tracy Eden.  Part of Pouncey's

DeLong - Redirect                                    622

1   deal – when I say his deal, part of his plea agreement was that

2   he had to cooperate with Commercial Factors in the litigation.

3   Commercial Factors deposed him again, and he said I thought

4   Tracy Eden knew.  So, you know, I would have loved to have been

5   able to finish this case because I think, by the end of it, I

6   might have actually known what happened.

7   Q.      But as we close out, sir, there is no doubt, there is

8   no dispute that Rudolph Terry in fact was issuing verifications

9   for product he didn't receive; he pled guilty to that?

10  A.      Absolutely.

11  Q.      All right.  And that was a significant burden you

12  carried throughout the course of this litigation?

13  A.      Yeah, I agree.

14          MR. BARRIERE: I pass the witness, Your Honor, at 3:22.

15          THE COURT: Duly noted.  Redirect.

16                      REDIRECT EXAMINATION

17  BY MR. BRIDGERS:

18  Q.      Mr. DeLong, did you indeed pay Jerry Thomas the amount

19  of money reflected in the records?

20  A.      Yes.  And if you want me to, I took one of these

21  ledgers and I went through it, just for my own information, in

22  case the question ever came up how much was paid for what

23  thing, and I multiplied it out, or it is better to say that I

24  added it up because that is what I did and, if it is important

25  to have the specific number, I can go over and pick up the

Ross - Direct                                    623

1   sheet and tell you exactly what my fee was and what Jerry

2   Thomas' fee was.

3   Q.      But basically you actually made the payments reflected

4   on the ledger that we admitted earlier this afternoon?

5   A.      Yes.

6           MR. BRIDGERS: Thank you, Your Honor.  No further

7   questions.

8           THE COURT: Thank you, sir.  You may step down.

9           THE WITNESS: Thank you.

10          MR. BRIDGERS: Your Honor, the defendants call Dr. Bill

11  Ross.

12          (WILLIAM G. ROSS, WITNESS, SWORN)

13                      DIRECT EXAMINATION

14  BY MR. BRIDGERS:

15  Q.      Professor Ross, could you tell us your name for the

16  record, please?

17  A.      My name is William G. Ross.

18  Q.      And what is your professional address?

19  A.      Cumberland School of Law of the Sanford University in

20  Birmingham, Alabama.

21  Q.      Do you have a license to practice law?

22  A.      Yes, I do.

23  Q.      And what state is that in?

24  A.      New York.  I am on retired status, however.

25  Q.      Tell us your educational background, please?

Ross - Direct                                                    624

1    A.        I graduated from Stanford University in California in

2    1976 with a bachelor's degree, and I received my J.D. from the

3    Harvard Law School in 1979.

4    Q.        And would you give us some of your professional

5    background, please?

6    A.        After law school, I became an associate at law firms

7    in New York and I practiced in New York for nine years in

8    Manhattan.   My areas of specialty were primarily in the

9    commercial litigation area.   I did securities litigation,

10   antitrust, trademark, copyright, personal injury defense, among

11   other areas.

12           And then, in 1988, I moved to Birmingham to become an

13   assistant professor at Cumberland.   I became a full professor

14   there in 1993 and received tenure the same year.

15   Q.        So what do you do for a living now?

16   A.        I am still a professor of law at the Cumberland School

17   of Law at Sanford University.

18   Q.        What do you teach at Cumberland?

19   A.        I teach civil procedure, equitable remedies,

20   constitutional law, constitutional history and professional

21   responsibility.   Not all of them in the same year.

22   Q.        All right.   Is there any particular specialty that you

23   have pursued in your academic career?

24   A.        Yes.   The two areas in which I publish and speak

25   regularly are professional responsibility and constitutional

```
                        Ross - Direct                    625
 1   history.

 2   Q.      In the area of professional responsibility, have you

 3   taught on that subject?

 4   A.      Yes, I have.

 5   Q.      And have you written on that subject in academic -

 6   A.      Yes, I have.

 7   Q.      Were those in academic type environments?

 8   A.      Yes.

 9   Q.      Are you a member of the American Law Institute?

10   A.      Yes, I am.

11   Q.      What is that?

12   A.      The American Law Institute is an organization of

13   approximately three thousand attorneys who are dedicated to the

14   improvement of American law and it is the American Law

15   Institute that prepares and publishes the restatements of the

16   law that we all studied in law school.

17   Q.      Has any of your work ever been cited by an appellate

18   court?

19   A.      Yes.

20   Q.      And tell us about that, please.

21   A.      A number of appellate courts, probably the most

22   significant citation is a United States Supreme Court cite, a

23   decision of 2002, which is an opinion by Justice Ginsburg

24   citing my *Honest Hour* book.

25   Q.      What is your *Honest Hour* book?
```

Ross - Direct                                    626

1    A.        *Honest Hour* is a book on the ethics of time-based

2    billing by attorneys.  It is called *The Honest Hour, The Ethics*

3    *of Time-based Billing by Attorneys*.  It was published in 1996.

4    Q.        And how did you come to be connected with this matter,

5    Professor Ross?

6    A.        The matter of time-based billing?.

7    Q.        No.

8    A.        Or ethics?

9              MR. BRIDGERS: And, actually, Your Honor if I may step

10   back, I think I would tender Professor Ross as an expert.

11             THE COURT:  All right.  Mr. Barriere.

12                       VOIR DIRE EXAMINATION

13   BY MR. BARRIERE:

14   Q.         I just want to make sure I understood, sir.  As of

15   2000, where were you employed?

16   A.        Sanford University.  I have been employed at Sanford

17   University regularly since 1988.

18   Q.        All right.  And so you were at Sanford in Birmingham

19   from 2000 through 2003?

20   A.        Yes.  During the 2001 to 2002 academic year I was a

21   visiting professor at Notre Dame.

22   Q.        All right.  In Indiana?

23   A.        Yes.  During the summer of 2002, I was a visiting

24   professor at Florida State in Tallahassee but, other than that,

25   I have taught regularly at Cumberland since 1988, including the

Ross - Direct                                      627

1      period of 2000 to the present.

2      Q.      All right.  As I understand it, you are not now, nor

3      have you ever been a member of the Georgia bar?

4      A.      No.

5      Q.      And you are not now, nor have you ever been, a member

6      of the Alabama bar?

7      A.      No.

8      Q.      All right.

9              MR. BARRIERE:  Your Honor, our objection would be

10     based on the Georgia statutes applicable to experts that seek

11     to testify in medical malpractice – excuse me – in legal

12     malpractice actions.  It's chapter 24-9-67.1©).  I will give

13     you that again. 24-9-67.1©). It provides, in relevant part, as

14     follows:

15              "Notwithstanding the provisions of subsection (b) of

16              this code section," which I will be happy to explain

17              in a moment, "of any other provision of law which

18              might be construed to the contrary, in professional

19              malpractice actions, the opinion of an expert who is

20              otherwise qualified as to the acceptable standard of

21              conduct of the professional whose conduct at issue

22              shall be admissible only if at the time of the act or

23              omissions is alleged to have occurred such expert was

24              licensed by an appropriate regulatory agency to

25              practice her or his profession in the state in which

Ross - Direct                    628

1    such  expert  was  practicing  or  teaching  in  the

2    profession  at  such  time."

3        As a result, Dr. Ross would be required, in order to

4    comply with the Georgia statute, to have been either teaching

5    in the state of New York at that time or licensed in the State

6    of Alabama and, for that reason, we would object to his being

7    admitted as an expert.

8        THE COURT: Can you give me that statute again?

9        MR. BARRIERE: Sure.  It is OCGA and, as I recall, the

10   "O"  is  –  I  am  not  sure  what  it  stands  for.    It  is  the

11   Consolidated Georgia Annotated.  It is code volume 24-9-67, I

12   think it is point one, paren "c," paren.

13       THE COURT: Mr. Bridgers.

14       MR. BRIDGERS:  Your Honor, my first objection to that

15   would be that OCGA 24 is Georgia's evidence code.  Georgia's

16   evidence code is not a factor here.  Federal rules of evidence

17   are.

18       I would have to go back and take a look at the statute

19   particularly, but this is part of Georgia's new tort reform

20   movement in the last year or two.  There are some issues about

21   retroactivity.  I wouldn't swear to the court I remember what

22   they are but there are some exceptions, you know, when cases

23   were pending.

24       But generally, more importantly, this is Georgia's

25   evidence code.  Georgia's evidence code is irrelevant.  The

Ross - Direct                                      629

1    federal evidence code is what is relevant.  And I would say

2    Professor Ross, having taught and wrote in this area for many

3    years, qualifies as an expert under the federal evidence

4    standard.

5             THE COURT: All right.  I mean, the standard that I am

6    to apply on the malpractice case is Georgia law; is it not?

7             MR. BRIDGERS: Yes, Your Honor

8             THE COURT: But you are saying this statute, you say if

9    I look at it, it is not going to be a matter of Georgia

10   substantive law, it is just a procedural rule?

11            MR. BRIDGERS: It is within the evidence code, Your

12   Honor, I think would be more accurate.  24 is Georgia's

13   evidence code.

14            THE COURT: Okay.  It is the evidence code.  Okay.  It

15   is a new one on me.  Let's break for about ten minutes and I

16   will have a look at it and we will be right back.  Thank you.

17            (Recess from 3:36 p.m. until 3:50 p.m.)

18            THE COURT:    Okay.  Professor Ross, have a seat

19   please.

20            Here is what I am going to do.  I have only spent just

21   a few minutes on this and did not have reason to look before.

22   I read the Georgia statute.  It says just what Mr. Barriere

23   said it does.  It appears to bar testimony of experts.  The

24   question then becomes was this an evidentiary rule that is just

25   applicable in Georgia courts or would it be a bar to testimony

Ross - Direct                                    630

1    in federal courts, as well.  That seems to be the question.

2         I found a case called *Dukes*.  I don't have the whole

3    thing.  It was a lengthy case, a thirty-eight page decision

4    found at 428 F. Supp. 2d 1298.  Again, 428 F. Supp. 2d 1298, a

5    United States District Court decision from the Northern

6    District Of Georgia, 2006.  And there it was medical testimony,

7    not legal testimony there, but it was – the case seems to be

8    very similar.  And in that case they applied the rule and

9    excluded the testimony.

10        We have got Professor Ross here.  I am going to go

11   ahead and hear his testimony by way of proffer so we have it

12   and it will give Mr. Bridgers some time to look at it.  I

13   assume you have been caught flat-footed as I have, so you can

14   brief it. If you think it is admissible, I would be happy to

15   look at a brief, you know, and then we can consider this at our

16   leisure.

17        So I'm going to let you go ahead and examine your

18   witness anyway by way of proffer.

19        MR. BRIDGERS: Well, Your Honor, there is certainly no

20   indication in any of the pretrial filings of the trustee that

21   there would be such an evidence –

22        THE COURT: Well, that is another issue, too.  I

23   haven't thought that one all the way through, as to whether or

24   not the objection should have been made in advance.

25        MR. BRIDGERS: It sounds like a reasonable course of

Ross - Direct                               631

1   action just to get the testimony in, at four o'clock.

2            MR. BARRIERE: Judge, I will simply state on the record

3   I first learned of this statute yesterday afternoon.

4            THE COURT: I appreciate that.  I mean, I think the

5   best way to handle it is just to let Professor Ross testify and

6   then you both can brief the question at your leisure.

7   BY MR. BRIDGERS:

8   Q.       Professor Ross, how did you come to be contacted about

9   testifying in this adversary matter?

10  A.       I received a telephone call from Mr. DeLong while I

11  was in Phoenix, Arizona, sometime in May, probably, during the

12  last week in May of 2006.

13  Q.       And had you ever met or known any of the defendants or

14  any of the lawyers involved in this case?

15  A.       Never.

16  Q.       And, Professor, what are the core topics that you are

17  here to address today?

18  A.       Primarily    the    malpractice    and    professional

19  responsibility issues.

20  Q.       In summary, Professor, what are your opinions?

21  A.       My opinion is stated in detail in the affidavit that

22  I provided, dated June 29, 2006, and my opinion is completely

23  unchanged since that time.  But it is my opinion that the

24  defendant here is not guilty of malpractice, did not breach any

25  rule of professional conduct, and that the representation, the

Ross - Direct                                    632

1    simultaneous representation by Mr. DeLong of both Terry

2    Manufacturing Company and Mr. Rudolph – excuse me – Mr. Rudolph

3    Terry – was proper.

4            MR. BRIDGERS: If I can approach the witness.

5    Q.      Let me show you what has not yet been marked but is

6    this your affidavit?

7    A.      Yes, it is.

8            MR. BRIDGERS:  Your Honor, I would ask that we mark

9    this exhibit.  This exhibit was not included in our pretrial

10   disclosures.  The reason it was not included is I did not

11   understand the court's standard of admitting expert reports,

12   and I would ask that the court make an exception for this

13   report basically to balance out the expert reports that the

14   trustee has admitted in its case.

15           THE COURT: Okay.  Mr. Barriere.

16           MR. BARRIERE: Well, I would object for that reason,

17   Your Honor.  I am doubly troubled because I don't – there is no

18   copy available, so I would object both on the admission for

19   failure to –

20           THE COURT: Wait a minute.  You have not seen this

21   report?

22           MR. BARRIERE: Well, I certainly saw it back at the

23   time that I deposed this witness in August of 2006.  I didn't

24   bring a copy with me, to my knowledge, and there is no copy

25   available right now.  So I object on that basis and I object on

Ross - Direct                                      633

1    the fact that it wasn't listed as a pretrial exhibit.

2           MR. BRIDGERS:  Your Honor, I am happy to provide a

3    copy if we can get a quick copy made.  I apologize for the

4    practicality of that.  It just came up.

5           THE COURT: Okay.  Well, why don't you proceed and go

6    ahead and finish your direct and then we will break and we will

7    give Mr. Barriere a few minutes to look at the report and

8    refresh his recollection before he takes Professor Ross on

9    cross-examination.

10          MR. BARRIERE: And just so the record is clear, Your

11   Honor, this is not a report.  As you will recall, this witness

12   did not tender a report.  That was why we moved to strike him.

13   The report was ultimately, I think, released several months

14   after his deposition.  This is an affidavit that was attached

15   to their motion for summary judgment.

16          MR. BRIDGERS: Your Honor, true, it is not entitled

17   report, but it contains basically everything that a report

18   would, perhaps not the CV.  We can attach a CV.

19          THE COURT: So is it –

20          MR. BRIDGERS: It is styled "affidavit," Your Honor.

21          THE COURT:   All right.

22          MR. BRIDGERS: It was attached to the plaintiff's

23   motion for summary judgment.

24          THE COURT: Okay.  In this adversary proceeding?

25          MR. BRIDGERS: Yes, Your Honor.

Ross - Direct                                              634

1          THE COURT: Okay. All right.

2    BY MR. BRIDGERS:

3    Q.       Professor Ross, generally what documents did you

4    review in order to provide these opinions?

5    A.       You say these opinions.  Do you mean the opinion on

6    which I based my affidavit or my opinions today, as well?

7    Q.       Your opinions today, as well, sir.

8    A.       I reviewed the complaints on this action, both the

9    civil and criminal informations.  I also reviewed the affidavit

10   of Frank Beltran.  I reviewed the deposition testimony of Frank

11   Beltran and, you know, I reviewed the relevant rules of

12   professional conduct and reported judicial decisions to the

13   extent there were any.

14   Q.       Professor, was there anything you asked for that was

15   not given or provided to you

16   A.       Never.

17   Q.       And do you believe there is anything else out there

18   in the universe that you needed to review in order to render

19   the opinions that you are rendering today?

20   A.       No.

21   Q.       Did you have enough information to reach your

22   conclusions in this case to a reasonable degree of legal

23   certainty?

24   A.       Yes.

25   Q.       And in preparing to answer these core questions, did

1    you do any legal research?

2    A.        Yes, I did.

3    Q.        What type of research did you do?

4    A.        I looked at whatever reported decisions I thought

5    were relevant.  I believe I also checked the databases for

6    ethics opinions in the fifty states.

7    Q.        And did you review –

8    A.        Excuse me.  I reviewed the state law; I reviewed

9    federal law; I reviewed the rules in Georgia; and I reviewed

10   the ethics opinions throughout the United States.

11   Q.        And, Professor, let me turn your attention to the

12   underlying litigation, the Commercial Factors litigation.  Have

13   you had the opportunity to review the complaints?  Excuse me.

14   Have you had the opportunity to review the original complaint

15   in the Commercial Factors case?

16   A.        I believe I have, but I am not absolutely certain.

17   Q.        All right.  In terms of documents you reviewed, do

18   you have an understanding that a case was begun by Commercial

19   Factors against Terry Manufacturing and other defendants?

20   A.        Yes.

21   Q.        And that at some point the plaintiff added fraud

22   claims against Terry Manufacturing?

23   A.        Yes.

24   Q.        And do you have an understanding that at some point

25   Rudolph Terry was added in as an individual defendant in that

Ross - Direct                                    636

1    action?

2    A.       Yes.

3    Q.       What is your understanding as to whether Mr. DeLong

4    continued to represent Terry Manufacturing and Rudolph Terry?

5    A.       It is my understanding that Mr. DeLong continued to

6    represent Terry Manufacturing after the complaint was amended

7    to include allegations against Rudolph Terry.

8    Q.       And in preparing to render your opinion, have you

9    spoken with Mr. DeLong about certain conversations he had

10   relating to a possible conflict of interest?

11   A.       Yes, I have.

12   Q.       And have you reviewed Mr. DeLong's deposition as to

13   that testimony?

14   A.       No, I don't believe I have.

15   Q.       Okay.  Were you in court this afternoon when Mr.

16   DeLong testified about his conversations he had with Rudolph

17   and Roy Terry?

18   A.       Yes, I was present throughout his testimony.

19   Q.       And, Professor Ross, before we go any further, have

20   you ever testified as an expert before?

21   A.       Yes, I have.

22   Q.       Now were you there at any of the events that took

23   place?

24   A.       No.

25   Q.       Have you relied on facts and assumptions regarding

Ross - Direct                                           637

1    what happened during those communications?

2    A.        Could you repeat the question, please?

3    Q.        Sure. Have you relied on the facts that you heard in

4    Mr. DeLong's testimony?  In other words, have you – are you

5    basing your opinions you are rendering here today on facts that

6    you have gathered from testimony and other documents?

7    A.        Yes.

8    Q.         And is that typical for an expert in such a

9    situation?

10   A.        Yes.

11   Q.        Do you have an understanding as to whether or not Mr.

12   DeLong did bring up the issue of a potential of a conflict of

13   interest?

14   A.        Yes, I do have an opinion.

15   Q.        Well, tell me, first, what your understanding is of

16   what Mr. DeLong did.

17   A.         It is my understanding that Mr. DeLong repeatedly

18   discussed the possibility of a conflict with Roy Terry and also

19   with Rudolph Terry, and this occurred on several occasions and

20   was brought up when he first learned or very shortly after he

21   first learned of a potential conflict and was raised at various

22   critical times.

23   Q.        From the testimony this afternoon, were you – did you

24   understand that Mr. DeLong suggested – raised the topic, at

25   least, of another counsel representing Rudolph Terry?

Ross - Direct                                    638

1    A.         Absolutely.

2    Q.         Do you understand from your testimony that Mr. DeLong

3    raised the possibility that another counsel should take a look

4    at this conflict?

5    A.         Absolutely.

6    Q.         And did you hear what Mr. DeLong said about the types

7    of information he passed on to the Terrys?

8    A.         Yes.

9    Q.         And did you also – are you also basing your opinion on

10   the conversations you had with Mr. DeLong prior to – as you

11   were becoming engaged?

12   A.         Yes.

13   Q.         Do you have an opinion, sir, as to whether a single

14   counsel can represent multiple defendants in a civil suit?

15   A.         Yes, I do.

16   Q.         And in this situation, what is that opinion, Professor

17   Ross?

18   A.         My opinion is that it is appropriate under certain

19   circumstances and that those circumstances were present in the

20   case at hand.

21   Q.         Under    what    circumstances    would    continued

22   representation be appropriate?

23   A.         Continued  representation  is  appropriate  where  the

24   attorney believes that he or she can provide competent and

25   effective representation to both parties and where the attorney

Ross - Direct                                      639

1    has discussed the potential of a conflict with both of the

2    parties or any of the parties and obtained their informed

3    consent.

4    Q.      Is there anything else an attorney needs to do to

5    obtain that informed consent?

6    A.      Under the Georgia rules in the year 2000, as I

7    understand them, it was not necessary for the attorney to

8    advise the clients to obtain independent counsel before making

9    a decision about dual representation but that Mr. DeLong, in

10   fact, did provide that suggestion to both Roy Terry and Rudolph

11   Terry.

12   Q.      Professor Ross, maybe I should back up.  At the time

13   of these discussions with the Terrys, were the ethical canons

14   or the standards controlling of Mr. DeLong's professional

15   conduct?

16   A.      The standards controlled before January 1, 2001.

17   Q.      So you are referring to the rules that were in effect

18   prior to January 1, 2001?

19   A.      Yes, I am.

20   Q.      Probably for the court reporter I should get you to

21   let me finish the question before you respond.

22   A.      Pardon me.

23   Q.      Professor Ross, what particular canons or standards

24   did you review to make that determination?

25   A.      I reviewed 4-102 and standards 35, 36 and 37.

Ross - Direct                                          640

1    Q.      And what of those standards led you to this

2    conclusion?

3    A.      Those standards led me to conclude that Mr. DeLong had

4    properly continued his representation of Terry Manufacturing

5    because he had notified Roy Terry, the president and the

6    principal shareholder of Terry Manufacturing, about the

7    potential for a conflict if Rudolph Terry became a party to the

8    lawsuit; and he also discussed this possibility with Rudolph

9    Terry and that both Roy Terry and Rudolph Terry offered what I

10   believed to have been their informed consent.  And as I said

11   earlier, Mr. DeLong also advised them of the possibility that

12   they might wish to seek outside counsel before making the

13   decision.

14   Q.      Have you - let me ask you some key facts about Terry

15   Manufacturing.  Is it your understanding that Terry

16   Manufacturing is a closely-held corporation?

17   A.      Yes.

18   Q.      Is it your understanding that basically the two

19   brothers were one hundred percent shareholders?

20   A.      It is my understanding that the two brothers were one

21   hundred percent shareholders of the common voting stock.

22   Q.      And is the fact that this was a closely-held

23   corporation, they were the hundred percent voting stock

24   shareholders significant on the issues, the legal malpractice

25   issues raised by the plaintiff in this case?

Ross - Direct                                               641

1    A.       Yes, it is.

2    Q.       And what is that significance?

3    A.       I think the significance is that, since there do not

4    appear to have been any other owners of the common stock, the

5    decision of Mr. Roy Terry and also Mr. Rudolph Terry to permit

6    Mr. DeLong to represent both the company and Rudolph Terry

7    under these circumstances did not have any and could not have

8    had any effect on any third-parties or at least on any third-

9    party owner of voting stock because there were none.

10   Q.       And, Professor Ross, just to make sure I understand

11   this, do you have an expert opinion as to whether the substance

12   of the disclosures, based on your understanding of Mr. DeLong's

13   testimony this afternoon, made to Rudolph and Roy Terry were

14   sufficient under the ethical rules applicable to him at that

15   time?

16   A.       Yes.

17   Q.       And what is that opinion?

18   A.       Of course, I was not present during those

19   conversations and it is my understanding that those

20   conversations have not been recorded, so I cannot be certain as

21   to exactly what was said but, based upon my conversations with

22   Mr. DeLong and based upon my review of the relevant documents

23   in this case, it is my opinion that Mr. DeLong fully informed

24   the clients of the possibility of a conflict of interest;

25   informed them that they might wish to seek outside counsel; and

Ross - Direct                                                642

1    provided this information and discussed the possibility of a

2    conflict on multiple occasions including critical points during

3    the course of the litigation.

4    Q.      Is it necessary under the applicable ethical standards

5    and professional conduct standards for an attorney to make –

6    strike that question.

7            Professor Ross, did you also, just to make sure the

8    record is clear, base that opinion on Mr. DeLong's testimony

9    this afternoon?

10   A.      Yes, although Mr. DeLong's testimony this afternoon

11   did not in any way change the opinions that I already held.

12   Q.      Was it consistent with what he had told you before?

13   A.      Absolutely.

14   Q.      What level –

15   A.      Absolutely to the extent I recall what he told me.

16   Q.      What level of disclosure is an attorney required to

17   provide under the standards in place under 2000?  Is there a

18   particular standard of what the attorney needs to tell the

19   clients in order for the clients to have a knowing waiver of

20   the conflict?

21   A.      It really depends upon the circumstances and there is

22   certainly no formula, to my knowledge, but based upon my

23   understanding of the facts in this case, I have reason to

24   believe that Mr. DeLong in effect more than fulfilled any

25   requirements imposed upon him by that rule, particularly

Ross - Direct                                                  643

1    because he – or by that standard – particularly because he

2    advised the clients that they might wish to obtain an

3    independent opinion from another attorney.  So, in effect, he

4    went beyond the requirements.

5            Also, he went beyond the requirements insofar as he

6    discussed this with them on more than just one occasion.

7    Q.      Professor Ross, are there in litigation conflicts that

8    are just simply unwaivable?

9    A.      Yes.

10   Q.      And was this one of those unwaivable conflicts?

11   A.      Absolutely not.

12   Q.      Why not?

13   A.      Well, for a number of reasons.  First of all, the way

14   in which most states formulate – and Georgia, as of 2000 –

15   formulate the rule on conflicts is that most conflicts are

16   waivable and, in this case, the conflict, to the extent there

17   was a conflict, it would appear to have been waivable insofar

18   as everything I have seen suggests, number one, that Mr. DeLong

19   believed that he could provide a competent and proper

20   representation to both of the parties at the same time and also

21   because he obtained their informed consent.

22   Q.      Have you been able to locate any particular cases

23   which points you to the conclusion that this was a waivable

24   conflict?

25   A.      I have not found any cases on point in the state of

Ross - Direct                                644

1    Georgia, and it is my understanding that there are no cases

2    that have come to light during the course of this litigation.

3    Q.        Professor Ross, perhaps I could remind you of the

4    *Keohane versus Keene* case out of the Northern District of

5    Georgia.

6    A.        Yes.  That case is not on all fours but it is

7    certainly relevant for the reasons I stated in my affidavit.

8    Q.        Generally what did the *Keohane* case, which is 2006

9    Westlaw 1275056, in general what did the Keohane case have to

10   add to this analysis?

11   A.        May I see my affidavit?

12   Q.        Would you like to reference the actual case law?

13   A.        Pardon?  Yes. Just to refresh my recollection.  As I

14   – I really don't think that I can describe this any more

15   accurately than I presented in my affidavit.  May I simply read

16   from the affidavit?  It is just a few lines.

17   Q.        Sure.

18   A.        "In Keohane, the court denied a motion to disqualify

19             an attorney who represented two fiduciaries of a

20             pension plan.  Although the court acknowledged that

21             there was a possibility that the two defendants raised

22             separate defenses, the court emphasized that

23             disqualification motions are disfavored.  The court

24             deferred to the determination by the attorney and the

25             client that the attorney should proceed with the

Ross - Direct                                    645

1          representation. Quote, 'After consideration, counsel

2          has determined that any defenses which may be raised

3          in this action are neither factually, nor legally,

4          inconsistent and, moreover, the defendants have given

5          their     informed     consent     to     simultaneous

6          representation.'"

7          And the court also said, quote:

8          "Under the Georgia rules of professional conduct, the

9          simultaneous representation of parties whose interest

10         in litigation may conflict, such as co-defendants in

11         a civil action, constitutes a 'waivable conflict.'"

12         So I cited this. I thought this was very useful

13     authority. It was very recent authority decided by the US

14     District Court of the Northern District of Georgia in July of

15     2006 and, although it is not on all fours, I thought that it

16     was useful insofar as it emphasized the importance of the

17     choice that attorneys have, that clients have in choosing their

18     attorneys and also the fact that conflicts as they may arise

19     happen to be waivable. So I think the decision is highly

20     relevant even though the facts are not identical with those in

21     the present case.

22     Q.    Did the court's description of – the line that you

23     just read:

24         "Under the Georgia rules of professional conduct, the

25         simultaneous representation of parties whose interest

Ross - Direct                                                646

1           in litigation may conflict, such as co-defendants in

2           a civil action, constitutes a waivable conflict."

3    Was that an important factor in this analysis?

4    A.      Yes, I think it is a very important factor and

5    certainly makes this case analogous to the present situation.

6    Q.      Professor Ross, have you been able to identify any

7    unwaivable conflict in litigation where it is not absolutely

8    necessary for the parties to be on opposite sides of the

9    litigation?  And, to explain that, obviously you can't

10   represent a husband and a wife in a divorce action; is that

11   correct?

12   A.      Yeah, generally so.

13   Q.      And have you ever identified another unwaivable

14   conflict in litigation where the parties were on the same side,

15   the same co-defendants, co-plaintiffs, whatever?

16   A.      Well, generally, it is my understanding that the rules

17   themselves do not permit an attorney to represent opposite

18   sides in the same litigation.  So by their own terms, the rules

19   generally preclude that.  Beyond that, I have never made any

20   actual study of what other circumstances might arise, but it is

21   my understanding that that is pretty much the only conflict,

22   generally speaking, that would not be waivable.

23           Again, there may be some that I haven't identified,

24   you know, since I have not exhaustively researched this issue.

25   But it is my understanding that, unless the parties are

Ross - Direct                                          647

1    directly adverse to one another, just about any conflict can be

2    waivable.

3    Q.      Mr. Ross, I want to follow-up with a hypothetical that

4    was addressed to Mr. Beltran yesterday.  My memory is that Mr.

5    Beltran was given the hypothetical of a wholly-owned

6    corporation, you know, sole stockholder, and the sole

7    stockholder is the president.  The president has been

8    misbehaving.  The president has done something for which the

9    company may be liable.  Mr. Beltran testified, is my memory, is

10   that a single attorney would have to withdraw, could not

11   represent the company, the president and the sole shareholder

12   at the same time.

13           Do you share that opinion?

14   A.      No, I do not.

15   Q.      And why not?

16   A.      Because in a case like that the company and the

17   president would seem to virtually be the alter-ego of one

18   another and so, first of all, the president would be the one to

19   make the decisions for the company.  The president would appear

20   to be the only one directly affected by the conflict decision,

21   and the president would have a right to speak for the company

22   unimpeded by, you know, any other party.

23   Q.      And under Mr. Beltran's hypothetical - under his

24   premise, would it be possible - excuse me.  His premise is that

25   it would be impossible for one attorney to do both.  Given that

Ross - Direct                                                           648

1    premise, would that lead to any logical next step as to how

2    many attorneys it would take to represent the president and

3    sole shareholder of a closely-held corporation?

4    A.      Well, it seems to be at least two, then.

5    Q.      Would therefore this lead to a situation where the

6    president needed to hire two attorneys to potentially sue each

7    other?

8    A.      Yes.

9    Q.      And is that the spirit or letter of the ethical rules

10   under which Mr. DeLong operated in the relevant time frames?

11   A.      Well, I believe that Mr. DeLong operated both within

12   the letter and the relevant rule and also within the spirit of

13   the relevant rule.

14   Q.      And why is that, sir?

15   A.      For a number of reasons.  Again, the reasons that I

16   pointed out in the affidavit.  First of all, Mr. DeLong, with

17   regard to the letter of the rule, fulfilled his obligation to

18   discuss the potential conflict with the client and obtained the

19   informed consent of the clients and – that's all for now.

20   Q.      Professor, I believe you have already addressed – was

21   under the rules applicable to Mr. DeLong in the year 2000, was

22   he required to obtain this conflict waiver in writing?

23   A.      No.

24   Q.      And I want to address another set of hypotheticals Mr.

25   Beltran gave.  He raised the issue that Mr. DeLong would have

Ross - Direct                                          649

1    been required under the old rules, because he had a financial

2    interest in the litigation, he would have been required to have

3    given a waiver in writing.  Is that your understanding of the

4    rules as they apply?

5    A.        Absolutely not.

6    Q.        And why not?

7    A.        Under that reasoning, an attorney could never

8    represent a client for a fee.  An attorney would always have a

9    conflict of interest whenever he was being paid for his work.

10   Q.        I want to continue to follow-up with your testimony,

11   Professor.  Let's just assume for a second that there was a

12   possible breach of Mr. DeLong's ethical duties.  Does that

13   necessarily lead to the conclusion that he has committed legal

14   malpractice or breached a standard of care applicable to

15   attorneys?

16   A.        No.  The law throughout the United States is very

17   clear that there is a divergence in the malpractice area from

18   the standard rule of tort.  As you may recall, the general rule

19   in tort law is that a breach of a statute, you know,

20   constitutes negligence, per se.  That rule does not apply

21   generally in the area of malpractice.  The breach of a rule of

22   professional conduct generally does not constitute malpractice,

23   per se, and in most jurisdictions it does not even furnish a

24   presumption of malpractice; it merely is evidence that can be

25   presented in support of malpractice.

Ross - Direct                                    650

1    Q.      All right.  Professor, I want to go to the malpractice

2    issue now, but given the material that you have looked at and

3    the factual assertions that you have described, do you have an

4    opinion  regarding  whether  or  not  Mr.  DeLong  violated  the

5    standard of care applicable to attorneys in like circumstances

6    in his representation of both Terry Manufacturing and Rudolph

7    Terry?

8    A.      Yes, I do.

9    Q.      And what is that opinion?

10            THE  COURT: Excuse me.   Do  you  need  some  water?

11            THE WITNESS: Yes, please.

12            (Pause)

13            THE COURT:  We had a prisoner testifying this morning

14   and I moved it out of the way because I didn't want –

15            THE WITNESS: I was looking for it.

16            THE COURT:   I didn't want him heaving that at me if

17   he didn't like the way things were going, but you can have all

18   of the water you would like.

19            MR. BRIDGERS:   I am truly not sure Roy could have

20   gotten it over to you.

21            THE COURT: Well, I wasn't going to take the chance.

22            MR. BRIDGERS:   That makes sense.

23   BY MR. BRIDGERS:

24   Q.      Professor, I would like to go back – let me let you

25   finish getting your water.  (Pause) Professor, I want to go

Ross - Direct                                651

1    back to that question.  Given the material you have reviewed,

2    your research, do you have an opinion about whether or not Mr.

3    DeLong violated the standard of care applicable to attorneys in

4    like and similar circumstances during his representation of

5    Terry Manufacturing and Rudolph Terry?

6    A.      I do have an opinion.

7    Q.      And what is that opinion, sir?

8    A.      My opinion is that there wasn't a breach.

9    Q.      And is it relevant to your determination – is the

10   nature of the allegations against Terry Manufacturing and

11   Rudolph Terry, are the nature of those allegations relevant to

12   your conclusion that the standard of care was not breached?

13   A.      Yes.

14   Q.      How so?

15   A.      Again, as I testified, Mr. DeLong, as far as I know,

16   spoke with Roy Terry, the president and principal shareholder

17   of Terry Manufacturing, on numerous occasions, including, as I

18   have emphasized, critical occasions, and that he did inform

19   both Roy Terry and Rudolph Terry of the potential for conflict;

20   suggested that they might wish to obtain an opinion of

21   independent counsel before deciding whether or not to continue

22   to retain him as an attorney in this matter, or at least as an

23   attorney for both; and that he obtained their informed consent

24   to the continuation of representation for both.

25   Q.      Professor Ross, if the factual allegations against

Ross - Direct                                                652

1    Terry Manufacturing and Rudolph Terry would have been identical

2    or very similar, would that have impacted on your decision,

3    your conclusion about whether the standard of care was

4    breached?

5    A.      Yes.

6    Q.      How so?

7    A.      To the extent that the allegations against both the

8    company and Rudolph Terry, individually, were identical or very

9    similar, that would mean that Mr. DeLong could have represented

10   both of them with less potential of a conflict, particularly

11   because of the unlikelihood that there would be separate

12   defenses raised.

13   Q.      And is your opinion that Mr. DeLong did not breach the

14   standard of care impacted by the shareholder status of Rudolph

15   and Roy Terry?

16   A.      Yes.

17   Q.      How so?

18   A.      Again, as I testified earlier --

19           MR. BARRIERE:  Your Honor, I am sorry to interrupt.

20   As I appreciate it, we simply have the witness reading into the

21   record his affidavit and it has been for some time; is that not

22   the case?

23           THE WITNESS: No, it is not.  The only part of the

24   affidavit I read was a part of paragraph fifteen when I was

25   discussing the *Keohane* case.  Other than that, I have not read

Ross - Direct                                        653

1     a word.

2                MR. BARRIERE: Are you reading from something now?

3                THE WITNESS: No, I am not.  The affidavit is in front

4     of me and I may be looking down, but I am not reading from it.

5     I will put it aside there.  Quite honestly, I could not see it

6     with my glasses on.  So if I am looking down and I have paper

7     in front of me – remember, I took my glasses off when I read

8     the affidavit.

9                THE COURT:   Objection overruled.

10               MR. BARRIERE: Withdrawn.

11               MR. BRIDGERS:   The glasses defense.

12    BY MR. BRIDGERS:

13    Q.      Did – Professor Ross, I think I was in the middle of

14    asking if your opinion that Mr. DeLong did not breach the

15    standard of care impacted by the shareholder status of Roy and

16    Rudolph Terry.

17    A.      Yes.

18    Q.      And could you finish up your thought?

19    A.      Could you repeat the question, please?

20    Q.      Sure.  Is your opinion that Mr. DeLong did not breach

21    the standard of care impacted by the shareholder status of

22    Rudolph and Roy Terry?

23    A.      Yes, that is one of the factors.

24    Q.      Okay.  How does that factor play into your analysis?

25    A.      As I testified earlier, the fact that there were no

Ross - Direct                                    654

1    far-flung  shareholders  in  this  case  who  would  have  been

2    affected by the dual representation did influence my opinion.

3    The  fact  that  all  of  the  voting  shares  appear  to  have  been

4    owned by Roy and Rudolph Terry, and it is my understanding that

5    Roy  Terry  owned  fifty-one  percent  of  the  voting  shares  and

6    Rudolph  Terry  owned  forty-nine  percent.    So  when  Mr.  DeLong

7    spoke  with  Roy  Terry  and  Rudolph  Terry,  he  was  speaking  to

8    owners  of  one  hundred  percent  of  the  shares  of  voting  stock,

9    and therefore there were no owners of voting shares that would

10   have been affected by the continued representation.

11   Q.       Is  it  similarly  significant  that  the  risk  of  the

12   conflict of interest really involved only those two consenting

13   parties as the shareholders?

14   A.       Would you repeat the question, please?

15   Q.       Sure.  Is it significant that the risk of the conflict

16   of interest involved really only these two parties?

17   A.       Yes, it is very significant.

18   Q.       Is  your  opinion  that  Mr.  DeLong  did  not  breach  the

19   professional duty of care affected by your understanding of the

20   Terrys' experience in business?

21   A.       Yes.

22   Q.       How so?

23   A.       I think that it is very significant that both Roy and

24   Rudolph  Terry  appear  to  have  been  highly  sophisticated

25   businessmen  and  I  do  believe  that  the  extent  to  which  an

Ross - Direct                                              655

1    attorney's duty to inform a client of a potential conflict can

2    be affected by the degree to which the client is sophisticated,

3    and I think that also has relevance with regard to the issue of

4    the waiver.   A sophisticated business person can waive a

5    conflict more easily, as it were, or more clearly give informed

6    consent to the continuation of dual representation than can an

7    unsophisticated client.

8    Q.      Professor, is the *Minnesota Tax Court versus City of*

9    *Anoka* case cited in your affidavit, was that relevant to this?

10   A.      Yes, it is.

11   Q.      And just for the citation, 2006 Westlaw 771932.

12   A.      Again, like the Keohane case, this case is not on all

13   fours, but I thought that it did have a significant relevance

14   to this case and that is why I cited it in my affidavit.   And

15   may I read again from the affidavit on that particular point?

16   Q.      Please, if you want to give a little more information

17   on that.

18   A.      I don't want to misquote the court.   I beg your

19   pardon?

20   Q.      Please, if you want to give a little more information

21   on that.

22   A.      I say in paragraph twenty:

23           "In this connection it should also be relevant that

24           both Roy Terry and Rudolph Terry presumably —"

25   Q.      Perhaps, Professor, I may just let you skip down and

Ross - Direct                                                    656

1    read your citation.  There is probably no reason to do that

2    again.

3    A.        *Kmart Corp versus County of Anoka*, 206 Westlaw 771932,

4    Minnesota Tax, Regular Division at star three.

5    Q.        And what was the pin cite there – not the pin cite but

6    the paren?

7    A.        Star three.

8    Q.        No, the paren that you have referenced in your

9    report?

10   A.        Oh, twenty, paragraph twenty.

11   Q.        All right.  Thank you.  Is your opinion that Mr.

12   DeLong did not breach the standard of care affected by your

13   understanding that the Terrys both wanted Mr. DeLong to

14   continue with the representation?

15   A.        Yes.

16   Q.        And how so?

17   A.        Clearly the fact that the president of the company

18   wanted Mr. DeLong to continue the representation is relevant,

19   as is the fact that Rudolph Terry, the other affected party,

20   also, in my understanding, encouraged Mr. DeLong to continue

21   with the representation.

22   Q.        And generally do courts defer to a client's selection

23   of attorneys?

24   A.        Absolutely.  And that was an important factor in my

25   decision, in my opinion.

Ross - Direct                                                   657

1   Q.      Is your opinion that Mr. DeLong did not breach the

2   standard of care affected by your understanding that he raised

3   the issue of a conflict of interest on several occasions?

4   A.      Yes.

5   Q.      And why is that important?

6   A.      Well, I think one occasion would have been enough but

7   I think that the repetition of this makes even clearer that

8   there was no breach of any duty in this case.  Obviously the

9   more times they heard it, the more opportunity they had to

10  consider the possibility of a conflict and the more clearly

11  there is evidence that there was in fact informed consent.

12          Also, as I indicated earlier, I think it is relevant

13  that Mr. DeLong not only raised this issue on various occasions

14  but raised it on occasions when there were changes in the

15  course of the litigation.  When, for example, the complaint was

16  amended to include Rudolph Terry, it is my understanding that

17  he brought this up again.  So whenever it appeared that there

18  might be some change in the circumstances that could affect

19  dual representation, it is my understanding that Mr. DeLong

20  reminded the client of the potential for a conflict and

21  reiterated his statements.

22  Q.      Do you think Mr. DeLong fell within the spirit of the

23  conflict laws that applied to him during the course of this?

24  A.      Absolutely, yes.  Not only did he follow the letter,

25  I think that he followed the spirit because he offered full and

Ross - Cross                                658

1    frank information to the client, as far as I know, about the

2    potential for a conflict and asked them or suggested that they

3    obtain outside counsel, which again was not required by the

4    rule and, you know, appears to have been concerned about all of

5    the various possibilities that could have arisen in the context

6    of a conflict.

7            MR. BRIDGERS: Your Honor, may I have a second?

8            (Pause)

9    Q.      Professor, just one more question.  I want to make

10   sure we have this cleared up from yesterday.  In your opinion,

11   does an attorney representing a closely-held corporation have

12   a duty to protect the creditors of that company?

13   A.      What do you mean by protect?

14   Q.      Well, does an attorney representing a closely-held

15   corporation, does the attorney's professional obligations go to

16   creditors or third parties?

17   A.      This is not an issue that I have specifically

18   researched but, based on everything I know generally about the

19   duty of an attorney, the duty of an attorney is to the

20   attorney's client and not to third parties.

21           MR. BRIDGERS: Your Honor, I would tender the witness.

22           THE COURT: Okay.  Mr. Barriere.

23                       CROSS-EXAMINATION

24   BY MR. BARRIERE:

25   Q.      Good afternoon, Dr. Ross.  I had a little trouble

Ross - Cross                    659

1    following some of what I heard, so bear with me.  I will go

2    through it perhaps a little slower.

3              Let's start with your contacts with the state of

4    Georgia.  As I appreciate it, you have never practiced law in

5    the state of Georgia?

6    A.        No.

7    Q.        You have never been admitted to practice law in the

8    state of Georgia?

9    A.        No.

10   Q.        Have you ever before acted as an expert with respect

11   to the Georgia duty of care for an attorney?

12   A.        Not to the best of my knowledge.

13   Q.        Well, you would know that; wouldn't you?

14   A.        I may have.  I have served as a consultant and expert

15   witness in a number of cases, and I can't, off of the top of my

16   head, recall any case involving Georgia but I may have.

17   Q.        Have you ever been admitted to testify as an expert in

18   a courtroom in Georgia?

19   A.        I have never testified in a courtroom in Georgia.  I'm

20   not certain that I have not been certified as an expert witness

21   in a case pending in Georgia.  Probably not.

22   Q.        Probably not, all right.  Am I correct, sir, your

23   principal expertise is with respect to legal fees and the

24   reasonableness of legal fees?

25   A.        That is the area in which I have most of my

Ross - Cross                                660

1    publications on ethics.

2    Q.      Have you ever published anything on the topic of

3    conflicts of interest?

4    A.      No.

5    Q.      All right.  Have you previously been tendered as an

6    expert with respect to conflicts of interest?

7    A.      Not to the best of my knowledge.  I would have to

8    check my resume again.

9    Q.      Have you ever been accepted as – if you have never

10   been tendered, I presume you have never been accepted as far as

11   an expert on conflicts of interest?

12   A.      Frankly, sir, I think I would need to review my resume

13   in order to answer that question thoroughly.

14   Q.      Take a moment.

15   A.      Actually my list is back in my briefcase.  May I?

16   Q.      Sure.

17           THE COURT: Go ahead.

18           THE WITNESS: Thank you.

19           (Pause)

20   Q.      My question, sir, is have you ever previously been

21   tendered as an expert on conflicts of interest?

22   A.      No.  I do believe that I have served as a consultant

23   on this issue.  I recall having issued some sort of an opinion

24   letter on this subject in Birmingham a couple of years ago, but

25   it is not on my resume or on my website, but I have not, to the

Ross - Cross                                              661

1    best of my knowledge, been tendered as an expert on the

2    subject.

3    Q.      All right.   And if you have not been tendered,

4    presumably you have never been accepted as an expert

5    previously?

6    A.      Right.

7    Q.      And indeed, sir, is the reality that most of your

8    professional focus, indeed what you are known for publically is

9    that you testify and comment and write about legal fees and the

10   propriety of fees and how to quantify legal fees; is that

11   correct?

12   A.      That has certainly been the large majority of my

13   writings about ethics but actually, in terms of testifying as

14   an expert witness, I have been called on a number of issues of

15   professional conduct and probably testified on issues involving

16   legal fees in fewer than half of those cases.

17   Q.      Okay.   So let's turn to your methodology.   I want to

18   make sure I understood what it was exactly you did here to come

19   to these conclusions.   You sat in the courtroom today.   We know

20   that.

21   A.      Yes.

22   Q.      You heard Mr. DeLong speak.   You didn't hear any of

23   the other testimony in the trial?

24   A.      No.

25   Q.      All right.   You read Mr. Beltran's report and you read

Ross - Cross                                                662

1    his deposition, correct?

2    A.       Yes, both.

3    Q.       You did not read any of the other depositions

4    conducted in this case, correct?

5    A.       No.

6    Q.       Did you review – we have got a whole bunch, fifteen,

7    I am told, boxes of information on the underlying litigation.

8    Did you look at any of that?

9    A.       No.  Well, excuse me, I don't know what's in all of

10   those boxes.  I might have.  If I may add one thing, when I was

11   on direct I believe I omitted reference to a couple of other

12   documents that I reviewed in preparation for my testimony, and

13   those are the affidavits of Roy Terry and Rudolph Terry.

14   Q.       The affidavits they filed in this case?

15   A.       Yes.

16   Q.       Okay.

17   A.       So I did review both of those.

18   Q.       All right.  But insofar as the underlying Commercial

19   Factors litigation, you have no knowledge about that other than

20   what Mr. DeLong may have told you, correct?

21   A.       Correct.

22   Q.       And that was either in the conversation you had with

23   him or the testimony you heard here today?

24   A.       Well, my knowledge of the Commercial Factors

25   litigation is based on my conversations with Mr. DeLong and

Ross - Cross                                    663

1    also whatever references there might have been in the Beltran

2    deposition, the Beltran affidavit and the Terry affidavits.

3    Q.      All right.  Well, you would agree with me, sir, that

4    your only source for the evaluation of how that litigation was

5    conducted on behalf of Terry Manufacturing and Rudolph Terry

6    has been your conversation with Mr. DeLong; right?

7    A.      Well, again, I may have seen references to it in other

8    places, as well, but primarily my conversations with Mr.

9    DeLong.

10   Q.      Okay.

11   A.      And also probably my conversations with other

12   attorneys in the firm.

13   Q.      Mr. Bridgers, perhaps?

14   A.      Mr. Bridgers, particularly, yes.

15   Q.      All right.  Mr. Bridgers wasn't involved in the

16   litigation, was he?

17   A.      Not to my knowledge.

18   Q.      Okay.  What day did you write your affidavit, what day

19   did you release your affidavit?

20   A.      It was sworn to on June 29, 2006.

21   Q.      Okay.  And how much before that had you had your

22   conversation with Mr. DeLong?

23   A.      As I testified on direct, I originally spoke with Mr.

24   DeLong probably during the last week of May, 2006.

25   Q.      And how long after you talked with him did you

Ross - Cross                                                664

1    actually render your report?

2    A.      When you say my report, do you mean –

3    Q.      Did you send him a letter with your findings?

4    A.      Yes.

5    Q.      And when did you send that?

6    A.      That was sent to him and dated June 7, 2006.

7    Q.      All right.  So the analysis that you performed to come

8    to the conclusions you are presenting today all occurred

9    between May 29 and June 6?

10   A.      Well, the opinions that went into that letter occurred

11   between sometime in late May and June 7.

12   Q.      Is there anything that you have testified to today

13   that was not included in that letter, other than the fact that

14   you heard Mr. DeLong testify today?

15   A.      Well, I obtained access to or received additional

16   documentation after I had prepared that letter, and some of

17   that was incorporated into my affidavit on June 29.

18   Q.      Am I correct, sir, that in your letter you concluded

19   that there had been an effective waiver of the conflict?

20   A.      Yes.

21   Q.      And that there was no breach of any duty owed by Mr.

22   DeLong?

23   A.      Yes.

24   Q.      Okay.  The substantive opinions you are offering here

25   today?

Ross - Cross                                          665

1    A.       Substantively – well, certainly there is no conflict

2    – in my mind, there is certainly no conflict between my opinion

3    letter and my affidavit.    And I was addressing somewhat

4    different issues in the two documents but the substance of the

5    opinions are in no way in conflict.

6    Q.       All right.  What is the standard of care applicable to

7    an attorney practicing in the state of Georgia?

8    A.       With regard to what?

9    Q.       This case.

10   A.       With regard to this case, it is my understanding, as

11   I testified on direct, that the attorney does have and did

12   have, prior to 2001, a duty to inform the affected parties of

13   the potential for a conflict and to obtain their informed

14   consent before proceeding with the dual representation.

15   Q.       Well, you have answered, I think, a different

16   question.    That was the rule with respect to waiver of

17   conflict.    As a general proposition, what is the standard of

18   care applicable to an attorney in a malpractice action?

19   A.       The attorney owes the client a duty of care that is

20   consistent with the duties owed to clients generally in the

21   jurisdiction.    In other words, a duty of loyalty, a duty of

22   competence, a duty of diligence, and all of the duties that are

23   prescribed by the rules of professional conduct.

24   Q.       Well, can you tell me, sir, what is the standard of

25   care by which one judges whether an attorney has acted

1    negligently or not?

2    A.       Whether he has breached that duty.

3    Q.       Okay.  What is the duty you are referring to?  This is

4    not a difficult question, I believe.  I am simply asking you

5    what have the Georgia courts told us, in a malpractice action,

6    what is the definition of the standard of the duty of care?

7    A.       It depends upon what type of action it is.  It would

8    depend upon what type of malpractice the attorney has been

9    charged with.

10   Q.       There are different standards of care depending upon

11   what type of malpractice; is that your testimony?

12   A.       Well, the attorney has a general standard of care

13   toward a client.  Again, standards that are the ones that I

14   mentioned before, the basic standard of competency, the

15   standard of diligence, you know, the standard of loyalty, these

16   are all standards, and in any given malpractice action, an

17   attorney may be charged with a breach of a particular standard.

18   Q.       All right.  Well, how would Georgia courts define the

19   standard of competence?

20   A.       That is a specific question, how would they define the

21   standard of competence, and the standard of competence is the

22   standard that the attorney must, you know, provide - be

23   knowledgeable about the law and have expertise in the area in

24   which he is rendering legal services.

25   Q.       In preparation of this report or your underlying

Ross - Cross                                   667

1    letter, did you read any cases in order to ascertain the

2    standard of care applicable to an attorney practicing in the

3    state of Georgia?

4    A.        I may have.  I don't specifically recall.

5    Q.        You don't specifically recall.  So when you told us

6    for the last 45 minutes or so that Mr. DeLong didn't breach the

7    standard of care, you did not have any underlying cases which

8    you used as a guiding light as to what the standard of care is;

9    is that correct?

10   A.        I believe that the guiding standard here of care is

11   the obligation that an attorney owes to the client when there

12   is a potential conflict of interest.  You know, there is your

13   duty of care, and that is the duty that I have been discussing.

14   Q.        Okay.  All right.  And what did you look at to come to

15   that conclusion or did you look at anything?

16   A.        Well, yes, as I indicated on direct, first of all, I

17   checked the Georgia law to see if there was any, you know, case

18   directly on point, particularly with regard to this issue of an

19   officer of a corporation, you know, that has been charged or is

20   to be charged with fraud in circumstances like this.  I

21   certainly didn't find any case on point, and I don't know of

22   any case on point.  And then I looked generally at Georgia

23   cases involving conflict of interest issues and, again, I

24   didn't – the case that I found that I thought was most

25   relevant, you know, was the *Keohane* case which had been decided

Ross - Cross                                      668

1    by a federal court only the month before, and I cited that in

2    my affidavit.

3         But I did not find any cases that were directly on

4    point but, you know, certainly there is significant law

5    generally on the question of the obligation of the attorney to

6    inform the client of the potential conflicts and to obtain

7    informed consent.

8    Q.    Okay.  What is the relationship between the standard

9    of care applicable to an attorney practicing in the state of

10   Georgia and the disciplinary rules – I am sorry, I have

11   misstated it again – the directory rules and the ethical

12   considerations?

13   A.    Would you repeat the question, please?

14   Q.    Sure.  What role in the standard of care is played by

15   the directory rules and the ethical considerations applicable

16   to attorneys practicing in the state of Georgia?

17   A.    I don't know what you mean by the word rule.

18   Q.    Well, how, if at all, is the standard of care defined

19   by the directory rules and the ethical considerations?

20   A.    Are you asking me what they say?

21   Q.    No.   I am asking you to what extent the ethical

22   considerations and the directory rules establish, in whole or

23   in part, due duty of care applicable to an attorney practicing

24   law in the state of Georgia?

25   A.    Oh, they establish the standard of care, yes.  They

Ross - Cross                                    669

1    prescribe the standard of care.

2    Q.      Okay. All right. Now, which of the directory rules

3    and the ethical considerations did you reference in coming to

4    the conclusion that Mr. DeLong did not breach a standard of

5    care?

6    A.      I was concerned with the rules that were in effect

7    before 2001 and that was, as I said on direct, rule 4-102 and

8    standards 35, 36 and 37 thereunder.

9    Q.      35, 36 and 37, all right.

10          (Pause)

11   Q.      All right. Now I want to make sure I understood what

12   you have testified were the requirements for an effective

13   waiver of a conflict of interest.

14   A.      Yes.

15   Q.      First, I understand from your testimony that it is

16   your view that absent a direct adversarial relationship between

17   the clients, i.e., one is suing the other or divorcing the

18   other, all conflicts are waivable in a civil context?

19   A.      Provided that the attorney himself is convinced that

20   he can provide adequate representation to both sides.

21   Q.      Okay. So let me make sure I understand. There was

22   basically a three-part test, if I understood your testimony.

23   One, the attorney must be convinced he can provide competent

24   representation to both sides?

25   A.      Yes.

Ross - Cross                                    670

1    Q.        Two, the clients must be informed of the actual or

2    potential conflict?

3    A.        Right.

4    Q.        And, three, they must provide consent, informed

5    consent?

6    A.        Yes.

7    Q.        All right. Now with respect to the first requirement,

8    the attorney must be convinced he can provide adequate

9    representation, is that an objective standard?  Is it

10   sufficient that I simply say, sure, I can do a fine job?

11   A.        I think every attorney has to decide that for himself.

12   So I think we can probably judge this done by the standard of

13   the reasonable attorney under the circumstances.

14   Q.        I heard two different things.  It is the reasonable

15   attorney, so it is an objective standard, or it is a subjective

16   standard?

17   A.        I think it probably incorporates elements of both.  I

18   think that the individual attorney has to make up his own mind

19   regarding this question based upon the circumstances known only

20   to him, and different attorneys may reach different conclusions

21   with regard to different conflicts.

22            So to that extent, I suppose it is subjective and yet

23   I suppose that it has an objective dimension insofar as one

24   could look at – an outsider could look at a particular

25   situation and say that no reasonable attorney under a

Ross - Cross                                671

1    particular circumstance could continue representation.  So it

2    really, I think, borrows from both subjective and objective

3    standard.

4    Q.      All right.  Now as I understand it, you didn't look at

5    the underlying pleadings in Commercial Factors; you didn't read

6    the depositions conducted in that case; correct?

7    A.      Right.

8    Q.      You did not, I guess, review other correspondence,

9    files, or any of the trial exhibits from  Commercial Factors;

10   is that correct?

11   A.      Insofar as I know.

12   Q.      You really don't know anything about the substance of

13   the case; is that a fair summary?

14   A.      Well, I wouldn't say I don't know anything about it,

15   but  I  do  not  -  I  have  not  read,  you  know,  all  of  those

16   documents that are in the courtroom today.

17   Q.      Indeed, unless I misunderstood you, you haven't read

18   anything; you have actually talked to Mr. DeLong and gotten his

19   spin on the case?

20   A.      Well, I have talked to Mr. DeLong but, as I said, I

21   have also reviewed the depositions of Roy and Rudolph Terry; I

22   have reviewed the Beltran affidavit; I reviewed the Beltran

23   deposition; I reviewed several of the complaints and amended

24   complaints in this case.  So I do have kind of a broad context

25   of understanding of the underlying issues in the litigation.

Ross - Cross                                                          672

1    Q.       All right.  Well, what did you do to satisfy yourself

2    that a reasonable attorney, not Mr. DeLong, but the objective

3    component,  a  reasonable  attorney  could  have  rationally

4    concluded  he  could  effectively  represent  both  Terry

5    Manufacturing and Rudolph Terry simultaneously?

6    A.       Well, I was influenced by a number of factors.  One of

7    the factors was the one to which I have previously referred,

8    which is that it appears that the –

9            THE COURT: Excuse me.  Go ahead.  I'm sorry.

10           THE WITNESS: That the allegations against both Terry

11   Manufacturing and Rudolph Terry were substantially the same.

12   During his testimony this morning, for example, Mr. DeLong

13   raised a point which I believe he mentioned earlier to me,

14   which is that the complaints referred generally to defendants

15   and did not actually specify a particular defendant, thereby

16   suggesting that the allegations in both were substantially

17   identical and, you know, to the extent that they are identical,

18   it would be very difficult indeed to identify a conflict.

19   Q.       Anything else?

20   A.       Yes.  I also took into account another issue which I

21   alluded to today, that both of the Terrys appear to have been

22   sophisticated business people –

23   Q.       Well, that doesn't have anything to do with whether

24   one could reasonably conclude that a reasonable attorney could

25   reasonably believe, if I understood your comments correctly,

Ross - Cross                                        673

1   that he could actually represent both?

2   A.        Well, I think that has at least some relevance insofar

3   as he would be working with more sophisticated people, could

4   better explain to them the potential for a conflict and better

5   deal with any conflict that might later arise.  And I also

6   think it is relevant, the other issue I mentioned earlier about

7   the defenses, you know, the fact that – it relates to my first

8   point, that to the extent that the allegations against both

9   Terry Manufacturing and Rudolph Terry individually were

10  substantially identical, it was unlikely that the attorney was

11  going to need to raise defenses that might lead to conflicts

12  between the two clients.  So that was another important

13  consideration in the formulation of my opinion that there could

14  be a waivable conflict.

15  Q.        Are you aware that Rudolph Terry pled guilty to

16  criminal conduct arising out of the same conduct which was at

17  the heart of the Commercial Factors litigation?

18  A.        Would you repeat the question, please?

19  Q.        Sure.  Are you aware that Rudolph Terry pled guilty to

20  criminal conduct which was the same conduct at the heart of the

21  Commercial Factors litigation?

22  A.        I am certainly aware that Rudolph Terry pleaded guilty

23  to criminal conduct, and I am aware that the criminal conduct

24  had some relation to the allegations in the complaint.  Whether

25  it was identical or not, I can't say.

Ross - Cross                                    674

1   Q.      All right.  A hypothetical, I have two clients, dual

2   representation.  One of them testifies and perjures himself.

3   Do you believe – and I have one innocent client who has not

4   testified falsely and I have one that has.  Can I, as a

5   reasonable attorney, not a subjective lawyer who is convinced

6   I can win any case, the reasonable attorney and I believe that

7   there is not a fundamental conflict such that I can't really

8   represent those two to the best of my ability?

9   A.      I think I would have to know more about the facts of

10  the case to give a definitive answer but, on the surface, it

11  looks  as  though  that  would  certainly  present  a  much  more

12  difficult issue of conflict than we have in the present case.

13  Q.      Well, has anyone told you and, if not, let me be the

14  first to do so, that there is significant evidence that Rudolph

15  Terry  perjured  himself  within  the  first  weeks  of  this

16  litigation.  Are you aware of that?

17  A.      I beg your pardon?

18  Q.      Were you aware of that?

19  A.      I may have heard it at some point.

20  Q.      Okay.  Well, again, I am now not the subjective

21  attorney but the reasonable attorney.  In your judgment, can

22  the reasonable attorney reasonably conclude that, once I have

23  a perjurer for a client and a client who is not a party to that

24  perjury, that I can continue to represent them effectively?

25  A.      Well, as I said before, I think that depends on the

Ross - Cross                                                    675

1    circumstances and I think that depends upon the circumstances

2    in which the perjury occurred.

3    Q.      Okay.  Well, what do you need to know?  I will help

4    you.

5    A.      I think I need to know a great deal more.  I am not

6    sure that any hypothetical could really cover every possible

7    circumstance, but I guess, to ask one question, at what point

8    in time?  Was the attorney aware of the perjury when he

9    originally discussed the potential of conflict with the client?

10   Q.      Well, let me ask you a question, then, sir.  Given

11   that you do need to know those sorts of facts about each case

12   that you evaluate – was there perjury, were there conflicting

13   defenses – isn't the reality that you can only give the sort of

14   opinion you are offering today once you know what happened in

15   the underlying litigation?

16   A.      Well, as I have testified before, I think I knew

17   enough about the underlying litigation to give my testimony in

18   this case.

19   Q.      All right.

20            THE COURT: Well, he didn't know what he didn't know.

21   Why don't you give him the facts as you think they are?

22            MR. BARRIERE: I will be happy to, Your Honor.

23   Q.      Were you aware that Rudolph Terry signed verifications

24   attesting to the fact that he had received millions of dollars

25   of product which were in fact never delivered to Terry

                              Ross - Cross                          676

1    Manufacturing?

2    A.       Yes, I have heard that.

3    Q.       You are aware of that?

4    A.       Yes, I have been aware of that since very early in my

5    participation in this process.

6    Q.       All right.  Are you aware at his first deposition Mr.

7    Terry confirmed receipt of that product and testified that he,

8    in turn, resold the product; are you aware of that?

9    A.       I believe I was.

10   Q.       Okay.  Are you aware of the fact that he indicated he

11   had multiple customers for the resale of that product but had

12   not collected from any of them?

13   A.       I am not sure whether I have heard that or not.

14   Q.       All right.  You are aware, sir, that in fact there was

15   no product?

16   A.       I believe I have heard that.

17   Q.       So you are aware that at least that first deposition

18   he perjured himself?

19   A.       Again, I have not read the deposition.

20   Q.       Well, based upon what I just told you, it sort of

21   sounds like perjury; doesn't it?

22   A.       It would.

23   Q.       Yeah, okay.

24   A.       But, again, I don't know that.

25   Q.       All right.  Now he testifies three weeks later, he is

Ross - Cross                                                    677

1    asked specifically about documents evidencing the sale of that

2    product to his own customers, asserts he has such a document.

3    Again, he is asked did he indeed get the product.  Of course,

4    the answer is yes.  He is asked what is he doing to collect and

5    he is pursuing his customers.  All of that was untrue, I will

6    represent to you, sir.  Are you aware of that?

7    A.        I may have heard it.

8    Q.        You may have heard it.  So now the lawsuit, I will

9    represent to you, was filed in December of 1999.  By mid-May of

10   2000, we have two depositions in which client "A," Rudolph

11   Terry, has perjured himself.  In your judgment under those

12   circumstances could a reasonable attorney conclude he could

13   effectively represent both the corporation, a fictional entity,

14   perhaps, but the innocent entity, and the perjurious client?

15   A.        I think he could.

16   Q.        He could?

17   A.        Yes.

18   Q.        All right.

19   A.        Under certain circumstances, which in my opinion were

20   present in this case.

21   Q.        And those circumstances specifically are?

22   A.        In that one hundred percent of the voting shares were

23   owned by these two individuals, including the person that you

24   describe as a perjurer, and they provided, both of them,

25   informed consent to the dual representation.

Ross - Cross                                          678

1    Q.        Are you of the opinion, sir – I guess I am inferring

2    this from your testimony.  Are you of the opinion, when I have

3    a closely-held corporation, one shareholder, two shareholders,

4    that if they tell me, look, we like you, you are a competent

5    guy, it is cheaper to use one than two, I should go forward as

6    their lawyer?

7    A.        Absolutely if you believe that you can provide

8    competent representation to both of them.

9    Q.        And, again, it is just a subjective or objective

10   standard, a bit of both?

11   A.        A bit of both.

12   Q.        And you believe that an objective attorney could

13   rationally conclude he could represent both the corporation and

14   its perjurious officer simultaneously?

15   A.        Yes.

16   Q.        What happens, if consistent with his obligations to

17   the court, he decides he needs to report that perjury?

18   A.        Would you repeat the question, please?

19   Q.        Yes.  What if he decides that, consistent with his

20   obligations to the court to ensure an accurate record, he

21   decides he needs to report that perjury?

22   A.        Well, I suppose then obviously he needs to report the

23   perjury.  Obviously an attorney owes a duty to the court as an

24   officer of the court.  If he concludes that he shouldn't report

25   the perjury, then of course he must.

Ross - Cross                                             679

1    Q.       And does he continue to represent these two clients or

2    does he withdraw?

3    A.       Again, that depends upon a number of factors.  One of

4    the factors is whether, if we are talking about only two

5    individuals, whether the other individual was aware of the

6    perjury.

7    Q.       Okay.  That's a good question.  Do I have to go to

8    both clients to ensure they are aware of the perjury in order

9    to get an informed consent?

10   A.       Would you repeat the question, please?

11   Q.       I will try.  Do I have to tell both clients that one

12   client perjured himself in order to obtain the informed

13   consent?

14   A.       I think that gets into some very complex issues

15   regarding the confidentiality of information and I am not here

16   as an expert on confidential – of attorney's confidences.

17   Q.       Well, I am a simple person and I will tell you this:

18   I would want my lawyer to tell me my co-defendant perjured

19   himself; wouldn't you?  It seems like kind of a relevant

20   problem.

21   A.       I think most clients probably would.

22   Q.       Yeah, I think so.  So, now, in order to get this

23   waiver, I have got to give informed consent; right?

24   A.       Yes.

25   Q.       And you are my co-defendant, you need to give informed

Ross - Cross                                    680

1    consent, correct?

2    A.      Yes.

3    Q.      And for both of us to give informed consent, don't you

4    need to be told that I perjured myself if I in fact did so?

5    A.      Again, I think that depends on the circumstances.

6    Q.      Well, I am a little perplexed, professor.  You just

7    told me – I didn't find it surprising – that pretty much anyone

8    would   like   to   know   whether   or   not   their   co-defendant

9    represented by the same lawyer had perjured themselves.  What

10   circumstances can you conceive of where one of the parties

11   would be pleased, blissful, and give informed consent without

12   knowing about his co-defendant's perjury?

13   A.      You are hypothesizing that the co-defendant did not

14   know of the perjury of the other defendant; is that correct?

15   Q.      Well, I am asking you doesn't the lawyer need to

16   ensure that; doesn't he need to tell both clients?

17   A.      Normally, yes.

18   Q.      All right.  And barring which there can be no informed

19   consent; correct?

20   A.      Again, I think that depends on the circumstances of

21   the case but that certainly is a relevant issue with regard to

22   informed consent.

23   Q.      All right.  Now as an attorney subject to an objective

24   standard and subjective, as you told me, can I have a good

25   faith belief that I can adequately represent both of my

Ross - Cross                                    681

1     defendants under the following circumstances:

2          The corporation owes nothing, never got any product,

3     has no enforceable obligation.  My other defendant, however,

4     signs off on a fraud, said that a product had been received.

5     And to mask that fraud, he wants the corporation to pay for it,

6     use the corporation's money.  Are you following me?

7     A.     Yes.

8     Q.     All right.  Can I objectively represent both parties

9     when I know, or should know, that I am being called upon by the

10    officer to use corporate funds for an obligation not owed by

11    the corporation?

12    A.     Again, I think that depends on the circumstance but,

13    in many cases, no.

14    Q.     No?

15    A.     In many cases.  Again, it depends on the

16    circumstances.

17    Q.     And you would agree with me, sir, notwithstanding the

18    subjective view of that officer – he has got a real incentive

19    to hide his fraud for the use of corporate funds – I, as an

20    independent attorney, have an obligation under the ethical

21    rules to conclude I cannot represent those parties effectively;

22    correct?

23    A.     That could be the conclusion of a reasonable attorney.

24    Q.     And once I reach that conclusion, it really doesn't

25    matter that that officer says to me, oh, no, no, I want you to

Ross - Cross                                                     682

1   represent both me and the corporation; you are a good guy and

2   you will be cheaper than two; correct?

3   A.      Would you repeat the question, please?

4   Q.      I will try.  Once I have concluded as a reasonable

5   attorney that I can't effectively represent both parties, it

6   doesn't matter that that officer, the officer who was the party

7   to the fraud, says, no, no, I really want you to represent both

8   me and the corporation; you seem like a competent guy and you

9   are cheaper than two?

10  A.      You are correct.

11  Q.      Okay.  And that's really the situation we are faced

12  with here; isn't it?

13  A.      I couldn't say.

14  Q.      You couldn't say because you don't know enough about

15  the underlying litigation; right?

16  A.      Well, I think there may be more facts here than – you

17  know, it is a complex case.  There are many facts and your

18  hypothetical may not address all of the relevant facts.

19  Q.      And since you don't know all of the relevant facts,

20  you're really not in a position to be so assertive as telling

21  us that Mr. DeLong plainly provided, quote, bold and frank

22  information, unquote, and plainly satisfied the standard of

23  care; correct?

24  A.      I stand by the opinion I gave in the affidavit based

25  upon the information I had then and based upon what I heard

Ross - Cross                                              683

1     from Mr. DeLong this morning.

2     Q.        I understand, professor, and I am not quibbling with

3     you other than you just don't have the information on the

4     underlying case other than the very limited materials you saw,

5     which were basically two affidavits by Roy and Rudolph Terry

6     and the other expert's deposition, and there was just one?

7     A.        Again, I have informed the court and informed all of

8     the parties today of what I have looked at and what I haven't

9     looked at.

10    Q.        EC 5-15.  Do you have it before you, sir?

11    A.        Yes.

12    Q.        All right.  You have read this, I presume, in

13    connection with your due diligence in order to give your

14    opinion?

15    A.        As far as I can recall.

16    Q.        Okay.  Quote:

17              "If a lawyer is requested to undertake or to continue

18              representation of multiple clients having potentially

19              differing interests, he must weigh carefully the

20              possibility that his judgment may be impaired or his

21              loyalty divided if he accepts or continues the

22              employment.  He should resolve all doubts against the

23              propriety of the representation."

24    Unquote.  Did I read that accurately?

25    A.        Yes.

Ross - Cross                                684

1    Q.      Good.    And, as I understood from your earlier

2    testimony, this ethical consideration is incorporated in the

3    duty of care applicable to attorneys faced with dual

4    representations; correct?

5    A.      Yes.

6    Q.      Now, I take it from the first clause this is the

7    lawyer's obligation.    He, he must weigh carefully the

8    possibility; correct?

9    A.      Yes.

10   Q.      He doesn't leave it to the client?

11   A.      Yes.

12   Q.      It is not sufficient if the client says, fine, I don't

13   care about all of that legal stuff, I want you to represent me

14   and the corporation?

15   A.      Yes.  This is precisely the obligation to which I have

16   referred on several occasions today during my testimony that,

17   irregardless of what the client wants, the attorney, himself or

18   herself, must be satisfied that his loyalty will not be

19   impaired, and I have alluded to that several times now.

20   Q.      Fine.  And what do you understand to be the meaning of

21   the term "differing interests?"

22   A.      Differing interests, interests that could lead to some

23   sort of conflict which would impair the loyalty of the

24   attorney.

25   Q.      All right.

Ross - Cross                                                    685

1    A.       The representation.

2    Q.       Let's go back to a hypothetical we talked about a

3    moment ago.  I have got my corporation and I have got my

4    defrauding officer.  Obviously one issue that comes to me, as

5    his attorney, is can I raise the defense of *ultra vires*, of

6    *ultra vires* conduct by the officer, he acted outside the scope

7    of his employment.  Is that a differing interest between the

8    corporation and that officer?

9    A.       It could indeed be.

10   Q.       It could be?  It would be; wouldn't it?

11   A.       Generally so.

12   Q.       Generally so, yeah.  I mean, by definition, I am

13   saying you acted *ultra vires*, you acted beyond the scope of

14   your duties as an officer, correct?

15   A.       Correct.

16   Q.       And plainly the officer, he has an interest in saying

17   otherwise; correct?

18   A.       Correct.

19   Q.       And particularly if there is an indemnity in place

20   because, if it is *ultra vires*, he is not entitled to indemnity;

21   is he?

22   A.       Correct.

23   Q.       Okay.  So once I get to that part, to the point I have

24   differing interests and, consistent with my ethical obligation,

25   I   should   resolve   all   doubts   against   the   propriety   of

Ross - Cross                                                686

1    representation; correct?

2    A.      Again, it depends upon the circumstances and also I

3    think it depends very much upon the point in time with which

4    the *ultra vires* issue arises.

5    Q.      Tell me more.  What do you mean by that?

6    A.      As the ethical consideration indicates, the attorney

7    should resolve all doubts against the propriety of the

8    representation, but this is a continuing duty and at the – it

9    is my understanding at the outset of the litigation, Mr. DeLong

10   did not intend to raise an *ultra vires* defense and that that

11   occurred only much later in the litigation, at which time the

12   clients had invested considerable resources in representation

13   by Mr. DeLong.  And so the nature of the resolution of the

14   doubts may differ in time.

15           If the attorney is aware of potential defenses, such

16   as the *ultra vires* defense, at the time that he initially

17   undertakes the dual representation, then that is a very

18   different equation with regard to the resolution of the doubts

19   against the propriety of the representation than he would have

20   if, as in this case, the defense arose at a much later point in

21   the litigation.

22   Q.      I see.  Okay.  Well, let me ask you this.  It has

23   been a while since I have taken corporate law, and I know you

24   have taught it, have you not, at some point?

25   A.      I never taught corporate law.

Ross - Cross                                                    687

1    Q.       You haven't taught corporate law.  Let's walk through

2    it together.  As I understand it, I have a claim of *ultra vires*

3    once I have evidence that the officer engaged in conduct

4    inimical to the corporation, criminal conduct, for example;

5    correct?

6    A.       Correct.

7    Q.       Okay.  So if under my hypothet I had my officer

8    testify, under oath, that he had signed for the receipt of

9    goods but he couldn't indicate what became of the goods, or

10   where the goods were, or who had purchased the goods, and that

11   raised doubt in my mind as to whether he was telling the truth,

12   would that lead naturally to the issue of whether an *ultra*

13   *vires* defense is a possibility?

14   A.       I think it would lead to consideration of the

15   possibility of an *ultra vires* defense.  I am not sure that it

16   would lead to a conclusion that there was an *ultra vires*

17   defense, much less a conclusion that an *ultra vires* defense

18   needed to be raised in a particular litigation.

19   Q.       Okay.  Well, let me ask you this.  Fair enough.  Once

20   I have concluded that there is a real possibility of an *ultra*

21   *vires* defense and I have testimony that seems to substantiate

22   that, have I not reached the point of a differing interest?

23   A.       Not necessarily because –

24   Q.       Potentially, the word, remember, our potentially

25   differing interests.

Ross - Cross                                  688

1   Q.        Well, then there are potentially differing interests

2   but that does not compel the withdrawal of the counsel.     It

3   simply says – the rule says that, when there are potentially

4   differing interests, he must carefully weigh the possibility

5   that his judgment may be impaired or his loyalty divided if he

6   accepts or continues the employment.    And so the mere presence

7   of potentially differing interests does not compel an attorney

8   to withdraw.    The potentially differing interest language is

9   modified by the language in EC 5-15 that, you know, he should

10  carefully  weigh  the  possibility  that  his  judgment  may  be

11  impaired or his loyalty divided.

12  Q.        Now as I understood your testimony a moment ago that

13  in  your  analysis  of  this  case,  the  reason  the  *ultra vires*

14  defense  didn't  compel  separate  representation  is  it  wasn't

15  raised until late in the game?

16  A.        And that may be part of it.    I am not sure that that

17  is all of it.

18  Q.        It was not raised.    Indeed I will stipulate with you,

19  sir,  that it was not raised until June 2003.    Are you aware,

20  however, that the very testimony I am referring to, which you

21  acknowledge certainly raised the real prospect of that defense,

22  came out in April of 2000, only two and a half months into this

23  case?

24  A.        I was not – I am not sure of the exact date.    I may

25  have seen it at some point and I may not.

Ross - Cross                                        689

1    Q.      Well, just accept my representation to you.  It

2    happened on April, I think, 28.

3    A.      Of 2000?

4    Q.      2000, right.  Now given that, does that not change

5    your view as to whether those differing interests did not occur

6    much earlier and there was reasonably less concern as a result

7    about the relative investment in this case?

8    A.      Well, it has always been my understanding, I think

9    since my very first conversation with Mr. DeLong, that Mr.

10   DeLong was aware from a very early point that Mr. Rudolph may

11   have or at least was going to be charged with fraudulent

12   activities.

13   Q.      And as a result there was a very real prospect

14   throughout of an *ultra vires* defense?

15   A.      Yes.  That is nothing new to me.  I have known that

16   since, as I say, the first time I talked to Mr. DeLong.

17   Q.      Very good.

18   A.      And I believe that I state that in my affidavit, as

19   well.

20   Q.      I don't have a copy but I will be happy to look at it

21   later.

22   A.      And also it is probably in my opinion letter.

23   Q.      All right.  We don't have a copy of that either.

24   Let's go to EC 5-15.

25   A.      Do you want me to read it?

Ross - Cross                                690

1    Q.        I will read it and please read along with me:

2              "A lawyer should never represent in litigation

3              multiple clients with differing interests, and there

4              are few situations in which you would be justified in

5              representing in litigation multiple clients with

6              potentially differing interests."

7    Did I read that accurately?

8    A.        Yes, right.

9    Q.        Okay.  Now once it became known there was a prospect

10   of an *ultra vires* defense, did these clients have differing

11   interests?

12   A.        They could have.

13   Q.        Okay.  And once it became known that one of the

14   clients was a perjurer, did they have differing interests?

15   A.        That would certainly create the potential for

16   differing interests.

17   Q.        And once it became obvious that the officer was

18   seeking to use the corporation's funds to hide his fraud, did

19   they have differing interests?

20   A.        That, too, would provide an indication of the

21   potential for differing interests.

22   Q.        Now let's wrap all of those three components up.

23   Don't you think those three strikes mean you're out?

24   A.        Not necessarily.  And the reason is that the very

25   point of the standard 37, in my understanding, is to provide a

Ross - Cross                    691

1    situation or provide an opportunity to the attorney to continue

2    representation where he has the informed consent of the

3    clients.  You know, as long as he, in his own and partly

4    subjective, partly objective, standard has concluded that he

5    can reasonably continue the representation without divided

6    loyalty and without providing less than the ordinary standard

7    of care that is owed to both of the clients.

8    Q.       Dr. Ross, do you really believe that any reasonable

9    attorney faced with those three factors could conclude he could

10   provide zealous and effective advocacy for both clients?

11   A.       In many circumstances, no; but under the particular

12   circumstances of this case, yes, based on what I know.

13   Q.       All right.  Now doesn't standard 37 in fact say, and

14   I'm quoting now:

15            "A lawyer may represent multiple clients if it is

16            obvious that he can adequately represent the interests

17            of each."

18   A.       Yes, that is what it says.

19   Q.       If it is obvious?

20   A.       Yes.

21   Q.       And it is your testimony that notwithstanding those

22   three critical components, it would have been obvious to a

23   reasonable attorney that he could adequately represent both?

24   A.       Under the circumstances of this case, if it was

25   obvious to Mr. DeLong.  Again this is, as we have seen, at

Ross - Cross                                                      692

1    least partly a subjective standard.  And so what may seem

2    obvious to one attorney might not necessarily seem obvious to

3    another.

4    Q.     Well, apparently not.  All right.  Now I want to talk

5    about the informed consent standard, if I may, sir.  I take it

6    we are walking off of this EC 5-16:

7           "In those instances in which a lawyer is justified in

8            representing two or more clients having differing

9            interests, it is nevertheless essential that each

10           client be given the opportunity to evaluate his need

11           for representation free of any potential conflict and

12           obtain other counsel if he so desires."

13          Is that the informed consent requirement, in effect?

14   A.     Yes.

15   Q.     Okay.  Am I correct in understanding in order to

16   obtain informed consent, I, as an attorney, must not – I have

17   to go beyond simply telling my client, you know, there is a

18   potential conflict, your interest might be adverse; right?  I

19   can't just use those words.  Don't I need to advise each client

20   what I would do if I represented him alone and what I would do

21   differently if I don't represent him alone?

22   A.     An attorney, I think, would be wise to provide the

23   information that you have described but, you know, I don't see

24   that it is actually compelled in so many words by the rule.

25   Q.     Well, okay.  What of what I just said can I dispense

Ross - Cross                                              693

1   with?

2   A.      Well, could you describe again what you said?

3   Q.      Sure.  My understanding was I have to tell my clients

4   this is what I will do for you if I represented you alone and

5   here is what I will do for you if I represent both of you and

6   here is how they differ.

7   A.      I certainly think that is one good way to go about it

8   but I don't think it is necessarily the only way and, again, I

9   don't think that that particular formula is prescribed by the

10  rules.

11  Q.      What is prescribed by the rules?

12  A.      Well, as I read the rules, it says, you know, if I

13  just read through the rule here, it says:

14          "In those instances in which a lawyer is justified in

15          representing two or more clients having differing

16          interests, it is nevertheless essential that each

17          client be given the opportunity to evaluate his need

18          for representation free of any potential conflict and

19          to obtain other counsel if he so desires.:

20  And I did not read into that rule the formula that you just

21  announced.

22  Q.      What formula would you use?  Let me just give you this

23  hypothetical.  I have come to you and said, look, I have got a

24  difficult problem.  I have two clients here and there are some

25  rough spots, they are sort of at odds.  What do I have to be

Ross - Cross                                    694

1    able to tell them about the substance of the representation,

2    the effective multiple representation in order to give informed

3    consent?

4    A.      Well, first, I think your formula is a good one and,

5    again, I am not saying that it is necessarily the formula one

6    would want to use in every case but, you know, it is a starting

7    point, at least.  In many cases, I think that would be, you

8    know, a very good way to proceed.  So I like that.

9            But, again, I don't see that the rule actually

10   requires that and, you know, obviously this particular ethical

11   consideration 5-16 seems to permit considerable latitude in the

12   actual way in which the attorney counsels the client and that

13   obviously is going to vary according to the nature of the

14   client and the nature of this situation.

15   Q.      Well, in the context of this situation, do you believe

16   it required Mr. DeLong to tell a representative of the

17   corporation, other than Rudolph Terry, you understand if I

18   represent your brother, I'm not going to be able to assert the

19   *ultra vires* defense or not be able to do so effectively and I'm

20   not going to be able to claim basically he was part of the

21   fraud?

22   A.      I think, to the extent he had that knowledge, I think

23   it could have been desirable for him to impart that –

24   Q.      Desirable?  Was it not required?

25   A.      Again, I don't read that into the rule.

Ross - Cross                                                    695

1    Q.      Okay.  Well, isn't informed consent by definition all

2    material facts for a reasonable client to make an informed

3    judgment?

4    A.      Yes.

5    Q.      Okay.  And would you not agree the fact that Rudolph

6    Terry was engaged in a fraud is material to this decision?

7    A.      Yes, I think it is certainly material.

8    Q.      All right.  Consistent with that, he is to explain

9    fully to each client the implications of the common

10   representation and should accept or continue employment only if

11   the client consents.  All right.

12   A.      Yes.

13   Q.      And, again, implications are legal defenses, legal

14   claims, in fact, on strategy, presenting to the jury, etc.;

15   right?

16   A.      Right.

17   Q.      Now we have talked a lot about the closely-held

18   corporation.  EC 5-18, again this is part of the standard of

19   care.

20           "Occasionally a lawyer for an entity is requested by

21           a stockholder, director, officer, employee, a

22           representative or other person connected with the

23           entity to represent him in an individual capacity.  In

24           such case, the lawyer may serve the individual only if

25           the lawyer is convinced that differing interests are

Ross - Cross                                696

1          not present."

2          Am I reading that correctly?

3     A.        Absolutely.

4     Q.        Now given that, sir, if I, as the attorney, conclude

5     that the corporation's interest and the stockholder's interest

6     are adverse, am I required to reject dual representation even

7     though he is the sole stockholder?

8     A.        I think the fact that he is the sole stockholder is

9     extremely relevant.

10    Q.        Well, if the interests are differing, am I not

11    compelled to reject dual representation?  Isn't that what the

12    rule says?

13    A.        May I read the rule through again?

14    Q.        Please, take your time.

15             (Pause)

16    A.        Again, the language, "In such case, the lawyer may

17    serve the individual only if the lawyer is convinced that

18    differing interests are not present."

19             So the rule says what the rule says, that the attorney

20    may not continue if he is convinced that differing interests

21    are not present.  So obviously it depends upon the definition

22    of the word "convinced" and the definition of "differing

23    interests."

24    Q.        Well, I am an attorney and I have reasonably concluded

25    there are differing interests between the corporation and the

Ross - Cross                                              697

1    stockholder.  Am I not precluded from representing both, even

2    though it's a sole stockholder?

3    A.        Well, first of all, I am not sure that the –

4    Q.        You can answer the question.

5    A.        – it would necessarily mean that the – this wouldn't

6    convince the attorney that there were differing interests but,

7    if the attorney were convinced – do you want me to answer – oh,

8    I shouldn't ask questions.  But if the attorney were convinced

9    that there were differing interests, then – could I strike

10   that, please?  The fact that the company is owned one hundred

11   percent, at least in terms of the common stock, the voting

12   shares, by two individuals who are the very individuals that

13   the attorney – from whom the attorney is seeking consent, I

14   think is critically relevant in this case.

15   Q.        Well, and you have told us that multiple times.  I

16   would like for you to answer my question about what this rule

17   says.  It doesn't strike me as a real challenge.  If the

18   attorney concludes there are differing interests between the

19   corporation and the shareholder, he is precluded from the dual

20   representation; isn't that what this rule says?

21   A.        That is what it says on its face but I think it needs

22   to be interpreted in the context of a closely-held corporation,

23   and particularly a corporation in which one hundred percent of

24   the voting shares are owned by the very two people to whom the

25   attorney is seeking – from whom the attorney is seeking

Ross - Cross                                           698

1    consent.

2    Q.        There is no exception in this rule; is there?

3    A.        Not directly, but I think that that is anticipated in

4    the language "convinced."   The attorney is less likely to be

5    convinced that there are differing interests if –

6    Q.         Do you have a single case that has followed this line

7    of reasoning, or is this simply Dr. Ross?

8    A.        I don't know of a case one way or the other.

9    Q.        What is that?

10   A.        I don't know of any case.

11   Q.        All right.  And just so we are clear here, when you

12   told us that Mr. DeLong provided bold and frank information,

13   what you were doing was repeating what you heard from him on

14   the stand, correct, that he told them there was a conflict and

15   they waived it?

16   A.        Are you quoting from –

17   Q.        I am quoting from your testimony.

18   A.        You are quoting from my testimony?

19   Q.        Yeah.

20   A.        I based that partly upon what I heard today in court

21   from Mr. DeLong and partly upon the various sources on which I

22   relied in my opinion letter and my affidavit.

23   Q.        And what specific information did you describe as

24   frank?

25   A.        My understanding based on Mr. DeLong's testimony today

Ross - Cross                                                    699

1    and my conversations with him that he informed the clients of

2    the potential for conflict and, with regard to the word

3    "frank," I think probably what I had in mind was that he

4    informed them that this could possibly be a serious conflict,

5    that there could indeed be issues in which, you know, there

6    might be a problem with divided loyalty and suggested that they

7    obtain outside counsel.

8              I think it is certainly very frank for an attorney to

9    suggest to a client that it obtain outside counsel.  It makes

10   very clear that the attorney considers this to be a serious

11   conflict and the attorney is encouraging the client to obtain

12   an outside opinion – if you don't believe me, go talk to

13   somebody else.

14   Q.        Well, that may be frank but it is also the minimum

15   required by the rule; isn't it?

16   A.        Pardon?

17   Q.        It may be frank but it is really what is the minimum

18   required by the rule?

19   A.        It is.

20   Q.        And what is required beyond that is that he tell them,

21   in order for them to be informed, the specific effect on their

22   case if he has dual representation?

23   A.        Yes.

24   Q.        And you don't know what Mr. DeLong could have said in

25   that regard?

Ross - Cross                                700

1    A.        I was not present at the conversations.

2              MR. BARRIERE: Your Honor, if I may have a moment?

3              THE COURT: I am sorry.

4              MR. BARRIERE: If I may have a moment, I think I am

5    done.

6              THE COURT: All right.

7              (Pause)

8              MR. BARRIERE: I will pass the witness, Your Honor.

9              THE COURT: Here is what we will do.  We are going to

10   call it a day.  It is twenty-five past, and we will do redirect

11   in the morning.

12             MR. BRIDGERS:   Your Honor, I have one question.

13             THE COURT: Okay.  You are going to ask it in the

14   morning.  Goodnight, gentlemen.

15             (Off the record at 5:28 p.m.)

701

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date:  March 16, 2007