## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In Re

TERRY MANUFACTURING            In re Case No. 03-32063-WRS
COMPANY, INC.,                  Chapter 7

        Debtor.


J. LESTER ALEXANDER, III,        Adv. Pro. No. 04-3135-WRS
TRUSTEE,

        Plaintiff,

v.

DELONG, CALDWELL, NOVOTNY &
BRIDGERS, LLC; DELONG,
CALDWELL, LOGUE & WISEBRAM;
DELONG & CALDWELL, LLC; and
EARNEST H. DELONG, JR.,

        Defendants.

## DEFENDANT'S DESIGNATION OF CONTENTS FOR INCLUSION IN RECORD ON APPEAL AND STATEMENT OF ISSUES ON APPEAL

The defendants herein pursuant to Bankruptcy Rule 8006, file this Designation of Contents for Inclusion in the Record on Appeal and Statement of Issues on Appeal:

***The following shall be included in the record on appeal:***

   1.    Plaintiff's Complaint, dated 12/08/2004; (AP Docket #1)

2.      Motion to Transfer Venue, dated 1/10/05; (Docket #6)

3.      Memorandum of Law in Support of Motion to Transfer Venue, dated 01/10/05; (Docket #7)

4.      Defendant's Answer, dated 01/10/05; (Docket #8)

5.      Response to Defendant's Motion to Transfer Venue, dated 01/25/05; (Doc #11)

6.      Memorandum Decision, dated 02/08/05; (Docket #13)

7.      Order on Motion to Transfer Venue, dated 02/08/05; (Docket #14)

8.      Motion for Leave to File Amended Complaint, dated 03/07/05; (Docket #23)

9.      Order Granting Motion to Amend Complaint, dated 03/14/05; (Docket #24)

10.     Amended Order on Plaintiff's Motion to Amend Complaint, dated 03/18/05; (Docket # 28)

11.     Objection to Motion for Leave to File First Amended and Restated Complaint, dated 03/25/05; (Docket #30)

12.     Brief, dated 03/25/05; (Docket #31)

13.     Reply to Objection to Trustee's Motion for Leave to File First Amended and Supplemental Complaint, dated 04/11/05; (Docket #32)

14.     Memorandum Decision, dated 04/14/05; (Docket #33)

15.     Order on Motion for Leave to File First Amended and Supplemental Complaint, dated 04/14/05; (Docket #34)

16.  Motion to Dismiss Case or in the Alternative Transfer Venue or Abstain on State Law Claims, dated 05/16/05;  (Docket #42)

17.  Supporting Brief and Memorandum of Law of Joint Motion to Dismiss, dated 05/16/05;  (Docket #43)

18.  Amended Complaint, dated 05/27/05;  (Docket #161)

19.  Trustee's Objections to Motion to Dismiss, dated 06/15/05;  (Docket #52)

20.  Response to Trustee's Opposition to Motion to Dismiss, Transfer Venue or Abstain, dated 06/30/05;  (Docket #57)

21.  Memorandum Decision; dated 07/25/05;  (Docket #76)

22.  Order Denying Motion to Transfer, dated 07/25/05;  (Docket #77)

23.  Order Granting Motion to Amend Complaint, dated 07/25/05;  (Docket #78)

24.  Defendants' Answer to the Second Amended and Restated Complaint, dated 08/04/05;  (Docket #82)

25.  Memorandum Decision/Opinion, dated 05/29/07;  (Docket #201)

26.  Judgment, dated 05/29/07;  (Docket #202)

27.  Defendant's Notice of Appeal, dated 06/08/07;

28.  This Designation of Contents and Statement of Issues, dated 06/22/07;

29.  Trial Transcript.

***Statement of Issues:***

1.  Whether the payments which Terry Manufacturing Company made to Earnest H. DeLong were fraudulent conveyances or fraudulent transfers

pursuant to O.C.G.A. § 2-2-22 or O.C.G.A.§2-2-70 to 2-2-80;

2.    Whether the payments Terry Manufacturing Company made to Mr. DeLong were fraudulent conveyances pursuant to 11 U.S.C. § 548(a)(1)(B);

3.    Whether Mr. DeLong received the payments made by Terry Manufacturing in good faith and for reasonably equivalent value;

4.    Whether, if Mr. DeLong is liable to the Trustee for any amounts of payments he received from Terry Manufacturing Company, he served as a mere conduit for those portions of the payments which were made to Terry Manufacturing Company's co-Counsel, Jerry Thomas, Esq. for work Mr. Thomas performed in the defense of the Company, for which payments Mr. DeLong should not be held liable;

5.    Whether the Court improperly denied Defendant's Motion to Transfer Venue.

6.    Whether the Court improperly denied Defendant's Motion to Dismiss the Complaint.

Submitted this 22nd day of June, 2007.

<div style="margin-left:50%">

s/ Charles R. Bridgers
Earnest H. DeLong, Jr.
Georgia Bar No. 217300
Michael A. Caldwell
Georgia Bar No. 102775
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Defendants*

</div>

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150
404/979-3170 Facsimile

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In Re

| | |
|---|---|
| TERRY MANUFACTURING<br>COMPANY, INC., | In re Case No. 03-32063-WRS<br>Chapter 7 |

        Debtor.

| | |
|---|---|
| J. LESTER ALEXANDER, III,<br>TRUSTEE, | Adv. Pro. No. 04-3135-WRS |

        Plaintiff,

v.

DELONG, CALDWELL, NOVOTNY &
BRIDGERS, LLC; DELONG,
CALDWELL, LOGUE & WISEBRAM;
DELONG & CALDWELL, LLC; and
EARNEST H. DELONG, JR.,

        Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2007, I electronically filed the foregoing **Defendant's Designation of Contents for Inclusion in Record on Appeal and Statement of Issues on Appeal** with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

> Brent B. Barrier, T.A.
> Catherine E. Lasky
> Phelps Dunbar, LLP
> One Canal Place

5

365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534

I further certify that I sent a copy of the foregoing by U.S. Mail, postage prepaid

to:

Jerry A. Buchanan
Buchanan & Land, LLP
Post Office Box 2848
Columbus, Georgia 31902

Submitted this 22nd day of June, 2007.

<div align="right">

s/ Charles R. Bridgers
Earnest H. DeLong, Jr.
Georgia Bar No. 217300
Michael A. Caldwell
Georgia Bar No. 102775
Charles R. Bridgers
Georgia Bar No. 080791
*Attorneys for Defendants*

</div>

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150
404/979-3170 Facsimile

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | |
| TERRY MANUFACTURING COMPANY, | ) | |
| INC., | ) | |
|     Debtor | ) | Case No. 03-32063 |
| | ) | |
| J. LESTER ALEXANDER, III | ) | |
| Trustee for Terry Manufacturing | ) | |
| Co., Inc. and Terry Uniform | ) | |
| Co., LLC | ) | |
| | ) | |
| vs. | ) | Adv. No. 04-3135 |
| | ) | |
| DELONG, CALDWELL, et al. | ) | |
| | | Montgomery, AL |
| | | February 2, 2007, 9:02 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

VOL. IV - Pages 702 to 780

APPEARANCES:                          Brent B. Barriere
                                      Catherine E. Lasky
                                      Phelps Dunbar, LP
                                      365 Canal St., Suite 2000
                                      One Canal Place
                                      New Orleans, LA 70130


Electronic Recorder
Operator:                             Linda Bodden

Transcriber:                          Patricia Basham
                                      6411 Quail Ridge Drive
                                      Bartlett, TN  38135
                                      9O1-372-O613


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

703

APPEARANCES (Continued):

Charles R. Bridgers
Earnest H. DeLong, Jr.
DeLong, Caldwell & Bridgers, L.L.C.
Suite 3100, Centennial Tower, 101 Marietta Street, NW
Atlanta, Georgia 30303

704

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| William G. Ross | -- | -- | 705 | -- |

Ross - Direct                                                705

1         (CALL TO ORDER)

2         THE COURT:   Please be seated.

3         MR. BARRIERE: Good morning, Your Honor.

4         MR. BRIDGERS:   Good morning, sir.

5         THE COURT: Good morning.  Where is – oh, okay.  Very

6    good.  Step forward, sir.  Mr. Ross, you are still under oath.

7    Good morning, sir.

8         MR. ROSS: Good morning.

9         (WILLIAM G. ROSS, WITNESS, RESUMED THE STAND)

10                    REDIRECT EXAMINATION

11   BY MR. BRIDGERS:

12   Q.       Professor Ross, I just have two questions for you.  In

13   a number of the questions in your cross examination, a number

14   of questions – there were a number of questions on the specific

15   definition of the standard of care.  To be clear in your

16   testimony, did you assume that the definition of the standard

17   of care was that degree of care and skill ordinarily employed

18   by an attorney under similar conditions and like circumstances?

19   A.       Yes, I did.

20   Q.       Professor, in a number of the hypotheticals given

21   yesterday in the cross-examination, Mr. Barriere asked you to

22   assume the Terry brothers had different knowledge of the facts.

23   Were your responses to those hypotheticals, then, based on the

24   assumption that Roy and Rudolph Terry actually had different

25   knowledge of the facts?

Ross - Direct                                      706

1    A.        Yes, it was.

2             MR.  BRIDGERS:    Your  Honor,  that  is  all  of  the

3    questions I have for Professor Ross.

4             THE COURT: Okay.  Thank you.  Professor Ross, I have

5    got a couple of questions.  One thing that has kind of piqued

6    my  interest  in  this  case  is  the  civil  action,  and  I  am

7    referring  to  the  Commercial  Factors  litigation  in  Georgia,

8    started out as what Mr. DeLong, I think, properly characterized

9    as a garden-variety collection case.  Did you have a chance to

10   look at the original complaint?

11            THE  WITNESS:  I  don't  believe  I  saw  the  original

12   complaint.

13            THE COURT:  I don't know if there is anything terribly

14   remarkable  about  it,  but  basically  what  had  happened  is  some

15   invoices had been issued by Floodgates to Terry Manufacturing.

16   Those  invoices,  at  least  some  of  them,  had  been  used  as

17   collateral  for  a  loan  and  I  guess,  pursuant  to  its  security

18   agreement, Commercial Factors somehow acquired the right to try

19   to collect those invoices.  So Commercial Factors was trying to

20   collect  some  invoices  that  had  been  issued  by  Floodgates  to

21   Terry Manufacturing.  And there were a number of invoices, in

22   the neighborhood of two to three million dollars was how much.

23   So it was a number of invoices.  As it turns out, Terry

24   Manufacturing didn't receive the first T-shirt under any of

25   those invoices.

707

1          So we have got a garden-variety collection case where

2     the defendant, at least Terry Manufacturing, didn't receive any

3     of the goods which are the subject of the complaint and yet we

4     have four hundred seventy-six thousand dollars in attorney's

5     fees that were required to defend that case.  Would the

6     magnitude of the attorney's fees pique your interest at all?

7               THE WITNESS: Yes.

8               THE COURT: Did you look at the billings?

9               THE WITNESS: No, I did not.

10              THE COURT: So you didn't render an opinion as to

11    whether or not those billings, you know, were correct,

12    incorrect, reasonable or anything like that?

13              THE WITNESS: No, I never had any occasion to do that.

14              THE COURT:  Okay.  So basically, if I understood your

15    testimony, your testimony, you looked at the relationship

16    between the Terry brothers, Terry Manufacturing, and you gave

17    us an opinion as to whether or not there was a conflict and

18    whether it could be waived?

19              THE WITNESS: Exactly.

20              THE COURT:  Okay.  All right.  Well, anyway, I have

21    asked a question.  I will allow just follow-up on that topic if

22    anybody is interested and then, otherwise, I think that is it.

23              MR. BRIDGERS: Your Honor, no follow-up from our

24    perspective.

25              THE COURT:  Well, thank you.  Please give my regards

708

1    to my good friend, John Carroll.

2            MR. ROSS: I will do that, Your Honor.

3            THE COURT:    All right.  Thank you.

4            MR. ROSS: Thank you, Your Honor.

5            MR. BRIDGERS: Your Honor, the defendants have no

6    additional witnesses.  I would like to perhaps work through the

7    evidence to make sure I understand what has been admitted by

8    the court, and then we will be able to rest.

9            THE COURT:    All right.  Okay.  What are your notes?

10           MR. BRIDGERS:   Your Honor, my notes indicate that the

11   court has said admitted Exhibits 1 through 28.  Exhibit 29 was

12   a general ledger which my memory is the court admitted after

13   Mr. DeLong testified about it.

14           THE COURT:    That's what my notes show, as well.

15           MR. BRIDGERS:   And my understanding is the court has

16   admitted Exhibit 30.  That the court has excluded 31 and 32,

17   which were the affidavits of Mr. Pouncey.

18           THE COURT:    That's what my notes show, as well.

19           MR. BRIDGERS: And they were of course tendered to the

20   court, as well.  That Defendant's 33, which is the financial

21   statement we marked, was admitted.  The only copy is right

22   here, Your Honor.  The clerk has it.  That one, yes.

23           THE COURT:    Okay.  Let me have a look at that.  Okay.

24   I don't recall 33.  Maybe it just came in.  Is this just

25   basically another copy?  I think we have got some financial

709

1    statements that are already into evidence in the plaintiff's

2    case.  Is this just another copy of this or is this different?

3         MR. BRIDGERS:   It is a different copy, Your Honor.

4    That is a copy that is marked with Mr. DeLong's – basically

5    this is in Mr. DeLong's file.  You can see the Bates number on

6    the bottom right.

7         THE COURT: Okay.  I do see that.

8         MR. BRIDGERS: This was, if the court recalls, this was

9    the one that the plaintiffs – it was originally in the

10    plaintiff's pack.  They substituted out another version of it,

11    and I wanted to introduce the original version, as well.

12         THE COURT: Oh, okay.  Bill, do you show anything for

13    33 in your notes.

14         MR. BRIDGERS: They are definitely different years,

15    definitely different years.

16         THE COURT: Mr. Barriere, why don't you have a look at

17    this.  Actually I don't think that was offered.  My courtroom

18    deputy doesn't have any record of it and I don't have any

19    recollection.  So let's have a look at it right now.

20         MR. BARRIERE: I have no objection to this, Your Honor.

21    We admitted 1999/2000.  I think the testimony of Mr. DeLong was

22    that this specific copy, which is '01 and '02 was also in his

23    records.

24         THE COURT: Okay.  So Defendant's 33 is admitted.

25         MR. BRIDGERS: Your Honor, my notes indicate that

710

1    defendant's tendered the files, Exhibit 34, and then the court

2    made its ruling about what it wanted.  And, Your Honor, the

3    last exhibit would be the affidavit of Professor Ross, which

4    Professor Ross worked from it yesterday.  I have handed to your

5    deputy clerk to mark.  The court may recall what I have said

6    was this was not on our pretrial disclosure list.  Basically,

7    my understanding, I didn't realize the court's practice was to

8    admit expert reports into evidence.  And I would ask, because

9    of the plaintiff's – the plaintiff's expert reports were

10   admitted into evidence.  I would request that the court, for

11   good cause, allow me to introduce this kind of basically to

12   balance out the other expert reports.

13        THE COURT: Okay.  Is this the same affidavit that was

14   attached to your motion for summary judgment filed in this

15   case?

16        MR. BRIDGERS: It was, Your Honor.

17        THE COURT: Okay.  Mr. Barriere, do you want to have a

18   look at this?

19        (Pause)

20        MR. BARRIERE: Your Honor, I think I probably have two

21   or three objections to this.  Number one, of course, it wasn't

22   listed on any pretrial list.  Two, it is not an expert report.

23   It is an affidavit, an out-of-court statement offered for the

24   truth of the merits and indeed we have had live testimony.

25        I have not had a copy of it until now.  I can

711

1    certainly sit and read it, but I think those would be my

2    objections regardless of whether I take five or ten minutes to

3    read it thoroughly or not.

4        THE COURT: Well, here is what I am going to do, then:

5    Mr. Bridgers just represented that that is the same affidavit

6    that's already in the court's record that we have had occasion

7    to look at in the past.  Assuming that is the case, I am going

8    to overrule your objection; admit the document.  If it later

9    turns out that this document is different, then I will hear

10   from you on that, you know, at your leisure; but assuming it is

11   what Mr. Bridgers says it is – I have no reason to believe that

12   it isn't, and so we will admit it over objection.

13       MR. BRIDGERS: Your Honor, I believe that is all of the

14   evidence offered by the defendants.

15       THE COURT: Now, that last one, was that 34 or 35?

16       COURTROOM DEPUTY: 35.

17       MR. BRIDGERS: 34 was the file, Your Honor.

18       THE COURT: Okay.  That is correct.  I have got you.

19   Well, we are clear.  Thank you.

20       MR. BRIDGERS:  Your Honor, with that, the defendants

21   rest.

22       THE COURT:   Mr. Barriere, any rebuttal?

23       MR. BARRIERE: No, Your Honor, we are not going to be

24   calling any witnesses.  I will make a motion and then I don't

25   know whether the court intends to entertain closing or not.

712

1            THE COURT: Yeah, what I intend to do, and I don't know

2      how prepared you are, I will give you a few minutes if that

3      will help you.  Maybe you are already ready to go.  But, yeah,

4      I will hear from you right now, any motions you have got, any

5      closing, oral closing you want to make.

6            In more complicated cases, typically I ask for

7      proposed findings and conclusions.  That helps me.  So I would

8      like proposed findings and conclusions from both sides within

9      30 days, and I prefer simultaneous filings on those.  I don't

10     want a lot of back-and-forth, each party reacting to the other

11     party's filing.  I am not really looking for that at this

12     point.

13            Basically what I am looking – what I want is each

14     side's sort of dream order or dream findings of fact and

15     conclusions of law, what you think the evidence showed, and

16     what findings you think the court ought to make, and what

17     conclusions of law you think the court ought to draw.  So that

18     is what I am looking for there.

19            Actually I have a few questions that I would like to

20     ask the lawyers at some point, but I think probably the best

21     thing is to hear your presentation and you may well address

22     some or all of them during your closing.

23            MR. BRIDGERS:   Brent, do you want to do closing or

24     just do it in – I would be willing to waive if you are and just

25     do –

713

1          MR. BARRIERE: Well, I think the court wants some

2     questions answered, so I am happy to walk through those, and

3     whatever I have will be brief.

4          MR. BRIDGERS:    Okay.

5          MR. BARRIERE: And initially - I am sorry.  Did you

6     have a comment?

7          MR. BRIDGERS: No.

8          MR. BARRIERE: Your Honor, we would move, as a matter

9     of law, at the close of the defendant's case with respect to

10    the malpractice claim.  We have a practical issue obviously in

11    that this is tied to a separate lawsuit involving Georgia

12    lawyers.  Undoubtedly the court will want to give serious

13    consideration to proposed findings of fact and conclusions of

14    law more broadly in its written reasons.  Nonetheless, we would

15    like to move forward with that related case.

16          I submit the court has heard no credible evidence that

17    the DeLong defendants did not fail to act properly in the face

18    of a plain and obvious conflict.  Dr. Ross, to the extent his

19    testimony was substantiated by any meaningful review of the

20    record or analysis of Georgia law - I suspect there are serious

21    questions in the court's mind in that regard - ultimately did

22    tell us that once it became obvious to the attorney, the

23    attorney, mind you, that Terry Manufacturing's principals had

24    engaged, or Rudolph Terry had engaged in perjury; Rudolph Terry

25    had engaged in a factoring fraud scheme; Rudolph Terry was

714

1      seeking to use two point three million dollars of the

2      corporation's money to pay a debt it did not owe, there was a

3      plain and obvious, unavoidable conflict between the interest of

4      the corporation and Rudolph Terry.

5           Now there seems to be this default position, both of

6      Mr. DeLong and frankly more surprisingly of Dr. Ross that,

7      well, that just don't matter when it is a closely-held

8      corporation as Mr. DeLong summarized.  If it is a closely held

9      corporation, I say we may have a conflict and they say we don't

10     care about that, we want to save the money, you represent

11     everyone, that is the end of the matter.

12          Well, that is not what the ethical considerations say.

13     That is not the standard of care.  Indeed Dr. Ross told us the

14     ethical considerations set forth the standard of care in this

15     area.  Once Mr. DeLong knew or should have known he had such a

16     fundamental and actual conflict, he should have withdrawn.  He

17     would have done so at a time when a handful of fees were

18     included – were raised in what the court properly noted at the

19     time at least appeared to be a garden-variety fraud.  He didn't

20     do so.  From March 2000 until July 2003, he represented both of

21     these entities.

22          THE COURT: Can you refresh my recollection?  What

23     happened to the litigation after the Terry bankruptcy filing in

24     this court then stayed the proceedings?  What happened to the

25     rest of the civil suit?

715

1          MR. BARRIERE: There was a motion for summary judgment.

2     Rudolph Terry had acknowledged a minimum indebtedness pursuant

3     to the factoring fraud scheme in his criminal plea of

4     approximately seven hundred eighty-five thousand dollars.

5     There had been a great deal of back-and-forth debate about

6     that, and the government ultimately negotiated we will get you

7     to agree the loss was seven eighty-five.

8          Commercial Factors came in thereafter and obtained –

9     this is about six or eight months later, I think in '04

10    sometime, seeks and obtains a summary judgment against Rudolph

11    for that amount.  At this point Rudolph is in jail.  We have

12    looked at the docket.  It appears that, once that summary

13    judgment was granted with respect to that discrete amount,

14    Commercial Factors ceased prosecuting it.  As I understand it,

15    the case is still listed as open on the Gwinnett County docket.

16    Apparently no action has been taken since that time.

17          The Terrys, as you know, under their current plea

18    arrangement have restitution obligations in the millions of

19    dollars.  My hunch is that Commercial Factors figures pursuing

20    an additional judgment against Rudolph Terry would not be worth

21    the time and effort in attorney's fees or paper.

22          So, Your Honor, I will turn to the balance of my

23    closing in a moment, but I would submit that, on this discrete

24    issue – was there a breach of the duty of care by acting for

25    three years in an obvious and extreme conflict – there is no

1    credible testimony other than what Mr. Beltran provided from an

2    expert standpoint and ultimately, surprisingly, what Dr. Ross

3    provided.    When  faced  with  the  facts  as  opposed  to  this

4    assumption  that  there  was  no  meaningful  substantive  dispute

5    between  the  parties,  he  acknowledged  there  was  a  serious

6    problem.

7          Let me say in the closing, Your Honor, a corporation

8    is a juridical entity.  I understand we tend to think, well,

9    the shareholder is the corporation or one or the other, but

10   that  is  not  what  the  ethical  considerations  say.    This

11   corporation,  of  course,  was  insolvent  at  that  time.    The

12   fiduciary  duties  were  owed  to  the  creditors.    Even  if  Mr.

13   DeLong  did  not  know  that  fact,  and  he  keeps  telling  us  he

14   doesn't,  the  fact  is,  as  an  attorney  bound  by  the  rules  of  the

15   state of Georgia, he had an absolute obligation to refrain from

16   being in that conflict and he ignored it.

17          THE COURT: Mr. Beltran made reference to one Georgia

18   case in particular.  I have forgotten the name right off of the

19   top of my head, but he mentioned it from the stand and it is

20   also in his report, and I wish I could remember the name of the

21   case.  But, I mean, have you got Georgia case law that says –

22   because, to me, this strikes me as a key issue as to sort of,

23   you know, who is the client, so to speak, in a situation like

24   this where you have got a small group, two shareholders, with

25   interests  adverse  to  the  corporation,  can  they  waive  the

717

1    conflict or is there a, you know, nonwaivable duty.

2        MR. BARRIERE: Absolutely.  Did you have the case?  I

3    can tell you we have a case on nonwaivable duties.  It was in

4    the context of a disqualification case.  It was the *Rapides*

5    *Bank* case.

6        THE COURT:   Well, that was – actually I started to

7    say I didn't read the case.  Actually I think I did read the

8    case at some point.

9        MR. BARRIERE: And there, of course, there was an

10   attorney representing the plaintiff beneficiaries.  Suit was

11   filed against a bank which had permitted the mother to take

12   funds from her children without proper authorization, and the

13   bank third-partied another bank which was actually the issuer

14   of one of the CDs.  The same attorney was representing both,

15   and there plainly was a full waiver.  The court acknowledged it

16   but said, look, at the end of the day the actions of the

17   children against the defendant may somehow evolve into a viable

18   claim by the defendant against this third-party, and we are

19   just not going to permit you to waive that even though we don't

20   have any dispute that the – it says:

21           "For this reason it was in error not to grant the

22           motion to disqualify the attorney from any further

23           involvement in this case even though he may have acted

24           in good faith and with the consent of both clients.

25           Where the fact the attorney represents conflicting

1          interests comes to the attention of the court before

2          which a case is pending, the court is required to

3          prevent the attorney from continuing to so act.  The

4          test of such case is not the actuality of conflict but

5          the possibility the conflict may arise."

6      I don't have it on the board, Your Honor, but as you

7  will recall, the ethical consideration is quite specific in

8  this regard.  It says, you know, if you are asked by the

9  shareholder and you represent the corporation and there are

10 differing interests, you may not act.  And that's the

11 attorney's obligation, and he can not in effect permit the

12 clients to superimpose their judgment based upon economic

13 factors, efficiency or the like.

14     So for that reason, Your Honor, and because of the

15 peculiarities of, in effect, the trailer lawsuit involving

16 Georgia lawyers, we would ask for a judgment as a matter of law

17 in the malpractice claims, recognizing that the court will

18 still want briefing so it may write a more fulsome opinion.

19     THE COURT: Right.  No, I understand that, but I made

20 the decision, and I might have even said something on the

21 record during one of our conferences, but I think for a while

22 I had consolidated the cases, at least for discovery or for

23 some administrative purposes.  At some point I think I made a

24 conscious decision that, look, this is getting too unwieldy, I

25 am going to separate the two cases.  So my thought is that, you

719

1      know, I have put the Georgia lawyers case on the back burner.

2      I am not really – I mean, I am aware that it is there, but I

3      think the thing to do is decide this case without regard to

4      that case and then, after this case is done, we will see what,

5      if anything, is left of the other case.

6           So I guess my view, you know, my approach is a little

7      different than yours.  Anyway, be that as it may, I think your

8      point is taken.  The bedrock point you are making is this bit

9      about a nonwaivable conflict.

10          I had another question.  I don't recall if it was you

11     or another lawyer a couple of years ago, somebody filed a

12     complaint and the core allegation was – and I don't remember if

13     the defendants were banks or accountants.  I don't think they

14     were lawyers, but the cause of action alleged was conspiracy to

15     breach a fiduciary duty.  And I looked at it and I decided, as

16     a matter of Alabama law, I don't believe there is any such

17     cause of action.  You know, I am just wondering, are you trying

18     to get through the backdoor what I have denied either you or

19     somebody else a couple of years ago?

20          MR. BARRIERE: Well, I don't think so, and the answer

21     is, yes, I was on the losing end of that stick.  As an aside –

22     I'm not sure it has any particular relevance to the question

23     you asked me – I believe Georgia actually recognizes that cause

24     of action.  One of the interesting points that we were debating

25     was would Alabama join the rest of the nation in recognizing

720

1    that cause of action.  I recall at the time we had oral

2    argument, Alabama was one of a handful of states --

3        THE COURT: Well, I think you had Georgia and Iowa and

4    then a lot of states that had not and at least some hint from

5    the Alabama Supreme Court, maybe nothing direct, that they

6    would not.

7        MR. BARRIERE: In any event, I don't see this as a

8    conspiracy to breach fiduciary duty case.  I think that you

9    have – I will come to the fraudulent conveyance issue in a

10   moment where I think that has – but I think this was a straight

11   duty owed by the DeLong defendants to the corporation.  And I

12   appreciate their notion that, you know, if Roy and Rudolph

13   Terry would be believed, we had this conversation and they

14   waived it knowingly and what have you, I think the court can

15   make its own judgment with respect to the credibility of those

16   two witnesses and the rather remarkable fact that we reportedly

17   had three series of conversations which can be remembered with

18   some clarity as contrast to every other conversation of years

19   ago, and there is absolutely no writing memorializing any of

20   this.

21       But, no, this is not a conspiracy claim; this is not

22   a – this is not the Terry's breach; it is the direct duty owed

23   by the attorney to the corporation which was breached.

24       THE COURT: One of the things that, you know, I was

25   wondering, you know, kind of in anticipation of the Terry

721

1    brothers testifying is that, you know, they have pretty much

2    lost everything; they are in jail.  Maybe I am wrong in this

3    but it would seem they have lost incentive to lie at this

4    point.   I thought they might come in, come clean on the

5    Commercial Factors fraud and come clean on all of this

6    financial statement fraud that we have been working through for

7    years and I thought, well, maybe they will just fess-up and

8    sleep better at night knowing that – thinking, well, the worst

9    has already happened to them and there is no incentive to lie.

10        I mean, they obviously gave false testimony with

11   regard to the Commercial Factors and the financial statement

12   issues, false, evasive, and yet they quite clearly testified to

13   these conversations with DeLong, and at this point they don't

14   have any incentive to lie; do they?

15        MR. BARRIERE:  Your Honor, I can't begin to fathom the

16   Terry brothers.  I will be candid with the court.  I mean, I,

17   too, naively had thought that we would hear Rudolph Terry give

18   us a meaningful discussion on what happened with respect to

19   Commercial Factors.  Instead, you know, as he testified, he was

20   the victim here of this sort of incredible and global

21   conspiracy that had brought him down.

22        I would only submit that, even at this late date,

23   plainly neither one of these gentlemen are in a position or are

24   willing to share with the court what in fact happened, and it

25   seemed to me that they were intent, yet again, on both

722

1    understating their role, claiming their role was innocent and

2    the like.

3            The way in which they handled this litigation was part

4    and parcel of that.  You know, the vast investment in fighting

5    off disclosure of the Rose documents was part and parcel of

6    that.  I can't see inside Mr. DeLong's brain.  I'm not sure

7    what he knew.  But this notion that, you know, that Rudolph

8    Terry attested to, that he had no idea what was going on and he

9    was just the victim of a bunch of lying lawyers and Jon Pouncey

10   and Mr. Eden, you know, extraordinary given that the man has

11   already pled guilty to mail fraud, and we couldn't even get him

12   to acknowledge that.  You will recall when I asked him did you

13   plead guilty to this factor, oh, no, no, I didn't plead guilty

14   to that.  It was just something involving mail fraud.

15           THE COURT:  Well, I am just wondering if in a way,

16   though, all of this line that we continue to hear from Roy and

17   Rudolph Terry even yesterday – I mean if you look at the

18   Commercial Factors case from this standpoint and say, okay,

19   Rudolph Terry is doing all of this bad stuff; he is defrauding

20   Commercial Factors; he is signing certification that these

21   invoices are valid invoices when in fact they weren't and that

22   Terry Manufacturing is this innocent entity out there, you

23   know, sort of pristine and spotless, then it looks kind of bad.

24   But if you attribute the fraud to the corporation, that Rudolph

25   is doing fraudulent stuff, then all of a sudden doesn't that

723

1  put DeLong's actions in a little bit different light?  I mean,

2  he is defending a corporation that is charged with fraud and

3  may well have committed fraud.  I mean, certainly some of that

4  money ran through Terry Manufacturing accounts.

5      So, you know, I am saying -- certainly you are not

6  suggesting that because DeLong at some point must have

7  suspected that maybe his client was in fact guilty of fraud,

8  that, well, I can't represent a guilty client, I have got to

9  withdraw.  You know, sort of a Perry Mason kind of thing, I

10  only represent innocent parties.  But doesn't that put DeLong's

11  action in a little bit different light?

12      MR. BARRIERE:  Well, I think the reality is the law,

13  I think, quite reasonably imposes the requirement that the

14  legal fiction of the corporation be viewed as a separate actor.

15  You know, by no later than April, Mr. DeLong had to believe and

16  certainly have overwhelmingly strong suspicions that everything

17  he had been hearing about the purchase of these receivables was

18  untrue.  I mean, this testimony was so fantastic.  And then it

19  is followed up three weeks later with even more fantastic and

20  incredible testimony, followed almost immediately by the notice

21  that Rudolph Terry is going to be added as a defendant and

22  there is going to be a fraud count.  The law insists, in

23  effect, that the corporation and the constituents it has,

24  including its creditors, be looked at as a separate legal

25  entity and that the *ultra vires*, criminal conduct not be

724

1    attributed for purposes of this analysis.  And, you know, I

2    think that was the quandary and the conflict that existed.

3         I think Mr. DeLong was free to act for one or the

4    other but he wasn't free to act for both because he could not,

5    as a result, represent the corporation's interest notwithstand-

6    ing the reality that we had two crooks that were pushing him.

7    That was his duty as a lawyer.  That is part of the imposition

8    of our practice and our profession.

9         At some point, you cannot take the view, as we heard,

10   well, my clients wanted me to do this, so I had to do it.  No,

11   you are licensed by the state in a noble profession and part of

12   the obligation associated with that is you abide by the ethical

13   considerations.  And when you have an officer who is plainly a

14   crook,    you    can't    represent    him    and    the    corporation

15   simultaneously.  It is just that simple.

16        And there could've been no serious doubt about Mr.

17   Terry's behavior by May.  He sat through probably five to six

18   hours of deposition testimony where he claims he has gotten,

19   you know, millions of T-shirts.  The invoices showed, as I

20   think the testimony shows in one of the depositions, that the

21   average price per T-shirt is six dollars and ninety cents.  We

22   have three million dollars outstanding.  This is a volume of

23   T-shirts that would fill this courtroom.  He won't, can't,

24   identify a single person who purchased those from him, but they

25   were all sold.  He can't identify what actions he has taken to

725

1    recover the funds.  That, in itself, should have raised

2    concern.  I mean, recognize my initial engagement is to force

3    a settlement as the attorney.  I have offered them two point

4    three million dollars but said I have to do so on a payment

5    plan because of my unusual cash flow.  The obvious question,

6    well, this is easy, let's go collect the money on the T-shirts,

7    if you really believe the story ever that they had purchased

8    the T-shirts.  You know, you bought them wholesale, you sold

9    them retail, let's go collect the money.  And Rudolph has given

10   this just incredible testimony that he can't remember who he

11   sold them to and where they are but he is trying to collect but

12   he hasn't really done anything to collect.

13        Mr. DeLong pointed out, quite rightly, that he has

14   been doing commercial litigation for thirty odd years.  This

15   was not a babe out of law school with stars in his eyes,

16   dazzled by the client.  This was plainly specious testimony.

17   He had to have known it.  He had to know that Mr. Terry was

18   perjuring himself.  And indeed, I think he finally admitted,

19   yeah, he had his doubts, and I think Dr. Ross told him that Mr.

20   DeLong had advised him he knew early that there was a fraud.

21        That's where the break point came.  And I understand

22   it is easy to default to sort of the commonsense approach, but

23   the law doesn't permit it.  That is the obligation imposed upon

24   our profession.  That is why, notwithstanding the argument with

25   Dr. Ross last night, it is the attorney's obligation when he

726

1     sees differing interests to withdraw or to insist he represent

2     but one.

3              THE COURT:  Some years ago I had a very small piece of

4     a big criminal prosecution where this fellow who had this

5     corporation bought scrap metal and he was shorting, on a very

6     consistent basis, shorting his suppliers, and there were

7     several people and there was one main guy running the

8     corporation and he had some family members and close friends

9     and partners that were involved.  And the office that I was in

10    at the time, you know, indicted several -- a handful of

11    individuals, including the big fellow, and also indicted the

12    corporation.  And I told my colleagues, I said I think this is

13    a bad idea because the corporation can't do -- you know,

14    corporation is just a legal fiction; it can't do anything in

15    and of itself.  It can't form any intent and it simply acts

16    through its officers and agents.  In this case we were already

17    getting ready to indict all of those people, you know, and I

18    remember asking the question.  I got out-voted and everything

19    else and they did, in fact, indict the corporation, as well as

20    a handful of individuals.

21             We had a lengthy jury trial.  The jury came back,

22    found all of the individuals not guilty and found the

23    corporation guilty.  I was absolutely astounded but it gave the

24    jury an out, but I was astounded at the time because obviously

25    at least one of the individuals had to be doing something

727

1    wrong, and probably several of them, but the corporation

2    couldn't be acting independent from the individuals.

3         We have got the same thing here. We have got a couple

4    of individuals that were running Terry Manufacturing and they

5    are both in jail now, they have done all kinds of -- you know,

6    guilty of all kinds of skulduggery and maybe there is more

7    stuff out there and that is what they didn't want to get into.

8    But, I mean, Terry Manufacturing couldn't act independently of

9    those guys. But you are saying that legally we can draw the

10   distinction between the individuals and not attribute the fraud

11   to the corporation?

12        MR. BARRIERE: I think you have to for purposes of

13   this analysis and, indeed, I submit that that is consistent

14   with the general view under the 544 cases that a debtor

15   corporation will be, in effect, viewed as divorced from its own

16   conduct. You know, otherwise we really couldn't have

17   fraudulent conveyance cases; we couldn't have actions and --

18        THE COURT: Well, certainly there is a ton of cases

19   out there that say you can't attribute the debtor's fraud to

20   the trustee, otherwise the trustee would never win.

21        MR. BARRIERE: Yeah, exactly. That the trustee is not

22   going to be held liable for that and the debtor-in-possession

23   is not going to be held liable for that, and I think that is

24   consistent with the same mentality. Look, at the time this was

25   going on, the real parties-in-interest here were the creditors

728

1     of Terry Manufacturing.  That is indisputable.  This company

2     was insolvent; the fiduciary duties were owed to the creditors

3     of Terry Manufacturing.  They were the ones who were ultimately

4     being injured, I submit to you, not only by the expenditure of

5     these funds but by the ultimately successful effort to cloak

6     its financial problems.

7            Now, Mr. DeLong tells us I had no idea.  I thought the

8     company was healthy, happy, strong, and I have no way to

9     disprove that because I am never going to get the Terrys to

10    acknowledge where the company really was other than the

11    entirely superficial confession you heard from Roy to the

12    effect that the financial statements weren't wholly accurate.

13           What I can tell you is this:  That the way the law

14    gets around the lawyer's claim I did not know the intricacies

15    of the corporation is that he has to deal with the corporation

16    as a separate juridical entity and he has to, as a result, make

17    his conflicts decision on that basis.

18           If not, what we have seen yesterday is what Dr. Ross

19    claimed, but does not exist under the Georgia laws, which is,

20    you know, that provided there is informed consent, that's the

21    end of the equation.  But even Dr. Ross acknowledged there has

22    to be an objectively substantive recognition that the attorney

23    can fully represent the interest of both the corporation and

24    the officers, and it has to be representing the interests of

25    the corporation separate from protecting the officer's criminal

729

1    conduct.   That  is  where  we  end  up  otherwise,  that  the
2    corporation  is  subservient  to  its  officers  and  that  the
3    corporation's  interest  is  protecting  the  officer's  criminal
4    conduct,  and  that  cannot  be  the  law.   That  is,  in  fact,  the
5    price  to  doing  business  in  a  corporate  form.   It  is  a  separate
6    juridical  entity  which  has  to  be  respected.   And  that  is
7    ultimately  where  Mr.  DeLong  ended  up,  I  submit  to  you,  which
8    was  conducting  this  case  in  a  way  for  three  and  a  half  years,
9    driven  principally  by  the  need  to  protect  Rudolph  Terry  as
10   opposed  to  bring  to  closure  what  exposure,  if  any  there  was,
11   for  Terry  Manufacturing.

12          I  don't  know  the  answer  of  whether  Commercial  Factors
13   would  have  settled  cheaper.   I  don't  know  the  answer  of  how
14   Commercial  Factors  would  have  responded  had  there  been  an
15   attorney  who  from  June  forward  was  taking  the  position  that
16   this  was  *ultra  vires*  conduct,  denying  perhaps  knowledge  of  it
17   occurring  but  saying,  in  effect,  if  it  happened,  it  is  not  our
18   problem.

19          But  I  do  know,  I  do  know  that  defense  would  have  been
20   far  more  compelling  if  it  had  been  raised  sometime  earlier  than
21   June  of  2003  after  this  sort  of  serial  defenses  of  we  do  owe
22   the  money  in  the  ordinary  course  to  we  don't  owe  the  money  and
23   we  don't  owe  the  money  because  we  never  got  the  product  and  we
24   don't  owe  the  money  because  this  was  really  a  scam  by  Jon
25   Pouncey  and  Tracy  Eden.   That  was  the  Rudolph  Terry  defense.

730

1          It is the same thing ultimately we heard in this

2     courtroom yesterday morning, which was anybody but me.  I was

3     the victim here.  I was scammed.  I submit that was not a

4     prudent approach on behalf of the corporation.  It simply could

5     have taken and should have taken the position this is conduct

6     outside the scope in which we have no involvement.

7          I think we have sort of moved into closing, but I will

8     be happy to keep going, Your Honor.

9          THE COURT:  Actually, I guess you have made the motion

10    on this and frankly I see your attorney malpractice case as

11    completely separate from your -- I had a batch of questions on

12    that, but I think what we will do is we will put that on the

13    side.  I will hear from Mr. Bridgers on the motion that you

14    have made right now, and we can discuss -- we will confine our

15    remarks for now to the malpractice aspect and then we will get

16    to the other later.

17          MR. BARRIERE:  Thank you.

18          MR. BRIDGERS:  Your Honor, I don't think I am going to

19    start off with by defending the Terrys.  I don't think that is

20    really what happened, and I don't think they deserve to be

21    defended, to a large extent.

22          However, when Mr. DeLong came into this case, he was

23    presented with a certain level of facts.  If nothing else, Mr.

24    Barriere demonstrated Mr. Rudolph Terry seemed to be all over

25    on those facts.  I think that is pretty obvious.

1          Mr. DeLong was presented with that.  There were some

2     issues about what he testified to earlier on about the product

3     and who got it and how that happened.  I would remind the court

4     that a few months later, I don't remember the exact time frame,

5     but Mr. DeLong actually filed in the court, either in discovery

6     or some type of pleading, a correction of that.  That was

7     corrected.

8          Also, all of these assumptions about conflicts and

9     waivers of the corporation do tend to be based on the fact, the

10    assumption, the guess, that Rudolph and Roy Terry knew

11    different things; and I think the entire course of everything

12    involving the Terry Brothers is that they all had overlapping

13    knowledge of everything.  I think that is a very fair reading

14    of the evidence.  The Terry brothers both knew what was going

15    on here; that Roy Terry understood, he knew that Rudolph had

16    done this, he knew that Rudolph was trying to settle this case.

17         So Mr. DeLong then is faced with the two, the only

18    people in the corporation, and at that point I think even Dr.

19    Ross, or it is really obvious that, even though the rules are

20    valid and the rules certainly give us some guidance, at some

21    point it is -- the rules become nonsensical when the only

22    available route to the corporation is to hire two lawyers to

23    sue each other in a closely-held corporation with two brothers

24    and two shareholders.  And that just leads to a nonsensical

25    approach.

732

1          THE COURT:  But that is the posture you are in right

2     here today; isn't it?

3          MR. BRIDGERS:  I am sorry, Your Honor.

4          THE COURT:  That is the posture you and – Mr. Barriere

5     is standing in the shoes of  Terry Manufacturing right now.  I

6     mean, isn't that the posture you are in right now this very

7     minute?

8          MR. BRIDGERS:  It is looking back not as to the

9     underlying case.  Certainly it is to legal malpractice, these

10    questions that have come up, but what we are -- but at the time

11    the Commercial Factors case against Terry Manufacturing and

12    Rudolph Terry was unitary.  It was always the same thing.  Mr.

13    DeLong did try to have the corporation removed, and Judge

14    Winegarden found that there was enough evidence that the

15    corporation was involved in this to let it go to a jury.  And

16    just as an aside, the docket will indicate the case has

17    actually been dismissed in Gwinnett County.  It is not still

18    pending.  It has been dismissed.

19         THE COURT:  Okay.  Thank you.

20         MR. BRIDGERS:  It is just on the docket.

21         As a technical and truly fair reading of legal

22    malpractice, it has never been based on the status of the

23    attorney.  It has been based on acts and errors and omissions.

24    And the only error and omission other than being there, that

25    Mr. Beltran pointed out, was filing summary judgment late, and

733

1    I don't think that was credible.  There is just no credibility

2    to the fact that waiting a few months, a few years to file

3    summary judgment, was a breach of the standard of care when, as

4    Mr. Beltran said, another lawyer in the same circumstance could

5    have made the same decision.  It is just because of Mr.

6    DeLong's status that he is somehow liable for that.

7            In the same way, Mr. Beltran acknowledged that Georgia

8    cases say, when there has not been a bad result for the

9    corporation, there is not legal malpractice.  It is not in a

10   vacuum. Now the obvious retort to that is the legal fees.  The

11   legal fees, though, if you look at those damages, there are

12   Georgia cases out there -- and I have just found them in the

13   recent time.  I will need to bring them to the court's

14   attention.  There are cases in Georgia that say that charging

15   of an excessive legal fee cannot be the basis of legal

16   malpractice.  Georgia courts just aren't going to get into

17   charging an excessive fee as being legal malpractice.

18           And then we also have to look at the fact that with

19   these unitary claims against Terry Manufacturing and the

20   unitary claims against Rudolph Terry, Mr. DeLong was faced

21   with, as the court said, defending the corporation based on

22   what Mr. Rudolph Terry did.  That issue was going to a jury.

23   That issue had to be defended.  Mr. DeLong testified that there

24   was a variety of reasonable efforts made over here in these

25   boxes that went to both Terry Manufacturing and Rudolph Terry,

734

1   and that he believed he could do that.

2           Again, Mr. Barriere, I think, demonstrated that the

3   Terry brothers knew a lot that Mr. DeLong did not know.  He was

4   sent out as a professional to do that.  As professionals, we

5   know that clients do dribble out information and that, even

6   when you understand that perhaps the clients have some

7   liability or there were some bad acts, your duties then are to

8   look at the liability.  Did Mr. Pouncey know?  Did Mr. Eden

9   know?  I would submit, Your Honor, that one thing Mr. DeLong

10  discovered was this was more complicated than just Rudolph

11  Terry and Floodgates with Jon Pouncey solely in a conspiracy or

12  whatever.  There were certainly some complicating factors with

13  Commercial Factors.  If the court will remember, Tracy Eden

14  held this -- we heard testimony that Tracy Eden of Commercial

15  Factors held this account by himself.  He didn't let the other

16  people in his corporation see it.  We have certainly got some

17  testimony from Mr. Pouncey.  We have got the documents Mr.

18  DeLong dug up from GMAC that GMAC had told them that some of

19  Terry Manufacturing's invoices could not be used as a basis for

20  loans.  I mean, certainly all of this stuff is efforts that had

21  to be made for Rudolph Terry or Terry Manufacturing.

22           I am probably getting a little bit more into the

23  substance of the duty, but I believe the court, at least for

24  the purposes of this motion, has heard Mr. DeLong testify that

25  he met the standard of care.  We have heard Dr. Ross testify

1    that he met the standard of care.  And so I think, as a matter

2    of law, the motion -- it would not be proper to grant the

3    motion.

4         THE COURT: Now, maybe I misunderstood Professor Ross'

5    testimony.  I don't think so, but I do want you to comment on

6    this to see if you think I have got it right.  We have got a

7    situation here with a closely-held corporation.  At least, the

8    common stock was closely held.  We have got this complicating

9    factor.  We have got all of these preferred shareholders and --

10    but I am just going to factor that out for the time being.

11         It seemed to me that -- I was trying to get a handle

12    on, when we have got this situation of a closely-held

13    corporation, under what circumstances may a conflict of

14    interest be waived, and how does one draw the line?  I mean, I

15    had understood Professor Ross to say there was no circumstance

16    under which the corporation could not waive, provided the

17    shareholders were basically adequately informed.  And once they

18    were adequately informed, once the attorneys subjectively

19    thought, well, you know, this is the best we can go forward,

20    then there is no circumstance under which there could be a

21    non-waivable conflict in the context of a closely-held

22    corporation.

23         Do you agree with that, or have I misunderstood or how

24    did you --

25         MR. BRIDGERS:  I think that was generally his

736

1    testimony.  I think he left open the possibility that it was --

2    you know, in another set of facts, there may be something

3    unique, but that generally in that situation you are dealing

4    with everyone as long as they have the same information, you

5    are dealing with everyone who has an interest in the

6    corporation.  Really, you know, legal fiction that it is --

7              THE COURT:    Let me stop you right there.  It gets

8    real interesting when you say, well, who is the corporation

9    when the net worth starts to head below zero.  Some people

10   might say, well, the corporation is the creditors or the public

11   or someone else because -- let me take a step back.  I remember

12   one of the first 11's I handled many years ago as a debtor's

13   lawyer, my client was a small corporation, insolvent,

14   controlled by one guy, and his liabilities exceeded the value

15   of his assets and there was no question of that.  And he wanted

16   to work, you know, struggle, fight through this trouble and

17   save his company.  He viewed himself very heroically, you know,

18   I am going to dig myself out.  And I remember telling him that,

19   if you try to dig yourself out of this hole and fail, the

20   creditors may not see your efforts as heroic, they may see your

21   efforts as you were gambling with our money and we were put in

22   the situation of sort of heads, I win, tails, you lose.    In

23   that particular case, you get a situation -- and I understand

24   that Mr. DeLong testified that he had financial statements

25   showing that there was plenty of net worth and that doesn't

737

1    apply and maybe that is a simple answer here.  But I am

2    thinking back, Professor Ross didn't seem to want to consider

3    the possibility that the corporation is anybody other than the

4    common shareholders, and yet we have got this big body of

5    bankruptcy law, insolvency law, that holds otherwise.

6            Is it just a simple matter of the creditors -- I am

7    sorry -- is it a simple matter of the shareholders saying,

8    yeah, we understand what is going on here, we waive the

9    conflict and that's the end of it?  Is that --

10           MR. BRIDGERS:   To throw one more fact into it, I

11   think that is the simple answer when the attorney doesn't know.

12           THE COURT:  Right.  Okay.

13           MR. BRIDGERS:  And if you throw that in and, again, if

14   nothing else was proved this week, it is that the Terrys

15   weren't telling nobody that they were in bad financial shape

16   because it would've been, (a), they were committing crimes, of

17   course but, (b), it would have caused some of this house of

18   cards to perhaps tumble a little bit faster.  So they brought

19   in a professional who had no idea of the company's status,

20   showed him documents that said we are doing pretty dad-gum

21   well, and sent him out to represent them.

22           THE COURT:  Of course, Mr. Barriere is going to come

23   back and say, well, yeah, that is what you were told at the

24   outset.  It became clear fairly early on that all of those

25   facts weren't true.

738

1          MR. BRIDGERS:  Your Honor, I would disagree that there

2     was any evidence at all presented that Mr. DeLong ever came to

3     the  understanding  that  the  company  was  insolvent  or  in

4     financial problems until they filed bankruptcy.  Mr. DeLong's

5     testimony  is  he  was  never  told  about  that  and,  again,  the

6     Terrys  were  hiding  this  through  the  whole  way.   They  were

7     hiding it to their banks, their vendors, their creditors.   I

8     think that is undisputed.  Mr. DeLong was sending them, you

9     know, like every other attorney in the world, does some work,

10    send  them  a  monthly  bill.   Well,  they  sent  a  check  back.

11    That's great.  Keep doing the work, sending checks back and

12    forth and had zero reason, zero reason to understand that this

13    company  might  have  been  insolvent  or  even  having  financial

14    problems until, poof, they file bankruptcy.

15         THE  COURT:    Okay.   Well,  no,  I  understand.    Your

16    argument is well taken there.  As I understood Professor Ross,

17    though, is that he said, well, looking at the plain language of

18    these ethical rules, it does not turn on questions of solvency.

19    I mean, he just said, well, there is a shareholder, there is a

20    corporation, he can waive it.  In other words, you are starting

21    to  draw  a  distinction  between  a  solvent  corporation  and  an

22    insolvent corporation --

23         MR. BRIDGERS:   I think so.

24         THE  COURT:   - which we certainly do that a lot in

25    bankruptcy law but, for purposes of his opinion yesterday, I

739

1  don't – I gathered that Professor Ross didn't see that

2  distinction. So I think he would say it doesn't matter, the

3  corporation could have been ten million dollars in the hole,

4  negative net worth, he would still allow the shareholders to

5  waive the conflict on behalf of the corporation. That was –

6  are you not understanding the testimony the same way?

7          MR. BRIDGERS: I think that – no, I do believe that

8  generally what his testimony is – was – but I don't think he

9  was factoring in perhaps some of the bankruptcy law that the

10  court has cited about looking to the creditors because there is

11  no evidence that anybody had any – excuse me – no evidence that

12  Mr. DeLong, at least, or that DeLong – any of the defendants –

13  had any evidence that they should have been looking at the

14  bankruptcy law. I mean, if I am dealing with you as a client

15  and you are not telling me that you have got a guardian over

16  here I should be dealing with, and I have no reason to know, I

17  have got to assume that I am dealing with you. It is perhaps

18  not a good analogy but, you see, if I don't know, I am looking

19  over here.

20          THE COURT: No, I understand your point and I think,

21  you know, as a theoretical matter, I think I agree with what

22  you are saying. I haven't thought this all the way through but

23  I guess the thing and, you know, maybe I should have asked

24  Professor Ross a couple more questions before we cut him loose,

25  but I think he would say, well, you know, whatever bankruptcy

740

1    law is, it is, that is fine and good, it doesn't affect the

2    standard that a lawyer owes a client.  And so I think he would

3    say, well, that is fine and good but that doesn't matter for

4    purposes of the decision that I am making and I think he

5    factored that out.

6         MR. BRIDGERS: I think he did.  I think he did, and I'm

7    not sure.   That is a good question as to whether it would

8    change his opinion.  I do not know.  I guess I am just kind of

9    going back to looking at a malpractice is errors and omissions

10   and knowledge of financial problems.  I am starting to mix in,

11   of course, the insolvency, but you have to look at what Mr.

12   DeLong could have known and it was just obvious that was being

13   hidden from him the entire time.

14        THE COURT: Well, you know, another thing, just to sort

15   of come at this problem from another idea, was Mr. DeLong put

16   in a position where he was damned if he did and damned if he

17   didn't?  That is, if he didn't put up a vigorous defense for

18   his joint client, he might have been guilty of malpractice.

19   Because he did, he is now guilty of malpractice.  I guess maybe

20   the answer to that is, well, no, because he couldn't do that,

21   he should have withdrawn.  I don't know, but I am sensitive to

22   the fact that, before you hold somebody liable, you have got to

23   have offered them a clear path to have avoided the situation

24   and gotten out, and I'm trying to picture where that was.   I

25   mean, I guess Mr. Beltran would say that Mr. DeLong should have

741

1      withdrawn over the objections of both of the Terry brothers.

2      Maybe that was Beltran's point.  But, anyway, I am sensitive to

3      the dilemma –

4            MR. BRIDGERS: And as the court says, I think obviously

5      had Mr. DeLong not defended Terry Manufacturing, we would be in

6      this  same  situation  with  a  different  set  of  facts  as

7      defendants.  But I think that is why legal malpractice has to

8      look at causation and the causation, damned if you do and

9      damned if you don't, the reality is there was no harm to Terry

10     Manufacturing. Terry Manufacturing was facing a twelve, fifteen

11     million dollar, you know, theoretical liability obviously but,

12     real, with RICO and three million dollars of invoices, and they

13     have never been held liable for a dime.  That is a crucial

14     point.

15           Now, obviously bankruptcy got in the way but the

16     court, I don't think it is possible and the law doesn't support

17     that you can just speculate and say what might have happened

18     had the case continued and --

19           THE COURT: Yeah, but isn't that what we have to do in

20     every malpractice case, say would things have been different

21     had the lawyer done something different?

22           MR. BRIDGERS: Well, to some extent, but as the – I

23     can't recall the case now, but in our motion for summary

24     judgment we quoted a case out of Georgia that basically said

25     that you can't do a legal malpractice case while the underlying

742

1    case is still pending, and the basis was because you don't know

2    what happened.  You can't have figured out what happened.

3         Now, I guess, theoretically this has just been

4    dismissed and stayed, but it is still the same thing.  Nothing

5    has happened wrong to the corporation to demonstrate that there

6    was a harm.  That's a key to legal malpractice because you have

7    got to say that you got hurt, and then you have to go back and

8    say, well, would another lawyer have avoided the hurt.  But

9    here there is no hurt to even start off with to figure out what

10   another lawyer would have done in the same situation.  And I

11   think that's also what's in the concept in defense of the legal

12   malpractice claim, Your Honor.

13        Your Honor, I think that is all of the argument I

14   have.  Mr. DeLong did make a – it would be unusual but Mr.

15   DeLong did make the offer that, if the court has any further

16   questions for him, he would be willing to go back under oath.

17   That's unusual and certainly at the court's discretion but that

18   is on the table.

19        THE COURT: No, I appreciate the offer but, no, the

20   evidence is closed.

21        MR. BARRIERE: I wanted to just address one point, Your

22   Honor, which I think is lost a bit in this discussion, which is

23   remember what the trustee is seeking here.  He is not seeking

24   damages of we could have settled for less, we could've gotten

25   a better deal, or our case would have been enforced.  He is

743

1    seeking disgorgement of fees, seeking disgorgement of fees, and

2    that is the appropriate remedy for precisely the issue here.

3         THE COURT: Well, why don't we segue into our

4    discussion of the other counts because that is one of the

5    points that I wanted to address.  If you prevail on one of your

6    fraudulent conveyance theories, then does that moot the

7    malpractice case?

8         MR. BARRIERE: Well, I don't think so.  From a very

9    practical issue, the insurance policy issued to Mr. DeLong and

10   his fellows cover the malpractice.  They do not cover the

11   fraudulent conveyance.  A simple fee dispute is not covered by

12   the insurance whatsoever.

13        So I think that we probably disagree on many things,

14   but the one thing we do agree on is that a resolution of the

15   malpractice policy issue – the malpractice policy issue is

16   critical because that is the starting point, if you will, for

17   whether we do or do not have insurance here.

18        THE COURT:  Okay.

19        MR. BARRIERE:  The only party from whom I can collect

20   a fraudulent conveyance action are these gentlemen and I

21   suspect – well, I am certain they will disagree that I am

22   entitled to collect a dime.  If I have to collect a dime,

23   better the insurer's dime than theirs.

24        THE COURT: Okay.  I understand.

25        MR. BARRIERE: As I said, we are looking for

744

1    disgorgement and that's, I think, one of the reasons that this

2    is a little different than the malpractice cases Mr. Bridgers

3    was referencing.  It seems to me that, when a disaffected

4    client – and that is where we are; we are the disaffected

5    client – is seeking not his general damages or consequential

6    damages but the actual disgorgement of the fees the attorney

7    received, it brings into real sharp focus the reality that the

8    principal issue is that the attorney breached his duties under

9    the ethical consideration.

10           We are not asking for, you know, that if Mr. DeLong

11    had done a better job, we would have settled with Commercial

12    Factors for a hundred thousand dollars, we would have walked

13    away and we have got this continued exposure.  We are not

14    asking for that.  We are simply asking for disgorgement of

15    fees.

16           Now with respect to the fraudulent conveyance case, I

17    think I can summarize my points fairly straightforward this

18    way:

19           One, I don't believe there can be a serious challenge

20    that a significant, if not most of this investment, was made

21    by, at least insofar as the Terrys were concerned, with actual

22    intent to hinder, delay, or defraud.  And the reason I say that

23    is this was an investment driven by their own admission to

24    cloak the Commercial Factors litigation and the underlying

25    factoring fraud from the other creditors.  I mean, that is a

745

1    constant theme in repetitively going back to the court and

2    saying keep Commercial Factors from deposing McDonald's,

3    notwithstanding the fact that Rudolph Terry claimed it was a

4    customer for these T-shirts.  Keep Commercial Factors from

5    deposing Perseco, notwithstanding the fact Rudolph Terry

6    identified them as a customer.  Keep our banks from being

7    deposed, notwithstanding that eleven million dollars supposedly

8    flew through the accounts.

9        You know, there was – we debated obviously.  It got

10   hung up on the issue of the precise number, but there plainly

11   were hundreds of hours and hundreds of thousands of dollars

12   invested in stifling any examination of Mr. Rose.

13       Now, the Rose financial statements were hardly a

14   matter of confidence.  Anyone who Rudolph or Roy Terry met at

15   Waffle House who they thought had fifteen dollars to invest in

16   this company was sent a prospectus, which included the

17   financial statements.  You could paper the walls of the company

18   with these financial statements.  So the notion that there was

19   this tremendous confidence that had to be protected is frankly

20   laughable.

21       It is plain, I think, that the Terrys – and I am not

22   sure what Mr. DeLong knew.  I am not sure what Mr. DeLong knew

23   frankly – recognized that the Commercial Factors attorneys, who

24   were effective, aggressive-cross examiners, were going to get

25   into this and these financial statements, if you got to the

746

1     point of actually examining Rose, it was going to open a

2     Pandora's box.  Indeed the very significant likelihood that at

3     least one of these financial statements wasn't even prepared by

4     Mr. Rose but was a cut and paste job done in Roy Terry's

5     office.

6               THE COURT: Well, on this actual intent to hinder,

7     delay and defraud theory, does it matter what Mr. DeLong knew

8     for purposes of that cause of action?

9               MR. BARRIERE: The cases tell us we look to the

10    mentality of the debtor, the mentality of the debtor.  Now, you

11    know, is there going to be the case where the wholly good-faith

12    transferee may escape liability?  Perhaps.  But I submit to you

13    that the documentary evidence, the notes taken by Mr. DeLong,

14    suggest he had some idea.  He didn't believe this was simply an

15    act of zealotry to keep these financial statements out of

16    Commercial Factors.  It simply is incomprehensible that he did

17    not recognize, and that Rudolph Terry did not somehow relate to

18    him, there was something here that needed to be kept under

19    wraps.  I mean, why else do this fight?  Is it really credible

20    that he simply said, well, my client doesn't want these things

21    to come out, they are highly confidential, even though hundreds

22    of copies have been disbursed and therefore I am going to

23    invest, make this kind of investment?  I submit it simply is

24    not credible.  He had to have some idea what was going on.

25               Is it credible, as he told us, that he never looked at

747

1    the underlying documents?  He spends hundreds of hours

2    litigating this but never asked to see the documents.  Is that

3    credible?  Is it credible, consistent with that, the idea that

4    he spent hours fighting a motion for protective order to

5    protect against production of documents that didn't exist, that

6    he was clueless about that?  How could you appear before a

7    court, consistent with your obligations as an advocate, to

8    fight against production of documents without having taken a

9    moment to see whether they exist?

10          I don't accept, and our papers will acknowledge, we do

11    not accept that there was innocence here.  If you look at the

12    bills, Your Honor, you will note that not a day goes by without

13    communications between Mr. DeLong and Rudolph Terry.  It is

14    inconceivable that an attorney, as he acknowledges, with thirty

15    years of sophisticated commercial litigation experience, was

16    simply under the illusion that Rudolph Terry was a victim, that

17    the financial statements were legitimate, this was a healthy

18    company that had sort of gotten into a problem made up by Jon

19    Pouncey and Tracy Eden.  It is just not credible.

20          Reasonably equivalent value is obviously not an issue

21    if there is actual intent to hinder delay, or defraud.  It is

22    the other test, was the company insolvent.  There has been a

23    stipulation to that effect.

24          Was there reasonably equivalent value?  Well, I think

25    the easy answer is that, under the Alabama statute, if a

748

1    company is insolvent, the burden shifts to the DeLong

2    defendants to demonstrate reasonably equivalent value.

3         The fact of the matter here is they can't do it

4    because they cannot separate what was invested to protect Terry

5    Manufacturing and what was invested to protect the interest of

6    Rudolph Terry. It is all one and the same. Now their response

7    is, well, the pleadings read the same way but –

8         THE COURT: Okay. Yeah, you're getting right to

9    another one of my points that I wanted to ask about. Now we

10   are moving to your theory, constructive fraud theory, okay.

11   Terry Manufacturing, for better or worse, was sued, was made a

12   defendant, had to be defended. Are you saying that it is an

13   all or nothing deal? I mean, I had in the back of my head the

14   possibility that maybe I need to look through the bills and try

15   to, you know, if I find in your favor on the constructive fraud

16   theory, I have got to try to pick through the bills and see

17   what part of these bills were reasonably equivalent value and

18   what was not, and I was going to ask you for some help on how

19   you think that ought to be done. But you are telling me I

20   don't do that; it is all or nothing?

21        MR. BARRIERE: I think that's right, and the reason I

22   say that, it is not your obligation, nor mine, to try and

23   isolate whether this fifteen minutes benefitted Rudolph or this

24   benefitted Terry Manufacturing. And I can't dispute, nor would

25   I, the lawsuit is filed against Terry Manufacturing. It would

749

1    have made an investment in a lawyer; not this lawyer, I think,

2    but a different lawyer.  But since that is their affirmative

3    defense, under the Alabama statute they have to come forth and

4    show this is what really benefitted the company.  And what they

5    have chosen to do, as you have heard, is simply say everything

6    benefitted the company.

7            THE COURT: You said this a couple of times now.  You

8    are puzzling me because I was thinking that this was your

9    burden as trustee and not their burden –

10           MR. BARRIERE: Under 547, I think it is my burden.

11   Under the Alabama statute, it is their burden.

12           THE COURT: 547 or 548?

13           MR. BARRIERE: I am sorry, 548.

14           THE COURT: Okay.  Because I put 547 on the side.

15   Let's talk about that later.

16           MR. BARRIERE: We will talk about that later.  548 is

17   my burden, but the Alabama Supreme Court has held that under

18   the Alabama statute, if I show insolvency, the burden shifts to

19   the recipient.

20           THE COURT: You have raised another good question.  We

21   have got a lawsuit that took place in Georgia; we have got a

22   Georgia lawyer; we have got Terry Manufacturing had a place of

23   business in Georgia and its main office in Alabama.  What

24   choice of law rule do I apply and how does that rule apply to

25   the facts of this case?  In other words, do I apply Georgia law

750

1    or Alabama law?

2           MR. BARRIERE: Well, we will start with the malpractice

3    case.  I think plainly Georgia law applies there.  The conduct

4    took place there.  The attorney is active there.  The general

5    rule on fraudulent conveyance, what I think is applicable here,

6    is that you look to the principal place of business of the

7    transferor.  We had this issue, as you may recall, with respect

8    to People's Bank.  So I think you look to Alabama law.

9           I believe, with the possible exception of this issue

10   of burden of proof, this may be, in large measure, a false

11   conflict.  Both the Georgia statute and the Alabama statute are

12   derived, largely whole and undigested, from the model uniform

13   fraudulent  conveyance  act.   So  I  don't  believe,  as  a

14   substantive matter, you are going to conclude that there is a

15   significant difference between the two.

16          With  respect  to  the  548  issue,  my  position  would

17   ultimately be, look, because I had an attorney involved in a

18   conflict, because this was plainly primarily for the benefit of

19   Rudolph  Terry,  I  am  entitled  to  disgorgement  of  the  fees

20   without having to do the impossible, which is to go through and

21   try and say this five minutes was for the benefit of Rudolph

22   Terry,  this  five  minutes  was  for  the  benefit  of  Terry

23   Manufacturing, because the fact of the matter is the bills

24   aren't  done  that  way.   I  mean,  they  are  all  done  in  global

25   because of the intent that Terry Manufacturing pay everything.

751

1          THE COURT:   Okay.

2          MR. BARRIERE: Quickly to the preference action, if I

3    may, Your Honor. I would have to say on the classic preference

4    analysis,  we  should  lose.   I  mean,  the  DeLong  defendants

5    continued to provide legal services, if their bills are to be

6    believed, after the last payment, which they did not receive

7    benefit.  I think that the resolution of the preference case is

8    in  large  measure  the  resolution  of  the  fraudulent  conveyance

9    action, which is should this law firm – were they providing any

10   benefit to Terry Manufacturing or is the reality that, given

11   their fundamental conflict, they should not have been engaged

12   as our counsel at all.

13          In some ways, Your Honor, I think it is analogous to

14   what you were faced with in the litigation involving the Steel

15   Law Firm and the resolution of the summary judgment there.  You

16   know, putting aside the nuances of this case, Mr. Steel had

17   done  a  fine  job  of  representing  Rudolph  Terry.   We  never

18   disputed that.  Our point was simply Rudolph Terry needed to

19   pay for his own defense.  It shouldn't have been the debtor's

20   burden.  And that is fundamentally what is at issue here.  And

21   Rudolph Terry had a real problem.  He had a real problem that

22   grew as cancer into a criminal problem, but he should have paid

23   for his own defense here.  And Mr. DeLong should have insisted

24   that there be a separate counsel such that we would not have

25   this debate.

1          Now the response I keep hearing is, well, that's just

2     unrealistic. As the doctor told us, if you have a closely-held

3     corporation, you get consent, that is the end of the equation.

4     But you can't square that with what the rules say. That is not

5     what the rules say. They say quite the opposite. It is the

6     attorney's obligation to make that call. The attorney, he is

7     the professional, not the client. And that is why, when the

8     attorney does not abide by that duty, disgorgement is the

9     appropriate remedy.

10          I don't disagree that, if I was seeking something

11    beyond disgorgement of fees, Mr. Bridgers' comment would be

12    well taken, that I would have to show that, (a), Mr. DeLong had

13    done something different. I think we have shown that. I think

14    the defense plainly would have been different had it been the

15    corporation alone, but that defense would have resulted in a

16    different economic result which we can't do here because the

17    case was stayed. But I am not seeking those economic

18    consequential damages; I am seeking disgorgement.

19          THE COURT: Okay. Let's see. A couple of things. You

20    have made claims under both section 548 and under state law.

21    Have you given any thought, are we going under 544(a) or 544(b)

22    as far as whose shoes Mr. Alexander is standing in, this

23    hypothetical lien creditor as of the date of the bankruptcy

24    petition or an actual creditor?

25          MR. BARRIERE: Well, I think the answer is I have not

753

1    because he falls into both – I have both.

2            THE COURT: Right.

3            MR. BARRIERE: So I have not really – I haven't studied

4    the question.

5            THE COURT: Okay.

6            MR. BARRIERE: And we have a stipulation to the effect

7    that I have got actual creditors who were actual creditors

8    prior to the first payment being made.

9            THE COURT: Okay.  Because, I mean, as you are aware,

10   the section 548 of the bankruptcy code was amended in the last

11   big batch of amendments.

12           MR. BARRIERE: Right.

13           THE COURT: The look-back period under 548 is not two

14   years but would you agree it was one year –

15           MR. BARRIERE: Yes, as I read the code, it is plain and

16   unambiguous that that two years applies only to cases filed –

17   in fact, I think it is after – it is not even the date the

18   president signed.  I think it was an effective date of several

19   months thereafter.

20           THE COURT: A hundred and eighty days after the --

21           MR. BARRIERE: And Terry Manufacturing, I believe,

22   filed initially under Chapter 11 on July 7, 2003, is stuck with

23   the one year.

24           THE COURT: Okay.  Let's see.  A couple of other

25   questions.  If I rule for the defendants, the answer to this

754

1    question doesn't matter.  If I rule for the plaintiff, who is

2    the defendant that's on the hook for your judgment?

3              MR. BARRIERE: Well, plainly Mr. DeLong.

4              THE COURT: An individual?

5              MR. BARRIERE: As an individual.  I think the other

6    defendant is DeLong and Caldwell, LLC.

7              THE COURT: Does that even exist anymore?

8              MR. BARRIERE: Well, I think what you are going to have

9    to find is DeLong and Caldwell, LLC existed at the time.  I

10   think what you're also going to find is, because it is not an

11   LLC, it was a general partnership.  So they will have an action

12   against what was a *de facto, in de jure,* general partnership,

13   DeLong and Caldwell.

14             THE COURT: Okay.  As far as what the records of the

15   Georgia Secretary of State showed during this period of time

16   from '99 to 2003, thereabouts, was DeLong and Caldwell a legal

17   entity at that –

18             MR. BARRIERE: No.  So what you have is what you had

19   before LLCs.  You have two lawyers get together and they form

20   a partnership.  And this notion that, well, we were really

21   DeLong, Caldwell, Logue and Wisebram, we just forgot to change

22   our name, that is not salable.  I mean, this was an LLC, and it

23   held itself out as an LLC, DeLong and Caldwell.  And we're not

24   talking about a significant burden.  You file one piece of

25   paper with the Secretary of State and they neglected to do so.

755

1        So it is like when you and I, or at least when I

2    started practicing law back in the practicing age when you had

3    two attorneys get together and it would have been Barriere and

4    Barriere, we didn't need to do anything further.  You didn't

5    record anything with the Secretary of State.  You still don't,

6    at least in the state of Louisiana, and I know the state of

7    Texas, unless you own property.  You have a partnership by

8    simply holding yourself out to the public, and that partnership

9    is liable for the malpractice of its members.  And this notion

10   that the client has some subjective view that he is hiring me

11   as opposed to Barriere and Barriere does not take away from the

12   co, joint and several liability of the partnership of which I

13   am a member.

14        And, here, I submit it is not even a close question.

15   We have the engagement letter on DeLong and Caldwell

16   letterhead. All of the correspondence is on DeLong and Caldwell

17   letterhead.  The bills are issued on DeLong and Caldwell.  The

18   bills insist that payment be made by check made payable to

19   DeLong and Caldwell.  And, in fact, these very bills were paid

20   by checks made payable to DeLong and Caldwell.  So those are

21   the defendants.

22        Now, as I appreciate it and we are going to have to

23   put this in briefing to you, as I appreciate it, if you have

24   successor law firms, the attorney who commits an act of

25   malpractice and then moves to another law firm, those successor

756

1    law firms may also be liable for it, but I have to acknowledge
2    I am not prepared to speak to that today.  The defendants I
3    know are on the hook, though, are Mr. DeLong and DeLong and
4    Caldwell, which I will ask the court to make a factual finding
5    was a general partnership, not an LLC, because they never
6    registered with the Secretary of State.

7         THE COURT: I had another – I realize I am kind of
8    jumping around.  I should have asked you this earlier.  My
9    initial thought, and I am certainly open to reconsidering, my
10   initial thought was that your fraudulent conveyance actions
11   were core proceedings and your malpractice action was a non-
12   core proceeding.  Do you agree or disagree with that?  On this
13   question of core or non-core, what are your thoughts?

14        MR.  BARRIERE: Well,  indisputably  the  fraudulent
15   conveyance actions are core proceedings, and I would agree
16   that, in the normal context, a malpractice action is a non-core
17   proceeding.  It would have existed outside the Chapter 11 case
18   in true theory because we can be comfortable that the Terrys
19   would not have presumably brought such an action but that is
20   not the standard.

21        I guess the only thing I'm struggling with is that
22   what makes this have elements of core is that,(a), it plainly
23   is an action that de facto, if not de jure, would only be
24   brought  by  a  trustee  and,  (b),  it  is  simply  seeking
25   disgorgement as opposed to consequential damages.

1          My gut tells me, though, at the end of the day you are

2    going to conclude it is non-core because it is not founded on

3    and would exist independent of the bankruptcy code.

4          THE COURT: All right.  Thank you.

5          MR. BARRIERE: The significance of that, of course, I

6    think at this point is limited other than the standard review

7    for appeal.

8          Thank you, Your Honor.

9          THE COURT: Thank you.

10          MR. BRIDGERS: Your Honor, I will first just start off

11    with one small note that I probably could have shortened some

12    of my evidentiary presentations if I understand the remedy

13    sought was mere disgorgement.  We had understood that this was

14    a general damages case.  In fact, I received a letter from Mr.

15    Barriere a week ago saying that he would be seeking punitive

16    damages against us today.

17          THE COURT: Okay.  So you are pleased?

18          MR. BRIDGERS: I am pleased.

19          THE COURT:  You are pleased that the remedy –

20          MR. BARRIERE: We will settle right now.

21          MR. BRIDGERS:  I am pleased, but it might have helped

22    us shorten a little bit.

23          Let me speak in reverse order, Your Honor, just to

24    keep things mixed up.  First I will talk about the corporate

25    issues.  DeLong, Caldwell and Wisebram, LLC, was in existence

758

1    the entire time.  This was the entity they all thought they

2    were doing.  Yes, there was not a name change done.  Was the

3    name of the attorney taken off of the letterhead?  Of course.

4    You don't put the name of the attorney on the letterhead when

5    the attorney is not in the office, and that is just a core

6    thing.

7            I will suggest to the court that Mr. Barriere's entire

8    premise about, then, therefore, this becomes a general

9    partnership is wholly and one hundred percent unsupported by

10   Georgia law.  Mr. Caldwell testified he never intended to be a

11   partner of Mr. DeLong and that is the standard in Georgia.  You

12   cannot have a general partnership without an intent to be a

13   general partner.   You can't accidentally stumble into a

14   general partnership.  And, of course, we will bring that

15   particular law to the court's attention, but I did want to

16   raise those issues as to the individual ideas.

17           And in terms of successors in interest, those issues

18   were never – certainly no real evidence was presented on those.

19   I mean, I guess perhaps there are theories of successor

20   interest but there was no evidence presented on that.

21           THE COURT: I recall some testimony from Mr. Caldwell,

22   maybe I misunderstood him, but he said that, no, this law firm

23   that you are in now with like four names, you are number four

24   on the list, DeLong, Caldwell – I have forgotten the third

25   fellow's name.

759

1          MR. BRIDGERS: Novotny but, yes, sir.

2          THE COURT: That's right, Novotny.  Okay.  That they

3    did not – I think he testified that they did not assume any

4    liability that any of the entities – whether that is correct

5    legally, I don't know, but I seem to recall that testimony.

6          MR. BRIDGERS: Actually, Your Honor, I am sorry.  I

7    should have been more – that evidence was presented that would

8    be perhaps a defense to some of the successor issues but, in

9    terms of the things you have to prove to show a successor

10   interest, none of that has been.

11         But I don't want to – Mr. Barriere didn't address it

12   in terribly much detail, and we can certainly address that

13   later with the court.

14         I will point out probably – in all of the fraudulent

15   transfer, fraudulent conveyance actions, there is a certain

16   certainly that if Mr. DeLong presented value to the company, in

17   good faith, and I think the good faith here certainly goes to

18   the matter of his knowledge of the solvency or insolvency.  And

19   I will, just as a throwaway line – not throwaway, of course,

20   but as a small digression state that I would completely

21   disagree with Mr. Barriere's characterization that Mr. DeLong

22   should have known there was financial problems here, and I will

23   get into that in a second.  There has just been no evidence

24   showing that whatsoever.

25         Mr. Barriere's position was interesting that the

760

1    efforts to defend Terry Manufacturing and Rudolph Terry were

2    one and the same, and you would have to do the impossible to

3    separate out what was done for one or the other.  And thinking

4    about it, I have to agree with that one hundred percent. Terry

5    Manufacturing – it is the last time I will say it, I promise –

6    Terry Manufacturing was going to trial, facing a jury based on

7    what Rudolph Terry did.  So what Rudolph Terry did, perhaps it

8    was also useful to gather information to defend him, but it had

9    to be there.

10         THE COURT: Well, if the fact finder doesn't buy the

11    *ultra vires* defense, then isn't Terry Manufacturing on the

12    hook?

13         MR.  BRIDGERS: Absolutely,  absolutely.   And Judge

14    Winegarden found, as a matter of law, it certainly wasn't clear

15    as a matter of law such that summary judgment could be granted

16    –

17         THE COURT: Well, of course, you had disputed facts in

18    Rudolph Terry's own deposition, didn't you?  He testified --

19         MR. BRIDGERS: As I poorly paraphrased, you do kind of

20    go to litigation with the facts you have got at times and

21    Rudolph Terry had done a good job of establishing a lot of

22    those facts before Mr. DeLong ever met them, and that was the

23    core of why Judge Winegarden – you know, Judge Winegarden saw

24    acknowledgments, saw Terry Manufacturing, saw Rudolph Terry

25    signing things.  But the court's fundamental point is correct,

1  that according to what the fact – the fact finder did not buy

2  the *ultra vires* defense.  In this closely-held corporation with

3  two brothers, Terry Manufacturing would have been completely on

4  the hook of that.

5           And to follow-up with something the court said

6  earlier, I do think, although I haven't asked him, I think Mr.

7  DeLong would rather be damned for what he did, which was

8  successfully defend Terry Manufacturing.  I mean, that is what

9  this was.  It was a successful defense of Terry Manufacturing.

10          THE COURT: Well, I don't know if Mr. Alexander is

11 going to agree with that.  He has got a one point nine million

12 dollar claim that he might have to object to later on.

13          MR. BRIDGERS: He may perhaps have to, Your Honor, but

14 the mere fact that it is still hanging out there, as I said,

15 means that as of now, as of today, Terry Manufacturing has

16 suffered no harm based on that claim, other than the legal

17 fees.  I understand that theory, yes, sir, but in terms of,

18 boy, you had a fifteen million dollar liability and you didn't

19 have to pay anything, that can only be categorized as a

20 success.

21          Let me go back to the Richard Rose situation a second.

22 Obviously companies enforce evidentiary privileges.  Mr. DeLong

23 has done it; Mr. Alexander testified he has done it in his

24 professional life.  The financial statements may have been

25 distributed.  I don't think there is any evidence that they

1    were distributed far and wide, but maybe they were out there.

2    But, still, the work papers –

3         THE COURT: We have got this huge adversary proceeding

4    with dozens and dozens and dozens of shareholders.  Every one

5    of them, every one of them alleging fraud.

6         MR. BRIDGERS: And the court has got a better

7    perspective on that than me.

8         THE COURT: Well, no, I realize that, but –

9         MR. BRIDGERS: But I think Mr. DeLong could say the

10   same thing.  Heck, I got the same thing and thought the same

11   thing.

12        THE COURT: Oh, I am not disputing that for a second.

13   He saw financial statements showing a pretty hefty net worth in

14   the year 2000, at least on the Rose financials.

15        MR. BRIDGERS: The fraudulent ones.  And as to those

16   work papers, some, again, practicality has to be looked at

17   this.  Even as I understood it to this very day Mr. Rose has

18   never let go of those work papers.  At least my understanding

19   of Mr. Alexander's testimony.

20        THE COURT: That's right, and I think there is quite –

21   a question out there whether any work papers exist.  Typically

22   what happens is when an outside accountant comes in and looks

23   at somebody's records, the first thing they do is they look at

24   things like general ledgers and stuff like that and then they

25   create a set of work papers.  And basically through these work

763

1    papers, the auditor documents – you know, he tests the numbers

2    to see if they are right or wrong, and these work papers

3    document the auditor's efforts to test these.

4        You know, for example, the first thing the auditor

5    does is, you know, the one hundred accounts are usually cash.

6    Well, the financials say there is, I don't know, ten million

7    dollars – I have forgotten what it was.  It shows a lot of

8    cash.  So what we are going to do is look at the bank

9    statements, reconcile them.  There is a routine they go through

10    and they determine whether or not that number is correct.

11        Then they go on down to accounts receivable and there

12    is a way they test the receivables.  You know, send out

13    notices, hey, do you owe this money.  Then they look at things

14    like inventories and they test the inventory.  I mean, I

15    remember years ago I worked an audit of a frozen food place,

16    and I had to spend a day in a twenty below zero locker counting

17    boxes of fish and meat and stuff.

18        MR. BRIDGERS: For that you went to law school?

19        THE COURT: Well, yeah, then I went to law school

20    because I got tired of freezing, you know, counting boxes of

21    this and boxes of that.  But, anyway, in all the while they are

22    making up these papers documenting what they are doing.

23        So if someone from the outside says, well, gosh, I

24    wonder if these financials are correct, the first thing they

25    are going to do is look at the outside auditor's work papers

1    and that is going to give them a road map into the financials

2    so they are not in this huge sea of paper but they have got a

3    much more – you know, they have got a much more concise – they

4    have a roadmap into this wilderness of the books and records.

5           So it was quite logical that Commercial Factors wanted

6    to look at those work papers.  It was certainly of interest

7    that Rose and Terry was claiming privilege.  A lot of people

8    are quite proud to say, no, our books and records are clean as

9    a whistle, come in and look at them, every number I have got is

10   right, my accountants are right. Rose has got work papers that

11   show that.  The fact that – it is sort of like being in a civil

12   case and asking somebody questions and then they start pleading

13   the Fifth Amendment.  It just sort of raises questions, and I

14   am interested in why – I mean, Mr. DeLong has been practicing

15   law a long time.  He spent a lot of time and a lot of his

16   client's money protecting these work papers.  You think he

17   would have said, you know, this is going to cost you tens of

18   thousands, a hundred thousand dollars in fees.  Is it really

19   worth the candle?  Let's look at what is in these work papers

20   and see.  Why don't we save this money.  And yet I think – I

21   not only think, I am pretty sure Mr. DeLong testified,  no, you

22   know, Roy and Rudolph didn't want to give up the work papers

23   and that was the end of it for him.

24         MR. BRIDGERS:  If Your Honor might also recall that

25   in the time leading up to this, there had been some threats,

765

1    some actions to go to the Terry's customers.  And I understand

2    maybe they had a reason to go.  There was a little testimony

3    about that.  But Mr. DeLong was faced with a situation where he

4    saw, in this collection case at this time, that they were

5    trying to get to the underlying customers with some of the

6    obligations.  And, Your Honor, I think the absolute strongest

7    --

8            THE COURT: But Rudolph Terry gave sworn testimony in

9    his early deposition saying, yeah, we got all of these T-shirts

10   in, I sold them to other people.

11           MR. BRIDGERS: I understand, Your Honor --

12           THE COURT: And clearly the Commercial Factors lawyer

13   at that point probably knew a lot of things that Mr. DeLong

14   didn't know, you know, because he is probably wondering, gosh,

15   why do they care about all of this stuff.

16           MR. BRIDGERS: Well, Your Honor, if I could go back to

17   one other piece of information about that, and that is why I

18   was trying to allude to the fact that maybe Commercial Factors

19   had a reason to look at, you know, to think about that.  But at

20   the same time, the status of the company – excuse me – the

21   status of the lawsuit was such that actually when Mr. DeLong

22   went and presented his reasons, knowing nothing about what is

23   in the work papers, but presenting his reasons as to why this

24   was not relevant or at least not even likely to lead to the

25   discovery of relevant evidence, the judge in the case agreed

1    with him.  And I think that goes a heck of a way to pointing

2    that Mr. DeLong had a reasonable basis based on law.  As you

3    know, the discovery standard is awfully low to go and get

4    something to take a look at, reasonably likely to lead to the

5    discovery of relevant evidence.  And Judge Winegarden agreed

6    for the reasons that Mr. DeLong presented objectively, and

7    certainly Judge Winegarden wasn't trying to cover up, you know,

8    the existence or the lack of existence or the fraudulent work

9    papers.  He didn't know about that, and there is no reason to

10   know that Mr. DeLong knew about that, as well.

11        So I think the most obvious response to that is that

12   another judge actually agreed with Mr. DeLong, taking a look at

13   the time, knowing everything.  So I would submit to the court

14   that, you know, that is the clearest indication of what the

15   status of things were at that particular time.

16        Your Honor, I think I would – I am not going to try to

17   address things together but just the general concepts because

18   it seems like it does come in on all of the different

19   fraudulent preferences, Mr. DeLong's subjective knowledge,

20   whether or not he knew about the solvency, whether or not he

21   acted in good faith.  And even though that has been questioned

22   and obviously Mr. DeLong knew that Terry Manufacturing and

23   Rudolph Terry had done some things they probably shouldn't

24   have, but that is what we do as lawyers.  That is why people

25   come to us, is to help us get out of trouble.  Mr. DeLong has

767

1    said before if people quit doing silly things, a lot of us

2    would have to get real jobs.  It is just something we do as a

3    lawyer.

4         But then we have to look at the value of the company.

5    As Mr. Barriere said, the work done was for one and the same.

6    So absolutely there was substantial value to the company.  Was

7    there maybe value to Rudolph?  Perhaps.  But if the value – if

8    all of the value that Rudolph got came to the company, well,

9    then, that just absolutely meets our burden – I'm not even sure

10   it is our burden.  I would have to look at the law.  But it

11   meets that concept of substantial value, and nobody has

12   testified that the work wasn't done; nobody has testified that

13   the work was over billed by rate; nobody has testified that Mr.

14   DeLong billed for stuff that he didn't do.

15        THE COURT: Well, I will certainly be interested in

16   whatever law you can find because Mr. Barriere, I thought, at

17   one point said that it was your burden to prove substantial

18   value.  I am not going to swear to this, but I am not sure that

19   that is right and you may want to take a look at that.

20        MR. BRIDGERS:   Yes, Your Honor.

21        THE COURT:   I mean, I will certainly take a look at

22   it, too, but, I mean, yeah, the burden of proof is extremely

23   important because, if I look at an issue and I say, well, gosh,

24   I can't make heads or tails of this, the party with the burden

25   of proof loses.  So, I mean, it can be determinative of the

768

1    outcome of a case.  So I see that as an important issue that I

2    haven't resolved in my own mind.

3              MR.  BRIDGERS: Yes,  sir,  we will look into it.   I

4    haven't looked at it yet but, of course –

5              THE COURT: You know, like I said, I am going to give

6    you 30 days to file something but I'm just letting you know

7    that is something that I am looking at and that may be of

8    interest to you, too.

9              MR. BRIDGERS: But even if we had the burden of proof,

10   I would submit to the court that if the actions – if the value

11   was one and the same for both, we would meet our burden, even

12   assuming we have it.

13             THE COURT: Well, let me ask you this.  What I'm trying

14   to do is maybe clarify just a little bit the theory of your

15   defense.  Do you see a distinction between, as I understood it

16   at one point when Mr. Barriere started talking about his

17   fraudulent conveyance case, he was talking about, well, Roy and

18   Rudolph had the actual intent to hinder, delay, defraud and,

19   therefore,  on  that  aspect,  this  idea  of  substantially

20   equivalent value doesn't matter.  In other words – I am not

21   asking the question very articulately, but it sounded to me

22   like you were starting to meld your defense and I see the

23   claims a little differently.  I mean, maybe you feel the same

24   body  of  evidence  works  on  both  claims  but,  if  I  am

25   understanding Mr. Barriere right, he is making two separate

769

1 claims.  One, the actual intent to hinder, delay or defraud.

2 In the alternative, this reasonably equivalent value.  So that

3 if you prevail on the reasonably equivalent value, you know,

4 let's just say it is a burden of proof thing and I rule for you

5 on that, the way I understand the law, there is another aspect.

6 Maybe I have got this wrong but I did want – and if I am

7 totally confusing you on this, maybe you just want to address

8 it in your filing.  But I am interested in your remarks vis-à-

9 vis the actual intent to hinder, delay or defraud and

10 basically, you know, that is pretty much the same under 548 and

11 state law, I think.

12    MR. BRIDGERS: Very close.

13    THE COURT: And then the other is the constructive

14 fraud claim about whether or not there was reasonably

15 equivalent value.  In other words, I see a distinction there

16 and maybe I am seeing something that is not there.  I don't

17 know.  But I just want to let you know that I see a distinction

18 there, and I have not seen a distinction in your presentation

19 of your defense.  And, like I say, maybe you don't need to.  I

20 don't know.  It is just something that's come to mind while I

21 have been listening to your remarks.

22    MR. BRIDGERS: Your Honor, I am not sure – if I merged

23 them, I am not sure I meant to and I can't tell you I didn't

24 mean to.  I would have to look at the elements a little bit,

25 but I think, as a concept, the Terrys could have been guilty of

770

1    doing bad things without Mr. DeLong being responsible for a

2    fraudulent conveyance, and his responsibility is determined by

3    what he knew about the solvency of the company and what value

4    he actually gave to the company in exchange for his services.

5    I mean, it is just a core concept that he can't be held liable

6    for something he had no idea about.

7         THE COURT: In other words, you see Mr. DeLong's good

8    faith as, at least, part of your defense in the actual fraud

9    count?

10        MR. BRIDGERS: Defense or part of their burden.  I am

11   not sure how the burden should course but, yes, I do.  I think

12   the Terrys could have acted with terrible intent and been

13   guilty of everything, including crimes, which perhaps they were

14   --

15        THE COURT: I don't think there is any perhaps.  They

16   came in, in prison garb.

17        MR. BRIDGERS: I am being flippant, Your Honor, of

18   course, but obviously, obviously they committed crimes here,

19   but I think they could have committed crimes but, if Mr.

20   DeLong, as a professional, comes in and has no idea of the

21   solvency of the company, has no idea that there are issues

22   about their financial status, and then gives value as he goes

23   along, you know, month after month after month, and gives a

24   value to the company, i.e., provides a defense to the company

25   of this twelve to fifteen million dollar potential liability,

771

1    absolutely that is key.  The Terrys can be guilty of bad things

2    here without Mr. DeLong being responsible for fraudulent

3    conveyances or even preferences, I would think.  I think it is

4    the same concept.  Different wording, of course, but it is

5    certainly the same concept.

6         THE COURT: Remember I asked Mr. Barriere a question,

7    and I want to take a step back.  As a bankruptcy judge, I am

8    passing on fee applications and the lawyers for trustees,

9    lawyers in several different kinds of context.  The final fee

10   application, I will look at it – as a matter fact, I just

11   issued a decision the other day where I went through a guy's,

12   a lawyer's time in a Chapter 11 case, completely unrelated

13   here, I went through his bill and I said, look, you did a bunch

14   of work here on some venue issues that I don't think was

15   appropriate, didn't benefit anybody, I am not going to pay you

16   for that, but I will pay you for the rest of the stuff you did.

17   And that is the kind of thing that I am used to doing.  And

18   then I see this bill, DeLong and Caldwell bill –

19        MR. BRIDGERS: Three and a half years of bills.

20        THE COURT: – and I am thinking we have got – now

21   obviously it is not a fee application or section 330 of the

22   bankruptcy code.  So those standards don't necessarily apply,

23   at least I don't think they do.  I haven't thought that one all

24   the way through.  But, on the other hand, you know, Barriere is

25   saying, well, you know, it is an all or nothing kind of

772

1    approach because he doesn't think there is a principled way to

2    pick through that.  And I'm thinking, well, gosh, I do that all

3    of the time, could I do that here.  In other words, you know,

4    do you think there is a middle ground or a half a loaf

5    position, or do you agree with Barriere that it is all or

6    nothing and therefore you win it all or you lose it all?

7           MR. BRIDGERS: Your Honor, truly I am not prepared to

8    give you a response to that.

9           THE COURT: I appreciate that but that's --

10          MR. BRIDGERS: It is certainly an issue we will think

11   about.

12          THE COURT: Well, that is one of the things I am going

13   to think through before I spend a whole lot of time picking

14   through, you know, these lengthy detailed bills, and is there

15   even any sense to do it if it is an all or nothing deal.  I

16   will look at it in a lot less detail than if I have got to make

17   a section 330 type determination.  Mr. Barriere thinks I don't.

18   You know, if you think I don't, I probably won't, but that's

19   something, you know, of interest to me because, you know, from

20   my point of view, going through a bill that length trying to

21   get an understanding of what was done, what should have been

22   done, could've been done, and so on and so forth, I mean that

23   is several days of my time.  And before I do that, you know,

24   I'm not going to spend a lot of time doing something that is of

25   no importance.

773

1          MR. BRIDGERS: We will address that obviously to the

2     court.  My reaction, though, would be just logically that the

3     company was going to possibly be responsible for Rudolph's

4     action and anything to figure out what Rudolph did, what he

5     knew, and truly what the other people and the plaintiff knew.

6     I mean, really, if the plaintiff, Commercial Factors – I mean,

7     I think Mr. DeLong was clear in his testimony that regardless

8     of what you believe about this case, this was not nearly as

9     simple of a case as the plaintiff in the Commercial Factors

10    case tried to portray it as.  It is obvious the plaintiff in

11    the Commercial Factors case had dealings with Mr. Pouncey.  As

12    I said, we found out later that GMAC wouldn't even let him use

13    some of Terry Manufacturing's stuff.  Mr. Pouncey said we all

14    knew about it, you know, we had some knowledge.  I won't say a

15    conspiracy.  I don't remember the pleadings well enough.  But

16    obviously all of that work done to figure out what the

17    plaintiff knew, even if it had some benefit for Rudolph, had to

18    be done for Terry Manufacturing because, again, as the court

19    alluded to, if it hadn't been done and Terry Manufacturing had

20    gotten held liable for many millions of dollars, we would be

21    here on the other end of the case.  And, as I said, I think Mr.

22    DeLong would rather be damned for what he did, which was be

23    successful in this litigation.

24          Your Honor, I would end my presentation.

25          THE COURT: Thank you, sir.

774

1          MR. BRIDGERS: As a practical matter, you had mentioned

2     30 days.

3          THE COURT: Yes.

4          MR. BRIDGERS: I am just wondering, we would like to

5     take a look at the transcript and I was wondering if we might

6     - I just have no idea how fast transcripts can come out, if we

7     could tie that to transcript.

8          THE COURT: Well, first of all, we have something

9     called ECRO. We have got a digital recording of everything

10    that is going on. Could we burn him a CD today or could you

11    get him one fairly shortly?

12         MS. BODDEN: It is probably going to take a while to

13    burn it.

14         THE COURT: Okay. Well, anyway, there are two

15    different things. We can give you the CD and that is pretty

16    cheap. I mean, you know, twenty bucks or so.

17         MR. BRIDGERS: Is it digitized? I mean, is it just the

18    recording or is it -

19         THE COURT: It is just a compact disk.

20         MR. BRIDGERS: Is it OCR'd?

21         THE COURT: No.

22         MR. BRIDGERS: It is just the text, okay.

23         THE COURT: It is just the audio. I mean, it is just

24    a recording, an audio recording of what we have had here. The

25    transcript, we have had three full days and then some on the

775

1    fourth day. A transcript may take a while. I don't know. Mr.

2    Barriere, do you have a problem waiting for a transcript to do

3    findings and conclusions?

4         MR. BARRIERE: My concern, Judge, is I think we are

5    looking at pushing this back significantly. I know we have

6    been working diligently with the Horton case. It was about 30

7    days to get the transcript, and that was just really a day's

8    testimony and about an hour in the morning. So I would be

9    concerned that we would, you know, be deferring this so long,

10   I would rather go with the audio and make do.

11        THE COURT: How long did it take you to get the Horton

12   transcript?

13        MR. BARRIERE: It was about a month, just shy of a

14   month, wasn't it?

15        MS. LASKY: I think so because it has to be sent out.

16        THE COURT: Right.

17        MR. BARRIERE: I think you gave us 30 days to do the

18   Horton findings of fact and conclusions of law, and it was just

19   a day or two before those were due that we got that transcript

20   back. As I said, you may recall that was one day of testimony

21   and then we had that expert at the last maybe ninety minutes

22   the second day. In the context here, we have over twice that.

23        THE COURT:    Right. No, I realize.

24        MR. BRIDGERS:    As an added complication, come March

25   20, Mr. DeLong is going in to have both hips replaced, so he is

776

1    going to be out of it for a number of weeks.

2            THE COURT:   Okay.

3            MR. BRIDGERS:   Could possibly we figure out, Your

4    Honor, if I may suggest, get a sense of how long the transcript

5    would take and, if it is going to take an inordinate amount of

6    time, maybe we will just skip it, but if it is - I just don't

7    know if thirty days is what you get no matter how long it is or

8    if thirty days is what you get for one day and four days takes

9    a hundred and twenty days.

10           THE COURT:   Well, why don't we do that?  Linda, why

11   don't you see if you can try to get an estimate as to what we

12   are talking about and tell her we have had -

13           MR. BRIDGERS:   The amount of money perhaps.

14           MR. BARRIERE: It is not expensive.   It is $3.50 a

15   page.

16           MS. LASKY: $3.50 a page on expedited.

17           MR. BRIDGERS:   $3.50?

18           MR. BARRIERE: If we are off - we can go off the record

19   and I will be happy to discuss with Mr. Bridgers the prospect

20   of having a private court reporting firm that would work more

21   expeditiously and take the oral transcript and generate a

22   transcript.

23           MR. BRIDGERS: $3.50 a page is hefty.

24           THE COURT:   I had forgotten that - it's that much?

25           MS. LASKY: $3.75?

1          MS. BODDEN: $3.75 for regular and expedited is $4.75.

2          THE COURT:   Well, I mean, I knew it wasn't cheap but

3     I didn't realize it was that much.  Okay.  Well, let's do this.

4     Maybe we can get together by phone in about a week, maybe next

5     Friday.  In the meantime, Mr. Bridgers, maybe you can get up

6     with Ms. Bodden and you might just drop a card if you –

7     actually I guess you have got his number in the file.  You can

8     get up with one another and within a week you can have an idea.

9     I mean if we are only talking thirty days for a transcript, you

10    know, we have got a lengthy, complex case.  I don't have a big

11    problem with letting you look at a transcript to do the

12    proposed findings.  You know, I just don't want to hold this up

13    too long but, you know, if it is going to be a reasonable

14    period of time, I don't have a problem with that.  And that may

15    work out with Mr. DeLong's schedule, too, then.

16          MR. BRIDGERS:   Would the court like to set – you had

17    suggested the possibility or told us we could submit something

18    regarding the expert qualifications, the admission of Dr. Ross'

19    testimony.  Would the court like to set any kind of time frame

20    for that, or how would you like that?  Would you like that in

21    the other presentation?

22          THE COURT:   Yeah.  I mean, I think we will just have

23    one filing whenever it is.  I don't see any need to, you know,

24    go through any separate briefing.  Whether you want to file two

25    separate documents at the same time or just file one document

778

1    and – I mean, that will be your call, but I had planned to set

2    some sort of schedule out there so that I would know when I

3    need to start working on this case and make sure everybody

4    knew.   To me, it is cleaner if we have got simultaneous

5    filings.  So maybe what we will do is we will just have a brief

6    telephone conference next Friday at — why don't we just pick a

7    time.   Ten o'clock.

8           MR. BARRIERE: Your Honor, I hate to be a problem.  I

9    am going to be on the road next Friday.  I will be in the air.

10          THE COURT:   Okay.

11          MR. BARRIERE: I am flying to D.C.  I am available any

12   other day next week.

13          THE COURT: How about Thursday?  I mean, I am thinking

14   that we are going to know within a matter of a day or two what

15   we are talking about.  I just want to know, you know, can we

16   get a transcript in two or three weeks or are we talking two or

17   three months.  What about Thursday?

18          MR. BARRIERE: That will be fine, Your Honor, and –

19          MR. BRIDGERS:   I am sure one of us will be available

20   on Thursday, Your Honor.

21          MR. BARRIERE:  In the interim, we will confer with Mr.

22   Bridgers concerning alternatives with respect to transcription.

23          THE COURT:   Okay.  Why don't we just say Thursday at

24   10:00 a.m.   I mean, I am contemplating about a five-minute

25   proceeding.   I mean, we are not going to argue; we are not

779

1    going – there is not going to be any great – it is not going to

2    be a lengthy thing, so you don't have to set aside a whole lot

3    of time for it.

4            Mr. Bridgers, anything else that we can do today?

5            MR. BRIDGERS:    No, Your Honor, I can't think of

6    anything.

7            THE COURT:    Okay.  Mr. Barriere, anything further?

8            MR. BARRIERE:    No, Your Honor.  I would simply close,

9    I don't want to overstate the possibility of segregating some

10   time.  I don't believe, for example, that it is defensible that

11   Terry Manufacturing really had an interest in this death

12   struggle over the production of its financial statements, and

13   that is fairly easily encapsulated.

14           My point simply was different, which is this defense

15   was driven by Rudolph's needs, not the company's, not the

16   reverse as was suggested by Mr. Bridgers a moment ago.  This

17   case began with an effort to, in effect, pay off Rudolph's

18   problem, and that set the tone and that was the theme

19   throughout the balance of the litigation.

20           Thank you, Your Honor.

21           THE COURT:    Okay.  Thank you.  We are adjourned.

22           (Off the record at 10:55 a.m.)

780

# C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date:  March 16, 2007