## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DISTRICT

| | | |
|---|---|---|
| IN RE: | ) | |
| TERRY MANUFACTURING | ) | **CASE NO. 03-32063-WRS** |
| COMPANY, INC. | ) | |
| | ) | **CHAPTER 7** |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| TERRY UNIFORM | ) | **CASE NO. 03-32213-WRS** |
| COMPANY, LLC. | ) | |
| | ) | **CHAPTER 7** |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY | ) | |
| INC. and TERRY UNIFORM | ) | |
| COMPANY, LLC. | ) | **CIVIL ACTION FILE** |
| | ) | **NO. 2:07-CV-0620** |
| Cross-Appellant/Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELONG, CALDWELL, NOVOTNY | ) | |
| & BRIDGERS, L.L.C., DELONG | ) | |
| CALDWELL LOGUE & WISEBRAM, | ) | |
| DELONG & CALDWELL, L.L.C. | ) | |
| AND EARNEST H. DELONG, JR., | ) | |
| | ) | |
| Appellants/Cross-Appellees | ) | |

## APPELLANT'S AMENDED BRIEF IN SUPPORT OF APPELLANT'S APPEAL FROM THE JUDGMENT AND MEMORANDUM DECISION ENTERED IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF ALABAMA

-1-

## Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Statement of Appellate Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Statement of the Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Standard of Appellate Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    The CFA Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    The Bankruptcy Court's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Enumeration of Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Argument and Citation of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    Terry Manufacturing Received Adequate Consideration and Value for the

    Payments to Mr. DeLong and Mr. Thomas . . . . . . . . . . . . . . . . . . . . . . . . 23

    Mr. DeLong was a Conduit for the Payments Made to Jerry Thomas . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## Table of Authorities

### Federal Cases

*Banks, Malloy v. Citizens Bank* (*In re First Security Mortgage Co.*), 33 F.3d 42 (10th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bonded Fin. Servs. v. Eur. Amer. Bank,* 838 F.2d 890 (7th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *31, 32, 33, 35*

*Bowers v. Atlanta Motor Speedway Inc. (In re Southeast Hotel Properties Ltd. Partnership),* 99 F.3d 151 (4th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . *32, 33*

*Christy v. Alexander & Alexander of N.Y.* ( *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey* ), 130 F.3d 52 (2d Cir.1997) . . . . . *31, 33*

*In Re: Enron Corporation* 475 F.3d 131 (2nd Cir. 2007) . . . . . . . . . . . . . . . . . . *5*

*In Re: Jewelcor* 11 F.3d 394 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re: John W. Morris,* 950 F.2d 1531 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re: Rodriguez,* 895 F.2d 725 (11th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Malloy v. Citizens Bank of Sapulpa (In re First Security Mortgage Co.),* 33 F.3d 42 (10th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Nordberg v. Arab Banking Corporation,* (*In re Chase & Sanborn Corporation*), 904 F.2d 588 (11th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*Rupp v. Markgraf,* 95 F.3d 936 (10th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Schafer v. Las Vegas Hilton Corp. ( In re Video Depot, Ltd.),* 127 F.3d 1195 (9th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Security First Nat'l Bank v. Brunson ( In re Matter of Coutee ),* 984 F.2d 138 (5th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34

*Carey v. U.S.A.,* 1992 WL 12004363 (Bankr. S.D. Ga. May 14, 1992) . . . . . . . 29

*Excello Press, Inc. v. Bowers, Inc. (In re Excello),* 104 B.R. 924 (Bankr.N.D.Ill.1989), *aff'd in part rev'd in part on other grounds,* 120 B.R. 938 (N.D.Ill.1990), *rev'd on other grounds,* 967 F.2d 1109 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Gropper v. Unitrac, S.A. ( In re Fabric Buys of Jericho, Inc.*), 33 B.R. 334 (Bankr.S.D.N.Y.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.),* 155 B.R. 332 (Bankr.S.D.N.Y.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In Re. Presidential Airways, Inc,* 228 B.R. 594 (Bkrtcy.E.D.Va.,1999) . . . . 32, 37

*In re Terry Mfg. Co., Inc.,* 345 B.R. 377 (Bkrtcy.M.D.Ala.,2006) . . . . . . . . . . . 29

*In Re Warnaco* (Not Reported in F.Supp.2d,) 2006 WL 278152, 97 A.F.T.R.2d 2006-958, S.D.N.Y., February 02, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## State Cases

*Hay v. Duskin*, 455 P.2d 281 (Ariz. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wyzard v. Goller*, 23 Cal. App. 4th 1183 (Cal. App. 4th 1994) . . . . . . . . . . . . . 29

*Bush v. Fourcher*, 3 Ga. App. 43, 59 S.E. 459 (1907) . . . . . . . . . . . . . . . . . . . . . . 22

*Cortland Wagon Co. v. Gordy*, 25 S.E. 574 (Ga. 1896) . . . . . . . . . . . . . . . . . . . . 29

*Hilliard v. Canton Wholesale, Co.*, 151 Ga. App. 184, 259 S.E.2d 182 (1979) .   22

*Jackson v. Bice*, 132 Ga. 51, 63 S.E. 823(1909) . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Liberty Mutual Insurance Company v. Lipscomb*, 56 Ga. App. 15, 192 S.E. 56 (1937)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Simms v. Floyd*, 65 Ga. 719(1889) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sweat v. Ehrensperger*, 97 Ga. App. 381, 103 S.E.2d 60 (1958) . . . . . . . . . . . . 23

**Federal Statutes**

11 U.S.C. § 550(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

28 U.S.C. § 158(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Federal Court Rules**

U.S.C.S. Bankruptcy Rule 8001(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

USCS Bankruptcy R 8013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**State Statutes**

O.C.G.A. § 16-4-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 26

O.C.G.A. § 16-8-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 26

O.C.G.A. § 16-8-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 26

O.C.G.A. § 16-8-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 26

O.C.G.A. § 18-2-22, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19, 28

O.C.G.A. § 18-2-70, et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19, 28

O.C.G.A. § 18-2-73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Other References**

45 A.L.R. 500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## PRELIMINARY STATEMENT

On May 29, 2007, the Bankruptcy Court for the Middle District Court of Alabama entered a judgment in favor of the Trustee in the adversary proceeding. On June 8, 2007, Appellant timely filed a Notice of Appeal of the Judgment which was entered by the Bankruptcy Court. On July 5, 2007, pursuant to USCS Bankruptcy R. 8007(b) the bankruptcy court clerk transmitted a copy of the record to the clerk of the district court.

Appellant received no further notification that the appeal had been docketed in the district court until his counsel received Appellees Motion to Dismiss via United States Mail.

In *In Re: Jewelcor*, the Court held that

> The 15-day period is triggered not by the letter of transmittal from the bankruptcy court clerk, but the docketing and sending of notice by the district court clerk. Without notice from the clerk of the district court, an appellant cannot be certain of the precise date on which the appeal was docketed.

11 F.3d 394, 397 (3rd Cir. 1993). The Court went further to explain that given the short and "extremely restricted time period" for appellant to file the brief, notice to the parties from the district court clerk is "critical." Id. Notice to the parties is essential and is a condition precedent to the commencement of the brief-filing limitations period. Id. at 398.

The Second Circuit in *In Re: Enron Corporation* has also held that "bankruptcy appellants must file their briefs within 15 days after entry of the appeal on the docket. The notice that the court clerk sends to the appellant triggers the time period." 475 F.3d 131, 134 (2nd Cir. 2007). The Court further stated that the fifteen days given to an appellant to file a brief only begins to run once the appeal is docketed and notice has been sent. 475 F.3d at 134-35.

Appellant filed his Response to Appellees Motion to Dismiss on August 9, 2007. In an abundance of caution, the Appellant then filed his Initial Brief on August 22, 2007. See Docket Entry Number 13. On August 28, 2007, the Appellees filed their reply brief and objected that Appellant's brief did not fully comply with the requirements of Bankruptcy Rule 8010. See Appelles' Brief, fn. 1. The Trustee suggested that Appellant's brief should not be accepted until the Trustee's Motion to Dismiss the Appeal has been decided.

Again, in an abundance of caution and to assure that these matters proceed as expeditiously as possible, Appellant resubmits his Brief, complying with the requirements of Bankruptcy Rule 8010.

## APPELLANT'S BRIEF

On June 8, 2007 Earnest H. DeLong filed his Notice of Appeal from the Judgment and the Memorandum Decision entered in the United States Bankruptcy Court for the Middle District of Alabama on May 29, 2007.  In accordance with the Rules of this Court, Appellant now files this Brief, showing the Court the following:

## STATEMENT OF APPELLATE JURISDICTION

This Court has Appellate Jurisdiction over this matter pursuant to U.S.C.S. Bankruptcy Rule 8001(a).  The Appellant takes the appeal as a matter of right taken from the judgment and order of the Bankruptcy Judge entered in the United States Bankruptcy Court for the Middle District of Alabama on May 29, 2007, as permitted by 28 U.S.C. § 158(a)(1).

## STATEMENT OF THE ISSUES PRESENTED

I.      Whether the Court erred by finding that the attorney fees and expense reimbursements paid to Mr. DeLong and Mr. Thomas during the pendency of the CFA litigation were fraudulent transfers within the meaning of O.C.G.A. §§ 18-2-22 and 18-2-70, et. seq.

II.     Whether the Court erred by finding that Terry Manufacturing Company did not receive adequate consideration and value for the payments made to Mr. DeLong and Mr. Thomas.

III.    Whether the Court erred by finding that Mr. DeLong was not a conduit for the payments made to Jerry Thomas.

## STANDARD OF APPELLATE REVIEW

In considering this Appeal, the findings of fact of the Bankruptcy Court shall not be set aside unless clearly erroneous. USCS Bankruptcy R 8013. The Court's conclusions of law are subject to de novo review. In re: John W. Morris, 950 F.2d 1531 (1992).

## STATEMENT OF THE CASE

### The CFA Litigation

On December 15, 1999 Commercial Factors of Atlanta, Inc. (hereinafter, "Commercial Factors" or "CFA") sued Floodgates, Ltd. (hereinafter, "Floodgates"), Jon L. Pouncey (hereinafter, "Pouncey") and Terry Manufacturing Company, Inc. (hereinafter, "TMC" or "the Company") in the Superior Court of Gwinnett County, Georgia. The Complaint alleged that the Defendants owed CFA $3,320,710.00, plus attorney fees, on Floodgates, Ltd invoices that CFA was holding. [P-1; T. 279, ln. 6 – 13; T. 351, ln. 16-21]

The Commercial Factors litigation arose from a factoring arrangement between Commercial Factors, whose President was Tracy Eden, and Floodgates, owned by Pouncey. Floodgates first began factoring invoices with Commercial Factors prior to

-10-

the 1996 Atlanta Olympic Games. During that time period TMC guaranteed the invoices that Floodgates factored with Commercial Factors. [T. 72-73] Several years later, Floodgates again began to factor TMC invoices with Commercial Factors. This time Floodgates submitted pre-signed, blank invoices obtained from TMC during the 1996 Olympics to CFA for factoring. [T. 74, ln. 11-19; T. 143, ln. 17-20] When those invoices were not paid, Commercial Factors contacted TMC and Rudolph Terry to demand payment. [T. 74] Long before Mr. DeLong ever heard of TMC or met Roy or Rudolph Terry, Rudolph Terry confirmed the validity of the invoices to Commercial Factors and caused TMC to make payments on the invoices while he attempted to negotiate a resolution of the matter. [T. 58, ln 9 - T. 59, ln 10; Pl Ex 18] Although CFA was holding TMC invoices reflecting unpaid balances totaling $3,320,710.00 it had factored only $2,130,000.00 of the invoices. Yet, in its Complaint it was demanding payment for all the TMC invoices in its possession.[Pl Ex 31]

Terry Manufacturing Company was an Alabama Corporation that had a facility located in Atlanta, Georgia. [T. 493, ln. 23 - T. 494, ln. 5] The brothers, Roy and Rudolph Terry, were the Company's sole officers, sole directors and sole voting shareholders. Roy Terry was the President of TMC and owned 51% of the outstanding shares. [T. 493, ln. 15-17] Rudolph Terry was the Company's Vice

President and Chief Financial Officer and owned 49% of the outstanding shares. [T. 399, ln. 21-25]  Rudolph Terry also was primarily responsible for the operation of Terry's Atlanta facility.[T. 399, ln. 19-21] The Trustee's examination of TMC's business operations revealed that the Company's income was approximately one hundred million dollars ($100,000,000.00) for the period, 2000 through 2003. [T. 277, ln. 19 – 23]

When CFA filed suit, Roy and Rudolph Terry decided that Rudolph Terry should take the lead in hiring an attorney to defend the Company. [T. 497, ln. 2-4] Rudolph Terry first hired Atlanta lawyer, Jerry Thomas. [T. 497, ln. 7-16]  Mr. Thomas introduced Mr. Terry to Earnest DeLong. [T. 497, ln. 11-18]  Mr. Terry then added Mr. DeLong to the TMC defense team for the Commercial Factors litigation. [T. 497, ln. 25 – T. 498, ln. 8; T. 401, ln. 12-21] Mr. DeLong had never heard of Terry Manufacturing Company before he was engaged to work for the Commercial Factors litigation. [T. 609, ln. 18-19]  The engagement was confirmed in a letter from Mr. DeLong to Mr. Rudolph Terry dated January 3, 2000. [D-10]

Mr. DeLong was designated lead counsel in the CFA litigation.  Mr. Thomas provided litigation support.  Mr. Thomas reviewed, edited and revised pleadings, motions and briefs.  He attended depositions and hearings.  He formulated questions for depositions and hearings. He did research.   [T. 562, ln. 6-13; T. 402-405; T. 403,

ln. 4 - T. 404, ln. 14; T. 562, ln. 5- T. 564, ln. 17] Mr. Thomas was not a member of DeLong and Caldwell, LLC.  He maintained a separate law practice at a separate location. [T. 48, ln. 17-22; T. 562, ln. 2-4; T. 48, ln. 17-24]

> Mr. DeLong described Mr. Thomas' work in the Commercial Factors litigation: he (Jerry Thomas) . . . did a lot more than he intended to when we got into it (the case).  He attended every deposition.  I, as the lead lawyer, I asked questions; Jerry would feed questions to me, would take notes. We would consult in breaks in the depositions.  He did the same thing in hearings.  When it came to brief writing, Jerry's favorite comment to me is there is no good writing, there is only good editing, and he took the responsibility of editing all of the briefs.  [T. 562, ln. 6-13]

Rudolph Terry testified that:

> "Mr. Thomas was, I guess one of his primary participation was in research and writing as it related to the briefs and the research, and then sometimes reviewing the writings or pleadings that were prepared by Mr. DeLong, but was very involved in the writings and pleadings that were prepared throughout the litigation." [T. 402-405]

Mr. Terry also testified that Mr. Thomas attended the depositions ("probably all"). He participated in the drafting of motions or other legal related correspondence.  He

drafted motions or other documents.  They frequently spoke on the phone. [T. 403, ln. 4 - T. 404, ln. 14; T. 562, ln. 5- T. 564, ln. 17]

The fee arrangement agreed upon among TMC,  Mr. DeLong and Mr. Thomas was that the Company would be billed at the rate of $250.00 per hour for lawyer services.  Mr. Thomas' time would not ordinarily be billed separately.  Instead, he generally would receive thirty-five (35%) percent of the fee. [T. 562, ln. 14-20] Both Rudolph Terry and Roy Terry were aware of and approved the billing arrangement. [T. 500, ln. 1 - 25; T. 406, ln. 12- 23]

For more than one month before CFA filed suit against TMC , and before TMC ever contacted either Mr. Thomas or Mr. DeLong,  Rudolph Terry, acting with the knowledge and consent of his brother, Roy, negotiated with CFA and its attorneys to settle CFA's claim.  Mr. Terry proposed that TMC would pay the factored Floodgates invoices, but he maintained that a payment schedule was necessary.  [Pl Exs. 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 & 30] [T. 58, ln 9 - T. 59, ln 10; Pl Ex 18]

On approximately August 11, 1999, (long before the Company had retained Mr. DeLong or Mr. Thomas) Rudolph Terry, on behalf of TMC, executed a document provided to him by CFA which acknowledged that "all the invoices represent goods which have been received . . . and are due and outstanding according to your [TMC's] records." [Pl Ex. 70]

-14-

When Mr. DeLong entered the case in January, the Terry brothers told him that the Company had more than $3,000,000.00 of open invoices with Floodgates, Ltd. They acknowledged that Floodgates had factored approximately $2,130,000.00 the invoices with CFA. They instructed Mr. DeLong to attempt to resolve the matter by agreeing to the entry of a consent judgment for the $2,130,000.00 figure, with a payment schedule. [T. 78-79; T. 424, ln. 21 –T. 425, ln. 4]

CFA rejected the settlement proposal that Mr. DeLong advanced on behalf of TMC. On January 31, 2000 Mr. DeLong filed the Company's response to the Complaint. In accord with the Terry brothers' factual representations to Mr. DeLong and Mr. Thomas, the Answer acknowledged that CFA had factored TMC invoices approximating $2,130,000.00 on behalf of Floodgates and that CFA had not been paid. It further stated that TMC had offered to pay the amount owed to CFA, provided CFA agreed to a payment schedule. In April, 2000 they amended the Answer to reflect that TMC had paid CFA an additional $193,000 on the Floodgates invoices, thus reducing the amount owed. [Pl.'s. EX 35]

On August 17, 2000, during a hearing in the Gwinnett Superior Court the trial Judge in the Commercial Factors litigation, *sua sponte*, convened and personally presided over a settlement conference. At the conclusion of the conference, TMC and its counsel understood that the case had been settled for $2,100,000. [T. 135, ln.

14-24] When the Court convened the settlement conference Roy Terry was notified. He approved and authorized the settlement that the parties reached.  When CFA refused to follow through with the settlement, Roy Terry then authorized Mr. DeLong to file a motion to enforce the settlement.  [T. 138, ln. 6 – 15; T. 468, ln. 19 – T. 469, ln. 5; T. 526, ln. 18-20; D-12; D-41]

On August 17, 2000, after the settlement conference was concluded, CFA amended its Complaint to add claims of "Conspiracy to Defraud", "Fraud and Deceit", and "Conversion" against TMC, Floodgates and Jon Pouncey.

Four months later, on December 5, 2000, CFA amended its Complaint to add Rudolph Terry as an additional defendant.  The Complaint repeated verbatim the same allegations against Mr. Terry for "Conspiracy to Defraud", "Fraud and Deceit", and "Conversion" that CFA had previously asserted against TMC, Floodgates and Jon Pouncey.  This latest iteration of the amended Complaint raised no new factual or legal claims against Rudolph Terry.  It was carefully crafted to couch each allegation in terms of *defendants' collective conduct.* [Pl Ex 59]

On March 19, 2001, pursuant to the trial Court's instruction that CFA set forth its claims of  "Conspiracy to Defraud", "Fraud and Deceit", and "Conversion" with the degree of particularity required by Georgia law, CFA again amended its Complaint.  Once again, however, consistent with the manner in which it originally

-16-

plead the claims, CFA raised no allegation of specific conduct by Rudolph Terry, or by any of the other Defendants. Instead, it continued to assert its claims in terms of *defendants' collective conduct.* [Def. Ex 3]

On February 20, 2002 CFA amended its Complaint to assert a claim under Georgia's RICO statute against Floodgates, Pouncey, TMC and Rudolph Terry. Once again CFA made no specific allegation of any particular conduct by Rudolph Terry, or by any of the other Defendants. Instead, it continued to assert its claims in terms of *defendants' collective conduct.* [D-6; T. 281, ln. 24 – T. 282, ln. 1; T. 582, ln. 4-20] For example, CFA's new Paragraph 58, set forth the following claims:

58.

Defendants Terry Manufacturing Company, Inc., Floodgates, Ltd., Jon L. Pouncey and Rudolph Terry violated O.C.G.A. § 16-4-4 by, among other activities, engaging in conduct which violated O.C.G.A. § 16-8-3 (theft by deception), O.C.G.A. § 16-8-4 (theft by conversion), O.C.G.A. § 16-8-7 (theft by receiving stolen property), and the use of the United States postal system to perpetrate and continue the fraudulent scheme to obtain money from Plaintiff under false pretenses.

CFA's RICO claim sought to treble the damage amount that it could recover against the Company, and it also sought punitive damages.

-17-

Mr. DeLong asserted every available defense that was factually and legally-supportable on behalf of TMC. [D-7; D-8; D-9; D-10]  The defenses included: (i) That the Company was not indebted to CFA in any amount; (ii) That the Company was not a party to the creation of the invoices that Floodgates, Ltd. sold to CFA (those invoices being the invoices at issue in the litigation); (iii) That the Company did not generally purchase goods from Floodgates, Ltd. after the 1996 Olympics; (iv) That the Company did not purchase goods as reflected in the invoices at issue in the litigation; (v) That the acts alleged against Rudolph Terry, if they occurred, were not acts committed within the scope of Rudolph Terry's employment at TMC; (vi) That the acts alleged against Rudolph Terry were *ultra vires* with regard to the Company, and that TMC was not liable to Commercial Factors. [D-25; D-26; D-27]

Mr. DeLong asserted those defenses at the appropriate points in the litigation and as the basis for the Company's Motion for Summary Judgment against Commercial Factors, following the close of discovery. [T. 559, ln. 3-10] However, before Mr. DeLong was hired to represent the Company, Terry Manufacturing Company, through the conduct of its sole shareholders, officers and directors had ratified the invoices, had agreed with CFA that it would pay them, and had made substantial payments on them. TMC had effectively admitted liability on the invoices

-18-

for the claimed sums during negotiations before Mr. DeLong became involved in the case. [T.196, ln. 12-21]

Terry Manufacturing was never found liable to Commercial Factors for any amount. [T. 63, ln. 20 – T. 64, ln. 5; T. 291, ln. 16 - 20]  Indeed, despite initially seeking damages in excess of three million dollars ($3,000,000.00), and, despite its later assertions of claims exceeding ten million dollars ($10,000,000.00), Commercial Factors was only willing to file a proof of claim under oath in the TMC bankruptcy for $1,793,000.42. [D-1; D-2; D-4; T. 563-564; T. 284, ln. 4 -18]

The Commercial Factors case was actively litigated for approximately three and one-half years.  During that time Mr. DeLong devoted in excess of 1800 hours to the case [T. 562, ln. 25 - T. 563, ln. 1]  There is no contention that Mr. DeLong and Mr. Thomas did not perform the work for which they billed. [T. 605, ln. 23 – T. 606, ln. 9] There is no contention that the rate charged by attorneys Mr. DeLong and Mr. Thomas was not reasonable. [T. 289, ln. 2 – 11; T. 290, ln. 4 – 7;  T. 605, ln. 23 – T. 606, ln. 9]  Mr. DeLong billed Terry Manufacturing Company for the time that both he and Mr. Thomas devoted to the case, using his firm's billing program. [T. 47, ln. 6-16]  Mr. DeLong was a conduit for the money paid by Terry Manufacturing Company for the services that Mr. Thomas  rendered in the litigation.  When Mr. DeLong received payments, he deposited the money into his trust account. He then

disbursed from that account to Mr. Thomas the portion of the fees that Mr. Thomas was due. [T. 52, ln. 3-8] In that manner Mr. Thomas was paid $167,304.74 for his services rendered in the CFA litigation. [P-13; D-29; T. 606, ln. 15 – T. 607, ln. 25; T. 622, ln. 18 - T. 623, ln. 5] During that same period, Terry Manufacturing's income was approximately one hundred million dollars. [T. 494, ln. 6-13; T. 277, ln. 19-23]

Before TMC filed its Bankruptcy petition, there was nothing to suggest that the Company was not viable. In fact, the information available to both Mr. DeLong and to CFA indicated that TMC substantial and financially sound. TMC paid its bills "in absolute accordance with the understanding" that it had with Mr. DeLong. [T. 609, ln. 7-8] Mr. DeLong discussed generating a settlement fund with the Terry brothers during the time that he was attempting to settle the case. The Company was then able to deposit four hundred thousand dollars ($400,000.00) with him, within a very short period of time. In Mr. DeLong's experience a small company owned by two people could do that only if it was on very sound financial footing. [T. 609, ln. 12-14]

### The Bankruptcy Court's Decision

The Bankruptcy Court held that TMC did not receive reasonably equivalent value in exchange for the attorney fees that it paid to Mr. DeLong and Mr. Thomas. In its Order the Court found significance in the fact that:

"Terry Manufacturing filed a pleading in court to the effect that it owed

$2.1 million, when in fact it had never received the first tee shirt, and

for that reason owed nothing. As Terry Manufacturing in fact owed

nothing on the invoices, the defense of the civil action should have been

a relatively straightforward matter. [Memorandum Decision, Pgs 5 & 6]

The Court went on to state that:

Terry Manufacturing never received the first tee shirt. This fact could

have been easily established with a modest amount of effort. However,

this fact could not be proven without also establishing that Rudolph

Terry had lied to Commercial Factors about the Floodgates invoices.

Thus, the thrust of DeLong's efforts was not to defend Terry

Manufacturing in the Commercial Factors civil action. Rather, it was

to shield Rudolph Terry from criminal liability, using Terry

Manufacturing to fund the effort and refusing to produce Terry

Manufacturing documents which would have gotten it off the hook,

while placing Rudolph Terry in jeopardy of a criminal indictment.

[Memorandum Decision, Pg 14]

The Court then held that:

Terry Manufacturing did not benefit from DeLong's services in the Commercial Factors litigation. As Terry Manufacturing did not receive the tee shirts represented by the Commercial Factors invoices, it had a simple, straight-forward defense, which DeLong could not raise without also establishing that Rudolph Terry falsely certified the Commercial Factors invoices.. . . . Terry Manufacturing did not receive adequate consideration for the cash transfers in suit, and therefore, this Court finds that the transfers are voidable as constructively fraudulent. [Memorandum Decision, Pgs 16 & 18]

The Bankruptcy Court also found that Mr. DeLong was not acting as a conduit when he received the attorney fees that TMC owed to Jerry Thomas. In the same decision, however, the Court held that Mr. DeLong was acting as a conduit when he received $400,000.00 from TMC that was intended as a fund to be used to facilitate the settlement of the case.

## II.  ENUMERATION OF ERRORS

1.    The Court erred by finding that the attorney fees and expense reimbursements paid to Mr. DeLong and Mr. Thomas during the pendency of the CFA litigation were fraudulent transfers within the meaning of O.C.G.A. §§ 18-2-22 and 18-2-70, et. seq.

2.      The Court erred by finding that Terry Manufacturing Company did not receive adequate consideration and value for the payments made to Mr. DeLong and Mr. Thomas.

3.      The Court erred by finding that Mr. DeLong was not acting as a conduit for the attorney fees that TMC paid to Mr. Thomas.

## ARGUMENT AND CITATION OF AUTHORITIES

### Terry Manufacturing Received Adequate Consideration And Value

### ForThe Payments To Mr. DeLong and Mr. Thomas

The Bankruptcy Court grounded its ruling on the fact that TMC "never received the first tee shirt". [Memorandum Decision, Pgs 5, 14, 15, 16] Unfortunately, the conduct of the Terry brothers before Mr. DeLong and Mr. Thomas were hired to defend the case rendered that fact essentially irrelevant and totally useless as a tool for defending TMC.  Before Mr. DeLong even became aware of the existence of TMC or the brothers who owned it, TMC had ratified and agreed to pay the invoices that were the basis of the CFA claims.  Most importantly, the Company received the full value of a vigorous defense that resulted in the Company never having been found liable to CFA for anything.

On August 11, 1999, before the litigation started, Rudolph Terry, on behalf of TMC, signed a document provided to him by CFA which acknowledged that "all the

invoices represent goods which have been received . . . and are due and outstanding according to your [TMC's] records". Rudolph Terry, acting with the knowledge and consent of his brother, had engaged in extensive negotiations with CFA's counsel. He had acknowledged that TMC owed money for the invoices. After receiving the demand for payment from CFA's counsel, TMC began to make payments on the invoices. When Mr. DeLong entered the case, the facts were already heavily weighted toward a finding that TMC had ratified the invoices and the acts of Rudolph Terry.

After Mr. DeLong was engaged to defend the case, the Terry Brothers instructed him to propose that TMC would consent to the entry of a judgment in the amount of the $2,130,000.00. When that failed, the Terry brothers instructed Mr. DeLong to file an Answer acknowledging that the Company owed $2,130,000 on unpaid invoices. After TMC's Answer was filed, TMC paid CFA an additional $193,000 on the invoices. In April, 2000, the Terry brothers directed Mr. DeLong to amend the Answer to reflect that the additional $193,000 had been paid on the Floodgates invoices, thus reducing the amount owed by a like amount. When the trial Court convened a settlement conference on August 17, 2000, Roy Terry was notified. He approved and authorized the $2,100,000 settlement that TMC believed the parties reached.

It is well settled in Georgia that it is not essential that the principal should expressly ratify by word or writing. It may be done by implication or by the subsequent acts or conduct of the parties. A ratification may be express or implied from the acts or silence of the principal. A ratification once made cannot be revoked. Slight circumstances and small matters will sometimes suffice to raise the presumption of ratification. Bush v. Fourcher, 3 Ga. App. 43, 59 S.E. 459 (1907).

An intention to ratify may often be presumed by the law from the conduct of the principal, and that presumption may be conclusive, even against the actual intention of the principal, where his conduct has been such that it would be inequitable to others to permit him to assert that he has not ratified the unauthorized act of his agent. By ratification of a tort committed for one's benefit, the ratifier becomes liable as if he had commanded it; otherwise, if the act was done for the benefit of a third person." Liberty Mutual Insurance Company v. Lipscomb, 56 Ga. App. 15, 192 S.E. 56 (1937).

The "Doctrine of Ratification" in the law of agency applies to a principal who by acquiescence or acceptance of the acts of an agent is deemed to ratify the agent's

conduct so that liability will attach to the principal to the same extent as if the acts of the agent had been originally authorized. <u>Hilliard v. Canton Wholesale, Co.</u>, 151 Ga. App. 184, 259 S.E.2d 182 (1979), citing <u>Bush v. Fourcher</u>, 3 Ga.App. 43, 49(5), 59 S.E. 459 (1907).  While a principal is not, as a general rule, liable for the wilful trespass of his agent, yet, if the trespass be committed by the principal's command, or if it is assented to by him, he is liable. Such assent or ratification may be implied from the conduct of the principal; and he cannot ratify the act of his agent in part, and repudiate it in part. <u>Sweat v. Ehrensperger</u>, 97 Ga. App. 381, 103 S.E.2d 60 (1958).

By the time that Mr. DeLong entered the Case, TMC already had signed and delivered a written statement to CFA acknowledging as genuine the $3,320,710.00 in invoices being held by CFA and stating that "all the invoices represent goods which have been received . . . and are due and outstanding according to your [TMC's] records." Furthermore, TMC had been negotiating to pay CFA $2.1 million on those invoices.  Because TMC had ratified the acts of Rudolph Terry, the defense of TMC must necessarily have been based upon a defense of Rudolph Terry's actions.

CFA's objective in the litigation was to force TMC to pay it at least $3,000,000.  The strategy it employed to accomplish that goal was to continually "ratchet up" the litigation. [T. V2, pg 414, ln. 14-25, pg 415, ln 1-3; T. Vol 3, pg 581, ln 25 - 582, ln 7; pg 584, ln4-12]  On December 10,1999, after it was not able to

secure the commitment to pay that amount from Mr. Terry, it filed suit. After it was not able to secure the commitment to pay that amount from TMC's attorneys, it began to aggressively pursue discovery. On August 17, 2000, after it was not able to secure the commitment to pay that amount at the settlement conference convened by the trial court, it amended the Complaint to add claims of "Conspiracy to Defraud", "Fraud and Deceit", and "Conversion" against TMC, Floodgates and Jon Pouncey. On December 5, 2001, after the tort claims against TMC had not produced the settlement proposal that it sought, it added Rudolph Terry, individually, as a Defendant.

Mr. DeLong and Mr. Thomas had defended TMC in the Commercial Factors litigation for eight months before the first tort claim was raised against TMC. They defended the Company for a year before Rudolph Terry was added, individually, as a defendant. When CFA asserted tort claims, it couched its allegations in very general terms. The allegations were directed at *defendants' collective conduct.* Every allegation stressed the unanimity of conduct by all the defendants. Paragraphs 40, 41. 42 and 43 of the Complaint are examples. In them, CFA asserted that:

40.

Defendants Terry Manufacturing, Inc., Floodgates, Ltd., Jon L. Pouncey and Rudolph Terry (collectively "Defendants") represented to

-27-

CFA the existence of (1) certain business relationships between Defendants, and (2) certain established commercial accounts pursuant to which Terry Manufacturing, Inc. was indebted to Floodgates, Ltd. ("the Accounts Receivable").

41.

Defendants knew said representations were false at the time they were made to CFA and Defendants made said representations with the intention and purpose of deceiving CFA. The representations were made for the express purpose of inducing CFA to purchase the Accounts Receivable from Floodgates.

43.

Relying on Defendants' representations, CFA purchased the Accounts Receivable from Defendant Floodgates. The Accounts Receivable, in direct contrast to Defendants' representations, did not represent goods actually sold but rather were sham transactions which had not taken place.

44.

Defendants acted in concert and conspired to obtain substantial amounts of cash from CFA under false pretenses. As a direct and

proximate result of Defendants' representations, CFA suffered loss and damage for which Defendants are liable to CFA.

CFA's final attempt to extract a settlement through increasing the pressure on the parties was to add the RICO Count on February 20, 2002.  Again though, the RICO allegations were directed at *defendants' collective conduct*.  Paragraphs 57 and 58 of CFA's Complaint demonstrate the point. [Def Ex 6]

57.

The actions of Defendants Terry Manufacturing Company, Inc., Floodgates, Ltd., Jon L. Pouncey and Rudolph Terry described above constitute a violation of O.C.G.A. § 16-14-4 and Plaintiff has been injured and damaged as a result.

58.

Defendants Terry Manufacturing Company, Inc., Floodgates, Ltd., Jon L. Pouncey and Rudolph Terry violated O.C.G.A. § 16-4-4 by, among other activities, engaging in conduct which violates O.C.G.A. § 16-8-3 (theft by deception), O.C.G.A. § 16-8-4 (theft by conversion), O.C.G.A. § 16-8-7 (theft by receiving stolen property), and the use of the United States postal system to perpetrate and continue the fraudulent scheme to obtain money from Plaintiff under false pretenses.  A summary of the

factual basis for these allegations is found in paragraphs 40 through 46 above.

Unfortunately for TMC by acknowledging that "all the invoices represent goods which have been received . . . and are due and outstanding according to your [TMC's] records" before Mr. DeLong and Mr. Thomas were engaged to represent the Company, TMC assured that the Company could not escape a trial. The fact that it was later disclosed that TMC did not receive a single tee shirt identified on the invoices certainly did not provide a safe harbor for the Company. On the contrary, it helped CFA establish one element of the fraud. TMC knew when it acknowledged the invoices, when it paid on the invoices and when it attempted to settle CFA's claim that it had received no tee shirts. Under Georgia law this was strong evidence that TMC had ratified Rudolph Terry's conduct.

It is undisputed that TMC was compelled to defend itself in the face of potentially crushing liability. The fact that Mr. DeLong and Mr. Thomas defended Rudolph Terry along with TMC did not increase the work required to solely defend TMC. All of their efforts were necessary for TMC's defense, because TMC's liability arose from the actions of Rudolph Terry. Without this defense, it is certain that a judgment would have been entered against TMC. During the first year of the litigation, the judgment would have been for at least $3,320,710.00. As CFA

ratcheted up the pressure by expanding its claims against the Company, the amount and scope of the judgment would have increased dramatically. As the result of Mr. DeLong's and Mr. Thomas' efforts, TMC never was found liable to CFA for any amount. Indeed, despite initially seeking damages in excess of three million dollars, and, eventually, in excess of ten million dollars, CFA could only file a proof of claim under oath in the bankruptcy court for $1,793,000.42. Thus, CFA was claiming throughout the litigation substantially more than TMC could have owed it. The defense that Mr. DeLong and Mr. Thomas provided to TMC prevented CFA from obtaining a judgment for far more than it was entitled to receive.

In the proceeding below, Defendants contended and the Bankruptcy Court agreed that Georgia's fraudulent transfer statutes apply in this case. Under Georgia law, former code, O.C.G.A. § 18-2-22 and current code, O.C.G.A. § 18-2-70, a fraudulent transfer occurs when a debtor makes a transfer without receiving a reasonably equivalent value in exchange for the transfer.

Georgia law, O.C.G.A. § 18-2-73, defines "value" as follows:

(a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise

made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

(c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate. (citations omitted). Therefore, this provision does not authorize voiding a transfer which 'confers an economic benefit upon the debtor.' either directly or indirectly." In re Terry Mfg. Co., Inc. 345 B.R. 377 (Bkrtcy.M.D.Ala.,2006), citing In re Rodriguez, 895 F.2d 725, 727 (11th Cir.1990). The Trustee has the burden of proving by a preponderance of the evidence that the debtor did not receive a reasonably equivalent value for the transfer it made. Carey v. U.S.A., 1992 WL 12004363 at 5(Bankr. S.D. Ga. May 14, 1992). Nordberg v. Arab Banking Corporation, (In re Chase & Sanborn Corporation), 904 F.2d 588, 593-94 (11th Cir.1990).

Courts in general have held that payments made in exchange for legal services may constitute "value, even if the transfer amounted to a preference among creditors and the transferor is insolvent". Wyzard v. Goller, 23 Cal. App. 4th 1183 (Cal. App. 4th 1994); See annotation, 45 A.L.R. 500. In general, transfers made in exchange for

legal services have been upheld as long as the services were definite and fixed. *Cortland Wagon Co. v. Gordy*, 25 S.E. 574 (Ga. 1896); *Hay v. Duski*n, 455 P.2d 281 (Ariz. 1969) (holding that even though debtor was insolvent a transfer made in good faith and for reasonable value was valid because the attorney's employment was "definite" and "fixed" rather than "uncertain" or indefinite"). It is ludicrous to suggest that TMC derived no benefit from the legal services that Mr. DeLong and Mr. Thomas rendered to it. The record is replete with evidence of the benefit that the Company derived. Accordingly, the decision of the Bankruptcy Court must be reversed.

### Mr. DeLong Was A Conduit For The Payments Made To Jerry Thomas

The record reveals that of the funds which Terry Manufacturing paid to Mr. DeLong, $164,087.24 was payment for legal services which Jerry Thomas, rendered to the Company. Under the billing arrangement between the Company and Messrs. DeLong and Thomas, Mr. DeLong was required to transfer that portion of the fees earned by Mr. Thomas to Mr. Thomas.

Under 11 U.S.C. § 550, the Trustee may not recover from Mr. DeLong those sums which TMC paid to him on behalf of Jerry Thomas for Mr. Thomas' legal services to the Company in the Commercial Factors litigation. As to those sums paid

to Jerry Thomas, Mr. DeLong was not an initial transferee of the funds but rather was a mere conduit of the funds which TMC owed to Mr. Thomas for his legal services.

*In Re Warnaco* (Not Reported in F.Supp.2d,) 2006 WL 278152, 97 A.F.T.R.2d 2006-958, S.D.N.Y., February 02, 2006 the Bankruptcy Court for the Southern District of New York explained the "mere conduit defense":

> However, preferential transfers may not be recovered from everyone whose hands have touched them. 11 U.S.C. § 550(a) ("Section 550(a)") provides that "the trustee [in bankruptcy] may recover from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a) . . . .

> The Bankruptcy Code does not define "initial transferee". The Second Circuit, however, has distinguished between an initial transferee and a "mere conduit." *Christy v. Alexander & Alexander of N.Y. ( In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57-58 (2d Cir.1997) (adopting the Seventh Circuit's "mere conduit" test from *Bonded Fin. Servs. v. Eur. Amer. Bank,* 838 F.2d 890, 893 (7th Cir.1988)).

According to the "mere conduit" test, "the minimum requirement of status as a 'transferee' is dominion over the money or asset [and] the right to put the money to one's own purposes." *Finley, Kumble,* 130 F.3d at 57 ( *quoting Bonded Financial,* 838 F.2d at 893). A "mere conduit," on the other hand, has no dominion or control over the asset; rather, it is a party with actual or constructive possession of the asset before transmitting it to someone else. Mere conduits can do no more than transmit a transferor-debtor's funds to a transferee.

The *Finley, Kumble* court identified as a mere conduit an insurance broker who transmitted a client's funds to a malpractice insurance company. Other mere conduits include couriers of checks, *Rupp v. Markgraf,* 95 F.3d 936, 940 (10th Cir.1996); *Banks, Malloy v. Citizens Bank* ( *In re First Security Mortgage Co.*), 33 F.3d 42 (10th Cir.1994); law firms holding funds in trust accounts, *Security First Nat'l Bank v. Brunson* ( *In re Matter of Coutee* ), 984 F.2d 138 (5th Cir.1993); and law firms acting as escrow agents, *Gropper v. Unitrac, S.A.* ( *In re Fabric Buys of Jericho, Inc.*), 33 B.R. 334 (Bankr.S.D.N.Y.1983).

In explaining the "mere conduit" defense, the Bankruptcy Court for the Eastern District of Virginia held in *In Re. Presidential Airways, Inc,* 228 B.R. 594, 600-601 (Bkrtcy.E.D.Va.,1999)

Courts have held that there is a distinction between transferees and conduits, for example, entities merely holding money for the debtor. A test has been established in order to determine whether the party is an initial transferee, which looks to whether the party had sufficient dominion or control over the property transferred "to put the money to one's own purposes." *Bowers v. Atlanta Motor Speedway Inc. (In re Southeast Hotel Properties Ltd. Partnership),* 99 F.3d 151, 154-55 (4th Cir.1996) (citing *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir.1988)). If the entity does not utilize the money for its own purposes, it is simply a conduit.

*Bowers* was the initial case wherein the Fourth Circuit adopted the test set forth in *Bonded.* Several courts in other jurisdictions addressing the issue of whether an entity was an initial transferee have used the test, although there was some controversy as to exactly what constituted "dominion and control". *Rupp v. Markgraf,* 95 F.3d 936, 939 (10th Cir.1996); *Malloy v. Citizens Bank of Sapulpa (In re First Security Mortgage Co.),* 33 F.3d 42, 44 (10th Cir.1994); *Nordberg v. Arab Banking Corp (In re Chase & Sanborn Corp.),* 904 F.2d 588, 598 (11th Cir.1990); *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker*

-36-

*Investments, Inc.),* 155 B.R. 332, 338 (Bankr.S.D.N.Y.1993); *see Christy v. Alexander & Alexander of New York Inc. ( In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52, 57 (2d Cir.1997); *Schafer v. Las Vegas Hilton Corp. ( In re Video Depot, Ltd.),* 127 F.3d 1195, 1199-1200 (9th Cir.1997). In adopting the *Bonded* test, *Bowers* concluded that "dominion and control" requires the initial transferee to have legal dominion and control over the funds transferred. *Bowers,* 99 F.3d at 156. The court further stated "to hold that a party needs only physical dominion and control over the funds to constitute an 'initial transferee' is to hold every agent or principal of a corporation to be the initial transferee when he or she effects a transfer of property in his or her representative capacity." *Id.* This "legal dominion and control" application is consistent with *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir.1993). There the court found that because the law firm who received funds from the debtor and deposited them into the firm's trust account, instead of its business account indicated that the firm was merely a fiduciary of the debtor and the bank was in fact the initial transferee. *Id.*

-37-

In a case substantially similar to the case at bar, the debtor, *Excello* commenced an adversary proceeding against Associated, an insurance broker for the debtor to recover alleged preferential transfers. *Excello Press, Inc. v. Bowers, Inc. (In re Excello),* 104 B.R. 924 (Bankr.N.D.Ill.1989), *aff'd in part rev'd in part on other grounds,* 120 B.R. 938 (N.D.Ill.1990), *rev'd on other grounds,* 967 F.2d 1109 (1992). The debtor made monthly payments to Associated who would then deposit the payments into an escrow account and pay the insurance premium portions to the insurance carrier. *Id.* The court concluded that Associated was not an initial transferee as set forth in section 550(a) but was instead, an agent of the insurer for whose benefit the payment was made. Relying on the test set forth in *Bonded,* the court found that Associated did not have dominion over or the right to put the money to its own use. Accordingly, the court determined that Associated was not a transferee liable under section 550(a). *Id.*

Following *Excello* and using the *Bonded* test, we conclude that RHH is merely a commercial conduit and not an initial transferee from which a preferential transfer may be recovered. In that as the insurance broker for the debtor, it received funds from the debtor to be paid to the

-38-

insurance companies. The nature and status of the small airline industry only allows insurance companies to deal with aviation insurance brokers. *601 Aside from the funds received for services to be rendered, RHH received virtually no benefit from the funds. It held the funds in a fiduciary account and pursuant to the debtor's instructions remitted payment to the various insurers to keep the insurance current. As such, we conclude RHH is not an initial transferee from which the funds may be recovered under section 550(a) and would not be liable for the return of the funds.

The trustee has failed to prove by a preponderance of the evidence the necessary elements of section 547(b). Furthermore, we find the transfers would nevertheless fall within the exception of section 547(c)(1) and, RHH is not an initial transferee from which a preferential transfer may be recovered. An order will be entered consistent with this opinion denying the plaintiff's request for a judgment on the complaint.

Here Rudolph Terry hired Mr. Thomas to represent TMC in the Commercial Factors litigation. Following Mr. Thomas' suggestion, Mr. Terry then hired Mr. DeLong to represent the Company. Upon hiring Mr. DeLong the lawyers and the Company agreed that Mr. DeLong would serve as lead counsel and that Mr. Thomas

would provide litigation support. They agreed that the attorneys would bill their time at the rate of $250.00 per hour and that Mr. Thomas would be paid 35% of the amount paid by TMC.  The parties agreed that Mr. DeLong would prepare and send the bills, using his firm's billing program.  Having retained Mr. Thomas and Mr. DeLong, TMC was obligated to pay them for the services they rendered and to reimburse them for the expenses that they incurred.  Jackson v. Bice, 132 Ga. 51, 63 S.E. 823(1909); Simms v. Floyd, 65 Ga. 719(1889).

This agreed billing arrangement governed the relationship between TMC, Mr. DeLong and Mr. Thomas throughout the entire time that the case was being litigated. In accordance with the agreement, TMC delivered its payments to Mr. DeLong.  Mr. DeLong deposited TMC's funds into his escrow account and paid Mr. Thomas the agreed amount from each deposit.  Mr. DeLong could have not done anything differently.  He had a contractual obligation to CFA to receive the payments that it made on behalf of Mr. Thomas and to disburse Mr. Thomas' money to him.  Had Mr. DeLong done anything else he would have been in violation of the contract with TMC.

Thus, as in *In Re Presidential Airways,* Mr. DeLong exercised no dominion or control over that portion of the TMC payments which were intended by the Company and the attorneys to be paid to Mr. Thomas as his portions of the legal fees. As to

those portions, Mr. DeLong served as a mere conduit to Jerry Thomas, Esq. for the funds. It is undisputed that Mr. Thomas, Mr. DeLong, and the Company understood that Mr. DeLong was not to exercise control or dominion over those portions of the funds that the Company was paying for the legal services that Mr. Thomas was rendering. Rather, Mr. DeLong was required and did deposit those funds into his attorney trust account, and, as required, he disbursed them to Mr. Thomas. Thus Mr. DeLong was not the "initial transferee" of those funds that were paid for Mr. Thomas' services.  Under these circumstances Mr. DeLong had no dominion or control over the portions of TMC's payments which were intended to be paid over to Jerry Thomas for his legal services.  Mr. DeLong was merely "a party with actual or constructive possession of the asset before transmitting it to someone else." Mere conduits can do no more than transmit a transferor-debtor's funds to a transferee.

Accordingly, the Bankruptcy Court erred, as a matter of law, in holding that the Trustee may recover from Mr. DeLong, the portions of TMC's payments which were transferred to Mr. Thomas for the legal services that Mr. Thomas performed on behalf of the Company in the Commercial Factors litigation.

## **CONCLUSION**

The Bankruptcy Court's finding that TMC received no value from the work that Mr. DeLong and Mr. Thomas performed in the Company's defense in the CFA

litigation is a conclusion derived from a grossly oversimplified view and understated description of the legal and financial risks that CFA's claims created for TMC. Since the Company's acts, both before and after CFA filed its suit, amounted to ratification of Rudolph Terry's fraud, the Company's interests in the litigation were coextensive with those of Rudolph Terry. The fact that he also benefitted from Mr. DeLong's and Mr. Thomas's defense efforts does not negate the benefit that TMC derived from that defense.

It is indisputable that CFA was attempting to recover from TMC sums which far exceeded the actual amount of liability that it could prove. The defense which Mr. DeLong and Mr. Thomas provided the Company was necessary to prevent CFA from obtaining such a windfall. Their work undeniably was "adequate consideration and value" which they rendered to TMC under Georgia law. Accordingly there was no fraudulent transfer to Mr. DeLong.

TMC paid only the legal fees that Mr. DeLong and Mr. Thomas earned in defending the Company. Mr. DeLong was obligated from the time he received TMC's checks to pay Mr. Thomas the portion of TMC's fees that Mr. Thomas had earned. Mr. DeLong had no discretion in paying or withholding the payments nor in reducing or increasing the amounts due to Mr. Thomas. He deposited the payments into his Trust account, and he disbursed to Mr. Thomas the amount due him. As to

Mr. Thomas' fees, Mr. DeLong clearly exercised no dominion or control.  He was a

mere conduit from TMC to Mr. Thomas for those portions of the fees.

      Respectfully submitted this 12th day of October, 2007.


                                          __ s/ Earnest H. DeLong, Jr._____
                                          Earnest H. DeLong, Jr
                                          Georgia Bar No. 217300

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DISTRICT

| | | |
|---|---|---|
| IN RE: | ) | |
| TERRY MANUFACTURING | ) | **CASE NO. 03-32063-WRS** |
| COMPANY, INC. | ) | |
| | ) | **CHAPTER 7** |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| TERRY UNIFORM | ) | **CASE NO. 03-32213-WRS** |
| COMPANY, LLC. | ) | |
| | ) | **CHAPTER 7** |
| Debtor. | ) | |

_____

| | | |
|---|---|---|
| J. LESTER ALEXANDER, III, | ) | |
| TRUSTEE OF TERRY | ) | |
| MANUFACTURING COMPANY | ) | |
| INC. and TERRY UNIFORM | ) | |
| COMPANY, LLC. | ) | **CIVIL ACTION FILE** |
| | ) | **NO. 2:07-CV-0620** |
| Cross-Appellant/Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELONG, CALDWELL, NOVOTNY | ) | |
| & BRIDGERS, L.L.C., DELONG | ) | |
| CALDWELL LOGUE & WISEBRAM, | ) | |
| DELONG & CALDWELL, L.L.C. | ) | |
| AND EARNEST H. DELONG, JR., | ) | |
| | ) | |
| Appellants/Cross-Appellees | ) | |

## <u>CERTIFICATE OF SERVICE</u>

-44-

I hereby certify that on the 12th day of October, 2007, I have served a copy of

the foregoing AMENDED APPELLANT'S BRIEF through the Court's ECF system

to the following counsel of record:

Brent B. Barrier, T.A.
Phelps Dunbar, LLP
One Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130-6534

Jerry A. Buchanan
Buchanan & Land, LLP
Post Office Box 2848
Columbus, GA 31902

Simeon F. Penton II
Kaufman & Rothfeder, PC
PO Drawer 4540
Montgomery, AL 36103-1969

This 12th day of October, 2007.


                              s/ Earnest H. DeLong, Jr.
                              Earnest H. DeLong, Jr
                              Georgia Bar No. 217300

DeLong, Caldwell & Bridgers, LLC
3100 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
404/979-3150